# 17-----

**Case Nos. 16-CV-4756 (NGG) (JO) (E.D.N.Y.), 17-CV-5228 (NGG) (JO) (E.D.N.Y.)**
========================================================

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

*In re* ELAINE DUKE, Acting Secretary of Homeland Security, et al.,

Petitioners.

## BRIEF IN OPPOSITION TO MOTION FOR STAY OF DISCOVERY
## BY *BATALLA-VIDAL* PLAINTIFF-RESPONDENTS

Muneer I. Ahmad, Esq.
Michael J. Wishnie, Esq.
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Karen Tumlin, Esq.
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd, #108-62
Los Angeles, CA 90010
Phone: (213) 639-3900

Justin Cox, Esq.
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

## INTRODUCTION

These cases arise from Petitioners' devastating decision to terminate the Deferred Action for Childhood Arrivals (DACA) program, upending the lives of hundreds of thousands of young immigrants and the millions of other people who study, work, live with, and depend on them. In this Court, Petitioners have filed a last-minute, after-hours motion for a stay of discovery pending review of their yet-unfiled mandamus petition. The motion is improper and unwarranted and therefore should be denied.

This Court typically does not intervene in discovery disputes, particularly when the District Court and Magistrate Judge are prudently monitoring and managing discovery and have accommodated Petitioners' concerns each time a valid objection has been raised. Moreover, Petitioners establish no grounds for this Court's extraordinary intervention *before* a mandamus petition is even filed. Other than a deposition scheduled for 9 A.M. EST on Friday, October 20, 2017, and a long-known-about deadline to produce a privilege log for their administrative record, Petitioners face no imminent deadlines that justify consideration, let alone granting, of this extraordinary application. And the deposition itself—which has been noticed for over two weeks—presents no risk of irreparable harm. Nothing prevents Petitioners' counsel from making privilege objections at the deposition and instructing the deponent not to answer, just as government counsel has done in other recent depositions.

1

This Court should respect the detailed and nuanced rulings of the Magistrate Judge and District Court Judge in this case, who have carefully balanced the interests of the parties while working diligently to ensure a proper record for judicial review (and any appeals therefrom). The District Court has also repeatedly admonished Petitioners for generating their own "emergencies" without engaging in the discovery process and seeking relief from the Magistrate Judge. This application is one more example. This Court should decline to interfere with ongoing discovery proceedings based on a last-minute claim of a non-existent emergency without the necessary showing of error, prejudice, and public interest favoring intervention.

## THE COURT SHOULD DENY THE MOTION TO STAY DISCOVERY

The Second Circuit balances four factors to determine whether a stay pending a mandamus petition is warranted: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 162 (2d Cir. 2012); *see also In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). The balance of factors in this case weighs strongly in favor of denying Petitioners' motion.

First, Petitioners have failed to make a "strong showing" that they are likely to succeed on the merits. They have not even filed the promised mandamus petition. Instead, they ask this Court to issue sweeping relief contrary to the carefully crafted

decisions below based on last-minute motion papers. Both Judge Garaufis and Magistrate Judge Orenstein have repeatedly considered—and rightly rejected—Petitioners' arguments for a stay. Second, Petitioners will not be irreparably injured absent a stay by a premature and routine discovery dispute that Petitioners had ample time and notice to resolve. Third, the issuance of a stay will substantially injure the *Batalla Vidal* Plaintiff-Respondents, by disrupting the expedited discovery ordered to ensure an adequate record is available for judicial review of the statutory and constitutional claims in this case. Finally, the public interest favors denying the emergency motion. Hundreds of thousands of lives hinge on the timely resolution of this case. Accordingly, the *Batalla Vidal* Plaintiff-Respondents respectfully request that this Court deny the Petitioners' motion.

## I.    Petitioners Are Unlikely to Prevail on the Merits

Petitioners have not made a "strong showing that [they are] likely to succeed on the merits." *Citigroup Global Mkts. Inc.*, 673 F.3d at 162. Indeed, Petitioners have failed to set out their merits arguments in more than summary fashion, and instead have requested a stay of discovery prior to even submitting a full petition. Petitioners' conclusory statements, regarding what the "government's mandamus petition *will* demonstrate," cannot provide sufficient justification to merit a stay. Pet'rs Emergency Mot. 3, Oct. 19, 2017 ("Pet'rs Mot.") (emphasis added). The unusual decision to seek a stay prior to filing a mandamus petition distinguishes this case from those Second Circuit cases cited by Petitioners in which a stay was granted. *See In re The City of New*

3

*York*, 607 F.3d 923, 932 (2d Cir. 2010); *In re Steinhardt Partners*, L.P., 9 F.3d 230, 233 (2d Cir. 1993). Without providing a fully briefed basis for seeking relief, Petitioners cannot meet the "strong showing" on likelihood of success required of them.

On the contrary, all evidence weighs against a finding that Petitioners are likely to succeed on the merits. Magistrate Judge Orenstein and Judge Garaufis have considered and rejected Petitioners' arguments on multiple occasions. *See, e.g.*, Add. 57 (rejecting Defendants' request for a stay of discovery pending resolution of their dispositive motions); Add. 9 (same); Pet'rs Mot. Add. 4 (affirming discovery on Plaintiffs' non-APA claims); Pet'rs Mot. Add. 48 ("Defendants have not carried their burden of showing that discovery should be stayed."); Pet'rs Mot. Add. 41 (rejecting Defendants' construction of the administrative record, and stating "the facts before the court and applicable law plainly support the plaintiffs' arguments and refute those proffered by the defendants"); Pet'rs Mot. Add. 52–53 (affirming the requirement that Defendants produce a privilege log).

Furthermore, there is nothing extraordinary about the production of a complete administrative record or privilege log before merits briefing, as Petitioners claim. Numerous cases proceed this way in district court, as "the federal rules give district courts broad discretion to manage the manner in which discovery proceeds." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003); *see, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 17-CV-5235 (N.D. Cal. Sept. 22, 2017), ECF No. 49; *United States v. Cty. of Nassau*, 188 F.R.D. 187, 188 (E.D.N.Y. 1999)

("[T]he mere filing of a dispositive motion—even one attacking the jurisdiction of the district court—does not warrant the issuance of a stay under Rule 26(c)."); *see also, e.g., Doe v. New York City Dep't of Educ.*, No. 16-CV-1684 (NGG), 2016 WL 7165953, at *2 (E.D.N.Y. Dec. 7, 2016) (same). Petitioners' emergency motion presents no compelling reason to set aside the orders of the Magistrate Judge and the District Court.

## II.    Petitioners' Assertions of Immediate Harm Are without Foundation

Petitioners' primary reason for seeking an emergency stay by 9:00 a.m. EST is to prevent the deposition of Mr. Gene Hamilton, who Petitioners claim is a high-level advisor to Acting Secretary Duke. Pet'rs Mot. at 6. However, Petitioners attempt to circumvent proper procedures for review of a routine discovery dispute and fail to identify any cognizable harm warranting an emergency stay.[1]

Magistrate Judge Orenstein considered and rejected Petitioners' claim that the Hamilton deposition would expose a high-level government official to providing testimony. Add. 95; *see also* Add. 92 (noting that Department of Homeland Security

---

[1] Petitioner's claims that the lower court's orders "enormously exacerbate the burden to identify documents and assert privileges" should also be disregarded. Pet'rs Mot. Add 6. "Many courts . . . have concluded that incurring litigation expenses does not amount to an irreparable harm." *Guifu Li v. A Perfect Franchise, Inc.*, 2011 WL 2293221, at *4 (N.D. Cal. June 8, 2011) (citing cases); *see also Nat. Res. Def. Council, Inc., v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108, 124 (S.D.N.Y. 2012) (citing *Graphic Comm'ns Union v. Chicago Tribune Co.*, 779 F.2d 13, 15 (7th Cir. 1985), for the proposition that "costs incurred as consequence of compliance with court order do not show irreparable harm"). This is especially true for the federal government, which has enormous resources (including tens of thousands of attorneys) at its disposal.

leadership website, listing fifty-seven officers, does not include Mr. Hamilton). Mr. Hamilton is a staff-level advisor within the Department of Homeland Security and not a leader within the agency. Add. 91-92. He is not an officer at the "apex of [his] organization" who is usually protected from providing testimony. *Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 250 (S.D.N.Y. 2015) (finding that the staff director of a Congressional subcommittee does not merit application of the apex doctrine); *New York v. Oneida Indian Nation of New York*, No. 95-cv-0554, 2001 WL 1708804 at *4 (N.D.N.Y. Nov. 9, 2001) (holding that an associate counsel and an advisor were not high-ranking officials meriting protection under the apex doctrine).

Petitioners' failure to pursue relief in the ordinary course belies the harms they now claim. Even after Magistrate Judge Orenstein overruled Petitioners' objections to the Hamilton deposition on October 11, 2017, Petitioners did not appeal the ruling to Judge Garaufis. Moreover, Petitioners have delayed raising this objection to the Hamilton deposition before the courts. Respondents noticed this deposition on October 5, 2017, fifteen days before it was to be held. On the same day, Petitioners confirmed Mr. Hamilton's availability for October 20, 2017. Add. 19-25. Now, on the eve of Mr. Hamilton's deposition, eight days after Magistrate Judge Orenstein rejected Petitioners' objections, fourteen days after being noticed of Mr. Hamilton's deposition, and without appealing the Magistrate Judge's ruling to the District Court,

Petitioners attempt to skirt the proper procedure for resolving discovery disputes by seeking an emergency stay from this Court.

Furthermore, to the extent Petitioners claim that Mr. Hamilton's deposition will "call for testimony regarding sensitive privileged matters," Pet'rs Mot. 6, such claims are best addressed on a question-by-question basis. As Judge Ward explained nearly twenty years ago, "[a] deposition cannot be barred simply because a deponent may be asked about privileged information" *Marisol A. v. Giuliani*, No. 95 CIV. 10533 (RJW), 1998 WL 132810, at *6 (S.D.N.Y. Mar. 23, 1998); *see also Sanstrom v. Rosa*, 1996 U.S. Dist. LEXIS 11923, *14 (S.D.N.Y. Aug. 16, 1996) ("[T]he mere fact that a witness may be asked questions that seek to elicit privileged matter does not provide a colorable basis for precluding the entire deposition"). Petitioners' counsel can raise any privilege objections at the deposition and instruct the deponent not to answer. In fact, in depositions just this week, Petitioners have asserted privilege objections and instructed deponents not to answer on the basis of those objections. *See, e.g.*, Add. 117-119. Petitioners fail to identify even a theoretical risk of harm that justifies this Court's urgent intervention.

Second, Petitioners also fail to identify any irreparable injury flowing from production of a privilege log. The district court has already extended the deadline for submitting a log. Add. 9. And for over two weeks, since October 2, 2017, Petitioners have been on notice that a privilege log to accompany the administrative record was due by October 20, 2017.

Having to submit a privilege log by itself is not irreparable injury. Petitioners have submitted a privilege log, for example, in parallel California lawsuits challenging the rescission of DACA. Yet Petitioners do not claim any harm or adverse consequence from having to record their privilege claims in those cases. Nor is it cognizable injury that petitioner have to actually demonstrate and detail specific claim of privilege; those requirements inherent in the production of a privilege log are designed to enable court review, not reason for relief premised on mandamus grounds. *See, e.g., In re Santa Fe Int'l Corp.*, 272 F.3d 705, 713 (5th Cir. 2001) ("The extraordinary writ of mandamus will not issue to grant [petitioner's] blanket request for protection of documents and communications not expressly claimed and shown to be privileged.").

Finally, Petitioners' complaints are premature. In its latest order, the District Court again narrowed the privilege log requirement at Petitioners' request, limiting the log only to materials considered by Attorney General Sessions, Acting Secretary Duke, and their first-tier subordinates. Pet'rs Mot. Add. 9. If Petitioners have other concrete concerns about the log, or if they are unable to meet the deadline for the privilege log imposed by the District Court, Petitioners are permitted to seek relief from Magistrate Judge Orenstein. Add. 4. Petitioners have not given any reason to believe that Judge Garaufis or Magistrate Judge Orenstein would not continue to consider and accommodate their requests, provided that they can demonstrate that such modifications are reasonable and necessary. Accordingly, Petitioners cannot complain

8

of irreparable harm where they have failed to avail themselves of existing channels for relief.

## III. Respondents Will Suffer Substantial Injuries if This Court Grants Petitioners' Motion

Respondents will suffer substantial injuries if this court grants an emergency stay of discovery. Multiple attorneys across many lawsuits challenging the unlawful termination of DACA have had to coordinate schedules and travel to Washington, D.C., for the deposition of Mr. Hamilton on the date Petitioners represented he would be available, and for which the *Batalla Vidal* Plaintiffs noticed it.

In addition, two individual Respondents will suffer specific harms if the court grants an emergency stay. *Batalla Vidal* Plaintiffs Martín Batalla Vidal and Antonio Alarcon have already traveled from New York to Washington, D.C., to attend Friday's deposition of Mr. Hamilton. Mr. Batalla Vidal took an unpaid day of leave from work and Mr. Alarcon will miss class at City University of New York Queens College Friday to attend the deposition personally. If the Court stays the deposition right before it is set to start, individual Respondents will have wasted significant time and effort traveling to Washington, D.C. Petitioners have not shown any concrete, harm that outweighs the burden to Respondents if this Court issues a last-minute stay.

## IV. The Public Interest Is Best Served by Denying Petitioners' Motion

Finally, the public interest lies in allowing the district court to adjudicate the serious claims in this case upon an adequate record and, if warranted, to grant

meaningful relief by the March 5, 2018 date for termination of DACA chosen by Petitioners. As the District Court has admonished Petitioners, expedited discovery is necessary to ensure that it can consider dispositive motions before the March 5, 2018 deadline arbitrarily imposed by Petitioners themselves. Any burden or time pressure arises not from the court's chosen schedule, but from Petitioners' *own decision* to abruptly terminate a program benefitting hundreds of thousands of young people and impacting millions of others. Petitioners do not deny that a stay of discovery will jeopardize the District Court's ability to timely resolve the case on a complete record before the March 5, 2018 deadline.

The public interest also lies in not permitting the government to circumvent rules applicable to all other litigants, thereby preventing courts from adjudicating claims before plaintiffs are irreparably injured. That public harm far overshadows the speculative injuries Petitioners try to assert, and Petitioners fail to give this Court any justification for imposing that harm based on an unsubmitted and unbriefed Mandamus Petition.

## CONCLUSION

For the foregoing reasons, the *Batalla Vidal* Plaintiff-Respondents respectfully request that the Court deny Petitioners' motion to stay discovery.

Dated:      October 20, 2017
New Haven, Connecticut

/s/ Michael J. Wishnie

| | |
|---|---|
| Muneer I. Ahmad, Esq. | Karen Tumlin, Esq. |
| Michael J. Wishnie, Esq. | NATIONAL IMMIGRATION LAW CENTER |
| JEROME N. FRANK LEGAL SVCS. ORG. | 3450 Wilshire Blvd, #108-62 |
| michael.wishnie@yale.edu | |
| Phone: (203) 432-4800 | Los Angeles, CA 90010 |
| | Phone: (213) 639-3900 |

Justin Cox, Esq.
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

*Attorneys for* Batalla Vidal *Plaintiff-Respondents*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit of Federal Rule of Appellate Procedure 21(d)(1) because the brief contains 2,743 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface, 14-point Garamond font.

/s/ Michael J. Wishnie
MICHAEL J. WISHNIE

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2017, I electronically filed the foregoing with the Clerk of the Court by emailing the petition to newcases@ca2.uscourts.gov. A copy will also be delivered to the district court. Service in compliance with Federal Rule of Appellate Procedure 21(a)(1) will be accomplished by e-mail to the following recipients: 'Mark.Stern@usdoj.gov'; 'AWright@civ.usdoj.gov'; 'thpulham@CIV.USDOJ.GOV'.

/s/ Muneer I. Ahmad
MUNEER I. AHMAD

# ADDENDUM

# TABLE OF CONTENTS

Dkt. 67.................................................................................................................................Add. 1

Dkt. 72.................................................................................................................................Add. 6

Dkt. 79 ..............................................................................................................................Add. 10

Dkt. 84 ..............................................................................................................................Add. 26

Dkt. 85 ..............................................................................................................................Add. 33

Sept. 26, 2017 Status Conf. Tr. .......................................................................................Add. 42

Oct. 11, 2017 Status Conf. Tr. .........................................................................................Add. 83

Oct. 18 2017 Neufeld Deposition Tr. (excerpts) (unofficial)........................................Add. 117

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MARTÍN JONATHAN BATALLA VIDAL, et al.,      CASE MANAGEMENT
                     Plaintiffs,      AND SCHEDULING ORDER
        -against-
ELAINE C. DUKE, et al.,      16-CV-4756 (NGG) (JO)
                  Defendants.
--------------------------------------------------------------X
--------------------------------------------------------------X
STATE OF NEW YORK, et al.,      17-CV-5228 (NGG) (JO)
                     Plaintiffs,
        -against-
DONALD TRUMP, et al.,
                  Defendants.
--------------------------------------------------------------X

James Orenstein, Magistrate Judge:

At a conference before the court on September 26, 2017, the court set a briefing schedule for dispositive motions, and, over the defendants' objection, I ordered discovery to proceed as set forth below:

I.     DEADLINES AND COURT APPEARANCES

| | |
|---|---|
| Joint proposal for schedule of bi-weekly status conferences to address outstanding discovery disputes due by: | September 29, 2017 |
| Deadline for all Rule 26(a)(1) disclosures: | October 4, 2017 |
| Deadline for defendants' production of administrative record and privilege log: | October 6, 2017 |
| Objections to discovery requests due by: | 1 week after service of requests |
| Responses to discovery requests due by: | 2 weeks after service of requests |
| Deposition errata due by: | 1 week after deposition |
| Joint status report due by: | 1 week before each status conference |
| All expert disclosures due by: | November 15, 2017 |
| All discovery to be completed by: | December 15, 2017 |

## II.   DISCOVERY

a.    <u>No stays of discovery absent an explicit court order.</u>  Discovery is not automatically stayed by the pendency of a dispositive motion, settlement discussions between the parties, referral to mediation, or an agreement between the parties to suspend discovery.  Any application for a stay of discovery must show good cause why such relief should be granted.

b.    <u>Written discovery.</u>  Unless otherwise agreed to by the parties or so ordered by the court, responses to any request for written discovery pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure are due no later than 14 days after service of the request.  All such requests and responses must conform to Local Civil Rules 26.3 (uniform definitions in discovery requests), 26.5 (cooperation among counsel in discovery), 26.6 (attorney review of form discovery requests), and 26.7 (discovery requests to be read reasonably).

c.    <u>Privilege.</u> The privilege log to be produced by October 6, 2017, shall include a description of every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such that record to be part of the official administrative record. Failure to describe a pertinent document in the privilege log due on October 6, 2017, will waive any later assertion of privilege absent a showing of good cause. *See* Loc. Civ. R. 26.2, 26.3.

d.    <u>Depositions.</u>  Pursuant to Local Civil Rule 26.5, counsel should cooperate, consistent with their clients' legitimate interests, in scheduling and conducting depositions.

i.    If counsel cannot agree on a schedule for a given deposition, the deponent must appear at the date, time, and place set forth in a notice properly served pursuant to Fed. R. Civ. P. 30 unless excused by the party that served the notice or by the court.

ii.    Counsel are obligated to attempt in good faith to resolve any dispute that arises during a deposition before seeking judicial intervention.

e.    <u>Expert discovery.</u>  Unless specific deadlines for expert discovery are set forth above, the deadline for completing all discovery includes the production of all expert reports, including any rebuttal reports.  The parties must ensure that they have completed underlying fact discovery, and that they have produced initial expert reports, in sufficient time for any rebuttal reports to have been served by the deadline.  Unless otherwise ordered, or unless the parties agree to proceed otherwise, expert depositions may take place at any time before trial.

f.    <u>Discovery disputes.</u>  Parties are obligated to attempt in good faith to resolve discovery disputes before seeking judicial intervention.  Any unresolved dispute must be brought to my attention in sufficient time for the dispute to be resolved and discovery to be completed according to the deadlines set forth above.  Motions to resolve discovery disputes shall be litigated in accordance with my Individual Practice Rules and Local Civil Rules 37.3 and 6.4.  Failure to submit a timely opposition in compliance with applicable rules may result in the motion being granted as unopposed.

g.      _Timeliness of requests._  To be timely, a request for written discovery, deposition notice, or subpoena must be served in sufficient time for the responding party to comply with the request in full before the relevant discovery deadline.  In the event that any such discovery demand is untimely, I may decide not to enforce it.

## III.      REQUIREMENTS FOR STATUS CONFERENCES

a.      No later than seven days before each status conference, the parties are directed to _file a joint report_ on the status of the case, the nature of any pending disputes (including the parties respective arguments on such disputes), and whether discovery is proceeding on schedule.  If there are no pending disputes requiring court intervention, I will entertain a joint application to adjourn or cancel the conference.  If the parties agree to discuss settlement at the status conference, the parties should also submit _ex parte_ statements of their respective settlement positions.

b.      All conferences will be in person unless otherwise ordered.  Any request to conduct a conference by telephone must be made at least 48 hours before the scheduled start of the conference.

c.      All conferences will start on time.  Any attorney who does not arrive on time may be directed to obtain a transcript of the proceeding and provide it to the represented party to avoid prejudice to that party arising from proceedings conducted in its absence.

d.      Counsel for each party must be fully familiar with the case and prepared to discuss the status of discovery, the party's current settlement position, and any unresolved issue in the case.  A party's counsel of record may send substitute counsel only if the latter is fully prepared to discuss all of the matters described above.

e.      If a conference cannot proceed due to counsel's failure to appear on time or unpreparedness to discuss the case, I will reschedule the conference and consider an order requiring the attorney responsible for the delay to reimburse the other participants' costs, including reasonable attorneys' fees.

f.      Only a party's counsel of record, or an attorney personally authorized to appear by the party (and not simply by the party's counsel of record) may appear on behalf of a party. If a law firm has appeared as counsel of record for a party, any attorney actually employed by that law firm may appear. An attorney acting "of counsel" for a party's counsel of record may not appear without the represented party's explicit authorization, as such an attorney has no authority to make binding representation on behalf of any party. _See_ N.Y. Rules of Prof'l Conduct 1.2(c), 22 N.Y.C. R.R. § 1200 (requiring client to give "informed consent" before an attorney may make a limited appearance on the client's behalf).

