# No.17-3345

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

*In re* ELAINE DUKE, Acting Secretary of Homeland Security, et al.,

Petitioners.

## ANSWER TO PETITION FOR A WRIT OF MANDAMUS
## BY *BATALLA VIDAL* RESPONDENTS

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Healy Ko, Law Student Intern
Victoria Roeck, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.
Michael J. Wishnie, Esq.
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Karen Tumlin, Esq.
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin Cox, Esq.
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF FACTS ................................................................... 2

    A.  Establishment of DACA ........................................................ 2

    B.  Petitioners' Termination of DACA ....................................... 4

    C.  District Court Proceedings .................................................... 6

        1.  *Administrative Record and Privilege Log* ............................ 8

        2.  *Discovery* ......................................................................... 10

        3.  *Emergency Motion for Stay* .............................................. 11

        4.  *Subsequent Proceedings in District Court* ......................... 11

LEGAL STANDARD ......................................................................... 12

ARGUMENT ..................................................................................... 13

    I.  MANDAMUS REVIEW IS NOT AVAILABLE TO PETITIONERS ......................... 13

    A.  Petitioners Raise No Novel or Significant Questions of Law ........................ 14

    B.  Other Adequate Remedies Exist ......................................... 17

    C.  The District Court Committed No "Clear and Indisputable" Error Warranting Mandamus Relief .......................................... 18

        1.  *The District Court Correctly Ordered Completion of Petitioners' Deficient Administrative Record* ............................... 19

        2.  *The District Court Did Not Abuse Its Discretion in Requiring a Privilege Log* ....... 25

        3.  *The Discovery Allowed in This Case is Appropriate* ................. 28

        4.  *Any Burden on Petitioners is Proportionate and Reasonable* ...................... 30

CONCLUSION .................................................................................. 33

# INTRODUCTION

This case arises from Petitioners' decision to terminate the Deferred Action for Childhood Arrivals ("DACA") program as of March 5, 2018. The program has allowed nearly one million young people to live, work, and securely remain in the only country they have ever called home. Respondents challenged the DACA termination as violative of the Administrative Procedure Act, the Regulatory Flexibility Act, and the Fifth Amendment. As is routine in such cases, Respondents sought the administrative record on their statutory claims and discovery on their constitutional claims. Since Petitioners refused to extend the deadlines they had arbitrarily imposed for terminating DACA, the District Court ordered an expedited schedule to ensure resolution of this case, on a proper record, by March 5. Rather than comply with the litigation schedule compelled by their own abrupt and arbitrary action, Respondents now seek extraordinary mandamus review in this Court as an end run around the routine process of resolving pre-trial disputes.

Despite the impending deadlines in the District Court, Petitioners have sought to stymie meaningful judicial review at every turn. For the administrative record on their decision to end this mammoth, well-established program, Petitioners produced a meager 256 pages of publicly available documents, which the Magistrate Judge correctly determined to be "manifestly incomplete." Pet'rs' Add. 42; *see also* Add. 240 (finding that same administrative record, proffered in parallel California litigation, "excluded highly relevant materials").

1

Petitioners also opposed any discovery whatsoever, even on constitutional claims, and resisted producing a privilege log. Petitioners continued to object even after they had *already* produced a partial privilege log for the *same* administrative record in the California litigation—perhaps because, following *in camera* review based on that log, Judge Alsup concluded that the government had improperly withheld numerous documents from the administrative record.

Petitioners seek the "drastic and extraordinary" intervention of mandamus, *Cheney v. District Court*, 542 U.S. 367, 380 (2004), for a set of ordinary disputes that have been diligently managed by the District Court. By failing to produce the whole administrative record, Petitioners are the sole party frustrating judicial review. Meanwhile, Respondents have propounded modest discovery requests, and the District Court has repeatedly limited production and accommodated Petitioners' requests for additional time.

The equities of this case are extraordinary, but the present discovery disputes are not. They present no novel or significant issues, and the government has failed to show a clear and indisputable right to the writ. This Court should resist Respondents' invitation to disrupt the orderly progress of the proceedings below.

## STATEMENT OF FACTS

### A. Establishment of DACA

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum announcing the DACA program. Add. 15. DACA enabled

eligible young people who came to the United States as children to apply for a renewable, two-year period of deferred action. *Id.* Deferred action is an exercise of prosecutorial discretion, which provides no lawful immigration status, but which grants relief from deportation and allows individuals to obtain employment authorization. *Id.*

To apply for DACA, applicants disclosed sensitive information to the Department of Homeland Security ("DHS"), including their immigration status, copies of personal documents such as passports and bank statements, and information that could identify family members. Add. 16. Applicants also paid a $495 processing fee. Add. 50. DHS vetted the applicants and required them to undergo a biometrics screening. Add. 39. If granted deferred action, DACA recipients could obtain work authorization, renewable every two years, and a Social Security number. Add. 15. As standard practice, approximately 180 days before their DACA expired, U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS, mailed individualized notices to recipients instructing them to renew their DACA between 120 and 150 days before expiration. Add. 168, 170.

Since 2012, nearly 800,000 young people have applied for and received DACA. Add. 17. In New York alone, close to 50,000 young people have received DACA and USCIS has granted more than 60,000 renewals for this group. Add. 248. DACA recipients have been able to obtain drivers' licenses, enroll in college and graduate

school, support themselves and their families, and live without fear of deportation. *See* Add. 249–253.