## IV.      POST-DISCOVERY MATTERS

a.      _Dispositive Motions Deadline._  The deadline for commencing dispositive motions is the date by which the _first_ action must be taken to commence such a motion pursuant to the individual practices of the district judge to whom this case is assigned.  As specified in the individual

practice rules of the assigned district judge (available at www.nyed.uscourts.gov), that action will be either (a) submitting a letter requesting a pre-motion conference, (b) requesting an oral argument date from the district judge, (c) initiating the exchange of statements pursuant to Local Civil Rule 56.1, or (d) filing the notice of motion together with supporting papers.

      b.    <u>Joint Pretrial Order Deadline.</u>  The deadline for submitting a joint pretrial order is the date by which the parties must file a single document that reflects input from all parties and that fully complies with the individual practice requirements of the district judge to whom the case is assigned (not my individual practice requirements, unless the parties have unanimously agreed to refer the case to a magistrate judge for all purposes including the entry of judgment pursuant to 28 U.S.C. § 636(c)).  If one party has completed its portion of the proposed pretrial order but cannot obtain input from an adversary, it must so advise me before the deadline.

      c.    <u>Generally, no extension due to the pendency of summary judgment motions.</u>

      i.    In cases that are assigned to a district judge whose individual practice rules require the submission of a joint pretrial order no later than 60 days after the close of discovery (as do most judges in this district, <u>see</u> www.nyed.uscourts.gov), I will <u>not</u> extend this deadline based on the anticipation or pendency of a summary judgment motion absent an order from the assigned district judge.

      ii.    The fact that a party intends to seek summary judgment will not be considered good cause to postpone a discussion of settlement at the pretrial conference or the submission of *ex parte* statements of the parties' respective settlement positions in advance.

V.    <u>EXTENSIONS OF DEADLINES.</u>

      a.    <u>The deadlines in this order will be enforced, and in light of the history and circumstances of these actions will be modified only upon a timely showing of the most compelling and unforeseeable of extraordinary circumstances.</u>  Failure to comply with a deadline may result in the imposition of appropriate sanctions pursuant to Rules 16 and 37 of the Federal Rules of Civil Procedure, including a recommendation of dispositive relief.

      b.    While the parties are encouraged to cooperate with each other in conducting discovery, they must not agree among themselves to any extensions or suspensions of discovery that will render them unable to meet any deadline set forth above; any such agreement requires court approval.  Similarly, an agreement among the parties to discuss settlement will not excuse failure to comply with any deadline set forth above.  Parties wishing to suspend discovery or adjourn a deadline to promote settlement discussions must seek permission from the court.

      c.    A request for an extension of any deadline submitted less than 14 days before that deadline will be considered untimely and will not be granted, absent extraordinary circumstances.

      d.    A request for modification of any deadline in this scheduling order must be in writing, and submitted in accordance with Rule II.A of my individual practice rules.

## VI.  ELECTRONIC FILING AND CONTACT INFORMATION

a.  _Mandatory electronic filing._  Pursuant to Administrative Order 2004-08, _all documents must be submitted electronically._  Except as set forth in my Individual Practice Rules or in an order, any document submitted to chambers by mail or fax will be discarded.

b.  _Attorney appearance and registration._  The attorney for each party with primary responsibility for the matter must, as soon as possible and in no event later than the attorney's first appearance in court:

i.  file a Notice of Appearance on behalf of _each_ represented party; and

ii.  register to receive electronic notification of every filing in the case via the court's ECF docketing system.

c.  _Current contact information._  The attorney representing each party is under a continuing obligation to keep the court apprised of any changes in contact information – including mailing addresses, email addresses, and daytime telephone numbers – by filing the appropriate Notice on ECF.

d.  _Redaction or deletion of personal data identifiers._  All public filings on the electronic docket must omit or redact personal data identifiers, pursuant to Fed. R. Civ. P 5.2.  Where an otherwise public document must include such information, the filing party must file a redacted version on the public docket and an unredacted version under seal.

SO ORDERED:

Dated:  Brooklyn, New York
        September 27, 2017

_____/s/_____
JAMES ORENSTEIN
U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MARTIN JONATHAN BATALLA VIDAL et al.,

                      Plaintiffs,

        -against-

ELAINE C. DUKE, Acting Secretary, Department of
Homeland Security, et al.,

                      Defendants.

------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                      Plaintiffs,

        -against-

DONALD TRUMP, President of the United States, et al.,

                      Defendants.

------------------------------------------------------------------X

**ORDER**

**16-CV-4756 (NGG) (JO)**

**ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

      On September 27, 2017, Magistrate Judge James Orenstein issued an order setting a

schedule for discovery in above-captioned cases challenging the Department of Homeland

Security's decision to terminate the Deferred Action for Childhood Arrivals ("DACA") program.

(Sept. 27, 2017, Scheduling and Case Management Order (the "Order") (Batalla Vidal Dkt.

67).[1])  Defendants have moved to vacate Paragraph II(c) of the Order, which directs them to

compile, by October 6, 2017, a privilege log identifying documents that they are not producing

---

[1]  Except as otherwise specified, citations are to the docket in Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.).

and with respect to which they are asserting a claim of privilege.[2]  (Order ¶ II(c); Defs. Mot. to Vacate the Order (the "Motion") (Dkt. 69).)

In addition to arguing that discovery is generally inappropriate in this case, Defendants also contend that Paragraph II(c) of the Order (1) raises "substantial separation-of-powers concerns" (Mot. at 2-3); (2) is vague and improperly requires Defendants to log and to claim privilege with respect to documents outside the administrative record (id. at 3-5); and (3) imposes a timeline for producing a privilege log that Defendants cannot possibly meet (id. at 5).  Defendants also maintain that discovery is inappropriate because the decision to end the DACA program is not subject to judicial review.  (Id. at 5-6.)

Because the Order is not dispositive, the court reviews whether it is "clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a); see also 28 U.S.C. § 636(b)(1)(A).  "[A] magistrate judge's decision is contrary to law only where it runs counter to controlling authority."  Pall Corp. v. Entegris, Inc., 655 F. Supp. 2d 169, 172 (E.D.N.Y. 2008).

Under the APA, judicial review of agency action is generally limited to the administrative record that the agency provides to the court.  Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).  "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate

---

[2]  The disputed paragraph of the Order reads in full as follows:

> The privilege log to be produced by October 6, 2017, shall include a description of every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such that record to be part of the official administrative record. Failure to describe a pertinent document in the privilege log due on October 6, 2017, will waive any later assertion of privilege absent a showing of good cause. See Loc. Civ. R. 26.2, 26.3.

(Order ¶ II(c).)

the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Id. at 744. The agency's designation of the administrative record "is generally afforded a presumption of regularity." Comprehensive Cmty. Dev. Corp. v. Sebelius, 890 F. Supp. 2d 305, 309 (S.D.N.Y. 2012) (quoting Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs, 722 F. Supp. 2d 535, 542 (D. Del. 2010)). The court may inquire beyond the administrative record, however, "when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice." Nat'l Audubon Soc. v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977)); see also Hill Dermaceuticals, Inc. v. Food & Drug Admin., 709 F.3d 44, 47 (D.C. Cir. 2013) (consultation of evidence outside the administrative record appropriate "to challenge gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review").

The court agrees that the October 6, 2017, deadline for producing a privilege log imposed by the Order should be modified. The Order currently requires Defendants to produce the administrative record and a privilege log on the same day. (Order ¶ I.) But without reviewing the administrative record, the court cannot assess whether that record is sufficient to permit review of Defendants' decision to rescind the DACA program, or whether Plaintiffs have shown that Defendants acted in bad faith in designating the record. See Nat. Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs., 631 F. Supp. 2d 23, 27 (D.D.C. 2009). Only once the court has reviewed the administrative record will it be able to assess whether

3

Defendants should be required to produce a privilege log, and what the scope of that log should be. Accordingly, the court MODIFIES the Order by extending Defendants' deadline to submit a privilege log by two weeks, to October 20, 2017.[3]

The court will address Defendants' remaining objections to Paragraph II(c) by separate order, which will follow before October 20, 2017. Defendants are invited to file a reply, not to exceed five pages, to Plaintiffs' oppositions no later than October 10, 2017. Defendants' arguments that courts cannot review the decision to end DACA are properly raised in Defendants' forthcoming dispositive motion and will be considered then.

SO ORDERED.

/s Nicholas G. Garaufis

Dated: Brooklyn, New York
      October 3, 2017

NICHOLAS G. GARAUFIS
United States District Judge

---

[3] The Batalla Vidal Plaintiffs have expressly consented to a "brief extension" to the deadline for Defendants to provide a privilege log. (Batalla Vidal Pls. Resp. in Opp'n to Mot. (Dkt. 70) at 1, 3.) The court is mindful that Defendants would find the task of compiling a privilege log by October 6, 2017, to be difficult, if not outright "impossible." (Mot. at 5.) The court notes, however, that it appears that Defendants could have spared themselves some trouble by seeking to clarify the Order with Judge Orenstein and with Plaintiffs; while Defendants object to the purported scope of the materials required to be identified in the privilege log (id.), Plaintiffs in both actions have taken the position that the Order only requires the Defendants to identify documents considered by the Department of Justice and the Department of Homeland Security—not the entire Executive Branch—in deciding to rescind the DACA program. (New York v. Trump Pls. Resp. in Opp'n to Mot. (New York v. Trump Dkt. 49) at 7-8 & n.6; Batalla Vidal Pls. Resp. in Opp'n to Mot. at 2-3 & n.2.) The court also notes that this urgency is the result of Defendants' decision to terminate the DACA program on short notice, requiring this court to expedite consideration of these actions.

October 10, 2017

The Honorable James Orenstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re: *Batalla Vidal et al. v. Duke et al.*, No. 16cv4756 (NGG) (JO)

Dear Judge Orenstein:

     We represent the Plaintiffs in the above-referenced matter.  This letter presents Plaintiffs' response to Defendants' objection to the deposition of Gene Hamilton, Counselor to Acting Secretary Duke.  *See* ECF No. 78. Defendants do not deny that Mr. Hamilton has information relevant to this lawsuit or that he can be made available for a deposition.  Rather, Defendants object solely based on a mistaken and belated application of the "apex doctrine," which Defendants failed to raise prior to 4:00 p.m. Eastern Time on the date the October 6 Joint Status Report was due, despite having multiple opportunities to do so since they first received notice of Plaintiffs' deposition request on September 28, 2017.

     Plaintiffs ask this Court to reject Defendants' arguments that Mr. Hamilton should be protected by the "apex doctrine."  First, Mr. Hamilton is not the kind of government employee protected by the "apex doctrine."  Second, the purposes of the "apex doctrine" would not be served by preventing his deposition.  Third, any concerns about particular categories of information that should be privileged are better addressed on a question-by-question basis than by precluding his deposition wholesale.

     A "counselor" to a cabinet secretary is not a "high-level government official" entitled to protection under the apex doctrine.  "This designation has generally only been applied to government officials who are at the apex of their organization." *Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 250 (S.D.N.Y. 2015) (finding that the staff director of a Congressional subcommittee does not merit application of the apex doctrine).  The doctrine has been applied to staff only at the highest levels. *See In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (applying the apex doctrine to the Vice President's chief of staff).  In contrast, Mr. Hamilton's role lies outside the formal Department of Homeland Security chain of command—he solely "provides advice and counsel" to a cabinet official, *see* ECF No. 78.  His position does not warrant application of the apex doctrine. *See New York v. Oneida Indian*

*Nation of New York*, No. 95-cv-0554, 2001 WL 1708804 at *4 (N.D.N.Y. Nov. 9, 2001) (holding that an associate counsel and an advisor were not high-ranking officials meriting protection under the apex doctrine).

Indeed, Plaintiffs' decision to depose Mr. Hamilton furthers the goals of the apex doctrine. In designating Mr. Hamilton, Plaintiffs recognized the "greater duties and time constraints" of other DHS officials, and therefore identified a low-ranking official within Acting Secretary Duke's office who has knowledge of the materials and decisions underlying the DACA Termination. *Lederman v. N.Y.C. Dept. of Parks and Recreation*, 731 F.3d 199, 203 (2d. Cir. 2013) (internal quotation marks omitted). In fact, Defendants proffered a higher-ranking official, an Assistant Secretary, in their Rule 26(a) Initial Disclosures (attached as Ex. A). Defendants also acknowledged that Mr. Hamilton is available for deposition on the noticed date without raising apex doctrine objections, *see* Email from Brad Rosenberg to David Chen, Oct. 5, 2017 (attached as Ex. B).

Lastly, to the extent Defendants believe that portions of Mr. Hamilton's testimony would be privileged, such claims are best addressed on a question-by-question basis. Plaintiffs intend to seek testimony on non-privileged matters, and even where the deliberative process privilege attaches, the privilege can be overridden for "good cause." *See In re Franklin Nat. Bank Sec. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979) (identifying a six-factor test to determine whether good cause exists to override the deliberative process privilege). "It is self evident that the fact-intensive *Franklin* test cannot be applied in generalized form in the absence of specific facts to form the substance of the balancing test." *Federal Housing Finance Agency v. JPMorgan Chase & Co.*, 978 F. Supp. 2d 267, 279 (S.D.N.Y. 2013).

For the foregoing reasons, Plaintiffs ask this Court to reject Defendants' objection to the deposition of Mr. Hamilton. Plaintiffs also note the need for this deposition to occur without additional delay due to the expedited discovery schedule in place in this case to ensure an adequate record is developed in advance of the date presently set for the termination of the DACA program. Plaintiffs thus ask this Court to reject Defendants' objection as soon as possible.

Respectfully submitted,                              Dated: October 10, 2017

/s/ Joshua A. Rosenthal

David Chen, Law Student Intern                Jessica R. Hanson, Esq. [†]
Susanna D. Evarts, Law Student Intern         Mayra B. Joachin, Esq. [†]
Victoria Roeck, Law Student Intern            Karen Tumlin, Esq.[†]
Healy Ko, Law Student Intern                  NATIONAL IMMIGRATION LAW CENTER
Hannah Schoen, Law Student Intern             3450 Wilshire Blvd, #108-62
Emily Villano, Law Student Intern             Los Angeles, CA 90010
Muneer I. Ahmad, Esq.[†]                       Phone: (213) 639-3900

Marisol Orihuela, Esq.[†]
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Justin Cox, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW
Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[†] *Appearing* pro hac vice

# EXHIBIT  A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al.*, | ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | )    No. 1:16-cv-04756 (NGG) (JO) |
| ELAINE C. DUKE, *et al.*, | ) ) |
| *Defendants.* | ) ) ) |

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | ) ) |
| *Plaintiffs,* | ) ) |
| v. | )    No. 1:17-cv-05228 (NGG) (JO) |
| DONALD TRUMP, *et al.*, | ) ) |
| *Defendants.* | ) ) ) |

## DEFENDANTS' RULE 26(a)(1) INITIAL DISCLOSURES

Defendants in the above-captioned actions ("Defendants") hereby provide the following initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure. Defendants provide these disclosures subject to their general objection to any discovery taking place in this litigation. These disclosures are based on information reasonably available to Defendants at the current time. Defendants reserve their rights to supplement these disclosures pursuant to Federal Rule of Civil Procedure 26(e).

1. **Rule 26(a)(1)(A)(i):**

The following individuals are likely to have discoverable information that Defendants may use to support their defenses, unless solely for impeachment. Unless otherwise noted, these individuals are employees of the Department of Homeland Security and may be reached through undersigned counsel.

a. Michael Dougherty: Mr. Dougherty is the Assistant Secretary of Border, Immigration and Trade in the Office of Policy. He testified before Congress regarding DACA on October 3, 2017, and likely has discoverable information about certain aspects of the rescission.

b. Philip T. Miller is the Deputy Executive Associate Director, Office of Enforcement and Removal Operations, Immigration and Customs Enforcement ("ICE"). He likely has discoverable information about the claims that pertain to ICE.

Defendants also identify any individuals who will be deposed in these cases, as well as all individuals identified in Plaintiffs' initial disclosures.

Defendants will supplement these disclosures as appropriate.

2. **Rule 26(a)(1)(A)(ii):**

The following documents, electronically stored information, and tangible things in Defendants' possession, custody, or control may be used to support their defenses, unless solely for impeachment.

a. Documents that are included in the administrative record regarding the DHS Acting Secretary's decision to rescind DACA

b. Documents that are publicly available on DHS, USCIS, ICE and/or CBP websites, including, but not limited to:

o Documents regarding the DACA policy

o Documents regarding the initial and renewal request process for DACA for the period from June 15, 2012 until September 5, 2017

o Documents regarding the rescission of DACA

> > o Documents regarding the renewal request process, and the October 5, 2017 deadline for properly filing renewal requests that must be accepted by October 5, 2017, for DACA that expires between September 5, 2017 and March 5, 2018
> >
> > o Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Form I-821D Instructions
> >
> > o Form I-765, Application for Employment Authorization, and Form I-765 Instructions
> >
> > o Form I-131, Application for Travel Document
> >
> > o Applications Request Forms and instructions related to DACA policy

> c. Correspondence with, testimony before, and responses to any questions for the record from Congress regarding the rescission of DACA

> d. Documents identified or produced by Plaintiffs

Defendants will supplement these disclosures as appropriate.

**3.    Rule 26(a)(1)(A)(iii):**

> Defendants have no claimed damages.

**4.    Rule 26(a)(1)(A)(iv):**

> Not applicable.

Dated: October 4, 2017        Respectfully submitted,

                                               CHAD A. READLER
                                               Acting Assistant Attorney General

                                               BRIDGET M. ROHDE
                                               Acting United States Attorney

                                               BRETT M. SHUMATE
                                               Deputy Assistant Attorney General

                                               JENNIFER D. RICKETTS
                                               Director

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

STEPHEN M. PEZZI
Trial Attorney

*/s/ Kate Bailey*
KATE BAILEY (MD Bar #1601270001)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 514-9239
Fax:  (202) 616-8470
Email:  kate.bailey@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2017, I served the foregoing DEFENDANTS'

RULE 26(a)(1) INITIAL DISCLOSURES via e-mail upon:

Lourdes Rosado
Diane Lucas
Abigail Taylor
Genevieve Nadeau
Colleen Melody
Marsha Chien
Jerome Frank Legal Servs. Org.
Batalla
Amy Taylor
Scott Foletta
Alexa Schapira
Justin Cox



*/s/ Kate Bailey*
KATE BAILEY

EXHIBIT  B



| From: | Rosenberg, Brad (CIV) |
| To: | David Chen |
| Cc: | |
| Subject: | RE: Batalla Vidal v. Baran, 1:16-cv-04756-NGG-JO |
| Date: | Thursday, October 5, 2017 9:44:27 AM |

Dear David:

While defendants reserve their rights to object to the depositions and discovery generally, including to raise these issues with the court as set forth in the email exchange below, Mr. Hamilton is available on October 20; his availability is otherwise very limited.  As for Mr. Neufeld, we believe that he is available on October 18, but are awaiting final confirmation.  Please let me know if these dates work from your perspective.

Thanks,
-Brad



**From:** David Chen
**Sent:** Thursday, October 05, 2017 8:57 AM
**To:** Rosenberg, Brad (CIV) <BRosenbe@civ.usdoj.gov>

**Subject:** Re: Batalla Vidal v. Baran, 1:16-cv-04756-NGG-JO

Dear Brad,
Plaintiffs have already consented to postponing the depositions of Mr. Neufeld and Mr. Hamilton by one week and do not consent to your request to postpone them for an additional two weeks. Additional postponement of discovery puts the parties at risk of not being able to complete discovery within the timeline necessary to resolve this case before Defendants terminate DACA. As you know, the parties are subject to an expedited discovery schedule because your clients refused to extend their own arbitrary deadlines. ECF No. 72, at 4 n.3

Add. 20

("this urgency is the result of Defendants' decision to terminate the DACA program on short notice, requiring this court to expedite consideration of these actions"). So that the parties can address these concerns with the Magistrate Judge, Plaintiffs will notice these two depositions for the week of October 16, 2017, and Defendants can seek relief from the Magistrate Judge at our October 11 conference. Case Management and Scheduling Order, ECF No. 67, at II(d)((i). We also disagree with you that the depositions of Mr. Neufeld and Mr. Hamilton are issues raised by your motion to vacate filed with the district court. Judge Garaufis's order modifying Magistrate Judge Orenstein's discovery order was limited only to section II(c), which concerns production of a privilege log. Nowhere does Judge Garaufis's order modify other parts of the discovery schedule.

Furthermore, Magistrate Judge Orenstein's discovery order was not limited to Plaintiff's APA claims. Since Plaintiffs have also alleged constitutional violations, which do not rest primarily on the administrative record, these depositions must proceed regardless the court's disposition of the government's arguments regarding the administrative record and related privilege log.

Thank you,

David Chen

Law Student Intern

Jerome N. Frank Legal Services Organization

PRIVILEGED AND CONFIDENTIAL

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure.   If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise.   Instead, please notify me immediately by return e-mail (including the original message in your reply) and by telephone and then delete and discard all copies of the e-mail.

> On Oct 4, 2017, at 5:33 PM, Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov> wrote:
>
> Dear David:
>
> I am writing to follow-up on the email exchange below.  As you are aware, yesterday Judge Garaufis issued an order that granted, in part, the government's motion regarding Magistrate Judge Orenstein's discovery order.  Judge Garaufis indicated that he would resolve the remaining, outstanding issues raised by the government in its motion by October 20.  One of those issues concerns whether there should be any discovery in this APA case.  In that regard, Judge Garaufis specifically noted that the court cannot assess whether the administrative record is sufficient to review the government's decision to rescind DACA until the government supplies the record.

In light of this outstanding issue, including the additional guidance that will be provided by the district court, we think it makes sense to postpone these depositions until after Judge Garaufis issues a final decision on the government's appeal of the magistrate judge's discovery order.  If the court does not provide further relief, the government would be prepared to schedule Messrs. Neufeld and Hamilton for depositions on October 25 and 27, respectively, but does not waive its objections to discovery taking place.  Should these depositions take place, the government reserves its rights to assert any appropriate objections during the depositions themselves, including by instructing witnesses not to answer to the extent a question calls for privileged information.

Please let us know if you agree with this proposal, which we think provides an efficient and expeditious path forward while allowing the district court the opportunity to resolve the government's outstanding objections.

Thanks,
-Brad

**From:** David Chen
**Sent:** Monday, October 02, 2017 10:17 PM
**To:** Rosenberg, Brad (CIV) <BRosenbe@civ.usdoj.gov>



**Subject:** Re: Batalla Vidal v. Baran, 1:16-cv-04756-NGG-JO

Dear Brad,

We will consent to a one week extension of the deposition schedule for Mr. Neufeld and Mr. Hamilton, but request that you let us know when they will be available next week by this Wednesday, October 4.

Will you also please confirm that the government agrees to make Mr. Neufeld and Mr. Hamilton available for deposition? If the government has any objections to either or both of their depositions, please notify us by this Wednesday, October 4, so we can try to address any objections or timely raise any issues before Magistrate Judge Orenstein.