Individual Respondents in this case, like Martín Batalla Vidal, have benefited greatly from this program. Add. 4. With DACA, Mr. Batalla Vidal has been able to pursue his dream of working in the medical profession by obtaining a scholarship, pursuing a college degree, and finding employment to provide for himself, his mother, and his siblings. Add. 4–5. Mr. Batalla Vidal is one of hundreds of thousands of aspiring Americans whose livelihood and ability to remain in their homes depend upon this program. Add. 18, 23–24 (describing educational and professional achievements of other plaintiffs with DACA as well as family members they are supporting).

On February 20, 2017, one month into the new administration, then-DHS Secretary John Kelly issued a memorandum that expressly retained the DACA program. Add. 63–68.

## B. Petitioners' Termination of DACA

In July 2017, Petitioners abruptly ceased the practice of issuing individualized renewal notices to DACA recipients. Add. 222–23. Petitioners did not announce the end of this longstanding practice.

On September 5, 2017, Attorney General Jeff Sessions announced the termination of the DACA program. Add. 22. Concurrently, Acting Secretary Elaine Duke issued a memorandum announcing that DHS would not accept initial

4

applications filed after September 5, 2017, and that DACA recipients whose deferred action expires on or before March 5, 2018 would have until October 5, 2017—exactly one month—to submit a renewal application ("DACA Termination"). Add. 21. DHS would reject all other DACA applications. *Id.* In short, beginning on March 6, 2018, and continuing every day thereafter for the next two years, thousands of persons will lose their DACA status and work authorization.

Petitioners provided two reasons for terminating DACA: first, "litigation risk" that a court could find the DACA program unlawful; and second, Attorney General Sessions' one-page letter to Acting Secretary Duke concluding, without any analysis, that DACA "was an unconstitutional exercise of authority by the Executive Branch." Add. 21–22; *see also* Add. 144.

After announcing the termination of DACA, Petitioners failed to send any corrected notices—general or individualized—to the thousands of DACA recipients who were required to renew by October 5 and who had previously received a standard USCIS renewal notice. Add. 23. These individuals reasonably relied on the USCIS notice they had received and were never notified about the date change, nor that they had only one month to renew their DACA status or be forever barred from doing so. *Id.*

More than 20,000 persons eligible to renew by October 5 did not submit a renewal application by that date. Add. 254. Hundreds of thousands of others are permanently foreclosed from seeking renewal of their status after March 5, 2018.

Further, all DACA recipients—who disclosed sensitive information to USCIS with the understanding that, absent limited circumstances, it would not be used against them in immigration proceedings—are at risk that USCIS will share their information with Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") for enforcement purposes. Add. 27.

Terminating DACA will result in the loss of tens of billions of dollars across the country, with New York alone at risk of losing nearly $2.6 billion if DACA recipients cannot work. Add. 18. And terminating DACA threatens to wrest nearly a million young people from the only home they have ever known.

## C.    District Court Proceedings

Plaintiff Martín Batalla Vidal filed this action on August 25, 2016, prior to the DACA Termination. Add. 121. He sought an order that he was eligible for a three-year work permit, pursuant to a since-revoked DHS memorandum,[1] notwithstanding entry of a nationwide order, *see Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), which had preliminarily enjoined that memorandum. Later that year, he filed an amended complaint and joined Make the Road New York ("MRNY") as a plaintiff. Add. 123. After the November 2016 election, and upon a series of extensions and

---

[1] On November 20, 2014, the Secretary of Homeland Security issued a memorandum creating the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and expanding DACA. Add. 58–62.

stays entered in the *Texas v. United States* litigation, the parties in this action moved to defer further briefing. Add. 124.

On September 5, 2017, after Attorney General Sessions announced the DACA termination, Respondents filed a request for a pre-motion conference, seeking permission to file a second amended complaint and to join additional parties. Add. 125. On September 14, the District Court held an initial status conference, where Petitioners stated that "the Attorney General and DHS decided that, in the exercise of their discretion, they're going to wind down this program." Add. 157.

On September 19, Respondents filed a Second Amended Complaint, including claims under the Administrative Procedure Act ("APA"), the Regulatory Flexibility Act, and the due process and equal protection guarantees of the Fifth Amendment. Add. 1–36. At a status conference on September 26, Petitioners refused to extend the October 5 renewal deadline or the March 5, 2018 end date. Resp'ts' First Add. 46.

"Driven by [Petitioners'] decision[] . . . not to move any deadlines," the District Court and Magistrate Judge set an expedited motions and discovery schedule to ensure that the court could properly resolve the case on an adequate record before March 5, 2018. Resp'ts' First Add. 68. The District Court ordered all dispositive motions be filed no later than December 15, with opposition briefing due January 13 and oral argument on January 18, 2018. Resp'ts' First Add. 77–78. Petitioners stated they were "comfortable with that schedule." Resp'ts' First Add. 80.

//

### 1.      *Administrative Record and Privilege Log*

Petitioners have been aware that they must produce an administrative record and a privilege log since September 26, 2017, when Magistrate Judge Orenstein announced from the bench that he was adopting Respondents' discovery proposal. Resp'ts' First Add. 67–70. This was confirmed in a written order issued the next day, Section II(c) of which required Petitioners to produce an administrative record with a privilege log by October 6. Resp'ts' First Add. 2.

On September 29, Petitioners appealed to the District Court, challenging only the privilege log provision of Section II(c). Add. 51-57. On October 3, the District Court accommodated Petitioners' objections, extending the privilege log deadline from October 6 to October 20, and reserving final judgment on whether one was needed until after Petitioners had first produced what they considered to be the whole administrative record. Resp'ts' First Add. 9.