Regarding the location for deposition, we intend to notice the depositions to be held at our offices in Washington, D.C.

Finally, we are not in coordination with plaintiffs in California, but we do not object to counsel from those cases attending the deposition.

Thank you,

David Chen
Law Student Intern
Jerome N. Frank Legal Services Organization
███████████

PRIVILEGED AND CONFIDENTIAL
This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure.  If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise.  Instead, please notify me immediately by return e-mail (including the original message in your reply) and by telephone and then delete and discard all copies of the e-mail.

> On Oct 2, 2017, at 4:00 PM, Rosenberg, Brad (CIV)
> <Brad.Rosenberg@usdoj.gov> wrote:
>
> Hi David:
>
> I am writing to follow-up on your email below.  We are still checking on dates on our end, but at this point we wanted to inquire about pushing the depositions back at least until next week.  Among other things, Mr. Neufeld is out of the country for most of this week.  We are still in the process of checking on Mr. Hamilton's schedule.
>
> We also wanted to inquire about whether you are coordinating with the California plaintiffs regarding these depositions.  To the extent we make witnesses

available for depositions, we would like to do so as
efficiently as possible, avoiding multiple depositions
of the same individual.

We can offer our offices at DOJ for the depositions, if
that works for you and your colleagues.

Thanks,
-Brad

---

**From:** Rosenberg, Brad (CIV)
**Sent:** Thursday, September 28, 2017 5:17 PM
**To:** 'David Chen' ▮▮▮▮▮▮▮▮▮▮▮▮▮; Pezzi, Stephen (CIV)
<spezzi@CIV.USDOJ.GOV>; Marutollo, Joseph (USANYE)
<Joseph.Marutollo@usdoj.gov>; Beckenhauer, Eric (CIV)
<EBeckenh@civ.usdoj.gov>



**Subject:** RE: Batalla Vidal v. Baran, 1:16-cv-04756-NGG-JO

Thanks, David.  We'll get back to you shortly about
this.

-Brad

---

**From:** David Chen ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, September 28, 2017 3:11 PM
**To:** Pezzi, Stephen (CIV) <spezzi@CIV.USDOJ.GOV>; Rosenberg, Brad (CIV)
<BRosenbe@civ.usdoj.gov>; Marutollo, Joseph (USANYE)
<Joseph.Marutollo@usdoj.gov>



**Subject:** Batalla Vidal v. Baran, 1:16-cv-04756-NGG-JO

Counsel,

As stated at our status conference on September 26, Plaintiffs intend to issue notices of depositions to persons with knowledge of the matters in the case. Initially, we intend to issue notices to the following individuals pursuant to Fed. R. Civ. P. 30:

- Donald Neufeld, Associate Director, Service Center Operations, United States Citizenship and Immigration Services
- Gene Hamilton, Deputy Chief of Staff for Policy, Department of Homeland Security

We are writing to request dates next week (Oct 2 - 6) that the above deponents will be available for an in-person deposition. We would also like to confirm that the deponents reside in the Washington D.C. area such that we can take their depositions there.

Thank you,

David Chen
Law Student Intern
Jerome N. Frank Legal Services Organization

PRIVILEGED AND CONFIDENTIAL
This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure.  If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise.  Instead, please notify me immediately by return e-mail (including the original message in your reply) and by telephone and then delete and discard all copies of the e-mail.

# The Jerome N. Frank Legal Services Organization

YALE LAW SCHOOL

October 13, 2017

VIA ECF

Honorable James Orenstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:** ***Batalla Vidal et al. v. Duke et al.*, No. 16-cv-4756 (NGG) (JO)**
***State of New York et al. v. Trump et al.*, No. 17-cv-5228 (NGG) (JO)**

Dear Magistrate Judge Orenstein:

Plaintiffs respectfully submit this letter asking the Court to compel Defendants to complete production of the administrative record. The administrative record produced to date is clearly deficient. On October 6, 2017, Defendants provided Plaintiffs with an administrative record consisting of all public materials, most of which were judicial opinions regarding a different program than that at issue here. Defendants have made three key errors in compiling the administrative record that warrant an order from the Court requiring complete production. First, Defendants applied an erroneously narrow standard when compiling the administrative record. Second, Defendants failed to produce whole categories of relevant and necessary documents. Finally, in attempting to deflect challenges to the administrative record they filed, Defendants conflated the standard for obtaining completion of the administrative record with the standard to obtain supplementation of the administrative record with extra-record evidence.

The Court ordered a comprehensive administrative record on September 27, 2017. *See* Case Management and Scheduling Order, at 1, ECF No. 67.[1] As is the norm in cases with claims arising under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, Defendants have an obligation to produce a complete record upon which the Court can properly base its decision on the merits. Because Defendants have failed to do so, Plaintiffs respectfully move for the Court to order Defendants to complete the administrative record by October 20, 2017.

Plaintiffs met and conferred with Defendants on October 13, 2017. Unfortunately, Defendants continued to maintain that the October 6 administrative record was complete and accurate, and refused to provide an explanation for the many omissions from the record. Defendants confirmed that the October 6 administrative record was limited to what Acting Secretary Duke had directly considered when deciding to terminate the DACA policy, and that no documents considered or relied on by subordinates or other decision makers were included. As Defendants were unwilling to resolve this issue with Plaintiffs' counsel out of court, Plaintiffs

---

[1] Unless otherwise noted, all ECF citations are to filings in the *Batalla Vidal v. Duke* action, 16-cv-4756.

P.O. BOX 209090, NEW HAVEN, CT 06520-9090 • TELEPHONE 203 432-4800 • FACSIMILE 203 432-1426
COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CT 06511

have no choice but to seek the Court's assistance with obtaining a complete administrative record.

## I. Defendants Applied an Incorrect Standard for What Documents an Agency is Required to Include in the Administrative Record

Defendants compiled a skeletal administrative record based on an erroneously narrow standard of what the record must include. It is clearly established that an agency must compile a complete administrative record on which the reviewing court can base its decision. The Supreme Court has held that a complete record must "be based on the *full* administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (emphasis added), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Courts subsequently have defined the "administrative record already in existence" for informal agency action as "what [the decision maker] had before him when he acted." *Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984); *see also James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) ("The administrative record includes all materials 'compiled' by the agency, that were 'before the agency at the time the decision was made.'" (quoting *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981))).

An agency must provide more than simply the documents that were *personally* considered by the final decision maker. "[I]f the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included as well." *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001). In other words, courts have required that agencies provide all documents that were *directly or indirectly* considered by the final decision makers in making their decision. *See Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012) (defining "relevant materials 'before the agency'" as "those that the agency decision-makers directly or indirectly considered" (citing *State of Delaware Dep't of Natural Res. and Envtl. Control v. U.S. Army Corp. of Eng'rs*, 722 F. Supp. 2d 535, 541 (D. Del. 2010))); *Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Engineers*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) ("This Court has interpreted the 'whole record' to include 'all documents and materials that the agency directly or indirectly considered . . . . [and nothing] more nor less.'" (quoting *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) (alteration and omission in original))); *Merritt Parkway Conservancy v. Mineta*, 424 F. Supp. 2d 396, 403 (D. Conn. 2006) (stating that "a document need not literally pass before the eyes of the final agency decisionmaker to be considered part of the administrative record" (internal quotation omitted)).

Contrary to this clear guidance from the courts, Defendants have produced only a subset of the administrative record. They characterize the record as consisting of "all non-privileged documents actually considered by the Acting Secretary of Homeland Security in making her decision to rescind the DACA policy." Defs.' Letter in Supp. of Mot. to Vacate Disc. Order, at 5, ECF No. 80. But the sparse record produced confirms that they have failed to produce all

documents directly or indirectly considered by the agency, and instead produced only those non-privileged documents personally considered by Acting Secretary Duke.[2]

Moreover, the Department of Homeland Security ("DHS") has failed to follow guidance published by the Department of Justice ("DOJ") regarding how agencies should compile an administrative record. That guidance, issued by the Executive Office for United States Attorneys, provides that materials "directly or indirectly considered" should include: (1) documents and materials whether or not they support the final agency decision; (2) documents and materials which were available to the decision-making office at the time the decision was made; (3) documents and materials considered by, or relied upon, by the agency; (4) documents and materials that were before the agency at the time of the challenged decision, even if the final agency decision-maker did not specifically consider them; and (5) privileged and non-privileged documents and materials. Joan Goldfrank, *Guidance to Client Agencies on Compiling the Administrative Record*, U.S. Atty. Bull. 7, 8 (Feb. 2000), http://www.justice.gov/usao/eousa/foia_reading_room/usab4801.pdf.[3] The administrative record as it stands fails to capture these categories of documents under the "directly or indirectly considered" standard articulated by the government's own publication.

## II. The Administrative Record Provided By Defendants is Glaringly Incomplete, Warranting an Order for Defendants to Complete It

The plainly incomplete record produced by Defendants rebuts the presumption of regularity ordinarily afforded the administrative record and warrants an order that the record be completed. In the Second Circuit, parties challenging agency decisions can overcome that presumption by providing a "strong suggestion" that the administrative record was incomplete. *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982). This is especially true where, as here, no formal agency proceedings have concretely determined the scope of the administrative record. *See id.* ("Determining what constitutes an agency's informational base . . . may present a disputed issue of fact when there has been no formal administrative proceeding."); *see also Pleasant E. Associates v. Martinez*, No. 02 CIV.4144 (LMM), 2002 WL 31458224, at *1 (S.D.N.Y. Nov. 4, 2002) (explaining that when no formal administrative proceedings occurred and when the scope of the administrative record is in dispute, it is improper for a court to grant summary judgment to the defendants without allowing some discovery).

---

[2] Plaintiffs maintain, in light of the sparse administrative record that Defendants have provided, that Defendants still be required to produce a privilege log by the October 20 deadline. *See* Order on Defs.' Mot. to Vacate, 3-4, ECF No. 72.

[3] DOJ has subsequently tried to limit the use of this guidance in order to obtain greater flexibility in litigation positions, but these tactical shifts in position do not undermine the persuasive value of the Goldfrank guidance. *See* Memorandum from Ronald J. Tenpas, Assistant Attorney Gen., U.S. Dep't of Justice, to Selected Agency Counsel, (Dec. 23, 2008), *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Oct. 12, 2017), ECF No. 71-1. Notably, the 2008 memorandum seeking to limit the effect of the Goldfrank guidance focuses solely on whether privileged materials are included in the record, not the inclusion of all non-privileged documents before the agency. *See also* Privilege Log, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Oct. 12, 2017), ECF No. 71-2 (attached hereto as Exhibit A).

3

### A. The Agency's Administrative Record is Grossly Inadequate

Applying the correct legal definition of the administrative record reveals that the record produced by Defendants is incomplete in five main respects, although a deficiency in just one of these categories would be sufficient to require that Defendants complete the current record.

First, and most blatantly, Defendants failed to provide any support in the administrative record for factual allegations made in support of terminating the DACA policy. For example, the record contains no documents related to Acting Secretary Duke's assertion in her memorandum terminating DACA that "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion." Memorandum from Elaine C. Duke, Acting Sec'y of Homeland Sec., to James W. McCament, Acting Dir., U.S. Citizenship and Immigration Servs., Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA), at n.1, Sept. 5, 2017 ("DACA Termination Memo"), Notice of Filing Admin. R., Ex. 1, at 253 n.1, ECF No. 77-1. For Defendants to assert the record is complete despite missing this information would suggest that Acting Secretary Duke had no evidence to support her conclusion, and highlights why courts require agencies to provide all documents both directly *and* indirectly considered. *Cf. United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 251 (2d Cir. 1977) ("It is not consonant with the purpose of a rulemaking proceeding to promulgate rules on the basis of inadequate data, or on data that [in] critical degree, is known only to the agency." (alteration in original) (quoting another source)).

Second, the record is devoid of any documents that purport to explain Defendants' decision to slowly wind down a program they assert is unlawful. Defendant Sessions' one-page legal analysis alerting Acting Secretary Duke that he considers DACA "an unconstitutional exercise of authority by the Executive Branch" provides only the vague reference to "costs and burdens that will be imposed on DHS associated with rescinding this policy" that counsel "an orderly and efficient wind-down process." Notice of Filing Admin. R., Ex. 1, at 251, ECF No. 77-1. The DACA Termination Memo, in a similarly conclusory manner, states that a wind down is needed "[r]ecognizing the complexities associated with winding down the program." *Id.* at 255. Nothing in the administrative record supports that bare claim of "complexities."

Similarly, the record contains no information about how the agency chose crucial dates in the termination process, including the September 5, 2017 date after which no new DACA applications would be considered, the October 5, 2017 deadline after which no renewal applications would be considered, and the March 5, 2018 final termination of the program. In their appearances before this Court, Defendants have previously represented that setting the renewal deadline for October 5 "was appropriate," Tr. 12:18–19, Sept. 14, 2017, and that "[i]n DHS's judgment, 30 days [notice] was a sufficient amount of time to complete the paperwork to file for renewals," *id.* 12:14–16. However, there is no information whatsoever within the administrative record about how this deadline was selected or how DHS concluded it was appropriate.

Third, the administrative record does not adequately reflect the role of DOJ or the White House in the decision-making process. The record contains a single, one-page document from DOJ that concludes, without analysis, that DACA is unlawful and instructs that DHS should terminate DACA. Notice of Filing Admin. R., Ex. 1, at 251, ECF No. 77-1. In their appearances before this Court, the Defendants have previously represented that DHS and DOJ were both

involved in the decision to terminate the DACA program. *See* Tr. 13:17–18, Sept. 14, 2017 ("The Attorney General and DHS both decided that this is an unlawful program . . . ."). Moreover, Attorney General Sessions personally announced the termination of the program. *See* Attorney General Sessions Delivers Remarks on DACA, *State of New York v. Trump*, No. 1:17-cv-05228 (E.D.N.Y. Oct. 4, 2017), ECF No. 55-75. During that announcement, Attorney General Sessions stated that "[o]ur collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program." *See id.* at 1. Despite the clear role of DOJ as a decision-making agency, the administrative record contains only a one-page document originating from DOJ. Moreover, Attorney General Sessions' letter contains no legal analysis to support his bare conclusion.

It is also clear that President Trump and the White House actively advised DHS and DOJ to terminate DACA. For example, on September 5, 2017, the White House announced that the President had "Restore[ed] Responsibility and the Rule of Law to Immigration" by terminating DACA.[4] The announcement underscores the active role of the White House in the decision: "If *President Trump* had refused to act, many States were prepared to pursue litigation to end DACA by court order." *Id.* (emphasis added). Despite this and many other assertions by the White House of its role in making decisions about the termination, the administrative record contains no documents sent from the White House to either DHS or DOJ.

Fourth, the administrative record excludes communications relevant to the DACA-termination decision. For example, nowhere in the record appears the August 14, 2017 letter from more than one hundred law professors to the White House, Chief of Staff John Kelly, and Acting Secretary Duke, urging them not to rescind the DACA program and arguing that the DACA program is legal. *See* Letter from Shoba Sivaprasad Wadhia, Samuel Weiss Faculty Scholar & Clinical Professor of Law, Penn State Law, to Donald Trump, President of the United States (Aug. 14, 2017) (attached hereto as Exhibit B). In President Trump's statement on the DACA termination, he noted that "[t]he Attorney General of the United States, the Attorneys General of many states, and virtually all other top legal experts have advised that the program is unlawful and unconstitutional and cannot be successfully defended in court." Statement, Donald J. Trump (Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president-donald-j-trump. Given the relevance of these communications to the DACA-policy termination and the reasons put forth by DHS and DOJ, their omission from the record raises the significant possibility that other communications were similarly omitted.

Finally, although much of the record consists of the various opinions in the *Texas v. United States* case, which concerned an entirely different policy, the record fails to reference cases, which were dismissed, that actually were brought to challenge the DACA program. *See Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015); *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015). The presence of one case (about a separate program) that Defendants believe supports their argument and exclusion of cases that actually concern the DACA program suggests the record is incomplete. *See Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) (allowing discovery on the completeness of the record, and noting "[t]he fact that defendants presented documents that seemed to support the rationality of their actions does not mean that the same conclusion

---

[4] *See* Press Release, The White House Office of the Press Secretary, President Donald J. Trump Restores Responsibility and the Rule of Law to Immigration (Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/president-donald-j-trump-restores-responsibility-and-rule-law.

would have been reached if the Court had been aware of other information that was before the agency").

## III. Defendants Failed to Distinguish Between Requests to Complete the Record and Requests to Supplement the Record for APA Claims

In arguing that Plaintiffs are not entitled to discovery to challenge the completeness of the administrative record, Defendants have incorrectly conflated the need to complete the record with the need to supplement the record. When an agency fails to include in the administrative record documents it considered when making its decision, courts require the agency to provide additional documentation—either on its own accord or through discovery—to ensure the court has the full record before it when making its decision. *See, e.g.*, *Dopico*, 687 F.2d 644 (requiring discovery on the completeness of the administrative record before the lower court could grant summary judgment to the agency). In contrast, if litigants wish to include additional, extra-record documents, they would need to demonstrate that the record should be supplemented. Parties seeking to supplement the administrative record must clear a higher bar, such as "when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997); *see also Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (noting a variety of circumstances in which courts have found supplementing the record necessary).

At this time, Plaintiffs are not moving to supplement the record. Instead, Plaintiffs merely ask this Court to order that Defendants provide an adequate record on which this Court may base its decision. While, if necessary, Plaintiffs will attempt to utilize the current discovery period to obtain a complete administrative record, Plaintiffs hope this will be unnecessary and that the Court will order Defendants to complete the administrative record in good faith, to include all documents that were directly and indirectly considered by Acting Secretary Duke when she decided to terminate the DACA policy.

Respectfully submitted,

/s/ Muneer I. Ahmad[†]

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Healy Ko, Law Student Intern
Victoria Roeck, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.[†]
Marisol Orihuela, Esq.[†]
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Jessica R. Hanson, Esq.[†]
Mayra B. Joachin, Esq.[†]
Karen Tumlin, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin Cox, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317

6

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq.[*]
Alexia Schapira, Esq.[*]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

/s/ Lourdes M. Rosado

Lourdes M. Rosado
Sania Khan
Diane Lucas
Ajay Saini
Civil Rights Bureau
Office of the New York Attorney General
120 Broadway, 23rd Floor
New York, NY 10271
Phone: (212) 416-6348

Colleen M. Melody[†]
Marsha Chien[†]
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Phone: (206) 464-7744

Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Batalla Vidal et al. Plaintiffs*

Jonathan B. Miller
Genevieve C. Nadeau[†]
Abigail B. Taylor[†]
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Phone: (617) 727-2200

*Attorneys for New York et al. plaintiffs*

CC: All Counsel (via ECF)

[†] Appearing *pro hac vice*
[*] Application for admission to E.D.N.Y. forthcoming



**U.S. Department of Justice**

Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

October 16, 2017

**By ECF**

The Honorable James Orenstein
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *Batalla Vidal, et al., v. Baran, et al.*, 16-CV-4756 (NGG) (JO)
       *State of New York, et al., v. Donald Trump, et al.*, 17-CV-5228 (NGG) (JO)

Dear Magistrate Judge Orenstein:

Pursuant to the Court's October 11, 2017 order, *Vidal* ECF No. 82, and in response to Plaintiffs' October 13, 2017 letter motion to complete the administrative record ("Pls.' Ltr. Mot."), *Vidal* ECF No. 84, Defendants respectfully submit the following letter in opposition. Defendants applied the correct legal standard in certifying and compiling the administrative record in this case, which includes all documents actually considered by the Acting Secretary of Homeland Security, Elaine C. Duke, as part of her decision to institute an orderly wind-down of the Department of Homeland Security's ("DHS") DACA policy. Plaintiffs' proposed standard does not meaningfully differ from the standard applied by Defendants, and to the extent that it does, is drawn from out-of-circuit case law in significantly different administrative contexts. Finally, as for the specific documents that Plaintiffs argue are missing from the administrative record, any such omissions, perhaps, would at most provide a basis for Plaintiffs to argue, on the merits, that the agency's decision was inadequate and should therefore be set aside (assuming that decision is reviewable), but they provide no basis to challenge the agency's compilation of the record, which is legally presumed to be adequate. Accordingly, Defendants respectfully request that the Court deny Plaintiffs' motion.

I.    **Defendants Compiled The Administrative Record Using An Appropriate Legal Standard.**

Defendants certified and produced an administrative record consisting of all documents actually considered by the Acting Secretary as part of her decision to wind-down the DACA policy—a construction of the record that fully complies with the applicable standard for the sort of informal agency action challenged here. *See, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (judicial review of agency action must "be based on the full administrative record that was before the Secretary at the time he made his decision"), *abrogated in part on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The record includes DHS documents, Department of Justice ("DOJ") documents, and congressional correspondence with the White House; it includes formal memoranda and informal letter correspondence; it includes published legal analysis of the DACA and DAPA policies; and it includes some documents suggesting that DACA be rescinded, and other documents suggesting that the policy should continue. No more is required, and this Court should reject Plaintiffs' attempt to force the inclusion of documents that were never considered by the actual agency

decision maker or that are internal to other components of the Executive Branch that did not actually take the action Plaintiffs challenge here.

**a.** Plaintiffs say, correctly, that judicial review of an administrative decision must "be based on the *full* administrative record that was before the Secretary at the time he made his decision," *Overton Park*, 401 U.S. at 420 (emphasis by Plaintiffs) (quoted in Pls.' Ltr. Mot. at 2). But the *Overton Park* standard is functionally identical to the standard applied by Defendants in this case. Defendants have produced the "full administrative record that was before the Secretary at the time [s]he made h[er] decision." *Id.*; *see also* Pls.' Ltr. Mot. at 2 ("Courts subsequently have defined the 'administrative record already in existence' for informal agency action as 'what [the decision maker] had before him when he acted.'") (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984)).

Ultimately, after citing a series of cases that are generally consistent with Defendants' understanding of the scope of an administrative record, Plaintiffs present their position as follows: "[C]ourts have required that agencies provide all documents that were *directly or indirectly* considered by the final decision makers in making their decision." Pls.' Ltr. Mot. at 2.