On October 6, 2017, Petitioners produced an administrative record consisting of fourteen publicly available documents totaling 256 pages, of which more than seventy percent were court opinions in the *Texas v. United States* litigation, Add. 128. One week later, on October 13, Respondents moved to complete the administrative record, on the ground that Petitioners had relied on an erroneously narrow standard, including only those documents that Acting Secretary Duke herself "actually considered." Resp'ts' First Add. 26–28.

On October 16, Petitioners again objected to the privilege log requirement. Resp'ts' First Add. 33-40. On October 17, the District Court, with the consent of Respondents, accommodated Petitioners' concerns once more by limiting the privilege log to only those documents considered by DHS and the Department of Justice ("DOJ"), based upon Petitioners' earlier admission that Attorney General Sessions and DHS jointly decided to terminate DACA. Pet'rs' Add. 10.

Despite the District Court's additional narrowing of the privilege log, on October 18, Petitioners again objected to its production and scope. Pet'rs' Add. 18–19. On October 19, the District Court narrowed the privilege log further, this time limiting it to documents considered by Acting Secretary Duke, Attorney General Sessions, and, implementing the requirement that records "directly or indirectly considered" by the decisionmakers be included in the administrative record, *see, e.g., Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012), their first-tier subordinates. Pet'rs' Add. 52–53.

That same day, the Magistrate Judge determined Petitioners' administrative record was "manifestly incomplete" and "excluded highly relevant materials." Pet'rs' Add. 42 (internal quotations omitted). The Magistrate Judge ordered Petitioners to complete the record by including all information "directly or indirectly considered by the final decision makers in making their decision." Pet'rs' Add. 41. The Magistrate Judge extended the deadline for production of the privilege log to October 27. Pet'rs' Add. 42.

## 2. Discovery

Based on Petitioners' decision to terminate DACA on March 5, 2018, Magistrate Judge Orenstein set an expedited discovery schedule. Resp'ts' First Add. 1. Both sides exchanged initial disclosures, and Respondents served interrogatories, requests for production, and requests for admission. In addition, on October 5, Respondents noticed the depositions of Donald Neufeld, Associate Director of Service Center Operations at USCIS, for October 18, and Gene Hamilton, then-Senior Counselor in the Office of the Secretary at DHS, for October 20. Respondents noticed the deponents after accommodating Petitioners' request to postpone the depositions by two weeks. Resp'ts' First Add. 20–25.

On October 6, in a Joint Discovery Status Report, Petitioners objected for the first time to Mr. Hamilton's deposition under the "apex doctrine." Add. 78–81, an argument rejected by Magistrate Orenstein on October 11. Resp'ts' First Add. 91. Petitioners did not appeal this order to the District Court.

On October 16, Petitioners provided fifty-six pages of emails in response to Respondents' requests for production, which did not include referenced email attachments. Petitioners also produced written responses to the interrogatories and requests for admission, including lengthy objections.

Respondents deposed Mr. Neufeld on October 18 and were mid-way through deposing Mr. Hamilton on October 20 when this Court issued an administrative stay. Order Granting Emergency Stay, ECF No. 23.

### 3.    *Emergency Motion for Stay*

On October 19, Petitioners filed an after-hours emergency motion with the Second Circuit to stay discovery pending review of their unfiled mandamus petition. Pet'rs' Second Corrected Emergency Mot. for Stay and Mandamus Pet., ECF No. 3. Twelve hours later, Respondents filed a brief in opposition. Br. in Opp. to Pet'rs' Emergency Mot., ECF No. 8. This Court granted a single-judge administrative stay on October 20, pending consideration of the stay motion by a three-judge panel, and contingent on Petitioners filing a mandamus petition by 3:00 PM on October 23. Order Granting Emergency Stay, ECF No. 23.

On October 23, Petitioners filed a petition for a writ of mandamus. Pet'rs' Full Pet. for Writ of Mandamus, ECF No. 33 ("Pet'rs' Mand."). That same day, this Court ordered argument on the stay motion before a three-judge panel and calendared the matter for the following day. After oral argument, the Court issued an order continuing the stay previously entered, pending a ruling on Petitioners' mandamus petition, and directed Respondents to file their opposition to the mandamus "promptly." The Court stated further that it would not adjudicate the mandamus petition until the District Court had ruled on "issues of jurisdiction and justiciability." Order Continuing Stay, ECF No. 40.

### 4.    *Subsequent Proceedings in District Court*

Following entry of this Court's October 24 order, the District Court directed Petitioners to file, by noon on October 27, 2017, "a supplemental brief explaining

why the court lacks jurisdiction to consider the claims . . . or why such claims are

otherwise non-justiciable," with Respondents' opposition due at noon on November

1. Add. 130. The government filed its supplemental brief on October 27, but did not

limit its arguments to jurisdiction and justiciability. Add. 91. On October 27,

Respondents moved to clarify, Add. 131, and that same day, the District Court

confirmed that Respondents "need not address" Petitioners' arguments outside of

those concerning jurisdiction and justiciability, since those "additional arguments . . .

would likely delay the court's disposition of [Petitioners'] threshold arguments for

dismissal." Add. 95. Respondents filed their opposition to Petitioners' arguments

concerning jurisdiction and justiciability on November 1. Add. 96–120. The motion is

pending before the District Court.