At least as a matter of linguistics, this standard is substantively indistinguishable from the standard applied by Defendants. If Plaintiffs replaced the words "directly or indirectly" with the word "actually," that sentence might have been an exact quote from undersigned counsel or Defendants' filings in this case. But those word-choice subtleties should ultimately make no difference here. Defendants used the modifier "actually" for purposes of transparency and fair notice, to make clear to Plaintiffs and the Court that the administrative record produced by Defendants was limited to documents considered by the "final decision maker" herself, Acting Secretary Duke—rather than including all documents related to the rescission of DACA from, say, rank-and-file personnel within DHS that were not considered by the Acting Secretary. *See infra*, Section I(b) (explaining why that decision was legally justified).[1]

In Defendants' view, if a document was "directly or indirectly considered" by the Acting Secretary, then it was "actually considered" (or just "considered") by her too. Put another way, if the United States Supreme Court issued an opinion that stated, with no further explanation, that an administrative record must include "all documents that were directly or indirectly considered by the final decision makers in making their decision," Pls.' Ltr. Mot. at 2 (emphasis added), Defendants would produce the same administrative record that they already produced on October 6. For that reason alone Plaintiffs' motion can be denied.[2]

---

[1] As confirmation that Defendants do not intend to shy away from the "directly or indirectly considered" language, but instead use the phrase "actually considered" because it is more precise and clear, Defendants refer the Court (and Plaintiffs) to language in a recent filing by Defendants in another DACA-rescission case in the Northern District of California, in which Defendants also defended the "actually considered" language. *See* Defs.' Opp'n to Pls.' Mot. to Compel at 12 n.3, *Regents of Univ. of Cal. v. DHS*, No. 17-5211-WHA (N.D. Cal. Oct. 12, 2017), ECF No. 71 (referencing "the uncontroversial principle that an administrative record generally includes material considered directly and indirectly by the decisionmaker") (citation omitted).

[2] Plaintiffs' letter says that, on a recent meet-and-confer call, "Defendants confirmed that the October 6 administrative record was limited to what Acting Secretary Duke had *directly considered* when deciding to terminate the DACA policy." Pls.' Ltr. Mot. at 1 (emphasis added). In fact, undersigned counsel said no such thing. Instead, undersigned counsel used the same language ("actually considered") used in this filing, previous filings, the administrative record certification filed on both coasts, and at the most recent status conference in this matter. *See*

**b.**   Notwithstanding the fact that the standard offered by Plaintiffs appears, at least to Defendants, to be effectively indistinguishable from the standard applied by Defendants, Plaintiffs' filing does suggest that there is disagreement between the parties on one particular issue: whether the administrative record must include documents that were never considered by the Acting Secretary herself, but instead were considered *only* by her subordinates or other rank-and-file staffers at DHS. *See* Pls.' Ltr. Mot. at 2.

The Court should begin with the Supreme Court's decision in *Overton Park*, which holds that judicial review must "be based on the full administrative record that was before *the Secretary* at the time *he* made his decision"—making no mention of a broader record based on all documents that were before the entire agency, or before the Secretary's subordinates. 401 U.S. at 420 (emphasis added); *see also, e.g.*, *Data Processing*, 745 F.2d at 684 (the record includes "what [the decision maker] had before *him* when *he* acted") (emphases added). Plaintiffs' position finds no support in these decisions.

For a relatively recent holding from within the Second Circuit that directly addresses this precise issue with additional specificity, Defendants respectfully refer the Court to Judge Engelmayer's cogent and well-reasoned opinion in *Comprehensive Community Development Corporation v. Sebelius*, which ultimately concludes that "the administrative record does not consist[] of materials before any employee in the agency, but rather, the agency decision-makers." 890 F. Supp. 2d 305, 314 (S.D.N.Y. 2012); *see also, e.g.*, *Pac. Shores Subdivision, Calif. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6-7 (D.D.C. 2006) ("[I]t is not enough for Pacific Shores to state that the documents were before the entire Corps, but rather it must instead prove that the documents were before the Corps' decisionmaker(s)." (citing *Overton Park*, 401 U.S. at 420)). *Comprehensive Community Development Corporation* also quoted the "directly or indirectly considered" language on which Plaintiffs place such heavy weight—but Judge Engelmayer nonetheless rejected efforts to require documents considered only by the actual decision maker's subordinates to be included in the record:

> To rebut the presumption of administrative regularity, such a party must show that the materials sought to be added were before the agency decision-maker. It is not enough to show that these materials were somewhere within the agency, because interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency would render judicial review meaningless.

*Comprehensive Cmty. Dev. Corp.*, 890 F. Supp. 2d at 309 (internal citations and alterations omitted). This is strong support for Defendants' position: that Plaintiffs' "directly or indirectly considered" language can and should be interpreted consistently with Defendants' "actually considered" formulation—

Oct. 11, 2017 Tr. at 17:22-24 ("Mr. Pezzi: I believe the applicable standard are the documents that were actually considered by the relevant agency decision maker."). Counsel for Defendants promptly raised the inaccuracy and respectfully requested that Plaintiffs correct it. Counsel for Plaintiffs did not dispute undersigned counsel's recollection of the call, but nevertheless refused to correct the inaccuracy. Ultimately, Defendants do not believe this statement should have an effect on the Court's analysis of the issues at stake here, so, for that reason, and to avoid creating a mini-trial on a collateral issue, counsel has not submitted a declaration swearing to his recollection under penalty of perjury. Undersigned counsel is willing to do so, however, should the Court be inclined to place any significance on this inaccurate presentation of the parties' meet-and-confer call. *See generally* Ex. 1, Email Chain re: "EDNY DACA Rescission Litigation - Meet-and-Confer Obligations and Administrative Record."

especially where, as here, the agency action at issue is an informal, policy-based decision of the type that an agency head may properly make without needing to rely on an extensive factual or evidentiary record compiled by her subordinates or the agency at large.

In this case, the only agency decision maker was Acting Secretary Duke, which is why Defendants limited the administrative record to documents that *she* actually considered—rather than documents considered only by her subordinates or rank-and-file DHS staffers. Holding to the contrary would have the effect of imposing discovery-like burdens on administrative agencies, as a matter of course, even when defending routine and informal agency actions—notwithstanding the well-settled presumption against discovery in Administrative Procedure Act ("APA") litigation.

As for the out-of-circuit authority that does appear to attribute some significance to the requirement to include documents "indirectly" considered by the relevant agency decision maker (rather than just quoting that phrase in passing with no further explanation), those cases typically arise in the context of some *formal* agency action, or full-on notice-and-comment rulemaking, in which "the work and recommendations of subordinates" are far more likely to play an important role in the decision making process. *See, e.g., Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001). In other words, Plaintiffs rely on language sometimes invoked in the context of formal rulemakings, formal adjudications, or other agency actions quite unlike the informal, policy-based decision at issue here; in such cases a range of internal, predecisional materials necessarily exists, often as well as extensive factual, scientific, or evidentiary material—or even thousands of comments from the general public. Administrative records in those sorts of cases, to be sure, are often much larger than the record produced in this case.

But that should come as no surprise—none of those cases speak to the sort of informal, policy-based decision at issue here, which centered on a judgment about litigation risk and the uncertain legal footing of a purely discretionary agency policy (rather than a complicated weighing of evidentiary, factual, or scientific material). Plaintiffs cite no cases in which a court ordered "completion" of an administrative record to include materials "indirectly considered" in a challenge to an informal policy decision of the type at issue here—even assuming that that standard has any independent significance or differs in any way from the standard Defendants have already applied. And, as the Second Circuit has explained, "[w]hat will constitute an adequate record for meaningful review may vary with the nature of the administrative action to be reviewed," and "when the judgment is one of policy . . . findings of fact such as would be required in an adjudicatory proceeding or in a formal 'on the record' hearing for rulemaking need not be made." *United States v. Nova Scotia Food Products Corp.*, 568 F. 2d 240, 249 (2d Cir. 1977) (internal quotation omitted).

**c.** Plaintiffs rely on a February 2000 article, written by an attorney who formerly worked for DOJ's Environment and Natural Resources Division ("ENRD"), which adopts a broader view of what should be included in an administrative record. *See* Pls.' Ltr. Mot. at 3 (citing Joan Goldfrank, *Guidance to Client Agencies on Compiling the Administrative Record* (Feb. 2000).[3] But that article never represented any binding statement of the position of the United States with respect to the compilation of an administrative record, and subsequent authoritative DOJ guidance has made explicit that any such guidance has been superseded. *See* Mem. of Ronald J. Tenpas, Assistant Attorney General, U.S. Dep't of Justice, to Selected Agency Counsel (Dec. 23, 2008), Ex. 2 (rejecting nearly identical guidance originally issued by ENRD). In any event, the litigating position of the United States is reflected in

---

[3] *Available at* http://www.justice.gov/usao/eousa/foia_reading_room/usab4801.pdf.

Defendants' filings in these matters—not in articles or superseded internal memoranda from specific DOJ attorneys or components.

## II.   Plaintiffs' Arguments About Allegedly Omitted Documents Do Not Rebut The Presumption Of Regularity, And Are Primarily Merits Arguments.

Plaintiffs also offer a host of specific documents (and categories of documents) that they claim should have been included in the administrative record. These arguments all suffer from three critical flaws: (1) they largely ignore the presumption of regularity that attaches, as a matter of law, to the administrative record compiled by the agency; (2) they generally overstate the significance of the documents in question; and (3) they are, in any event, merits arguments that (at most) go to the basis (or lack thereof) for the Acting Secretary's decision, rather than the completeness of the administrative record.

**a.**   As Judge Garaufis put it, "[t]he agency's designation of the administrative record 'is generally afforded a presumption of regularity.'" *See* Oct. 3, 2017 Order at 3, *Vidal* ECF No. 72 (quoting *Comprehensive Cmty. Dev. Corp.*, 890 F. Supp. 2d at 309); *see also Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993) ("The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary."). This rule recognizes that, in APA cases, "the agency and not the court is the principal decision maker," and it discourages courts from "supplement[ing] the record . . . in the belief that they were better informed than the administrators empowered by Congress." *San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287, 1325 (D.C. Cir. 1984), *vacated in part on other grounds*, 760 F.2d 1320 (D.C. Cir. 1985). In other words, the agency officials familiar with the decision under review are presumed to have properly designated the administrative record, absent a showing by Plaintiffs that extra-record materials are necessary to reveal the agency's rationale for the decision. *See Estate of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. 2009). Here, Plaintiffs have not made such a showing—nor could they, given the existence of the September 5, 2017 rescission memo, which summarized and presented Acting Secretary Duke's reasoning. Plaintiffs may disagree with that reasoning, or find the explanation deficient, *see infra*, Section II(c), but there is no mystery as to the reasons offered by the Acting Secretary to justify this decision. Accordingly, the presumption of regularity holds, and these arguments can be rejected on that basis alone.

**b.**   As for the specific documents (or categories of documents) that Plaintiffs claim are missing from the administrative record, Plaintiffs fault the agency for allegedly failing to include documents "that purport to explain Defendants' decision to slowly wind down a program they assert is unlawful" or detailing "how the agency chose crucial dates in the termination process." Pls.' Ltr. Mot. at 4. But in any event, both the Attorney General's letter to Acting Secretary Duke, AR 251, and the rescission memo itself, AR 252-56, address this topic, albeit briefly. But otherwise, documents on this subject are classic pre-decisional and deliberative communications that are protected by (at least) the deliberative-process privilege and were properly omitted from the record on that basis. *See, e.g.*, *Mothers for Peace*, 789 F.2d at 44-45 (explaining that, absent a showing of bad faith, transcripts of deliberative agency proceedings must not be considered on judicial review); *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 333 (2d Cir. 1977) (affirming district court's refusal to order production of deliberative intra-agency memoranda in a record-review case).

Plaintiffs' suggestion that internal DOJ (and perhaps even White House) documents should be included in the administrative record, even if never shared with DHS or the Acting Secretary, is similarly mistaken. It is the Acting Secretary, not the Attorney General, who is vested with the

statutory authority to enforce our nation's immigration laws, *see* 8 U.S.C. § 1103(a)(1). And, in fact, the administrative record already includes DOJ documents, to the extent they are non-privileged and were considered by the Acting Secretary as part of her decision to rescind the DACA policy. *See* Administrative Record, AR 4-36 (Office of Legal Counsel Memorandum), AR 238-40 (letter to the Attorney General), AR 251 (letter from the Attorney General).

Plaintiffs contend that "Attorney General Sessions'[s] letter contains no legal analysis to support his bare conclusion." Pls.' Ltr. Mot. at 5. Even if that were true, the validity of the underlying legal judgments embedded within the Attorney General's letter to the Acting Secretary are not at stake in this litigation—assuming it is reviewable at all, this case requires the Court to determine, at most, whether the Acting Secretary's decision is rational, for the reasons she stated and on the record that she relied upon. Defendants will ultimately argue that the Acting Secretary's decision was sound—whether or not the Attorney General's underlying legal conclusion and predictions about future litigation would have proven to be accurate if the *Texas v. United States* litigation had continued.

Similarly, Plaintiffs contend that the record is incomplete because it contained judicial decisions from the *Texas* litigation, but did not include other opinions in other cases "that actually concern the DACA program." Pls.' Ltr. Mot. at 5. First of all, contrary to Plaintiffs' suggestion, the *Texas* litigation resulted in a nationwide injunction of not just DAPA, but also an expanded version of the DACA policy.[4] And the *Texas* plaintiffs recently threatened to amend their complaint to directly challenge what remained of DACA after the *Texas* injunction, on the same legal theory that had been accepted by the Fifth Circuit and affirmed by the Supreme Court. *See* AR 238-40. In any case, this is an improper attempt by Plaintiffs to tell the agency decision maker what she *should* have considered in making her decision—it says nothing about what she actually considered, and that is the relevant question at this stage of the litigation. Plaintiffs do not assert that these other opinions were considered by the Acting Secretary as part of her decision, and there is no obligation to include every single potentially relevant legal authority as part of an administrative record for a decision of this sort—otherwise DHS would have had to, for example, include the entirety of the Immigration and Nationality Act and the United States Constitution in the administrative record.

Plaintiffs also argue that the record is incomplete because it does not contain an August 14, 2017 letter from law professors offering their views to the President (copying Acting Secretary Duke) on the legality of DACA. This example is particularly unpersuasive because it is not, as Plaintiffs argue, "the relevance of [] communications to the DACA-policy termination," Pls.' Ltr. Mot. at 5, that determines whether a document should be included in the administrative record—even accepting that an unsolicited letter from law professors is "relevant" to a decision like this one. An agency decision maker is not required to consider every communication from any member of the public in making a decision. Plaintiffs may wish that the Acting Secretary had considered that letter in making her decision, but her focus on other documents is the *reason* it was not included—it does not call into question the completeness of the record.

Plaintiffs also make much of a footnote in the Acting Secretary's September 5, 2017 memorandum, which reports that, although deferred action policies are generally "meant to be applied only on an individualized case-by-case basis," in fact, "USCIS has not been able to identify specific

---

[4] *See, e.g.*, *Texas v. United States*, 86 F. Supp. 3d 591, 678 n.111 (S.D. Tex. 2015) ("While this Court's opinion concentrates on the DAPA program, the same reasoning applies, and the facts and the law compel the same result, to the expansions of DACA contained in the DAPA Directive").

denial cases where an applicant appeared to satisfy the programmatic categorical criteria . . . but still had his or her application denied based solely on discretion." Sept. 5, 2017 Memo at 2 & n.1, AR 253. But this factual statement is about the *lack* of certain data, not its existence, and the absence of additional documentation considered by the Acting Secretary therefore raises no questions about the completeness of the administrative record—the relevant conclusion is presented in the decision memo itself. And as discussed further below, *see infra*, Section II(c), to the extent Plaintiffs believe that the Acting Secretary's decision is not supported by the record, that is ultimately a merits argument.

Finally, Plaintiffs' suggestion that the presumption of completeness ordinarily afforded an administrative record may be more easily overcome "where, as here, no formal agency proceedings have concretely determined the scope of the administrative record" is unsupported. Pls.' Ltr. Mot. at 3. Plaintiffs rely on *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982), but that case involved "a strong suggestion that the record before the Court was not complete: conspicuously absent were the . . . fundamental documents—the very basis for federal decision-making about [the challenged grants]." *Id.* No such showing of conspicuously absent, fundamental documents has been made here.

**c.** Setting aside their merit on a document-by-document basis, Plaintiffs' arguments about what they would have expected to find in the administrative record are all, ultimately, *merits* arguments—not a justification for a broader administrative record. It is a well-settled principle of administrative law that where, as here, there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam). "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citations omitted). "If that finding is not sustainable on the administrative record made, then the . . . decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp*, 411 U.S. at 143 (citation omitted). Here, Defendants have produced a 256-page administrative record that includes all of the non-privileged documents that were actually considered by the agency decision maker. If Plaintiffs believe that that record is insufficient to support the agency's decision, then their remedy is not to compel the production of a broader administrative record—it is for Plaintiffs to file a merits brief asking that the decision be set aside, to which Defendants will respond on the merits. *See id.*

## III.    Plaintiffs' Have Already Obtained Extra-Record Documents.

Plaintiffs claim that "[i]n arguing that Plaintiffs are not entitled to discovery to challenge the completeness of the administrative record, Defendants have incorrectly conflated the need to complete the record with the need to supplement the record." Pls.' Ltr. Mot. at 6. To the extent Plaintiffs are referring to Defendants' *prior* filings opposing *discovery*, Defendants have not "incorrectly conflated" anything, but instead have made straightforward arguments about the general inappropriateness of judicial review of the Executive Branch's exercise of prosecutorial discretion in the immigration context, and the importance of limiting any judicial review that does take place to the administrative record compiled by the agency—a record that is legally presumed to be regular. That is true even where, as here, Plaintiffs bring constitutional claims, because constitutional claims challenging allegedly unlawful agency action are still APA claims, because both the waiver of sovereign immunity and the source of Plaintiffs' private right of action on their constitutional claims derive from the APA. *See* 5 U.S.C. § 706(2)(B) (the reviewing court may "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity").

Similarly, Plaintiffs claim that "[a]t this time, Plaintiffs are not moving to supplement the record." Pls.' Ltr. Mot. at 6. Again, Defendants do not fully understand this statement, but to the extent it is a belated concession that judicial review in this case may be, as is typical, limited to the administrative record (either with or without the documents Plaintiffs claim should be included), Defendants welcome it. Defendants are currently expending hundreds of hours per week processing and reviewing massive numbers of extra-record documents, and responding to interrogatories and requests for admission, as a result of Plaintiffs' discovery requests that go well beyond the administrative record. Extra-record documents have already been produced to Plaintiffs at their request, so Plaintiffs' sudden disclaimer of interest in those documents is hard to understand.

## IV.    Defendants' Pending Objection Letter Raises Potentially Overlapping Issues.

Finally, Defendants respectfully note that Defendants' objection letter regarding this Court's September 27, 2017 case-management and scheduling order, *Vidal* ECF No. 67, remains pending before Judge Garaufis. Although that letter focused primarily on Section II(c) of this Court's September 27, 2017 Order (which required the production of a privilege log along with the administrative record), the letter also raised broader arguments about the proper scope of judicial review in this case, including the breadth of the administrative record and any associated privilege log, and the propriety of any discovery beyond the administrative record. Judge Garaufis has stated his intent to rule on those broader objections no later than October 20, 2017, *see* Oct. 3, 2017 Order at 4, and that ruling is likely to inform this Court's analysis on at least some of the issues raised in Plaintiffs' motion to complete the administrative record. Of course, this Court has the authority to dispose of Plaintiffs' motion at any time. But in the interest of judicial efficiency, this Court may wish to await that forthcoming ruling from Judge Garaufis before addressing Plaintiffs' motion to complete the administrative record.

*        *        *

Defendants thank the Court for its consideration of this matter, and respectfully request that Plaintiffs' motion be denied.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar #995500)
KATE BAILEY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 305-8576
Fax:  (202) 616-8470
Email:  stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------------x
     MAKE THE ROAD NEW YORK and
 3   MARTIN JONATHAN BATALLA VIDAL,

 4                      PLAINTIFFS,

 5        versus                          16 CV 4756(NGG-JO)

 6   KATHY A. BARAN, ET AL,

 7                      DEFENDANTS.        U.S. Courthouse
                                          225 Cadman Plaza East
 8   -------------------------------------x Brooklyn, New York
                                          September 26th, 2017
 9                                        4:00 PM

10

11         TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
             BEFORE THE HONORABLE NICHOLAS GARAUFIS, USDJ
12                              and
                   THE HONORABLE JAMES ORENSTEIN, USMJ

13
                             APPEARANCES
14
     Attorneys for Plaintiffs:
15   JEROME N. FRANK LEGAL SERVICES ORGANIZATION
     P. O. Box 209090
16   New Haven, Connecticut  06520
     BY:  MICHAEL WISHNIE, ESQ.
17        MUNEER AHMAD, ESQ.
          MARISOL ORIHUELA, ESQ.
18        DAVID CHEN, LAW STUDENT

19   NATIONAL IMMIGRATION LAW CENTER
     3435 Wilshire Boulevard, Suite 1600
20   Los Angeles, California  90010
     BY:  KAREN TUMLIN, ESQ.
21        JUSTIN COX, ESQ.
          MAYRA JOACHIN, ESQ.
22        JESSICA HANSON, ESQ.

23   MAKE THE ROAD NEW YORK
     301 Grove Street
24   Brooklyn, New York 11237
     BY:  AMY TAYLOR, ESQ.

25
```

```
 1                    CONTINUED APPEARANCES

 2   Attorneys for the Plaintiff States:

 3   THE COMMONWEALTH OF MASSACHUSETTS
     OFFICE OF THE ATTORNEY GENERAL
 4   PUBLIC PROTECTION AND ADVOCACY BUREAU
     100 Cambridge Street, 11th Floor
 5   Boston, Massachusetts  02108
     BY:  GENEVIEVE NADEAU, ESQ.
 6
     ATTORNEY GENERAL OF WASHINGTON
 7   BOB FERGUSON
     800 5th Avenue, Suite 2000
 8   Seattle, Washington 98104
     BY:  COLLEEN MELODY, ESQ.
 9
     STATE OF NEW YORK
10   OFFICE OF THE ATTORNEY GENERAL
     ERIC SCHNEIDERMAN
11   120 Broadway
     New York, New York 10271
12   BY:  LOURDES ROSADO, ESQ.

13   Attorneys for Defendants:
     U. S. DEPARTMENT OF JUSTICE
14   CIVIL DIVISION - FEDERAL PROGRAMS BRANCH
     950 Pennsylvania Avenue, NW
15   Washington, DC 20530
     BY:  BRETT SHUMATE, ESQ.
16        STEPHEN PEZZI, ESQ.