## LEGAL STANDARD

A writ of mandamus "is a 'drastic and extraordinary' remedy 'reserved for really

extraordinary causes.'" *Cheney v. District Court*, 542 U.S. 367, 380 (2004) (internal

citation omitted). Petitioners cannot circumvent the normal course of district court

review unless: (1) there are "no other adequate means to attain the relief" that

Petitioners seek, *id.* (internal quotations omitted); (2) the Petitioners' "right to issuance

of the writ is 'clear and indisputable,'" *id.* at 381 (internal citations omitted); and (3)

even where the first two requirements are satisfied, a reviewing court in its exercise of

discretion is "satisfied that the writ is appropriate under the circumstances," *id.* Given

the extraordinary nature of mandamus, this Court has issued the writ only in

"exceptional circumstances amounting to a judicial usurpation of power *or* a clear abuse of discretion." *In re City of New York*, 607 F.3d 923, 943 (2d Cir. 2010) (citing *Cheney*, 542 U.S. at 380) (emphasis in original).

## ARGUMENT

### I. MANDAMUS REVIEW IS NOT AVAILABLE TO PETITIONERS

This Court has "expressed reluctance to issue writs of mandamus to overturn discovery rulings," and this case should be no exception. *In re City of New York*, 607 F.3d at 939 (internal quotations omitted); *see also In re W.R. Grace & Co.-Conn.*, 984 F.2d 587, 589 (2d Cir. 1993) ("Pretrial discovery orders are generally not appealable, and [this Court has] expressed reluctance to circumvent this salutary rule by use of mandamus.") (internal citations omitted).

Petitioners fail to satisfy the high standards required for mandamus review. First, Petitioners have not demonstrated a writ is appropriate under the circumstances, as the issues on which they seek review involve ordinary discovery rulings and do not raise any new or important questions of law. Second, they have failed to exhaust the many adequate remedies at their disposal. Third, Petitioners have failed to establish a "clear and indisputable right" to a writ. Their petition is merely an attempt to evade their well-settled obligation to produce the "whole record," APA § 706, and to run out the clock on meaningful judicial review.

//

13

## A.    Petitioners Raise No Novel or Significant Questions of Law

An extraordinary writ of mandamus is appropriate only where there is "a novel and significant question of law" and "the presence of a legal issue whose resolution will aid in the administration of justice." *In re City of New York*, 607 F.3d at 939. Petitioners fail to meet either condition.

First, nowhere do Petitioners identify any novel or significant issues of law. Petitioners claim that the district court's discovery orders "upend[] fundamental principles of judicial review of agency action." Pet'rs' Mand. 16. This is incorrect. The District Court has applied settled legal principles, and its unremarkable discovery orders have been consistent with those issued by courts in this and other circuits confronted with significant doubts about the adequacy of an administrative record. Its orders are also consistent with those in other "hybrid" cases raising APA and constitutional claims. *See infra* Section I.C. The District Court has managed the proceedings methodically, issuing orders to complete the record, produce a privilege log, and allow limited discovery. *Id.* The issues on which Petitioners seek mandamus review are quite pedestrian.

Second, Petitioners' exaggerated rhetoric that the actions of the District Court would "threaten the separation of powers" and make litigation "unduly intrusive and practically impossible" is overblown. Pet'rs' Mand. 4. The District Court denied the request to stay discovery by applying settled precedent to the specific facts of this case, particularly considering the need to ensure resolution of this action by the date

14

imposed by Petitioners for terminating DACA, March 5, 2018. Pet'rs' Add. 48 (applying three-factor test for good cause developed in *Negrete v. Citibank, N.A.*, No. 15-CV- 7250 (RWS), 2015 WL 8207466, at *1 (S.D.N.Y. Dec. 7, 2015)).

Moreover, Respondents served a set of targeted discovery requests that were limited in scope, *see supra* page 10. *Cf. Cheney*, 542 U.S. at 387 (noting that plaintiffs sought "everything under the sky"). The District Court addressed Petitioners' separation of powers concerns: limiting the scope of the privilege log to DHS and DOJ documents, Pet'rs' Add. 7–9, and then further to only those documents considered by Attorney General Sessions, Acting Secretary Duke, and their first-tier subordinates, Pet'rs' Add. 52–53. The Magistrate Judge's order requiring *completion* of the administrative record similarly applied the proper legal standard to the facts—such as the record's sparseness, the irrelevancy of much of the included material, and its glaring omissions. Pet'rs' Add. 41–42. In short, the questions presented in this petition are neither new nor significant.

Even assuming *arguendo* that the District Court "deviate[d] from settled legal principles governing judicial review of agency action," Pet'rs' Mand. 15, this Court has explained that "an allegedly incorrect application of a well-developed principle does not, by itself, give rise to such a novel and important issue as to warrant mandamus review." *In re City of New York*, 607 F.3d at 940 (internal quotations omitted). Where an order "rested on the district judge's appraisal of facts and exercise of discretion," no issue of first impression is presented. *American Express Warehousing, Ltd. v.*

*Transamerica Ins. Co.*, 380 F.2d 277, 283 (2d Cir. 1967); *see also United States v. DiStefano*, 464 F.2d 845, 850 (2d Cir. 1972) (finding that even if "the judge was wrong, indeed very wrong . . . that is not enough" to grant mandamus).

Neither would the mandamus ruling "aid in the administration of justice." *In re City of New York*, 607 F.3d at 939. The District Court is simply asking Petitioners to comply with the well-established APA requirement to produce a complete record on which the court can make an informed decision, and with ordinary discovery rulings on the non-APA claims. Because the District Court has not acted in error, addressing this petition will neither aid future courts in discovery proceedings nor forestall future error. *See infra* Section I.C.