17   U. S. ATTORNEY'S OFFICE
     EASTERN DISTRICT OF NEW YORK
18   CIVIL DIVISION
     271 Cadman Plaza East
19   Brooklyn, New York 11201
     BY:  JOSEPH MARUTOLLO, AUSA
20        SUSAN RILEY, CHIEF CIVIL DIVISION

21
     Court Reporter:
22   LISA SCHMID, CCR, RMR
     Official Court Reporter
23   225 Cadman Plaza East
     Brooklyn, New York 11201
24   Phone:  718-613-2644 Fax:  718-613-2379
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

```
 1              THE CLERK:  All rise.

 2              THE COURT:  Please be seated.

 3              THE CLERK:  Everybody on the Vidal matter, counsel,

 4    please state your appearances.

 5              THE COURT:  Appearances for plaintiffs in both

 6    cases.  Let's start -- go ahead, whoever wishes to go first.

 7              MR. AHMAD:  Good afternoon, Your Honor.  Muneer

 8    Ahmad from the Jerome N. Frank Legal Services Organization

 9    appearing for plaintiffs in the Batalla Vidal matter.

10              THE COURT:  All right.  I think we should put

11    everybody on the record this time.

12              MR. CHEN:  Your Honor, David Chen, law student

13    intern at Jerome N. Frank Legal Services Organization at the

14    Yale Law School.

15              THE COURT:  All right.

16              MR. COX:  Justin Cox with the National Immigration

17    Law Center for the Batalla Vidal plaintiffs.

18              MS. TUMLIN:  Karen Tumlin, National Immigration Law

19    Center, for the Batalla Vidal plaintiffs.

20              MR. WISHNIE:  Mike Wishnie, Jerome N. Frank Legal

21    Services Organization for the plaintiffs.

22              MS. TAYLOR:  Amy Taylor, Make the Road New York, for

23    the plaintiffs.

24              THE COURT:  Where are you from?

25              MS. TAYLOR:  Make the Road New York.
```

1              THE COURT:  Yes?

2              MS. ORIHUELA:  Marisol Orihuela, Jerome N. Frank

3    Legal Services Organization the Batalla Vidal plaintiffs.

4              MS. HANSON:  Jessica Hanson with the National

5    Immigration Law Center for the Batalla Vidal plaintiffs.

6              MS. JOACHIN:  Mayra Joachin, National Immigration

7    Law Center, for the Batalla Vidal plaintiffs.

8              MS. ROSADO:  Good afternoon, Your Honor.  Lourdes

9    Rosado.  I'm the Bureau Chief of Civil Rights in the Office of

10   New York State Attorney General Schneiderman, and I'm here on

11   behalf of the plaintiff states in the New York v. Trump case.

12             MS. MELODY:  Good afternoon.  Colleen Melody for the

13   State of Washington, Civil Rights Unit, here for the plaintiff

14   states.

15             MS. NADEAU:  Good afternoon.  Genovese Nadeau from

16   the Massachusetts Attorney General Civil Rights Division.

17             THE COURT:  All right.  Okay.  Welcome.

18             Yes?

19             MR. SHUMATE:  Good afternoon, Your Honor.  Brett

20   Shumate from the Department of Justice for the government.

21             MR. PEZZI:  Stephen Pezzi, also from the Department

22   of Justice, on behalf of defendants.

23             MR. MARUTOLLO:  Joseph Marutollo from the U. S.

24   Attorney's Office.  Good afternoon, Your Honor.

25             THE COURT:  Good afternoon.

1          All right.  I'm joined by Magistrate Judge James

2   Orenstein, who is also assigned to both of these cases.

3          And what I'd like to do first is, when we last met,

4   I asked Mr. Shumate to check on the position of his client as

5   to the scheduling of the different steps that the government

6   intended to implement regarding the DACA.

7          MR. SHUMATE:  Yes, Your Honor.  Thank you for

8   providing us an opportunity to consider your concerns.  I can

9   assure the Court, I took this back to our clients.  We

10  considered them carefully and extensively.

11         The Department of Homeland Security has ultimately

12  decided to maintain the October 5th deadline for DACA renewal

13  applications for those whose benefits expire between September

14  5th and October 5th.  That decision was not made lightly.  It

15  was considered extensively, and we appreciate the Court

16  sharing its concerns about that deadline.

17         Ultimately, the Department feels that the October

18  5th deadline was an appropriate deadline to promptly and

19  efficiently in an orderly matter wind down the program.  They

20  want to do it for equal treatment for all individuals who are

21  affected by the expiration of the DACA program.  So

22  ultimately, the Department wants to maintain that October 5th

23  deadline, Your Honor.

24         THE COURT:  Now, as I said the last time, I

25  understood that the executive branch had made a commitment to

1    members of the House and the Senate that it would pursue a

2    legislative solution -- I think arguably, at least according

3    to the minority leader of the House of Representatives -- that

4    would be resolved by the end of the year.

5            How does all this fit together, finding a

6    legislative solution while still pursuing a termination of the

7    program?  What is this?  I don't understand.  I just don't

8    understand.  So you'll have to explain it to me.

9            MR. SHUMATE:  Sure.  I can't really take a position

10   on what's going on in Congress right now, Your Honor, but I

11   think the best thing for us to do is maintain the current

12   schedule.

13           The government continues to believe that the

14   plaintiffs' claims suffer from significant defects on their

15   face and we would like to file a Motion to Dismiss.  We're

16   prepared to do so under the Court's existing schedule.

17           If by chance there is a legislative solution, then

18   we'll have to consider the impact on the Court's decision

19   here.  But ultimately, we don't think there is any reason for

20   the Court to move any more quickly than the schedule we've

21   already got.  If by some chance, Congress does act and enacts

22   some legislative fix, we can consider the effects on this case

23   at that time, Your Honor.

24           THE COURT:  Well, it wasn't Congress' commitment.

25   It was the President's commitment to the members of the

1   legislature. I don't know what Congress will do.

2          But is there a plan that we can all grasp at this

3   point from the branch of the government that you represent,

4   that might permit us to forebear on this whole judicial

5   process?  That's really what I want to know.

6          MR. SHUMATE:  Your Honor, unfortunately, I can't

7   speak to the legislative process or the executive branch's

8   view of the legislation.

9          THE COURT:  You are the executive branch.  You work

10  for the President.  You don't work for anybody else.  He's the

11  one who made the commitment, allegedly, and so you would know

12  whether his commitment is going to be pursued.  That's all I'm

13  asking.  Is this something that is going forward?

14         Look, as a practical matter, there are not only

15  800,000 people affected by what may happen here.  There are

16  literally millions of people because there are families.

17  There are children.  These people, some of them have children.

18  They have jobs.  They work in all kinds of pursuits.  They are

19  teachers.  They work in private industry.  They're making the

20  country stronger.

21         They don't know -- I have said it before in this

22  courtroom -- they don't know any other language.  They don't

23  know any other country.  And yet, they're sitting at home in

24  fear of being removed from the United States.  So this isn't

25  just -- this is a problem that's everybody's problem.

1      And the President -- the President of the United

2    States said that he was trying to find a solution for all of

3    these wonderful people who are contributing so much to

4    America.  These were -- I'm paraphrasing him, but, I think

5    it's a fair statement of his position.

6      And what I want to know is, what's the hurry?  They

7    have been here, some of them, for like 25 years, maybe more.

8    So my question is, who down there -- your client -- is

9    creating this interworem kind of situation for these people --

10   with you telling me that because it's about a regulation or a

11   rule or nonrule, that the Court has no jurisdiction, which is

12   what you told me the last time.

13     I'm just wondering.  What is the problem here?

14   Where -- this is a democracy.  We operate under a

15   Constitution.  These people have thrived in America -- and you

16   can't come into court to espouse a position that is heartless.

17     See, I don't understand that.  You know, I'm 68

18   years old.  I've worked in every branch of the federal

19   government.  I've worked in the executive.  I've worked in the

20   legislative branch, and I've worked in the judiciary, and I

21   have never seen a circumstance like this.

22     People need to work together.  They need to get with

23   the program.  They need to take care of good, decent people

24   who contribute to America.

25     And telling me that it can't wait -- can't even wait

1   until the end of the year.  You can't give anyone hope.  I

2   just don't understand it.  But I understand that that's your

3   position.  And the message has been received by the Court.  I

4   appreciate that you came to give that position.

5          It's unacceptable, quite frankly, to me, as a human

6   being and as an American.  I'm just glad that I was born in

7   Patterson, New Jersey and not in Mexico City, is all I can

8   say.

9          Please be seated.

10         We need to talk about the discovery.

11         MAGISTRATE JUDGE ORENSTEIN:  All right.  I've got

12  the parties' submissions.  I'm prepared to address the issue

13  based on the letters, but if there is something anybody

14  feels -- I don't -- I'm not inviting a regurgitation of what's

15  in the letters, but if there's something that you've come up

16  since submitting the letters or something in addition that's

17  left out, of course, I'll hear you briefly before I address

18  that issue.

19         MR. SHUMATE:  I just will say, Your Honor, Mr. Pezzi

20  will speak to this issue.

21         MAGISTRATE JUDGE ORENSTEIN:  Mr. Pezzi?  Go ahead.

22         THE COURT:  What is your job?

23         MR. PEZZI:  I'm a trial attorney in the Federal

24  Programs Branch of the Civil Division.

25         THE COURT:  How long have you been there?

```
 1              MR. PEZZI:  A little over a year.

 2              THE COURT:  And where were you before that?

 3              MR. PEZZI:  Before that, I was in the Washington,

 4   D.C. office of Kirkland and Ellis.

 5              THE COURT:  Kirkland and Ellis?  Okay.  Thank you.

 6              MR. PEZZI:  Thank you, Your Honor.

 7              Your Honor, we have set forth our position in the

 8   letter that we filed on Friday, as we said, and that remains

 9   the current statement of our position on discovery, how

10   discovery should proceed in this matter.

11              The only things that I would add right now is that

12   we do have some specific concerns at both a high level and

13   with some of the particular proposals in plaintiffs' letter,

14   which I'm happy to address now if Your Honor would like to

15   hear them.

16              And then the other piece of information that I would

17   offer is that we continue to have discussions with the

18   plaintiffs in the State of New York action to -- I've not had

19   an opportunity to file a letter quite yet.  My understanding

20   is they have a slightly different vision of how the schedule

21   may proceed in this matter which might affect the Court's --

22   might affect Your Honor's consideration of some of those

23   issues.

24              MAGISTRATE JUDGE ORENSTEIN:  Did you say you've got

25   issues with the proposal in the plaintiffs' letter?  You had
```

```
 1    that proposal at the time you submitted your letter, right?

 2              MR. PEZZI:  No, we submitted the letters

 3    simultaneously.

 4              MAGISTRATE JUDGE ORENSTEIN:  No, I know you

 5    submitted the letters before, but my understanding from the

 6    correspondence was that you made a meet and confer and

 7    actually discussed the plaintiffs' proposal?

 8              MR. PEZZI:  We discussed our positions on discovery,

 9    Your Honor.

10              MAGISTRATE JUDGE ORENSTEIN:  Excuse me, Mr. Pezzi.

11    Sorry to interrupt.  I wasn't understanding your answer.

12              Did you discuss with the plaintiffs the proposal

13    that made its way into the letter?

14              MR. PEZZI:  At a high level, Your Honor --

15              MAGISTRATE JUDGE ORENSTEIN:  The dates?

16              MR. PEZZI:  Excuse me, Your Honor?

17              MAGISTRATE JUDGE ORENSTEIN:  The dates?

18              MR. PEZZI:  We discussed some of the dates that

19    appeared on plaintiffs' proposal, not all of them.

20              MAGISTRATE JUDGE ORENSTEIN:  All right.  I guess

21    where I'm going with that is I will be somewhat less

22    sympathetic to matters that you knew about and are just

23    telling me you have objections to now, when you could have

24    done it in your letter.

25              But go ahead.
```

```
 1              MR. PEZZI:  Of course, Your Honor.  And just to be

 2    clear, the objections that I intended to raise right now was

 3    regarding issues that we were not aware of --

 4              THE COURT:  Okay.

 5              MR. PEZZI:  -- until the plaintiffs submitted the

 6    letter.

 7              THE COURT:  Go ahead.

 8              MR. PEZZI:  So one thing, Your Honor, I think

 9    plaintiffs' proposal has required us to object to any

10    discovery requests within one week --

11              THE COURT:  Yes.

12              MR. PEZZI:  -- notwithstanding we have two weeks to

13    respond to discovery.  We think that is not necessarily the

14    deadline and we would prefer that the objections and responses

15    come at the same time, at least two weeks from the service of

16    any request, to the extent we're going to be in discovery.

17              Similarly, Your Honor --

18              THE COURT:  Let me ask you this.  When do you plan

19    to start deporting the people who are not even qualified to

20    apply for a continuation of their work permits -- in other

21    words, people whose permits end after March 5th?  When is that

22    going to start, administratively?

23              MR. PEZZI:  Your Honor, I can't speak to the plans

24    of any of the Department of Homeland Security --

25              THE COURT:  Well, you work -- you're their lawyer.
```

1          MR. PEZZI:  I am their lawyer.

2          THE COURT:  What do you mean you can't speak to the

3    plans?  You mean these people should be put in a position

4    where they don't have an idea of when someone is going to

5    knock on their door and they're going to be yanked out of this

6    country?

7          MR. PEZZI:  (No response.)

8          THE COURT:  I mean, I'm just asking.  You're their

9    lawyer.

10          MR. PEZZI:  Your Honor, under the --

11          THE COURT:  I'm told you're not the President's

12    lawyer -- lawyers, but you are the Department of Homeland

13    Security's lawyers.  What does Ms. Duke have in mind for, you

14    know, these people -- who aren't even counted among the

15    800,000, some of them --

16          MR. PEZZI:  Your Honor --

17          THE COURT:  -- people who have never applied, for

18    instance, for the potential protection under DACA.  Do you

19    have any idea?

20          MR. PEZZI:  Your Honor, I can't speculate as to what

21    plans, if any, the Department of Homeland Security has in the

22    event, for example, that there is no legislative fix in the

23    next six months.  That is not something that I'm aware of and

24    I'm not sure if this is something the Department of Homeland

25    Security is aware of.  It would be speculation on my part.

1              THE COURT:  Well, you come in here and you work for

2      the -- you're their lawyer.  You're the Department's lawyer.

3      You must have expected that a guy like me would be asking

4      someone like you about what your plans are, so that we can

5      figure out whether there is some immediacy that we must

6      address.  Right?

7              MR. PEZZI:  Your Honor, the only thing I would add

8      is that the expiration of the DACA policy or the expiration of

9      DACA status as to any particular individuals, of course, is

10     not necessarily meaning that removal proceedings begin

11     immediately or at all.  There are still priorities set by the

12     Department of Homeland Security, and some of the

13     considerations that Your Honor expressed earlier may very well

14     be on the minds of the folks over at the Department of

15     Homeland Security.  So unfortunately, I have no more detail.

16             MAGISTRATE JUDGE ORENSTEIN:  But I take it -- and

17     Judge Garaufis' point goes very much to what I'm concerned

18     about in terms of setting a discovery schedule, if that's

19     indeed where we go -- I guess in the absence of more specific

20     information, I should assume that the people who would be

21     impacted by the resolution at this case will be impacted as of

22     March 5th, and that whatever is going to happen in court has

23     to be resolved by then, if it's going to have meaningful -- if

24     it's going to provide meaningful relief for those who are

25     entitled to it, correct?

```
 1              MR. PEZZI:  Your Honor, certainly, March 5th will be
 2    a significant date.
 3              MAGISTRATE JUDGE ORENSTEIN:  I didn't ask, sir, if
 4    it's a significant date.  I think we can all understand from
 5    this proceeding that it is.
 6              I'm asking you if it's fair to assume, in the
 7    absence of more specific information, that we need to build a
 8    schedule that resolves all the issues in the case by March
 9    5th, so that if the plaintiffs are entitled to relief, it is
10    meaningful.  Fair assumption?
11              MR. PEZZI:  Understood, Your Honor.  Yes.
12              MAGISTRATE JUDGE ORENSTEIN:  Okay.  So we'll assume
13    that, absent some other news that you give us, that the
14    deportations start at least for some people on March 5th.
15              MR. PEZZI:  Your Honor, to be clear --
16              MAGISTRATE JUDGE ORENSTEIN:  So would you tell me,
17    please, the concerns that you have about the discovery
18    schedule?  You don't want to give objections before you
19    provide responses.  Anything else?
20              MR. PEZZI:  Yes.  I'm happy to offer some other
21    things, but quickly, Your Honor, just to be clear, I don't
22    want to be misunderstood as representing that deportations
23    will start on March 5th.
24              THE COURT:  No.  I get it, sir.  And please move on.
25    You have been clear.  You won't tell us anything beyond that.
```

1    And I'm just telling you that until you give us something more

2    specific, I think we have to assume that these proceedings

3    must conclude by March 5th in order not to be moot.

4              MR. PEZZI:  Understood, Your Honor.

5              As to the discovery schedule that appears in

6    plaintiffs' letter --

7              THE COURT:  Yes?

8              MR. PEZZI:  -- I think most importantly, the

9    discovery that plaintiffs are proposing is in large measure

10   premised on the idea that the administrative record will in

11   some way be deficient for Your Honor's consideration of this

12   case.  I think that is a premature objection to lodge before

13   we have had the opportunity --

14             THE COURT:  Well, can you tell me what -- what

15   administrative record are we talking about?

16             First off, who are the decision makers?

17             MR. PEZZI:  So plaintiffs are challenging the

18   decision by the Department of Homeland Security for rescinding

19   DACA's memorandum of June 2012.  So that's a decision by the

20   Department of Homeland Security.

21             MAGISTRATE JUDGE ORENSTEIN:  Well, as I read the

22   complaint, they also talk about a decision by the Department

23   of Justice now.  That's what's alleged.

24             MR. PEZZI:  They have made statements to that

25   effect, Your Honor.  Our position is that the Department of

```
1   Homeland Security is the agency that has taken the action --
2           THE COURT:  So you will -- just so I understand, the
3   administrative record will be confined to records from the
4   Department of Homeland Security, won't include any decision
5   making records from -- or information from the Department of
6   Justice or from the White House?
7           MR. PEZZI:  No, Your Honor.  That's not what I'm
8   saying.
9           MAGISTRATE JUDGE ORENSTEIN:  Okay.  What are you
10  saying?
11          MR. PEZZI:  I'm saying that the administrative
12  records will contain all of the documents that were relied
13  upon by the Secretary of Homeland -- the Acting Secretary of
14  Homeland Security, Elaine Duke, when she rescinded the
15  memorandum.
16          Some of those materials may very well come from
17  beyond the Department of Homeland Security.  For example, in
18  the memorandum itself, it explicitly mentions a letter from
19  the Attorney General.
20          As to any specific content of the administrative
21  record, I'm not yet in a position to make clear
22  representations about what --
23          MAGISTRATE JUDGE ORENSTEIN:  Fair enough.
24          MR. PEZZI:  -- is included.
25          But to the extent materials other than Department of
```

 1   the Homeland Security materials were considered by the

 2   decision maker and to the extent the materials were not

 3   privileged, they will be included.

 4          MAGISTRATE JUDGE ORENSTEIN:  Okay.  You mentioned

 5   the Attorney General.  He is not a decision maker, correct?

 6          MR. PEZZI:  That's correct, Your Honor.

 7          MAGISTRATE JUDGE ORENSTEIN:  He's announced the

 8   decision?

 9          MR. PEZZI:  My understanding is that the decision

10   was announced via memo from the Department of Homeland

11   Security.  There were some contemporaneous statements by the

12   Attorney General and perhaps in some other --

13          THE COURT:  Contemporaneous statements broadcast to

14   the public providing information was not an announcement,

15   though.  I just want to make sure I understand the words the

16   way you're using them --

17          MR. PEZZI:  Sure, Your Honor.

18          MAGISTRATE JUDGE ORENSTEIN:  -- in case they don't

19   match up with the way I'm using them.

20          MR. PEZZI:  I'm not sure I would call it an

21   announcement, but regardless of whether it's an announcement

22   or not, the unlawful agency action that plaintiffs allege took

23   place was a decision of the Department of Homeland Security.

24          MAGISTRATE JUDGE ORENSTEIN:  Okay.  So your concern

25   is that they want information beyond what you will choose to

```
 1    turn over in the administrative records?  I understand that

 2    concern.  What else?

 3              MR. PEZZI:  Your Honor, they've proposed biweekly

 4    status conferences to resolve discovery disputes.  Perhaps I'm

 5    more optimistic than they are that we will be able to work

 6    collaboratively to resolve those disputes as they arise.

 7              MAGISTRATE JUDGE ORENSTEIN:  Yes.

 8              MR. PEZZI:  I hope they don't arise and I hope they

 9    are limited, based on the representations that we've heard

10    from plaintiffs so far about the sort of discovery they're

11    interested in, which hasn't been as specific as we would like,

12    to fully understand the scope of discovery they would like to

13    take.

14              There may be some issues that need to be resolved by

15    motions practice or otherwise.  We just think at this time, we

16    would take a more optimistic tone, and I assume we'll be able

17    to work out --

18              THE COURT:  I think that I can ask to put things on

19    the calendar and take them off if there's no dispute to be

20    resolved.

21              MR. PEZZI:  If that you're preference, Your Honor.

22    That's fine from our perspective.

23              THE COURT:  All right.  Anything else?

24              MR. PEZZI:  Your Honor, their letter mentions expert

25    discovery.
```

 1          THE COURT:  Yes?

 2          MR. PEZZI:  I'm not sure what the basis for any

 3  expert discovery or expert testimony would be in this case.

 4          THE COURT:  Uh-huh (affirmative response).

 5          MR. PEZZI:  So we would ask that there not be any

 6  particular time period set for expert discovery, absent

 7  further showing of the plaintiff.

 8          MAGISTRATE JUDGE ORENSTEIN:  All right.  Anything

 9  else?

10          MR. PEZZI:  And then lastly, Your Honor, their

11  letter focuses on the idea of privilege logs and requiring a

12  specific date by which we produce a privilege log.  I think

13  there are two issues there they mentioned.

14          One is, a privilege log is typically not accompanied

15  by the administrative record.  Privileged documents are not

16  part of the administrative record.  We would object to the

17  requirement to produce a privilege log simultaneously with the

18  administrative record.

19          MAGISTRATE JUDGE ORENSTEIN:  Well, wait, wait, wait.

20  I take it there may be some records that were considered in

21  the decision making process as to which you will assert

22  privilege.  No?

23          MR. PEZZI:  Your Honor, to the extent privileged

24  documents were considered by the Department of Homeland

25  Security, those are not part of the administrative record.

```
1              MAGISTRATE JUDGE ORENSTEIN:  Sir, it's going to be

2     so much easier if you answer the questions that I ask.  I hope

3     we'll do that going forward.

4              I take it the decision making process included the

5     consideration of some records as to which you will assert

6     privilege, is that correct?

7              MR. PEZZI:  That may be right.  That may be correct,

8     Your Honor.  That is something that I would have to --

9              MAGISTRATE JUDGE ORENSTEIN:  Look, I don't ask you

10    to speculate.  I ask you to tell me things that you without a

11    doubt know, because you wouldn't be here standing up for the

12    government on this if you weren't already familiar with the

13    administrative record that you're talking about.  Am I correct

14    in that assumption?

15             MR. PEZZI:  You're not, Your Honor.

16             MAGISTRATE JUDGE ORENSTEIN:  No?  Okay.

17             MR. PEZZI:  The administrative record is still being

18    compiled --

19             MAGISTRATE JUDGE ORENSTEIN:  Who here representing

20    the government is familiar with the administrative record that

21    will have to be produced?

22             MR. PEZZI:  Your Honor, the administrative record is

23    in the process of being complied by the relevant agency

24    officials.

25             MAGISTRATE JUDGE ORENSTEIN:  Okay.
```

1          MR. PEZZI:  That is, of course, something that we

2     will be working with our agency client to complete as soon as

3     possible.