Finally, Petitioners argue that the District Court must determine threshold jurisdiction and justiciability issues only before ordering completion of the administrative record. Pet'rs' Mand. 18. Petitioners delayed filing a motion to dismiss on these grounds until October 27, even though Respondents had filed the operative pleading, their Second Amended Complaint, on September 19, 2017. Petitioners have now moved to dismiss for lack of jurisdiction and non-justiciability, but those two issues are not properly before this Court. *See* 28 U.S.C. § 1292; *see Wabtec Corp. v. Faiveley Transport Malmo AB*, 525 F.3d 135, 137 (2d Cir. 2008) ("[D]enial of a motion to dismiss, even when the motion is based upon jurisdictional grounds, is not immediately reviewable.") (quoting *Catlin v. United States*, 324 U.S. 229, 236 (1945)); *see*

*also In re Ivy,* 901 F.2d 7, 10 (2d Cir. 1990) (noting "the general rule that appellate courts should avoid determining jurisdictional issues on a petition for mandamus").[2]

## B. Other Adequate Remedies Exist

Petitioners have failed to show that mandamus is the only adequate remedy for the relief they seek. Rather, they seek mandamus review to circumvent both the normal course for resolving discovery disputes in the District Court and the usual procedures for appellate review, which prevent parties from premature litigation of discovery matters in this Court.

First, Petitioners have failed to pursue routine mechanisms in the District Court that could obviate the need for mandamus. Petitioners have not moved for a protective order or to seal the record. Nor have they sought additional time, if still needed, to complete the administrative record or privilege log, even though the District Court has accommodated such requests multiple times. Resp'ts' First Add. 8–9; Pet'rs' Add. 7–9, 51–53.[3]

---

[2] The government's arguments regarding jurisdiction and justiciability are also wrong. As set forth in Respondents' briefing in the District Court, Petitioners incorrectly conflate an agency's non-enforcement decision *with regard to an individual* with an agency's *categorical* decision to terminate a previous program. Petitioners also rely on an overbroad reading of 8 U.S.C. § 1252(g) that neither the text of the statute nor controlling precedent can sustain. *See* Add. 96–120. However, if this Court determines that jurisdiction and justiciability are reviewable on this mandamus, Respondents request an opportunity for supplemental briefing to ensure an adequate opportunity to address these issues.

[3] Additionally, rather than consult with Respondents to develop efficient ways to compile a privilege log, as encouraged by Local Rule 26.3 Committee Note,

Second, the District Court did not foreclose Petitioners from submitting dispositive motions addressing jurisdiction and justiciability. The court allowed Petitioners to submit a motion to dismiss at any point during the discovery process until December 15, 2017. Rather than submit their motion as soon as possible, Petitioners agreed to the District Court's proposed schedule, Resp'ts' First Add. 80, and, even then, delayed moving to dismiss until ordered by this Court and the District Court after seeking an emergency stay and this exceptional writ.

Third, where opportunity to seek certification for interlocutory appeal still exists, 28 U.S.C. § 1292(b), this Court should deny mandamus petitions. *See Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (concluding that a party may petition for a writ of mandamus "[i]f a district court refuses certification, or certification is not otherwise available"); *In re W.R. Grace & Co.-Conn.*, 984 F.2d 587, 589 (2d Cir. 1993) (denying mandamus where district court did not certify its decisions for review). Petitioners have not sought certification, and a writ of mandamus is premature.

## C. The District Court Committed No "Clear and Indisputable" Error Warranting Mandamus Relief

Petitioners have not carried their burden to demonstrate a "clear and indisputable" right to mandamus relief. *Cheney*, 542 U.S. at 381. Such a right can be established only where a district court has committed a "judicial usurpation of power

---

Petitioners merely assert that doing so would "impos[e] significant and intrusive burdens." Pet'rs' Mand. 27.

*or* a clear abuse of discretion." *In re City of New York*, 607 F.3d at 943. But the District Court has merely directed Petitioners to fulfill their basic obligation under the APA to produce a complete administrative record. Requiring a privilege log is also well within a district court's discretion, and limited discovery on Respondents' constitutional claims has not subjected Petitioners to disproportionate burdens. The District Court has acted responsibly, and there are no "exceptional circumstances" justifying drastic intervention from this Court. *Cheney*, 542 at 380.

### 1.     The District Court Correctly Ordered Completion of Petitioners' Deficient Administrative Record

Petitioners produced a grossly inadequate administrative record, consisting of only 256 pages of publicly available materials, 185 of which related to a different deferred action program, and 41 of which consisted of the original memoranda creating and extending DACA, along with an Office of Legal Counsel ("OLC") opinion concluding that the extended DACA program was legal. Add. 58–74. It is implausible that the scant remaining thirty pages were the only materials considered before Respondents decided to terminate a successful multi-year program that profoundly impacts millions of people. This decision unquestionably involved multiple meetings among large numbers of officials considering various policy options. Add. 172–92. Recognizing this deficit, the District Court appropriately directed Petitioners to complete the administrative record.

Section 706 of the APA requires that judicial review of agency action be based on the "whole record." *See also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (review of agency action must be based on "the *full* administrative record that was before the Secretary at the time he made his decision") (emphasis added).[4] Courts have clarified that this standard requires inclusion of all documents that the agency decisionmakers *directly* or *indirectly* considered in making the challenged decision. *See, e.g., Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) ("The complete administrative record consists of all documents and materials directly or indirectly considered by the agency."); *accord Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).[5] Petitioners do not contest that this standard applies. Resp'ts' First Add. 34; Pet'rs' Add. 41.