4          MAGISTRATE JUDGE ORENSTEIN:  All right.  What's your

5     next point?

6          MR. PEZZI:  But I can't make any representations

7     about the content.

8          THE COURT:  I understand what you're telling me.

9          Move on to your next point, please?

10         MR. PEZZI:  And then the second point on the

11    privilege log issue, Your Honor, is that we would -- the

12    federal rules don't apply to any particular date as to the

13    production of the privilege log.  So to the extent plaintiffs

14    were suggesting -- and I don't think it's clear from the

15    letter -- that every sort of document production would be

16    accompanied by a privilege log on that day, our preference

17    would be a privilege log could be compiled at the end of the

18    document production, to the extent that --

19         THE COURT:  From the plaintiffs, any issue you want

20    to raise that aren't in the letters?

21         MR. COX:  Thank you, Your Honor.  Justin Cox for the

22    plaintiffs.

23         I think we've pretty much covered our view of things

24    in the letter.  The only thing that I would add is, you know,

25    the administrative record we, of course, do think that the

1    Department of Justice, it is important to include the

2    materials from them, as well.

3              MAGISTRATE JUDGE ORENSTEIN:  I don't hear Mr. Pezzi

4    saying that they won't be included necessarily, just that they

5    want to have a label on things and that is the label they will

6    give the administrative record is one that is produced by the

7    Department of Homeland Security.  I take it includes records

8    produced by -- created by the Justice Department or anybody

9    else who is involved.  The label on it doesn't matter to you,

10   does it?

11             MR. COX:  That's correct, Your Honor.

12             MAGISTRATE JUDGE ORENSTEIN:  Okay.

13             MR. COX:  The label doesn't matter.  The only thing

14   that we care be about are the records that the Department of

15   Justice considered when reaching the conclusion that appears

16   to form the basis for the entire termination of DACA, which is

17   that it is allegedly unconstitutional or otherwise unlawful.

18             With regards to the schedule that the defendants

19   propose in their letter, you know, it seems to have the idea

20   that there's just going to be one set of document request.  We

21   think it needs to be a little bit more of a material process.

22             MAGISTRATE JUDGE ORENSTEIN:  Yes.

23             MR. COX:  We hope to narrow things, of course, from

24   the beginning.

25             You know, with regard to expert reports, I don't

 1  really understand why we wouldn't have that option.  The Court

 2  can, of course, consider or not --

 3          THE COURT:  Do you have any experts -- not by name

 4  necessarily, but types of expertise in mind?

 5          MR. COX:  Well, Your Honor, there could be -- we

 6  think there could be expert reports on historical background,

 7  which is a factor that is considered in the *Arlington Heights*

 8  analysis or someone who could talk about the history of

 9  deferred action, the use of deferred action, to help

10  contextualize the DACA program and the decision to end it.

11          But I think in general, Your Honor, we have covered

12  the issues that we think --

13          THE COURT:  Okay.

14          MR. COX:  Yeah.

15          THE COURT:  And anybody from the State of New York

16  versus Trump plaintiffs?  I haven't received a letter from

17  you, but anyone?  Ms. -- forgive me.  Ms. Rosado?

18          MS. ROSADO:  Ms. Rosado, that's right, Your Honor.

19  Thank you.  Yes.  On behalf of the plaintiff states.

20          So we did participate in the meet and confer --

21          MAGISTRATE JUDGE ORENSTEIN:  Yes?

22          MS. ROSADO:  -- with the Batalla Vidal parties on

23  the 20th.  We at that time informed the government that we

24  were  planning to file an amended complaint on Wednesday,

25  October 4th.  From there, we wanted to calculate our schedule.

1          They informed us after the conference that they

2     would be amenable to a thirty-day -- thirty days after our

3     amended complaint to file their Motion to Dismiss our action.

4          Then after that point, we were able to give them

5     yesterday afternoon our thinking around discovery, in terms of

6     what we need.  And the timeline, we start off very similar to

7     what was laid out in the Batalla Vidal letter to you, that we

8     want to start discovery right away at the end of this week,

9     given the deadline that we are facing.

10          We also would like to -- we look forward to getting

11     the administrative record and we understand the government is

12     going to produce -- on the 6th.

13          We would, again, as Mr. Cox was saying that we are

14     very interested in his read up statements and allegations in

15     our complaint that go to specifically statements made by White

16     House and DOJ officials about participation in that decision

17     making.  We hope that the administrative record does reflect

18     that decision making when we see it.  But we will, of course,

19     be reserving the right to seek further discovery on the

20     administrative record if it's not there.

21          But generally we laid out a deadline, our timeline

22     that starts the discovery later this week.  The plaintiffs

23     also informed DOJ that we would go along with the same

24     deadlines that Batalla Vidal plaintiffs articulated in their

25     letter, and that we would expect objections to be served

1   within about a week after we serve -- serve our discovery,

2   with the goal that two weeks later, we would receive the

3   responses.

4           And the timeline we basically set forth to DOJ

5   yesterday was ending discovery around mid-November, a little

6   bit earlier than Batalla Vidal plaintiffs.

7           MAGISTRATE JUDGE ORENSTEIN:  We have, I believe,

8   November 15th for fact discovery, if I'm not mistaken.

9           MS. ROSADO:  December 15th in Vidal -- so we were

10  just ending a little earlier based on some strategic choices

11  we made about what kind of discovery we're going to seek to

12  share with the government.

13          THE COURT:  Can you be done by that --

14          MAGISTRATE JUDGE ORENSTEIN:  Okay.

15          THE COURT:  -- schedule, by November 15th?

16          MS. ROSADO:  I think we can, Your Honor, in terms of

17  discovery, if the government is cooperative.  Obviously, we're

18  anticipating serving document request interrogatories and at

19  least one 30(b)(6) notice, but we do think we can be done by

20  then.

21          MAGISTRATE JUDGE ORENSTEIN:  All right, folks.  I've

22  considered the arguments in the letter -- in the letters, I

23  should say.  I believe we need to have discovery go forward,

24  notwithstanding dependency or anticipated dependency on the

25  Motion to Dismiss.

```
 1              And in the absence of more specific counterproposals

 2    from the defendants as to specific deadlines, I'm going to

 3    adopt the Batalla Vidal plaintiffs' proposed schedule.

 4              It is a quick schedule.  I note it's not quite as

 5    quick as what some of you at least are facing in the Northern

 6    District of California, where I think you've got what, 'til

 7    the beginning of November to complete discovery, if I'm not

 8    mistaken?  In any event, don't pause on that.

 9              Look, I'm -- the decision I'm making here is very

10    much driven by decisions that you folks are making at the

11    defense table, which is exercising your prerogative not to

12    move any deadlines that have been created, but I think if

13    we're not going to moot this case out and have basically a

14    judgment because we can't get the record completed -- which

15    wouldn't be fair to anybody -- we have to get discovery done

16    on an expedited basis.

17              So I'm going to adopt that schedule.  There are

18    clearly going to be a number of areas on which you disagree,

19    and I'll try to give some guidance now, but I do think it will

20    be terribly useful to have regular meetings.  They'll be in my

21    courtroom.  It will just be part of the discovery process,

22    unless there's some other reason to meet with Judge Garaufis.

23              The dates that you proposed, biweekly, starting on

24    October 13th runs into some problems.  We've got Veteran's

25    Day.  We've got Thanksgiving Friday.  I want to ask all of you
```

1   to confer.  Is there some particular importance to having the

2   conference on Fridays that I'm missing?

3              MR. COX:  No, Your Honor.

4              MR. PEZZI:  No.

5              MAGISTRATE JUDGE ORENSTEIN:  So let's not worry

6   about doing it on Fridays.  I will -- to the extent possible,

7   I will adjust my schedule because I know you've got a lot of

8   schedules to work out.  Come up with some biweekly proposals.

9              But what I'm going to ask you to do is, a week

10  before the conference, if you think this is workable -- I'm

11  happy to hear a counterproposal -- but a week before the

12  conference, give me a joint status report that just goes

13  through the disputes that you think are ripe for resolution at

14  the next conference.

15             I think, despite your optimism, Mr. Pezzi -- I hope

16  you're right -- but I think we're going to have a lot of

17  issues to resolve, and I want to have a regular schedule,

18  getting through those that are ripe and moving on to the next

19  one.

20             To that end, I think you're going to identify on the

21  defense side -- frankly, on both sides -- you're going to

22  identify objections that you have to the requests that you're

23  facing a lot sooner than you'll compile the records that are

24  responsive to those requests.  So I think it does make sense

25  to have a staggered schedule, where a week after the request

1    is served, you serve objections and then, a week after that,

2    you serve responses.

3           With respect to a privilege log, again, largely

4    driven by necessity, getting this resolved in time to have

5    meaningful relief, if there's relief to which the parties are

6    entitled, we need to sort that out.

7           So if you're going to be -- and I want to make sure

8    I'm very good -- I'm not talking about things that are

9    withheld from the administrative record because I don't want

10   to run up against your definition of what's withheld and

11   what's simply not in the record.

12          If there are records, there's information that was

13   considered in the decision making process, whether or not you

14   believe it to be part of the record, the administrative

15   record.  If there are such records that exist and are not

16   being included in the administrative record based on a claim

17   of privilege, I expect there to be concurrent with the

18   services of the record a privilege log that conforms to the

19   local rules.  You can look them up on our website, the local

20   rules that have fairly detailed instructions about what must

21   go into a privilege log.

22          So I'll adopt in all other respects the interim

23   deadlines that were set forth in the Batalla Vidal plaintiffs'

24   proposal.

25          One other issue I want to raise ancillary to that, I

1    saw that the order from Judge Alsup scheduling essentially a

2    tutorial session in the California case.  We have been in

3    touch with the court in California.  Judge Garaufis is on

4    trial and unavailable, but I am available and I'm willing to

5    make arrangements, in the absence of any objection -- if there

6    is one, please let me know -- but I think just to help me get

7    up to speed on the issues in this case, I'm going to attend by

8    video conference.  Does anybody have objection to that?

9              MR. PEZZI:  No objection.

10             MR. COX:  No, Your Honor.

11             MAGISTRATE JUDGE ORENSTEIN:  All right.  Can I have

12   from you by Friday the proposed schedule for biweekly

13   meetings?  And I will issue a scheduling order that reflects

14   the rulings that I've made here today.

15             Anything else, folks, that you think we need to

16   address on discovery-related issues?

17             MR. COX:  Just one matter, Your Honor.  We were

18   wondering if it would possible for depositions, if we could

19   simply notice a deposition for a particular, you know, DHS

20   employee or if we need to issue a subpoena.  We're happy to

21   talk about that, but I didn't know, Your Honor, if that is

22   something that you want to talk about.

23             MAGISTRATE JUDGE ORENSTEIN:  Well, I wanted -- this

24   is simple between two issues.  One is whether you have

25   deposition or not, I understand there is going to be

1    objections to that.  You don't want to go beyond the

2    administrative record.  We'll work that out.  You'll T up the

3    dispute.

4              But as to -- I'll turn to Mr. Pezzi, I guess, in the

5    first instance between a subpoena and a notice, to the extent

6    depositions are allowed, do you care?

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. PEZZI:  We don't, Your Honor.  We're far more

2     interested just to know as soon as possible that that needs to

3     be -- that Plaintiffs are received and deposed.  You know, it

4     will allow us to form a position, and if there's going to be,

5     let us know as early as possible, and not --

6          JUDGE ORENSTEIN:  And look, folks, you have got a

7     lot on your plates, and I do hope you will work things out.

8     But given the very -- it is going to be a very quick six

9     months, or less, really.  So as much as I encourage you to

10    work things out, even more I encourage you to figure out as

11    quickly as possible if you are going to reach an impasse, and

12    as soon as you recognize that, tee it up.  Let's not have

13    things bog down and Well, we think we can still work it out,

14    all right?

15         All right.  Anything else on the discovery before I

16    turn it back to Judge Garaufis?  I know he wants to discuss

17    motion dates at the end of the process.

18         JUDGE GARAUFIS:  Yes, okay.  Thank you very much.

19         JUDGE ORENSTEIN:  Thank you.

20         JUDGE GARAUFIS:  In the California case, I have got

21    the District Court's case management order, and it indicates

22    that motions for summary judgment, provisional relief for the

23    dismiss are due by noon on November 1st.  And I am wondering

24    whether we need to adjust our schedule or not with regard to

25    motion practice since there is a parallel case in California

1    and there is only so much person power to deal with all these

2    cases.  So let me hear from both sides on that.  The

3    Government wants to make a motion to dismiss.  We have got

4    discovery going on.  Anything from the plaintiffs on this?

5              MR. CHEN:   Thank you, Your Honor.  Plaintiffs are

6    amenable to the current schedule that has been ordered in the

7    Batalla Vidal case.  But of course, if the Court decides to

8    move more expeditiously, the plaintiffs are also amendable to

9    that well.

10             JUDGE GARAUFIS:   Well, technically, no action -- I

11   expect no action will be taken against any individual between

12   now and March 5th.  I might be wrong on that, but my concern

13   is to resolve the issues so they do not become moot before

14   March 5th and to queue this case up for appellate review by

15   March 5th so that you can take whatever measures you need to

16   take in the Circuit Court and put it before that Court for its

17   consideration.

18             So I am just wondering, there was some discussion

19   about requesting some sort of preliminary relief, and I would

20   like to at least get an initial statement from Plaintiffs as

21   to whether and under what circumstances that kind of

22   application could be made, and that is irrespective of a

23   motion to dismiss, obviously, because it -- the two do not

24   necessarily have to be on the same track.

25             MR. CHEN:   Your Honor, we think that -- one point

```
 1    that we are concerned about right now is the October 5th
 2    deadline.  We do think that individuals who are unable to meet
 3    that deadline will be hurt because if their DACA status
 4    expires between October 5th and March 5th and they have missed
 5    that deadline, then they will be subject to deportation.  And
 6    so as a result of that in the last status conference,
 7    Plaintiffs had expressed that they may be -- we may be ready
 8    to move and seek emergency relief in the form of a temporary
 9    restraining order.  We are still prepared to do that,
10    Your Honor, and we are --
11              JUDGE GARAUFIS:  It would be motion for a
12    preliminary injunction.  At this point, a TRO probably would
13    not be in the cards.  You are not applying ex parte on this.
14    You have got the opposition right here in the room.  I would
15    expect that they would be noticed and they would have an
16    opportunity to respond and that we could hold a hearing on a
17    preliminary injunction.
18              What I am asking is whether this is a real or
19    technical concern on your part, at least at this point?
20              MR. CHEN:   Your Honor, we do --
21              JUDGE GARAUFIS:   Why wouldn't someone in that
22    category of individuals who could apply for a renewal of a
23    work permit apply -- during the period of October 5th to
24    March 5th, go ahead and do so in any event?
25              MR. CHEN:   Your Honor, so the way that the DACA
```

```
 1   termination memo works prevents individuals from filing
 2   renewal applications after the October 5th deadline if they --
 3   if they miss that deadline through reasons that they can't
 4   control.  For example, there is an onerous $495 filing fee.
 5   They need to gather necessary records in order to file for
 6   renewal, and because of that, the abrupt announcement of that
 7   deadline, we believe that there are many DACA recipients who
 8   will be unable to renew.  And we think that there is a real
 9   danger there that if they cannot renew by that deadline and
10   their DACA permit expires, they will be put in danger and no
11   longer have that protection from deportation.
12            In the alternative, Your Honor, in the alternative
13   to a TRO motion, Plaintiffs were proposing that the Court
14   could issue an order to Defendants to show cause why the
15   October 5th deadline should not be -- should not be enjoined.
16   And the Court could direct the Government to file that
17   response by, say, Friday, September 29th, and Plaintiffs could
18   respond by Monday, October 2nd giving the time Court -- giving
19   the Court time to consider the papers and potentially grant
20   relief before the October 5th deadline, Your Honor.
21            JUDGE GARAUFIS:  Anybody from the State Plaintiffs
22   want to speak on that issue?
23            MS. ROSADO:  Thank you, Your Honor.  Lourdes Rosado,
24   again, on behalf of the Plaintiff States.
25            And we certainly are dismayed to hear that
```

1   the Government is not extending that October 5th deadline and

2   shares the same concern for the people in our states.

3          We would definitely -- I would have to check back

4   with our other states since we are representative of 16 states

5   about joining in such an order, but we can say that we

6   definitely support the \intent\intend of the Batalla Vidal

7   Plaintiff in pursuing -- pursing that relief.

8          JUDGE GARAUFIS:  One of my concerns is that if we

9   are going to go forward with these cases, that we provide a

10  full record to the U.S. Court of Appeals.  And that is, I

11  think, in deference to the dealing justice in this case, we

12  need to have a full record.  So I am, at least at this point,

13  disinclined to exercise any kind of extraordinary relief.  But

14  I will take your motion if you wish to make it.  But I warn

15  you that the solution to this circumstance, this situation

16  is better achieved by a more derivative process.  If we are

17  not going to have a derivative process from the executive

18  branch and we are being forced to act more expeditiously, than

19  we will act.  But I am very concerned about getting full

20  discovery here, and so what I am going to do is I am going

21  to move the motion schedule.

22          (Pause in proceedings.)

23          JUDGE GARAUFIS:  All right.  I am going to move the

24  motion schedule.  Motions for summary judgment to dismiss and

25  provisional relief, if any, are due no later than

1   December 15th.  Opposition is due no later than January 13th.

2   Oral argument will take place on January 18th.  I do not need

3   replies.  I just need you here.

4          If for any reason a party needs to make an emergency

5   motion, please feel free to do so at any time.  I assure you

6   that any ordinary motions such as a motion to dismiss or

7   summary judgment is not going to be decided until after the

8   first of the year.  I understand what the problems are, but I

9   really believe that we need to have full discovery here.  We

10  need to review whatever there is of an administrative record

11  and review any depositions that are held.  So the judicial

12  branch needs to work in an orderly but expeditious way in this

13  case.  The next critical date, I believe, may be March 5th.

14  You can convince me I am wrong possibly, but what I am really

15  trying to do is take this out of the political realm and put

16  it into the judicial realm.

17         So that is the new schedule.  If you decide to make

18  a motion to dismiss tomorrow, do not expect to get an answer

19  by next Wednesday.

20         MR. CHEN:  Your Honor, if I could clarify one thing

21  regarding the schedule?

22         The last -- in the last order that this Court

23  issued, there was a matter of a motion for class

24  certification, and that was scheduled for -- to be -- to be

25  submitted by Plaintiffs on October the 20th.  And so the

1    schedule that you had just proposed, I believe omitted that

2    motion for class certification.  So I was just --

3              JUDGE GARAUFIS:  I will reconsider that as well.

4              MR. CHEN:  Okay.

5              JUDGE GARAUFIS:  I am not sure how we will fit that

6    in, but at this point -- well, you have your Second Amended

7    Complaint, which I have reviewed.  You have expanded the

8    number of plaintiffs.  There are various categories

9    of potential injury.  Some of them will automatically be

10   injured as a result of the order from the Department of

11   Homeland Security who stand no chance of having their work

12   permits extended two or three years.  So I think whether or

13   not we have a class action or we just leave it as it is, any

14   relief that is provided by the Courts would necessarily apply

15   to many, many people.

16             But a motion for class certification, we will give

17   you a schedule for that as well, but I am not going to do it

18   today.

19             MR. CHEN:  All right.  Thank you.

20             JUDGE GARAUFIS:  Is there anything else from    you

21   -- oh, and the other thing is that even though Judge Orenstein

22   and I are together on the bench, we are doing this for

23   efficiency, and obviously, if any party objects to a decision

24   by Judge Orenstein on discovery, they can always take an

25   appeal to the District Court.  I will point out that we have a

1  group of magistrate judges in this district who are truly

2  extraordinary.  I may have had two appeals from a magistrate

3  judge's discovery order in 17 years.  And what that basically

4  says is they know the extent and the limits of their authority

5  and they are good shepherds of their cases.  So that goes for

6  Judge Orenstein and everybody else who is a magistrate judge

7  in the Eastern District of New York.

8          So is there anything else for today from -- well,

9  yes sir?

10          JUDGE ORENSTEIN:  Well, just on that point:  To the

11  extent any party anticipates seeking Judge Garaufis's review

12  of a discovery order that I issue, we need to figure out a

13  schedule.  Again, because of timing concerns, we are not going

14  to leave it to the full 14 days that would otherwise be

15  provided under the rules.  I will consult with you about a

16  shorter schedule, but I anticipate a very tight schedule for

17  seek and review again to make sure that we can get everything

18  done.

19          So go ahead.

20          MR. PEZZI:  Understood, Your Honor.

21          On the issue of efficiency with regard to the

22  schedule Your Honor has ordered, we're comfortable with that

23  schedule.  The only thing that I would ask is that the

24  plaintiffs work collaboratively; and indeed, I think because

25  the legal issues in the two cases are, perhaps not completely

1  identical, but almost identical and certainly significantly

2  overlapping, that the plaintiffs submit a joint brief of some

3  sort.  That's what the plaintiffs are doing in the California

4  matters.  And we think that that would be a more efficient way

5  to present the issues to Your Honor for decision.

6          JUDGE GARAUFIS:  All right.  Thank you.

7          Well, I used to work for the State Attorney

8  General's Office in the dark ages, in the prehistoric ages,

9  and I think that I would be the last person in the world to

10  tell the Attorney Generals of 16 states how to put forward

11  their position.  You have got two separate -- these are truly

12  two separate cases brought by two disparate entities, in

13  effect.  To the extent that the issues are identical, I will

14  leave it to the parties, to the various plaintiffs to try to

15  work that out.

16          But to the extent that you need to have separate

17  briefs, I leave that to you to work that out.  It would be

18  more efficient, obviously, taking your suggestion, to have a

19  joint brief, but it is also very difficult to do, particularly

20  where we are under such an exquisite set of time constraints

21  as we are today.  Ordinarily, we could do better, but I will

22  leave it to the people at Plaintiffs' table to work that

23  through to try to coordinate their efforts as best as

24  possible.