Rather, Petitioners claim that the District Court must rely on the record compiled by an agency, regardless of obvious defects. Yet a district court is not so powerless. The presumption of regularity is rebutted where, as here, the challenging party makes a "strong suggestion" that the record is incomplete. *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) (requiring discovery on the completeness of the

---

[4] *See also James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) ("The administrative record includes all materials 'compiled' by the agency, that were 'before the agency at the time the decision was made.'") (quoting *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981)).
[5] District courts in this Circuit have also adopted this standard. *See, e.g., Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012) (defining "relevant materials 'before the agency'" as "those that the agency decision-makers directly or indirectly considered").

administrative record, where government omitted "fundamental documents"). This is especially true where no formal agency proceedings have concretely determined the scope of the administrative record. *See id.* Petitioners' "assurances that they have submitted the full record will not substitute for the Court's independent consideration of that issue." *Id.* Requiring courts always to accept the agency's word, even when confronted by obvious omissions, would frustrate the meaningful judicial review for which Congress provided in the APA.

When courts determine that an agency's administrative record is incomplete, they typically require the agency to provide additional documentation—either on its own accord or through discovery—to ensure the court has the full record before it.[6] *See, e.g.*, *Dopico*, 687 F.2d at 654 (allowing discovery); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 793 (D.C. Cir. 1984) (finding that an incomplete administrative record created an "asymmetry in information [which] undermines the reliability of a court's review"); *Nat. Res. Def. Council, Inc. v. Train,* 519 F.2d 287, 292 (D.C. Cir. 1975) ("[P]laintiffs are entitled to an opportunity to determine, by limited discovery, whether any other documents which are properly part of the administrative record have been withheld."). In this case, Respondents sought, and the District Court ordered, that

---

[6] Petitioners claim the proper remedy in this case is to remand to the agency to supplement the record. Pet'rs' Mand. 19. The District Court has in fact "remanded" the task of completing the administrative record to the agency by ordering Petitioners to compile the administrative record in good faith according to the proper standard.

Petitioners complete the administrative record in good faith, applying the correct legal standard. Resp'ts' First Add. 26; Pet'rs' Add. 40, 42.

Moreover, Petitioners' claim that the termination of DACA was a policy decision and therefore does not require a detailed administrative record, Pet'rs' Mand. 21, lacks merit. As set forth *infra*, Petitioners have omitted categories of documents necessary to justify any agency action, let alone one that abruptly reverses a long-settled policy on which millions of people have relied. *See F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 537 (2009) (Kennedy, J., concurring) ("Where there is a policy change the record may be much more developed because the agency based its prior policy on factual findings.").

In this case, Petitioners compiled a skeletal administrative record containing multiple glaring omissions. First, the administrative record does not adequately reflect Attorney General Sessions' role in the decision to terminate DACA, despite Petitioners' repeated representations that he was a decision-maker. *See* Add. 157 ("[T]he Attorney General and DHS decided that . . . they're going to wind down this program[.]"); Add. 144 (same); Add. 155 (same). The record contains a single, one-page document from DOJ concluding, without analysis, that DACA is unlawful. Add. 69. Nor does the record disclose why DOJ departed from its prior analysis, stated in internal documents and external briefing, that DACA is lawful. Therefore, the administrative record lacks additional DOJ documents directly or indirectly considered by Acting Secretary Duke or Attorney General Sessions.

Second, in the California cases for which the government produced an identical administrative record, Judge Alsup reviewed *in camera* documents DHS had listed in a privilege log and ordered that the government include some of those materials in the administrative record. Judge Alsup concluded that the government had improperly excluded 35 DHS documents out of 84 examined *in camera.* Add. 245. Petitioners should have included those documents in the identical administrative record produced for this case as well.

Third, Petitioners failed to provide evidence for important factual allegations made in support of terminating DACA. For example, the record contains no documents relating to Acting Secretary Duke's assertion in her memorandum terminating DACA that "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion." Resp'ts' First Add. 29. This assertion is important because Petitioners' reasoning for termination appears to rest on the view that in implementing DACA, DHS had not exercised discretion on a case-by-case basis, as required by law. The absence of any evidence in the administrative record for Petitioner Duke's essential finding confirms that the record is incomplete.

Fourth, the administrative record contains only those documents *personally* considered by Acting Secretary Duke, contrary to the agreed-upon standard that the administrative record includes all documents "directly and indirectly considered" by

23

the decisionmaker. Petitioners maintain that the record need include only "non-privileged documents actually considered by the Acting Secretary of Homeland Security in making her decision[.]" Add. 88. Petitioners also claim that the "actually considered" standard is "substantively indistinguishable" from the "directly or indirectly" standard. Resp'ts' First Add. 34. This is incorrect.

Courts have found that "directly or indirectly" considered encompasses a broader range of materials. *See Bethlehem Steel Corp. v. EPA*, 638 F.2d 994, 1000 (7th Cir. 1980) (holding that a complete administrative record includes "any documents that might have influenced the agency's decision" and not merely those on which the agency relied in its final decision) (quotation marks and citations omitted); *Amfac Resorts v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (holding that the administrative record must include "the work and recommendations of subordinates" if the agency decision maker based his decision on them). The District Court correctly determined that Petitioners applied an inappropriate standard in compiling the administrative record. To make the "indirectly considered" prong more administrable, the District Court directed the government to include in the administrative record all documents actually considered by Attorney General Sessions' and Acting Secretary Duke's first-tier subordinates. Pet'rs' Add. 52–53.

Fifth, the record lacks any documentation that purports to explain Petitioners' decision to continue for six months a program they claim is illegal. Petitioner Sessions' one-page letter concluded that DACA is "unconstitutional" and counseled

24

an "orderly and efficient wind-down process." Add. 69. Yet the administrative record fails to explain why, and on what authority, the government *maintained*, for six months a program it believed to be unconstitutional.