25          Now, the judge -- the judge in the Northern District

```
 1   of California set a date for trial, I think in the beginning
 2   of February, for a bench trial.  If there are any issues that
 3   needed to be resolved at a bench trial, I am not going to set
 4   any date for any trial unless I find after reading your papers
 5   that a bench trial is needed.  So you can, you know, do your
 6   trial preparation for Judge Alsup in California, but we will
 7   let you know if we need anything more from anyone.  If the
 8   papers suffice, then we will decide on the papers.
 9            Is there anything else from the United States
10   Government?
11            MR. SHUMATE:   No, Your Honor.  Thank you.
12            JUDGE GARAUFIS:  Okay.  Is there anything else from
13   any of the plaintiffs?
14            MS. ROSADO:  No, Your Honor.
15            MR. CHEN:   No, Your Honor.
16            JUDGE GARAUFIS:  Okay.  Well, thank you for coming
17   up to New York.  It is always nice to see you.
18            MS. ROSADO:  Thank you.
19            JUDGE GARAUFIS:  Have a good day.
20            MR. CHEN:  Thank you.
21            MS. ROSADO:  Thank you, Your Honor.
22            JUDGE ORENSTEIN:  Have a good day.
23            (Matter concluded.)
24                       --oo0oo--
25
```

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
    -------------------------------x
 3                                  :
    MARTIN JONATHAN BATALLA VIDAL,  :    16-CV-4756 (NGG)(JO)
 4                                  :
             Plaintiff,             :    United States Courthouse
 5                                  :    Brooklyn, New York
           -against-               :
 6                                  :    October 11, 2017
    KATHY A. BARAN, ET AL.,         :    2:00 p.m.
 7                                  :
             Defendants.            :
 8                                  :
    -------------------------------x
 9                                  :
    STATE OF NEW YORK, ET AL.,      :    17-CV-5228 (NGG)(JO)
10                                  :
             Plaintiffs,            :
11                                  :
           -against-               :
12                                  :
    DONALD J. TRUMP, ET AL.,        :
13                                  :
             Defendants.            :
14                                  :
    -------------------------------x
15
           TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
16           BEFORE THE HONORABLE JAMES ORENSTEIN
             UNITED STATES MAGISTRATE DISTRICT JUDGE
17

18  APPEARANCES

19  For Badalla Vidal:     NATIONAL IMMIGRATION LAW CENTER
                                1121 14th Street - Suite 200
20                              Washington, D.C. 20005

21                         BY:  JOSHUA ROSENTHAL, ESQ.
                                MARISOL ORIHUELA, ESQ.
22

23                         JEROME N. FRANK LEGAL SVCS. ORG.
                                P.O. BOX 209090
24                              New Haven, Connecticut 06520

25                         BY:  VICTORIA ROECK, Law Student/Intern
```

LAM     OCR     RPR

2

```
 1   APPEARANCES (continued)

 2

 3   For States:              STATE OF NEW YORK
                              OFFICE OF THE ATTORNEY GENERAL
 4                                120 Broadway
                                  New York, New York 10271
 5
                              BY:  SANIA KHAN, ESQ.
 6                                 DIANE LUCAS, ESQ.

 7

 8   For Defendants:          U.S. DEPARTMENT OF JUSTICE
                              CIVIL DIVISION-FEDERAL PROGRAMS BRANCH
 8                                950 Pennsylvania Avenue, N.W.
                                  Washington, D.C. 20530
 9

10                            BY:  STEPHEN PEZZI, ESQ.

11

12   Telephonic appearance:  MARSHA CHIEN

13                           JUSTIN COX

14                           SUSANNA EVARTS

15                           JESSICA HANSON

16                           MAYRA JOACHIN

17                           GENEVIEVE NADEAU

18                           ABIGAIL TAYLOR

19                           KAREN TUMLIN

20                           MICHAEL WISHNIE

21

22   Court Reporter:          LINDA A. MARINO, RPR
                              225 Cadman Plaza East
23                            Brooklyn, NY 10021
                              (718) 613-2484
24

     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

LAM        OCR        RPR

Case 17-3345, Document 8, 10/10/2017, 2152481, Page101 of 135

Proceedings

1      THE COURT:  Good afternoon, everybody.  Have a seat,

2  please.

3      THE COURTROOM DEPUTY:  Civil cause for a status

4  conference, Batalla Vidal v. Baron, et al., Docket No.

5  16-CV-4756; and State of New York, et al., v. Donald Trump, et

6  al., Docket No. 17-CV-5228.

7      Will the parties please state your appearances for

8  the record?

9      THE COURT:  There are so many.  We'll dispense with

10  going through the list.  We have a sign-in, which I'll include

11  with the minute order.  But please, each time you speak, just

12  identify yourself for the record.

13      Good to see you all.  Thank you for your status

14  report and the supplemental letters.  So I've got a few things

15  on the agenda and I'll hear from you about the discovery

16  disputes.  Before we get to that, two housekeeping matters I

17  wanted to raise with you.

18      First, just as a scheduling matter, we have one of

19  our biweekly conferences scheduled for November 29, which it

20  turns out -- I'm doing my best to accommodate my schedule to

21  yours because there are a lot of moving pieces here.

22  November 29 may be difficult for me.

23      Does anybody have any reason to think that moving

24  that either to November 30 or December 1 would present a

25  problem?

4

Proceedings

1          November 30, do you think that's a problem?

2          MR. PEZZI:  That's the Thursday and Friday after?

3          THE COURT:  Yes.

4          MR. PEZZI:  Not from the Government's perspective.

5          THE COURT:  From the Plaintiffs, anybody think that

6  will present a problem?

7          MR. ROSENTHAL:  We're not aware of any issues with

8  that.

9          THE COURT:  I won't set it in stone, but let's plan

10  on the following day, November 30.  Just caucus among

11  yourselves and your colleagues and let me know by tomorrow if

12  that's going to be a problem.  I'd greatly appreciate moving

13  that.

14          Second thing, and this is, again, something I want

15  you to consider, not necessarily react immediately.  The

16  States plaintiffs filing of the amended complaint last week

17  prompted me to consider something I hadn't really given any

18  thought to.

19          One of the declarations, Exhibit 170, was by the

20  general counsel of Univision, Jonathan Schwartz, who -- and it

21  occurs to me I should have considered this earlier -- who,

22  like Ms. Rohde, the U.S. Attorney, is an old colleague and an

23  old friend of mine.  We've socialized together in the past,

24  I'm sure we will in the future.  I've canceled some upcoming

25  plans with Mr. Schwartz.

LAM        OCR        RPR

Case 17-3345, Document 8, 10/10/2017, 2152481, Page103 of 135

Proceedings

1      Nothing about the relationship on either side

2  prompts me to think that I need to recuse, but I thought it

3  was worth a disclosure, especially since Mr. Schwartz wouldn't

4  be public record the way that my former association with

5  Ms. Rohde would be.

6      Again, I may have missed something in thinking about

7  it, but I want to make sure I apprised all of you.  If any of

8  you think that that's basis for, on either side, a motion to

9  recuse, please make that within a week or I'll consider it

10  behind us and waived.

11      Those are the two housekeeping things.

12      You've raised in your status report and the

13  follow-on letter two specific disputes regarding depositions.

14  Let me ask you first to take up Mr. Neufeld, the Associate

15  Director of Service Center Operations at USCIS.

16      As I understand, Mr. Pezzi the objection is just

17  based on, basically, the status of Judge Garaufis' order and

18  your objection to any nonrecord discovery.

19      MR. PEZZI:  That's right, your Honor.

20      THE COURT:  Okay.

21      MR. PEZZI:  The Hamilton deposition we have more

22  specific issues with.

23      THE COURT:  We'll get to that, but I just wanted to

24  get this behind us.

25      MR. PEZZI:  You're correct.

LAM      OCR      RPR

6
Proceedings

1          THE COURT:  You've given me your positions on that.

2     I'm happy to hear, frankly, briefly further argument, but I

3     don't want to keep you from saying something you haven't

4     already told me.

5          Mr. Pezzi?

6          MR. PEZZI:  I don't have anything particular to add

7     to that.

8          THE COURT:  Plaintiffs?

9          MR. ROSENTHAL:  We don't have much in particular.

10    It's our position that the order before -- the matter before

11    Judge Garaufis is limited to Section 2C of your Honor's order.

12         THE COURT:  All right.  I do agree, I think that

13    Judge Garaufis' ruling didn't have any other effect on my

14    discovery order.  And you know, the Government continually and

15    somewhat insistently refers to this as an APA case.  There is

16    certainly that in the case, but there are other claims and

17    those claims are not necessarily limited to the administrative

18    record.

19         So, I don't think there's a basis for holding off on

20    Mr. Neufeld's deposition.  So, that objection is overruled.

21         Let's go on to Mr. Hamilton.  He's a senior

22    counselor in the Office of the Secretary.  Again, I have read

23    your respective positions, but I'll give both sides an

24    opportunity to be herd.

25         Mr. Pezzi?

Proceedings

1       MR. PEZZI:  Your Honor, our position, like you said,

2  is laid forth in the status report we filed.  That's our

3  objection and that's our position.  Unless you have any

4  particular questions about it --

5       THE COURT:  I do.

6       You saw the plaintiffs' response citing some case

7  law.  I've done my own research, and in particular -- you can

8  have a seat.  I don't want anybody to get uncomfortable.

9        In particular, in the Southern District of New York,

10  the SEC against the House Weighs and Means Committee from

11  2015, which sort of summarizes the application of the apex

12  doctrine, and, really, there's no one comparable to

13  Mr. Hamilton in that survey of cases that have been deemed

14  sufficiently high-ranking government officials to apply the

15  apex doctrine.  The apex doctrine takes it's name for a

16  particular reason:  It refers to people at the apex.

17       Do you have any authority, besides the ones you've

18  cited, that would suggest somebody at Mr. Hamilton's level of

19  responsibility is subject to that doctrine?

20       MR. PEZZI:  Your Honor, I mean, the only thing I

21  have to say to that is that there certainly is not an

22  overwhelming amount of case law on this issue --

23       THE COURT:  No, no, whether it's overwhelming or

24  not, is there any case that supports your position?

25       MR. PEZZI:  I do think the Letterman case in the

LAM     OCR     RPR

Case 17-3345, Document 8, 10/10/2017, 2152481, Page106 of 135

Proceedings

1   Second Circuit in 2013, which adopts the standard that had

2   been adopted in several other circuits, does set out

3   requirements of exceptional circumstances that have to be

4   shown --

5            THE COURT:  Letterman applied to the Mayor or Deputy

6   Mayor of New York City.

7            MR. PEZZI:  That's right, your Honor.

8            THE COURT:  And I've read Letterman.  Nothing in it

9   suggests that the doctrine applies to somebody like

10  Mr. Hamilton.

11           What am I missing here?

12           MR. PEZZI:  Your Honor, I have nothing to add upon

13  that point, other than --

14           THE COURT:  But you have a case, Mr. Pezzi, that

15  actually does support the position?

16           MR. PEZZI:  On the precise point of someone at

17  Mr. Hamilton's specific level, I don't have a specific case

18  that addresses someone in that particular responsibility

19  within the chain of command.

20           The only thing I would add to that is that

21  Mr. Hamilton does not fit neatly on the DHS work chart,

22  frankly, which makes this a more awkward fit, but he is a very

23  senior member of the Secretary of Homeland Security's

24  immediate staff and in many ways functions akin to a chief of

25  staff to the Secretary of Homeland Security --

LAM      OCR      RPR

Proceedings

1        THE COURT:  But he's not chief of staff and there is

2    one; right, Chad Wolf?

3        MR. PEZZI:  Your Honor, that may be right --

4        THE COURT:  It is according to the Department of

5    Homeland Security's website.

6        MR. PEZZI:  I don't doubt that, your Honor.

7        THE COURT:  So, he's not the chief of staff.

8        MR. PEZZI:  His title is senior counsel.

9        THE COURT:  Right.  Let me ask you the question this

10    way, perhaps:  Is he considered a leader, Mr. Hamilton, a

11    leader of the Department of Homeland Security?

12        MR. PEZZI:  I'm not sure I'd describe him as a

13    leader.  I do think he's a member of the senior leadership

14    staff.

15        THE COURT:  But he's a staff member.  Look, I was,

16    myself, Associate Deputy Attorney General, nice big title.

17    But it's a staff position.

18        MR. PEZZI:  I don't disagree.

19        THE COURT:  The apex doctrine doesn't protect staff

20    members.  Is there some case law that suggests otherwise?

21        MR. PEZZI:  I'm not sure I would agree that the apex

22    doctrine doesn't protect staff members.  I believe one of the

23    cases is, for example, is about the Vice President's Chief of

24    Staff --

25        THE COURT:  Yes, in exceptional circumstances the

LAM        OCR        RPR

Add. 91

Proceedings

1   chief of staff.  That's not Mr. Hamilton either, but --

2            MR. PEZZI:  If your Honor is asking me whether we

3   have some other cases that do not appear in the papers that

4   apply more directly, the answer is no.

5            THE COURT:  And you don't consider him leader of the

6   department.

7            MR. PEZZI:  I'm not sure I'd characterize him as a

8   leader of the department.  I'm not exactly sure what you mean

9   by "leader."

10           THE COURT:  I'll adopt the Department's definition.

11           MR. PEZZI:  Again, your Honor --

12           THE COURT:  No, you can tell me.  I will adopt your

13   position.

14           Do you believe that he's a leader?

15           MR. PEZZI:  I'm not sure I could tell you whether or

16   not I believe he's a leader.

17           THE COURT:  Do you want to check your client's

18   website.

19           MR. PEZZI:  Your Honor, I do not doubt if you're

20   telling me that the website says that he's not a leader --

21           THE COURT:  The website lists 57 people by name who

22   are considered leadership.  It's on a page called leadership.

23   It has 57 people by name and two positions that are vacant.

24   Mr. Hamilton, I'm sure it will not surprise you to hear, is

25   not on it.

11

Proceedings

1          MR. PEZZI:  That may be right, your Honor --

2          THE COURT:  It may be?  I will take the time for you

3    to pause, go to a computer, and look it up.

4          MR. PEZZI:  I'm sure that is right, your Honor.

5          THE COURT:  Now, the one case in your status report

6    that suggested otherwise, at least by the parenthetical

7    description of it, was the citation to In Re:  SEC ex rel

8    Glotzer, which was about counsel.

9          MR. PEZZI:  That's right.

10         THE COURT:  Which I also read that, which had

11   nothing to do with the apex doctrine.  It was decided on the

12   basis of the failure to follow certain required administrative

13   procedures before seeking depositions.

14         Do you want to explain how that came to be in your

15   list of cases that you thought were on point about whether the

16   apex doctrine applies?

17         MR. PEZZI:  Your Honor, I don't have the precise

18   parenthetical in front of me.  My understanding is that one of

19   the important components of --

20         THE COURT:  You have it there, right?  You can pause

21   to look it up.  I don't want to catch you unawares or put you

22   at a disadvantage.

23         MR. PEZZI:  Yes.

24         THE COURT:  And there are lots of ways a written

25   mandamus may issue to achieve particular results, but it has

LAM      OCR      RPR

Proceedings

1    nothing, as I'm sure you know because you must have read it

2    before you put it in your document, it has nothing to do with

3    the issue now before me, right?

4           MR. PEZZI:  I'm not sure I would say it has nothing

5    to do with the issue now before you.  And the reason I say

6    that an important part of the apex doctrine, as I understand

7    it, is that there is a sort of exhaustion-like requirement

8    built in that plaintiffs first seek the sort of evidence and

9    testimony they're looking for from less senior officials, and

10   my assumption is that that is the basis for that citation.

11          THE COURT:  You don't know?

12          MR. PEZZI:  Your Honor, for these reasons mandamus

13   is often granted to present senior officials from the burden

14   of providing testimony and --

15          THE COURT:  If that's the reasoning to put it there,

16   it's at a level of subtlety that greatly exceeds my abilities

17   to discern.  So, I won't attribute an intent to mislead to you

18   there, but I will tell you that it is such a subtle path of

19   reasoning to justify its position in the status report that

20   it's entirely lost on me.  And I'll ask you to consider that

21   in future submissions.

22          MR. PEZZI:  Understood.

23          THE COURT:  Thank you.

24          Anything else on Mr. Hamilton?

25          MR. ROSENTHAL:  If I could, your Honor.

Proceedings

1        THE COURT:  Yes.

2        MR. ROSENTHAL:  As plaintiffs noted in our

3   submission with regard to Mr. Hamilton, we believe that there

4   may be certain privilege-based objections raised during the

5   deposition.  And in the interest of using Mr. Hamilton's time

6   efficiently, we think that it may be helpful if the Court were

7   able to make itself available on the 20th during the

8   deposition and would be curious to know the Court' preferred

9   practices on these kind of issues.

10       THE COURT:  Okay.  First, let me take a look at the

11  20th.

12       I have some conferences in court, but through the

13  day, at least until just before 4 o'clock, I'll be at your

14  disposal.  What I'll ask you to do is confer in advance, try

15  to figure out the area --

16       I suppose before we get to that, you seem to have

17  inferred correctly from my colloquy with Mr. Pezzi that the

18  objection to Mr. Neufeld's deposition is overruled.  So, let

19  me just make that clear.

20       In terms of the deposition schedule, look, I get it

21  that there are any number of privileges used that may quite

22  legitimately arise.  So, try to identify them as best you can

23  in advance and either agree to put them off to have them

24  resolved later; if possible, key them up to a resolution in

25  advance.  That may be more difficult because you can't really

Proceedings

1    anticipate the flow of the questions.

2           During the deposition, if you find yourself with a

3    dispute, do your best to sort of collect them all for a

4    convenient break -- the lunch hour or the end of the day --

5    leaving time for me to resolve them and get back to your

6    deposition before 4 o'clock so that we don't have a lot of

7    calls that interrupt the flow of your deposition and that,

8    frankly, interrupt my day more than necessary.

9           So, just do your best to manage the time

10   efficiently.  But, yes, just call chambers and let them know

11   you've got an issue and take it from there.

12          MS. LUCAS:  Your Honor, the plaintiff States have

13   one thing to add.

14          THE COURT:  I'm sorry, Ms.?

15          MS. LUCAS:  Diane Lucas.

16          We join on in the Batalla Vidal plaintiff arguments

17   related to the apex doctrine and that it does not apply to the

18   deposition of Gene Hamilton.

19          We also wanted to note that this is equally

20   applicable to depositions that we would note in the future,

21   and we request that these arguments be applied to depositions

22   we noticed in the future.

23          We also wanted to inform the Court that we are

24   planning on taking part in the deposition for a limited

25   period, for about 20 minutes.

LAM        OCR        RPR

Proceedings

1      THE COURT:  On the last one, I completely expect --
2  and if that's not been clear, I want to make it clear.
3      You know, it's one thing to say Mr. Hamilton doesn't
4  qualify for the apex doctrine.  That's quite a different thing
5  to say that he should get deposed separately in the two cases.
6  You folks need to coordinate so that people avoid duplicate
7  depositions whether they're high-, middle-, low-ranking
8  officials or anyone else.
9      In terms of applying arguments to future issues,
10 each one will arise on its own merits, so I'm not prejudging.
11 But I understand this is something that will come up again.
12     All right.  I think your status report mentioned
13 some other issues that you might have to raise for today.
14     MR. ROSENTHAL:  Excuse me, your Honor, before we
15 leave the matter of depositions, I also wanted to check your
16 availability on the 18th for the deposition of Mr. Neufeld, to
17 the extent that similar issues arise then.
18     THE COURT:  I'll do my best but, again, you guys
19 have to do your best to sort of collect things up and then try
20 to make an appointment with folks in my chambers to get with
21 me if I'm not available at that time and move on to other
22 topics so that you're not just sitting around waiting for me
23 if I'm not available.  That's a day that on I'm on arraignment
24 duty here at the court, which is unpredictable and may take up
25 a lot of my time or very little.

LAM       OCR       RPR

Proceedings

1    We're all sort of still at the early stages of the

2    litigation.  I've had little to no experience with the cast of

3    characters here so I don't know you, you don't know me.  But I

4    hope as we go through the litigation, my approach to issues

5    will become predictable because that will help you avoid the

6    disputes that will cause you to interrupt your depositions for

7    a phone call.  If you can make a pretty good guess of how it's

8    going to turn out, you can resolve it on your own.  I'm not

9    going to discourage you from calling me as needed, but I am

10   going to encourage you to try to figure out if it's a good use

11   of your time.

12       Am I right that your status report mentions some

13   other disputes that were brewing in discovery?

14       MS. ROECK:  Yes, your Honor.  This is Victoria

15   Roeck, law student/intern with Jerome N. Frank Legal Services

16   Organization.

17       THE COURT:  Yes, ma'am.

18       MS. ROECK:  We would like to address deficiencies in

19   the administrative record and respectfully request through an

20   oral motion that the Court order defendants to complete it.

21       We received the administrative record on Friday, as

22   did the Court.  In its current state, it is not complete.

23   Defendants have assembled the administrative record according

24   to an erroneously narrow standard, which they stated in a

25   filing with the Court yesterday, which is they claim the

Proceedings

1   administrative record encompasses all nonprivileged documents

2   that the agency decision maker actually considered.

3           But we respectfully request the Court to order

4   defendants to compile the administrative record, such as in

5   accordance with the correct standard, which is all documents

6   before the agency decision makers at the time of the decision.

7           THE COURT:  Okay.  I understand the request.

8           Mr. Pezzi?

9           MR. PEZZI:  Your Honor, I'd say a few things.

10          First of all, with the exception of privilege issue,

11  which it does sound like we have a disagreement --

12          THE COURT:  Yes.

13          MR. PEZZI:  I'm not sure that the standard that was

14  just announced by counsel for plaintiffs is different in any

15  meaningful sense from the standard that we applied, but it's

16  possible that I misheard it.

17          THE COURT:  Just in terms of the right formulation,

18  is Ms. Roeck correct in your view?

19          MR. PEZZI:  Our position --

20          THE COURT:  No, no, not your position, just is she

21  right?  Did she accurately quote the applicable standard?

22          MR. PEZZI:  I believe the applicable standard are

23  the documents that were actually considered by the relevant

24  agency decision maker.

25          THE COURT:  All right.  I'm not going to resolve

LAM        OCR        RPR

Proceedings

1   this by shooting from the hip.  I don't know off the top of my

2   head what the applicable standard is.  My strong suspicion is

3   it's not hard to determine.

4        And there is absolutely daylight between the

5   standard you've identified and the that one Ms. Roeck has.

6   So, you guys all know what the right standard is, I will, and

7   somebody is going to be wrong.  That's exactly the sort of

8   dispute you shouldn't need me to resolve.  So, talk to each

9   other, but I'm not going to resolve today because I'm just not

10  equipped to do so.  Tee it up in letters quickly because

11  that's obviously a hugely important matter to get behind us

12  quickly.