Sixth, the administrative record does not include documents relating to the February 2017 decision by DHS to keep the DACA program in place. *See* Add. 64. Petitioners' consideration of whether to continue, modify, or terminate DACA dates back at least to that time. The administrative record therefore should include documents explaining Petitioners' about-face, from the February 2017 decision retaining DACA to a September 2017 decision terminating DACA.

In sum, the District Court's sensible order to complete the administrative record was based on significant evidence that the record improperly excluded documents that DHS and DOJ had directly or indirectly considered.

### 2. The District Court Did Not Abuse Its Discretion in Requiring a Privilege Log

The District Court was within its discretion to require the production of a privilege log and to limit its scope in response to Petitioners' requests.

Courts commonly order the production of a privilege log concurrent with an administrative record, recognizing that it is often impossible for plaintiffs and courts to assess the nature of an assertion of privilege without a log. *See Nw. Envtl. Advocates v. EPA*, CIV. 05-1876-HA, 2008 WL 111054, at *4 (D. Or. Jan. 7, 2008) ("Absent [a privilege] log, plaintiff has no way to challenge assertion of the privilege, and this

court has no way to evaluate the claim."); *see also New York v. Salazar*, 701 F. Supp. 2d 224, 229 (N.D.N.Y. 2010) (noting that the Department of Interior affirmatively produced a privilege log along with the administrative record); *accord Citizens Against Casino Gambling in Erie County v. Stevens*, 2012 WL 2405195, at *2 (W.D.N.Y. June 23, 2012).

Petitioners' reliance on *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26 (D.C. Cir. 1986) (en banc), to argue that deliberative materials are not part of the administrative record, is unavailing. First, *San Luis Obispo* did not concern a privilege log at all, but whether a party could introduce deliberative process materials obtained elsewhere into the administrative record. *Id.* at 44. A privilege log does not require Petitioners to *disclose* materials, but only to identify documents over which they intend to assert privilege. Second, a privilege log typically applies to documents withheld from the administrative record for any privilege, including deliberative process. *See, e.g., Gill v. Dep't of Justice*, No. 14-CV-03120-RS (KAW), 2015 WL 9258075, at *7 (N.D. Cal. Dec. 18, 2015) (requiring DOJ to produce privilege log of documents withheld from administrative record on deliberative process privilege grounds); *Miami Nation of Indians v. Babbitt*, 979 F. Supp. 771, 778 (N.D. Ind. 1996) ("The United States is expected to specify which materials it contends the deliberative process privilege protects with specificity[.]"). It is simply not unusual in APA cases to order that a privilege log accompany the administrative record.

Moreover, the District Court exercised its discretion in moderation, limiting the privilege log's scope three times in response to Petitioners' requests, "mindful that overbroad discovery would inappropriately interfere with agencies' day-to-day workings[.]" Pet'rs' Add. 51. Specifically, the District Court (1) delayed production of the privilege log until after the Magistrate Judge decided whether the administrative record was complete, Resp'ts' First Add. 9, (2) narrowed its scope to apply only to DHS and DOJ, Pet'rs' Add. 7–9, and (3) limited the log to documents considered by Attorney General Sessions, Acting Secretary Duke, and their first-tier subordinates. Pet'rs' Add. 52–53.

Further, the Northern District of California's treatment of the privilege log Petitioners produced in parallel litigation over the identical administrative record confirms its importance in this case, and that it can be done without undue burden. As stated above, Judge Alsup's order that DHS produce a privilege log led to *in camera* review of documents and a finding that nearly half of the logged documents had been improperly excluded from the administrative record—the same administrative record produced in this matter. Add. 245. Judge Alsup's *in camera* review demonstrates that the order to produce a privilege log in this case was prudent in facilitating meaningful judicial review and not unduly burdensome.

Petitioners' concern that they might waive privilege if they did not identify documents within the log is unwarranted. Pet'rs' Mand. 33. The Magistrate Judge's original scheduling order explains that Petitioners can maintain their right to assert

27

privilege on documents excluded from the log by making a showing of good cause for excluding them. Resp'ts' First Add. 2. Petitioners may also request relief from the Magistrate Judge if they wish to exclude documents from the privilege log.

Finally, the District Court acted reasonably in requiring materials from first-tier subordinates to be included in the privilege log. *Contra* Pet'rs' Mand. 19–20. The District Court tailored its order to implement the "directly or indirectly considered" standard, a standard often interpreted to encompass the decisionmaker's subordinates. *See, e.g., Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001); *Animal Legal Def. Fund v. Vilsack*, 110 F. Supp. 3d 157, 160 (D.D.C. 2015).

If anything, the District Court narrowed Petitioners' obligations under well-established administrative law by limiting its order to only first-tier subordinates, as opposed to all subordinates whose materials were indirectly considered by agency decision-makers. The privilege log requirement hardly affords Petitioners a "clear and indisputable" right to a writ of mandamus.

### 3. The Discovery Allowed in This Case is Appropriate

Petitioners also fail to establish a "clear and indisputable" right to a writ of mandamus to bar discovery on Respondents' constitutional claims. The *Batalla Vidal* Respondents allege that Petitioners violated procedural due process by failing to send corrected notices to certain DACA recipients who were misled by the individualized written notices they had previously received. Add. 23, 33. Respondents also allege that Petitioners violated equal protection because the DACA Termination was

28

substantially motivated by animus toward Latinos and Mexicans. Add. 34. The District Court rightly declined to prohibit Respondents from pursuing the limited discovery they have served regarding these claims.