13        MS. ROECK:  Your Honor, we're prepared to submit

14  briefing on this issue by Friday.  We'd like a shortened

15  schedule so it can be addressed.

16        THE COURT:  Okay.  Friday and Monday, please.

17        MS. ROECK:  Thank you.

18        MS. LUCAS:  And your Honor --

19        THE COURT:  Just give me a moment to make a

20  notation.

21        I'm sorry, who was speaking?

22        MS. LUCAS:  Diane Lucas, on behalf of plaintiff

23  States.

24        I wanted to note that the plaintiff States join on

25  that oral motion from the Batalla Vidal plaintiffs.  And we

LAM        OCR        RPR

Add. 100

Proceedings

1    also want to highlight a Southern District of New York case

2    that defines complete administrative record as including all

3    materials that the agency directly or indirectly considered in

4    rendering its decision.  This is Comprehensive Community

5    Development Corp. v. Sebelius, 890 F. Supp 2d 305.

6              THE COURT:  For future reference, I'm not going to

7    remember it -- this is exactly why I want a letter -- and I

8    haven't read it.

9              Folks, there is, I'm sure, a certain value that you

10   might perceive on either side in saying on the public record

11   something that won't help me get to a decision.  I'm going to

12   ask you to try to avoid that and let's use our time

13   profitably.

14             This is nothing I can decide.  I'll hear from you

15   both in your letters and I'll make a decision.

16             MS. LUCAS:  Understood.  Thank you.

17             MR. PEZZI:  Your Honor?

18             THE COURT:  Yes.

19             MR. PEZZI:  Can I ask whether there's any particular

20   page limitation you'd like to apply to these filings and

21   whether plaintiffs could file a joint filing rather than

22   responding to two letters on the same issue?

23             THE COURT:  Look, this is not a routine case.

24   Typically on a letter motion, I would limit everybody to three

25   pages, single-spaced.  I've had cases where I've had to go

                LAM       OCR       RPR

Proceedings

1 | beyond that and give very specific formating directives

2 | because people why were trying to evade the spirit of it.  I

3 | don't anticipate that's going to be a problem.

4 |      Use your judgment.  I'm not going to limit you.  In

5 | terms of duplication of effort among the several plaintiffs,

6 | you know, I assume that all the plaintiffs are essentially on

7 | the same page unless they tell me otherwise.  They don't have

8 | to file something that just doesn't need to.

9 |      I won't make it a requirement that the two sets of

10 | plaintiffs file a single document because it may be that they

11 | don't have quite agreement on how to present an issue.  I'll

12 | encourage you folks to do a single document where you can;

13 | where you can't, you don't it.

14 |      But you can respond to all the arguments that you

15 | have to respond to.

16 |      MR. PEZZI:  Absolutely.

17 |      THE COURT:  I'm not going to impose artificial

18 | limits unless the lack of more specific guidance starts to be

19 | a problem.  I'm counting on that not happening.

20 |      Was there another issue?  No?

21 |      Folks, before I let you go, I know you have a lot on

22 | your plate --

23 |      MS. LUCAS:  I'm sorry, your Honor, we do have one

24 | other issue.

25 |      THE COURT:  Yes, go ahead.

LAM     OCR     RPR

Proceedings

1        MS. KHAN:  Good afternoon, your Honor.  My name is

2  Sania Khan, from the New York State Attorney General Office on

3  behalf of plaintiff States.

4        Plaintiff States were hoping that -- well, first, as

5  the Court's aware, plaintiff States did serve their discovery

6  request on September 29, 2017.  The joint status report was

7  then filed on October 6.  After the joint status report was

8  filed, defendants actually served us with objections.

9        So, in the interest of saving the Court time and

10  potential motion practice, we were hoping that we could

11  highlight a few of those objections today to try to resolve

12  them on the record if possible.

13        THE COURT:  I won't stop you.  If I don't feel I can

14  resolve it, I'll let you know that.  If I think I can give you

15  some guidance that may help you resolve it on your own, I'll

16  let you know that.

17        MS. KHAN:  Thank you, your Honor.

18        THE COURT:  Take a shot.

19        MS. KHAN:  Thank you.

20        So, for context, we had served a discovery request

21  with regard to notices that were served to DACA applicants and

22  grantees.  The government has responded with an objection

23  stating this is publicly-available information, specifically

24  with regard to the notices, and, therefore, they won't be

25  produced.

LAM      OCR      RPR

Proceedings

1      We just want a clarification at this point that if

2 defendants are stating that no notices were sent beyond the

3 standard renewal notices and if those notices weren't sent

4 after August 2017, which is relevant to our procedural and due

5 process claims and equitable estoppel claims, then that is an

6 answer and we just want a clarification as to that point.

7      THE COURT:  Do you want to respond?

8      MR. PEZZI:  Yes, your Honor.  I'd like to respond

9 most importantly by noting that we served these objections

10 some of them on Friday, some yesterday.  We're still owed

11 responses to some on Friday and some from Monday.  We haven't

12 heard from the plaintiffs about any problem with our objection

13 until hearing about it now.

14      THE COURT:  I will get to this before we close, but

15 to the extent you're complaining about being sandbagged, I

16 will have something to say about that as well with respect to

17 the apex issue that I've already resolved.

18      MR. PEZZI:  Understood, your Honor.  And I'm not

19 complaining, I'm just trying to be realistic about teeing up

20 these issues in a way that's efficient for your Honor.

21      Also, I think I have a hard time seeing how we can

22 have a productive conversation about specific objections --

23      THE COURT:  I did not ask for a speech, Mr. Pezzi, I

24 really just wanted response to the issue that was raised.  If

25 you're not prepared to give me one, you're not; but if you

Proceedings

1    are, let's hear it.

2           MR. PEZZI:  On that precise factual issue, I'm not

3    prepared to offer a particular response.  And I think once we

4    serve our responses and we can meet with plaintiffs we can tee

5    up any issues for your Honor that you can decide.

6           THE COURT:  Okay.  If the basis for the objection

7    was this is publicly-available, that's not going to fly.  You

8    have it, it's discovery.  Or, rather, if it's discoverable and

9    in your possession, the fact that they might be able to get it

10   from somebody else isn't a reason not to produce it okay.

11          MR. PEZZI:  Yes, sir.

12          THE COURT:  I'm sure as you confer on this, you'll

13   keep that in mine.

14          What was next?

15          MS. KHAN:  Thank you, your Honor.  Just one

16   clarification:  The objections to us were actually served on

17   Friday and the Batalla Vidal plaintiffs were served yesterday.

18          With regard to -- the second objection deals with

19   information regarding families or guardians of DACA applicants

20   and grantees.  It's the defendants' position that this not

21   relevant to this litigation.  It's plaintiff State's position

22   that this is wholly relevant to this litigation since the

23   termination of DACA does impact not only applicants and

24   grantees --

25          THE COURT:  Sorry, please, what is the "it" that is

Proceedings

1   relevant?

2        MS. KHAN:  The information regarding families or

3   guardians of DACA applicants and grantees.  So, this is in the

4   context of our requests with regard to the information that

5   the government has on these individuals.

6        THE COURT:  Look, I think that's one where I'm just

7   not going to be in a position today to tell you if it is or

8   isn't relevant.  Go ahead.

9        MS. KHAN:  I guess that's it's own thing, but the

10  issue on the record that we were hoping to get was just

11  confirmation that that information, the information of the

12  families and the guardians, is kept with the information of

13  the DACA applicants and grantees, if that information is in

14  one place.

15       THE COURT:  Do you know that, Mr. Pezzi?

16       MR. PEZZI:  Again, that's something that I would

17  need to confer with my client and, again it's something our

18  response --

19       THE COURT:  Look, it's going to be really important,

20  and I'll come back to this to explain in a coherent way my

21  concern here, but it's going to be really important on all

22  sides that you come prepared.  If you know you've got a

23  disagreement about an issue, you at least need to know

24  factually what's at stake here.

25            In fairness, a discovery request that your opponent

LAM        OCR        RPR

Add. 106

Proceedings

1   has made, on either side; a discovery request that your

2   opponent has made and you have not responded to it yet, I will

3   expect you to come to court knowing at a minimum what there is

4   that is responsive to the request and not to say I need to

5   confer with my client further about that.

6          Understood, everybody?

7          (A chorus of yes, your Honors.)

8          THE COURT:  Okay.  And now that you're on notice I

9   will enforce it.

10         MS. LUCAS:  Your Honor, two other things we wanted

11  bring up on that point related to the defendants' objections.

12         They also objected to two requests for admissions

13  related to the use of information from DACA applications and

14  that they would not be used for immigration enforcement

15  purposes.

16         THE COURT:  That's one of the new claims in the

17  complaint, right?

18         MS. LUCAS:  Yes, it's related to our due process

19  claim as well as our equitable estoppel claim.

20         THE COURT:  Right.

21         MS. LUCAS:  Defendants objected, saying that this

22  was a mischaracterization of policy in addition to some other

23  objections.  However, this was a policy that was stated on the

24  record in the Northern District of California case, it has

25  been -- it's was on the defendants' website --

                    LAM      OCR      RPR

26
Proceedings

1    THE COURT:  Sorry, what's the asserted policy?

2    MS. LUCAS:  The policy is related to -- I can

3    actually read it to you.

4    THE COURT:  Okay.

5    MS. LUCAS:  This was our RFA, but it was taken from

6    the -- the language was taken from the USCIS website.

7    THE COURT:  Okay.

8    MS. LUCAS:  And our RFA was:  Since September 5,

9    2017, it has been and continues to be the policy of DHS that

10   information provided to United States Citizenship and

11   Immigration Services as part of a DACA application, including

12   information about the applicant's family members or guardians,

13   shall not be used by DHS or any entity within DHS, including

14   Immigrations and Customs Enforcement and/or Customs and Border

15   Protection, for the purposes of immigration enforcement unless

16   the DACA applicant or grantee meets the criteria for the

17   issuance of a notice to appear or a referral to ICE under the

18   criteria set forth in USCIS' notice to appear or the applicant

19   or grantee poses a risk to national security or public safety.

20       So, as I noted, this was taken from the website.  It

21   was also mostly stated in the Northern District of California

22   case.

23   THE COURT:  Question, if I may.  Is the RFA asking

24   the defendants to admit that that was, in fact, their policy

25   or is it asking them to admit that was what they said their

Proceedings

1  policy was at certain times and places.

2          MS. LUCAS:  That since September 5, that it has been

3  and continues to be their policy.

4          THE COURT:  That's the request for admission.

5          MS. LUCAS:  Yes.

6          THE COURT:  And what's the concern with their

7  response?

8          MS. LUCAS:  They just say it's a mischaracterization

9  without more.

10         And this is problematic, particularly because, as I

11  stated, this was a policy they stated on the record in the

12  California -- Northern District of California case --

13         THE COURT:  And Mr. Pezzi, I'm happy to hear from

14  you.  Do you have anything to say?

15         MR. PEZZI:  We have objected, but we'll respond to

16  the request for admission.  I think the reason for the

17  objection was that that was a summary rather than a precise

18  quotation to policy from the website.

19         THE COURT:  You can explain however you like, and I

20  understand that there is often nuance to these things, but I

21  think the beginning of the response has to be yes, we admitted

22  or no, we deny it.

23         MR. PEZZI:  That may very well be, your Honor --

24         THE COURT:  No, it very well will be because if it's

25  not, again, you'll have a ruling that says otherwise.

LAM     OCR     RPR

28

Proceedings

1        MR. PEZZI:  Absolutely.  We understand our

2   obligations to respond to the --

3        THE COURT:  And to respond in the manner required by

4   the Federal Rules of Civil Procedure.

5        MR. PEZZI:  Understood.

6        MS. LUCAS:  Just to be clear for the record, there's

7   also the second related RFA that just says during the pendency

8   of this litigation, that there will be no changes to the

9   policies stated in RFA number one.

10       THE COURT:  You're asking them to admit something

11  about what will happen in the future?

12       MS. LUCAS:  What will happen during the pendency of

13  this litigation.

14       THE COURT:  I have to take a look at it, but that

15  strikes me as being not quite what an RFA is for.  I will

16  start an RFA, basically ask the opposing party to confirm or

17  deny your description of the state of the world as it is or

18  was at some point in the past, not to commit to a course of

19  action.

20       MS. LUCAS:  The purpose of an RFA is to determine

21  what is their current stance as to what they plan to do during

22  the pendency of litigation, so what is their policy as to what

23  their --

24       THE COURT:  All right.  I have to take a look, but

25  it strikes plea as not exactly what an RFA is designed to do.

Proceedings

1    But if there's dispute, I'll hear.

2                Anything else?

3                MS. LUCAS:  Yes.

4                THE COURT:  I need to be able to rely on you when

5    you say one more thing.  You're at least two past your one

6    more thing.

7                MS. LUCAS:  Sorry, the RFAs were related.  That

8    constitutes one.

9                The second thing that we wanted to bring up with

10   respect to this is with respect to the defendants' objection

11   to our discovery request to the extent that they're related to

12   APA claims.  They said that they should only be based upon the

13   administrative record compiled by DHS.

14               First, we take issue with them limiting it to

15   documents compiled by the DHS, but, also, what we want to talk

16   about now is that our discovery requests are focused on other

17   claims as we talked about, the equitable estoppel claim and

18   due process claim, and are not limited.

19               THE COURT:  That's my understanding.

20               MS. LUCAS:  We wanted to make that clear so we could

21   actually resolve that issue.

22               THE COURT:  You understand that, right?

23               This isn't just an APA case, there are other claims

24   here that you're litigating that unless Judge Garaufis orders

25   otherwise are subject to discovery, correct?

LAM        OCR        RPR

Proceedings

1      MR. PEZZI:  Your Honor, we're absolutely currently

2  compliant with your Honor's discovery order --

3      THE COURT:  Mr. Pezzi, I'm going to really ask you

4  to consider pursuing a course where when I ask a question you

5  respond to the question I've asked.  I know I discussed this

6  with you last time.  It's going to become more and more

7  problematic if you continue to resist doing that.

8          So, let me phrase the question one more time and see

9  if I have better luck with it.  You understand that discovery

10  is proceeding now and will continue to proceed unless

11  otherwise ordered by Judge Garaufis on claims other than just

12  the APA claims; you understand that, correct?

13      MR. PEZZI:  Understood, your Honor.

14      THE COURT:  And that discovery is not limited to the

15  record on claims that are not raised in the APA, correct?

16      MR. PEZZI:  That's not our position.  We have

17  obviously lost on that position thus far --

18      THE COURT:  Correct.

19      MR. PEZZI:  -- so unless something changes, of

20  course discovery will proceed.

21      THE COURT:  Very good.

22          Anything else, Mr. Pezzi, on your side?

23      MR. PEZZI:  No, your Honor.

24      THE COURT:  Mr. Pezzi, I'm going to direct this to

25  your side of the case but not to you personally.  I have been

LAM      OCR      RPR

Proceedings

1    in the position myself as a litigator where I was what we used

2    to call the stunt lawyer.  Not saying that's what you are, but

3    the one that had to show up to be the face of the position

4    that wasn't doing well.  But I have to raise this concern, and

5    it's about the overall stance of the government and the

6    government clients to this litigation so far.

7              I've seen the government raise arguments on an

8    appeal of my decision to Judge Garaufis that weren't raised to

9    me.  Terribly inefficient.

10             The litigation over the application of the apex

11   doctrine appears to have been conducted in such a way as to

12   get your views before the Court in a way that didn't allow the

13   plaintiffs fair time to get their views in front of the Court

14   in what was supposed to be a joint submission.  I was able to

15   accommodate that by allowing a later submission, but there's

16   not how it's supposed to work.

17             We've already discussed my concerns about your

18   citation of the Glotzer case in a way that I thought was,

19   frankly, wholly inappropriate.

20             And we've had the continuing problem of responses

21   that charitably would be described as not directly addressing

22   the inquiry.  I'm hearing a lot of responses along the lines

23   of well, I have to go back and check with my client.  There's

24   lot of running out the clock going on here.

25             Now, you have some of your colleagues from the U.S.

Proceedings

1   Attorney's Office here, and I know I deal with them all the

2   time and I know I can rely on their good faith, through long

3   and happy experience with them.  I don't know you and your

4   colleagues from main Justice, but I'm beginning to have a

5   concern that the main Justice attorneys who are taking the

6   lead in this litigation are less concerned with maintaining

7   that very high standard.

8            Now, I say this not because I'm considering any

9   sanctions for what's gone on before, because I'm not, but it's

10  going -- a continuation of these practices is going to shape

11  my view of disputes as they arise in the future.  And, most

12  significantly -- and it's worth emphasizing -- one of the

13  criteria for expanding the scope of review beyond the

14  administrative record on the APA claims:  The strong

15  preliminary showing of bad faith and improper behavior, which

16  can include -- and I'm citing an Eastern District case from

17  2006, Tummino v. Von Eschenbach, 427 F. Supp 2d. 212.  That

18  shows that improper behavior can include a calculated

19  filibuster to avoid judicial review.

20           And there's no reason that the way the defendants

21  choose to litigate this case, including their insistence on

22  deadlines that serve to frustrate the orderly resolution of

23  the claims before the Court, can't be taken into account in

24  making that determination.

25           I say that because I don't attribute bad faith to

LAM        OCR        RPR

Proceedings

1   anyone at this point, but the record is building in a way that

2   may support that inference.  And I want you to be on notice of

3   that so that you can consider it and consider whether you want

4   to change the way you're approaching some of these disputes

5   that are arising so that I won't have cause to consider that

6   this is a judicial filibuster.

7            MR. PEZZI:  Your Honor, can I respond to that very

8   quickly?

9            THE COURT:  Yes, of course.

10           MR. PEZZI:  I just want to be a hundred percent

11  crystal clear about this:  I take extremely seriously

12  everything that you just said and I know my colleagues at

13  Department of Justice, in D.C., New York, and elsewhere, take

14  it extremely seriously as well.  Our obligation to present

15  arguments to the Court and factual statements in good faith is

16  absolutely critical to the credibility of the Department of

17  Justice and it's not something that I or any of my colleagues

18  would ever fool around with.

19           So, I understand the issue that your Honor has

20  raised.  Just be aware that we take them very seriously, as we

21  always do, our obligations to proceed in good faith in any

22  litigation matter, including a matter of this importance.

23           There are some specific issues with some of the

24  other points your Honor made that I won't get into on a

25  point-by-point basis, but I suspect that's not what you're

LAM        OCR        RPR

Proceedings

1  looking for right now, but I want make sure you understand we

2  take that very seriously.

3          THE COURT:  I'm delighted to hear it and I'm sure

4  those words will be reflected by future actions and I look

5  forward to that.

6          Anything else for today?  All right.  Thank you all.

7  Have a good day.

8

9          (Matter concluded.)

10

11                          *  *  *  *  *

12

13

14  I certify that the foregoing is a correct transcript from the

15  record of proceedings in the above-entitled matter.

16

17      /s/ Linda A. Marino                October 11, 2017
    _____      _____
18       LINDA A. MARINO                          DATE

19

20

21

22

23

24

25

                        LAM      OCR      RPR

|        | 1  | UNEDITED ROUGH DRAFT - DONALD NEWFELD |
|--------|----|---------------------------------------|
| ):50:53 | 2  | send notices to DACA applicants about updates to |
| ):50:57 | 3  | the status of the application? |
| ):51:01 | 4  | A    I'm not following the question. |
| ):51:04 | 5  | Q    Did SCOPS have policies about sending |
| ):51:08 | 6  | notices to DACA applicants when the status of the |
| ):51:13 | 7  | application changed when it was updated? |
| ):51:19 | 8  | A    First I need to clarify SCOPS does not |
| ):51:22 | 9  | have its own policies.  We only follow the policy |
| ):51:26 | 10 | of USCIS. |
| ):51:29 | 11 | Q    Does USCIS have those policy about |
| ):51:32 | 12 | sending notices? |
| ):51:37 | 13 | A    I'm not sure whether it is buy policy |
| ):51:40 | 14 | or regulation nonetheless we do issue approval |
| ):51:44 | 15 | notice request for evidence and that is those are |
| ):51:47 | 16 | policy decisions at some point that were made |
| ):51:50 | 17 | that people need to be notified of approval |
| ):51:54 | 18 | denial. |
| ):51:56 | 19 | Q    So how were those -- how were those |
| ):52:00 | 20 | decisions to issue those notices made? |
| ):52:04 | 21 | A    As I said I don't recall whether they |
| ):52:08 | 22 | are by regulation.  I believe they are caught by |

```
              1        UNEDITED ROUGH DRAFT - DONALD NEWFELD
):40:44       2        Q     Do you know if someone took notes or
):40:46       3    minutes of that meetings?
):40:48       4        A     I don't believe so.
):40:57       5        Q     Were written minutes shared afterwards?
):41:00       6        A     No.
):41:01       7        Q     Do you know what was discussed at that
):41:02       8    meeting?
):41:04       9        A     Yes.
):41:06      10        Q     What was the content of the discussion?
):41:08      11        MR. TYLER:  I'll object on the grounds
):41:11      12    of deliberative process, attorney/client
):41:13      13    privilege, attorney work product privilege.
):41:17      14    Directing the witness not the answer.
):41:31      15        MR CHEN:  Just for the record, briefly
):41:34      16    note our objection to the invocation of the
):41:38      17    deliberative process instruction in this
):41:42      18    deposition.  First, we don't think its
):41:43      19    appropriate to invoke that privilege generally in
):41:45      20    this case because plaintiff's are challenging the
):41:46      21    agency's decision making process.  And even if
):41:49      22    the privilege does apply in this case we don't
```

```
            1            UNEDITED ROUGH DRAFT - DONALD NEWFELD
.:03:57     2     of the DACA program.

.:04:00     3     BY MR CHEN:

.:04:01     4         Q    At that meeting were you aware that the

.:04:04     5     DACA program would be terminated?

.:04:07     6             MR. TYLER:  Objection.  I will direct

.:04:09     7     the witness not to answer.  Deliberative process

.:04:10     8     privilege, attorney/client privilege.

.:04:15     9             MR CHEN:  I would note for the record

.:04:16    10     that plaintiffs again object to the deliberative

.:04:17    11     process privilege and the attorney/client

.:04:18    12     privilege instructions for the same reasons as

.:04:21    13     previously stated.  I won't keep repeating it but

.:04:24    14     that objection stands with respect to all

.:04:26    15     deliberative process privilege process

.:04:26    16     instructions going forward and attorney/client

.:04:31    17     privilege instructions going forward.

.:04:35    18     BY MR CHEN:

.:04:41    19         Q    From who were you made aware of the

.:04:42    20     decision to terminate the DACA program?

.:04:47    21             MR. TYLER:  Vague.  Are you referring

.:04:48    22     to the final decision?
```

Add. 119

83