Respondents are entitled to discovery on their procedural due process claim in order to properly evaluate all three prongs of the *Mathews v. Eldridge* test. 424 U.S. 319, 335 (1976). To determine if the government deprived someone of a liberty or property interest without procedural due process, a court must examine: (1) the private interest affected; (2) the probable value added, if any, of additional procedures; and (3) the government's interest, including the "fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*

The third prong of this test is especially fact-dependent. Without discovery, the District Court cannot assess the "fiscal and administrative burdens" that corrected notices would have imposed on the government.[7] In addition, as the District Court noted, this claim does not address the decision to end the DACA program, but instead challenges how Petitioners communicated that decision to DACA beneficiaries. Pet'rs' Add. 3. Thus, this claim cannot rest solely on the administrative

---

[7] Respondents inquired about administrative burdens of corrected notices in written discovery and the deposition of Donald Neufeld, who leads the DHS office that manages renewal notices for DACA recipients. *See, e.g.*, Add. 167–69. Indeed, in the summer of 2017, when DHS ceased its years-long practice of issuing renewal notices, it was Mr. Neufeld, in his capacity as director of service center operations, who questioned more senior, policy-making officials about this decision. *Id.*

record, which is limited to documents concerning the decision to terminate DACA, and discovery is appropriate.

Second, Respondents are entitled to discovery on their equal protection claim in order to show whether discriminatory intent was "a 'substantial' or 'motivating' factor behind" the DACA Termination. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *see also Raza v. City of New York*, 998 F. Supp. 2d 70, 79–80 (E.D.N.Y. 2013). "Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Discovery is appropriate on factors relevant to the discriminatory intent analysis, including the administrative history, "especially where there are contemporary statements by" the decisionmakers; the historical background of the decision; any procedural or substantive departures; and the decision's disparate impact. *Hunter*, 471 U.S. at 227; *Arlington Heights*, 429 U.S. at 266–68.

### 4. Any Burden on Petitioners is Proportionate and Reasonable

The burdens imposed on Petitioners by the discovery process are not sufficient to prove a "clear and indisputable" right to a writ of mandamus. Discovery in this case has not been particularly burdensome to Petitioners, especially relative to "the

importance of the issues at stake in the action" and in light of Petitioners' far superior "access to relevant information." Fed. R. Civ. P. 26(b)(1).

Respondents have made deliberate efforts to ensure that discovery be as limited as possible while still allowing them to litigate their case. Respondents have served only nine interrogatories and seven requests for production on each decision-making agency. Respondents also served seventy-five requests for admission on DHS and thirty-nine on DOJ and noticed two depositions of mid-level officials. In their responses, Petitioners have not produced lengthy documents. For example, in answer to the Requests for Production, Petitioners produced a total of fifty-six pages of records, which largely consisted of redundant scheduling emails. Respondents' modest discovery requests have not generated an undue burden.

Petitioners' claims that they are overburdened by discovery requests are based upon their conflation of the modest burdens they face in this case with those in other cases challenging the DACA Termination. Indeed, in their mandamus petition, Petitioners fail to distinguish between discovery requests served by Respondents and those propounded in parallel cases, including those filed in California. Pet'rs' Mand. 27–28. Petitioners' declarations refer to documents requested in the cases filed in California, Pet'rs' Add. 23–35, not documents requested in this case. Any alleged burdens caused by orders in the California cases cannot, of course, justify this Court's intervention into discovery managed by the District Court in this case.

Petitioners have similarly exaggerated the burden placed upon them by the requirement to produce a privilege log. They claimed on October 18, 2017, that DHS has collected one million documents and diverted significant resources as a result of the District Court's discovery orders, Pet'rs' Mand. 13. But in *this* case, unlike those in California, the District Court has limited the privilege log to only records within two agencies, DHS and DOJ, and only to records considered by Attorney General Sessions, Acting Secretary Duke, and their first-tier subordinates. As such, the District Court, has repeatedly demonstrated its pragmatism and willingness—often on consent—to alleviate Petitioners' asserted burdens.

Finally, to the extent that the compressed discovery schedule imposes some burden on Petitioners, this onus is of Petitioners' own making. Petitioners set the March 5, 2018 termination date and refused to extend any of the deadlines for the termination of the DACA program. Resp'ts' First Add. 68.

In sum, the discovery burdens borne by Petitioners pale in comparison to the importance of the issues involved in this case. At stake are the lives of nearly 800,000 young people for whom DACA ensures a secure life in the only place they have called home, the futures of millions of individuals—U.S. citizen and non-citizen alike—who depend on individuals with DACA, and the communities in which DACA recipients play an integral part. Any burden that resuming discovery might impose on Petitioners is far outweighed by the unfair prejudice that denying or further delaying discovery would cause Respondents.

## CONCLUSION

For the foregoing reasons, Respondents request that this Court promptly deny the petition for a writ of mandamus and vacate the stay on discovery and completion of the administrative record.

Respectfully submitted,

/s/ Michael J. Wishnie

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Healy Ko, Law Student Intern
Victoria Roeck, Law Student Intern
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq.
Michael J. Wishnie, Esq.
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Karen Tumlin, Esq.
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin Cox, Esq.
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005

*Attorneys for* Batalla Vidal *Plaintiff-Respondents*

November 6, 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the word limit of Federal Rule of Appellate Procedure 21(d)(1) because the motion contains 7,791 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface, 14-point Garamond font.

/s/ Michael J. Wishnie
MICHAEL J. WISHNIE

# CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2017, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. All counsel in this case are participants in the district court's CM/ECF system.

/s/ Michael J. Wishnie
MICHAEL J. WISHNIE