# ADDENDUM

# TABLE OF CONTENTS

ECF No. 60 ..................................................................................Add. 1

ECF No. 60-1 (Excerpts)..............................................................Add. 37

ECF No. 69 ................................................................................Add. 51

ECF No. 77-1 (Excerpts) .............................................................Add. 58

ECF No. 78 ................................................................................Add. 75

ECF No. 80 ................................................................................Add. 84

ECF No. 95 ................................................................................Add. 91

ECF No. 98 ................................................................................Add. 94

ECF No. 102 ..............................................................................Add. 96

District Court Docket, updated as of Nov. 1, 2017 ......................Add. 121

Sept. 14, 2017 Status Conference Tr. ..........................................Add. 132

Excerpts from Donald Neufeld Deposition, Oct. 18, 2017...........Add. 167

Excerpts from James McCament Deposition, Oct. 17, 2017.........Add. 171

Pet'rs' Resp. to Resp'ts' First Set of Interrogatories ...................Add. 193

Order Re Mot. to Complete A.R., Regents of the Univ. of Cal. v. U.S. Dep't Homeland Sec., CV 17-05211, ECF No. 79 (N.D. Cal. Oct. 17, 2017).......Add. 233

USCIS, *Deferred Action for Childhood Arrival Process – Through Fiscal Year 2017, 3rd Qtr.* (Sept. 20, 2017)...................................................Add. 247

Tom Wong, et al., *DACA Recipients' Economic and Education Gains Continue to Grow*, Center for American Progress (Aug. 28, 2017)................Add. 249

Jill Colvin, *Thousands Eligible for DACA Renewals Failed to Apply in Time*, PBS News Hour (Oct. 19, 2017), https://www.pbs.org/newshour/nation/thousands-eligible-for-daca-renewals-failed-to-apply-in-time.................................... Add. 254

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States, <br><br> *Defendants*. | **SECOND AMENDED COMPLAINT** <br><br> Case No. 1:16-cv-04756 (NGG) (JO) |

## INTRODUCTION

Plaintiffs Martín Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas,

Mariano Mondragon, and Carolina Fung Feng ("Individual Plaintiffs"), on behalf of themselves

and all other similarly situated individuals, and Make the Road New York ("MRNY"), on behalf

of itself, its members and clients, and all similarly situated individuals (collectively "Plaintiffs"

or "Named Plaintiffs"), bring this action to challenge the Trump Administration's unlawful

termination of the Deferred Action for Childhood Arrivals ("DACA") program. Nearly one

million young immigrants rely on DACA to work, study, hold driver's licenses, serve in the

military, support their families, and live securely in the only country they know as home.

Defendants' arbitrary decision to terminate this established and successful program upends the

lives of these individuals and threatens to destabilize their families, communities, and

workplaces. The termination of DACA violates federal statutes and the Constitution, necessitating this Court's intervention to protect against imminent and devastating harm.

The termination of DACA will prevent Mr. Batalla Vidal from caring for patients at the nursing home where he works. It will prohibit Ms. Fernandez from working to support her two U.S.-citizen children, making her mortgage payments, and paying for health insurance for her family. It will throw into disarray the lives of Mr. Mondragon's two young children and pregnant wife, who depend on his ability to make a living wage. It will bar Mr. Vargas, who recently started attending night classes at City University of New York School of Law, from fulfilling his dream of becoming a lawyer. Defendants' decision to abruptly end the program will force nearly 800,000 people to live with the persistent fear of being separated from their families.

Defendants impose these harms in violation of the procedural requirements meant to protect individuals from arbitrary government action. The termination of DACA binds the Department of Homeland Security to categorically deny deferred action to new applicants as of September 5, 2017, and to deny all renewal applications as of October 5, 2017, without following public notice-and-comment procedures required by the Administrative Procedure Act ("APA"), and without the analysis required by the Regulatory Flexibility Act.

Separately, Defendants' DACA termination reverses longstanding agency policy on which nearly 800,000 people have relied, including assurances to DACA applicants that the information they provided would not be used against them or their loved ones. Under the APA, Defendants must provide a reasoned explanation for choosing to terminate this program. Rather than do so, Defendants have justified the reversal based on fear of a hypothetical lawsuit, the legally erroneous claim that DACA is unlawful, and a variety of inaccurate factual assertions.

Defendants' termination of DACA additionally violates the Fifth Amendment. Defendants have failed to correct misleading notices previously sent to many DACA recipients who are now required to submit renewal applications by October 5, 2017, in violation of procedural due process requirements. Finally, Defendants' contradictory, illogical, and false explanations for terminating DACA evidence that the true reasons for ending this highly successful program are pretextual, in violation of the guarantee of equal protection under law.

Because Plaintiffs and other similarly situated individuals face the imminent loss of their eligibility for DACA status due to Defendants' unlawful actions, Plaintiffs ask this Court to declare the termination of DACA unlawful and to enjoin its enforcement.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the U.S. Constitution, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*., and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601 *et seq.*

2.      Venue properly lies in this district because Individual Plaintiffs reside in the district, and Plaintiff Make the Road New York ("MRNY") operates community centers in Bushwick, Brooklyn; Jackson Heights, Queens; Port Richmond, Staten Island; and Brentwood, Long Island. 28 U.S.C. § 1391(e)(1). Venue also properly lies in this district because a substantial part of the events or omissions giving rise to this action occurred in the district. *Id*. § 1391(b).

## PARTIES

**Plaintiff Martín Batalla Vidal**

3.      Plaintiff Martín Jonathan Batalla Vidal ("Mr. Batalla Vidal") is a recipient of DACA. He has resided in Queens, New York for twenty years.

4.     Mr. Batalla Vidal was born in Mexico and raised in New York since he was a young child. Mr. Batalla Vidal has a younger brother who has also received DACA, and two younger brothers who were born in the United States. Mr. Batalla Vidal considers New York his home, as it is the only place he has lived in since he was a child.

5.     Mr. Batalla Vidal attended Bushwick Leaders High School for Academic Excellence in Brooklyn, New York from September 2004 until his graduation in June 2008.

6.     After graduating from high school, Mr. Batalla Vidal hoped to attend a nursing program at a school such as the City University of New York ("CUNY"), but could not seriously consider these programs because those universities did not offer financial aid to undocumented students. His guidance counselor and other advisors also stressed the difficulty of finding work in the medical field without employment authorization, in light of which Mr. Batalla Vidal chose not to pursue a degree he might not be able to use in the future.

7.     In November 2012, the Obama Administration created DACA. In November 2014, Mr. Batalla Vidal applied for DACA with the assistance of MRNY. To prepare his application, Mr. Batalla Vidal attended a workshop at MRNY's Brooklyn office, where he made follow-up visits. To prove his eligibility for DACA, Mr. Batalla Vidal spent many hours over the course of several months gathering paperwork and obtaining documents from his high school, hospital, and bank. On February 17, 2015, DHS approved Mr. Batalla Vidal's application.

8.     Receiving DACA reinvigorated Mr. Batalla Vidal's dreams of working in the medical profession, and in fall 2015, he enrolled at ASA College in a medical assistant's degree program. With DACA, Mr. Batalla Vidal was able to raise money for school and support his mother and younger siblings. He worked two jobs at the same time, full time at Bocca Catering and part time at the New York Sports Club. He currently works full time at Park Terrace

Rehabilitation and Nursing Center, where he cares for patients with serious health needs. Mr. Batalla Vidal also received a scholarship for DACA recipients from ASA College.

9.      Defendants approved Mr. Batalla Vidal's DACA renewal on February 16, 2017. His current grant will expire on February 15, 2019. Because of Defendants' termination of DACA, Mr. Batalla Vidal is ineligible to apply to renew DACA.

10.     Through employment he was able to obtain with DACA, Mr. Batalla Vidal can financially support himself, his mother, and his younger siblings. Mr. Batalla Vidal's ability to pursue his career and provide for his family has been thrown into jeopardy due to Defendants' termination of DACA. Without Mr. Batalla Vidal's income, he and his family will face significant financial hardship. If Mr. Batalla Vidal is deported, his family will also lose his emotional support and be irreparably harmed.

**Plaintiff Antonio Alarcon**

11.     Plaintiff Antonio Alarcon ("Mr. Alarcon") is a recipient of DACA. He resides in Queens, New York.

12.     Mr. Alarcon was born in Mexico and has lived in New York since he was eleven years old. As a child, he lived in New York with his parents, while his younger brother stayed behind in Mexico with their grandparents. When Mr. Alarcon was seventeen, his grandparents passed away, and his parents felt compelled to return to Mexico to care for his younger brother. When his parents left, Mr. Alarcon moved in with his aunt and uncle.

13.     Mr. Alarcon received DACA on March 26, 2013, with the assistance of MRNY, which then hired Mr. Alarcon as an Immigrant Youth Organizer. Employment by virtue of DACA enabled Mr. Alarcon to financially support himself, his aunt, and his uncle as he pursued his education.

14.     Mr. Alarcon graduated from Flushing High School, and received his associate's degree from LaGuardia Community College in 2015. He is currently pursuing a Bachelor of Arts degree in Film Studies from Queens College, where he is on track to graduate in December 2017.

15.     Through his employment and volunteer activities, Mr. Alarcon has become a leading voice for youth in his community and beyond. From facilitating local youth meetings and retreats, to serving as a regional coordinator on national campaigns, he has worked to expand educational opportunities for immigrant youth throughout New York and the United States.

16.     Defendants granted Mr. Alarcon DACA renewals on March 6, 2015 and again on January 26, 2017. His current grant will expire on January 25, 2019. He is ineligible to renew DACA because of Defendants' termination of the program, thereby jeopardizing his and his family's wellbeing.

**Plaintiff Eliana Fernandez**

17.     Plaintiff Eliana Fernandez ("Ms. Fernandez") is a recipient of DACA. She resides in Suffolk County, New York.

18.     Ms. Fernandez was born in Ecuador and came to the United States at the age of fourteen, where she was finally able to reunite with her parents after not seeing them for many years. She has lived in New York since she was fourteen years old. She has two New York-born, U.S. citizen, children of elementary-school age, whom she is raising.

19.     Ms. Fernandez first received DACA on December 11, 2012 and renewed her status on November 4, 2016. Her current grant will expire on November 20, 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

20.     Ms. Fernandez has worked hard to build a life for herself and her family. Despite being ineligible for financial aid and other types of support, she attended St. Joseph's College,

where she was on the Dean's List many semesters and earned a degree in Sociology in 2015. She

now works as an Immigration Case Manager in MRNY's Long Island office. This semester she

started graduate school at CUNY School of Professional Studies to obtain an Advanced

Certificate on Immigration Law.

21.    Ms. Fernandez is a mother and homeowner who contributes every day to the state

of New York by working, studying, and giving back to her community. She was able to achieve

these goals because of DACA, which allowed her to go back to school, earn a living wage, and

purchase a home in which her children can grow up.

22.    Without DACA, Ms. Fernandez would no longer have a driver's license to drive

her children to the doctor or to school. Without the employment authorization that her DACA

status provides, she could not afford her mortgage or her family's health insurance. Defendants'

termination of the DACA program puts Ms. Fernandez at risk of being separated from her

children, as she was from her parents as a child.

**Plaintiff Carlos Vargas**

23.    Plaintiff Carlos Vargas ("Mr. Vargas") is a recipient of DACA. He resides in

Staten Island, New York.

24.    Mr. Vargas was born in Puebla, Mexico. He came to the United States with his

mother, who was struggling to raise Mr. Vargas and his siblings after Mr. Vargas's father passed

away two months before he was born. Mr. Vargas has lived in New York City since he was four,

and in Staten Island since he was sixteen.

25.    Mr. Vargas began working in restaurants at age thirteen to help his family,

leaving school at 3 P.M. and working shifts from 4 P.M. to midnight, five days a week. He had

hoped to attend college but was told by a school counselor that he could not attend because he was undocumented.

26.     After graduating from James Madison High School in Brooklyn, Mr. Vargas began working sixty hours per week to support his family, while remaining committed to going to college and earning a degree. Mr. Vargas learned that his undocumented status would not prevent him from enrolling in CUNY College of Staten Island ("CUNY CSI"), provided he could pay his tuition without government loans. He applied for admission and was accepted. By taking classes at night and working full time during the day, Mr. Vargas obtained his Bachelor of Science degree in Business in 2014.

27.     Mr. Vargas applied for DACA in August 2012. His application was granted on December 13, 2012. DHS renewed his DACA on November 14, 2014 and again on September 14, 2016, with his current grant expiring on September 13, 2018. Mr. Vargas is no longer eligible to renew DACA as a result of Defendants' termination of the program.

28.     DACA allowed Mr. Vargas to obtain work authorization and a New York driver's license for the first time in his life, thereby opening up new employment and life opportunities.

29.     After volunteering for many years in Staten Island for Make the Road New York, El Centro del Inmigrante, and the Staten Island Community Job Center, Mr. Vargas became accredited as a U.S. Department of Justice Accredited Representative, authorizing him to represent individuals before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, the component of the Department of Justice that hears immigration cases.

30.     Mr. Vargas now works at MRNY, where he screens individuals and provides assistance applying for DACA and other forms of immigration relief. He plans to become a

lawyer so that he can be a more effective advocate for his community. Last month, he began attending evening classes at CUNY School of Law.

**Plaintiff Mariano Mondragon**

31.     Plaintiff Mariano Mondragon ("Mr. Mondragon") is a recipient of DACA. He resides in Queens, New York.

32.     Mr. Mondragon was born in Mexico and first came to the United States with his father in 1999, when he was fourteen years old. Six months after they arrived, his father returned to Mexico while Mr. Mondragon remained in the United States with his aunt. He has not seen his parents in seventeen years.

33.     Mr. Mondragon began working at the age of sixteen. Since graduating from Flushing High School in 2005, he has worked in the restaurant industry.

34.     Mr. Mondragon has been married for five years. He and his wife have two U.S.-born children together, ages eight and one, and his wife is pregnant with their third child.

35.     Mr. Mondragon also has a ten-year-old daughter from a previous relationship. Her mother moved to Mexico when she was pregnant. While Mr. Mondragon has never met his daughter in person, he provides financial support for her.

36.     Mr. Mondragon received DACA on April 14, 2014 and renewed it on February 25, 2016. His DACA status will expire on February 24, 2018. In addition, two of Mr. Mondragon's brothers are DACA recipients.

37.     DACA has allowed Mr. Mondragon to support his family by working as a bartender in Manhattan and it has provided assurance that he will not be separated from his children and wife.

38.     At the time of filing this complaint, Mr. Mondragon is making every effort to renew his DACA status before the October 5, 2017 deadline.

**Plaintiff Carolina Fung Feng**

39.     Plaintiff Carolina Fung Feng ("Ms. Fung Feng") is a recipient of DACA. She resides in Middle Village, Queens.

40.     Ms. Fung Feng was born in Costa Rica and came to the United States to live with her aunt in 2001 when she was twelve. She has not seen her father—her only living parent—since she left Costa Rica sixteen years ago. Ms. Fung Feng first applied for DACA around September 2012 and was approved around December 2012. She has successfully renewed DACA twice, in July 2014 and June 2016. Her status expires in September 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

41.     Ms. Fung Feng graduated from Hunter College in January 2013 with a Bachelor of Arts in English-Spanish Translation and Interpretation, and English Language Arts. She also received an English teaching certification from Teaching House in 2015.

42.     Ms. Fung Feng has worked for MRNY since 2015 as a Program Assistant for the Adult Literacy Program. She supports her younger brother, a U.S. citizen who graduated from CUNY City College in 2017, and her younger cousin, who came to the U.S. to study.

**Plaintiff Make the Road New York**

43.     Plaintiff Make the Road New York ("MRNY") brings this action on behalf of itself, as well as on behalf of its clients and members and all similarly situated individuals. MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to empowering immigrant, Latino, and working-class communities in New York. With offices in Brooklyn, Queens, Staten Island, and Suffolk County, MRNY integrates adult and youth education, legal

and survival services, and community and civic engagement, in order to assist low-income New Yorkers improve their lives and neighborhoods.

44.     MRNY has a legal department staffed by twenty-three attorneys and eleven advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as in affirmative applications for immigration relief. MRNY also directly assists individuals prepare the documentation and paperwork necessary for DACA applications and renewals. Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

45.     MRNY currently offers weekly DACA clinics in large group settings in Queens and assists DACA-eligible individuals through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers. MRNY also provides assistance with DACA renewals in its Brooklyn, Staten Island, and Long Island offices. Since fall 2012, MRNY has conducted approximately 392 DACA clinics and has submitted more than 2,582 DACA applications on behalf of its clients. MRNY assists its DACA-eligible clients with initial applications as well as renewals.

46.     MRNY has more than 20,000 dues-paying members residing in New York City and Long Island, primarily in the boroughs of Queens and Brooklyn. Its members include Plaintiffs Batalla Vidal, Alarcon, Fernandez, Vargas, Mondragon, and Fung Feng, along with many other members who will lose their DACA status as a result of Defendants' termination of the program.

47.     At least eleven current MRNY employees have DACA, including Plaintiffs Alarcon, Fernandez, Fung Feng, and Vargas.

48.     Approximately forty MRNY members, and a significant additional number of MRNY clients, have DACA that expires between September 5, 2017 and March 5, 2018 and are therefore subject to the mandatory October 5, 2017 renewal deadline. Of these members, MRNY has not been able to reach four DACA recipients to inform them they need to renew now. Some of these MRNY members and clients have received notices from Defendants advising them to renew "as soon as possible" and within 120 to 150 days before their status expires. Defendants' notices have made no mention of the October 5, 2017 deadline. None of these MRNY members or clients have received a corrected notice from Defendants informing them of the mandatory October 5, 2017 deadline for renewals.

49.     At least seven MRNY members, and an additional number of clients, were eligible for DACA as of September 5, 2017, but had not yet submitted their initial applications. Most of them were in the process of assembling the documentation necessary to satisfy the DACA eligibility requirements.

50.     Still, other youth members of MRNY, and an additional number of clients, were not eligible for DACA on September 5, 2017 but will become eligible for DACA in the future, under the terms of the 2012 Guidance. One member received a letter from her GED course indicating she met the education requirement of DACA on September 7, 2017—two days after she lost the ability to apply for DACA.

51.     Plaintiff MRNY, its staff, its members, and its clients are aggrieved by Defendants' final agency action and have exhausted their administrative remedies.

52.     The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program terminated unlawfully, and in having their DACA applications and renewals considered, are germane to MRNY's purpose of advocating for the rights of low-income

immigrant communities, to its role as an employer of individuals with DACA, and are inextricably bound up with the legal services that MRNY attorneys provide the organization's clients.

53.     MRNY's clients face hindrances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources.

54.     Defendants' planned unlawful termination of the DACA program has already directly harmed MRNY by causing the organization to divert its resources from other time-sensitive immigration cases to assist individuals to apply for renewals by October 5, 2017, and to conduct additional screenings of its clients (members and non-members) to determine whether they are eligible for other forms of immigration relief.

55.     Since September 5, 2017, MRNY has already hosted twelve workshops on DACA renewal that they would not have had to host if Defendants had not terminated the program. MRNY's ActionNYC program in Queens, part of an initiative co-sponsored by the N.Y.C. Office of Immigrant Affairs and CUNY that connects New Yorkers with free and safe immigration services, has had to be put on hold for a month. Five Department of Justice Accredited Representative staff members who each do screenings and immigration application assistance had to cancel all of their September appointments and reschedule them for October and later, in order to schedule DACA renewal applications in their September slots. This has also involved the extra administrative burden of calling and rescheduling numerous appointments and delaying work on their other active cases.

56.     In addition, MRNY's legal team has expended its limited resources creating Know-Your-Rights materials, answering calls, addressing walk-in questions, mailing renewal

applications, and coordinating an emergency support plan, including mental health support, for members, clients, and staff due to the termination.

57.     MRNY has spent additional money on application fees for individuals who have received scholarships that would not be granted until after their applications needed to be submitted, as well as on priority shipping fees for renewal applications, to ensure they arrive by the October 5 deadline.

58.     MRNY will sustain further injuries if its DACA employees lose work authorization as a result of the Defendants' actions.

59.     MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

60.     These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court.

61.     As a New York-focused, non-profit organization, MRNY is a "small organization" under the RFA. 5 U.S.C. § 601(4). MRNY is directly affected by Defendants' termination of DACA, as the Agency's final action has adversely affected it. *Id.* § 611(a)(1).

**Defendants**

62.     Defendant Elaine C. Duke is the Acting Secretary of the U.S. Department of Homeland Security. She is sued in her official capacity.

63.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and the head of the U.S. Department of Justice. He is sued in his official capacity.

64.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

# STATEMENT OF FACTS

**The 2012 DACA Memorandum**

65.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano ("the Secretary") announced the creation of the DACA program, which set out guidelines for U.S. Citizenship and Immigration Services ("USCIS") to use its prosecutorial discretion to extend deferred action to certain young immigrants "who were brought to this country as children and know only this country as home." Mem. from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012 ("DACA Memorandum") (attached hereto as Exhibit A). Those granted deferred action also became eligible for employment authorization. 8 C.F.R. § 274a.12(c)(14).

66.     The DACA Memorandum states that individuals who came to the United States as children, lack a serious criminal history, attend school or participate in the Armed Services, and meet other criteria may request that the Secretary grant deferred action, a discretionary form of relief from removal, for a period of two years, subject to renewal. Those granted deferred action in this manner could also obtain employment authorization and a social security card. *See* Ex. A, DACA Memorandum.

67.     The Secretary made findings that the individuals eligible to apply for DACA "have already contributed to our country in significant ways" and "lacked the intent to violate the law." *Id.* at 1. She found that our nation's immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case," and that the limited resources of DHS must be "focused on people who meet our enforcement priorities." *Id.*

68.     Individuals who met the criteria listed in the DACA Memorandum did not automatically receive deferred action. Instead, DHS was directed to exercise its discretion to consider grants of deferred action "on a case by case basis." *Id*.

69.     Pursuant to the DACA Memorandum, USCIS established an application and background-check procedure to evaluate whether individuals would qualify for deferred action. Applicants were required to disclose extensive sensitive and personal information to Defendants, including their lack of lawful immigration status as of June 15, 2012, current and previous mailing addresses, country of birth, dates of initial and subsequent entries, and contact information. *See* USCIS Form I-821D and Instructions (attached hereto as Exhibit B).

70.     In order to prove that they met the eligibility criteria, DACA applicants also routinely provided Defendants documents containing personal information, including copies of school records, pay stubs, bank statements, passports, birth certificates, and similar records.

71.     The information and records DACA applicants provided Defendants frequently included sensitive and personal information about third parties as well, including family members of DACA applicants.

72.     Defendants consistently represented to DACA applicants that the information they provided would be protected from disclosure to U.S. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") for immigration enforcement proceedings against them and their family members or guardians, except in limited, delineated circumstances. *Id.* at 20; U.S. Citizenship & Immigration Servs.: Frequently Asked Questions (excerpt attached hereto as Exhibit C); Letter from Jeh Johnson, Sec'y of Homeland Sec., to Judy Chu, U.S. House Representative (Dec. 30, 2016) ("[T]he U.S. government represented to [DACA] applicants that the personal information they provided will not later be used for

immigration enforcement purposes. . . . We believe these representations . . . must continue to be honored.") (attached hereto as Exhibit D). These assurances allowed applicants to apply for deferred action without fear that the information they provided would later be used by Defendants to deport them or their families.

**Impact of the DACA Program**

73.     Since the program was first introduced in 2012, nearly 800,000 individuals have received deferred action and employment authorization under DACA. Close to 42,000 DACA recipients live in New York State alone.

74.     As a result of the DACA program, these young immigrants have been able to enroll in colleges and universities, and to obtain jobs, driver's licenses, bank accounts, and health insurance (through employment, college, or state-run programs). DACA recipients have come to rely on the program to allow them to work, study, and live without the constant threat of deportation. Indeed, in reliance on the program, DACA recipients have made significant investments in their futures, such as enrolling in higher education and graduate programs; pursuing employment opportunities; marrying and having children of their own; and purchasing homes and automobiles, to name a few examples.

75.     They have also relied on the availability of renewing DACA. New York DACA recipients have submitted more than 53,000 renewal applications since DACA began—10,000 more than initial applications, meaning that some recipients have renewed more than once.

76.     This reliance has continued since Defendant President Trump took office, because he maintained the program for nearly eight months, accepting both first-time applications and renewals while assuring DACA-eligible immigrants that he would "take care of" them.

77. The Trump Administration's arbitrary decision to terminate DACA reverberates well beyond the nearly 800,000 DACA recipients. The opportunities DACA recipients acquired and created as a result of the program benefitted their families, communities, and employers, as well. All of these groups stand to lose these gains, on which they have come to rely, if Defendants' arbitrary decision to end DACA stands.

78. For example, Ms. Fernandez works as an immigration advocate with MRNY and is enrolled in a graduate program at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law. Without DACA, she will be forced to leave her job and cease her studies. If Ms. Fernandez is deported, her two U.S.-citizen sons will be left without their primary caretaker. Like Ms. Fernandez, many DACA recipients depend on their work authorization to financially support family members, including U.S.-citizen children and siblings.

79. The positive impact DACA has made on the overall U.S. economy would disappear if the Administration's arbitrary decision to terminate the program holds. Economists calculate that DACA has boosted labor-force participation, raised DACA recipients' purchasing power, and increased state and federal tax revenues.

80. Economists estimate that the U.S. economy would lose tens of billions of dollars if the program is terminated. New York state alone stands to lose nearly $2.6 billion if DACA recipients leave the workforce. Terminating the program would have a significant fiscal and economic cost—estimated to be more than $60 billion—borne by the entire U.S. population.

**The Trump Administration's Animus Toward Individuals of Latino and Mexican Heritage**

81. A hallmark of Defendant Trump's campaign and presidency has been unabashed nativism, in both words and deeds, rarely seen in this country's recent history. As part of that

nativist platform, Defendant Trump and some members of his Administration have portrayed immigrants as imminent threats to the health, safety, and wellbeing of the United States.

82.    One group that Defendant Trump has repeatedly targeted is Latinos, especially those of Mexican heritage. When Defendant Trump announced his candidacy in June 2015, he labeled Latinos and Mexicans as "criminals," a characterization he used to justify his harsh immigration proposals.

83.    In his presidential announcement speech, then-candidate Trump stated: "When Mexico sends its people, they're not sending their best . . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."

84.    Defending these remarks, then-candidate Trump explained: "I can't apologize for the truth. I said tremendous crime is coming across." He later added: "What can be simpler or more accurately stated? The Mexican Government is forcing their most unwanted people into the United States. They are, in many cases, criminals, drug dealers, [and] rapists . . . ."

85.    A few weeks after he announced his candidacy, Defendant Trump again described Mexicans as murderers and rapists, stating, "I do business with the Mexican people, but you have people coming through the border that are from all over. And they're bad. They're really bad." He labeled the people who were coming in as "killers and rapists."

86.    During a Republican presidential debate in August 2015, then-candidate Trump again characterized Mexicans as criminals. He stated that "the Mexican government is much smarter, much sharper, much more cunning and they send the bad ones over because they don't want to pay for them, they don't want to take care of them."

87.     Later that same month, Defendant Trump criticized fellow-candidate Jeb Bush because his wife is Latina, retweeting a post criticizing Governor Bush, which told him to stop speaking "Mexican" and instead speak English.

*88.*     In May 2016, then-candidate Trump criticized U.S. District Judge Gonzalo Curiel for his Mexican heritage. Judge Curiel was born a U.S. citizen in Indiana. While Judge Curiel was presiding over a lawsuit against Trump University, then-candidate Trump complained that the jurist would not be able to fairly adjudicate the case because of his ancestry: "He's a Mexican. We're building a wall between here and Mexico. The answer is, he is giving us very unfair rulings—rulings that people can't even believe."

89.     Since his inauguration, Defendant Trump has continued to express animus toward Mexicans and Latinos through both his words and actions. In August 2017, in a speech in Arizona, Defendant Trump described some undocumented immigrants as "animals."

90.     That same month, Defendant Trump pardoned former Sheriff Joe Arpaio for contempt of court. Sheriff Arpaio had violated an injunction barring the Maricopa County Sheriff's Office from implementing a policy that allowed officers to arrest someone on suspicion of illegal presence and directed officers to consider "race or 'Mexican ancestry'" as a factor. *United States v. Arpaio*, 2017 WL 3268180 (D. Ariz. 2017). By pardoning Sheriff Arpaio, Defendant Trump implicitly approved of unconstitutional discrimination against Latinos and Mexicans, and stated that Sheriff Arpaio was convicted merely for "doing his job."

91.     In his speeches since the Inauguration, when discussing the undocumented Latino community, Defendant Trump has characterized them as criminals and gang members.

92.     In his April 2017 prepared remarks announcing the Department of Justice's

"Renewed Commitment to Criminal Immigration Enforcement," Defendant Sessions argued for

securing the borders by taking a stand against "filth."

**The Trump Administration's Decision to Terminate the DACA Program**

93.     On June 29, 2017, Texas Attorney General Ken Paxton, along with the attorneys

general of nine other states, wrote Defendant Sessions threatening to amend their complaint in

*Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), to challenge the DACA program if

Defendants did not terminate DACA by September 5, 2017.

94.     On September 5, 2017, Defendant Duke issued a memorandum announcing that

DHS would terminate the DACA program. *See* Mem. from Elaine C. Duke, Acting Sec'y of

Homeland Sec., to James W. McCament, Acting Dir., U.S. Citizenship and Immigration

Servs., *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)*, Sept. 5,

2017 ("DACA Termination") (attached hereto as Exhibit E).

95.     Defendants Sessions, Duke, and Trump jointly made the decision to end DACA

and jointly prepared the DACA Termination.

96.     The DACA Termination directs DHS to categorically reject all new DACA

applications received after September 5, 2017. DHS will consider renewal applications from

existing DACA recipients whose status expires on or before March 5, 2018, but only if such

renewal applications are received by October 5, 2017. DHS will categorically reject renewal

applications from DACA recipients whose status expires after March 5, 2018.

97.     Defendant Duke stated that the decision was based on two reasons: (1) the

preliminary injunction issued against a separate program, *see Texas v. United States*, 86 F. Supp.

3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*,

136 S. Ct. 2271 (2016) (per curiam); and (2) Defendant Sessions' opinion that DACA "was an unconstitutional exercise of authority by the Executive Branch," *see* Ex. E, DACA Termination.

98.     DHS provided no other explanation for its decision to terminate DACA.

99.     The preliminary injunction issued by a Texas court does not reach the original DACA program. Rather, it enjoins the Deferred Action for Parents of Americans and Lawful Permanent Residents program, a different program which is no longer in force.

100.     On September 5, 2017, Defendant Sessions held a press conference, falsely asserting that DACA "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences." He stated further, "It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *Attorney General Sessions Delivers Remarks on DACA*, Dep't of Justice (Sept. 5, 2017) (attached hereto as Exhibit F).

101.     While Defendant Duke based the decision to terminate DACA on the legally erroneous conclusion that DHS lacks authority to exercise its discretion in granting deferred action under DACA, Defendant Trump has made contradictory statements that suggest he believes it is within his executive authority. On September 5, 2017, shortly after the DACA Termination was published, Defendant Trump tweeted that if Congress did not act before March 5, 2018, he would "revisit this issue." If the unlawfulness of DACA were the true reason for terminating the program, then the President would lack authority to "revisit" ending DACA.

102.     In addition, on September 14, 2017, a week after the Administration's announcement terminating DACA, and facing multiple suits challenging his actions, Defendant Trump tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!....." This statement is

inconsistent with previous statements by Defendant Trump and the Trump Administration, and reflects the arbitrariness of the Administration's decision to end the program.

103.    The DACA status of more than 150,000 DACA recipients will expire before March 5, 2018. Many of those individuals have received the standard DHS renewal notice directing the recipient to submit a renewal application "as soon as possible," and to avoid a lapse in status by submitting the renewal application 120 to 150 days before expiration. *See* Dep't Homeland Sec., I-797C Notice of Action, July 15, 2017 (attached hereto as Exhibit G).

104.    Defendants' renewal notices do not advise recipients whose status will expire before March 5, 2018 that they, in fact, must submit a renewal application by the October 5, 2017 deadline.

105.    On information and belief, DHS has not provided and does not plan to provide accurate or corrected individualized notices to those DACA recipients who must renew by October 5, 2017, including those individuals whom Defendants have previously advised to renew "as soon as possible" but without mention of the October 5, 2017 deadline.

**Impact of the DACA Termination on Named Plaintiffs and the Putative Class**

106.    The DACA Termination will upend the lives of the nearly 800,000 DACA recipients, as well as those of their families, communities, and employers. Without DACA, the Individual Plaintiffs will lose their work authorization, preventing them from supporting themselves and their families. MRNY will lose approximately a dozen highly valued employees.

107.    For example, Mr. Batalla Vidal relies on his work authorization through DACA to work at a rehabilitation center caring for elderly and disabled patients; he supports himself, his mother, and his younger siblings. Without Mr. Batalla Vidal's income, he and his family will face substantial financial hardship.

108.    Ms. Fernandez depends on her work authorization to support herself and her two U.S.-citizen children.

109.    Additionally, the DACA Termination will prevent DACA recipients from enrolling in university and graduate programs since they will be unable to secure employment after graduating, blocking all future opportunities for professional or educational advancement. Similarly, their inability to secure employment while in school would severely hinder their financial ability to afford their education.

110.    For example, Mr. Alarcon relies on DACA to allow him to enroll as a Bachelor of Arts candidate at Queens College, where he is on track to graduate in December 2017.

111.    Ms. Fernandez has also relied on DACA to graduate from college and has just enrolled in graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law.

112.    The October 5, 2017 renewal deadline imposed on DACA recipients whose deferred action and work permit expire before March 5, 2018 is untenable for many DACA recipients for various reasons, including financial ones.

113.    For example, eighteen-year-old DACA recipient Guendi Castro and her nineteen-year-old brother Edgar Castro, also a DACA recipient, came to the United States from Mexico as toddlers. They currently live in New Mexico with their parents. Their DACA permits expire in early December 2017, and both must renew by October 5th or risk losing the protections of deferred action.

114.    Ms. Castro and her brother are struggling to muster the funds to pay the renewal fees by October 5th.  She, her brother, and both of their parents work full time so they can pay for the family's household expenses, leaving little income to pay for both DACA renewal fees,

which add up to approximately $1,000. Ms. Castro and her brother are actively fundraising to pay the renewal fees, but at this moment still lack sufficient funds to file their renewals.

115.    In addition, the September 5, 2017, cutoff for initial applicants has inflicted severe harm on those who were unable to file by September 5, 2017.

116.    For example, Jose Rangel is DACA eligible, lives in Houston, Texas, and is thirty-four years old. He arrived in the United States from Mexico when he was six. He is married and has a seven-year-old U.S.-citizen daughter.

117.    Mr. Rangel did not apply for DACA in 2012 because he received erroneous legal advice that he was not eligible. Years later, a friend insisted he was eligible and encouraged him to apply.

118.    In mid-to-late August 2017, Mr. Rangel and his lawyer completed his initial application, which was ready to be finalized and mailed. On September 5, 2017, when Mr. Rangel heard Defendant Sessions' announcement, he was relieved that he had finished his DACA application two-weeks earlier and assumed it had been submitted.

119.    After calling his lawyer to confirm, Mr. Rangel found out that due to Hurricane Harvey, his lawyer's office had been closed and they were behind on mailing out applications—preventing his initial DACA application from being filed by September 5, 2017 and depriving him of the opportunity to receive the status.

120.    Similarly, M.J. is an eighteen-year-old Mexican national who has lived in the United States for almost all of her life. M.J.'s U.S.-citizen stepfather had been in the process of petitioning for her to receive permanent resident status. However, her stepfather became abusive and recently abandoned the family petition, leaving M.J. without status.

121.   M.J. met with non-profit attorneys who advised her to apply for DACA. The attorneys started work on the case, but Hurricane Harvey prevented them from completing the application because their homes and offices were flooded and closed.

122.   On the day Harvey landed, the attorneys tried to work with M.J. to get documents together and file for DACA prior to the expected announcement of the program's termination, but Houston was largely under water and the schools were closed, preventing M.J. from getting the requisite documents, the attorneys from getting into the office, and the postal service from sending any mail. There was no viable way for M.J. to file her DACA before September 5th.

123.   The DACA Termination, in most states, including New York, will prevent individuals from obtaining driver's licenses or state identification cards. For example, Ms. Fernandez relies on her driver's license to bring her children to school every day and the doctor when needed. Many DACA recipients rely on a driver's licenses or state identification cards as a form of photo identification for banking, insurance, notarizations, and other everyday services.

124.   Moreover, the DACA Termination places these individuals at risk of immediate apprehension and deportation. Under Defendant Trump, DHS has significantly increased its targeting of DACA recipients whose statuses have lapsed for deportation.

125.   The Trump Administration's new enforcement priorities, which are so all encompassing that they cannot in earnest be called "priorities," target individuals who would qualify for DACA. Trump has directed DHS to prioritize for removal anyone present in the United States without admission or parole, including those eligible for DACA.

126.   In fact, at the same time the DACA Termination was announced, the government issued "talking points" stating, *inter alia*, that: "The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorization to prepare for and

arrange their departure from the United States . . . ." Similarly, a DHS "Frequently Asked Questions" document issued the same day refers to the time period prior to March 5, 2018 as a "grace period for DACA recipients" whose grants of deferred action will soon expire "to make appropriate plans to leave the country."

127.    DHS can easily deport the Plaintiffs because the Department already has their personal information. Plaintiffs and other DACA recipients provided extensive personal information to DHS in reliance on the agency's repeated promises to use the information only to grant them protection from deportation, and not to use that information for immigration-enforcement purposes except in narrow, delineated circumstances.

128.    Notwithstanding those prior assurances, DHS has changed its policy regarding the permissible uses of the information provided by DACA applicants to remove the limitations on using that information for immigration-enforcement purposes.  This policy change constitutes final agency action.

129.    If they are deported from the United States, Plaintiffs and others similarly situated face grievous harm. The Individual Plaintiffs, as well as the members and clients of MRNY, will be forced to leave the only country that many of them have known as home; they have grown up in American neighborhoods, attended American schools, and have structured their lives around living in the United States.

130.    The termination of DACA is already having profound impacts on the lives of DACA recipients. DACA recipients, including Individual Plaintiffs, fear deportation. Some have started to make provisions for what happens if they were deported, such as having difficult conversations with their parents and children about emergency plans.

131.    Faced with the loss of their work authorization, many DACA recipients have taken on additional jobs while they still have work authorization.

## CLASS ACTION ALLEGATIONS

132.    Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Named Plaintiffs seek to represent a certified Plaintiff class consisting of (1) all persons with DACA as of September 5, 2017; and (2) all persons who are or will be eligible for DACA under the terms of the 2012 Guidance.

133.    Plaintiffs seek to represent the above-described class for all claims except that under the Regulatory Flexibility Act.

134.    This action meets all the Rule 23(a) prerequisites for maintaining a class action.

135.    The class members are sufficiently numerous as to render joinder impracticable, satisfying Rule (23)(a)(1). Defendants' decision to terminate the DACA program without providing adequate reasons and based on legal error, without going through the proper notice-and-comment procedure, without providing corrected notices to individual recipients subject to the October 5, 2017 renewal deadline, and based on animus toward individuals of Latino and Mexican origin, harms millions of individuals residing throughout the United States. In addition, the class action is the only appropriate procedural avenue for the protection of the class members' constitutional rights and rights under the APA.

136.    This action presents common questions of law and fact, resolution of which will not require individualized determinations of the circumstances to any plaintiff, satisfying Rule 23(a)(2). Such common questions of law and fact include, but are not limited to:

        a.      whether the DACA Termination constituted a substantive rule, such that notice-and-comment rulemaking was required under 5 U.S.C. § 706(2)(D);

     b.    whether Defendants' termination of DACA and change in the policy regarding the permissible uses of the sensitive information DACA applicants provided was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A);

     c.    whether Defendants failed to provide corrected notices to individuals whom Defendants had previously written advising them to renew "as soon as possible" but without mention of the October 5, 2017 deadline, in violation of procedural due process; and

     d.    whether the termination of DACA was substantially motivated by animus toward individuals of Latino and Mexican origin, and whether it had a disparate impact on such individuals in violation of the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

137.    The Named Plaintiffs' claims are typical of the putative class, satisfying Rule 23(a)(3). Like the other members of the class, the Defendants' termination of the DACA program and change to the confidentiality policy without providing adequate reasons, in violation of 5 U.S.C. § 706(2)(A); failure to go through the proper notice-and-comment procedure, in violation of 5 U.S.C. § 706(2)(D); having its decision substantially motivated by animus, in violation of the equal protection guarantee of the Fifth Amendment; and failure to provide adequate notice to individuals who must renew by October 5, 2017, in violation of the Due Process Clause of the Fifth Amendment, harms the Named Plaintiffs.

138.    The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys, satisfying Rule 23(a)(4).

139.     The Named Plaintiffs' interests do not conflict with other members of the class. Instead, the Named Plaintiffs' interests are the same as those of the class: not to be subjected to agency rules that are promulgated without adequate basis, without undergoing the required notice-and-comment procedure, and that are implemented without fair notice and based on animus towards individuals of Latino and Mexican origin.

140.     The legal theories under which the Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class would rely, and the harms suffered by the Named Plaintiffs are typical of those suffered by the class members.

141.     With respect to Rule 23(a)(4) adequacy, undersigned counsel are qualified, experienced, and able to conduct the litigation. The attorneys have the necessary knowledge, experience, and resources to litigate this matter. In addition, attorneys have expended the time and effort necessary to identify the class.

142.     Counsel for Plaintiffs do not anticipate any conflicts of interest between the Named Plaintiffs and the other class members, nor does Counsel anticipate any reason that the other class members would dispute the adequacy of Counsel's representation.

143.     This action also meets all the requirements of, and is brought in accordance with, Rule 23(b)(2). Defendants' unlawful termination of the DACA program and changes to the confidentiality policy pose a real and immediate threat generally applicable to each member of the class, thus making final declaratory and injunctive relief with respect to the class as a whole appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Administrative Procedure Act: Agency Action Without Observance of Procedure Required By Law**
**By all Plaintiffs against Defendants Duke and Sessions**

144. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145. The APA requires that agency action that is substantive in nature follow notice-and-comment procedures. 5 U.S.C. § 706(2)(D).

146. The DACA Termination constitutes a substantive rule, as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria.

147. It is undisputed that Defendants failed to follow notice-and-comment rulemaking procedures prior to issuing the DACA Termination.

148. Defendants' termination of DACA violated the APA.

### SECOND CLAIM FOR RELIEF
**Administrative Procedure Act: Agency Action that is Arbitrary and Capricious, An Abuse of Discretion, and Otherwise Not In Accordance with Law**
**By all Plaintiffs against Defendants Duke and Sessions**

149. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

150. The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

151. Defendants' DACA Termination and its change to the confidentiality of DACA applicant information constitute final agency action, and are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law because they (a) lack a rational

explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors.

152. Defendants justified the DACA Termination on the grounds of litigation risk and the legal conclusion that the program is unlawful. These grounds are inadequate to justify termination, are legally erroneous, and fail to address the government's previous conclusion that the DACA program was lawful. These justifications are also contradicted by Defendant Trump's own subsequent statement that he would "revisit" the termination if necessary.

153. Defendants provided no justification for many of the details of the DACA Termination, including the September 5, 2017 deadline for initial applications; the October 5, 2017 deadline to file renewal applications; the March 5, 2018 cut-off for renewal eligibility; and changes to the confidentiality of applicant information.

154. Defendants' termination of DACA and changes to the confidentiality of DACA-applicant information violated the APA.

**THIRD CLAIM FOR RELIEF**
**Regulatory Flexibility Act**
**By Plaintiff MRNY against Defendants Duke and Sessions**

155. Plaintiff repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156. DHS failed to conduct any regulatory flexibility analysis to determine how the DACA Termination will affect small entities, such as MRNY, in violation of the Regulatory Flexibility Act. 5 U.S.C. §§ 601 *et seq.*

157. MRNY, as a "small organization" within the meaning of 5 U.S.C. § 601(4), is directly affected by the DACA Termination, and therefore DHS was required to conduct a regulatory flexibility analysis prior to promulgating the rule.

158.     It is undisputed that Defendants failed to conduct a regulatory flexibility analysis.

159.     Defendants' termination of DACA violated the RFA.

### FOURTH CLAIM FOR RELIEF
### Fifth Amendment (Procedural Due Process)
### By all Plaintiffs against Defendants Duke and Sessions

160.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161.     The hallmark of due process is notice and a meaningful opportunity to be heard.

162.     The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law.

163.     Defendants have not provided DACA recipients with the process to which they are entitled.

164.     Defendants, in individualized written notices, have advised many DACA recipients whose status expires by March 5, 2018 to apply to renew "as soon as possible" and, to ensure no lapse in status, to renew between 120 to 150 days before expiration.

165.     Defendants have not sent corrected notices to these DACA recipients advising them that they must apply to renew DACA by October 5, 2017 or be forever ineligible to renew their status. Nor do Defendants intend to issue such corrected notices, on information and belief.

166.     Defendants' failure to issue corrected notices advising of the October 5, 2017 deadline violates the Due Process Clause of the Fifth Amendment.

## FIFTH CLAIM FOR RELIEF
### Fifth Amendment (Equal Protection)
### By all Plaintiffs against All Defendants

167.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

168.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying to any person equal protection of the laws.

169.    The DACA Termination targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups.

170.    Defendants Sessions, Duke, and Trump have violated the equal protection guarantee of the Fifth Amendment because the DACA Termination was substantially motivated by animus toward Latinos and, in particular, Mexicans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

171.    Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are void and without legal force or effect;

(a) Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 702–706;

(b) Declare that the DACA Termination and actions taken by Defendants to terminate DACA are in violation of the equal protection and due process guarantees of the Fifth Amendment of the U.S. Constitution and contrary to the law of the United States;

(c) Vacate and set aside the DACA Termination and any other action taken by Defendants to terminate DACA, including the change to the confidentiality of DACA-applicant information;

(d) Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from implementing or enforcing the DACA Termination and the change in confidentiality of DACA-applicant information, and from taking any other action to terminate DACA that is not in compliance with applicable law or the U.S. Constitution; and

(e) Grant such other relief as this Court deems just and proper.

Dated: September 19, 2017

Respectfully submitted,

/s/ Michael J. Wishnie

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern[*]
Healy Ko, Law Student Intern[*]
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Melissa Keaney, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[*] Motion for law-student appearance forthcoming
[†] Motion for *pro hac vice* admission pending

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2017, a true and correct copy of the foregoing Second Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Michael Wishnie
Michael Wishnie, Supervising Attorney (MW 1952)
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06511
Tel: (203) 432-4800
Fax: (203) 432-1426
michael.wishnie@ylsclinics.org



# Instructions for Consideration of Deferred Action
# for Childhood Arrivals

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-821D**
OMB No. 1615-0124
Expires 01/31/2019

## What is the Purpose of this Form?

An individual may file Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to request that U.S. Citizenship and Immigration Services (USCIS) exercise prosecutorial discretion in his or her favor under the Deferred Action for Childhood Arrivals (DACA) process, including consideration for Renewal of deferred action. USCIS considers deferring action (including Renewal of deferred action) on a case-by-case basis, based on the guidelines in the **What is a Childhood Arrival for Purposes of This Form** section of these instructions. Deferred action is a discretionary determination to defer removal of an individual as an act of prosecutorial discretion. Individuals who receive deferred action will not be placed into removal proceedings or removed from the United States for a specified period of time, unless the Department of Homeland Security (DHS) chooses to terminate the deferral. See the Secretary of Homeland Security's memorandum issued on June 15, 2012 (Secretary's memorandum), upon which the DACA process is based, at **www.uscis.gov/childhoodarrivals**.

## When Should I Use Form I-821D?

Use this form to request consideration of Initial DACA or Renewal of DACA. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. All individuals filing Form I-821D, whether for an Initial or a Renewal of deferred action, must also file Form I-765, Application for Employment Authorization, and Form I-765 Worksheet, Form I-765WS. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more information.

**CAUTION:** If you file this request more than 150 days prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date. **USCIS encourages renewal requestors to file as early in the 150-day period as possible - ideally, at least 120 days prior to the DACA expiration date.**

**NOTE:** If you have received DACA and you are filing within one year after your last period of deferred action expired, please follow the instructions provided below for renewal requestors.

**NOTE:** If U.S. Immigration and Customs Enforcement (ICE) initially deferred action in your case and you are seeking a Renewal, you must file Form I-821D and select and complete **Item Number 2.** in **Part 1.** of Form I-821D. You must also respond to ALL subsequent questions on the form. You must also submit documentation to establish how you satisfy the guidelines as if you were filing an Initial request for consideration of deferred action.

If you are currently in immigration detention, you may not request consideration of DACA or Renewal of DACA from USCIS. If you think you meet the guidelines of this process, you should identify yourself to your deportation officer.

## What is a Childhood Arrival for Purposes of This Form?

An individual may be considered for Initial DACA if he or she:

1. Was under 31 years of age as of June 15, 2012;

2. Came to the United States before reaching his or her 16th birthday;

3. Has continuously resided in the United States since June 15, 2007, up to the present time;

4. Was present in the United States on June 15, 2012 and at the time of making his or her request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012;

   **NOTE:** No lawful status on June 15, 2012 means that:

   **A.** You never had a lawful immigration status on or before June 15, 2012; or

   **B.** Any lawful immigration status or parole that you obtained prior to June 15, 2012 had expired as of June 15, 2012.

6. Is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a general educational development (GED) certificate, or is an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard; and

7. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

An individual may be considered for **Renewal** of DACA if he or she met the guidelines for consideration of Initial DACA (see above) AND he or she:

1. Did not depart the United States on or after August 15, 2012 without advance parole;

2. Has continuously resided in the United States since he or she submitted his or her most recent request for DACA that was approved up to the present time; and

3. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

---

### Who May File Form I-821D?

1. **Childhood Arrivals Who Have Never Been in Removal Proceedings.** If you have never been in removal proceedings, submit this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the guidelines described in the Secretary's memorandum to be considered for deferred action.

2. **Childhood Arrivals Whose Removal Proceedings Were Terminated.** If you were in removal proceedings which have been terminated by the immigration judge prior to this request, you may use this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the guidelines described in the Secretary's memorandum to be considered for deferred action.

3. **Childhood Arrivals In Removal Proceedings, With a Final Removal Order, or With Voluntary Departure.** If you are in removal proceedings, have a final order of removal, exclusion, or deportation issued in any other context, have a voluntary departure order, or if your proceedings have been administratively closed, you may use this form to request that USCIS consider deferring action in your case, even if you are under 15 years of age at the time of filing. For the purpose of this form, "removal proceedings" includes exclusion or deportation proceedings initiated before April 1, 1997, an Immigration and Nationality Act (INA) section 240 removal proceeding, expedited removal, reinstatement of a final order of exclusion, deportation, or removal, an INA section 217 removal after admission under the Visa Waiver Program, removal as a criminal alien under INA section 238, or any other kind of removal proceeding under U.S. immigration law in any other context (e.g., at the border or within the United States by an immigration agent).

4. **Childhood Arrivals Whose Case Was Deferred and Who Are Seeking Renewal of DACA.** If USCIS or ICE deferred action in your case under DACA, you may use this form to request consideration of Renewal of DACA from USCIS.

---

---

## General Instructions

USCIS provides forms free of charge through the USCIS website. In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which can be downloaded for free at **http://get.adobe.com/reader/**.

Each request must be properly signed and accompanied by Form I-765 with fees and Form I-765WS. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment. A photocopy of a signed request or typewritten name in place of a signature is not acceptable. This request is not considered properly filed until accepted by USCIS.

**Evidence.** You must submit all required evidence and supporting documentation with your request at the time of filing. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more details.

You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

**NOTE:** If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

**Biometric Services Appointment.** Individuals requesting DACA must provide fingerprints, photographs, and signatures (biometrics). You may receive a notice scheduling you to appear at an Application Support Center (ASC) for biometrics collection. Failure to comply with the notice may result in the denial of your deferred action request. USCIS may, in its discretion, waive the collection of certain biometrics.

**Copies.** You may submit a legible photocopy of any document, unless you are specifically required to file an original document with this request. Original documents submitted when not required may remain a part of the record, and USCIS will not automatically return them to you.

**Translations.** Any document you submit to USCIS that contains a foreign language must have a full English translation. The translator must certify that the English translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.

An example of a certification would read, "I [typed name], certify that I am fluent (conversant) in the English and [insert other language] languages, and that the above/attached document is an accurate translation of the document attached entitled [name of document]." The certification should also include the date, the translator's signature and typed name, and the translator's address.

**Advance Parole.** If you wish to file a request for Advance Parole, please follow the instructions for filing Form I-131, Application for Travel Document. You can get the most current information on how to apply for advance parole by visiting the USCIS website at **www.uscis.gov/i-131** or calling the National Customer Service Line at **1-800-375-5283** or **1-800-767-1833** (TTY for the hearing impaired). Customer service officers are available Monday - Friday from 8 a.m. - 6 p.m. in each U.S. time zone.

**Travel Warning.** On or after August 15, 2012, if you travel outside of the United States before USCIS has determined whether to defer action in your case, you will not be considered for deferred action. Even after USCIS has deferred action in your case under DACA, you should not travel outside the United States unless you have been issued an Advance Parole Document by USCIS. Deferred action will terminate automatically if you travel outside the United States without obtaining an Advance Parole Document from USCIS. In addition, leaving the United States, even with an Advance Parole Document, may impact your ability to return to the United States.

---

**How To Fill Out Form I-821D**

1. This form consists of eight parts. Requestors for Initial DACA and those requestors seeking Renewal of DACA should fill out most parts. However, only requestors for Initial DACA should complete **Part 3.**  See below for greater detail.

   **Part 1. Information About You.**  All requestors must complete this part.

   **Part 2. Residence and Travel Information.**  All requestors must complete this part. Please be aware that Initial requestors must provide more extensive information than Renewal requestors.

   **Part 3. For Initial Requests Only.**  Renewal requestors should skip this part.

   **Part 4. Criminal, National Security, and Public Safety Information.**  All requestors must complete this part.

   **Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.**  All requestors must complete this part.

   **Part 6. Contact Information, Certification, and Signature of the Interpreter.**  Any requestor using an interpreter must complete this part.

   **Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other than the Requestor.**  If you had someone else prepare your request, he or she must complete this part.

   **Part 8. Additional Information.**  Any requestor may complete this part if additional space is needed.

2. Further Information on filling out Form I-821D:

   **A.** Type or print legibly in black ink.

   **B.** If you need extra space to complete any item within this request, use **Part 8. Additional Information** and make additional copies of this sheet as needed.  Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

   **C.** Answer all questions fully and accurately.  If an item is not applicable or the answer is "none," type or print "N/ A," unless otherwise directed.

   **D.** All dates must be entered as mm/dd/yyyy.  You may provide approximate dates if you do not know the exact date. Do not leave a date response blank.

   **E.** **Processing Information.**  You must provide the biometrics information requested in **Part 1.**, **Item Numbers 15. - 20.**  Providing this information as part of your request may reduce the time you spend at your USCIS ASC appointment.

   **F.** **Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.**  Select the box that indicates whether someone interpreted this form for you.  If applicable, the attorney, accredited representative, or other individual who helped prepare this form for you must complete **Part 7.** and sign and date the form.  Every request must contain the requestor's original signature.  A photocopy of a signed request or a typewritten name in place of a signature is **not** acceptable.  Sign and date the form and provide your daytime telephone number, mobile telephone number, and email address.  If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf.  A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment.

   **G.** **Part 6. Contact Information, Certification, and Signature of the Interpreter.**  If you used an interpreter to read the instructions and complete the questions on this form, the interpreter must fill out **Part 6.**  The interpreter must provide his or her full name, the name of his or her business or organization, an address, a daytime telephone number, and an email address.  He or she must also sign and date the form.

H. **Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other Than the Requestor.** If the person who completed this request, is someone other than the person named in **Part 1.**, he or she must complete this section of the request, provide his or her name, the address of his or her business or organization (if any), and his or her contact information. If the person completing this request is an attorney or accredited representative, he or she must submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with this request. Further, the attorney or accredited representative, and anyone who assisted in preparing your request, must sign and date the request. This section of the request **MUST** contain the original signature of the attorney or accredited representative, and anyone who assisted in preparing your request. A typewritten name in place of a signature is not acceptable.

---

### Evidence for Initial Requests Only

**NOTE:** If you are submitting an **Initial Request** for consideration of DACA to USCIS, you will need to submit documents showing how you believe you have satisfied each DACA guideline.

1. What documents should you submit with your Form I-821?

   A. You do not need to submit original documents unless USCIS requests them.

   B. Evidence and supporting documents that you file with your Form I-821D should show that you are at least 15 years of age at the time of filing, if required (see the **Who May File Form I-821D** section of these instructions for more information), and that you meet all of the following:

      (1) Were born after June 15, 1981 (i.e., You were not age 31 or older on June 15, 2012);

      (2) Arrived in the United States before 16 years of age;

      (3) Have continuously resided in the United States since June 15, 2007, up to the present time;

      (4) Were present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

      (5) Had no lawful status on June 15, 2012; and

      (6) Are currently in school, graduated or received a certificate of completion from high school, obtained a GED certificate or other equivalent state-authorized exam in the United States, or that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard.

2. What documents do you need to provide to prove identity?

   Submit copies of any of the following:

   A. Passport;

   B. Birth certificate accompanied by photo identification;

   C. Any national identity document from your country of origin bearing your photo and/or fingerprint;

   D. Any U.S. government immigration or other document bearing your name and photograph (e.g., EADs, visas, driver's licenses, non-driver cards);

   E. Any school-issued form of identification with photo;

   F. Military identification document with photo;

   G. State-issued photo ID showing date of birth; or

   H. Any other document with photo that you believe is relevant.

   **NOTE:** Expired documents are acceptable.

---

3. **What documents may show that you came to the United States before your 16th birthday?**

   Submit copies of any of the following documents:

   **A.** Passport with an admission stamp indicating when you entered the United States;

   **B.** Form I-94, I-94W, or I-95 Arrival-Departure Record;

   **C.** Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);

   **D.** Travel records, such as transportation tickets showing your dates of travel to the United States;

   **E.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

   **F.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

   **G.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding); or

   **H.** Any other document that you believe is relevant.

4. **If you left the United States for some period of time before your 16th birthday and returned on or after your 16th birthday to begin your current period of continuous residence, what documents may show that you established residence before your 16th birthday?**

   Submit copies of any of the following documents:

   **A.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

   **B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

   **C.** Documents evidencing that you were physically present in the United States for multiple years prior to your 16th birthday; or

   **D.** Any other relevant document.

5. **What documents may show that you continuously resided in the United States since June 15, 2007, up to the present date?**

   Submit copies of any relevant documents such as:

   **A.** Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

   **B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

   **NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

   **C.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

**E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

**G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

**H.** Any other relevant document.

**6.   Do brief departures interrupt continuous residence?**

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence.  If you were absent from the United States for any period of time, your absence will be considered brief, casual, and innocent, if it was on or after June 15, 2007, and before August 15, 2012, and:

**A.** The absence was short and reasonably calculated to accomplish the purpose for the absence;

**B.** The absence was not because of an order of exclusion, deportation, or removal;

**C.** The absence was not because of an order of voluntary departure or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

**D.** The purpose of the absence and/or your actions while outside of the United States were not contrary to law.

**In Part 3. Arrival/Residence Information,** list all your absences from the United States since June 15, 2007.  Include information about all your departure and return dates, and the reason for your departures.  Documents you can submit that may show your absence was brief, casual, and innocent include, but are not limited to:

**A.** Plane or other transportation tickets or itinerary showing the travel dates;

**B.** Passport entries;

**C.** Hotel receipts showing the dates you were abroad;

**D.** Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);

**E.** Copy of Advance Parole Document issued by USCIS; and

**F.** Any other evidence that could support a brief, casual, and innocent absence.

**7.   What documents may demonstrate that you were present in the United States on June 15, 2012?**

Submit copies of any relevant documents such as:

**A.** Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

**B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:**  In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates.  Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer.  Letters must also be signed by the employer and include the employer's contact information.

C. School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

D. Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

E. Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

F. Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

G. Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

H. Any other relevant document.

8. **What documents may show you had no lawful status on June 15, 2012?**  (Submit documents if you were admitted or paroled, or otherwise obtained a lawful immigration status, on or before June 15, 2012, or you were or are in removal proceedings.)

Submit copies of any of the following documents:

A. Form I-94, I-94W, or I-95 Arrival/Departure Record showing the date your authorized stay expired;

B. If you have a final order of exclusion, deportation, or removal issued as of June 15, 2012, submit a copy of that order and related charging documents, if available;

C. An INS or DHS charging document placing you into removal proceedings, if available; or

D. Any other document that you believe is relevant to show that on June 15, 2012, you had no lawful status.

9. **What documents may demonstrate that you:  a) are currently in school in the United States at the time of filing; b) have graduated or received a certificate of completion or a certificate of attendance from a U.S. high school, a U.S. public or private college or university, including community college; or c) have obtained a GED certificate or other equivalent state-authorized exam in the United States?** (If applicable)

USCIS recognizes that schools, educational programs, school districts, and state education agencies around the country issue educational records in a variety of formats.  USCIS does not require educational records to be presented in any particular format.

A. To be considered "currently in school," you are to demonstrate that you are currently enrolled in one of the following:

(1) A U.S. public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or home school program meeting state requirements;

(2) An education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in post-secondary education, job training, or employment, and where you are working toward such placement, and that the program:

(a) Is administered by a non-profit entity; or

(b) Is funded in whole or in part by Federal, state, local, or municipal funds; or

(c) Is of demonstrated effectiveness;

(3) An education program in the U.S. assisting students in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other equivalent state-authorized exam, and that the program:

    **(a)** Is administered by a non-profit entity; or

    **(b)** Is funded in whole or in part by Federal, state, local, or municipal funds; or

    **(c)** Is of demonstrated effectiveness;

**(4)** A U.S. public or private college or university including community college.

Evidence of enrollment may include, but is not limited to: school registration cards, acceptance or other letters demonstrating enrollment or attendance, current transcripts, report cards, progress reports, or other documents issued by a school district, state education agency, school, or program. These documents should show your name; the name of the school district, or state educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your current educational or grade level.

If you have been accepted for enrollment and your classes have not yet begun, you may submit an acceptance letter with evidence that you have registered for classes or any other relevant evidence showing you have committed to starting classes on a certain date, including, for example, a copy of your tuition bill, your class schedule, or your Individualized Educational Program.

If you are enrolled in an educational, literacy, or career training program (including vocational training or an ESL course), evidence that the program is funded in whole or in part by Federal, state, local, or municipal funds includes a letter or other documentation from an authorized representative of the program that includes information such as: your name and date of enrollment, the duration of the program and expected completion date, the program's source of public funding, and the program's authorized representative's contact information.

If you are enrolled in an education, literacy, or career training program that is not publicly funded, evidence that the program is of demonstrated effectiveness may include information from an authorized school representative relating to: the duration of the program's existence; the program's track record in placing students in employment, job training, or post-secondary education; receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or any other information indicating the program's overall quality.

**B.** Evidence to show that you meet the educational guideline because you have "graduated from school" or "obtained a GED certificate" or other equivalent state-authorized exam in the United States includes, but is not limited to:

**(1)** A high school diploma from a U.S. public or private high school or secondary school;

**(2)** A recognized equivalent of a U.S. high school diploma under state law, including a GED certificate or other equivalent state-authorized exam, a certificate of completion, or a certificate of attendance;

**(3)** A transcript that identifies the date of graduation or program completion;

**(4)** An enrollment history that shows the date of graduation or program completion;

**(5)** A degree from a public or private college or university or a community college; or

**(6)** An alternate award from a U.S. public or private high school or secondary school.

These documents should show your name; the name of the U.S. school district, educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your date of graduation or completion.

**10. What documents may demonstrate that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?** (If applicable)

Submit copies of the following documents:

**A.** Form DD-214, Certificate of Release or Discharge from Active Duty;

**B.** NGB Form 22, National Guard Report of Separation and Record of Service;

Add. 45

**C.** Military personnel records;

**D.** Military health records; or

**E.** Any other relevant document.

**11. What additional documents should you submit if you are currently or have been in removal proceedings?**

Submit a copy of the removal order, any document issued by the immigration judge, or the final decision of the Board of Immigration Appeals (BIA), if available.  If you have not been in removal proceedings, this question does not apply to you.

**12. What evidence should I submit to demonstrate my criminal history?**

If you have been arrested for or charged with any felony (i.e., a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year) or misdemeanor (i.e., a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days) in the United States, or a crime in any country other than the United States, you must submit evidence demonstrating the results of the arrest or charges brought against you.  If the charges against you were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

**A.** If you have ever been arrested for any felony or misdemeanor in the United States, or a crime in any country other than the United States, and no charges were filed, submit an original official statement by the arresting agency or applicable court order confirming that no charges were filed for each arrest.  If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**B.** If you have ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any country other than the United States, submit an original or court-certified copy of the complete arrest record and disposition for each incident (e.g., dismissal order, conviction and sentencing record, acquittal order).  If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**C.** If you have ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record, submit:

**(1)** An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or

**(2)** An original statement from the court that no record exists of your arrest or conviction.

If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**NOTE:  You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol - or drug-related.**

---

## Evidence for Renewal Requests Only

**NOTE:**  If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

If you are seeking a **Renewal** of DACA, respond to all questions, except where the section or question indicates "For Initial Requests Only."

If you are currently in exclusion, deportation, or removal proceedings, see **Item Number 11.** (above) for additional guidance.

If you have any criminal history, see **Item Number 12.** (above) for additional guidance.

With your Renewal request, you only need to submit any new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS. If USCIS needs more documentation from you, USCIS will send a Request for Evidence to you explaining the needed information. However, you should submit new documents if any of the following situations apply to you:

1. You are currently in exclusion, deportation, or removal proceedings (please note, you do not need to submit these documents if your case was administratively closed); or

2. You have been charged with, or convicted of, a felony or misdemeanor (please note, you do not need to submit these documents if you already submitted them with a previous DACA request).

**NOTE:** You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

If ICE initially deferred action in your case and you are seeking a Renewal, you must select and complete **Item Number 2.** in **Part 1.** of Form I-821D. You must also respond to **ALL** subsequent questions on the form. You must also submit documentation to establish how you satisfy the guidelines as if you were filing an Initial request for consideration of deferred action.

**NOTE:** You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol-or drug- related.

---

### Additional Information Relevant to ALL Requests for DACA

**1. What other factors will USCIS consider when making a determination on deferred action?**

USCIS will also conduct a background check. USCIS may consider deferring action in your case even if you have been arrested or detained by any law enforcement officer and charges were filed, or if charges were filed against you without an arrest. USCIS will evaluate the totality of the circumstances in reaching a decision on deferred action.

In accordance with the Secretary's memorandum, if USCIS determines that you have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or that you otherwise pose a threat to national security or public safety, USCIS is unlikely to defer action in your case. See the Frequently Asked Questions at **www.uscis.gov/childhoodarrivals**.

Even if you satisfy the threshold criteria for consideration of DACA, USCIS may deny your request if it determines, in its unreviewable discretion, that an exercise of prosecutorial discretion is not warranted in your case.

**2. What else should you submit with Form I-821D?**

USCIS will not consider deferring action in your case unless your Form I-821D is accompanied by Form I-765, with fees, and Form I-765WS. If you do not include Form I-765 with all applicable fees with your Form I-821D, your entire submission will be rejected.

**Optional E-Notification of Request Acceptance.** You may submit Form G-1145, Notification of Application/ Petition Acceptance, an optional form, which will notify you electronically when USCIS accepts your request for DACA.

---

### What is the Filing Fee?

There is no filing fee for Form I-821D. However, you must submit both filing and biometric services fees with Form I-765. Read Form I-765 filing instructions for complete information at **www.uscis.gov/I-765**.

---

Add. 47

## Where to File?

Please see our USCIS website at **www.uscis.gov/I-821D** or call the USCIS National Customer Service Center at **1-800-375-5283** for the most current information about where to file this form. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

## Address Changes

You must inform USCIS if you change your address. For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:** Do not submit a change of address request to USCIS Lockbox facilities because these facilities do not process change of address requests.

## Processing Information

**Initial Processing.** Once your request has been received by USCIS, USCIS will check the request for completeness. If you do not completely fill out the form, USCIS may deny or reject your request.

**Requests for More Information, Including Biometrics or Interview.** We may request more information or evidence, or we may request that you appear at a USCIS office for an interview. We may also request that you provide the originals of any copies you submit. We will return these originals when they are no longer needed.

If the same documents are required for both Form I-821D and Form I-765 that are filed together, the documents only have to be submitted once.

At the time of any interview or other appearance at a USCIS office, USCIS may require that you provide biometric information (e.g., photograph, fingerprints, signature) to verify your identity and update your background information.

**Decision.** USCIS will review your request to determine whether the exercise of prosecutorial discretion is appropriate in your case. Each case will be considered on an individual, case-by-case basis. Even if you satisfy the threshold criteria for consideration of DACA, USCIS may determine, in its unreviewable discretion, that deferred action is not warranted in your case. You will be notified of the decision in writing. There is no motion to reopen/reconsider the decision and there is no right to appeal.

## USCIS Forms and Information

To ensure you are using the latest version of this form, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information. If you do not have Internet access, you may order USCIS forms by calling our toll-free number at **1-800-870-3676**. You may also obtain forms and information by calling the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

As an alternative to waiting in line for assistance at your local USCIS office, you can now schedule an appointment through our Internet-based system, **InfoPass**. To access the system, visit our website at **infopass.uscis.gov**. Use the **InfoPass** appointment scheduler and follow the screen prompts to set up your appointment. **InfoPass** generates an electronic appointment notice that appears on the screen.

## Penalties

If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a Federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

## USCIS Privacy Act Statement

**AUTHORITIES:** The information requested on this form, and the associated evidence, is collected under the Immigration and Nationality Act, section 101, et seq.

**PURPOSE:** The primary purpose for providing the requested information on this form is to determine if you should be considered for deferred action as a childhood arrival. The information you provide will be used in making a decision whether to defer removal action in your case as an exercise of prosecutorial discretion.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your request.

**ROUTINE USES:** The information you provide on this form may be shared with other Federal, state, local, and foreign government agencies and authorized organizations following approved routine uses described in the associated published system of records notices [DHS/USCIS-007 - Benefits Information System and DHS/USCIS-001 - Alien File, Index, and National File Tracking System of Records which can be found at **www.dhs.gov/privacy**].

## Other Disclosure Information

Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (**www.uscis.gov/NTA**). The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. **The above information sharing clause covers family members and guardians, in addition to the requestor.**

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid OMB control number. The public reporting burden for this collection of information is estimated at 3 hours per response, including the time for reviewing instructions and completing and submitting the form. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 20 Massachusetts Ave NW, Washington, DC 20529-2140; OMB No. 1615-0124. **Do not mail your completed Form I-821D to this address.**

Add. 49

## Reminder

### *For Initial and Renewal Request*

☐ Did you submit Form I-765 along with the filing and biometric services fees ($495) required for the application or employment authorization, and did you also submit a completed Form I-765WS?

☐ Did you answer every relevant **Item Number**?

☐ Did you provide an original, handwritten signature and date your request?

☐ Did you submit the necessary documents? For Initial requests, did you submit documents to meet each guideline? For Renewal requests, see the section titled Evidence for Renewal Requests Only.

☐ If you were issued a final order of exclusion, deportation, or removal, did you include a copy of that final order (if available and if you had not already submitted it to USCIS)?

☐ If your exclusion, deportation, or removal proceedings were terminated by an immigration judge, did you include a copy of the immigration judge's termination order (if available and if you had not already submitted it to USCIS)?

☐ If you have ever been arrested for, charged with, or convicted of any felony or misdemeanor in the United States or any crime in any country other than the United States, did you submit an original, official, or court-certified document that shows your complete arrest record and final disposition for each incident (if available and if you had not already submitted it to USCIS)?

### *For Initial Requests Only*

☐ Did you submit evidence to show that you came to the United States while under 16 years of age?

☐ Did you submit evidence to prove your identity, date of initial entry, and continuous residence from June 15, 2007 (or earlier) up to the present time?

☐ Did you submit evidence that you are currently in school, have a GED certificate, have graduated or received a certificate of completion from high school, or are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?

☐ Did you provide evidence showing that you had no lawful status as of June 15, 2012?



**U.S. Department of Justice**
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

September 29, 2017

**By ECF and Fax**
The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: *Batalla Vidal, et al., v. Baran, et al.*, 16-cv-4756 (NGG) (JO)
     *State of New York, et al., v. Donald Trump, et al.*, 17-cv-5228 (NGG) (JO)

Dear Judge Garaufis:

   Defendants respectfully seek relief from a portion of Magistrate Judge Orenstein's
September 27, 2017 case-management and scheduling order, *Vidal* ECF No. 67 ("the Order"), in
the above-captioned matters, which ordered discovery to proceed on an expedited schedule.  As a
threshold matter, Defendants maintain their objections (incorporated here by reference, *see
generally* Defs.' Sept. 22, 2017 Ltr. re: Discovery, *Vidal* ECF No. 65) to (1) any discovery in these
cases; (2) any discovery before the resolution of Defendants' forthcoming dispositive motions;
and (3) any discovery before the production of the administrative record.  In addition, Defendants
object to Paragraph II(c) of the Order, which requires Defendants to produce a privilege log
identifying all documents "considered within any component of the executive branch as part of the
process of determining the policy and actions at issue in these actions," because it is beyond the
authority of the Court and raises substantial separation-of-powers concerns.  In addition to other
objections, Defendants note at the outset that Paragraph II(c) of the Order imposes an impossible
burden on them, as it requires Defendants and undefined Executive Branch entities to identify,
collect, process, review, and create a privilege log for *all* privileged documents responsive to the
Order, within the entire Executive Branch, by October 6, 2017—a mere nine calendar days after
the issuance of the Order—or suffer waiver of all privileges as to those documents.  *See* Order
¶ II(c).

   For these reasons, and as set forth in more detail below, Defendants respectfully request
that the Court, at minimum, vacate Paragraph II(c) of the Order.  Given the timing of the privilege
waiver provision, Defendants also respectfully request that this objection be ruled upon as
expeditiously as possible, to allow, if necessary, opportunity for the Solicitor General of the United
States to consider pursuing immediate mandamus relief from the U.S. Court of Appeals for the
Second Circuit and, if immediate relief is sought, to seek it no earlier than October 3, 2017.  For
the same reason, Defendants also request that, if the requested relief is denied, the Court
immediately stay the Order for a reasonable time to allow for the pursuit of meaningful appellate
review.[1]

---

   [1] Pursuant to the Local Rules and Federal Rule of Civil Procedure 72(a), Defendants are presenting this
objection to the district court, rather than to the Magistrate Judge, in the first instance.  *See, e.g., McNamee v. Clemens,*

Subject to Defendants' continued objections, Defendants will continue to prepare a privilege log, to be produced on October 6, 2017, which identifies any privileged documents that were actually considered by the agency decision maker: Acting Secretary of Homeland Security Elaine C. Duke. *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision.").

## I.    The Order

On September 27, 2017, Magistrate Judge Orenstein issued the Order, which was entered "over the defendants' objection."  Order at 1.  Paragraph II(c) of the Order provides:

> The privilege log to be produced by October 6, 2017, shall include a description of every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such that record to be part of the official administrative record.  Failure to describe a pertinent document in the privilege log due on October 6, 2017, will waive any later assertion of privilege absent a showing of good cause.  *See* Loc. Civ. R. 26.2, 26.3.

Order ¶ II(c).  At the time the Order was issued—and to this day—there were no outstanding requests for the production of documents.  The Order therefore cannot be based on any rationale pertaining to discovery, even assuming that discovery should be permitted at all in these challenges to allegedly unlawful agency action.  And Plaintiffs have never sought any relief as broad as that issued by the Order.  *See Vidal* Pls.' Sept. 22, 2017 Ltr. re: Discovery, *Vidal* ECF No. 66, at 4 (requesting a privilege log identifying any documents withheld from the administrative record on the basis of privilege).

## II.   Defendants' Objections to the Order

*a.    The Order Raises Substantial Separation-of-Powers Concerns.*  On its face, the Order applies not only to the primary agency defendant, the Department of Homeland Security ("DHS"), and the Acting Secretary of Homeland Security who issued the memorandum concerning the rescission of the DACA policy, but also to "any component of the executive branch."  Order ¶ II(c).  In addition to DHS (and some of its components), Plaintiffs have named the President and the Attorney General as Defendants.  Plaintiffs have not, however, named any other Executive

---

2014 WL 1338720, at *2 n.4 (E.D.N.Y. Apr. 2, 2014).  And because this matter "require[s] immediate attention," Defendants are filing this objection with the Court, in letter form, via ECF and fax.  *See* Individual Rules of Judge Nicholas G. Garaufis § II.A.  Before filing, undersigned counsel for Defendants contacted counsel for Plaintiffs by telephone and email to meet and confer.  The *Vidal* plaintiffs noted that they "take no position on the defendants' exercising of their right to appeal section 2(c) of Judge Orenstein's order," but that they do "intend to oppose the content of that appeal."  The *State of New York* plaintiffs noted that they "take no position with regard to DOJ's exercise of its right to appeal," and that they also "do not consent to the substance of DOJ's challenge to Part II(c)" of the Order.

Branch departments or agencies as defendants.  Nonetheless, the Order requires Defendants to identify on a privilege log "every document considered within any component of the executive branch" that was "part of the process of determining the policy and actions at issue in these actions," *id.*, regardless of where those documents are actually located, and regardless of whether they were ever shared with any of the Defendants.

Applying the Order to White House documents, in particular, raises substantial separation-of-powers concerns.  In addition to any other privileges that may apply, many of these documents are likely subject to a strong claim of executive privilege.  Courts are charged with narrowing cases as much as possible before forcing consideration of executive privilege, but the Order requires such consideration immediately.  *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 390 (2004) (lower court should "narrow . . . the scope of the subpoenas" prior to requiring consideration of executive privilege).  As the Supreme Court has held, resort to mandamus may be appropriate in response to discovery of this sort—including before the Executive Branch is actually forced to assert specific privilege claims—because "[o]nce executive privilege is asserted, coequal branches of the Government are set on a collision course" and "[t]he Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Id.* at 389; *see also id.* at 385 (discovery directed to the White House raises "special considerations" regarding "the Executive Branch's interests in maintaining the autonomy of its office" and "the high respect that is owed to the office of the Chief Executive"). The *Cheney* Court specifically rejected the contention that the White House could sufficiently protect itself against intrusive discovery through individual privilege assertions.  *Id.* at 390.

The Order also applies, on its face, to senior leadership offices within DHS and the Department of Justice.  Discovery targeted at senior, cabinet-level officials and their leadership staff is highly disfavored.  *See, e.g.*, *Nat'l Nutritional Foods Ass'n v. FDA*, 491 F.2d 1141, 1145 (2d Cir. 1974) (Friendly, J.) ("It is hardly necessary to say that when a decision has been made by the Secretary of the Interior, courts will not entertain an inquiry as to the extent of his investigation and knowledge of the points decided, or as to the methods by which he reached his determination.").[2]

Based on these separation-of-powers concerns alone, Paragraph II(c) of the Order should be vacated.

***b.     The Order is Impermissibly Vague, Improperly Defines the Scope of the Administrative Record, and Impermissibly Requires the Logging of Privileged Documents Outside the Scope of Any Record.***  The Order, which in effect is a discovery request issued by the court, is also impermissibly vague.  Under threat of sanctions for non-compliance, *see* Order ¶ V(a), and waiver of privilege over any omitted documents, *see id.* ¶ II(c), the Order requires an immediate assertion of privilege over any documents considered "as part of the process of determining the policy and actions at issue in these actions," *id.*

---

[2] Based on the allegations in the complaints, Defendants presume that the Order, at a minimum, was intended to apply to DHS, DOJ, and the White House.  But its text sweeps far broader—*all* Executive Branch agencies risk waiver of privilege over any records relating to "the policy and actions at issue in these actions," Order ¶ II(c), unless they unerringly perform in a nine-day sprint to compile this Executive-Branch-wide privilege log.

At the outset, the *State of New York* plaintiffs have not yet even filed their operative complaint, making it impossible to identify what is "at issue in these actions" with the sort of clarity and specificity required for Defendants and their counsel to ensure that they do not inadvertently run afoul of the Order and thus risk sanctions or waiver. More fundamentally, the phrase "as part of the process of determining the policy and actions at issue," *id.*, is inherently vague, particularly when paired with the explicit warning in the Order that its scope is not limited to anything resembling a traditional administrative record. To the contrary, the Order expressly applies to documents "regardless of whether the defendants deem such that record to be part of the official administrative record." *Id.*

The Order also fails to recognize that the scope of the administrative record must be bounded by the proper scope of administrative review. It is well-settled that agency action is to be judged only on the basis of the agency's stated reasons for its decision. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962). It is "not the function of the court to probe the mental processes" of the agency. *United States v. Morgan*, 304 U.S. 1, 18 (1938) ("*Morgan I*"). "Just as a judge cannot be subjected to such a scrutiny . . . so the integrity of the administrative process must be equally respected." *United States v. Morgan*, 313 U.S. 409, 422 (1941) ("*Morgan II*"). Accordingly, "such inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Overton Park*, 401 U.S. at 420. Where, as here, administrative determinations and reasons are provided at the time of the decision, "there must be a strong showing of bad faith or improper behavior before such inquiry may be made." *Id.* No such determination of bad faith or improper behavior has been made here.

For many of these same reasons, inquiry into privilege is generally unnecessary in the context of a record-review case. Here, however, the Order requires the identification of privileged documents on a log in connection with the filing of the administrative record, even though a properly constructed administrative record does not include privileged documents. *See San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 44-45 (D.C. Cir. 1986) (*en banc*) (refusing to supplement the record to consider transcripts of agency proceedings protected by the deliberative-process privilege); *Town of Norfolk v. Army Corps of Eng'rs*, 968 F.2d 1438, 1455-58 (1st Cir. 1992) (upholding exclusion of documents from administrative record on attorney-client and deliberative-process privilege grounds); *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 312-13 (S.D.N.Y. 2012) ("[C]ourts have consistently recognized that, for the purpose of judicial review of agency action, deliberative materials antecedent to the agency's decision fall outside the administrative record.").

For that reason, agencies need not (and generally do not) produce any privilege log at all with an administrative record. *See, e.g.*, *Great Am. Ins. Co. v. United States*, No. 12-9718, 2013 WL 4506929, at *8 (N.D. Ill. Aug. 23, 2013) ("The law is clear: [since] predecisional and deliberative documents are not part of the administrative record to begin with, . . . they do not need to be logged as withheld from the administrative record."). And it is certainly not required that the agency log *all* privileged documents within the scope of Paragraph II(c) of the Order, "regardless of whether the defendants deem such that record to be part of the official administrative record." Order ¶ II(c). Such an order upends the presumption of regularity that typically applies

4

to the question of whether an administrative record has been properly compiled. *See Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993) ("The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary."); *Comprehensive Cmty. Dev. Corp.*, 890 F. Supp. 2d at 309 (same).

       *c.*     *It is Impossible for Defendants to Comply with the Order.*  It is impossible for Defendants to comply with the Order on a nine-day timeline. The Order applies to every component of the Executive Branch. And even if it were limited to DHS (including its components), the Department of Justice, and the White House, and even assuming that Defendants could overcome the vagueness problems detailed above, compliance would require, at an absolute minimum: (1) the identification of custodians likely to possess responsive records; (2) the retrieval (in a forensically sound manner) of potentially responsive records; (3) the processing of those records on an electronic-review platform; (4) document-by-document, line-by-line review of individual records for responsiveness; (5) the identification of any applicable privileges (including, where applicable, coordination with other agencies and the White House to ascertain whether and under what circumstances privilege should be asserted); and (6) the creation of a privilege log consistent with this Court's Local Rules. It is simply not possible for all of this to take place before October 6th. Nor could Defendants have been reasonably on notice of such an obligation before the Order was issued, given that the Order extends far beyond the scope of an administrative record, because it extends to privileged documents and to records never considered by the actual agency decision maker. *See Overton Park*, 401 U.S. at 420; *San Luis Obispo*, 789 F.2d at 44-45. Ordering the impossible is an abuse of discretion. *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 166 (D.C. Cir. 2017).

       *d.*     *Additional Fundamental Flaws With These Lawsuits.*  There are other fundamental flaws with the Order that derive from proceeding into expedited discovery prior to considering threshold dismissal arguments that would be dispositive, as Defendants argued in their recent letter to Magistrate Judge Orenstein. *See* Defs.' Sept. 22, 2017 Ltr. re: Discovery.

       First, like the original DACA policy itself, its rescission is an exercise of "prosecutorial discretion" that is "a special province of the Executive," and "'[t]his broad discretion . . . rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489-90 (1999) ("*AAADC*") (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). That is true even in the face of allegations of unequal treatment in its exercise. *Id.* at 487-89 (rejecting argument that plaintiffs entitled to "factual development for their claim," explaining that "an alien unlawfully in this country has no constitutional right to assert [a] selective enforcement" claim); *United States v. Armstrong*, 517 U.S. 456, 463-65 (1996) (must be "clear evidence," including evidence relating to others similarly situated who are treated more favorably, to displace presumption prosecutor acted with proper motive); *AAADC*, 525 U.S. at 489 (citing *Armstrong*, and explaining that "[t]hese concerns are greatly magnified in the deportation context").

       Second, these claims are barred by 8 U.S.C. § 1252(g), which specifies that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision

or action by the Attorney General [now Secretary][3] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." In interpreting that language, the Supreme Court specifically explained that this statute "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *AAADC*, 525 U.S. at 485 n.9. The statute was "clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed" through individual removal proceedings and judicial review thereof. *Id.* at 485.

Third, review of an administrative decision is to be made on the administrative record. 5 U.S.C. § 706; *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). Here, the record has not yet been compiled, and agencies are accorded a strong presumption of regularity in compiling the record, and it is to be supplemented only if there are "gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review," *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013), or upon a "strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers," *Hoffman*, 132 F.3d at 14. No such showing has been made.

\*      \*      \*

The Order in question amounts to an improper discovery request from the court that is an abuse of discretion and is manifestly unjust. Defendants therefore ask that it be vacated promptly. Should the Court deny that request, Defendants' respectfully request that the Court grant a stay of the order, so that Defendants have a meaningful opportunity to seek appellate review, and can avoid risking privilege waiver, sanctions, or contempt.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT M. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS

---

[3] *See* 6 U.S.C. § 557 ("[A]fter the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary."); *Elgharib v. Napolitano*, 600 F.3d 597, 606-07 (6th Cir. 2010) ("When Congress passed the Homeland Security Act of 2002, it transferred to DHS authority over all functions that the former Immigration Naturalization Service ('INS') or its officers previously carried out. This legislation effectively replaced all statutory references to the INS or its officers with references to the applicable DHS official. Thus, under 6 U.S.C. § 557, references in federal law to any agency or officer whose functions have been transferred to DHS shall be deemed to refer to the Secretary of DHS or other official or component to which the functions were transferred.") (internal citations and quotation marks omitted).

6

Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar #995500)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel.: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
Tel: (718) 254-6288
Fax: (718) 254-7489
Email: joseph.marutollo@usdoj.gov

*Counsel for Defendants*

CC:

The Honorable James Orenstein
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



November 20, 2014

MEMORANDUM FOR:   León Rodríguez
                  Director
                  U.S. Citizenship and Immigration Services

                  Thomas S. Winkowski
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  R. Gil Kerlikowske
                  Commissioner
                  U.S. Customs and Border Protection

FROM:             Jeh Charles Johnson
                  Secretary

SUBJECT:          **Exercising Prosecutorial Discretion with Respect to
                  Individuals Who Came to the United States as
                  Children and with Respect to Certain Individuals
                  Who Are the Parents of U.S. Citizens or Permanent
                  Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1

**www.dhs.gov**

AR 00000037

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1] A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986. Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission. As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States. Nor can deferred action itself lead to a green card. Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3] Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1] Deferred action, in one form or another, dates back to at least the 1960s. "Deferred action" per se dates back at least as far as 1975. *See,* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2] INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization");* INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3] In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas. Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal. More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

2

AR 00000038

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security. Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

## A.    Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis. The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years. On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.** DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today. The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981). That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**. The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments. This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014. Beginning on that date, USCIS should issue all work

AR 00000039

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.** In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

### B. Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

4

AR 00000040

the Immigration and Nationality Act.[4] Deferred action granted pursuant to the program shall be for a period of three years. Applicants will pay the work authorization and biometrics fees, which currently amount to $465. There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement. As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal. Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only an Act of Congress can confer these rights. It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law. This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

AR 00000041

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

February 20, 2017

MEMORANDUM FOR:    Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM:    John Kelly
Secretary

SUBJECT:    **Enforcement of the Immigration Laws to Serve the National Interest**

This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017. It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

www.dhs.gov

AR 00000229

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

## A. The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

2

AR 00000230

## B. **Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States**

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

3

AR 00000231

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

## C. Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

## D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

4

AR 00000232

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

### E. Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F. Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G. Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

5

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

## H. Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

## I. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

6

AR 00000234



## Office of the Attorney General
### Washington, D. C. 20530

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

Add. 69



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

September 5, 2017

MEMORANDUM FOR: James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

FROM: Elaine C. Duke
Acting Secretary

SUBJECT: **Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

Add. 70

Re: Rescission of June 15, 2012 DACA Memorandum
Page 2

## Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply

---

[1] Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] *Id.*

AR 00000253

Re: Rescission of June 15, 2012 DACA Memorandum
Page 3

with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7]

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

---

[5] *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

AR 00000254

Re: Rescission of June 15, 2012 DACA Memorandum
Page 4

**Rescission of the June 15, 2012 DACA Memorandum**

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

AR 00000255

Re: Rescission of June 15, 2012 DACA Memorandum
Page 5

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

AR 00000256

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

———————————————————————
)
MARTÍN JONATHAN BATALLA VIDAL, )
*et al.*, )
 )
     *Plaintiffs,* )
 )
     v. )   No. 1:16-cv-04756 (NGG) (JO)
 )
ELAINE C. DUKE, *et al.*, )
 )
     *Defendants.* )
———————————————————————)


———————————————————————
)
STATE OF NEW YORK, *et al.*, )
 )
     *Plaintiffs,* )
 )
     v. )   No. 1:17-cv-05228 (NGG) (JO)
 )
DONALD TRUMP, *et al.*, )
 )
     *Defendants.* )
———————————————————————)


## JOINT STATUS REPORT

   In accordance with the Court's September 27, 2017 Case Management and Scheduling Order, counsel for the parties, having conferred, hereby jointly notify the Court of the status of these matters:

### I.  Status of the Cases

   1.   Plaintiffs and Defendants exchanged initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure on October 4, 2017.

2.      Defendants are scheduled to certify and serve the administrative record on all Plaintiffs on October 6, 2017.

3.      In accordance with Judge Garaufis's October 3, 2017 Order modifying in part this Court's September 27 Order, the current deadline for Defendants' privilege log (if any) has been extended to October 20, 2017.

4.      On September 28, 2017, the *Batalla Vidal* Plaintiffs identified two individuals for deposition, in an attempt to cooperatively identify a date for each deposition.

5.      On September 29, 2017, the State Plaintiffs in *New York v. Trump* served a First Set of Interrogatories and Request for Documents, as well as a First Set of Requests for Admission.

6.      On September 30, October 4, and October 5, 2017, Plaintiffs in *Batalla Vidal v. Trump* served Interrogatories, Requests for Production, and Requests for Admission.

7.      Defendants intend to serve their Objections to the State Plaintiffs' discovery requests later this evening.  Defendants also intend to serve objections and responses to all other pending discovery requests in a timely manner, consistent with the schedule ordered by the Court.

8.      Over Defendants' objection, on October 5, 2017, the *Batalla Vidal* Plaintiffs noticed the deposition of Donald Neufeld, Associate Director, Service Center Operations, United States Citizenship and Immigration Services, for October 18, 2017.  Defendants have confirmed that Mr. Neufeld is available on that date. The State Plaintiffs are discussing plans to attend and participate in the deposition with the *Batalla Vidal* Plaintiffs.  Defendants maintain (and incorporate by reference) their objections to the appropriateness of any discovery in this case, generally, and to this deposition, specifically, including on the ground that Judge Garaufis has not yet determined whether the administrative "record is sufficient to permit review of Defendants' decision to rescind the DACA program."  Doc. 72, Order, at 3.

9. Over Defendants' objection, on October 5, 2017, the *Batalla Vidal* Plaintiffs noticed the deposition of Gene Hamilton, Senior Counselor in the Office of the Secretary of the Department of Homeland Security, for October 20, 2017. Defendants have confirmed that Mr. Hamilton is available on that date. The State Plaintiffs are discussing plans to attend and participate in the deposition with the *Batalla Vidal* Plaintiffs. Defendants maintain (and incorporate by reference) their objections to the appropriateness of any discovery in this case, generally, and to this deposition, specifically, including on the grounds that the "apex doctrine" shields high-ranking government officials from the obligation to testify absent exceptional circumstances and that Judge Garaufis has not yet determined whether the administrative "record is sufficient to permit review of Defendants' decision to rescind the DACA program." Doc. 72, Order, at 3.

10. Counsel for Plaintiffs and Defendants will be present at the status conference scheduled for October 11, 2017. All other discovery matters are proceeding on the schedule set forth in this Court's September 27 Order.

**II.** **Pending Disputes**

Depositions

*Batalla Vidal* Plaintiffs seek the Court's assistance regarding the *Batalla Vidal* Plaintiffs' noticed depositions of Gene Hamilton, Senior Counselor in the Office of the Secretary of the Department of Homeland Security, and Donald Neufeld, Associate Director, Service Center Operations, United States Citizenship and Immigration Services. On October 4, 2017, Defendants notified the *Batalla Vidal* Plaintiffs of their proposal to postpone the depositions of Donald Neufeld and Gene Hamilton until October 25 and 27, respectively, pending the District Court's resolution of the outstanding objections Defendants raised in their motion to vacate

Judge Orenstein's scheduling order. ECF No. 67. The *Batalla Vidal* Plaintiffs informed

Defendants on October 5, 2017, that they did not consent to Defendants' proposal.

The *Batalla Vidal* Plaintiffs' position is that the deposition of each of these individuals is

appropriate because each individual has information that is relevant to the claims contained in

Plaintiffs' Second Amended Complaint, including Plaintiffs' claims under the APA as well as

the U.S. Constitution.

Defendants' position is that this discovery is not appropriate pending U.S. District Judge

Garaufis's determination of Defendants' motion to vacate. ECF 69. Moreover, Defendants

specifically object to the deposition of Mr. Hamilton, who is the Senior Counselor in the Office

of the Secretary of the Department of Homeland Security and, as such, provides advice and

counsel to the DHS Secretary and Deputy Secretary on national security matters.

The *Batalla Vidal* Plaintiffs object to Defendants raising the "apex doctrine" for the first

time in the joint status report through lengthy edits received after 4:00 PM Eastern Time today.

These legal arguments were not included in Defendants' initial draft received the night before.

Defendants did not meet and confer with plaintiffs or give prior notice of their objections to Mr.

Hamilton's deposition, other than their position that discovery was inappropriate at this juncture.

*Batalla Vidal* Plaintiffs respectfully request an opportunity to submit a response to the

defendants' new objections, which are presented below, no later than 2 pm Eastern Time on

October 10, 2017, so that the Court can resolve these issues in the status conference the

following day.

<u>Defendants' Objections to Mr. Hamilton's Deposition</u>

A well-established principle demonstrates that high-level government officials, such as

Mr. Hamilton, should not ordinarily be required to testify concerning their official actions. *See*

*United States v. Morgan*, 313 U.S. 409, 422 (1941); *Lederman v. New York City Dep't of Parks and Rec.*, 731 F.3d 199, 203 (2d Cir. 2013) ("[T]o depose a high-ranking government official, a party must demonstrate exceptional circumstances … for example, that the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means.").

Two rationales underlie this principle, also known as the "apex doctrine." First, as the Supreme Court recognized in *Morgan*, parties litigating against federal agencies are precluded from examining the processes by which high-ranking agency officials exercise discretion and make decisions. 313 U.S. at 422. Insulating the deliberative process of high-level public officials from judicial scrutiny helps preserve constitutional separation of powers. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) (noting that "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government"). As the Court of Appeals for the Eleventh Circuit has recognized, compelling the testimony of high-ranking agency officials "would have serious repercussions for the relationship between two coequal branches of government." *In re United States (Jackson)*, 624 F.3d 1368, 1373-74 (11th Cir. 2010) (observing that "compelling the [Food and Drug Administration] Commissioner's testimony by telephone for 30 minutes disrespected the separation of powers"). And as Senior Counselor most, if not all, of the information Plaintiffs seek would likely be covered by the deliberative-process and other privileges.

Second, as a practical matter, if high-level government officials could be subject to deposition in every civil action involving their agency, the officials would be impeded from exercising their duties. *See In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (noting that "[h]igh

ranking government officials have greater duties and time constraints than other witnesses"). In

*Community Federal Savings & Loan v. Federal Home Loan Bank Board*, 96 F.R.D. 619, 621

(D.D.C. 1983), the court explained this well-recognized basis for protecting high-ranking

government officials from depositions:

> [P]ublic policy requires that the time and energies of public officials be conserved
> for the public's business to as great an extent as may be consistent with the ends
> of justice in particular cases. Considering the volume of litigation to which the
> government is a party, a failure to place reasonable limits upon private litigants'
> access to responsible governmental officials as sources of routine pre-trial
> discovery would result in a severe disruption of the government's primary
> function.

Absent such limits, there is "a tremendous potential for abuse or harassment." *K.C.R. v. County*

*of Los Angeles*, No. CV 13-3806 PSG (SSx), 2014 WL 3434257, at *3 (C.D. Cal. July 11, 2014)

(quotation omitted). For these reasons, mandamus is often granted to protect senior officials

from the burden of providing testimony. *See, e.g.*, *In re United States*, 624 F.3d 1368, 1373

(11th Cir. 2010) (issuing a writ of mandamus to preclude the deposition of the EPA

Administrator); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) ("The duties of high-ranking

executive officers should not be interrupted by judicial demands for information that could be

obtained elsewhere.") (issuing writ of mandamus to preclude deposition of the Vice President's

chief of staff); *In re United States*, 197 F.3d 310, 314 (8th Cir. 1999) (issuing writ of mandamus

to preclude testimony of Attorney General and Deputy Attorney General); *In re FDIC*, 58 F.3d

1055, 1060 (5th Cir. 1995) (issuing writ of mandamus to preclude testimony of three members of

the Board of the FDIC); *United States Board of Parole v. Merhige*, 487 F.2d 25, 29 (4th Cir.

1973) (issuing writ of mandamus to preclude deposition of members of the Board of Parole); *see*

*also In re Northern Marianas Islands*, 694 F.3d 1051, 1059-1061 (9th Cir. 2012); *In re SEC ex*

*rel Glotzer*, 374 F.3d 184, 187-192 (2d Cir. 2004) (issuing writ of mandamus to preclude deposition of SEC attorneys).

Here, Plaintiffs have not yet attempted either to obtain the information they seek through less intrusive means or to justify that exceptional circumstances warrant the deposition of a high-ranking DHS official. Although Defendants have held Mr. Hamilton's schedule for October 20 open as a courtesy, their position is that the burden on his time and official duties does not justify the deposition.[1]


Other Discovery

As Defendants are scheduled to produce the Administrative Record today, it is possible that a dispute with respect to the record's sufficiency will arise before the October 11, 2017, conference as well.

In addition, Plaintiffs anticipate that Defendants will object to at least one of the written discovery requests by the *Batalla Vidal* and/or State Plaintiffs, and such objection(s) may be appropriate for the Court to address at the  conference.

Dated: October 6, 2017                          Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

---

[1] Defendants will be prepared to address this issue more fully at the status conference and, if requested, can formally move for a protective order.

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

STEPHEN M. PEZZI
Trial Attorney

*/s/ Kate Bailey*
KATE BAILEY (MD Bar #1601270001)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 514-9239
Fax:  (202) 616-8470
Email:  kate.bailey@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Joint Status Report with the Clerk of the Court through the ECF system on October 6, 2017, which system provided a copy of the notice to all parties.

/s/ *Kate Bailey*
KATE BAILEY
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division



**U.S. Department of Justice**
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

October 10, 2017

**By ECF and Fax**
The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *Batalla Vidal, et al., v. Baran, et al.*, 16-cv-4756 (NGG) (JO)
*State of New York, et al., v. Donald Trump, et al.*, 17-cv-5228 (NGG) (JO)

Dear Judge Garaufis:

Defendants respectfully submit this reply letter pursuant to the Court's October 3, 2017 Order, *Vidal* ECF No. 72, which granted in part Defendants' requested relief from Magistrate Judge Orenstein's September 27, 2017 case-management and scheduling order, *Vidal* ECF No. 67. Defendants appreciate this Court's prompt action in response to their previous letter, which relieved Defendants from the obligation—at least, until October 20, 2017—to produce a privilege log including

> a description of every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such that record to be part of the official administrative record.

Sept. 27, 2017 Order ¶ II(c) ("the Privilege Log Order"). Defendants now respectfully request that they be permanently relieved of this obligation, which reaches far beyond the proper scope of judicial review of agency action and—notwithstanding Plaintiffs' various concessions and attempts to offer competing saving constructions—remains vague, overly broad, and unduly burdensome. In the alternative, the Privilege Log Order should be narrowed substantially, to apply only to records that were actually considered by the Acting Secretary of Homeland Security as part of her decision to rescind the DACA policy but were omitted from the administrative record because they are privileged.[1]

Finally, Defendants continue to argue that no discovery in this litigation is necessary or appropriate. Discovery is especially inappropriate before resolution of Defendants' dispositive motions, which will be purely legal and fully dispositive of this case. At a minimum, no discovery—including depositions—is proper in the absence of a strong showing of bad faith or improper behavior, which Plaintiffs have not even attempted to make here.

---

[1] Defendants served and filed the administrative record on Friday, October 6. Notice of Filing of Administrative Record, *Vidal* ECF No. 77. A courtesy copy has been delivered to chambers.

# I.      The Privilege Log Order should be vacated in its entirety.

Defendants appreciate this Court's October 3, 2017 Order extending the deadline from October 6 to October 20 for Defendants to produce the privilege log contemplated by the Privilege Log Order.  But Defendants remain subject to the Privilege Log Order, and all of the same arguments advanced in Defendants' original objection letter of September 29, 2017, *Vidal* ECF No. 69, remain applicable, notwithstanding the two-week extension to file on October 20.  The order still raises separation-of-powers concerns, as it applies, on its face, to "any component of the executive branch," including the White House.  *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367 (2004).  It is still unreasonably vague, as it applies to any privileged documents that were "part of the process of determining the policy and actions at issue in these actions," a phrase that is difficult to decipher and that is massive in its potential scope.  The Privilege Log Order would still be impossible to comply with, if taken literally, even with the two-week extension.  And the Privilege Log Order is still founded—indeed, explicitly so—on the flawed premise that judicial review of agency action may extend beyond the administrative record even without any finding of bad faith.  This Court's October 3, 2017 order explicitly rejects that premise.  *See* Oct. 3, 2017 Order at 2-3.

Plaintiffs' concessions cannot relieve Defendants of this court-ordered obligation, which, in any event, was imposed upon Defendants without being requested by Plaintiffs at all. Defendants cannot ignore a court order on threat of sanctions and privilege waiver with nothing but assurances that their litigation adversaries believe a detailed order crafted by a federal judge does not mean what it says.  That is especially true where, as here, Plaintiffs' saving constructions of the Privilege Log Order are implausible.  For example, if, as both sets of Plaintiffs suggest, *see State of New York* Pls.' Oct. 3, 2017 Ltr., ECF No. 49, at 7 n.6; *Vidal* Pls.' Oct. 3, 2017 Ltr., ECF No. 70, at 2 n.2, the Magistrate Judge had intended that the Order apply only to the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ"), the order would have said so.  In fact, the Privilege Log Order applies explicitly to "any component of the executive branch," a definition that unquestionably reaches beyond DHS, and not just to DOJ (including its most senior leadership offices), but also to the White House and to every part of every agency of the Executive Branch.  Although other portions of the Privilege Log Order are vague, that language is clear.[2]

For all the reasons stated above and in Defendants' previous filings, there is no legal basis to require the production of *any* privilege log with an administrative record—let alone a privilege log that far exceeds the bounds of any concept of a traditional administrative record.  *See, e.g.*, *Great Am. Ins. Co. v. United States*, 2013 WL 4506929, at *8 (N.D. Ill. Aug. 23, 2013) ("The law is clear: [since] predecisional and deliberative documents are not part of the administrative record to begin with, . . . they do not need to be logged as withheld from the administrative record."); *see also See San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 44-45 (D.C. Cir. 1986) (en banc) (refusing to supplement the administrative record with privileged documents); *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 312-13 (S.D.N.Y. 2012)

---

[2] Defendants also note that the Magistrate Judge's case-management and scheduling order suggests that even complete agreement between the parties—even on routine matters like extensions of internal discovery response deadlines—requires court approval to be effective.  *See* Sept. 27, 2017 Order ¶ V(b) ("While the parties are encouraged to cooperate with each other in conducting discovery, they must not agree among themselves to any extensions or suspensions of discovery that will render them unable to meet any deadline set forth above; any such agreement requires court approval.").

2

("[C]ourts have consistently recognized that, for the purpose of judicial review of agency action, deliberative materials antecedent to the agency's decision fall outside the administrative record."). And tasking Defendants with such a novel burden is even less appropriate where, as here, the Magistrate Judge has already ordered the parties (over Defendants' continued objection) to begin discovery, which is ongoing. Assuming discovery continues, Defendants will produce privilege logs, at the appropriate time, as is necessary to justify any claims of privilege that Defendants actually assert in response to Plaintiffs' document requests.

In sum, Defendants remain subject to an order that is legally improper on its face. And whatever its legal merit, the Privilege Log Order remains impossible to comply with, and its new deadline approaches quickly. Defendants respectfully request that this Court relieve Defendants of this unjust, unnecessary, and prejudicial burden.

## II.     In the alternative, the Privilege Log Order should be narrowed substantially.

To the extent this Court requires the production of a privilege log in connection with the administrative record—notwithstanding the lack of any legal basis for doing so (*see, e.g.*, *Great Am. Ins. Co.*, 2013 WL 4506929, at *8), and the lack of any actual *need* to do so (given that Plaintiffs can still serve discovery requests, to which Defendants may respond by claiming privilege, on a log, as appropriate), the Privilege Log Order should be narrowed substantially. Specifically, such an order should apply only to records that were actually considered by the Acting Secretary of Homeland Security as part of her decision to rescind the DACA policy but were omitted from the administrative record because they are privileged.

As an initial matter, Plaintiffs apparently now agree with Defendants that burdening the White House with this sort of obligation is presumptively inappropriate, and so they now, appropriately, disclaim any interest in any privilege log produced by the White House in connection with the administrative record. *See State of New York* Pls.' Oct. 3, 2017 Ltr. at 7 n.6; *Vidal* Pls.' Oct. 3, 2017 Ltr. at 2 n.2. For that reason, the Court should, at an absolute minimum, modify the Privilege Log Order to exclude the White House from its reach.[3]

Plaintiffs do, however, seek to broaden the scope of the administrative record (and any associated privilege log) to include DOJ. That is inappropriate for several reasons. For starters, the request is procedurally improper. If Plaintiffs are dissatisfied with the scope of the administrative record, the proper remedy is (1) to meet and confer regarding the specific documents (or specific categories of documents) they believe were omitted improperly, and (2) if the parties cannot reach a resolution of the issue, Plaintiffs may file a motion to supplement the administrative record, to which Defendants can respond. But before any of that has happened, this Court should assume that the administrative record is complete and properly compiled—indeed, as this Court explicitly noted in its most recent order, a well-settled legal presumption requires the Court to do so. *See* Oct. 3, 2017 Order at 3 ("The agency's designation of the administrative record 'is generally afforded a presumption of regularity.'") (quoting *Comprehensive Cmty. Dev. Corp*, 890 F. Supp. 2d at 309).

---

[3] Plaintiffs have since served discovery that implicates some of these very same issues, so the Court should keep this concession in mind to the extent that Plaintiffs eventually insist on discovery of information or documents from the White House. But in light of the concessions made here, and the possibility that the parties will be able to resolve any discovery disagreements through the meet-and-confer process, the Court need not weigh in on that issue further at this time.

On the merits, the suggestion that DOJ produce a separate administrative record (with or without a privilege log) is nonsensical as a matter of law. There is no administrative record—and could be no administrative record—for DOJ in this case, because DOJ did not make the relevant administrative decision that Plaintiffs are challenging, nor did it have the authority to do so. Plaintiffs' APA challenge, as it must, specifies an alleged "final agency action," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting 5 U.S.C. § 704), which they believe to be unlawful and to be causing them harm: the September 5, 2017 DHS memorandum, signed by Acting Secretary of Homeland Security Elaine C. Duke, rescinding the DACA policy. That APA challenge—to a DHS memorandum, rescinding a DHS policy, which had been created by a previous DHS memorandum, and which was operated by DHS over the past five years—is necessarily a challenge to allegedly unlawful agency action *by DHS*. *See* 5 U.S.C. § 702 (creating a cause of action for "[a] person suffering legal wrong because of agency action").

To be sure, as is common, other components of the Executive Branch, including, in this instance, the Department of Justice, participated in deliberations regarding the rescission of DACA (most, but not all of which remain privileged). That should come as no surprise, and Defendants do not dispute it as a factual matter. In fact, that is why Defendants included some DOJ documents in the administrative record: because (1) they were non-privileged and (2) they were actually considered by the Acting Secretary in making her decision. *See* Administrative Record, AR 4-36 (Office of Legal Counsel Memorandum), AR 238-40 (letter to the Attorney General), AR 251 (letter from the Attorney General). But, as a legal matter, the Acting Secretary of Homeland Security made this decision, and only she *could have* made this decision. That is why no other agency owes any separate administrative record—let alone a privilege log to be produced alongside an administrative record.

### III.    This Court should stay discovery.

The Privilege Log Order is merely one particularly problematic symptom of the Magistrate Judge's broader decision to reject Defendants' arguments as to why discovery is inappropriate and, to the extent there should be any discovery in this litigation at all, it should at least await resolution of Defendants' forthcoming dispositive motions—motions that will raise arguments that are strong, purely legal, and completely dispositive of Plaintiffs' claims. *See, e.g.*, *Richards v. N. Shore Long Island Jewish Health Sys.*, 2011 WL 4407518, at *1 (E.D.N.Y. Sept. 21, 2011); *see also* Defs.' Sept. 29, 2017 Ltr. § II(d), *Vidal* ECF No. 69 (*citing Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489-90 (1999); *United States v. Armstrong*, 517 U.S. 456, 463-65 (1996); 8 U.S.C. § 1252(g)).

In any case, it is difficult to understand what purpose *any* discovery would serve in this case. It is a well-settled principle of administrative law that where, as here, there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam). "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citations omitted). "If that finding is not sustainable on the administrative record made, then the . . . decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp*, 411 U.S. at 143 (citation omitted). Here, Defendants have produced a 256-page administrative record that includes all of the non-privileged documents that were actually considered by the agency decision maker. If Plaintiffs believe that that record

is insufficient to support the agency's decision, then the next step is not discovery—it is for Plaintiffs to file a merits brief asking that the decision be set aside. *See id.*

Although this Court has not yet weighed in on the broader question of the appropriateness of discovery, the only relevant order issued by this Court is entirely consistent with Defendants' view of how this case should proceed. This Court's order correctly noted: (1) "[u]nder the APA, judicial review of agency action is generally limited to the administrative record that the agency provides to the court," Oct. 3, 2017 Order at 2 (citing *Fla. Power & Light*, 470 U.S. at 743-44); (2) "[t]he agency's designation of the administrative record 'is generally afforded a presumption of regularity,'" *id.* at 3 (quoting *Comprehensive Cmty. Dev. Corp.*, 890 F. Supp. 2d at 309); and (3) any inquiry "beyond the administrative record" in a case like this one (with a formal decision memo from the agency) requires "'a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers,'" *id.* (quoting *Nat'l Audobon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997)). Neither this Court nor the Magistrate Judge have made any finding of bad faith that would upset the presumptions limiting review to the administrative record, or of regularity in its composition. Plaintiffs have not even attempted to make such a showing.

Moreover, Defendants have already produced a comprehensive administrative record, which includes all non-privileged documents actually considered by the Acting Secretary of Homeland Security in making her decision to rescind the DACA policy. It includes DHS documents, DOJ documents, and even congressional correspondence with the White House; it includes formal memoranda and informal letter correspondence; it includes published legal analysis of the DACA and DAPA policies; and it includes some documents suggesting that DACA be rescinded, and other documents suggesting that the policy should continue. Defendants are confident that this record will ultimately be sufficient to support the Acting Secretary's decision as a matter of law, but for current purposes, it provides more than enough for Plaintiffs to understand the bases for the decision and advance arguments challenging it. Discovery is therefore unnecessary, in addition to being inappropriate and unwarranted as a legal matter. Accordingly, any discovery (including depositions, written discovery, and document discovery) should be stayed pending further order of this Court.

*     *     *

For these reasons, Defendants respectfully request (1) that the Privilege Log Order be vacated in its entirety; (2) in the alternative, that the Privilege Log Order be narrowed to apply only to documents that were actually considered by the Acting Secretary but were omitted from the administrative record because they are privileged; and (3) that any discovery be stayed pending further order of this Court. [4]

---

[4] The Court's October 3 Order suggests that "Defendants could have spared themselves some trouble by seeking to clarify the [Privilege Log] Order with Judge Orenstein and with Plaintiffs," Oct. 3, 2017 Order at 4 n.3, and Plaintiffs make similar suggestions in their recent letters. Defendants respectfully note that they did meet-and-confer with Plaintiffs, by phone and by email, but Plaintiffs refused to consent to the relief sought, and made no suggestion that they would have been willing to consent to a motion to narrow the Order in the ways they later suggested in their letters. Nor do Plaintiffs have the authority to clarify a court order imposed on Defendants—especially one they did not ask for. Finally, courts in this district have held that it is not only permissible, but actually required, that relief from a non-dispositive order of a Magistrate Judge be sought directly from the district court—not the Magistrate Judge—in the first instance. *See, e.g.*, *McNamee v. Clemens*, 2014 WL 1338720, at *2 n.4 (E.D.N.Y. Apr. 2, 2014) ("[O]bjections to a magistrate judge's nondispositive order [must] be timely made to the district judge assigned to the case."); *accord Mestecky v. N.Y.C. Dep't of Educ.*, 2016 WL 7217637, at *2 (E.D.N.Y. Dec. 12, 2016); *NG v. HSBC Mortg. Corp.*, 262 F.R.D. 135, 136 (E.D.N.Y. 2009).

5

Dated: October 10, 2017        Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar #995500)
KATE BAILEY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Telephone:  (202) 305-8576
Fax:  (202) 616-8470
Email: stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*

CC:

The Honorable James Orenstein (by ECF)
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

All counsel of record (by ECF)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al*., <br><br>            Plaintiffs, <br><br>     v. <br><br> ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security, *et al*., <br><br>            Defendants. | No. 16-cv-4756 (NGG) (JO) |
| STATE OF NEW YORK, *et al*., <br><br>            Plaintiffs, <br><br>     v. <br><br> DONALD TRUMP, in his official capacity as President of the United States, *et al*., <br><br>            Defendants. | No. 17-cv-5228 (NGG) (JO) |

<u>**NOTICE OF MOTION TO DISMISS**</u>

      **PLEASE TAKE NOTICE** that, upon the Memorandum of Law, dated October 27, 2017,

Defendants in the above-captioned actions will move this Court before the Honorable Nicholas G.

Garaufis, United States District Judge, at the United States District Court for the Eastern District

of New York, located at 225 Cadman Plaza East, Brooklyn, New York 11201, at a date and time

to be determined by the Court, to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and

12(b)(6).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the schedule endorsed by the Court on October 24, 2017, Plaintiffs' opposition papers shall be served no later than 12:00 noon on November 1, 2017.

Dated: October 27, 2017            Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar #995500)
KATE BAILEY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel.: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY 11201

Case 17-3345, Document 55-2, 11/06/2017, 2165388, Page95 of 256

Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*

CC:

All Counsel of Record (by ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MARTIN JONATHAN BATALLA VIDAL et al.,

                    Plaintiffs,

           -against-

ELAINE C. DUKE, Acting Secretary, Department of
Homeland Security, et al.,

                    Defendants.
-----------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                    Plaintiffs,

           -against-

DONALD TRUMP, President of the United States, et al.,

                    Defendants.
-----------------------------------------------------------------------X

**ORDER**

**16-CV-4756 (NGG) (JO)**

**ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

On October 20, 2017, the U.S. Court of Appeals for the Second Circuit granted

Defendants' motion for an emergency stay of discovery and record supplementation in this court

pending Defendants' filing of a petition for a writ of mandamus. (USCA Order (Dkt. 91[1]).) On

October 24, 2017, that court extended the stay pending determination of Defendants' mandamus

petition and deferred ruling on the petition "until such time as the district court has considered

and decided expeditiously issues of jurisdiction and justiciability." (Order (Dkt. 42), In re Duke,

No. 17-3345 (2d Cir.).) To facilitate its prompt consideration of these issues, this court directed

the parties to file supplemental briefs as to whether it "lacks jurisdiction to consider the claims

---

[1] Docket citations refer to the docket in Batalla Vidal v. Duke, No. 16-4756 (E.D.N.Y.), except as otherwise noted.

1

raised in [the above-captioned cases] or why such claims are otherwise non-justiciable." (Oct. 24, 2017, Order.)

In response to that order, Defendants have submitted a motion to dismiss that not only addresses the issues of jurisdiction and justiciability referenced by the Second Circuit's and this court's October 24, 2017, orders, but also argues that (1) the court should dismiss these cases for failure to state a claim and (2) the court should not issue a nationwide injunction, should the court conclude that Plaintiffs are entitled to relief. (Defs. Mot. to Dismiss (Dkt. 95).) Plaintiffs in Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.), have requested that the court clarify that they need not address Defendants' additional arguments in their supplemental brief or, alternatively, that it grant them leave to file an overlong brief so that they may address those arguments. (Batalla Vidal Pls. Oct. 27, 2017, Ltr. (Dkt. 96).)

Consistent with the Second Circuit's October 24, 2017, order, the court will first address issues of jurisdiction and justiciability. Considering Defendants' additional arguments now would likely delay the court's disposition of Defendants' threshold arguments for dismissal, notwithstanding the Second Circuit's instruction that the court decide those issues expeditiously. Accordingly, Plaintiffs need not address Defendants' arguments, other than those pertaining to issues of jurisdiction and justiciability, in their November 1, 2017, supplemental briefs.

SO ORDERED.

/s Nicholas G. Garaufis

Dated: Brooklyn, New York
      October 27, 2017

NICHOLAS G. GARAUFIS
United States District Judge

2

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals.<br><br>       *Plaintiffs,*<br><br>       *v.*<br><br>ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States,<br><br>       *Defendants.* | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 1:16-cv-04756 (NGG) (JO) |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

LEGAL STANDARD...................................................................................................... 3

ARGUMENT .................................................................................................................. 4

    I.     Defendants' Decision to Terminate DACA is Not Immune from APA Review ............ 4

        A.     Defendants' Termination of DACA Is Not Immune from APA Review as a Decision "Committed to Agency Discretion by Law" Because the Court Has Meaningful Standards to Apply ......................................................................................... 5

        B.     That Defendants' Termination of a Programmatic Federal Policy Is Immigration-Related Does Not Change the Above Analysis ........................................ 10

        C.     Section 701(a)(2) Does Not Limit Plaintiffs' Constitutional Claims ..................... 11

    II.    Section 1252(g) Does Not Preclude Jurisdiction of this Case ..................................... 12

    III.   Make the Road New York Has a Cause of Action Under the APA .............................. 16

CONCLUSION............................................................................................................... 18

i

# TABLE OF AUTHORITIES

**CASES**  **PAGE(S)**

*Abourezk v. Reagan,*
    785 F.2d 1043 (D.C. Cir. 1986) .................................................................................. 17

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ...................................................................................... 6

*Botezatu v. I.N.S.,*
    195 F.3d 311 (7th Cir. 1999) ...................................................................................... 15

*Calcano-Martinez v. I.N.S.,*
    232 F.3d 328 (2d Cir. 2000) ....................................................................................... 13

*Califano v. Sanders,*
    430 U.S. 99 (1977) ...................................................................................................... 5

*Caplin & Drysdale, Chartered v. United States,*
    491 U.S. 617 (1989) .................................................................................................... 17

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) .................................................................................................... 5, 12

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.Á.R.L.,*
    790 F.3d 411 (2d Cir. 2015) ....................................................................................... 3

*Coyotl v. Kelly,*
    No. 1:17-cv-1670-MHC, 2017 WL 2889681 (N.D. Ga. June 12, 2017) ................... 15

*Crowley Caribbean Transp., Inc. v. Peña,*
    37 F.3d 671 (D.C. Cir. 1994) ..................................................................................... 6, 7

*Demore v. Kim,*
    538 U.S. 510 (2003) .................................................................................................... 14

*Dunlop v. Bachowski,*
    421 U.S. 560 (1975) .................................................................................................... 4

*Fornalik v. Perryman,*
    223 F.3d 523 (7th Cir. 2000) ...................................................................................... 14

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .................................................................................................... 11

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg. Eyeglasses*,
   545 U.S. 308 (2005) .................................................................................................. 12

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir. 2017) ................................................................................... 18

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ......................................................................................... *passim*

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................................................. 17

*I.C.C. v. Bhd. of Locomotive Eng'rs*,
   482 U.S. 270 (1987) ................................................................................................. 10

*I.N.S. v. Yueh-Shaio Yang*,
   519 U.S. 26 (1996) ................................................................................................ 5, 6

*Int'l Refugee Assistance Project v. Trump*,
   No. TDC-17-0361, No. TDC-17-2921, No. TDC-17-2969, 2017 WL 4674314
   (D. Md. Oct. 17, 2017) .......................................................................................... 6, 18

*Kenney v. Glickman*,
   96 F.3d 1118 (8th Cir. 1996) .................................................................................... 6

*Kwai Fun Wong v. United States*,
   373 F.3d 952 (9th Cir. 2004) ................................................................................... 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ............................................................................................. 16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................... 4

*Lunney v. United States*,
   319 F.3d 550 (2d Cir. 2003) ..................................................................................... 11

*Mach Mining, L.L.C. v. EEOC*,
   135 S. Ct. 1645 (2015) ............................................................................................... 4

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ................................................................................... 6

*New York City Emps. Ret. Sys. v. S.E.C.*,
   45 F.3d 7 (2d Cir. 1995) ............................................................................................. 6

iii

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) ..................................................................... 6, 11

*Powers v. Ohio*,
    499 U.S. 400 (1991) ....................................................................................... 17

*Ragin v. Harry Macklowe Real Estate Co.*,
    6 F.3d 898 (2d Cir. 1993) ............................................................................... 17

*Reno v. American-Arab Anti-Discrimination Committee*,
    525 U.S. 471 (1999) ................................................................... 6, 12, 13, 15

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ............................................................... *passim*

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016) ...................................................... 4, 5, 6, 16

*Sharkey v. Quarantillo*,
    541 F.3d 75 (2d Cir. 2008) ............................................................................. 4

*Smith v. Kansas City Title & Tr. Co.*,
    255 U.S. 180 (1921) ....................................................................................... 12

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................................ 14

*Torres v. U.S. Dep't of Homeland Sec.*,
    No. 17-cv-1840, 2017 WL 4340385 (S.D. Cal. Sept. 29, 2017) ................... 15

*Trump v. Int'l Refugee Assistance Project*,
    137 S. Ct. 2080 (2017) ................................................................................... 18

*Trump v. Int'l Refugee Assistance Project*,
    No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017) ................................ 18

*U.S. Dep't. of Labor v. Triplett*,
    494 U.S. 715 (1990) ....................................................................................... 17

*United States v. Armstrong*,
    517 U.S. 456 (1996) ......................................................................................... 6

*Vasquez v. Aviles*,
    639 F. App'x 898 (3d Cir. 2016) .................................................................. 15

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche L.L.P.*,
  549 F.3d 100 (2d Cir. 2008) ................................................................... 4

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................... 17

*Webster v. Doe*,
  486 U.S. 592 (1988) ........................................................................... 11

*Westchester v. U.S. Dep't of Hous. & Urban Dev.*,
  778 F.3d 412 (2d Cir. 2015) ................................................................... 5

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ........................................................................... 15

## STATUTES, RULES, & REGULATIONS

5 U.S.C. § 701(a)(2) ..................................................................... 5, 10, 11

5 U.S.C. §§ 701 *et. seq.* ..................................................................... 6, 12

8 C.F.R. § 109.1(b)(7) ........................................................................... 9

8 C.F.R. § 274a.12(c)(14) ........................................................................ 9

8 U.S.C. § 1103(a)(3) ........................................................................... 9

8 U.S.C. § 1252(g) ........................................................................ *passim*

28 U.S.C. § 1331 ............................................................................... 12

Fed. R. Civ. P. 12(b)(1) ................................................................... 1, 3, 16

Fed. R. Civ. P. 12(b)(6) ........................................................................ 16

Pub. L. No. 113-76, Div. F, tit. II, 128 Stat. 5, 251 (Jan. 17, 2014) ..................... 9

Pub. L. No. 110-329, 122 Stat. 3574, 3659 (Sept. 30, 2008) ................................ 9

## OTHER AUTHORITIES

Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President,
The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens
Unlawfully Present in the United States and to Defer Removal of Others,
*Opinions of the Office of Legal Counsel of the Department of Justice* (Op. O.L.C. Vol. 38)

Case 17-3345, Document 55-2, 11/06/2017, 2165388, Page104 of 256

(Nov. 19, 2014), https://www.justice.gov/file/179206/download ............................................ 9

Remarks on DACA, Attorney General Jeffrey Beauregard Sessions
   (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-
   remarks-daca. ............................................................................................................................. 3

# INTRODUCTION

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano announced the creation of the Deferred Action for Childhood Arrivals ("DACA") program. As Defendants themselves have explained, DACA is a program that provided guidance for the Department of Homeland Security's ("DHS") exercise of prosecutorial discretion in the form of a grant of deferred action, based on a case-by-case determination by DHS officials. *See* Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") (ECF No. 95-1) at 4-6.

Under the DACA program, millions of people benefitted, including but not limited to DACA recipients (like the individual Plaintiffs in this case), and their families, communities, and employers (including Plaintiff Make the Road New York). Plaintiffs, on behalf of themselves and others similarly situated, have challenged the abrupt and unlawful manner in which DACA was terminated.

For purposes of Defendants' Rule 12(b)(1) motion, all of Plaintiffs' allegations must be taken as true. Defendants nonetheless maintain that their decision to terminate DACA is entirely immune from judicial review even if, as Plaintiffs allege: Defendants' stated reasons for terminating DACA are legally erroneous and based in substantial part on a desire to discriminate against Latinos and Mexicans. Defendants contend this Court lacks power to review even if the termination of DACA injures millions of people by failing to comply with procedural due process and the procedural protections of the Administrative Procedures Act ("APA") and the Regulatory Flexibility Act ("RFA").[1]

---

[1] Plaintiffs also allege that the DACA termination included changes to the confidentiality policy, under which DACA applicants were promised that the information they provided the government (including about their parents) would not be used for immigration enforcement purposes except in narrow, delineated circumstances; Plaintiffs challenge the changes to that policy under the APA. *See* Second Am. Compl. ("SAC") (ECF No. 60) ¶¶ 137, 143, 151, 153-54.

1

As explained below, all of Defendants' jurisdictional and justiciability arguments fail because they are rooted in the flawed characterization of Plaintiffs' claims as challenging denials of deferred action to specific individuals. This simply is not the case. Plaintiffs challenge the wholesale termination of the DACA program, an agency action that is appropriate for judicial review.

Defendants' theory of jurisdiction-stripping is dangerously broad. This Court is not being asked to interfere with or block an individual removal proceeding or deportation, nor to set deferred action priorities for federal immigration officials. Yet Defendants attempt to dramatically expand narrow restrictions on judicial review of decisions of that nature to cut off *any* judicial review of *all* actions related to deferred action. Their contentions for doing so are unsupported by precedent, logic, or our constitutional separation of powers, none of which give the Executive the kind of blank check that the Trump Administration currently claims.

Finally, this Court should be wary of Defendants' attempted invocation of absolute discretion and non-justiciability for the additional reason that Defendants have repeatedly stated that DACA was terminated because courts, including the Supreme Court of the United States, would enjoin the purportedly unreviewable exercise of prosecutorial discretion. Defendants cannot have it both ways; they cannot both characterize the termination of DACA as motivated by prospective judicial review, yet bar the Court from reviewing it.

For all these reasons, Defendants' motion should be denied.

## BACKGROUND

On September 5, 2017, Defendants announced the termination of DACA, categorically ending the availability of deferred action for nearly 800,000 young immigrants who have relied on DACA to study, work, and live securely in their communities. The termination, which was

announced by the Department of Justice ("DOJ") at a press conference, fundamentally changed the rules that apply to those who had received deferred action through DACA. Defendants ended discretionary review of any newly filed individual requests and set a new and unprecedented timeline for a final renewal for a subset of affected individuals. By memorandum from Acting Secretary Duke (released at the aforementioned press conference), DHS officials were ordered to reject all new DACA applications as of September 5, 2017 and to reject all renewal applications received after October 5, 2017.[2]

Defendants' decision to end the DACA program admittedly did not take into account any of the benefits of DACA or the reliance interests it has engendered. Instead, Defendants state that their decision was based on perceived "litigation risk," and the erroneous legal conclusion that DACA was unlawful. Defs.' Mem. at 1. As Defendants explain it, the decision to terminate DACA was based on a series of contingent future events: that Texas and other states would sue to enjoin DACA; that DACA would be held unlawful; that DACA would be enjoined; and then that said injunction would be extremely disruptive. *See id.* As Defendants tell it, the only alternative they perceived to this series of contingencies was to immediately terminate DACA. *Id.*

## LEGAL STANDARD

A district court may only dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.Á.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (citations omitted). In reviewing a motion to dismiss, the Court must "accept as true all material allegations of the complaint[ ] and . . . construe the complaint in favor of the complaining party."

---

[2] *See* Remarks on DACA, Attorney General Jeffrey Beauregard Sessions (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche L.L.P.*, 549 F.3d 100, 106 (2d Cir. 2008) (internal quotation marks omitted). "At the pleading stage," courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (alteration in original) (internal quotations and citation omitted).

## ARGUMENT

The Court should deny Defendants' motion to dismiss because: (1) Defendants' decision to terminate DACA is not committed to agency discretion, and the Court has meaningful standards to apply; (2) 8 U.S.C. § 1252(g) is only applicable in narrow circumstances that are not at issue in this litigation; and (3) Plaintiff Make the Road New York has a cause of action under the APA.

**I.     Defendants' Decision to Terminate DACA is Not Immune from APA Review**

There is a strong presumption in favor of judicial review of agency actions, subject only to narrow exceptions. *See, e.g.*, *Mach Mining, L.L.C. v. EEOC*, 135 S. Ct. 1645, 1651 (2015). This strong presumption of reviewability can only be overcome by "clear and convincing evidence" that Congress intended for the agency action to be unreviewable. *Sharkey v. Quarantillo*, 541 F.3d 75, 84 (2d Cir. 2008); *see also Salazar v. King*, 822 F.3d 61, 75 (2d Cir. 2016) (noting that "[i]n the absence of an express statutory prohibition," the agency has a "heavy burden" to show that its decision is unreviewable (citing *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)). Defendants argue that the decision to terminate DACA is an "enforcement" action, immune from APA review because prosecutorial discretion is "committed to agency discretion by law," such that the Court has no meaningful standard by which to evaluate whether the termination of DACA was lawful. *See* Defs.' Mem. at 12-16. In addition, Defendants attempt to distance themselves from applicable

4

case law by claiming that the context of immigration law makes this case somehow unique from those precedents. *See id.* at 16-17. Defendants are wrong on both fronts.

**A.   Defendants' Termination of DACA Is Not Immune from APA Review as a Decision "Committed to Agency Discretion by Law" Because the Court Has Meaningful Standards to Apply**

A narrow exception to APA review is for action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As the Supreme Court has emphasized, this is a "very narrow exception" only "applicable in . . . rare instances." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). This narrow exception only applies if the applicable statutes, regulations, formal or informal agency guidance, or settled course of adjudication provide absolutely nothing against which the court may review the action at hand. *See I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996); *Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir. 2015); *Salazar*, 822 F.3d at 76.

Defendants' argument that this exception applies here mischaracterizes the termination of DACA as a decision about whether to enforce immigration law as to particular individual noncitizens. *See* Defs.' Mem. at 13-14. But Plaintiffs do not challenge the application of federal immigration law (or the decision to forebear from doing so) to any particular individual; instead, they challenge the decision by Defendants to terminate a federal program through which nearly 800,000 people have directly benefitted, and the manner in which that termination was carried out. Defendants cite no cases even suggesting that such a sweeping change to a programmatic federal

policy is immune from judicial review. On the contrary, courts have consistently found that challenges to broad agency policies dealing with enforcement are reviewable.[3]

Instead, to support their expansive interpretation of § 701(a)(2), Defendants rely only on cases challenging a specific agency decision to take or not take discretionary enforcement action. *See* Defs.' Mem. at 13-15. *Heckler v. Chaney* involved an agency's decision not to take particular requested enforcement actions. 470 U.S. 821 (1985). *Reno v. American-Arab Anti-Discrimination Committee* ("*ADC*") was a challenge to an agency decision to target specific individuals for deportation. 525 U.S. 471 (1999). *United States v. Armstrong* considered the circumstances under which criminal defendants could challenge the prosecutor's decision to enforce criminal laws against them specifically. 517 U.S. 456 (1996). And *Mada-Luna v. Fitzpatrick*—which concerned a particular noncitizen's request for deferred action—actually undermines Defendants' own contention; while it noted (in dicta) that denial of that individual's request was not reviewable, *Mada-Luna* considered his APA challenge to the deferred action operating instructions on the merits. 813 F.2d 1006 (9th Cir. 1987). Plaintiffs do not challenge any specific enforcement decision, and so none of these cases support the weight Defendants attempt to put on them.[4]

---

[3] *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, No. TDC-17-2921, No. TDC-17-2969, 2017 WL 4674314, at *13 (D. Md. Oct. 17, 2017); *Kenney v. Glickman*, 96 F.3d 1118, 1123-24 (8th Cir. 1996); *New York City Emps. Ret. Sys. v. S.E.C.*, 45 F.3d 7, 10-11 (2d Cir. 1995); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 677 (D.C. Cir. 1994); *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985).

[4] The other cases Defendants cite are even further afield. *Perales v. Casillas* relied on a dated, out-of-circuit rule that only "statutory or regulatory provisions" could offer a standard for the court to apply on review. 903 F.2d 1043, 1047 (5th Cir. 1990). *But see I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (establishing that an established course of agency practice is sufficient to offer a basis for judicial review); *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016) (same). *Arpaio v. Obama* affirmed dismissal of a county sheriff's challenge to the DAPA deferred action program for lack of standing. 797 F.3d 11 (D.C. Cir. 2015).

6

The "complicated balancing of a number of factors" required in determining whether to take a particular enforcement action, *Chaney*, 470 U.S. at 831, is wholly absent from the categorical decision to end the DACA program. The mechanics of the program's termination illustrate that point: the deadlines are not based on individualized factors or enforcement priorities; nor is the final March 5, 2018 cut-off based on the complicated balancing of factors at play when deciding whether to take a particular enforcement action. To the contrary, DHS has given its staff categorical instructions to reject *all* initial requests for DACA received after September 5, 2017, and *all* requests for DACA renewals received after October 5, 2017. Wholesale termination of a program through which individuals could be considered for prosecutorial discretion simply does not fall under the *Chaney* presumption against reviewability. *See, e.g.*, *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676-77 (D.C. Cir. 1994) (distinguishing general enforcement policy decisions from "the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision").

The D.C. Circuit case *Robbins v. Reagan* is instructive as to why Defendants' reliance on *Chaney* is misplaced. 780 F.2d 37 (D.C. Cir. 1985). *Robbins* set out at least three reasons why *Chaney* and its presumption against reviewability did not apply in a case involving an agency's decision to rescind a commitment to fund the building of a shelter. *Id.* at 46-47. First, while *Chaney* reasoned that decisions declining to take enforcement action do not implicate the exercise of "coercive power over individuals' liberty or property rights, and thus do not infringe upon areas that courts often are called upon to protect," 470 U.S. at 832 (emphasis omitted), the rescission of a commitment is a different matter. As *Robbins* explained:

> By contrast, rescissions of commitments, whether or not they technically implicate liberty and property interests as defined under the fifth and fourteenth amendments, exert much more direct influence on the individuals or entities to whom the repudiated commitments were made.

7

*Robbins*, 780 F.2d at 47. Second, *Robbins* held that reviewing an agency's rescission of its own prior policy did not implicate any concerns that the court would be taking on the discretionary balancing role of the agency. "Rather, the court is simply ensuring a limited degree of fidelity to the agency's own decision [on] how to use its resources." *Id.* Third, whereas an agency's decision *not* to take action may "necessitate a focusless evaluation of agency policy and priorities—a role for which courts are not suited," "[r]ecissions of prior obligations clearly fall into the 'focused action' category," giving courts a "specific affirmative action to be reviewed." *Id.* For these reasons, the D.C. Circuit in *Robbins* held that the agency's decision to rescind a prior commitment did not fall within the "committed to agency discretion by law" exemption. In so holding, the D.C. Circuit cautioned, "[t]his court has long held that an agency's change in direction from a previously announced intention is a danger signal that triggers scrutiny to ensure that the agency's change of course is not based on impermissible or irrelevant factors." *Id.* at 48.

The wholesale termination of the DACA program is procedurally analogous to—and of much larger scope and import than—the situation in *Robbins*. Here, DHS rescinded its own policy and commitment to hundreds of thousands of individuals who have reordered their lives in reliance on that commitment. The same three reasons the *Robbins* Court gave for why *Chaney*'s presumption against reviewability did not apply are equally germane here: (1) the DACA termination was an affirmative reversal of agency policy effecting a "coercive power over individuals' liberty or property rights" that *Chaney*'s non-action avoided and that partially justified its immunity from review, 470 U.S. at 832; (2) reviewing DHS and DOJ's rescission of their own policy does not implicate a concern that the Court would interfere with the discretionary balancing role of the agencies; and (3) the termination of the agencies' own prior policy gives the Court a "specific affirmative action to be reviewed." *Robbins*, 780 F.2d at 47.

In addition, the Court has meaningful standards and past agency guidance and practice with which to review the termination of the DACA program, including but not limited to federal congressional appropriations acts mandating DHS focus their enforcement efforts on those with serious criminal histories or who present national security threats;[5] statutory mandates regarding enforcement priorities;[6] formal DOJ and DHS regulations authorizing deferred action since the 1980s;[7] over fifty years of group-based deferred action programs, *see* Defs.' Mem. at 3, 6, none of which were ever terminated in this way; the 2012 DACA Memorandum itself, *see Robbins*, 780 F.2d at 47 (rescission of agency's own prior policy provides a "specific affirmative action to be reviewed"); and the Office of Legal Counsel's in-depth, published legal analysis of the proposal to expand the DACA program.[8] The Court has ample material with which to review the termination of the DACA program.

Defendants' explanation for the termination of DACA also undermines their attempt to analogize to *Chaney*. Defendants identified "litigation risk" as a primary basis for terminating DACA—revealing that there are available standards for a court to apply in reviewing the existence and structure of the DACA program. Notably, they did not rely on the kind of justifications that characterize decisions committed to agency discretion under *Chaney*—such as a concern about effective use of agency resources or case-specific factors. *See* 470 U.S. at 831-32. Defendants

---

[5] *See* Consolidated Appropriations Act, Pub. L. No. 113-76, Div. F, tit. II, 128 Stat. 5, 251 (Jan. 17, 2014); Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, Pub. L. No. 110-329, 122 Stat. 3574, 3659 (Sept. 30, 2008).

[6] 8 U.S.C. § 1103(a)(3) (2012).

[7] *See* 8 C.F.R. § 109.1(b)(7) (1982); 8 C.F.R. § 274a.12(c)(14) (2017).

[8] Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, *Opinions of the Office of Legal Counsel of the Department of Justice* (Op. O.L.C. Vol. 38) (Nov. 19, 2014), https://www.justice.gov/file/179206/download.

9

provide this Court with no precedent that insulates a large-scale rescission of an entire program as immune from judicial review.

Defendants cannot take refuge under § 701(a)(2) when both the practical effect and stated reason for their actions are contrary to the narrow exception to APA review. Defendants' citation to *I.C.C. v. Bhd. of Locomotive Eng'rs ("BLE")*, 482 U.S. 270 (1987), does not change the analysis. *BLE* applies when the Court is satisfied that an agency decision is unambiguously discretionary and unreviewable. *Id.* at 283. That threshold step is what Defendants fail to demonstrate here. Defendants' stated reasons for terminating DACA—because DACA was unlawful and subject to immediate injunction by the Texas Attorney General—refute the basis for applying § 701(a)(2) in the first place. *BLE* does not bless agency doublespeak or mandate that court ignore practical reality. Where § 701(a)(2) *applies*, *BLE* confirms that an agency's volunteered rationale for taking "otherwise unreviewable action" is insufficient to overcome § 701(a)(2), 482 U.S. at 283. *BLE* does not require this Court to disregard Defendants' own legal and non-discretionary explanation for terminating DACA in deciding whether § 701(a)(2) applies at all to oust the Court of jurisdiction. Defendants fail to establish why jurisdiction should be assessed on a fundamentally different theory than how they publicly explained and defended the termination of the DACA program.

### B. That Defendants' Termination of a Programmatic Federal Policy Is Immigration-Related Does Not Change the Above Analysis

Misapplying *Chaney*, Defendants suggest that "[t]his presumption of nonreviewability applies with particular force when it comes to immigration." Defs.' Mem. at 14. That Defendants' challenged action occurred in the general context of immigration, however, does not change the analysis above. Contrary to Defendants' characterization of Plaintiffs' claims, the Court is *not* being called upon to review the intricate policy outcomes the DACA termination effected (or the

policy outcomes of the creation of DACA). Instead, Plaintiffs are contesting the abrupt and radical departure from prior policies and the procedural means by which Defendants chose to make that change. This is not a case where Plaintiffs' claims would require the Court to determine how Defendants should grant DACA relief, so as to threaten the agency's ability to balance discretionary factors, *see Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990); or to review an agency action that is so desultory that there is no relevant law or guidance to apply, *see Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003) (holding unreviewable the U.S. Navy's statement that it did not have possession of a medal because there was no law to apply to review the Navy's discretion for possessing a physical object).

## C.    Section 701(a)(2) Does Not Limit Plaintiffs' Constitutional Claims

Even if 5 U.S.C. § 701(a)(2) precluded APA review (which, as explained above, it does not), Defendants cannot use it to block Plaintiffs' constitutional claims. The Supreme Court has recognized that judicial review of constitutional claims is still available even if an agency action is "committed to agency discretion" pursuant to § 701(a)(2). *Webster v. Doe*, 486 U.S. 592, 603 (1988). In *Webster*, for example, the Court held that a gay CIA agent's equal-protection and due-process claims must be allowed to go forward, notwithstanding the fact that the employment decision was "committed to agency discretion." *Id.* As the Court explained, "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," and Congress did not make such an intent clear in enacting the APA. *Id.*; *see also Franklin v. Massachusetts*, 505 U.S. 788, 801-03 (1992) (likewise holding constitutional claims justiciable, notwithstanding that the claims were unreviewable under the APA).

In sum, Defendants' arguments with respect to 5 U.S.C. § 701(a)(2) are simply inapplicable to this case. The wholesale and categorical termination of a program that provided case-by-case

deferred action eligibility for hundreds of thousands is an action that the Court may review using ample statutory and regulatory authority, together with the agencies' own policies, protocols, and longstanding practices, from which the termination of DACA is a radical departure. The "very narrow exception" to APA review for actions committed to agency discretion by law, *Overton Park*, 401 U.S. at 410, simply does not apply here, and therefore the APA provides for judicial review of the termination of the DACA program.

## II.    Section 1252(g) Does Not Preclude Jurisdiction of this Case

This Court has subject matter jurisdiction to consider Plaintiffs' claims under 5 U.S.C. §§ 701 *et seq.* (the Administrative Procedure Act), and 28 U.S.C. § 1331 (federal question jurisdiction).[9] Defendants argue, however, that 8 U.S.C. § 1252(g) strips this Court of jurisdiction. Defendants' reading of § 1252(g) comports neither with a plain reading of the statute nor controlling precedent.

The plain text of the Immigration and Nationality Act ("INA") refutes Defendants' jurisdiction argument. Section 1252(g) strips district courts of jurisdiction from reviewing only a limited set of discrete actions that the Secretary of Homeland Security may take: a "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders." *ADC*, 525 U.S. at 482 (emphases in original) (quoting § 1252(g)).[10] This lawsuit involves none of these discrete

---

[9] The District Courts' authority to review federal questions is broad. *See, e.g., Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg. Eyeglasses*, 545 U.S. 308, 310 (2005) (holding that there can be federal question jurisdiction in the absence of a federal law creating a cause of action if there is an important national interest to be served in providing a "federal forum" for review); *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180, 199 (1921) ("[W]here it appears from the bill or statement of the plaintiff that the right to relief depends upon the construction or application of the Constitution or laws of the United States, and that such federal claim is not merely colorable, and rests upon a reasonable foundation, the District Court has jurisdiction under this provision.").

[10] Section 1252(g) reads, in full:

      (g) Exclusive jurisdiction

decisions. Plaintiffs do not challenge Defendants' decision to commence proceedings against any individual, to adjudicate a case against any individual, or execute a removal order against any individual. Plaintiffs challenge a substantially different agency action: the decision to categorically terminate a program that established criteria for granting deferred action to individuals.

In *ADC*, the Supreme Court confirmed that § 1252(g) is a narrow provision, strictly limited to the three specific actions outlined in its text. *Id. ADC* was explicit, in fact, that § 1252(g)'s sweep does *not* include all decisions or actions along the road to deportation. Writing for the majority, Justice Scalia explained:

> [Section 1252(g)] applies only to three discrete actions that the Attorney General may take[] . . . . There are of course many other decisions or actions that may be part of the deportation process-such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order.
>
> It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.

*Id.*

Contrary to Defendants' argument here, courts have repeatedly recognized that § 1252(g) is not "a general jurisdictional limitation" to claims that arise from or relate to actual or potential removal proceedings. *Id. See, e.g.*, *Calcano-Martinez v. I.N.S.*, 232 F.3d 328, 339 n.5 (2d Cir. 2000) ("The Supreme Court thus held that [§ 1252(g)] applies in a very narrow class of cases.").

---

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

For example, in the State of Texas' challenge to the DAPA program, the district court and Fifth Circuit held that 1252(g) presented no bar. *Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015), *rev'd,* (Nov. 25, 2015) (holding that 8 U.S.C. § 1252(g) did not apply and explaining, "Congress has expressly limited or precluded judicial review of many immigration decisions, including some that are made in the Secretary's 'sole and unreviewable discretion,' but DAPA is not one of them") (internal footnotes omitted). *See also Fornalik v. Perryman*, 223 F.3d 523, 532 (7th Cir. 2000) (holding that § 1252(g) presented no bar to reviewing procedurally conflicting deferred action determinations and defendants' failure to exercise discretion to resolve the conflict); *Kwai Fun Wong v. United States*, 373 F.3d 952, 964 (9th Cir. 2004) ("Following []*ADC*, we have narrowly construed § 1252(g).") (collecting cases).

The plain reading of the statute also draws support from other canons of statutory interpretation. There is a strong presumption in favor of allowing judicial review of administrative actions, and statutes should not be construed to preclude judicial review of unconstitutional actions. *See Demore v. Kim*, 538 U.S. 510, 517 (2003) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." (citation omitted)).

Defendants' efforts to expand the scope of § 1252(g) have no merit. Defendants erroneously attempt to sweep Plaintiffs' claims into § 1252(g) by arguing that the rescission of DACA is a "necessary step" in commencing enforcement proceedings and that Plaintiffs cannot "circumvent" § 1252(g) by "singling out that single step [to deny DACA] for preemptive challenge." Defs.' Mem. at 18. However, the rescission of an individual's DACA status is not itself a necessary step to commence an enforcement proceeding against a DACA recipient, but rather (at most) a step that makes the former DACA recipient available for the commencement of removal proceedings against him. Even under Defendants' erroneous characterization, § 1252(g) does not

strip courts of jurisdiction over "necessary steps," and an expansive reading of the narrow text to cover all preliminary steps to removal is precisely what *ADC* rejected. *See* 525 U.S. at 482 (rejecting the contention that "that § 1252(g) covers the universe of deportation claims—that it is a sort of 'zipper' clause that says 'no judicial review in deportation cases'"). Whether § 1252(g) applies is not based on the timing of the decision but rather the *nature* of the decision.

Second, Defendants' jurisdiction argument (again) mischaracterizes Plaintiffs' claims, attempting to blur the distinction between case-by-case denials of deferred action and the categorical termination of the program. The plain text of § 1252(g) only covers case-by-case decisions, and each of the cases Defendants cite in support of their expansive reading of § 1252(g) deals with *individual* determinations, a situation wholly different than what Plaintiffs challenge here.[11] *See ADC*, 525 U.S. at 471 (challenge to government's decision to institute removal proceedings against *individual* immigrants); *Botezatu v. I.N.S.*, 195 F.3d 311 (7th Cir. 1999) (noncitizen challenging Government's refusal to grant his *individual* request to forebear from executing his removal order); *Vasquez v. Aviles*, 639 F. App'x 898 (3d Cir. 2016) (same).

Finally, Defendants' broad invocation of the Executive's authority over foreign policy, *see* Defs.' Mem. at 14, does not insulate their action from judicial review, particularly considering that Defendants' decision to terminate DACA articulated *no* foreign policy considerations. Invoking the shibboleth of "foreign policy" does not insulate the actions of an executive agency from scrutiny; a reviewing court must "listen with care" to determine whether the agency's judgment actually "rest[s] on foreign policy expertise." *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001) (despite

---

[11] Even with regard to individual decisions related to DACA, district courts have held that § 1252(g) is inapplicable. *Torres v. U.S. Dep't of Homeland Sec.*, No. 17-cv-1840, 2017 WL 4340385, at *4 (S.D. Cal. Sept. 29, 2017); *Coyotl v. Kelly*, No. 1:17-cv-1670-MHC, 2017 WL 2889681, at *9 (N.D. Ga. June 12, 2017) (§ 1252(g) did not bar judicial review of whether defendants complied with their own procedures in revoking plaintiff's DACA permit).

government's invocation of a foreign policy rationale—that judicial review of the viability of a detained noncitizen's removal would "interfere with 'sensitive' repatriation negotiations"—the government failed to explain how such review "could make a significant difference in th[at] respect"). The Secretary's memorandum terminating the DACA program is devoid of any foreign policy rationale for the decision, much less one founded on foreign policy expertise.

## III.    Make the Road New York Has a Cause of Action Under the APA

Defendants do not contest that any of the Plaintiffs have standing,[12] but nonetheless contend that Make the Road New York lacks a cause of action under the APA, arguing that the INA does not protect "advocacy organizations" from the "incidental effects" of "a denial of deferred action." Defs.' Mem. at 20-21. Once more, Defendants' arguments mischaracterize the relevant legal test and the claims Plaintiffs assert.

"[I]n the APA context," the zone of interests test is "not especially demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014) (citation and internal quotation marks omitted). A plaintiff's interest need only "arguably" fall within the zone of interests to have a cause of action, and the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* (citation and quotation marks omitted); *see also* Salazar, 822 F.3d at 73.

Make the Road New York is a nonprofit organization dedicated to empowering immigrant, Latino, and working-class communities in New York; it provides direct services to thousands of

---

[12] Defendants additionally argue that Plaintiffs lack "standing" to assert their procedural due process claim, Defs.' Mem. at 35, but their argument is based on the sufficiency of the pleadings and arises under Rule 12(b)(6), not Rule 12(b)(1). In accordance with Judge Garaufis's order dated October 27, 2017 (ECF No. 98), Plaintiffs do not address that argument here.

16

clients applying for DACA, helping with the necessary paperwork and documentation, and offering large-group clinics to assist their members and clients with DACA. *See generally* SAC ¶¶ 43-61. Make the Road New York has more than 20,000 dues-paying members, including scores of current DACA recipients and other members who were or would have become eligible to apply for DACA had it not been terminated. *See id.* ¶¶ 46-50. Approximately a dozen of its current employees have DACA. *Id.* ¶ 47. Make the Road New York asserts standing on behalf of itself,[13] associational standing on behalf of its members,[14] and third-party standing on behalf of its clients.[15]

The various interests that Make the Road New York represents plainly fall within those protected by the INA, and it therefore has a cause of action under the APA. Make the Road New York's members and clients with DACA, for example, have precisely the same interests as the individual Plaintiffs (who Defendants have not argued lack a cause of action), including the interest in being able to lawfully work in the only country most of them have ever called home. And far from feeling only "incidental effects" from "a denial of deferred action," Defs.' Mem. at 21, the wholesale termination of DACA threatens to deprive Make the Road New York of a number of highly-valued employees (whom the INA will prohibit the organization from employing after their current periods of DACA expire), to say nothing of the multitude of other injuries the termination inflicts on the organization. In comparable circumstances, courts have had no trouble holding that organizational plaintiffs are within the zone of interests of the INA and therefore have a cause of

---

[13] *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (recognizing that an organization may have standing to seek "relief from injury to itself"); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993).

[14] *See generally Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

[15] *See generally Powers v. Ohio*, 499 U.S. 400, 410-11 (1991); *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 718-22 (1990); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989).

17

action under the APA. *See, e.g.*, *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986) (organization that invites foreign nationals to speak at rallies); *Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, No. TDC-17-2921, No. TDC-17-2969, 2017 WL 4674314, at *13 (D. Md. Oct. 17, 2017) (organizations that employ or collaborate with foreign nationals affected by President Trump's most recent travel ban of mostly majority-Muslim countries); *cf. Hawaii v. Trump*, 859 F.3d 741, 766 (9th Cir. 2017) (state that hires employees and enrolls students from countries affected by second version of the travel ban), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) *and cert. granted, judgment vacated as moot*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017).

## CONCLUSION

For the foregoing reasons, Plaintiffs ask that the Court deny Defendants' motion to dismiss.

Respectfully submitted,                                     Dated: November 1, 2017

/s/ Jessica R. Hanson
_____

David Chen, Law Student Intern[†]
Susanna D. Evarts, Law Student Intern[†]
Victoria Roeck, Law Student Intern[†]
Healy Ko, Law Student Intern[†]
Hannah Schoen, Law Student Intern[†]
Emily Villano, Law Student Intern[†]
Muneer I. Ahmad, Esq.[†]
Marisol Orihuela, Esq.[†]
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

† *Appearing* pro hac vice

Jessica R. Hanson, Esq. [†]
Mayra B. Joachin, Esq. [†]
Karen Tumlin, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., #108-62
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin Cox, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

18

ACO

# U.S. District Court
# Eastern District of New York (Brooklyn)
# CIVIL DOCKET FOR CASE #: 1:16–cv–04756–NGG–JO

Batalla Vidal v. Baran et al
Assigned to: Judge Nicholas G. Garaufis
Referred to: Magistrate Judge James Orenstein
Cause: 05:551 Administrative Procedure Act

Date Filed: 08/25/2016
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 08/25/2016 | 1 | COMPLAINT against All Defendants filing fee $ 400, receipt number 0207–8866017 Was the Disclosure Statement on Civil Cover Sheet completed –YES,, filed by Martin Jonathan Batalla Vidal. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Civil Cover Sheet) (Taylor, Amy) (Entered: 08/25/2016) |
| 08/25/2016 | 2 | Civil Cover Sheet.. by Martin Jonathan Batalla Vidal (Taylor, Amy) (Entered: 08/25/2016) |
| 08/25/2016 | | Case Assigned to Judge Nicholas G. Garaufis and Magistrate Judge James Orenstein. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Davis, Kimberly) (Entered: 08/25/2016) |
| 08/25/2016 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. **Do NOT return or file the consent unless all parties have signed the consent.** (Davis, Kimberly) (Entered: 08/25/2016) |
| 08/25/2016 | 4 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made, if any. (Davis, Kimberly) (Entered: 08/25/2016) |
| 08/26/2016 | 5 | NOTICE of Appearance by Michael J. Wishnie on behalf of All Plaintiffs (aty to be noticed) (Wishnie, Michael) (Entered: 08/26/2016) |
| 08/26/2016 | 6 | Proposed Summons. by Martin Jonathan Batalla Vidal (Wishnie, Michael) (Entered: 08/26/2016) |
| 08/29/2016 | 7 | Summons Issued as to Kathy A. Baran, Susan M. Curda, Kelvin Medlock, Donald W. Neufeld. (Lee, Tiffeny) (Entered: 08/29/2016) |
| 08/29/2016 | 8 | MOTION for Leave to Appear Pro Hac Vice *Karen C. Tumlin* Filing fee $ 150, receipt number 0207–8875764. by Martin Jonathan Batalla Vidal. (Attachments: # 1 Notice of Motion, # 2 Affidavit in Support) (Tumlin, Karen) (Entered: 08/29/2016) |
| 08/30/2016 | | ORDER denying 8 Motion for Leave to Appear Pro Hac Vice –– The motion is denied without prejudice to renewal in conformity with this court's local rules, which require that an application for admission *pro hac vice* include a certificate from the state court of each state in which the applicant is a member of the bar confirming that the applicant is a member in good standing of the state court's bar. *See* Loc. Civ. R. 1.3(c). Ordered by Magistrate Judge James Orenstein on 8/30/2016. (Howley, Thomas) (Entered: 08/30/2016) |
| 08/30/2016 | 9 | SUMMONS Returned Executed by Martin Jonathan Batalla Vidal. All Defendants. (Wishnie, Michael) (Entered: 08/30/2016) |

| 08/30/2016 | 10 | Letter MOTION for pre motion conference by Martin Jonathan Batalla Vidal. (Wishnie, Michael) (Entered: 08/30/2016) |
|---|---|---|
| 08/30/2016 | 11 | First MOTION for Leave to Appear Pro Hac Vice *on behalf of Clement Lee* Filing fee $ 150, receipt number 0207–8878570. by Martin Jonathan Batalla Vidal. (Taylor, Amy) (Entered: 08/30/2016) |
| 08/30/2016 | | ORDER granting Plaintiff's 10 application for Pre–Motion Conference. The application is GRANTED. The parties are instructed to confer and contact the court's Deputy at 718–613–2545 to schedule the pre–motion conference. Ordered by Judge Nicholas G. Garaufis on 8/30/2016. (Polaris, Julian) (Entered: 08/30/2016) |
| 08/31/2016 | 12 | ORDER granting 11 Motion for Leave to Appear Pro Hac Vice –– Attorney Clement K. Lee, Esq. is permitted to argue or try this case in whole or in part as counsel or advocate. By September 7, 2016, Mr. Lee shall register for ECF. Registration is available online at the EDNY's homepage. Once registered, Mr. Lee shall file a notice of appearance and ensure that he receives electronic notification of activity in this case. Mr. Lee shall also ensure that the $150 admission fee be submitted to the Clerk's Office. Ordered by Magistrate Judge James Orenstein on 8/31/2016. (Howley, Thomas) (Entered: 08/31/2016) |
| 08/31/2016 | 13 | MOTION for Leave to File *Law Student Appearances* by Martin Jonathan Batalla Vidal. (Attachments: # 1 Law Student Intern Appearance Form of Willem Bloom, # 2 Law Student Intern Appearance Form of Jordan Laris Cohen, # 3 Law Student Intern Appearance Form of Amit Jain, # 4 Law Student Intern Appearance Form of Aaron Korthuis, # 5 Law Student Intern Appearance Form of Zachary Manfredi) (Wishnie, Michael) (Entered: 08/31/2016) |
| 08/31/2016 | 14 | MOTION for Leave to Appear Pro Hac Vice *on behalf of Karen C. Tumlin* Filing fee $ 150, receipt number 0207–8880437. by Martin Jonathan Batalla Vidal. (Attachments: # 1 Affidavit in Support, # 2 Certificate of Good Standing) (Tumlin, Karen) (Entered: 08/31/2016) |
| 09/01/2016 | 15 | ORDER granting 14 Motion for Leave to Appear Pro Hac Vice –– Attorney Karen C. Tumlin, Esq. is permitted to argue or try this case in whole or in part as counsel or advocate. By September 8, 2016, Ms. Tumlin shall register for ECF. Registration is available online at the EDNY's homepage. Once registered, Ms. Tumlin shall file a notice of appearance and ensure that she receives electronic notification of activity in this case. Ms. Tumlin shall also ensure that the $150 admission fee be submitted to the Clerk's Office. Ordered by Magistrate Judge James Orenstein on 9/1/2016. (Howley, Thomas) (Entered: 09/01/2016) |
| 09/01/2016 | | ORDER granting 13 Motion for Leave to File *Law Student Appearances* –– The motion is granted. The law students are authorized to appear under the supervision of attorney Michael J. Wishnie. Ordered by Magistrate Judge James Orenstein on 9/1/2016. (Howley, Thomas) (Entered: 09/01/2016) |
| 09/01/2016 | 16 | NOTICE of Appearance by Clement Lee on behalf of Martin Jonathan Batalla Vidal (aty to be noticed) (Lee, Clement) (Entered: 09/01/2016) |
| 09/07/2016 | 17 | NOTICE of Appearance by Scott Dunn on behalf of All Defendants (aty to be noticed) (Dunn, Scott) (Entered: 09/07/2016) |
| 09/07/2016 | 18 | MOTION for Leave to Appear Pro Hac Vice *on behalf of Muneer I. Ahmad* Filing fee $ 150, receipt number 0207–8892225. by Martin Jonathan Batalla Vidal. (Ahmad, Muneer) (Entered: 09/07/2016) |
| 09/07/2016 | 19 | NOTICE of Appearance by Karen C. Tumlin on behalf of Martin Jonathan Batalla Vidal (notification declined or already on case) (Tumlin, Karen) (Entered: 09/07/2016) |
| 09/08/2016 | 20 | ORDER granting 18 Motion for Leave to Appear Pro Hac Vice –– Attorney Muneer I. Ahmad, Esq. is permitted to argue or try this case in whole or in part as counsel or advocate. By September 15, 2016, Mr. Ahmad shall register for ECF. Registration is available online at the EDNY's homepage. Once registered, Mr. Ahmad shall file a notice of appearance and ensure that he receives electronic notification of activity in this case. Mr. Ahmad shall also ensure that the $150 admission fee be submitted to the Clerk's Office. Ordered by Magistrate Judge James Orenstein on 9/8/2016. (Howley, Thomas) (Entered: 09/08/2016) |

| 09/09/2016 | 21 | NOTICE of Appearance by Adam Kirschner on behalf of All Defendants (aty to be noticed) (Kirschner, Adam) (Entered: 09/09/2016) |
|---|---|---|
| 09/09/2016 | 22 | NOTICE of Appearance by Muneer Ahmad on behalf of Martin Jonathan Batalla Vidal (notification declined or already on case) (Ahmad, Muneer) (Entered: 09/09/2016) |
| 09/15/2016 | 23 | NOTICE by Kathy A. Baran, Susan M. Curda, Kelvin Medlock, Donald W. Neufeld , *Proposed Briefing Schedule* (Kirschner, Adam) (Entered: 09/15/2016) |
| 09/19/2016 | 24 | MOTION for Leave to Appear Pro Hac Vice *on behalf of Marisol Orihuela* Filing fee $ 150, receipt number 0207–8921984. by Martin Jonathan Batalla Vidal. (Orihuela, Marisol) (Entered: 09/19/2016) |
| 09/20/2016 | 25 | ORDER granting 24 Motion for Leave to Appear Pro Hac Vice –– Attorney Marisol Orihuela, Esq. is permitted to argue or try this case in whole or in part as counsel or advocate. By September 27, 2016, Ms. Orihuela shall register for ECF. Registration is available online at the EDNY's homepage. Once registered, Ms. Orihuela shall file a notice of appearance and ensure that she receives electronic notification of activity in this case. Ms. Orihuela shall also ensure that the $150 admission fee be submitted to the Clerk's Office. Ordered by Magistrate Judge James Orenstein on 9/20/2016. (Howley, Thomas) (Entered: 09/20/2016) |
| 09/20/2016 | 26 | NOTICE of Appearance by Marisol Orihuela on behalf of Martin Jonathan Batalla Vidal (notification declined or already on case) (Orihuela, Marisol) (Entered: 09/20/2016) |
| 09/21/2016 | 27 | MOTION for Leave to Appear Pro Hac Vice *Justin Cox* Filing fee $ 150, receipt number 0207–8931610. by Martin Jonathan Batalla Vidal. (Cox, Justin) (Entered: 09/21/2016) |
| 09/22/2016 | | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Pre–Motion Conference held on 9/22/2016. Counsel for both parties present. The court granted leave for Plaintiff to file an amended complaint, and for both parties to file motions for dismissal or summary judgment. The court set the following schedule: Plaintiff shall file his amended complaint by September 29, 2016; Plaintiff shall serve his motion by October 6, 2016; Defendants shall serve their consolidated opposition and cross–motion by November 10, 2016; Plaintiff shall serve his reply, if any, and his consolidated opposition by November 30, 2016; and Defendants shall serve their reply, if any, and file the fully briefed motions by December 28, 2016. Oral argument is scheduled for January 25, 2017, at 2 p.m. The court granted Defendants' oral request to stay Defendants' answer to the anticipated amended complaint until 30 days after the court rules on the parties' dispositive motions. (Court Reporter Anthony Mancuso) (Polaris, Julian) (Entered: 09/22/2016) |
| 09/22/2016 | 28 | ORDER granting 27 Motion for Leave to Appear Pro Hac Vice –– Attorney Justin B. Cox, Esq. is permitted to argue or try this case in whole or in part as counsel or advocate. By September 29, 2016, Mr. Cox shall register for ECF. Registration is available online at the EDNY's homepage. Once registered, Mr. Cox shall file a notice of appearance and ensure that he receives electronic notification of activity in this case. Mr. Cox shall also ensure that the $150 admission fee be submitted to the Clerk's Office. Ordered by Magistrate Judge James Orenstein on 9/22/2016. (Howley, Thomas) (Entered: 09/22/2016) |
| 09/29/2016 | 29 | AMENDED COMPLAINT against All Defendants, filed by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit) (Wishnie, Michael) (Entered: 09/29/2016) |
| 10/05/2016 | 30 | Proposed Summons. by Martin Jonathan Batalla Vidal, Make the Road New York (Wishnie, Michael) (Entered: 10/05/2016) |
| 10/05/2016 | 31 | NOTICE of Appearance by Justin B. Cox on behalf of All Plaintiffs (aty to be noticed) (Cox, Justin) (Entered: 10/05/2016) |
| 10/11/2016 | 32 | Summons Issued as to Leon Rodriguez, U.S. Attorney and U.S. Attorney General. (Lee, Tiffeny) (Entered: 10/11/2016) |

| 10/12/2016 | 33 | SUMMONS Returned Executed by Make the Road New York, Martin Jonathan Batalla Vidal. Leon Rodriguez served on 10/11/2016, answer due 11/1/2016. (Wishnie, Michael) (Entered: 10/12/2016) |
|---|---|---|
| 10/27/2016 | 34 | MOTION for Leave to File *Law Student Appearances* by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Law Student Appearances) (Wishnie, Michael) (Entered: 10/27/2016) |
| 11/21/2016 | 35 | First MOTION to Stay *Briefing Schedule* by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Proposed Order) (Wishnie, Michael) (Entered: 11/21/2016) |
| 11/22/2016 | 36 | ORDER granting 35 Motion to Stay Briefing Schedule. Plaintiffs' response to Defendants' Motion to Dismiss and Motion in Opposition to Plaintiffs' Motion for Summary Judgment is due on February 20,2017. Defendant's reply is due on March 20,2017. The hearing currently scheduled for January 25,2017 will be postponed until briefing is completed. So Ordered by Judge Nicholas G. Garaufis on 11/21/2016. (Lee, Tiffeny) (Entered: 11/22/2016) |
| 11/28/2016 | | ORDER granting 34 Motion for Leave to File –– The motion is granted. The law students are authorized to appear under the supervision of attorney Michael J. Wishnie. Ordered by Magistrate Judge James Orenstein on 11/28/2016. (Miao, Tiffany) (Entered: 11/28/2016) |
| 02/13/2017 | 37 | Joint MOTION to Stay *Briefing Schedule* by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Proposed Order) (Wishnie, Michael) (Entered: 02/13/2017) |
| 02/15/2017 | 38 | ORDER granting Joint 37 Motion to Stay Briefing Schedule. Plaintiffs' response to Defendants' Motion to Dismiss and Motion in Opposition to Plaintiffs' Motion for Summary Judgment is due on April 17, 2017. Defendants' reply is due on May 15, 2017. So Ordered by Judge Nicholas G. Garaufis on 2/14/2017. (Lee, Tiffeny) (Entered: 02/15/2017) |
| 03/27/2017 | 39 | NOTICE of Appearance by Daniel Halainen on behalf of All Defendants (aty to be noticed) (Halainen, Daniel) (Entered: 03/27/2017) |
| 04/04/2017 | 40 | Joint MOTION to Stay *Briefing Schedule and Schedule Joint Status Report* by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Proposed Order) (Wishnie, Michael) (Entered: 04/04/2017) |
| 04/05/2017 | 41 | ORDER granting 40 Motion to Stay Briefing Schedule. The Court hereby GRANTS Plaintiffs' and Defendants' joint motion to indefinitely stay the briefing schedule. Plaintiffs' and Defendants' joint status report to the Court is due on September 15,2017. So Ordered by Judge Nicholas G. Garaufis on 4/4/2017. (Lee, Tiffeny) (Entered: 04/05/2017) |
| 05/15/2017 | 42 | NOTICE of Appearance by Joseph Anthony Marutollo on behalf of All Defendants (aty to be noticed) (Marutollo, Joseph) (Entered: 05/15/2017) |
| 08/04/2017 | 43 | NOTICE of Change of Mailing address and telephone number by Justin B. Cox (Cox, Justin) (Entered: 08/04/2017) |
| 08/28/2017 | 44 | Notice of MOTION for Leave to Appear Pro Hac Vice *of Jessica R. Hanson,* Filing fee $ 150, receipt number 02079785605. by Martin Jonathan Batalla Vidal. (Attachments: # 1 Payment Confirmation) (Barrett, C) (Entered: 08/28/2017) |
| 08/29/2017 | 45 | ORDER denying 44 Motion for Leave to Appear Pro Hac Vice –– The motion is denied without prejudice to renewal in conformity with this court's local rules, which require that an application for admission *pro hac vice* include a certificate from the state court of each state in which the applicant is a member of the bar confirming that the applicant is a member of the state court's bar. *See* Loc. Civ. R. 1.3(c). If and when the applicant seeks renewal, she must file a second motion for leave to appear *pro hac vice*. If the court grants the motion, counsel may request a refund of the second filing fee with the Clerk of the Court. Ordered by Magistrate Judge James Orenstein on 8/29/2017. (Miao, Tiffany) (Entered: 08/29/2017) |

| 09/05/2017 | 46 | MOTION for pre motion conference by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Exhibit A–F) (Wishnie, Michael) (Entered: 09/05/2017) |
| --- | --- | --- |
| 09/05/2017 | | ORDER re Plaintiffs' 46 Application for Pre–Motion Conference: The Application is GRANTED. The parties are instructed to confer and contact the court's Deputy at 718–613–2545 to schedule the pre–motion conference. Ordered by Judge Nicholas G. Garaufis on 9/5/2017. (Scott, Conrad) (Entered: 09/05/2017) |
| 09/05/2017 | 47 | MOTION for Leave to Appear Pro Hac Vice *Jessica R. Hanson* Filing fee $ 150, receipt number 0207–9804601. by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Certificate of Good Standing) (Hanson, Jessica) (Entered: 09/05/2017) |
| 09/05/2017 | 48 | MOTION for Leave to Appear Pro Hac Vice *Mayra B. Joachin* Filing fee $ 150, receipt number 0207–9805274. by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Certificate of Good Standing) (Joachin, Mayra) (Entered: 09/05/2017) |
| 09/06/2017 | | ORDER granting 47 Motion for Leave to Appear Pro Hac Vice –– Attorney Jessica Hanson, Esq. is permitted to argue or try this case in whole or in part as counsel or advocate. By September 13, 2017, Ms. Hanson shall register for ECF. Registration is available online at the EDNY's homepage. Once registered, Ms. Hanson shall file a notice of appearance and ensure that she receives electronic notification of activity in this case. Ms. Hanson shall also ensure that the $150 admission fee be submitted to the Clerk's Office. Ordered by Magistrate Judge James Orenstein on 9/6/2017. (Miao, Tiffany) (Entered: 09/06/2017) |
| 09/06/2017 | | ORDER granting 48 Motion for Leave to Appear Pro Hac Vice –– Attorney Mayra Joachin, Esq. is permitted to argue or try this case in whole or in part as counsel or advocate. By September 13, 2017, Ms. Joachin shall register for ECF. Registration is available online at the EDNY's homepage. Once registered, Ms. Joachin shall file a notice of appearance and ensure that she receives electronic notification of activity in this case. Ms. Joachin shall also ensure that the $150 admission fee be submitted to the Clerk's Office. Ordered by Magistrate Judge James Orenstein on 9/6/2017. (Miao, Tiffany) (Entered: 09/06/2017) |
| 09/07/2017 | 49 | NOTICE of Appearance by Jessica Hanson on behalf of All Plaintiffs (notification declined or already on case) (Hanson, Jessica) (Entered: 09/07/2017) |
| 09/07/2017 | 50 | NOTICE of Appearance by Mayra B. Joachin on behalf of All Plaintiffs (notification declined or already on case) (Joachin, Mayra) (Entered: 09/07/2017) |
| 09/07/2017 | 51 | ORDER re Plaintiffs' 46 Application for Pre–Motion Conference. Plaintiffs are DIRECTED, by no later than Monday, September 11, 2017, to file either their proposed second amended complaint or a letter (1) identifying all claims Plaintiffs wish to assert in a second amended complaint, specifically including any claims for which Plaintiffs intend to seek class treatment; (2) describing the interests in this case of any additional parties Plaintiffs wish to add as plaintiffs in a second amended complaint; and (3) identifying any additional parties Plaintiffs wish to name as defendants and explaining why Plaintiffs intend to name such parties as defendants. The Government is DIRECTED, by no later than Wednesday, September 13, 2017, to file a letter stating, with as much specificity as possible, its position on Plaintiffs' proposal to amend their complaint. The parties should be prepared to discuss these filings at the pre–motion conference currently scheduled for September 14, 2017, at 2:30 p.m. Ordered by Judge Nicholas G. Garaufis on September 7, 2017. (Scott, Conrad) (Entered: 09/07/2017) |
| 09/11/2017 | 52 | Letter by Martin Jonathan Batalla Vidal, Make the Road New York (Wishnie, Michael) (Entered: 09/11/2017) |
| 09/12/2017 | 53 | NOTICE of Appearance by Brett Shumate on behalf of All Defendants (aty to be noticed) (Shumate, Brett) (Entered: 09/12/2017) |
| 09/12/2017 | 54 | MOTION for Leave to File *Law Student Appearances* by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Law Student Intern Appearance Form of David Chen, # 2 Law Student Intern Appearance Form of Hannah Schoen, # 3 Law Student Intern Appearance Form of Emily Villano) (Wishnie, Michael) (Entered: 09/12/2017) |

| 09/13/2017 | 55 | NOTICE of Appearance by Brad Rosenberg on behalf of All Defendants (aty to be noticed) (Rosenberg, Brad) (Entered: 09/13/2017) |
|---|---|---|
| 09/13/2017 | 56 | Letter *in Response to Order (ECF No. 51), Letter (ECF No. 52)* by Kathy A. Baran, Susan M. Curda, Kelvin Medlock, Donald W. Neufeld, Leon Rodriguez (Rosenberg, Brad) (Entered: 09/13/2017) |
| 09/13/2017 | 57 | CERTIFICATE OF SERVICE by Martin Jonathan Batalla Vidal, Make the Road New York re 54 MOTION for Leave to File *Law Student Appearances Corrected* (Wishnie, Michael) (Entered: 09/13/2017) |
| 09/14/2017 | | ORDER granting 54 Motion for Leave to File –– The motion is granted. Law students David Chen, Hannah Schoen, and Emily Villano are authorized to appear under the supervision of attorney Michael Wishnie. Ordered by Magistrate Judge James Orenstein on 9/14/2017. (Miao, Tiffany) (Entered: 09/14/2017) |
| 09/15/2017 | | Minute Entry for proceedings held before Judge Nicholas G. Garaufis and Magistrate Judge James Orenstein: Pre–Motion Conference held on 9/14/2017. Counsel for all parties present. The court GRANTED Plaintiffs leave to file a second amended complaint. Plaintiffs shall file their second amended complaint by 9/19/2017. The court GRANTED Defendants leave to file a motion to dismiss and, separately, GRANTED Plaintiffs leave to move for class certification. The court set the following schedule for the anticipated motions: Defendants shall serve their motion to dismiss, and Plaintiffs shall serve their motion for class certification, by 10/20/2017; the parties shall serve their respective responses by 11/17/2017; and the parties shall serve their respective replies and file the fully briefed motions by 12/15/2017. A status conference will be held on 9/26/2017, at 4:00 PM, at which the parties are DIRECTED to appear. Judge Orenstein will address discovery issues in a separate order. (Court Reporter Georgette Betts) (Scott, Conrad) (Entered: 09/15/2017) |
| 09/15/2017 | 58 | ORDER: As discussed on the record at the conference in the *Batalla Vidal* action on September 14, 2017, I respectfully direct the parties to meet and confer about discovery. No later than September 22, 2017, the parties shall report their respective positions on the threshold question of whether discovery should proceed now or await the resolution of the defendants' anticipated motion for dismissal. By the same date, the parties shall submit their respective scheduling proposals in the event discovery is not stayed, as well as a proposed schedule for litigating any specific discovery disputes that the parties have identified as likely to arise. I will expect the parties to be prepared to discuss all matters relating to discovery at the next conference on September 26, 2017. In light of the fact that the parties to the *Batalla Vidal* action have agreed to the filing of a second amended complaint that will include claims that overlap with those already asserted in *State of New York* action, I encourage the plaintiffs' counsel in the latter case to participate in the meet–and–confer process in the former. Although issue has not yet been joined in the *State of New York* action, the participation of counsel from that case in the discovery planning process in the *Batalla Vidal* action will help to avoid needless burdens on the parties in each case. I therefore invite counsel for the parties in the *State of New York* action to appear at the conference in the *Batalla Vidal* action on September 26, 2017, and to participate in the discussion of issues relating to the discovery process. Ordered by Magistrate Judge James Orenstein on 9/15/2017. (Orenstein, James) (Entered: 09/15/2017) |
| 09/19/2017 | 59 | MOTION for Leave to Appear Pro Hac Vice *on behalf of Joshua A. Rosenthal* Filing fee $ 150, receipt number 0207–9840907. by Martin Jonathan Batalla Vidal, Make the Road New York. (Attachments: # 1 Certificate of Good Standing) (Rosenthal, Joshua) (Entered: 09/19/2017) |
| 09/19/2017 | 60 | AMENDED COMPLAINT *Second* against Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump, filed by Make the Road New York, Martin Jonathan Batalla Vidal. (Attachments: # 1 Exhibit A–G) (Wishnie, Michael) (Entered: 09/19/2017) |
| 09/19/2017 | 61 | NOTICE of Voluntary Dismissal by Martin Jonathan Batalla Vidal, Make the Road New York *against Kathy A. Baran, Kelvin Medlock, Susan M. Curda, Donald Neufeld, and Leon Rodriguez* (Wishnie, Michael) (Entered: 09/19/2017) |
| 09/20/2017 | | ORDER granting 59 Motion for Leave to Appear Pro Hac Vice –– Attorney Joshua Rosenthal, Esq. is permitted to argue or try this case in whole or in part as counsel or |

| | | advocate. By September 27, 2017, Mr. Rosenthal shall register for ECF. Registration is available online at the EDNY's homepage. Once registered, Mr. Rosenthal shall file a notice of appearance and ensure that he receives electronic notification of activity in this case. Mr. Rosenthal shall also ensure that the $150 admission fee be submitted to the Clerk's Office. Ordered by Magistrate Judge James Orenstein on 9/20/2017. (Miao, Tiffany) (Entered: 09/20/2017) |
|---|---|---|
| 09/20/2017 | 62 | NOTICE of Appearance by Stephen M. Pezzi on behalf of All Defendants (aty to be noticed) (Pezzi, Stephen) (Entered: 09/20/2017) |
| 09/20/2017 | 63 | MOTION to Withdraw as Attorney by Kathy A. Baran, Susan M. Curda, Kelvin Medlock, Donald W. Neufeld, Leon Rodriguez. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Proposed Order) (Halainen, Daniel) (Entered: 09/20/2017) |
| 09/21/2017 | | ORDER granting 63 Motion to Withdraw as Attorney –– The motion is granted; attorney Daniel Halainen and attorney Adam Kirschner terminated. Ordered by Magistrate Judge James Orenstein on 9/21/2017. (Miao, Tiffany) (Entered: 09/21/2017) |
| 09/21/2017 | 64 | NOTICE of Appearance by Joshua Rosenthal on behalf of All Plaintiffs (notification declined or already on case) (Rosenthal, Joshua) (Entered: 09/21/2017) |
| 09/22/2017 | 65 | Letter *in Response to Sept. 15, 2017 Order Regarding Defendants' Position on Discovery* by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump (Pezzi, Stephen) (Entered: 09/22/2017) |
| 09/22/2017 | 66 | Letter *in Response to September 15, 2017 Order Regarding Discovery* by Martin Jonathan Batalla Vidal (Cox, Justin) (Entered: 09/22/2017) |
| 09/27/2017 | 67 | **SCHEDULING ORDER:** Joint proposal for schedule of bi−weekly status conferences to address outstanding discovery disputes due by: September 29, 2017. Deadline for all Rule 26(a)(1) disclosures: October 4, 2017. Deadline for defendants' production of administrative record and privilege log: October 6, 2017. Objections to discovery requests due by: 1 week after service of requests. Responses to discovery requests due by: 2 weeks after service of requests. Deposition errata due by: 1 week after deposition. Joint status report due by: 1 week before each status conference. All expert disclosures due by: November 15, 2017. All discovery to be completed by: December 15, 2017. **SEE ATTACHED ORDER.** Ordered by Magistrate Judge James Orenstein on 9/27/2017. (Orenstein, James) (Entered: 09/27/2017) |
| 09/29/2017 | 68 | Proposed Scheduling Order *Joint Schedule Re: Discovery* by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas (Wishnie, Michael) (Entered: 09/29/2017) |
| 09/29/2017 | 69 | Letter MOTION to Vacate *in part Sept. 27, 2017 Case−Management and Scheduling Order* by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump. (Pezzi, Stephen) (Entered: 09/29/2017) |
| 09/30/2017 | | ORDER re: Defendants' 69 Motion to Vacate in Part Magistrate Judge James Orenstein's 67 Case Management and Scheduling Order. Plaintiffs are DIRECTED to respond to Defendants' motion by no later than Tuesday, October 3, 2017, at 12 p.m. Ordered by Judge Nicholas G. Garaufis on 9/30/2017. (Scott, Conrad) (Entered: 09/30/2017) |
| 10/02/2017 | | Minute Entry for proceedings held before Judge Nicholas G. Garaufis and Magistrate Judge James Orenstein: Status Conference held on 9/26/2017. Counsel for all parties and for the States of Massachusetts, New York, and Washington present. The court revised the briefing schedule for Defendants' anticipated motion to dismiss and set a briefing schedule for Plaintiffs' anticipated motion for preliminary relief as follows: Defendants shall file their anticipated motion to dismiss, or a motion for summary judgment, and Plaintiffs shall file any motion for preliminary relief, by no later than December 15, 2017; and Plaintiffs shall file their opposition to Defendants' anticipated motion, and Defendants shall file their opposition to any motion for preliminary relief, by January 13, 2018. The parties are directed to disregard Individual Rule III(B), regarding bundling of motion papers, for purposes of these anticipated motions. The court will hear oral argument on the motion or motions on January 18, 2018. (Court Reporters Lisa Schmid and David Roy) (Scott, Conrad) (Entered: 10/02/2017) |

| 10/02/2017 | | SCHEDULING ORDER: I respectfully direct the parties to appear before me for a status conference on each of the following dates, at 2:00 p.m. in courtroom 11D South: October 11, October 25, November 8, November 29, and December 13, 2017. I further respectfully direct the parties to submit a joint status report by October 6, 2017, in advance of the first conference scheduled above, and to submit a joint status report no later than one week before each subsequent conference. I will cancel any conference on the parties' unanimous request. Any counsel of record who wishes to listen to a conference by telephone may make arrangements to do so, but any counsel who wishes to be heard at a conference must appear in person. Ordered by Magistrate Judge James Orenstein on 10/2/2017. (Orenstein, James) (Entered: 10/02/2017) |
|---|---|---|
| 10/03/2017 | 70 | RESPONSE in Opposition re 69 Letter MOTION to Vacate *in part Sept. 27, 2017 Case−Management and Scheduling Order* filed by All Plaintiffs. (Ahmad, Muneer) (Entered: 10/03/2017) |
| 10/03/2017 | 71 | MOTION for Leave to File *Law Student Appearances* by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas. (Attachments: # 1 Law Student Appearance Form of Victoria Roeck, # 2 Law Student Appearance Form of Healy Ko) (Wishnie, Michael) (Entered: 10/03/2017) |
| 10/03/2017 | 72 | ORDER re Defendants' Motion to Vacate in Part Magistrate Judge James Orenstein's Case Management and Scheduling Order: The Motion is GRANTED in part, as stated in the attached order. Defendants' time to submit a privilege log is extended to October 20, 2017. The court will address Defendants' remaining objections by separate order. Defendants are invited to file a reply, not to exceed five pages, to Plaintiffs' oppositions no later than October 10, 2017. Re (69) Motion to Vacate in Case 16−CV−4756−NGG−JO and (48) Motion to Vacate in Case 17−CV−5228−NGG−JO. Ordered by Judge Nicholas G. Garaufis on 10/3/2017. (Scott, Conrad) (Entered: 10/03/2017) |
| 10/04/2017 | 73 | NOTICE of Appearance by Mary Bailey on behalf of All Defendants (aty to be noticed) (Bailey, Mary) (Entered: 10/04/2017) |
| 10/05/2017 | 74 | NOTICE of Change of Address by Karen C. Tumlin (Tumlin, Karen) (Entered: 10/05/2017) |
| 10/05/2017 | 75 | NOTICE of Change of Address by Mayra B. Joachin (Joachin, Mayra) (Entered: 10/05/2017) |
| 10/05/2017 | 76 | NOTICE of Change of Address by Jessica Hanson (Hanson, Jessica) (Entered: 10/05/2017) |
| 10/06/2017 | | ORDER granting 71 Motion for Leave to File –– The motion is granted. Law students Victoria Roeck and Healy Ko are authorized to appear under the supervision of attorney Michael Wishnie. Ordered by Magistrate Judge James Orenstein on 10/6/2017. (Drake, Shaw) (Entered: 10/06/2017) |
| 10/06/2017 | 77 | NOTICE by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump *of Filing of Administrative Record* (Attachments: # 1 Ex. 1 – Administrative Record) (Pezzi, Stephen) (Entered: 10/06/2017) |
| 10/06/2017 | 78 | STATUS REPORT *(Joint)* by Kathy A. Baran, Susan M. Curda, Elaine C. Duke, Kelvin Medlock, Donald W. Neufeld, Leon Rodriguez, Jefferson Beauregard Sessions, Donald J. Trump (Bailey, Kate) (Entered: 10/06/2017) |
| 10/09/2017 | | ORDER re docket entry #78 in *CV 16−4756* and docket entry #57 in *CV 17−5228 STATUS REPORT (Joint)* –– The plaintiffs may file a response to the defendants' objections to discovery by 2:00 p.m. on October 10, 2017. Ordered by Magistrate Judge James Orenstein on 10/9/2017. (Guy, Alicia) (Entered: 10/09/2017) |
| 10/10/2017 | 79 | Letter *in Response to the Defendants' Objections to Discovery* by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas (Rosenthal, Joshua) (Entered: 10/10/2017) |
| 10/10/2017 | 80 | REPLY in Support re 69 Letter MOTION to Vacate *in part Sept. 27, 2017 Case−Management and Scheduling Order* filed by Elaine C. Duke, Jefferson |

| | | Beauregard Sessions, Donald J. Trump. (Pezzi, Stephen) (Entered: 10/10/2017) |
|---|---|---|
| 10/11/2017 | 81 | Minute Entry for proceedings held before Magistrate Judge James Orenstein:Status Conference held on 10/11/2017, ( Status Conference set for 11/30/2017 02:00 PM in Courtroom 11D South before Magistrate Judge James Orenstein.) SCHEDULING: (1) The next status conference will be held on October 25, 2017, at 2:00 p.m. (2) A further status conference will be held on November 8, 2017, at 2:00 p.m. (3) A further status conference will be held on November 30, 2017, at 2:00 p.m. (4) A further status conference will be held on December 13, 2017, at 2:00 p.m. SUMMARY: (1) The conference previously scheduled for November 29, 2017, was adjourned to November 30, 2017, at 2:00 p.m. (2) I provided information to the parties about former colleagues and friends of mine who are involved in the litigation. I see no need to disqualify myself *sua sponte*, but any party seeking my disqualification on the basis of that information may file a motion by October 18, 2017. (3) As set forth on the record, I overruled the defendants' objections to the depositions of Donald Neufeld and Gene Hamilton. Other discovery disputes were not ripe for resolution today. The plaintiffs shall file a letter motion to compel the defendants to complete their production of the administrative record by October 13, 2017, and the defendants shall respond by October 16, 2017. (Court Reporter Linda Marino.) (Orenstein, James) (Entered: 10/11/2017) |
| 10/11/2017 | 82 | SCHEDULING ORDER: At a conference on October 11, 2017, I made certain discovery rulings as to which the parties may seek review. See Fed. R. Civ. P. 72(a). Because the exigencies of this case make it impractical to allow the parties the full 14 days to file objections that would normally be available, I direct any party seeking review of this or any other ruling I make in this case to file objections no later than two business days after the ruling at issue unless otherwise ordered. *See, e.g.*, *Hispanic Counseling Ctr., Inc. v. Inc. Vill. of Hempstead*, 237 F. Supp. 2d 284, 290 (E.D.N.Y. 2002). Responses to such objections shall be due two business days after the objections are filed unless otherwise ordered. Ordered by Magistrate Judge James Orenstein on 10/11/2017. (Orenstein, James) (Entered: 10/11/2017) |
| 10/13/2017 | 83 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on October 11, 2017, before Judge James Orenstein. Court Reporter/Transcriber Linda A. Marino, Telephone number 718–613–2484. Email address: lindacsr@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/3/2017. Redacted Transcript Deadline set for 11/13/2017. Release of Transcript Restriction set for 1/11/2018. (Marino, Linda) (Entered: 10/13/2017) |
| 10/13/2017 | 84 | Letter MOTION to Produce *a Complete Administrative Record* by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas. (Attachments: # 1 Exhibit A–B) (Ahmad, Muneer) (Entered: 10/13/2017) |
| 10/16/2017 | 85 | RESPONSE in Opposition re 84 Letter MOTION to Produce *a Complete Administrative Record* filed by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump. (Attachments: # 1 Exhibit 1 – Email Chain re: Meet–and–Confer, # 2 Exhibit 2 – Tenpas Memorandum) (Pezzi, Stephen) (Entered: 10/16/2017) |
| 10/17/2017 | 86 | MEMORANDUM & ORDER, The Court GRANTS in part, DENIES in part and RESERVES RULING in part on Defendants' motion to vacate the Order (Dkt. 69). So Ordered by Judge Nicholas G. Garaufis on 10/17/2017. (Re: (69) Motion to Vacate in case 1:16–cv–04756–NGG–JO; and, (48) Motion to Vacate in case 1:17–cv–05228–NGG–JO) (Lee, Tiffeny) (Entered: 10/17/2017) |
| 10/18/2017 | 87 | Letter MOTION to Stay by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump. (Attachments: # 1 Supporting Declarations) (Pezzi, Stephen) (Entered: 10/18/2017) |
| 10/18/2017 | 88 | STATUS REPORT *(Joint)* by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas (Attachments: # 1 Certificate of Service) (Ahmad, Muneer) (Entered: 10/18/2017) |

| | | |
|---|---|---|
| 10/19/2017 | 89 | ORDER granting (84) Motion to Produce in case 1:16–cv–04756–NGG–JO. For the reasons set forth in the attached document, I grant the motion to compel and respectfully direct the defendants to complete production of the administrative record by 3:00 p.m., Eastern Daylight Time, on October 27, 2017. Ordered by Magistrate Judge James Orenstein on 10/19/2017. (Orenstein, James) (Entered: 10/19/2017) |
| 10/19/2017 | 90 | ORDER re: Motion to Stay in Case No. 1:16–cv–04756 (Dkt. 87) and Motion to Stay in Case No. 1:17–cv–05228 (Dkt. 64): The motion is denied for the reasons stated in the attached order. Ordered by Judge Nicholas G. Garaufis on 10/19/2017. (Scott, Conrad) (Entered: 10/19/2017) |
| 10/20/2017 | 91 | USCA ORDER – The Government's emergency motion for a stay of discovery and record supplementation in the proceedings before the District Court is GRANTED pending its consideration by a regular three–judge panel of the Court, it being understood that during the pendency of this emergency motion and the stay hereby granted no rights or claims of rights of any of the parties shall have been waived or forfeited. The stay is contingent upon the Government filing the "full petition for a writ of mandamus", as described in its papers, on October 23, 2017 by 3:00 p.m. EST. It is so ordered. Certified Copy Issued: 10/20/17. USCA #17–3345. See also 17–cv–5228 (McGee, Mary Ann) (Entered: 10/20/2017) |
| 10/23/2017 | 92 | MOTION to Adjourn Conference *(Unopposed)* by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump. (Pezzi, Stephen) (Entered: 10/23/2017) |
| 10/23/2017 | | ORDER granting 92 Motion to Adjourn Conference –– The motion is granted on consent. The conference previously set for October 25, 2017, will be rescheduled immediately upon any resumption of discovery in this case. All other previously scheduled court appearance remain in effect. Ordered by Magistrate Judge James Orenstein on 10/23/2017. (Drake, Shaw) (Entered: 10/23/2017) |
| 10/23/2017 | | ORDER: In light of the stay issued on October 20, 2017, by the U.S. Court of Appeals for the Second Circuit, the parties' deadline for filing supplemental letter briefs discussing whether the privilege–log requirement should extend to materials considered by second–tier subordinates (Oct. 19, 2017, Batalla Vidal v. Duke, No. 16–CV–4756, Dkt. 90) at 11) is ADJOURNED, pending further notice. Ordered by Judge Nicholas G. Garaufis on 10/23/2017. (Scott, Conrad) (Entered: 10/23/2017) |
| 10/23/2017 | 93 | Letter by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas (Attachments: # 1 Certificate of Service) (Joachin, Mayra) (Entered: 10/23/2017) |
| 10/24/2017 | | ORDER re 93 Letter –– The parties have no obligation to brief discovery disputes while the stay is in effect. However, the parties are free to take into account the fact that the pendency stay only heightens the need to make swift progress to complete the exchange of information to which the parties are entitled in the limited time available when and if the discovery process resumes. Accordingly, to promote that necessary efficiency, any party anticipating the need for discovery relief is free to file a letter motion for such relief as it deems appropriate at any time while the stay is in effect. The opposing party may, but need not, file its opposition within two business days; should it elect not to do so, its opposition will be due no later than 48 hours after the issuance of any order lifting the stay. Ordered by Magistrate Judge James Orenstein on 10/24/2017. (Salvador, Anjali) (Entered: 10/24/2017) |
| 10/24/2017 | | ORDER: In light of the order issued by the U.S. Court of Appeals for the Second Circuit in In re Duke, No. 17–3345, on October 24, 2017 (Dkt. 42), Defendants are DIRECTED to submit, by no later than 12:00 noon on Friday, October 27, 2017, a supplemental brief explaining why the court lacks jurisdiction to consider the claims raised in Batalla Vidal v. Duke, No. 16–4756, and New York v. Trump, No. 17–CV–5228, or why such claims are otherwise non–justiciable. Plaintiffs in each of these cases are DIRECTED to submit supplemental briefs in opposition by no later than 12:00 noon on Wednesday, November 1, 2017. The parties should include all arguments in support of their positions in their briefs; the court will not consider arguments incorporated by reference to other filings in these or any other cases. Ordered by Judge Nicholas G. Garaufis on 10/24/2017. (Scott, Conrad) (Entered: 10/24/2017) |

| 10/25/2017 | 94 | MOTION for Leave to File Excess Pages *for Defendants' Brief (Unopposed)* by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump. (Marutollo, Joseph) (Entered: 10/25/2017) |
| 10/26/2017 | | ORDER re: Defendants' (94) Application for Leave to File Excess Pages in Case No. 16–CV–04756 and (70) Application for Leave to File Excess Pages in Case No. 17–CV–05228: The applications are granted. Ordered by Judge Nicholas G. Garaufis on 10/26/2017. (Scott, Conrad) (Entered: 10/26/2017) |
| 10/27/2017 | 95 | MOTION to Dismiss by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump. Responses due by 11/1/2017 (Attachments: # 1 Memorandum in Support) (Pezzi, Stephen) (Entered: 10/27/2017) |
| 10/27/2017 | 96 | Letter MOTION for Leave to File Excess Pages *, or in the Alternative, for Clarification,* by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas. (Joachin, Mayra) (Entered: 10/27/2017) |
| 10/27/2017 | 97 | NOTICE by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump re 95 MOTION to Dismiss – *Errata to Memorandum of Law in support of Defendants' Motion to Dismiss* (Marutollo, Joseph) (Entered: 10/27/2017) |
| 10/27/2017 | 98 | ORDER re: Plaintiffs' (96) Motion for Clarification or for Leave to File Excess Pages in No. 16–CV–4756. Plaintiffs in Batalla Vidal v. Duke, No. 16–CV–4756, and New York v. Trump, No. 17–CV–5228, need not address Defendants' arguments, other than those pertaining to issues of jurisdiction and justiciability, in their supplemental briefs due November 1, 2017. See the attached order. Ordered by Judge Nicholas G. Garaufis on 10/27/2017. (Scott, Conrad) (Entered: 10/27/2017) |
| 10/30/2017 | 99 | USCA ORDER – The stay entered on Friday, October 20, 2017 pending this hearing today by a three–judge panel is hereby extended until determination of the mandamus petition filed Monday, October 23, 2017. Resolution of the mandamus petition is deferred until such time as the District Court has considered and decided expeditiously issues of jurisdiction and justiciability. Response briefs on the mandamus petition may be filed promptly. The filing of any other or further briefs is deferred until further notice. Certified Copy Issued: 10/24/17. USCA #17–3345. See also 17–cv–5228. (McGee, Mary Ann) (Entered: 10/30/2017) |
| 10/30/2017 | 100 | Letter *Motion to Set Briefing Schedule* by Elaine C. Duke, Jefferson Beauregard Sessions, Donald J. Trump (Pezzi, Stephen) (Entered: 10/30/2017) |
| 10/31/2017 | 101 | Letter *Response Opposing Defendants Proposed Schedule* by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas (Attachments: # 1 Certificate of Service) (Rosenthal, Joshua) (Entered: 10/31/2017) |
| 11/01/2017 | 102 | RESPONSE in Opposition re 95 MOTION to Dismiss filed by Antonio Alarcon, Martin Jonathan Batalla Vidal, Carolina Fung Feng, Eliana Fernandez, Make the Road New York, Mariano Mondragon, Carlos Vargas. (Attachments: # 1 Certificate of Service) (Hanson, Jessica) (Entered: 11/01/2017) |

1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                     16-CV-4756(NGG-JO)
 3   MAKE THE ROAD NEW YORK and
     MARTIN JONATHAN BATALLA VIDAL,
 4                                   United States Courthouse
             Plaintiffs,             Brooklyn, New York
 5
             -against-               September 14, 2017
 6                                   2:30 p.m.
     KATHY A. BARAN, ET AL.,
 7
             Defendants.
 8
     --------------------------------x
 9

10        TRANSCRIPT OF CIVIL CAUSE FOR PRE MOTION CONFERENCE
            BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
11             UNITED STATES SENIOR DISTRICT JUDGE
           UNITED STATES MAGISTRATE JUDGE JAMES ORENSTEIN
12

13   APPEARANCES

14   Attorneys for Plaintiff: JEROME N. FRANK LEGAL SVCS. ORG.
                              P.O. BOX 209090
15                            New Haven, Connecticut 06520
                              BY:  MICHAEL J. WISHNIE, ESQ.
16                            SUSANNA D. EVARTS(STUDENT INTERN)

17                            NATIONAL IMMIGRATION LAW CENTER
                              3435 Wilshire Boulevard, Suite 1600
18                            Los Angeles, California 90010
                              BY:  KAREN TUMLIN, ESQ.
19                                 JUSTIN COX, ESQ.
                                   MAYRA JOACHIN, ESQ.
20                                 MARISOL ORIHUELA, ESQ.
                                   MUNEER I. AHMAD, ESQ.
21                                 JESSICA HANSON, ESQ.

22                            MAKE THE ROAD NEW YORK
                              301 Grove Street
23                            Brooklyn, New York 11237
                              BY:  AMY S. TAYLOR, ESQ.

24

25
```

1

2    Attorneys for Defendant:
                         U.S. DEPARTMENT OF JUSTICE
                         CIVIL DIVISION
3                        FEDERAL PROGRAMS BRANCH
                         950 Pennsylvania Avenue, N.W.
4                        Washington, D.C. 20530
                         BY  BRETT A. SHUMATE,
5                            DEPUTY ASSISTANT ATTORNEY GENERAL
                             JOHN R. TYLER, ASSISTANT BRANCH DIR.
6                            BRAD ROSENBERG, SR. TRIAL COUNSEL

7                        UNITED STATES ATTORNEY'S OFFICE
                         Civil Division
8                        271 Cadman Plaza East
                         Brooklyn, New York 11201
9                        BY:  JOSEPH A. MARUTOLLO, AUSA
                             SUSAN L. RILEY, CHIEF CIVIL DIVISION
10

11

12

13

14

15

16

17

18

19   Court Reporter:          Georgette K. Betts, RPR, CSR, OCR
                         Phone:  (718)804-2777
20                       Fax:    (718)804-2795
                         Email:  Georgetteb25@gmail.com
21

22

23   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
24

25

1          THE COURT:  You may be seated in the back and on the

2     side.  Call the case, please.

3          THE COURTROOM DEPUTY:  Everybody on the Vidal matter

4     please state your appearances for the record.

5          THE COURT:  All right.  For the plaintiff.

6          MR. WISHNIE:  Good afternoon, Your Honor, for

7     plaintiffs, Michael Wishnie, Jerome N. Frank Legal Services

8     Organization, Yale Law School.  With me today is law student

9     intern, Susanna Evarts.  Ms. Evarts will be prepared to

10    address the Court regarding the claims set forth in our

11    filings.

12          Attorney Karen Tumlin of the National Immigration

13    Law Center will be prepared to address the Court regarding

14    case management and scheduling, any matters like that.  I'll

15    invite everybody else to introduce themselves.

16          THE COURT:  That's fine, please go ahead.

17          MR. COX:  Justin Cox with the National Immigration

18    Law Center.

19          MS. JOACHIN:  Mayra Joachin, National Immigration

20    Law Center.

21          MS. HANSON:  Jessica Hanson, National Immigration

22    Law Center.

23          MS. TAYLOR:  Amy Taylor, Make The Road New York.

24          MS. ORIHUELA:  Marisol Orihuela, Jerome N. Frank

25    Legal Services Organization.

4

1           MR. AHMAD:  Muneer Ahmad, Jerome N. Frank Legal

2    Services Organization.

3           THE COURT:  Thank you.  Yes.

4           MS. RILEY:  Good afternoon, Your Honor, Susan Riley,

5    chief of the civil division in the U.S. Attorney's Office.

6           THE COURT:  Nice to see you again, Ms. Riley.

7           MS. RILEY:  Thank you, Your Honor.

8           I'd like to introduce to you our Deputy Assistant

9    Attorney General for the civil division in Washington, D.C.,

10   Brett Shumate.  He will be presenting the government's

11   arguments today.

12          Also at counsel table is John Tyler, an assistant

13   director in the Federal Programs Branch in the civil division

14   Department of Justice in Washington, D.C.  With us also is

15   Brad Rosenberg, also of the Federal Programs Branch of the

16   civil division in Washington, D.C.  Lastly, but not least, Joe

17   Marutollo of our offices, USAO office, chief of immigration

18   litigation.

19          THE COURT:  He has replaced Mr. Dunn?

20          MS. RILEY:  Yes, he has, Your Honor.

21          THE COURT:  Who has taken the bench in New York

22   City.

23          MS. RILEY:  Yes, he has.

24          THE COURT:  How nice for him.

25          MS. RILEY:  Yes, it is, Your Honor.

5

1      THE COURT:  All right.  It's nice to see every one

2  from out of town, New Haven and Washington.

3      With me is Magistrate Judge James Orenstein, who is

4  also assigned to this case and we thought for the purposes of

5  efficiency the two of us would preside over this proceeding.

6  You may be seated.

7      This case was brought last year and it was, in

8  effect, stayed while the political process continued and here

9  we are on September 14th, 2017, and we've been asked by the

10 plaintiffs to file a second amended complaint.

11     So why don't we start with the application made by

12 the plaintiff.

13     MS. EVARTS:  Good afternoon, Your Honor, thank you.

14 I would like to first start by introducing my client, Martin

15 Batalla Vidal and many members of Make the Road New York who

16 are with us today.

17     THE COURT:  Where is your client?

18     MR. VIDAL:  Right here, Your Honor.

19     THE COURT:  Nice to meet you.

20     MS. EVARTS:  Second, with your permission, I would

21 like to state the case briefly as we see it.

22     THE COURT:  Have you been keeping up with all the

23 news from Washington and Florida that's been articulated by

24 the President in the last 12 hours about this case -- not

25 about this case about the DACA situation?

1          MS. EVARTS:  Yes, I have, Your Honor.

2          THE COURT:  Okay, fine.  I'll be asking the other

3     side a few questions about that.  Go ahead.

4          MS. EVARTS:  The Trump administration's decision to

5     terminate the DACA program was both heartless and cruel and it

6     was also illegal.  The purpose of the Administrative Procedure

7     Act, the APA, is to ensure that when an agency undertakes

8     action that it think through its decision and it think through

9     the cost of taking that action and make a deliberate decision,

10    especially -- this is especially true when people's lives are

11    at stake.

12         THE COURT:  They didn't follow the Administrative

13    Procedure Act when the established DACA, did they?  That was

14    done without an opportunity for notice and comment, right?

15         MS. EVARTS:  That is correct, Your Honor.

16         THE COURT:  So going in there hasn't been -- the APA

17    wasn't followed but you're saying they should be following it

18    in connection with the rescission.

19         MS. EVARTS:  Yes.

20         THE COURT:  Is that it?

21         MS. EVARTS:  We are, Your Honor.

22         THE COURT:  Okay.

23         MS. EVARTS:  And while we fully acknowledge that an

24    agency can change its policy, when it does it needs to be

25    legal, it cannot be pretextual and it needs to be

1    constitutional.  The agency has failed all three of those.

2              After its termination of the DACA program, we

3    proposed to amend our complaint in order to bring claims,

4    statutory claims and constitutional claims.  Our statutory

5    claims arise under the Administrative Procedure Act and the

6    Regulatory Flexibility Act.  And our constitutional claims

7    arise under the equal protection guarantee of the Fifth

8    Amendment along with the due process clause of the Fifth

9    Amendment.

10             And I can describe the claims in more depth if you

11   would like, Your Honor.

12             THE COURT:  Well, briefly speaking, you are

13   proposing to amend the complaint, according to your letter, to

14   make certain claims for individuals who are not yet plaintiffs

15   in the case, right?

16             MS. EVARTS:  That is correct, Your Honor.

17             THE COURT:  And also to make claims on behalf of a

18   class or a number of classes.

19             MS. EVARTS:  That is correct, Your Honor.

20             THE COURT:  Can you describe the class or classes

21   that you propose to include in your amended complaint.

22             MS. EVARTS:  Yes, Your Honor.  We propose a

23   nationwide class that would be nationwide.  And I can get into

24   more detail.  We also expect in our class certification

25   motion, if you grant us leave to amend our complaint, that we

1   will also more fully flesh out the particular aspects of the

2   class that we propose.

3           THE COURT:  When could you have this second amended

4   complaint filed so we can move along with this case, and as

5   the government -- as the Attorney General has established

6   certain deadlines for making application to extend these

7   permits.

8           Just state your name for the court reporter.

9           MS. TUMLIN:  Absolutely.  Karen Tumlin for

10  plaintiffs.  Your Honor, the plaintiffs are prepared to file

11  our second amended complaint on Tuesday, the 19th, if that

12  would work for the Court.

13          THE COURT:  All right.  And so you are pretty far

14  along then in preparing your second amended complaint.

15          MS. TUMLIN:  We're working diligently, Your Honor.

16          THE COURT:  Okay, well, that's what weekends are

17  for.

18          MS. TUMLIN:  Turns out.

19          THE COURT:  Let me just ask the government --

20  welcome, first of all, sir.

21          MR. SHUMATE:  Thank you, Your Honor.

22          THE COURT:  Let me just ask you, are you the career

23  person in your position at the justice department or are you

24  the political appointee?

25          MR. SHUMATE:  I'm the political appointee, Your

1    Honor.

2           THE COURT:  Which means you know more about what the

3    President is thinking than a career person would.

4           MR. SHUMATE:  I don't think you should assume that,

5    Your Honor, but --

6           THE COURT:  Okay.

7           MR. SHUMATE:  -- I'm the Deputy Assistant Attorney

8    General for the Federal Programs.

9           THE COURT:  Well, it is nice to have you here.

10          MR. SHUMATE:  Thank you.

11          THE COURT:  So I take it from your correspondence

12   that you don't object to the filing of the second amended

13   complaint.

14          MR. SHUMATE:  That's correct, Your Honor.

15          First of all, I just wanted to say that we recognize

16   the importance of this case, the significance of the issues

17   that are presented, and the public interest in the case.  So

18   we obviously have no objection to the filing of the amended

19   complaint.  We see it makes perfect sense to move this case

20   along quickly, so we're not opposing the amended complaint.

21          What the government would be willing to do is file a

22   motion to dismiss within 30 days of when we see the amended

23   complaint.  Even though we typically have 60 days, we're

24   willing to move very quickly to put the Court in a position to

25   address what we think are fundamental flaws in the claims that

1    the plaintiffs propose to bring by the end of the year.  And

2    as you know, there is a March deadline in DHS's memorandum.

3    In the event the Court does not dismiss the case, we feel the

4    Court should do that, the Court will be able to take some

5    action and we can move to PI briefing potentially next year if

6    the plaintiffs so choose to do so.

7            But we think the best course of action would be, for

8    example, if the plaintiffs were to file the amended complaint

9    next week, we would file a motion to dismiss within 30 days,

10   say October 20th, the plaintiffs could have another 30 days or

11   so to file an opposition, which we would propose

12   November 17th, we would file a reply on December 15th and then

13   the Court could hold a hearing, if it decided to do so, at the

14   end of the year and the Court would be in a position to make

15   the decision on our motion to dismiss end of this year, early

16   next year.  So that would --

17           THE COURT:  Okay.  Let me just ask you this.  Isn't

18   there -- there's a first deadline that was set forth by the

19   Attorney General in his statement and that I think was

20   October 5th.  What was that deadline for?

21           MR. SHUMATE:  So it's actually -- October 5th,

22   that's correct, it is actually a DHS deadline for renewal

23   applications for certain categories of individuals whose

24   permits expire.  So, yes, that deadline is upcoming.

25           One thing the plaintiffs had asked us to consider is

1  whether DHS would consider extending that deadline in light of

2  the hurricanes in Texas and Florida.  We took that issue very

3  seriously, we took it to DHS, they have considered our

4  request.  Their position right now is that that deadline will

5  remain October 5th as of now, but I am authorized to say that

6  they are actively considering whether to extend the deadline

7  in light of the hurricanes.  So that's what I know about the

8  October 5th deadline.  As of right now, it still stands.

9           THE COURT:  I'm more concerned about the October 5th

10  deadline in terms of how it might prejudice the rights of

11  certain persons who are already covered by the DACA

12  certificates or permits, work permits and so on that have

13  already been issued.  And so I'm not worried -- I mean, we're

14  all concerned about what has happened with the hurricanes, but

15  if you're living in Michigan or in Oregon or in Vermont, you

16  don't have a problem with the hurricane, you've got a problem

17  with the fact that based on this deadline you may be preempted

18  from making an application to extend the benefit that you

19  received under DACA.  So since this is a nationwide program, I

20  think we should just not focus on people in the impacted areas

21  from the hurricanes, we need to focus on everybody.  If this

22  is going to be an application for a nationwide class, we have

23  to think of the whole country, so -- and then there's also the

24  question of whether DHS and the immigration officials have the

25  latitude, absent DACA, to grant certain applications

12

1  irrespective of whether DACA exists and whether this, in

2  effect, creates a legislative rule on the part of DHS that

3  bars people, based on their classification, from being

4  considered for this kind of benefit or remedy or exception to

5  the general rule.

6       I'm just wondering, have you all thought about the

7  question of whether that kind of hard and fast deadline for

8  certain categories of individuals covered by DACA would, in

9  effect, constitute a legislative rule, irrespective of whether

10  the creation of DACA violated that in effect the requirement

11  that legislative rules not be established.

12       MR. SHUMATE:  Thank you, Your Honor.  We certainly

13  understand the plaintiffs' concern about the October 5th

14  deadline.  In DHS's judgment, 30 days was a sufficient amount

15  of time to allow individuals to complete the paperwork to file

16  for renewals.  I think there is a virtue in having a clear

17  deadline that people know about, that's clear and why we're

18  reporting.  So in their discretion they thought that was

19  appropriate and, in their defense, Your Honor, this is a

20  decision that has been made to wind down the program.  It was

21  not an abrupt decision, so the program is not ending

22  immediately.  Nobody is losing their DACA benefits

23  immediately.  The opportunity has been provided to renew

24  certain applications and so we think that is eminently

25  reasonable.

1          And our position in the case is that this decision

2   to rescind DACA is not subject to judicial review of the APA

3   at all.  So it is not subject to the arbitrary and capricious

4   decision-making requirement, it's not subject to notice in

5   common rule making, so this was an eminently reasonable

6   decision that, you know, it's an exercise of prosecutorial

7   discretion.  We had to decide how to wind it down in some way,

8   so they felt this was just a reasonable way to establish some

9   deadlines so folks would have clear notice of what the

10  deadlines would be.

11          THE COURT:  Well, the Attorney General said in his

12  statement that DACA is unconstitutional and yet in this

13  process you're allowing people to renew, certain people, whose

14  coverage ends by a certain time to renew even though it is an

15  allegedly unconstitutional procedure.  Is that what -- do I

16  get that right or do I get that wrong?

17          MR. SHUMATE:  That is right.  The Attorney General

18  and DHS both decided that this is an unlawful program and what

19  they decided was -- it was a decision based on litigation

20  risk.  That if we did not wind down the program in a

21  responsible way it was very likely that the other states were

22  going to go to the Southern District of Texas and ask for an

23  immediate preliminary injunction in which case the program

24  could have been ended immediately.  So in their judgment what

25  they decided to do is we're going to have a responsible way to

1    wind this program down that gives folks a chance to know when

2    the deadlines are, gives an opportunity to apply for renewal

3    permits so people aren't losing their benefits immediately.

4    So it was a decision based on litigation risk that if we

5    didn't wind this down in a responsible way, then the District

6    Court in Texas would do it for us.

7          MS. TUMLIN:  If I may speak briefly to the

8    October 5th and the notice issue.  Leaving aside the

9    tremendous turmoil that states and individuals impacted by the

10    hurricanes but looking at the entire country, one of the

11    things that we're greatly troubled by as plaintiffs and would

12    like to address to the Court is, the renewal process for DACA

13    how it has worked traditionally is 180 days before someone's

14    work authorization in DACA is set to expire they get a notice

15    and that notice directs them to file the renewal application

16    between 120 and 150 days.  And those notices -- and I think

17    the government can of course correct me if this is not the

18    case -- have continued to go out, but what that means with the

19    hard and fast October 5th deadline is, individuals whose DACA

20    is expiring between February and March, have received notices

21    that are false and misleading in this context that has

22    changed.  They don't state that you only have until

23    October 5th and our understanding is there is no plan to

24    provide individualized notice that provides the right date and

25    provide a warning to individuals that if they don't submit

1  their renewal applications three weeks from today, not in the

2  120- or 150-day window, that they risk losing their chance to

3  renew.

4          THE COURT:  I see.  So let me just move on to the

5  next question, which is after you file your second amended

6  complaint, assuming that the problem isn't resolved

7  legislatively by the political branches, if you will, of the

8  federal government, between now and October 5th --

9          MS. TUMLIN:  Correct.

10          THE COURT:  -- then do you anticipate requesting

11  some kind of preliminary injunctive relief?  What can we

12  expect, what can the Court expect from the plaintiffs, the

13  new -- the current plaintiff and any additional plaintiffs at

14  that point.  I'm just trying to plan for what may happen.  My

15  hope would be, frankly, that the executive branch would put a

16  voluntary halt to this, the termination process, to permit

17  Congress and the President to find a legislative solution so

18  the courts are not involved.

19          There are apparently 800,000 individuals who are

20  affected potentially by what's happening with DACA, and that

21  doesn't even cover family members of those people who are also

22  potentially affected.  There are people who are working

23  supporting families.  We're not talking about people who are

24  children, we're talking about people who are grown and in the

25  work force many, many of them, and they support families, they

16

1    support their parents, they support their own children some of

2    them.  This is a much wider situation than just the

3    individuals.  And this affects others as well.  They pay

4    taxes, they pay rent, they pay for mortgages, they support

5    their communities, and so I'm concerned, the Court is

6    concerned that the government if it proceeds with these

7    arbitrary deadlines, which is what they are, they are just

8    arbitrary deadlines, that the consequence will be far greater

9    in scope than simply you can't apply and down the road some

10   judge or the Congress will solve the problem and all will be

11   well, all right.  We can't expect that in this environment

12   that is a likely outcome.  It's a hoped for outcome.  And from

13   what the President has said in the last 24 hours, I'm

14   encouraged that this can be resolved by a legislative

15   solution.  But you're here because you anticipate that it may

16   not be resolved by a legislative solution.  So I'm just

17   wondering whether you have a plan since you're plaintiffs.

18            MS. TUMLIN:  Yes.

19            THE COURT:  So tell us, give us a little bit of a

20   hint as to where we're going to go from here apart from the

21   filing of a second amended complaint.

22            MS. TUMLIN:  Absolutely, Your Honor, I appreciate

23   that.  And I'd like to do that in two tracks:  One, talking

24   about what the Court might anticipate what plaintiffs' plan

25   might be for the October 5th and then we can turn to the other

1     deadline, which is the March deadline.

2              So with respect to whether any type of injunctive

3     relief or temporary restraining order would be sought in

4     advance of the October 5th deadline, a couple of things would

5     be useful.  I think having, first and foremost, a date certain

6     by when the defendants can provide an answer whether the

7     government will voluntarily extend that deadline and perhaps

8     coming back and having another conference when we're closer to

9     that date, perhaps around September the 25th would be amenable

10    to plaintiffs or 26th.  We're sitting three weeks today from

11    the deadline for October 5th.  But at that point we can make a

12    determination and be ready to set a schedule if we were still

13    in a situation where the defendants had not moved the

14    October 5th date and it became necessary to seek immediate

15    relief.  So that would be one plan, Your Honor.

16             We could -- if that became necessary, a need for

17    temporary restraining order that's something we could file on

18    Monday, October the 2nd.

19             THE COURT:  So you're saying something like

20    Thursday, September 28th might be a good date?

21             MS. TUMLIN:  I was suggesting the Monday or Tuesday,

22    the 25th or 26th for a conference, Your Honor, to see the

23    defendants may have more information at that time and then if

24    we're in resolution, terrific, we can focus on the March 5th

25    date.  If not, we could proceed to set a schedule for a

1   temporary restraining order if that's still necessary.

2          THE COURT:  Let me hear from the deputy assistant

3   attorney general.

4          MR. SHUMATE:  Thank you, Your Honor.  We obviously

5   have no objection to coming back for another status

6   conference.  I think we can also just engage with the

7   plaintiffs and let them know the government's position or file

8   a letter with the Court letting the Court know what DHS has

9   decided on the October 5th deadline.  It may obviate the need

10  for a status conference, I can't speak to that now, it's still

11  actively under consideration.

12         THE COURT:  Well, let me say this with great respect

13  for the Department of Homeland Security, that it would be

14  helpful if we could try to avoid judicial intervention in this

15  case if all that it takes, at least at this point, is to

16  extend one deadline, the reason for which is unknown to me and

17  probably unknown to many people, but which is so close in time

18  that taking into account the President's comments where he

19  said in a tweet today -- I do follow the President's tweets --

20  Does anybody really want to throw out good, educated and

21  accomplished young people who have jobs, some serving in the

22  military, question mark.  Really.  And I think that the

23  message that's being sent is that there is room for a solution

24  and to set -- to keep a deadline that is so close in time to

25  today while a solution is being engineered -- and it's

1   difficult to engineer these solutions for reasons that I need

2   not go into, you can read about them in the media -- that it

3   would be useful to take some of the pressure off the various

4   parties, particularly those who are affected, these people,

5   these good, educated and accomplished young people who the

6   President speaks about with admiration, so that way at least

7   we wouldn't have to deal with a potential judicial

8   intervention at this early stage and we would give the

9   Congress and the President the opportunity to work through

10   some of the difficulties that they may face in engineering the

11   solution.  And that's really -- that's the Court's hope.  The

12   Court can stay out of this and that the political branches of

13   the government can resolve this.  And it would appear there is

14   some progress being made in that regard and DHS I believe

15   would be well served by giving that process the chance to bear

16   fruit.

17         So I wish you would take that back to your client.

18         Who is the secretary of DHS now that General Kelly

19   has become Chief of Staff?

20         MR. SHUMATE:  Acting Secretary Duke.

21         THE COURT:  You know, General Kelly, according to

22   the Daily News at least, was at the dinner last night at the

23   White House with the democratic leaders of the House and the

24   Senate where the President and leadership, the minority

25   leadership had a discussion about this very issue, so he's

1    very familiar with this situation and I'm sure he could be

2    helpful as well.

3              MR. SHUMATE:  Yes, Your Honor, we will absolutely

4    take your concerns back to our clients.

5              I think one thing to keep in mind is if the

6    plaintiffs intend to move for a TRO or a preliminary

7    injunction so close to that October 5th deadline, we do have

8    serious concerns about the merits of their claims.  That they

9    are going to ask for that type of emergency relief, they are

10   going to have a show a likelihood of success in the merits,

11   so --

12             THE COURT:  I know all the rules.

13             MR. SHUMATE:  Right.  We think it really makes sense

14   to initiate a briefing schedule on our motion to dismiss so we

15   can get moving quickly to put the Court in a position to

16   address what we think are substantial defects in their claims.

17   So what we would propose --

18             THE COURT:  But that motion to dismiss goes beyond

19   October 5th, right?

20             MR. SHUMATE:  Yes.

21             THE COURT:  The schedule -- we don't even have a

22   motion until when, according to your schedule?

23             MR. SHUMATE:  October 20th.  But the plaintiffs have

24   not yet indicated whether they for certain intend to move for

25   a TRO or a preliminary injunction before that October 5th

1    deadline.  So I think barring some kind of a commitment that

2    they intend to do that, it would be well served and Court

3    would be to go ahead and initiate a briefing schedule on our

4    motion to dismiss.

5         THE COURT:  What is the injury to the government in

6    moving the date by which someone would have to apply for a

7    continuation of a work permit, for instance, from October 5th

8    to December 15th for instance, just for the sake of argument?

9    What is the harm that's done in that situation when all it

10   basically does is it affords the Congress during the latter

11   part of this session and the White House to draw up and enact

12   a legislative solution.

13        MR. SHUMATE:  The harm would be, Your Honor,

14   interference with a decision that is committed to the

15   executive branch.  This is all about prosecutorial discretion.

16   The deferred action is a restraint on deportation.  It's a

17   decision not to deport.

18        So if an Article III Court were to second guess the

19   decisions of the executive branch has made about how to

20   exercise its prosecutorial discretion, that would be

21   interference with the executive branch's prerogatives in terms

22   of how it exercises discretion under the immigration laws.

23        THE COURT:  Well, I understand that argument and I

24   even made that argument when I was chief counsel of the FAA in

25   Washington from time to time, but the flip side of that is

1    that the President has said that he doesn't want to throw out

2    good, educated and accomplished young people who have jobs,

3    some serving in the military.  And so it might appear to be

4    arbitrary and capricious to establish a hard and fast policy

5    that would throw these people out of the country even though

6    they meet all of these wonderful standards that he recognizes

7    and he is, after all, not the Secretary of Homeland Security,

8    he's the president.  So his own statements would belie any

9    effort to throw these people out without good cause and it

10   would just seem to be arbitrary and I'm not concluding that,

11   but it could be argued with some merit that it constitutes an

12   arbitrary and capricious act if it doesn't afford the DHS with

13   flexibility where it is a hard and fast rule.  And so that's

14   one of my concerns.

15          So take that back to your clients so that they

16   understand that the Court has deep concerns about how this

17   would play out if there isn't some flexibility and movement

18   with regard to this date that's been established for

19   October 5th.  That's the only date that I'm concerned about

20   right now.

21          The ultimate outcome of this case should not be in a

22   Court of law in my opinion.  It should be handled by the

23   political branches.  But if it can't be handled by the

24   political branches, I have an obligation within the law to

25   protect the 800,000 people or at least those who are within my

1    jurisdiction, which could be tens of thousands of people, from

2    any arbitrary and capricious implementation of legislative

3    rule, which this may or may not be.

4           I just want you to understand that in view of where

5    we are today, this afternoon, I don't know about tomorrow,

6    this afternoon it would make sense in my view to be more

7    flexible about the cutoff date so that we could actually

8    resolve this in a more orderly and appropriate way.

9           That's what I would like you to take back to the

10   acting secretary.

11           MR. SHUMATE:  Absolutely, Your Honor.

12           THE COURT:  Thank you.  Judge Orenstein.

13           JUDGE ORENSTEIN:  Thank you, Judge Garaufis.  I

14   wanted to jump in only because you teed up the issue and it's

15   going to affect something that I'll be addressing when we get

16   to other pretrial matters.

17           I want to understand the harm relating to the

18   October 5th deadline.  Are you saying the harm that you're

19   seeking to avoid is not necessarily related to the deadline

20   itself but to judicial control of the deadline?

21           MR. SHUMATE:  I would also say that there is a

22   concern that if we start pushing this October 5th deadline

23   back we're going to jam officials at the DHS who process the

24   applications.

25           JUDGE ORENSTEIN:  Right.

1     MR. SHUMATE:  So they need a certain amount of time

2     to process the flood of applications.  I'm not sure exactly

3     how much time they need, but that's something we can talk

4     about --

5          JUDGE ORENSTEIN:  That's a separate issue.

6          MR. SHUMATE:  Separate issue.

7          JUDGE ORENSTEIN:  In terms of the harm arising from

8     the wrong branch of government making the decision, I'm just

9     having trouble understanding what you're saying.  Is it that

10    the harm is infringing on the Executive's exercise of

11    prosecutorial discretion as to when to discontinue its

12    exercise of prosecutorial discretion that it believes to be an

13    unconstitutional exercise of that discretion?

14         MR. SHUMATE:  That's correct, Your Honor.

15         JUDGE ORENSTEIN:  You want to control how long you

16    do something that you believe to be unconstitutional.

17         MR. SHUMATE:  Because this is a matter -- the

18    enforcement and --

19         JUDGE ORENSTEIN:  Why are you doing something that's

20    unconstitutional at all?

21         MR. SHUMATE:  Because the Attorney General decided

22    that it would be harsh -- we'd be in a much different

23    situation if the Attorney General had decided we need to end

24    this program now.  We need to wind this down in an orderly

25    fashion.  So it wasn't just a decision that DACA is

25

1   unconstitutional, it was also a policy judgment that in light

2   of the importance of this issue that really Congress should

3   make this decision, we're going to wind this down in an

4   orderly manner rather than just cutting it off tomorrow, which

5   would be -- you know, I'm sure we would be arguing about TRO

6   in a different matter, so --

7          JUDGE ORENSTEIN:  But if the judiciary says it's

8   appropriate under applicable law for that process that you

9   believe to be unconstitutional to go longer, that itself is an

10  unconstitutional intrusion on the President.

11         MR. SHUMATE:  I think it would be a violation of

12  separation of powers or --

13         JUDGE ORENSTEIN:  Thank you.

14         MR. SHUMATE:  Yes, Judge.

15         THE COURT:  And the other question is, with regard

16  to those whose DACA status expires after March 5th, 2018,

17  those individuals would be barred from applying for a renewal.

18  I don't know where that date came from but that's the other

19  piece of this.

20         MR. SHUMATE:  I think --

21         THE COURT:  So, in other words, it would be okay to

22  extend someone's coverage by DACA if their status expires

23  before March 5th that would be okay, but it would be

24  unconstitutional and improper to extend someone whose coverage

25  expires after March 5th, 2018.

1      MR. SHUMATE:  These are decisions that are committed

2 to the executive branch and the Attorney General and DHS

3 decided that in the exercise of their discretion, they're

4 going to wind down this program that had substantial

5 litigation risk, that they believe as a policy matter really

6 Congress should make this decision.  Let's give a six-month

7 window to wind this down in an orderly fashion.

8      Yes, they may seem arbitrary, but these are

9 decisions that are best left by the -- decisions best made by

10 the executive branch because these are competing policy

11 interests.  So while they may seem arbitrary in the abstract,

12 these are decisions that have to be committed to the executive

13 branch or else courts are going to be second guessing.  If

14 October 5th is arbitrary what's to say that November 5th isn't

15 arbitrary or December 5th isn't arbitrary.  So it's entirely

16 reasonable for the government to set a hard deadline, that is,

17 everybody knows about, that folks have 30 days to meet that

18 deadline.

19      So, again, we will go back to DHS and absolutely

20 express the Court's concern about that deadline.  But I do

21 believe that that is an eminently reasonable decision to make

22 by the executive branch in their discretion.  We're going to

23 wind this down in an orderly fashion, let's set October 5th as

24 the deadline for these renewal applications and March 5th as

25 the deadline to wind down the program altogether.

1          THE COURT:  Now you've got a president who has

2     basically said that this is going to affect all these

3     wonderful people and we have to find a legislative solution

4     and you're putting the President, in effect, up against the

5     wall and he's got to solve this problem by a date that's been

6     set by a bureaucrat at the Department of Homeland Security.  I

7     don't understand how that makes sense if the President has

8     already stated he's committed to finding a political solution,

9     meaning that the political branches, Congress and the

10    President would find a solution.  Isn't it time to go back --

11    and you said you will, but it's not just -- you're not just

12    doing it for the Court, you're doing it for the administration

13    that -- and there are people who, obviously, oppose this kind

14    of solution that the President is hinting at and there's going

15    to be give and take, and the concern of the Court is that

16    October 5th is three weeks away and the date that was set was

17    set before the president made his statements and it would make

18    a lot of sense from various vantage points to extend this

19    deadline.  And you know something about deadlines, they can be

20    extended.  No one will be harmed by extending this deadline.

21    Certainly not the $800,000 people who are sweating over

22    whether someone is going to knock on their door and send them

23    to a country they don't even know, where they speak a language

24    they don't even speak.

25               So, on the one hand, those are the only -- they are

1   really the only people who are going to be injured here.  The

2   other people who are going to be injured are people who have a

3   political axe to grind or they have a philosophical

4   disagreement or whatever it happens to be, but you can

5   always -- the fact is you can always deport them later if you

6   can't reach an agreement and the courts let you do it.  You

7   can always deport them later.  And they're not going to object

8   to being here an extra six months or an extra year while you

9   find them.

10          So I don't see what the -- there is no harm done, in

11  the Court's view, by allowing this legislative process to play

12  out and not establishing this October 5th deadline and also

13  barring people whose permits expire after, what is it,

14  March 5th from applying.  You can always deny them.  You have

15  discretion.  And that's another point that has to be made.

16          Even without DACA, the Department of Homeland

17  Security would still have discretion to allow people to remain

18  in the United States.  So you don't need DACA for that.  DACA

19  established a protocol that helped the people at Homeland

20  Security understand what the priorities of the prior

21  administration were, that's what DACA did.  It was not a

22  statute, it wasn't even a formal rule making.  So that's

23  another concern -- just add that to my concern for your

24  clients.

25          Is there anything else before we set your schedule

1  for your motion to dismiss?

2            Anything else from the plaintiff?

3            MS. TUMLIN:  No, Your Honor, we'd be happy to move

4  on to scheduling on the motion to dismiss and then class cert.

5            THE COURT:  Okay.  On the motion to dismiss, tell me

6  what your schedule is.

7            MR. SHUMATE:  So our thought was as soon as they

8  file the amended complaint we would file our motion to dismiss

9  within 30 days, I think that would probably put us around

10  October 20.  The plaintiffs could have 30 days to file an

11  opposition, so around November 17th, and then we could file a

12  reply December 15th and the Court could hold a hearing after

13  that.

14            THE COURT:  All right, any disagreement over that,

15  that schedule?

16            MS. TUMLIN:  No, Your Honor, that's workable.  The

17  one thing plaintiffs would be interested perhaps preceding

18  around the October 20th date would be a meet and confer with

19  the government on a Rule 26 discovery schedule, and then a

20  date to present a report to the Court.

21            JUDGE ORENSTEIN:  We'll take that up separately and

22  that's on the agenda for today.

23            THE COURT:  Okay.  And judge Orenstein will be

24  handling that whole discovery process and he'll go over that

25  with you in a few minutes.

1          MS. TUMLIN:  Your Honor, just to clarify, we did

2     have a chance to confer with the defendants that under these

3     dates we think it would be efficient for plaintiffs to be

4     moving on those same dates for our class cert.  So on the

5     October 20th date you would receive the motion for class

6     certification from the plaintiffs with the defendants' motion

7     under Rule 12 and then we would oppose and reply on the same

8     dates.

9          THE COURT:  Is that agreeable?

10         MR. SHUMATE:  Yes, Your Honor.

11         THE COURT:  So both sides will be sending me

12    Christmas presents in December.

13         MS. TUMLIN:  Many.

14         THE COURT:  I want to thank you all.

15         All right.  Which brings us to the discovery issue.

16         JUDGE ORENSTEIN:  Right.  You want to be heard,

17    Mr. Shumate?

18         MR. SHUMATE:  Sure.

19         JUDGE ORENSTEIN:  Go ahead.

20         MR. SHUMATE:  Oh, no, I'm sorry.

21         JUDGE ORENSTEIN:  Let me just frame the issue.  So

22    as Ms. Tumlin was saying, the issue comes with a Rule 26

23    conference and let me ask you, have the parties conferred

24    already about just the threshold issue of whether there is

25    discovery and what discovery is appropriate at this stage?

1              MR. SHUMATE:  Yes, we have.

2              THE COURT:  What have you come up with?

3              MR. SHUMATE:  Our position is that no discovery is

4    appropriate in this case.  The primary claims that are being

5    brought are APA claims, which typically are not susceptible to

6    discovery they're -- the Court makes a decision based on the

7    record that is before the Court, we don't look behind that

8    record.  So we have decisions, the Court -- you know, assuming

9    the claims survive a motion to dismiss, the Court will decide

10   whether this action on its face is arbitrary and capricious.

11   So at least for the APA claims we don't think discovery is

12   appropriate.

13              On the constitutional claims, again, we don't think

14   discovery is appropriate.  We think those claims are

15   susceptible to a motion to dismiss.

16              JUDGE ORENSTEIN:  But typically at least my cases, I

17   know Ms. Riley knows this because I've had the U.S. Attorney's

18   Offices in many cases and some of her colleagues are here,

19   typically the mere fact that the motion to dismiss is not in

20   itself a reason to postpone discovery and, as we've been

21   talking about it at some length today, the parties on both

22   sides, obviously the plaintiffs and the class that they hope

23   to represent and the many government officials who have

24   administrative tasks, they all have an interest in knowing

25   what's coming on October 5th and March 5th.  It strikes me

1    that if there is going to be discovery there's going to be

2    little enough time to do it to allow an orderly resolution of

3    the merits.

4           So here's what I'm going to propose.  I really don't

5    anticipate we can give you all a fair chance to argue the

6    issue much less have resolve today, but I would like to very

7    quickly we'll set a schedule very quickly to confer about this

8    and tee up with your respective positions in letters two

9    things:  One, the threshold issue of whether discovery should

10   proceed and, second, this will require a real meet and confer,

11   assuming that it does, what it should look like, what

12   deadlines we should set, how if at all it should be phased.

13   To the extent it goes forward there are going to be, I'm sure,

14   some very contentious issues because I know you want to rely

15   on a very concrete administrative record, I imagine you want

16   to get into the intent of various actors and that will

17   implicate the question of depositions.  Please identify the

18   issues that are going to divide you and come up with a

19   proposal for getting done what you would agree has to be done

20   if discovery goes forward and what issues need to be resolved,

21   because we need to address them quickly.

22           MR. SHUMATE:  Your Honor, we will certainly do that.

23   I would just say here that the government will strongly oppose

24   any discovery here and to the extent the Court wants to move

25   quickly and plaintiffs want to move quickly, any attempt to

1   get discovery of cabinet officials is going to be strongly

2   opposed by the government.

3            JUDGE ORENSTEIN:  I anticipate that there are a lot

4   of contentious issues here, I'm not making an assumption one

5   way or the other about how they play out, but if the parties

6   are going to get the rulings that they need in time to have a

7   practical effect, we're going to have to have those discovery

8   issues resolved quickly.  So I want you to get started on

9   meeting and conferring.

10           Unless there's an objection to this schedule I'd

11  like to have your respective positions, I don't care if it's

12  two letters or one, your respective positions on the threshold

13  issue of whether it should go forward by next Friday and so I

14  guess that would be the 23rd, a week from tomorrow.

15           MS. TUMLIN:  Twenty-second.

16           MR. SHUMATE:  Twenty-second.

17           THE COURT:  The 22nd.

18           JUDGE ORENSTEIN:  The 22nd, okay.  Thank you.  I was

19  looking at the wrong date.

20           So by September 22nd your respective positions and

21  accompanying that either a joint proposal or competing

22  proposals for a schedule.  To the extent you can identify

23  issues that you agree would need to be decided within a

24  discovery regime and you want to propose dates for getting

25  those done, all the better.  And then let's -- I don't know if

1    you want to do this as a joint conference.

2            THE COURT:  Yes, what I'm going to do here is I'm

3    setting a status conference for Tuesday, September 26th at

4    4:00 p.m.  It would be earlier but I have a -- I'm spending a

5    great deal of time with the criminal division in Washington on

6    a fraud trial next week and the week after and the week after

7    and the week after.  So my trial day ends at 4:00 p.m. and

8    we'll take you promptly at 4:00 o'clock.

9            JUDGE ORENSTEIN:  We'll address these issues there

10   as well.

11           MR. SHUMATE:  Just to be clear, what are we prepared

12   to discuss on the status conference, the discovery issues, the

13   October 5th deadline as well.

14           THE COURT:  Oh, yes, absolutely.

15           You're going to tell me all about your discussions

16   with your client, about how cooperative your client is going

17   to be with my suggestion.

18           MR. SHUMATE:  I will.

19           JUDGE ORENSTEIN:  Anything else that we thought we

20   needed to address in terms of discovery issues that have to be

21   resolved early on.

22           THE COURT:  Anything else from the plaintiff?

23           MS. TUMLIN:  No, Your Honor.

24           JUDGE ORENSTEIN:  Thank you.

25           MS. TUMLIN:  Your Honors.

```
1              THE COURT:  Does the plaintiff have anything else
2    for today?
3              MS. TUMLIN:  No, thank you, Your Honors.
4              THE COURT:  All right.  Is there anything else from
5    the defense?
6              MR. SHUMATE:  No, Your Honor, thank you both.
7              THE COURT:  Thank you very much everyone.
8              (Matter concluded.)
9
10                    *    *    *    *    *
11
12   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
13
14   s/ Georgette K. Betts              September 15, 2017
15   GEORGETTE K. BETTS                 DATE
16
17
18
19
20
21
22
23
24
25
```

```
 1           IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2

 3    -------------------------x
                               )
 4    MARTIN JONATHAN BATALLA   )
      VIDAL, et al.,            )
 5                             )
                 Plaintiffs,   )
 6                             ) Case No.
               v               ) 1:16-CV-04756(NGG)(JO)
 7                             )
      ELAINE C. DUKE, Acting    )
 8    Secretary Department of   )
      Homeland Security         )
 9    JEFFERSON BEAUREGARD      )
      SESSION III, Attorney     )
10    General of the United     )
      States,and DONALD J TRUMP,)
11    President of the UNITED   )
      STATES,                   )
12                             )
                 Defendants.   )
13    -------------------------x

14

15          Deposition of DONALD NEUFELD

16                Washington, DC

17          Wednesday, October 18, 2017

18                    9:16 a.m.

19

20    Job No.: 37566

21    Pages: 1 - 211

22    Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

Page 42

1      Q    Do you know when these policies were
2  set?
3      A    Are we talking specifically about DACA
4  or all adjudications?
5      Q    Specifically about DACA.
6      A    So it would have been since the
7  beginning of the program.
8      Q    So since the beginning of the program
9  SCOPS or USCIS had sent these -- had sent notice
10 to DACA recipients when their status changed or
11 updated?
12     A    Yes.
13     Q    Did USCIS send notices for when a DACA
14 recipient's DACA status was terminated for
15 whatever reason before it expired?
16     A    Yes.
17     Q    Did USCIS ever send notices to DACA
18 recipients notifying them about changes to the
19 DACA program?
20          MR. TYLER:  Objection.  Vague.
21 BY MR CHEN:
22     Q    Do you understand the question,

Page 43

1  Mr. Neufeld?
2      A    I don't know what you mean by changes to
3  the program.
4      Q    Are you aware of when -- if the DACA
5  program changed since it was first issued in 2012?
6          MR. TYLER:  Objection.  Vague.
7          THE WITNESS:  I still -- I don't know
8  what you mean by program.
9  BY MR CHEN:
10     Q    The -- did USCIS ever issue notices to
11 remind DACA recipients to renew their
12 applications?
13     A    Yes.
14     Q    And about when did they send these
15 notices?
16     A    That changed over time.  I think we
17 started initially with sending them a notice at
18 the 120 day point.  So, 120 days before their
19 current DACA would have expired we would issue a
20 notice.  And then that changed to six months
21 advance notice.
22     Q    When did that change?

Page 44

1      A    I don't recall specifically, probably at
2  least a year ago.
3      Q    So generally it was around 2016, late
4  2016?
5      A    I don't recall specifically.  It might
6  have been earlier.
7      Q    What was the rationale?  Why were -- why
8  did that policy change?
9          MR. TYLER:  Objection.  Lack of
10 foundation.
11 BY MR CHEN:
12     Q    Do you know when the -- why the policies
13 changed from 120 days to 180 days?
14     A    I know that advocacy groups were
15 complaining that that was insufficient notice and
16 that not enough people were applying early enough
17 so that they could prevent a lapse of their DACA
18 status.
19     Q    Do you know who these advocacy groups
20 were?
21     A    I don't recall specific groups.
22     Q    Do you know generally who these groups

Page 45

1  were?
2      A    No.
3      Q    Were there any other reasons for
4  changing the notice from 120 to 180 days?
5      A    Not that I recall.
6      Q    Were you involved in the establishment
7  of these notice processes?
8      A    In some ways, yes.
9      Q    Can you explain what ways you were
10 involved?
11     A    With the stand-up of the DACA program
12 there was a -- there were many meetings in the
13 early days comprised of many people from different
14 parts of the agency working through how best to
15 stand up this program and there were many
16 conversations at that time about whether and when
17 to issue reminder notices and I participated in
18 those conversations.
19     Q    And do you know about when those
20 conversations happened?
21     A    In the first 60 days following the
22 issuance of the memo.

Olender Legal Solutions
A Global Litigation Solutions Company

Page 46

1    Q    Do you know who else was involved in
2  those conversations?
3    A    There were many people involved in those
4  conversations.  I can recall some of them.
5    Q    Can you name some of the individuals who
6  you can recall?
7    A    Ali Mayorkas (phonetic), Denice Vanison.
8  Laurie Shalabaum (phonetic).  Many different
9  people from counsel.  Dan Renaud, Tracy Renaud.
10 Many people.
11   Q    Were you -- what were some of the
12 factors that you considered in setting those
13 notice policies?
14   A    I need to repeat that SCOPS doesn't set
15 policy.  So there were many discussions at the
16 executive level.  For the most part those
17 conversations were about how to implement policy
18 decisions that were being made at the department
19 level.
20   Q    And can you explain what those policy
21 decisions at the department level were?
22   A    Let me think.  One of them would have

Page 47

1  been -- you know, whether we are going to issue
2  reminder notices again, how far in advance to
3  issue the reminder notices.  There were -- there
4  were a lot of issues in the early days surrounding
5  what types of crimes would be disqualifying.
6    Q    So are you saying that the policy to
7  issue reminder notices was made at the department
8  level?
9    A    I believe so, yes.
10   Q    Do you know who was involved in making
11 those policies?
12   A    At the department level?
13   Q    Yeah.
14   A    No.  Other than our director
15 participated, I'm sure.
16   Q    Do you know when those policies were
17 set?
18   A    Well, the majority of policy decisions
19 needed to be made in the first 60 days because
20 that was the time we had to stand up the program
21 and we needed to inform the public.
22   Q    So were the policy to -- was the policy

Page 48

1  to make, to issue reminder notices made within the
2  60 days?
3    A    I believe so, yes.
4    Q    Were you involved in the making of those
5  policies?
6    A    I was involved in discussions about how
7  we could issue notices.  I was not in the decision
8  making process for that policy.  I was not part of
9  the group that decided that.
10   Q    Were you consulted at all in that
11 decision to make --
12   A    Yes.
13   Q    -- policy?  What was the nature of that
14 consultation?
15   A    To offer how we might implement that
16 policy if it were adopted.
17   Q    What was your recommendation to how
18 SCOPS might implement that policy?
19        MR. TYLER:  Object on the grounds of
20 privilege.  It is deliberative process
21 information.  Direct the witness not to answer.
22

Page 49

1  BY MR CHEN:
2    Q    Were you -- did you write any memoranda
3  or documents in response to the consultation about
4  how to implement the policy?
5    A    I don't believe so.  There may be email
6  messages around that subject dating back to that
7  time period.
8    Q    Do you know -- so around what time were
9  those email messages?
10   A    As I said, this -- all of this was in
11 the first 60 days.
12   Q    Do you know who were the recipients of
13 those email messages?
14   A    No, because I don't even recall specific
15 email messages.
16   Q    Let's return to the DACA notices to
17 renew that were sent to DACA applicants.  What did
18 these notices say?
19   A    I don't know specifically.
20   Q    Do you remember generally what they
21 said?
22   A    It was a reminder that their DACA time

Olender Legal Solutions
A Global Litigation Solutions Company

Page 50

1  period was expiring and that they should submit a
2  new -- a request for renewal if they wanted to
3  extend.
4      Q    Was there a time period that the notices
5  recommended DACA applicants submit their renewals?
6      A    That changed over the course of the
7  years of operation.  I believe originally that
8  recommended time period was 120 to 150 days in
9  advance.  And then that evolved to -- I'm not
10 certain.  I know that we began encouraging people
11 to apply 150 days in advance or more.
12     Q    Did SCOPS have a name for these notices?
13 How did they refer to the notices?
14     A    Reminder notices.
15     Q    Reminder notices.  Did SCOPS send
16 reminder notices to all DACA recipients whose
17 status was about to expire?
18     A    For a period of time, yes.
19     Q    What period of time was that?
20     A    From the beginning of the DACA program
21 until -- I don't recall specifically, but within
22 the last year I believe we have stopped issuing

Page 51

1  those notices.
2      Q    Within the last year, do you know about
3  what time within the last year?
4      A    No.
5      Q    Do you know who might know that
6  information?
7      A    I don't know who, I know there are
8  records that would relate to that.
9      Q    What are the -- do you know who created
10 these records?
11     A    No.
12     Q    Do you know when these records were
13 created?
14     A    No.
15     Q    What were the nature of these records?
16 Were they memoranda or reports?
17     A    I don't know.
18     Q    So how are you aware that there are
19 records relating to the termination of these
20 notices?
21     A    I know that there were communications to
22 the team that would have been responsible for

Page 52

1  development of the capability to issue those
2  notices in ELIS not -- that they did not need to
3  work on that capability.
4      Q    Who are these individuals that were
5  sending these communications?
6      A    I'm not sure.
7      Q    Did they send them to you?  The
8  communications that you referred to, did the --
9  were the communications sent to you, Mr. Neufeld?
10     A    Not that I recall.
11     Q    So how were you aware, made aware of
12 these communications?
13     A    I'm aware that the decision was made and
14 I'm aware that it was communicated in some way.  I
15 don't know specifically the vehicle of
16 communication to the developers.
17     Q    Who informed you that the -- that the
18 decision was made?
19     A    Kathy Nuebel.
20     Q    Do you know about when she informed you
21 of that decision?
22     A    Several months ago.  I don't recall more

Page 53

1  specifically than that.
2      Q    When, in what form did she inform you?
3  Was this a conversation?
4      A    Email messages.
5      Q    Who -- do you know who else -- who else
6  was on that email -- sorry, was CCed on that
7  email?
8      A    I do not.
9      Q    Do you recall what the subject of the
10 email was?
11     A    The subject line, I do not.
12     Q    Was this in response to a previous
13 email?
14     A    It was in response to me raising the
15 question as to whether we would develop that
16 capability in ELIS.
17     Q    Do you know about when you sent that
18 request?
19     A    Several months ago is all I can recall.
20     Q    In that email that was sent to you, do
21 you remember if there were any attachments to the
22 email?

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
    THE REGENTS OF THE UNIVERSITY OF   ) Case No.
 5  CALIFORNIA and JANET NAPOLITANO,   ) 17-CV-05211-WHA
    in her official capacity as        )
 6  President of the University of     )
    California,                        )
 7                                     )
            Plaintiffs,                )
 8                                     )
        v.                             )
 9                                     )
    U.S. DEPARTMENT OF HOMELAND        )
10  SECURITY and ELAINE DUKE, in her   )
    official capacity as Acting        )
11  Secretary of the Department of     )
    Homeland Security,                 )
12                                     )
            Defendants.                )
13  -----------------------------------)
    AND RELATED CASES.                 )
14  -----------------------------------)
15                    - - -
16            Tuesday, October 17, 2017
17                    - - -
18
19      Videotaped deposition of JAMES McCAMENT,
20  taken at the offices of Gibson, Dunn & Crutcher,
21  1050 Connecticut Avenue NW, Washington, D.C.,
22  beginning at 9:14 a.m., before Nancy J. Martin, a
23  Registered Merit Reporter, Certified Shorthand
24  Reporter.
25
```

1  communications you had with people in the White House

2  as acting director on the topic of DACA?

3      A.  As far as E-mail communication and

4  conversation -- I mean E-mail contact.

5      Q.  Well, I'm talking about communications

6  generally.

7      A.  Generally, that's true, yes.

8      Q.  So you didn't have any phone conversations or

9  face-to-face meetings with White House people about

10  DACA while you were acting director?

11      A.  There was a White House meeting, yes.

12      Q.  Okay.

13      A.  You mentioned phone conversations.  I don't

14  recall any phone conversations.

15      Q.  Okay.  And then E-mails that were forwarded

16  from the White House through DHS through the

17  Secretary's office to you?

18      A.  So I don't recall any E-mails being forwarded

19  through them over to me.

20      Q.  Okay.

21      A.  And I can explain further.

22      Q.  Sure.

23      A.  Outside of DACA.

24      Q.  Okay.

25      A.  Which is to say in other topics as deputy --

Page 70

1    or acting director, sorry.  As acting director, there

2    would be at times approaches from White House staff on

3    questions on other non DACA topics.

4         Q.  Okay.

5         A.  So that's why I draw the distinction because

6    I can see other topics where they were direct.  I just

7    don't recall direct E-mail conversations from the

8    White House on.  There may have been, maybe in the

9    E-mail.

10        Q.  On DACA?

11        A.  Right.

12        Q.  How about indirect?  By "indirect," it sounds

13   like stuff was forwarded to you.  Is that fair?

14        A.  I think that's fair.  Again, this is a

15   compressed time line.

16        Q.  Yeah.

17        A.  What I recall more is questions coming from

18   the Secretary's office, perhaps phrased as "The White

19   House is asking" or direct.  So I don't want to say

20   there wasn't an E-mail that said, "We have this

21   question."  From my recollection is it largely was

22   from -- through the Secretary's office and questions

23   on DACA.

24        Q.  Got you.  Do you remember the identities of

25   any of the people in the White House from whom those

Page 71

1   communications originated?

2        A.  As far as the E-mail type of conversation, we

3   can speak to the -- later.

4        Q.  Yes.

5        A.  Again, I don't recall a direct E-mail sort of

6   being forwarded on, but I don't want to misspeak that

7   there isn't one.  Just, there was a lot of discussion

8   with the Secretary, you know, through the Secretary's

9   office, et cetera.  So I just don't recall one coming,

10  like, forwarded on.  Might be.

11       Q.  I'm sorry.

12       A.  Sure.

13       Q.  What I was going to ask was whether or not

14  you actually got an E-mail forwarded, you know,

15  regardless of how the communication came.  Was that

16  ever tied to the identity of a White House staffer, so

17  and so "wants to know about 'X'"?

18       A.  Not that I recall.  Not worded that way.

19       Q.  Okay.  Worded any way that gave you a name?

20       A.  Not worded in a way that would give a name

21  either.

22       Q.  Okay.

23       A.  Then again, that compares to other requests

24  on other areas and issues.

25       Q.  Okay.  Just based on conversations that you

1    had or however you might have -- are you aware of

2    people in the White House who were engaged on this

3    issue on DACA?

4         A.   From those E-mail conversations or --

5         Q.   From any source.

6         A.   Largely, those two sitting in one of the

7    meetings or a meeting, and I remember those names.

8    But I don't recall sort of a reference to an "X"

9    person "wants this."  And generally what I recall is

10   if there was an ask, it was -- it may be "the White

11   House is asking" type of question.  Does that make

12   sense?

13        Q.   Yeah.  So it sounds like, with respect to

14   anything other than in-person -- it sounds like you

15   had one in-person meeting on this issue while you were

16   acting Secretary?

17        A.   That's what I recall.  Acting director.

18        Q.   Sorry.  Acting director.  Thank you.

19        A.   Please clarify.

20        Q.   I gave you a promotion.

21        A.   That's right.

22        Q.   So you remember one meeting while you were

23   acting director with White House people on the topic

24   of DACA?

25        A.   Yes.  I remember one meeting being held in

Page 73

1  completion on discussion of DACA.

2       Q.  Okay.  That you attended?

3       A.  That I attended.

4       Q.  Okay.  Are you aware of other meetings that

5  you did not attend?

6       A.  I'm not aware of other meetings that I did

7  not attend, but there may well have been.

8       Q.  Okay.

9       A.  I mean that's not unusual.

10      Q.  Understood.  And obviously, I'm, you know,

11  just trying to get what you know.

12      A.  Sure.

13      Q.  Okay.  So let's talk, then, about that

14  meeting.  Do you remember when it happened?

15      A.  I believe it was August 24.

16      Q.  August 24.  Where did it happen?

17      A.  The Roosevelt Room.

18      Q.  Okay.  Which is where?

19      A.  In the White House, west wing.

20      Q.  Okay.  Who was there that you remember?

21      A.  That I recall, Acting Secretary Duke, General

22  Kelly, the chief of staff, the attorney general, Jeff

23  Sessions.  I'm reflecting around the table.  Rachel

24  Brand with Department of Justice.  OMB Director

25  Mulvaney.  Deputy Secretary of State Sullivan.

Page 74

1    Stephen Miller.  I think Rob Porter.  I believe I have

2    that name right.

3          Q.   What's Mr. Porter's role?

4          A.   He is the staff -- I was going to say

5    executive secretary, but it's that staff secretary

6    or -- I probably have misapplied the title, but, in

7    essence, who handles correspondence, I believe, for

8    the White House, but I may have the title wrong.

9               Don McGhan.  Kierstjen Nielsen, the deputy

10   chief of staff to -- or currently the deputy chief of

11   staff.  I believe John Bash.

12         Q.   Who's John Bash?

13         A.   He's, I think, special counsel, and I believe

14   also -- I have to double-check the title.  I believe

15   special assistant to the President as well.  Marc

16   Short, who is -- I'm sorry.

17         Q.   Who is Mr. Short?

18         A.   The head of the legislative, White House

19   legislative affairs operation.  It may be a more

20   expanded title, but I think that he is the head of

21   legislative affairs.

22         Q.   Anybody else you can remember?

23         A.   Gene Hamilton, the senior counsel to the

24   Secretary.  I believe Chad Wolf.  There may have been

25   a couple of others as well.  I'm just trying to kind

```
                                              Page 75
 1   of think through.  Danielle Cutrona.
 2        Q.  How do you spell Cutrona?
 3        A.  I believe C-u-t-r-o-n-a.
 4        Q.  And who is she?
 5        A.  She works for the attorney general directly.
 6        Q.  Anyone else you remember?
 7        A.  I believe Andrew Bremberg as well.
 8        Q.  Who is that?
 9        A.  He also, I believe, is a special assistant to
10   the President, but I might have the title adjusted
11   incorrectly.  I think there may have been one or two
12   others, but I'm just not recalling at the moment.
13        Q.  Okay.  Do you remember how long the meeting
14   lasted?
15        A.  Approximately.
16        Q.  How long, about, did it last?
17        A.  Approximately an hour to an hour and a half.
18        Q.  How did you come to be there?  Did you get an
19   E-mail invitation?  Did you get a phone call?
20        A.  I did receive --
21        Q.  Okay.  From whom?
22        A.  As I recall, from the chief of staff.  DHS
23   chief of staff.
24        Q.  Okay.  And do you remember what that said?
25   What did the E-mail say?
```

Page 76

1      A.  I recall generally what it said.

2      Q.  What did it say?

3      A.  As I recall, that there would be a meeting in

4  the EEOB, or White House.  I'm not sure which was said

5  since they're adjacent.  And that I would be

6  attending.  That was how I knew that was the case.

7      Q.  Okay.  Anything else in that E-mail?  Did

8  you -- well, anything else on that E-mail?

9      A.  What I recall is that it was to discuss DACA.

10     Q.  Was there an agenda attached?

11     A.  No, not to that E-mail.

12     Q.  Did you ever receive an agenda for that

13  meeting?

14     A.  I don't recall receiving an agenda.  I

15  received an invite.

16     Q.  Okay.  Did you receive any E-mail, whatever

17  you were going to call it, anything like an agenda,

18  anything that set forth what was to be discussed?

19     A.  I don't recall receiving the agenda or a

20  read-ahead before the meeting.

21     Q.  You got a package of information at the

22  meeting of some kind?

23     A.  I recall receiving at the meeting what we

24  would say is the read-ahead, but the agenda.  I don't

25  recall receiving anything prior.  Could have been.  I

Page 77

1    don't remember that.

2        Q.  So you got a hard copy of it when you got

3    there?

4        A.  Yes, as I recall.

5        Q.  What was that package?  What did it look

6    like?

7            MR. GARDNER:  Objection.  Vague.

8            Are you asking for the content?  Just so I'm

9    clear.

10   BY MR. DETTMER:

11       Q.  I mean was it a sheet of paper?  Was it a,

12   you know, binder?  What was it?

13       A.  A sheet of paper.

14       Q.  Okay.  And did it -- I guess what I'm trying

15   to get is the content in the sense of, you know, was

16   it an agenda?  Was it a bunch of data?  What kind of

17   information was it giving you?

18           MR. GARDNER:  Objection.  I'm not trying to

19   be obstreperous.  I will allow him to answer the

20   question, but I don't want him to get into privileged

21   testimony.

22           So to the extent you can answer his question

23   without divulging privileged information, please go

24   ahead and answer.  Let's take it step by step.

25           MR. DETTMER:  Sure.

```
 1            THE WITNESS:  Sure.
 2            It was an agenda.
 3   BY MR. DETTMER:
 4       Q.  Okay.  And it was one sheet of paper?
 5       A.  As I recall, yes.
 6       Q.  And do you know who put that agenda together?
 7       A.  My understanding was that the White House
 8   did.
 9       Q.  Who led the meeting?
10       A.  General Kelly.  Yeah.  Right.
11       Q.  Okay.  And who -- were there sort of
12   presentations given during the meeting?
13       A.  As I recall there were --
14            MR. GARDNER:  I'm sorry.  I'm going to lodge
15   an objection at this point.
16            You can answer that question with a "yes" or
17   "no," but the content of that information would be
18   subject to privilege.
19            So again, we'll just take it step by step.
20            THE WITNESS:  Would you ask your question
21   again.
22   BY MR. DETTMER:
23       Q.  Were there presentations given at the
24   meeting?
25       A.  I viewed that as more as discussions.
```

1      Q.   Okay.  So you said General Kelly led the
2  meeting, which I take to mean he was sort of the
3  moderator or the director of who was talking.  Who
4  sort of -- can you -- let me start over.
5           Who did the most talking at the meeting?
6           MR. GARDNER:  Objection.  At this point I do
7  think we are getting into privileged information
8  subject both to deliberative process privilege,
9  potentially Presidential communications privilege.
10           MR. DETTMER:  I'm not asking for any
11  substance.  I'm just asking for --
12           MR. GARDNER:  The identity of an individual?
13  Is that what you're asking for?
14           MR. DETTMER:  Yeah.  Who did the
15  most talking.
16           MR. GARDNER:  So you can answer as to the
17  individuals.
18           THE WITNESS:  Multiple people spoke.
19  BY MR. DETTMER
20      Q.   Okay.  Who spoke at the meeting?
21      A.   General Kelly, Acting Secretary Duke,
22  Attorney General Sessions.  As I recall, Rachel Brand.
23  I believe Deputy Secretary Sullivan, but I may be
24  misremembering, I believe.  Don McGhan, Stephen
25  Miller.  I think Marc Short as well.  Multiple folks

```
                                          Page 80
 1  spoke.  So I may not be remembering someone.
 2       Q.  Did you speak at the meeting?
 3       A.  At the very end.
 4       Q.  Okay.  For how long?
 5       A.  Less than a minute.
 6       Q.  Okay.  Do you remember about how long the
 7  Attorney General spoke at that meeting?  Can you
 8  approximate?
 9       A.  It's difficult to approximate, but I can
10  explain that.
11       Q.  Sure.
12       A.  Multiple conversations, multiple times people
13  spoke.  It's just a bit harder for me to approximate
14  time lines over that hour and a half --
15       Q.  And I understand.
16       A.  -- people spoke.
17       Q.  You know, we've all been at meetings with a
18  lot of people.  Obviously, you and I are dominating
19  this conversation for obvious reasons.
20       A.  Right.
21       Q.  You know, and we've all sort of seen meetings
22  dominated by one person or another.  Were there people
23  who spoke for the bulk of the meeting at this meeting
24  you were at, or was it sort of more evenly spread out
25  among the participants?
```

                                            Page 81

1          A.   I would say somewhere in between.

2          Q.   Okay.  And who were the people who spoke the

3    most?  The ones that you just identified?

4          A.   I would say almost all of those spoke, not

5    necessarily equally but quite a bit.

6          Q.   And who talked the most?  Obviously, General

7    Kelly was leading the meeting.  Who else?

8          A.   General Kelly.  Acting Secretary Duke, the

9    attorney general.  As I recall, Don McGhan, Stephen

10   Miller.  Marc Short, to your point, less so --

11         Q.   Okay.

12         A.   -- strategy.  And Director Mulvaney.

13         Q.   Less so?

14         A.   As I recall, probably less so than those

15   others.

16              MR. DETTMER:  Okay.  In the interest of time,

17   I mean I gather from our exchange that you're going to

18   assert the privilege objections to all my questions

19   about what did each one of these people say.

20              MR. GARDNER:  And just to be absolutely clear

21   with you, that's right.  I'm really trying to give you

22   as much latitude as reasonably possible.  We would

23   assert both the attorney-client privilege,

24   deliberative process privilege, and potentially the

25   Presidential communications privilege over the subject

Page 217

1    clearly created by the service operations director.

2         Q.  Did you ever use this document or refer to

3    this document in your work at USCIS?

4         A.  Not that I recall.

5         Q.  Did you ever provide copies of it to

6    legislators or their staff members?

7         A.  No, not that I recall.  I'm pretty sure I did

8    not.  And I could explain that if you'll note.

9         Q.  Sure.

10        A.  If you'll note, I believe it's on each page.

11   I won't go through all the pages.  If you'll notice at

12   the beginning of Page 2 at the bottom, "For Official

13   Use Only, Law Enforcement Sensitive."  It would not be

14   the type of information we would unilaterally turn

15   over.  There may have been a reason that we do.  I

16   just don't recall turning over the SOP.  It's

17   possible, but I don't recall that.

18        Q.  Okay.  I think I just have a few more

19   questions for you about a different document, and then

20   I know some of my colleagues are going to want to ask

21   you some questions as well.

22        A.  Okay.

23             (Deposition Exhibit 18 was marked for

24             identification.)

25             MR. DETTMER:  While you're looking at that,

Page 218

1   Exhibit 18 is a printout from the website of
2   Department of Homeland Security, and it is a statement
3   from Acting Secretary Duke on the rescission of
4   deferred action for childhood arrivals.  It's dated --
5   or at least release date is September 5, 2017.
6        Q.  Have you read this document before?
7        A.  I've -- yes.
8        Q.  Okay.  And I think you testified earlier that
9   you did not see any drafts of this before it was
10  released?
11       A.  I don't recall seeing any drafts.
12       Q.  Okay.  Do you know, just from your work in
13  USCIS, who might have been involved in writing this?
14       A.  I believe the Secretary for one, Acting
15  Secretary.  I don't know specifically anyone else that
16  I was told who had or had an understanding, but -- so
17  there could be others as well.
18       Q.  In the second paragraph of this statement,
19  Secretary Duke writes -- Acting Secretary Duke writes,
20  "As a result of recent litigation, we were faced with
21  two options, wind the program down in an orderly
22  fashion that protects beneficiaries in the near term,
23  while working with Congress to pass legislation, or
24  allow the judiciary to potentially shut the program
25  down completely and immediately."

Page 219

1          Are you aware of other options that were

2     considered in connection with the shutdown of this

3     program.

4          MR. GARDNER:  I'm going to object.

5          You can answer that question with a "yes" or

6     "no."  The contents of what those other options may or

7     may not be would be subject to deliberative process

8     privilege.  So I just want to make sure we take it one

9     step at a time.

10         If you understand his question.

11         Or if you would rephrase it one more time.

12     BY MR. DETTMER:

13         Q.  Well, go ahead and --

14         A.  So were there other options beyond the two

15     that she expressed with respect to wind it down or

16     allow the judiciary to potentially shut the program

17     down completely?

18         Q.  Yes.

19         A.  I'm not aware of other options.  They're both

20     pretty broad, especially wind it down in an orderly

21     fashion.

22         Q.  Well, not to be too obvious, but there's the

23     option of --

24         A.  Sustaining?

25         Q.  -- keeping the program going and litigating

```
 1    the case.

 2         A.  Yeah.  Fair.  Yeah.

 3         Q.  I mean I'm sure there are other options as

 4    well.  And, you know, My question is whether others

 5    were considered or whether really only those two were

 6    discussed.

 7              MR. GARDNER:  Objection.  Compound.  If you

 8    can rephrase it, we can take it that way because I do

 9    think your question as phrased does implicate the

10    deliberative process privilege.  The way you phrased

11    it originally did not.  I'm sorry.  I'm not trying to

12    be difficult.

13              MR. DETTMER:  No, I understand.  I guess part

14    of my issue is that in a sense, the deliberative

15    process is being described here in this public

16    document, and, you know, I'm being limited to just

17    what's on the face of this, and there seems to be at a

18    minimum, some kind of waiver.

19              MR. GARDNER:  I understand that's your

20    position.  We disagree.  I'm not going to convince

21    you, and you're not going to convince me here.  But I

22    believe the way you phrased the question initially, he

23    could answer.  The way you rephrased it, I do think is

24    objectionable.  So if you want to re-ask it the

25    original way and he can answer with a "yes" or "no," I
```

1   won't lodge an objection to that.  I'm not trying to

2   be obstreperous.

3          MR. DETTMER:  I understand.

4      Q.  So other than the two options that are listed

5   here in that paragraph I read, were there other

6   options that were discussed or considered in this

7   process?

8      A.  I see.  Beyond those two?

9      Q.  Yes.

10     A.  As I recall, yes.  One other one.

11     Q.  Okay.  And what was that?

12         MR. GARDNER:  I'll object.

13         Instruct the witness not to answer as

14  revealing deliberative process, or subject to

15  deliberative process privilege.

16         THE WITNESS:  I'll follow the advice of

17  counsel.

18  BY MR. DETTMER:

19     Q.  You're following his instruction; right?

20     A.  Right.

21         MR. GARDNER:  Just so we're on the same page,

22  I understood you were asking him about what that other

23  option was that is not identified in this document?

24         MR. DETTMER:  Right.

25         MR. GARDNER:  Okay.

Page 222

1  BY MR. DETTMER:

2      Q.  So, well, due to the assertion of privilege,

3  I can't ask about the third option.  Your recollection

4  is that there were in fact three options that were

5  discussed?

6      A.  Three options.  These are the two that were

7  the predominant.

8      Q.  Okay.  Predominant that were discussed?

9      A.  Yes.

10     Q.  Okay.  Now, the last sentence in that

11  paragraph is, "The administration chose the least

12  disruptive option."  So in your view -- actually, I'm

13  sorry.  Let me back up because I have another

14  question.  So I want to put to the side the

15  deliberations that you all had about recession and

16  just ask you, sitting here today, do you see other

17  options for how the situation that was presented that

18  led to the rescission, you know, what other options do

19  you see that were possibilities for getting out of

20  that situation or for dealing with that situation?

21     A.  As a result of the recent litigation?

22     Q.  Yeah.

23     A.  The way she begins that?

24         Again, going back to what we discussed

25  earlier, looking at not only litigation and the threat

Page 223

```
 1    by the state attorney general but the specific court
 2    in previous actions, those seem to me to be the
 3    options.  I will incorporate your earlier statement of
 4    doing nothing or --
 5         Q.  Staying the course?
 6         A.  Staying the course.  Different ways of saying
 7    that.  As I sit here and look back -- right? -- we
 8    discussed earlier, like I referenced other district
 9    courts across the country.  Perhaps that's a little
10    bit -- this is my perspective.  Perhaps a little
11    different.  We don't know the outcome.  This is the
12    judge who took action on DAPA.
13              And so for that reason, the do nothing or
14    stay the course, to use your language that you
15    reference, I think that then links to the second point
16    the Secretary made, that that could allow the
17    judiciary to potentially shut down the program
18    completely and immediately, or that particular
19    district court judge through an injunctive action.
20         Q.  All right.  So let me go on and talk about
21    that sentence that I read, "The administration chose
22    the least disruptive option" is what Secretary Duke
23    writes there.  I think we may have touched on this,
24    but you recognize, obviously, that rescission as it
25    was done is disruptive even if, in Secretary Duke's
```

1    view, it's the least disruptive option; is that right?

2        A.   So I would agree it's the least disruptive,

3    but the point is there is a disruptive -- I can define

4    that in my view if you'd like.

5        Q.   Sure.

6        A.   So "disruptive" meaning it's referencing back

7    to the two options, winding the program down or

8    allowing the possibility of the judiciary to act.

9    That would be the least disruptive.  You referenced

10   earlier the program sustaining.  So staying the

11   course, to use your language, would not disrupt

12   because that would continue.  But of these two

13   options, between those two DHS, USCIS retained some

14   level of ability to wind-down the program.

15       Q.   Let me ask another question just about that

16   same paragraph.  Secretary Duke writes, "wind down the

17   program in an orderly fashion that protects

18   beneficiaries in the near term while working with

19   Congress to pass legislation."  Do you know, is that

20   happening?  Is DHS working with Congress to pass

21   legislation?

22           MR. GARDNER:  Objection.  Calls for

23   disclosure of information subject to deliberative

24   process privilege.

25           MR. DETTMER:  I'm just asking if it's

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals, | Case No. 16-cv-4756 (NGG)(JO) |
| Plaintiffs, | **DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS** |
| v. | |
| ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States, | (Garaufis, J.) (Orenstein, M.J.) |
| Defendants. | |

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, in accordance with the Order of the Honorable James Orenstein, U.S. Magistrate Judge, dated September 27, 2017, Defendants, by and through counsel, provide the following Objections and Responses to Plaintiffs' First Set of Interrogatories. Defendants' objections and responses are based on information known to Defendants at this time, and are made without prejudice to additional objections should Defendants subsequently identify additional grounds for objection, or should additional or different information become available. The information submitted herewith is being provided in accordance with the Federal Rules of Civil Procedure, which generally permit discovery of matters not privileged that are relevant to the claims or defenses in this civil action

1

and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(l). Accordingly, Defendants do not, by providing such information, waive any objection to its admissibility on the grounds of relevance, materiality, privilege, competency, or any other appropriate ground. Defendants reserve the right to amend, supplement, or alter these objections and responses at any time. A statement that Defendants will produce documents in response to any of Plaintiffs' requests for production is not meant to imply that such documents exist, but only that Defendants will produce them if they do exist and can be located based on a search that is proportional to the reasonable needs of this case, and subject to any of Defendants' objections to Plaintiffs' requests for production.

### OBJECTIONS WHICH APPLY TO ALL INTERROGATORIES

1.      Separate and apart from the specific objections set forth below, Defendants object to any discovery taking place in this case to the extent such discovery is brought pursuant to claims purportedly under the Administrative Procedure Act, as resolution of any such claims should be based upon the administrative record compiled by the Department of Homeland Security.

2.      Defendants object to any discovery taking place before resolution of Defendants' forthcoming dispositive motions.

3.      Defendants object to Plaintiffs' Interrogatories to the extent that they seek (a) attorney work product; (b) communications protected by the attorney-client privilege; (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) any other applicable privilege or protection. Defendants object to Plaintiffs' Interrogatories to the extent they assume that certain

types of information exist. By providing these objections, Defendants do not hereby imply that information exists that is responsive to Plaintiffs' Interrogatories.

4. Each and every response contained herein is subject to the above objections, which apply to each and every response, regardless of whether a specific objection is interposed in a specific response. The making of a specific objection in response to a particular request is not intended to constitute a waiver of any other objection not specifically referenced in the particular response.

5. Defendants specifically reserve the right to make further objections as necessary to the extent that additional issues arise as to the meaning of and/or information sought by discovery.

6. Defendants object to the extent that any request is contrary to any future and further order(s) of the Court.[1]

### OBJECTIONS TO DEFINITIONS

7. Defendants object to the inclusion of definitions for any term not relied on in these Interrogatories. Any requirement that Defendants respond to such definitions in the abstract is not proportional to the needs of the case and the burden of such a response outweighs its likely benefit, which is none. Defendants do not hereby waive any future objection to the definition of such terms or to the employment of Defendants' own definition of such terms.

8. Defendants object to the definition of "Defendants" as overly broad and outside of the scope of discovery. Fed. R. Civ. P. 26(b)(1). Defendants interpret the definition of Defendants to mean Attorney General Jefferson B. Sessions, III, in his official capacity, as well as the following components of the Department of Justice: the Office of the Attorney General (OAG), the Office of the Deputy Attorney General (ODAG), the Office of the Associate Attorney General (OASG), the Office of Legal Counsel (OLC), the Civil Rights Division (CRT),

---

[1] Pursuant to Defendants' prior reservation of the right to make additional objections should they subsequently identify additional grounds for objection, this objection has been added to Defendants' previous objections on October 16, 2017.

the Civil Division (CIV), the Office of the Solicitor General (OSG); and Elaine C. Duke, Acting Secretary of Homeland Security (DHS), in her official capacity, as well as the relevant offices within the following components of DHS: Headquarters, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS). The components listed are relevant as those in which searches for responsive information relevant to decisions about the exercise of DHS's prosecutorial discretion in the form of deferred action could conceivably be proportional to the likelihood of locating such information and its likely benefit to the litigation. Information from the Executive Office of the President will not be provided in response to these Interrogatories. *See Cheney v. U.S. District Court*, 542 U.S. 367, 388 (2004).

9.      Defendants object to the definition of "date" as overbroad and unduly burdensome. Defendants interpret date to mean "the exact date, month, and year, if ascertainable." To the extent an approximation is required, it will be provided and will be designated as such. The approximation will not include a description about "relationship to other events."

10.      Defendants object to the definition of "identify" in reference to an individual as improperly requiring the disclosure of material, the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation.

11.      Defendants object to the definition of "identify" in reference to a document because that definition is unduly burdensome and goes beyond the requirements of Fed. R. Civ. P. 34 and Local Rule 26.3(c)(4).

12.      Defendants object to the definition of "Department of Homeland Security" as overbroad. Defendants will construe Department of Homeland Security to mean the relevant offices within the following relevant components of the Department of Homeland Security: Headquarters, CBP, ICE and USCIS, which are the components of DHS which are likely to have responsive information.

13.      Defendants object to the definition of "DHS employee" or "DHS employees" as

overly broad. DHS employee or employees will be construed to mean any current or former employee, in his or her official capacity as a DHS employee, of a relevant office within a relevant component of DHS: Headquarters, CBP, ICE, and USCIS.

14.     Defendants object to the definition of "DOJ employee" or "DOJ employees" as overly broad. DOJ employee or employees will be construed to mean any current or former employee, in his or her official capacity as a DOJ employee, of OAG, ODAG, OASG, OLC, OSG, CRT, or CIV.

15.     Defendants object to the definition of "USCIS employee" or "USCIS employees" as overly broad. USCIS employee or employees will be construed to mean any current or former employee, in his or her official capacity as a USCIS employee, of a relevant office within USCIS.

16.     Defendants object to the definition of "Trump Administration" on the basis that it is overbroad. Defendants will interpret Trump Administration to mean President Donald Trump in his official capacity as President, as well as any other current or former employee, in his/her official capacity, of the Executive Office of the President since January 20, 2017.

17.     Defendants object to the definition of the phrase "DACA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by DACA, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

18.     Defendants object to the definition of the phrase "DACA recipient" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by DACA, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

19.     Defendants object to the definition of the phrase "DAPA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action that would have been afforded by the DAPA policy had it been implemented, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

20.     Defendants object to the definition of the phrase "expanded-DACA Program" to the extent the definition fails to describe the exercise of DHS's prosecutorial discretion in the form of deferred action afforded by the DACA policy, *i.e.*, the deferral of immigration enforcement action authorized by law for a temporary period.

21.     Defendants object to the definition of "staff" as overly broad.  Staff will be construed to mean any current or former employee, official, or contractor whose information is within the possession, custody, or control of a relevant component of a relevant agency in carrying out official agency business.

22.     Defendants object to the definition of "Reason" or "Reasons" as overly broad, and not sufficient to permit a reasoned inquiry or response.  Defendants will construe "Reason" or "Reasons" to mean the basis for Defendants' actions.

23.     Defendants object to the definition of the term "process" on the basis that it is overbroad in its inclusion of "other persons," and its inclusion of "Defendants" rather than the single Defendant to whom this Request for Production is directed.  Defendants also object to the definition of the term "process" in that it includes communications, meetings, and discussions, whether or not those communications, meetings, and discussions had any relationship to any challenged action or decision with regard to the exercise of prosecutorial discretion in the form of deferred action.

24.     Defendant objects to the inclusion of a definition of "present for" as vague in its inclusion of "telephone presence" and "any form of electronic presence."  Defendant will interpret the term "present for" to mean "a participant in a meeting, conversation, or discussion, whether in person, by telephone, by videoconference, or by other live communications method."

25.     Defendant objects to the definition of "discussion" or "discussions" as vague and overbroad to the extent it includes "any communication" in addition to the specified methods set forth in the definition.

26.     Defendant objects to the definition of "relating to" and "relate to" as overly broad, particularly in their inclusion of the terms "Setting forth," "mentioning," and "referring to."  Defendant will construe "relate to" or "relating to" based on the context of potentially responsive

6

documents to include only those documents "describing," "discussing," "commenting upon," "supporting" or "contradicting" the topic in question to a sufficient extent as to shed light on the parties' claims or defenses.

27.     Defendants object to the definitions in paragraphs 25-27 as overly broad. Defendants will interpret the requests in accordance with the definitions in Local Rule 26.3(d), or, for terms not defined in the Local Rules, using the plain meaning of the words included in the request.

## OBJECTIONS TO INSTRUCTIONS

28.     Defendants object to Instruction 1 as overly broad. Defendants will respond to Interrogatories on the basis of a reasonable inquiry consistent with the obligations of Fed. R. Civ. P. 26(b)(1) and 26(g).

29.     Defendants object to Instruction 2 to the extent that it implies any obligation outside of the scope of Fed. R. Civ. P. 26(b)(5) and Fed. R. Civ. P. 33(b)(3). Defendants will comply with the requirements of the Federal Rules of Civil Procedure and the local rules of this Court.

30.     Defendants object to Instruction 3 to the extent that it implies any obligation outside the scope of Fed. R. Civ. P. 26(b)(1) and Fed. R. Civ. P. 33. Defendants will comply with the requirements of the Federal Rules of Civil Procedure and the local rules of this Court.

31.     Defendants object to Instruction 4 to the extent that it goes beyond the requirements of Fed. R. Civ. P. 33(d)(1). Defendants will comply with the requirements of the Federal Rules of Civil Procedure and the local rules of this Court.

32.     Defendants object to Instruction 5 to the extent that it goes beyond the requirements of Local Rule 26.3(c)(3). Defendants will comply with the requirements of the local rules of this Court.

## OBJECTIONS AND RESPONSES
## TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

**Interrogatory No. 1**

Please state the reason or reasons for Defendants' decision to terminate the DACA program, including the factors Defendants considered when making the decision, and the weight assigned to each factor.

**Objections to Interrogatory No. 1**

1.     Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.     Defendants object to the portion of Interrogatory No. 1 seeking "the weight assigned to each factor" as vague and not capable of yielding a reasoned response.

3.     Defendants object to the portion of Interrogatory No. 1 seeking "the factors Defendants considered when making the decision" as seeking information that is not relevant to the party's claims or defenses to the extent that this portion of Interrogatory No. 1 seeks information other than the reason or reasons for Defendants' decision.

4.     Defendants object to Interrogatory No. 1 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) any other applicable privilege or protection.

5.     Defendants object to Interrogatory No. 1 as containing three discrete subparts: (1) the reason or reasons for Defendants' decision; (2) the factors Defendants considered; and (3) the weight assigned to each factor.  To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to each of these three sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 1**

Subject to these objections, Defendant DHS states that the reasons for the rescission of the DACA policy are set forth in Acting Secretary of Homeland Security Elaine Duke's

8

memorandum dated September 5, 2017 to James W. McCament, Acting Director, U.S. Citizenship and Immigration Services (USCIS), Thomas D. Homan, Acting Director U.S. Immigration and Customs Enforcement (ICE), Kevin K. McAleenan, Acting Commissioner, U.S. Customs and Border Protection (CBP), Joseph B. Maher, Acting General Counsel, Ambassador James D. Nealon, Assistant Secretary International Engagement, and Julie M. Kirchner, Citizenship and Immigration Services Ombudsman, regarding *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* ("DACA Rescission Memorandum"), which is publicly available and included in the certified Administrative Record filed in this action on October 6, 2017. The Administrative Record also contains non-privileged information actually considered by the Acting Secretary in connection with that decision.

**Interrogatory No. 2**

Please state the reason or reasons for Defendants' decisions (a) to terminate the DACA program on September 5, 2017; (b) to set March 5, 2018, as the end date for renewals; (c) to set October 5, 2017, as the deadline for renewal applications; and (d) to stop accepting initial applications or renewal applications, from DACA recipients whose status expired by September 5, 2017, as of September 5, 2017.

**Objections to Interrogatory No. 2**

1.      Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.      Defendants object to Interrogatory No. 2 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

3.    Defendants object to Interrogatory No. 2 as containing four discrete subparts, as labeled (a) through (d).  To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to each of these four sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 2**

Subject to these objections, Defendant DHS incorporates by reference herein its response to Interrogatory Number 1 in response to part (a) of this Interrogatory.  Defendant DHS further states in response to part (a) that upon receiving the Attorney General's September 4, 2017 letter concluding DACA to be unlawful, Defendant DHS acted quickly to comply with the law by rescinding DACA and to mitigate litigation risk presented by Texas and the other plaintiff-states' assertion that they would amend the complaint in *Texas v. United States* to challenge DACA. Defendant DHS also incorporates by reference its response to Interrogatory 1 in response to parts (b), (c) and (d) of this Interrogatory and further states that the Acting Secretary, in considering both the Attorney General's advice regarding the unlawfulness and litigation-related vulnerabilities of DACA, as well as the complexities associated with winding down the policy, determined to provide a limited window in which USCIS will adjudicate certain requests for DACA and associated applications meeting certain parameters, as described in the DACA Rescission Memorandum.  The deadlines referenced in parts (b), (c) and (d) of this Interrogatory were selected in order to facilitate the orderly wind-down of DACA without suddenly terminating deferred action for all DACA recipients.

The Acting Secretary decided to stop accepting initial DACA request or renewal requests from DACA recipients whose DACA expired before September 5, 2017, as of September 5, 2017, in accordance with the Acting Secretary's decision to rescind the DACA policy as of that date.  Initial and renewal DACA requests already received by USCIS as of September 5, 2017, continue to be adjudicated.

October 5, 2017 was selected as the deadline for DHS acceptance of renewal requests for DACA grants set to expire between September 5, 2017 and March 5, 2018, in order to provide a limited grace period for such DACA recipients to properly file their renewal requests. The October 5 deadline was selected in order to not disadvantage DACA recipients with DACA grants set to expire between September 5, 2017, and March 5, 2018, who had not yet sought renewal, as compared with DACA recipients with DACA grants set to expire between September 5, 2017, and March 5, 2018, who had already submitted renewal requests as of September 5, 2017. The six-month timeframe was also selected in part because it is consistent with USCIS's prior practice of sending DACA recipients reminder notices approximately 180 days in advance of expiration encouraging those recipients to request renewal 150 to 120 days in advance of expiration of their current period of deferred action under DACA. October 5, 2017 was further selected as the deadline for submitting renewal requests for DACA grants set to expire between September 5, 2017 and March 5, 2018, due to operational considerations, in order to provide USCIS with sufficient time to adjudicate the majority of renewal requests before March 5, 2018.

Similarly, March 5, 2018 was selected as the end date for renewals in order to facilitate an efficient and orderly wind-down of DACA without suddenly terminating deferred action for all DACA recipients.

**Interrogatory No. 3**

Please identify the date, location, participants, and subject of any meetings or conversations among staff of the Department of Justice, Department of Homeland Security, and Executive Office of the President between January 20, 2017, and September 5, 2017, during which a decision was made on continuing or terminating the DACA program.

**Objections to Interrogatory No. 3**

1.      Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.      Defendants object to Interrogatory No. 3 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common

interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

3.      Defendants object to the interrogatory to the extent that it purports to require the identification of the date, location, participants, and subject of any meetings involving the Executive Office of the President.  *See Cheney v. U.S. District Court*, 542 U.S. 367, 388 (2004).

4.      Defendants object to Interrogatory No. 3 to the extent that it incorrectly assumes that "a decision was made" as part of a meeting or discussion.

5.      Defendants object to Interrogatory No. 3 as containing four discrete subparts: (1) "identify the date . . . of any meetings . . ."; (2) "identify the . . . location . . . of any meetings . . ."' (3) "identify the . . . participants . . . of any meetings . . ."; and (4) "identify the . . . subject of any meetings . . . ."  To the extent possible based on the time permitted, a reasonable review of their records, and consistent with the above objections, Defendants will provide a non-privileged answer to each of these four sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 3**

Subject to these objections, Defendant DHS responds to Interrogatory Number 3 only on behalf of DHS and states as follows:

A decision not to rescind DACA at that time was made by former Secretary of Homeland Security John Kelly on February 20, 2017, as reflected in his February 20, 2017 Memorandum entitled *Enforcement of the Immigration Laws to Serve the National Interest*.  Multiple internal, pre-decisional, deliberative and attorney-client privileged meetings, conversations, and communications among DHS staff took place prior to issuance of that memorandum.

A decision to rescind DAPA and expanded DACA was made by former Secretary of Homeland Security John Kelly on June 15, 2017, as reflected in his June 15, 2017 Memorandum entitled, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")*.  Multiple internal, pre-

12

decisional, deliberative and attorney-client privileged meetings, conversations, and communications among DHS staff took place prior to issuance of that memorandum.

Defendant DHS incorporates by reference herein its response to Interrogatory Number 1. The decision to rescind DACA was made by Acting Secretary of Homeland Security Elaine C. Duke on September 5, 2017, as reflected in her September 5, 2017 Memorandum entitled, *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*." Multiple internal, pre-decisional, deliberative and attorney-client privileged meetings, conversations, and communications among DHS staff took place prior to issuance of that memorandum.

Defendant DHS reserves the right to supplement this response with any additional relevant, responsive, non-privileged information that is within its possession, custody, or control and capable of being ascertained with reasonable diligence.

**Interrogatory No. 4**

Please identify the date, location, participants, and subject of any meetings or conversations among staff of the Department of Justice, Department of Homeland Security, and Executive Office of the President, between January 20, 2017, and September 5, 2017, during which decisions were made (a) to terminate the DACA program on September 5, 2017; (b) to set March 5, 2018, as the end date for renewals; (c) to set October 5, 2017, as the deadline for renewal applications; and (d) to stop accepting initial applications or renewal applications from DACA recipients whose status expired by September 5, 2017, as of September 5, 2017.

**Objections to Interrogatory No. 4**

1.    Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.    Defendants object to Interrogatory No. 4 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e)

13

information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

     3.     Defendants object to the interrogatory to the extent that it purports to require the identification of the date, location, participants, and subject of any meetings involving the Executive Office of the President. *See Cheney v. U.S. District Court*, 542 U.S. 367, 388 (2004).

     4.     Defendants object to Interrogatory No. 4 to the extent that it incorrectly assumes that "decisions were made" as part of a meeting or discussion.

     5.     Defendants object to Interrogatory No. 4 as containing four discrete subparts, as labeled (a) through (d). To the extent possible based on the time permitted, a reasonable review of their records, and consistent with the above objections, Defendants will provide a non-privileged answer to each of these four sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 4**

     Defendant DHS responds to Interrogatory Number 4 only on behalf of DHS and states as follows:

     Defendant DHS incorporates by reference herein its response to Interrogatory Numbers 1 and 3. The decision to rescind DACA was made by Acting Secretary of Homeland Security Elaine C. Duke on September 5, 2017, as reflected in her September 5, 2017 Memorandum entitled, *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*." That memorandum also reflects the Acting Secretary's decision with respect to the deadlines referenced in parts (b)-(d) of this Interrogatory and other parameters for adjudicating DACA requests. Multiple internal, pre-decisional, deliberative and attorney-client privileged meetings, conversations, and communications among DHS staff took place prior to issuance of that memorandum.

     Defendant DHS reserves the right to supplement this response with any additional relevant, responsive, non-privileged information that is within its possession, custody, or control and capable of being ascertained with reasonable diligence.

**Interrogatory No. 5**

Please identify the date, location, participants, and subject of any meetings or conversations that Defendants conducted between June 1, 2017 and September 5, 2017, with representatives or staff of a state that participated in the *Texas v. United States* litigation, regarding the decision whether to continue or terminate the DACA program.

**Objections to Interrogatory No. 5**

1.      Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.      Defendants object to Interrogatory No. 5 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

3.      Defendants object to Interrogatory No. 5 as vague and overbroad to the extent it seeks information about meetings or conversations with individuals, the identity of which or whom is immaterial to the claims in this litigation, and because the burden of responding is disproportionate to the needs of this case.

4.      Defendants object to Interrogatory No. 5 to the extent it seeks information from Civil Division litigation counsel, as retrieving any such information would be overly broad and unduly burdensome due to the nature of the Civil Division's representation of the interests of the United States.

5.      Defendants object to Interrogatory No. 5 as seeking information that is not relevant because the legal validity of DACA does not depend on the details of any particular litigation, including the details of the *Texas v. United States* litigation, but rather, to legal principles set forth by the judiciary in its rulings.

15

6.      Defendants object to Interrogatory No. 5 as containing four discrete subparts: (1) "identify the date . . . of any meetings . . ."; (2) "identify the . . . location . . . of any meetings . . ."' (3) "identify the . . . participants . . . of any meetings . . ."; and (4) "identify the . . . subject of any meetings . . . ."  To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to each of these four sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

7.      Defendants object to Interrogatory No. 5 as overbroad to the extent that "a state that participated in" includes all 26 plaintiff states and over fifteen states that participated as amici.  Defendants also object to Interrogatory No. 5 as vague and overbroad to the extent that "representatives or staff of a state" could be interpreted to encompass any state employee or any other person "represent[ing]" any of the numerous states that "participated in" the *Texas v. United States* litigation.  This overbroad request would thereby seek records of every meeting or discussion held between Defendants and hundreds of thousands of individuals who constitute "staff" or "representatives" of the more than 40 states that "participated" in some way in the litigation.  Accordingly, Defendants will construe "representatives or staff of a state" to be limited to those persons known to have authority to represent the plaintiff states in high-level decision-making regarding the litigation.[2]

**Response to Interrogatory No. 5**

Subject to these objections, Defendant DOJ has identified the following meetings and conversations between officials of the Department of Justice and state officials with authority in the *Texas v. United States* litigation:

| Date | No. of Mtgs. | Location | Participant Names and Titles | Meeting Subject |
|------|--------------|----------|------------------------------|-----------------|
| Summer 2017 | Multiple | Telephone | -  Career attorneys in the Civil Division, U.S. Dep't of Justice | Future proceedings in *Texas v. United States* litigation |

[2] Pursuant to Defendants' prior reservation of the right to make additional objections should they subsequently identify additional grounds for objection, this objection has been added to Defendants' previous objections on October 16, 2017.

| Date | No. of Mtgs. | Location | Participant Names and Titles | Meeting Subject |
|---|---|---|---|---|
| | | | - Counsel for plaintiff-states | |
| June 29, 2017 (approximate) | 1 | Telephone | - Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Scott Keller, Solicitor General, Texas | Forthcoming correspondence in *Texas v. United States* litigation |
| Aug. 17, 2017 | 1 | Telephone | - Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Scott Keller, Solicitor General, Texas | Responses to pending motions and possibility of staying *Texas v. United States* litigation |
| Late Aug., 2017 | 1 or 2 | Telephone | - Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Scott Keller, Solicitor General, Texas | Future proceedings in *Texas v. United States* litigation and United States plans for a decision regarding DACA policy |
| Late Aug. 2017 Or early Sept. 2017 | 1 | Telephone | - Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Danielle Cutrona, Counselor to AG Sessions<br>- Scott Keller, Solicitor General, Texas | Future proceedings in *Texas v. United States* litigation and United States plans for a decision regarding DACA policy |
| Week preceding Sept. 5, 2017 | 1 | Telephone | - Jefferson B. Sessions, III, Attorney General of the United States<br>- Chad Readler, Assistant Attorney General (Acting), U.S. Dep't of Justice<br>- Jesse Panuccio, Principal Deputy Associate Attorney General, U.S. Dep't of Justice<br>- Danielle Cutrona, Counselor to Attorney General Sessions<br>- Ken Paxton, Attorney General, Texas<br>- Other Texan attorneys | Proceedings in *Texas v. United States* litigation |

Additionally, Defendant DHS states, on behalf of itself:

| Date | No. of Mtgs. | Location | Participant Names and Titles | Meeting Subject |
|---|---|---|---|---|
| Aug. 8, 2017 | 1 | Telephone | - Gene Hamilton, Senior Counselor to Acting Secretary<br>- Michael Toth, Representative of the Texas Attorney General's Office | The June 29, 2017 letter from Texas Attorney General Ken Paxton to United States Attorney General Jefferson B. Sessions, requesting the Secretary of DHS phase out and rescind DACA by September 5, 2017. |
| Aug. 28, 2017 (approximate) | 1 | Telephone | - Gene Hamilton, Senior Counselor to Acting Secretary<br>- Michael Toth, Representative of the Texas Attorney General's Office | Possible follow-up call regarding same subject. |

Defendants reserve the right to supplement this response with any additional relevant, responsive, non-privileged information that is within its possession, custody, or control and capable of being ascertained with reasonable diligence.

**Interrogatory No. 6**

17

Please identify any and all Department of Homeland Security, Department of Justice, or other White House staff who were consulted for, participated in, or contributed to analysis of the lawfulness of the DACA program; the decision whether to continue or terminate the DACA program; or any decision regarding the nature of the DACA termination between January 20, 2017 and September 5, 2017.

**Objections to Interrogatory No. 6**

1.      Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.      Defendants object to Interrogatory No. 6 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege, including the presidential communications privilege; or (f) any other applicable privilege or protection.

3.      Defendants object to the interrogatory to the extent that it purports to require the identification of White House staff who were consulted for, participated in, or contributed to the analysis of the issues that are subject to this request. *See Cheney v. U.S. District Court*, 542 U.S. 367, 388 (2004).

4.      Defendants object to Interrogatory No. 6 as vague and overbroad to the extent it seeks information about persons who "were consulted for, participated in, or contributed to analysis..." to the extent it seeks information about individuals with mere peripheral involvement, as the identity of such individuals is not relevant, such individuals are unlikely to have relevant information, and identifying all such individuals would be excessively burdensome and disproportionate to the needs of the case. Defendants will construe Interrogatory No. 6 to seek information about non-White House individuals who participated materially in the subject of this Interrogatory.

5.      Defendants object to Interrogatory No. 6 as vague and overbroad to the extent it seeks information about "any decision regarding the nature of the DACA termination."

Defendants will construe Interrogatory No. 6 to seek information about the decisions challenged in this litigation.

6.      Defendants object to Interrogatory No. 6 as containing three discrete subparts regarding: (1) "analysis of the lawfulness of the DACA program"; (2) "the decision whether to continue or terminate the DACA program"; or (3) "any decision regarding the nature of the DACA termination." To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to each of these three sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

**Response to Interrogatory No. 6**

Subject to these objections, Defendants have identified to date the following individuals as having consulted for, participated in, or contributed to the topics listed in the sub-parts of the interrogatory:

| NAME | TITLE |
|---|---|
| **DOJ** | |
| Chad A. Readler | Assistant Attorney General (Acting), Civil Division |
| Curtis E. Gannon | Assistant Attorney General (Acting), Office of Legal Counsel (OLC) |
| Daniel L. Koffsky | Deputy Assistant Attorney General, OLC |
| Danielle Cutrona | Counselor to the Attorney General |
| Edwin Kneedler | Deputy Solicitor General |
| Henry C. Whitaker | Deputy Assistant Attorney General, OLC |
| Jefferson B. Sessions, III | Attorney General |
| Jeffrey B. Wall | Principal Deputy Solicitor General |
| Jeremy Bylund | Deputy Associate Attorney General |
| Jesse Panuccio | Principal Deputy Associate Attorney General |
| Jody Hunt | Chief of Staff to the Attorney General |
| Laura E. Heim | Attorney-Adviser, OLC |
| Noel Francisco | Solicitor General |
| Rachael Tucker | Counsel to the Attorney General |
| Rachel Brand | Associate Attorney General |
| Rosemary Hart | Special Counsel, OLC |
| Scott G. Stewart | Counsel to the Assistant Attorney General, OLC |
| Zack Tripp | Assistant to the Solicitor General |

19

| DHS[3] | |
|---|---|
| Adam V. Loiacono | Deputy Principal Legal Advisor for Enforcement and Litigation, ICE |
| Ben Cassidy | Assistant Secretary, DHS Office of Legislative Affairs (OLA) |
| Chad Wolf | Acting Chief of Staff to the Acting Secretary |
| Craig Symons | USCIS Chief Counsel |
| Dimple Shah | Deputy General Counsel |
| Donald Neufeld | Associate Director, Service Center Operations Directorate |
| Elaine Duke | Acting Secretary of Homeland Security |
| Elizabeth Neumann | Deputy Chief of Staff to the Acting Secretary |
| Ernest DeStefano | Chief, Office of Intake and Data Production (Acting Deputy Associate Director, Service Center Operations Directorate July 8, 2017 – September 8, 2017) |
| Gene Hamilton | Senior Counselor to the Acting Secretary |
| Gillian Christensen | Senior Advisor, Office of External Affairs |
| James D. Nealon | Assistant Secretary for International Engagement |
| James W. McCament | Deputy Director (then Acting Director) of USCIS |
| Jennifer Higgins | Associate Director, Refugee, Asylum and International Operations Directorate (then Acting Deputy Director) |
| John Feere | Senior Advisor, ICE |
| Joseph B. Maher | Acting General Counsel |
| Joseph Moore | Chief Financial Officer |
| Julie Koller | Deputy Associate Chief Counsel, Enforcement and Operations, CBP Office of the Chief Counsel |
| Kathy Nuebel-Kovarik | Chief of the USCIS Office of Policy and Strategy |
| Lora Ries | Acting Chief of Staff (August 28, 2017 to the present) |
| Michael Dougherty | Assistant Secretary for Border, Immigration and Trade Policy |
| Nader Baroukh | Associate General Counsel |
| Thomas D. Homan | Acting Director of U.S. Immigrations and Customs Enforcement (ICE) |
| Todd Hoffman | Executive Director, Admissibility and Passenger Programs, Office of Field Operations |
| **EXECUTIVE OFFICE OF THE PRESIDENT** | |
| Andrew Bremberg | Assistant to the President and the Director of the Domestic Policy Council for President Trump |
| Donald McGahn | White House Counsel and Assistant to the President |
| Gregory Katsas | Deputy Assistant and Deputy Counsel to President Trump |

---

[3] The USCIS personnel listed below were aware of, participated in meetings and/or conversations, and or provided operational information related to DACA rescission or wind-down before September 5, 2017.

| John Bash | Special Assistant and Associate Counsel |
| John Kelly | White House Chief of Staff |
| Kirstjen Nielsen | Principal Deputy White House Chief of Staff |
| Marc Short | White House Director of Legislative Affairs and Deputy Assistant to the President |
| Mick Mulvaney | Director, Office of Management and Budget |
| Rick Dearborn | White House Deputy Chief of Staff for Legislative, Intergovernmental Affairs and Implementation |
| Robert Porter | White House Staff Secretary |
| Stephen Miller | Senior Advisor for Policy |

Defendants reserve the right to supplement this response with any additional relevant, responsive, non-privileged information that is within its possession, custody, or control and capable of being ascertained with reasonable diligence.

## Interrogatory No. 7

Please state the number of DACA recipients who are eligible to apply for DACA renewal between September 6, 2017 and October 5, 2017, both nationally and for each state. Please also state the number of DACA recipients who have applied for DACA renewal since September 5, 2017, broken down by date (both the date the application was received and the date a decision was made), and the total number that were granted, rejected on the merits, returned without adjudication on the merits due to the date the renewal application was received, or denied for any other reason (broken down by the reason for denial).

## Objections to Interrogatory No. 7

1.      Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.      Defendants object to Interrogatory No. 7 to the extent that the request seeks information protected by the law enforcement privilege; material the disclosure of which would

21

violate legitimate privacy interests and expectations of persons not party to this litigation; or any other applicable privilege or protection.

3. Defendants object to Interrogatory No. 7 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information for which the burden of examining, auditing, compiling, abstracting and/or summarizing the records required to derive or ascertain the answer to this interrogatory would outweigh the likely benefit.

4. Defendants object to Interrogatory No. 7 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information disproportionate to the needs of the case.

5. Defendants object to Interrogatory No. 7 as containing seven discrete subparts regarding: (1) "the number of DACA recipients who are eligible . . . nationally"; (2) "the number of DACA recipients who are eligible . . . for each state"; (3) "the number of DACA recipients who have applied for DACA renewal"; (4) "the total number that were granted"; (5) "the total number . . . rejected on the merits"; (6) "the total number . . . returned without adjudication"' and (7) "the total number . . . denied for any other reason."   To the extent possible based on a reasonable review of their records and consistent with the above objections, Defendants will provide a non-privileged answer to the first three sub-parts, but will treat them as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.  Defendants object to answering sub-parts four through seven as these sub-parts exceed Plaintiffs' limit on interrogatories under Fed. R. Civ. P. 33.

**Response to Interrogatory No. 7**

Subject to these objections, Defendant USCIS responds that the number of DACA recipients who were eligible under the parameters of the DACA Rescission Memorandum to request DACA renewal between September 6, 2017, and October 5, 2017 (i.e., individuals with

valid DACA on September 5, 2017 whose DACA expired or expires between September 5, 2017 and March 5, 2018), nationally is approximately 154,200, based on best available information.

Defendant USCIS further responds that as of October 11, 2017, the estimated number of DACA recipients who were eligible under the parameters of the September 5, 2017 DACA Rescission Memorandum to request DACA renewal between September 6, 2017, and October 5, 2017, by state is approximately as follows, based on best available information:

| State/Territory | Count of Individuals |
|---|---|
| Alabama | 880 |
| Alaska | 20 |
| American Samoa | <10 |
| Arizona | 5,370 |
| Arkansas | 1,070 |
| Armed Forces Americas | <10 |
| Armed Forces Pacific | <10 |
| California | 41,300 |
| Colorado | 3,860 |
| Connecticut | 980 |
| Delaware | 290 |
| District of Columbia | 140 |
| Florida | 5,860 |
| Georgia | 4,860 |
| Guam | <10 |
| Hawaii | 80 |
| Idaho | 740 |
| Illinois | 8,650 |
| Indiana | 1,820 |
| Iowa | 540 |

23

| | |
|---|---|
| Kansas | 1,480 |
| Kentucky | 680 |
| Louisiana | 460 |
| Maine | <10 |
| Maryland | 2,160 |
| Massachusetts | 1,380 |
| Michigan | 1,270 |
| Minnesota | 1,300 |
| Mississippi | 280 |
| Missouri | 700 |
| Montana | 20 |
| Nebraska | 690 |
| Nevada | 2,140 |
| New Hampshire | 60 |
| New Jersey | 4,170 |
| New Mexico | 1,420 |
| New York | 7,610 |
| North Carolina | 4,730 |
| North Dakota | 20 |
| Northern Marianas | <10 |
| Ohio | 890 |
| Oklahoma | 1,350 |
| Oregon | 2,390 |
| Pennsylvania | 1,080 |
| Puerto Rico | 30 |
| Rhode Island | 240 |
| South Carolina | 1,370 |

24

| | |
|---|---|
| South Dakota | 50 |
| Tennessee | 1,660 |
| Texas | 28,200 |
| Utah | 2,080 |
| Virgin Islands | <10 |
| Virginia | 2,230 |
| Washington | 3,900 |
| West Virginia | 30 |
| Wisconsin | 1,580 |
| Wyoming | 160 |

Defendant USCIS further responds that the number of DACA recipients who have requested renewal of DACA since September 5, 2017, broken down by date the request was received and the date a decision was made is approximately as follows, based on best available information:

| Count of Individuals | |
|---|---|
| **Received Date** | **Total** |
| 09/05/2017 | 4,239 |
| 09/06/2017 | 961 |
| 09/07/2017 | 1,215 |
| 09/08/2017 | 1,791 |
| 09/11/2017 | 4,415 |
| 09/12/2017 | 3,018 |
| 09/13/2017 | 1,953 |
| 09/14/2017 | 2,608 |
| 09/15/2017 | 2,600 |

| | |
|---|---|
| 09/18/2017 | 6,417 |
| 09/19/2017 | 2,068 |
| 09/20/2017 | 1,843 |
| 09/21/2017 | 2,284 |
| 09/22/2017 | 2,714 |
| 09/25/2017 | 5,965 |
| 09/26/2017 | 2,881 |
| 09/27/2017 | 2,509 |
| 09/28/2017 | 3,545 |
| 09/29/2017 | 3,649 |
| 10/02/2017 | 8,401 |
| 10/03/2017 | 4,412 |
| 10/04/2017 | 5,624 |
| 10/05/2017 | 3,863 |
| **Grand Total** | **78,975** |

| Count of Individuals | |
|---|---|
| **Decision Date** | **Total** |
| 09/21/2017 | 5 |
| 09/22/2017 | 3 |
| 09/25/2017 | 5 |
| 09/27/2017 | 733 |
| 09/28/2017 | 64 |
| 09/29/2017 | 658 |
| 10/02/2017 | 429 |
| 10/03/2017 | 8 |

| 10/04/2017 | 23 |
|:---:|:---:|
| 10/05/2017 | 168 |
| 10/06/2017 | 53 |
| 10/07/2017 | 1 |
| 10/10/2017 | 54 |
| 10/11/2017 | 1 |
| 10/12/2017 | 7,676 |
| **Grand Total** | **9,881** |

Defendant USCIS further responds that of the number of DACA recipients who requested renewal since September 5, 2017, the total number who have been granted renewal as of October 13, 2017, was approximately 9,863, and the total number who have been denied renewal as of that date is approximately 18, based on best available information. USCIS databases do not capture the specific reasons for denial of a DACA request. Individualized case-by-case review would be required, which is unduly burdensome, particularly if the number of DACA denials increases.

Defendant USCIS further responds that as of October 12, 2017, of the number of DACA recipients who requested renewal since September 5, 2017, the total number whose requests were "rejected on the merits" was approximately 10,197, based on best available information. USCIS interprets "rejected on the merits" to mean a rejection that was not based solely on the date the renewal request was received.

Finally, Defendant USCIS responds that as of October 12, 2017, of the number of DACA recipients who requested renewal since September 5, 2017, the total number whose requests were "returned without adjudication due to the date the renewal application was received" was: 0, based on best available information. As of October 12, 2017, USCIS has received approximately 4,152 DACA renewal requests on or after October 6, 2017, based on best available data, that likely will be rejected once USCIS finishes a full account of the DACA renewal requests received.

**Interrogatory No. 8**

Please explain the process, procedures, channels of review, or allocations of responsibility for policy development, including for promulgating a legislative rule, interpretive rule, general statement of policy, or guidance, that were in effect from January 20, 2017 until the present.

**Objections to Interrogatory No. 8**

1.     Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.     Defendants object to Interrogatory No. 8 as exceeding the total limit on written interrogatories, including all discrete subparts, under Fed. R. Civ. P. 33.

3.     Defendants object to Interrogatory No. 8 as containing four discrete subparts regarding: (1) "process"; (2) "procedures"; (3) "channels of review"; and (4) "allocations of responsibility."   To the extent Plaintiffs have not already exceeded the total limit on interrogatories under Fed. R. Civ. P. 33, Defendants treat each of the sub-parts as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

4.     Defendants object to Interrogatory No. 8 to the extent that the request seeks (a) attorney work product; (b) communications protected by the attorney-client privilege, (c) information protected by the deliberative-process privilege, the joint defense privilege, common interest privilege, or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) any other applicable privilege or protection.

5.     Defendants object to Interrogatory No. 8 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information that is overly broad as it seeks information about any policy or procedure whatsoever and any aspect of policy development whatsoever, not in any way limited to DACA and thus having no conceivable relationship to the claims and defenses in this litigation.

6.      Defendants object to Interrogatory No. 8 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information disproportionate to the needs of the case.

7.      Defendant objects on the basis that the request is vague and does not provide an adequate description upon which to base a reasonable inquiry.

## Response to Interrogatory No. 8

Defendants have objected to this interrogatory in full and cannot identify a meaningful, narrowing construction that would yield a response relevant to the issues in this litigation.

## Interrogatory No. 9

Please identify the kinds of notices that were sent to DACA recipients since January 20, 2017, which mention renewing their DACA status. Please state, for each kind of notice, the time period during which the notices were sent, the number of individuals who were sent the notice, the time at which each notice was sent in relation to the date that the DACA recipient's status expired, and all languages that the notice was translated into. Please identify any changes that were made to the notice templates, any changes that were made to the dates such notices were mailed, and state the reason or reasons for the changes made, as of September 5, 2017.

## Objections to Interrogatory No. 9

1.      Defendants incorporate by reference the above objections which apply to all interrogatories as well as the objections to the definitions and instructions.

2.      Defendants object to Interrogatory No. 9 as exceeding the total limit on written interrogatories, including all discrete subparts, under Fed. R. Civ. P. 33.

3.      Defendants object to Interrogatory No. 9 as containing eight discrete subparts regarding: (1) "identify the kinds of notices"; (2) "state . . . the time period during which the notices were sent"; (3) "state . . . the number of individuals"; (4) "state . . . the time at which each notice was sent in relation to the date . . .; (5) "state . . . all languages that the notice was translated into"; (6) "identify any changes that were made to the notice templates"; (7) "identify

any changes that were made to the dates"; and (8) "state the reason or rea[s]ons for the changes made." To the extent Plaintiffs have not already exceeded the total limit on interrogatories under Fed. R. Civ. P. 33, Defendants treat each of the sub-parts as separate interrogatories for the purpose of Plaintiffs' total limit on interrogatories.

4.　Defendants object to Interrogatory No. 9 to the extent that the request seeks information protected by the law enforcement privilege; material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; or any other applicable privilege or protection.

5.　Defendants object to Interrogatory No. 9 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information for which the burden of examining, auditing, compiling, abstracting and/or summarizing the records required to derive or ascertain the answer to this interrogatory would outweigh the likely benefit.

6.　Defendants object to Interrogatory No. 9 as seeking information that is not relevant to any party's claim or defense, or, to the extent it seeks relevant information, requests information disproportionate to the needs of the case.

7.　Defendants object to Interrogatory No. 9 as vague to the extent it seeks "kinds of notices", which is not a term that has been defined or is subject to ready definition on its face. Defendants will construe "kinds of notices" to mean the titles of notices sent.

### Response to Interrogatory No. 9

Subject to these objections, Defendant USCIS responds that a single type of notice was sent to DACA recipients since January 20, 2017, which mentioned renewing DACA. This automatically generated notice ("180-day notice') was in use from approximately April 2015 to approximately July 15, 2017. In most cases, the 180-day notice was sent to DACA recipients approximately 178-180 days in advance of their most recent DACA expiration date. The notice, to which no changes were made between January 20, 2017 and approximately July 15, 2017 when USCIS ceased issuing the notice, stated in part:

> "Our records indicate that U.S. Citizenship and Immigration Service (USCIS) granted DACA in your case and that your current period of deferred action will expire in less than 180 days."

The 180-day notice was not translated from English into other languages.

The automatic generation of the 180-day notice was utilized only for DACA requests that were receipted into the CLAIMS 3 system. This feature was never developed for or implemented in the ELIS system in which DACA requests have been adjudicated since approximately February 1, 2016.

This automatic generation feature was phased out in CLAIMS 3 in July 2017 as CLAIMS 3 notice printing migrated from the CLAIMS 3 print server to the Electronic Print Management System (EPMS). In June/July 2017, USCIS made a policy and operational decision not to rewrite the 180-day reminder notice service for CLAIMS 3 cases to EPMS due to significant operational costs associated with re-building this service, and the fact that the overwhelming majority of pending DACA requests were by then handled in ELIS and had been adjudicated in ELIS since approximately February 1, 2016.

For a break out of the time period on or after January 20, 2017, during which the 180-day notices were sent, the number of individuals who were sent the notice, and the time at which each notice was sent in relation to the date that the individual's DACA was set to expire, based on best available information, Defendant USCIS responds with the following chart:

| U.S. Citizenship and Immigration Services |
| Form I-821D, Consideration of Deferred Action for Childhood Arrivals |
| Count of DACA Expiration Notices Sent |
| Grouped by number of Days between Notice Sent and DACA Expiration |

| | Number of days' notice before DACA expiration date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Expiration Notice Sent Date | 84 | 107 | 112 | 149 | 176 | 177 | 178 | 179 | 180 | Total |
| 01/20/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 307 | 307 |
| 01/23/17 | 0 | 0 | 0 | 0 | 0 | 0 | 3,375 | 2,922 | 438 | 6,735 |
| 01/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,060 | 1,194 | 3,254 |
| 01/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,118 | 2,118 |
| 01/27/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 260 | 260 |
| 01/29/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 95 | 48 | 143 |
| 01/30/17 | 0 | 0 | 0 | 0 | 0 | 0 | 291 | 268 | 1,366 | 1,925 |
| 01/31/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 239 | 239 |
| 02/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 02/03/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 424 | 424 |
| 02/06/17 | 0 | 0 | 0 | 0 | 0 | 0 | 391 | 408 | 421 | 1,220 |
| 02/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 286 | 286 |
| 02/08/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 37 | 37 |
| 02/09/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 02/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 437 | 437 |
| 02/13/17 | 0 | 0 | 0 | 0 | 0 | 0 | 417 | 427 | 427 | 1,271 |
| 02/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 210 | 211 |
| 02/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 | 22 |
| 02/17/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 412 | 412 |
| 02/18/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 304 | 304 |
| 02/19/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 98 | 103 |
| 02/21/17 | 0 | 0 | 0 | 0 | 0 | 64 | 233 | 405 | 278 | 980 |
| 02/22/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 12 |
| 02/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,495 | 2,495 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/27/17 | 0 | 0 | 0 | 0 | 0 | 0 | 4,111 | 4,269 | 323 | 8,703 |
| 02/28/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,525 | 2,805 | 5,330 |
| 03/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 29 |
| 03/03/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,900 | 2,900 |
| 03/06/17 | 0 | 0 | 0 | 0 | 0 | 0 | 2,843 | 314 | 219 | 3,376 |
| 03/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 136 | 136 |
| 03/08/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 77 | 77 |
| 03/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| 03/13/17 | 0 | 0 | 0 | 0 | 0 | 0 | 281 | 322 | 2,724 | 3,327 |
| 03/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,111 | 2,111 |
| 03/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 142 | 142 |
| 03/17/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,998 | 1,998 |
| 03/20/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,703 | 2,692 | 1,889 | 6,284 |
| 03/21/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 253 | 253 |
| 03/22/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 78 | 78 |
| 03/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,838 | 1,838 |
| 03/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,116 | 3,116 |
| 03/26/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 3,019 | 3,024 |
| 03/27/17 | 0 | 0 | 0 | 0 | 0 | 0 | 282 | 318 | 1,753 | 2,353 |
| 03/28/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 273 | 273 |
| 03/29/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 152 | 152 |
| 03/31/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 240 | 240 |
| 04/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| 04/03/17 | 0 | 0 | 0 | 1 | 0 | 0 | 320 | 284 | 318 | 923 |
| 04/04/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,913 | 1,913 |
| 04/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 243 | 243 |
| 04/09/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,579 | 550 | 2,129 |

33

| 04/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,474 | 972 | 1,605 | 4,051 |
| 04/11/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 187 | 187 |
| 04/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 106 | 106 |
| 04/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 7 |
| 04/17/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,696 | 3,040 | 273 | 5,009 |
| 04/18/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 138 | 138 |
| 04/21/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 254 | 254 |
| 04/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 314 | 204 | 291 | 809 |
| 04/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 138 | 138 |
| 04/27/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| 04/28/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 259 | 259 |
| 04/29/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 |
| 05/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 2,010 | 3,269 | 242 | 5,521 |
| 05/02/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,033 | 2,429 | 5,462 |
| 05/03/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 05/04/17 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 05/05/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 248 | 248 |
| 05/08/17 | 0 | 0 | 0 | 0 | 0 | 0 | 248 | 354 | 322 | 924 |
| 05/09/17 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 194 | 195 |
| 05/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 05/12/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 248 | 248 |
| 05/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,177 | 116 | 1,437 | 2,730 |
| 05/16/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,746 | 2,746 |
| 05/18/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 05/19/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 255 | 255 |
| 05/21/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 1 | 16 |
| 05/22/17 | 0 | 0 | 0 | 0 | 0 | 0 | 298 | 292 | 293 | 883 |

34

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 05/23/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 184 | 185 |
| 05/24/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,277 | 1,277 |
| 05/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 40 |
| 05/26/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,486 | 2,486 |
| 05/30/17 | 0 | 0 | 0 | 0 | 0 | 845 | 905 | 3,414 | 55 | 5,219 |
| 05/31/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,110 | 5,110 |
| 06/01/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 103 | 103 |
| 06/02/17 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 246 | 247 |
| 06/05/17 | 0 | 0 | 0 | 0 | 0 | 0 | 847 | 2,434 | 4,398 | 7,679 |
| 06/06/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,040 | 1,040 |
| 06/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,067 | 5,888 | 9,955 |
| 06/08/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 100 |
| 06/09/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 235 | 235 |
| 06/12/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,794 | 3,486 | 459 | 5,739 |
| 06/13/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,356 | 2,965 | 4,321 |
| 06/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,934 | 1,934 |
| 06/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 97 | 97 |
| 06/16/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 984 | 984 |
| 06/19/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 1,309 | 3,427 | 5,736 |
| 06/20/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,195 | 2,195 |
| 06/21/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,878 | 2,878 |
| 06/22/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 93 | 93 |
| 06/23/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 212 | 212 |
| 06/25/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 381 | 6,720 | 7,101 |
| 06/26/17 | 0 | 0 | 0 | 0 | 0 | 0 | 392 | 266 | 5,180 | 5,838 |
| 06/30/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 230 | 230 |
| 07/03/17 | 0 | 0 | 0 | 0 | 0 | 0 | 4,538 | 4,111 | 3,709 | 12,358 |

35

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/05/17 | 0 | 0 | 0 | 0 | 7 | 0 | 1,535 | 0 | 228 | 1,770 |
| 07/06/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 64 | 64 |
| 07/07/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,186 | 1,186 |
| 07/10/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1,757 | 1,885 | 1,142 | 4,784 |
| 07/11/17 | 0 | 0 | 0 | 0 | 3 | 0 | 6 | 0 | 1,250 | 1,259 |
| 07/12/17 | 0 | 0 | 0 | 0 | 3 | 11 | 1 | 2 | 1,535 | 1,552 |
| 07/13/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 119 | 119 |
| 07/14/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 201 | 201 |
| 07/15/17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,901 | 1,901 |
| **Total** | 1 | 1 | 1 | 1 | 13 | 920 | 34,239 | 52,906 | 112,496 | 200,578 |

Dated: October 16, 2017          Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

/s/ *Brad P. Rosenberg*
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
KATE BAILEY (MD Bar #1601270001)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530

36

Tel.: (202) 514-3374
Fax: (202) 616-8460
Email: brad.rosenberg@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
Tel: (718) 254-6288
Fax: (718) 254-7489
Email: joseph.marutollo@usdoj.gov

*Counsel for Defendants*

37

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 16, 2017, I caused to be served the

foregoing DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS'

FIRST SET OF INTERROGATORIES TO DEFENDANTS via e-mail upon:

| | |
|---|---|
| Lourdes Rosado | lourdes.rosado@ag.ny.gov |
| Diane Lucas | diane.lucas@ag.ny.gov |
| Abigail Taylor | abigail.taylor@state.ma.us |
| Genevieve Nadeau | Genevieve.Nadeau@MassMail.State.MA.US |
| Colleen Melody | ColleenM1@ATG.WA.GOV |
| Marsha Chien | MarshaC@ATG.WA.GOV |
| Jerome Frank Legal Servs. Org. | BatallaVidal_LSO@mailman.yale.edu |
| Batalla | Batalla@nilc.org |
| Amy Taylor | amy.taylor@maketheroadny.org |
| Scott Foletta | scott.foletta@maketheroadny.org |
| Alexa Schapira | Alexia.Schapira@maketheroadny.org |
| Justin Cox | cox@nilc.org |

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG

## **VERIFICATION**

Based on information that I obtained in the course of my official USCIS duties, I declare under penalty of perjury that the substance of the USCIS narrative responses to these Interrogatories are true and correct.

DATE: _October 16, 2017_    SIGNATURE: _James W. McCament_

# VERIFICATION

I, Scott Krause, am the Executive Secretary of the United States Department of Homeland Security (DHS). Based on information that I obtained in the course of my official DHS duties, I declare under penalty of perjury that the substance of the DHS Headquarters narrative responses to these Interrogatories are true and correct.

Executed on October 16, 2017

_Scott Krause_

Scott Krause

**United States District Court**
For the Northern District of California

1

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7               FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   THE REGENTS OF THE UNIVERSITY OF
     CALIFORNIA and JANET NAPOLITANO,
11   in her official capacity as President of the          No. C 17-05211 WHA
     University of California,                              No. C 17-05235 WHA
12                                                          No. C 17-05329 WHA
                      Plaintiffs,                           No. C 17-05380 WHA
13
14        v.

15   UNITED STATES DEPARTMENT OF                            **ORDER RE MOTION**
     HOMELAND SECURITY and ELAINE                           **TO COMPLETE**
16   DUKE, in her official capacity as Acting               **ADMINISTRATIVE RECORD**
     Secretary of the Department of Homeland
17   Security,

18                    Defendants.
                                                    /
19

20                          **INTRODUCTION**

21        Under the Administrative Procedure Act, plaintiffs seek to compel completion of the

22   administrative record.  Federal defendants oppose.  For the reasons herein, plaintiffs' motion is

23   **GRANTED IN PART** and **DENIED IN PART**.

24                          **STATEMENT**

25        On June 15, 2012, the Secretary of the Department of Homeland Security issued a

26   memorandum promulgating a deferred action policy for those without lawful immigration status

27   who came to the United States as children, were continuous residents in the United States for at

28   least five years, had graduated from high school, obtained a GED, or served in the military, and

**United States District Court**
For the Northern District of California

met certain other criteria — a memorandum and policy known as Deferred Action for Childhood Arrivals, "DACA" for short (Dkt. No. 64-1 at 1–3).[1]

After the change in administrations in 2017, the new Secretary of DHS, John Kelly, announced that DACA would be continued notwithstanding the rescission of other immigration policies (*id.* at 230). This was done despite, and with the knowledge of, the decision of the Court of Appeals for the Fifth Circuit in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), invalidating a different deferred action policy and the Supreme Court's affirmance of that decision by an equally divided vote, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

On September 5, 2017, however, the Acting Secretary of DHS, Elaine Duke, reversed the agency's position and announced DACA's end, effective March 5, 2018.

We now have five lawsuits in this district challenging that rescission.[2] Each action is proceeding on a parallel track and on the same schedule, which schedule was designed to reach a decision on the merits and to allow appellate review by the March 5 deadline.[3]

Pursuant to the scheduling order, the federal defendants filed the administrative record on October 6. It consisted of fourteen documents spanning 256 pages, each of which was already available to the public, and had, in fact, already been filed in this action (Dkt. No. 49 ¶ 3; Dkt. No. 64-1).

In unison, plaintiffs now move to require completion of the administrative record in accordance with Section 706 of Title 5 of the United States Code. They argue that the current record is incomplete because it contains only documents personally considered by the Acting Secretary (and then only some considered by her) and excludes any and all other documents that indirectly led to the rescission.

---

[1]   All docket numbers herein refer to the docket in Case No. C 17-05211 WHA.

[2]   There are two additional DACA lawsuits proceeding in the Eastern District of New York before Judge Nicholas Garaufis, *State of New York v. Trump*, Case No. 17-cv-05228 NGG, and *Vidal v. Baran*, Case No. 16-cv-04756 NGG.

[3]   The fifth lawsuit, *County of Santa Clara v. Trump*, Case No. 17-cv-05813 HRL, was related after plaintiffs' motion was fully briefed and argued.

2

The federal defendants oppose, arguing that they have already filed a complete administrative record, which they contend is properly limited to unprivileged documents actually considered by the "decision-maker," here, the Acting Secretary (Opp. at 8–9).

This order follows full briefing and oral argument and the Court's review of all materials *in camera* that appeared on the government's privilege log.

**ANALYSIS**

1.     SCOPE OF THE ADMINISTRATIVE RECORD.

Section 706 of the APA provides that judicial review of agency action shall be based on "the whole record." The administrative record "is not necessarily those documents that the agency has compiled and submitted as the administrative record" but rather "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555–56 (9th Cir. 1989). This includes not only documents that "literally pass[ed] before the eyes of the final agency decision maker" but also documents that were considered and relied upon by subordinates who provided recommendations to the decision-maker. *People of State of Cal. ex rel. Lockyer v. United States Dep't of Agriculture*, Nos. C05-3508 & C05-4038, 2006 WL 708914, at *2 (N.D. Cal. Mar. 16, 2006) (Magistrate Judge Elizabeth Laporte) (internal citations and quotations omitted); *see also Amfac Resorts, L.L.C. v. United States Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (Judge Royce Lamberth).

The requirement that a reviewing court consider "the whole record" before rendering a decision "ensures that neither party is withholding evidence unfavorable to its position and that the agencies are not taking advantage of post hoc rationalizations for administrative decisions. *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

While it is presumed that the administrative record submitted by defendants is complete, plaintiffs can rebut this presumption with "clear evidence to the contrary." *Cook Inletkeeper v. EPA*, 400 F. App'x 239, 240 (9th Cir. 2010) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)).

1    Defendants contend a showing of bad faith or impropriety is required in order to compel

2 a complete production of the administrative record.  This is incorrect.  True, bad faith is one

3 basis for requiring supplementation of an administrative record, but it is not the exclusive basis.

4 Our court of appeals has repeatedly recognized other grounds for requiring supplementation,

5 including where it appears the "agency relied on documents not [already] included in the

6 record."  *Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982)*; Fence Creek*

7 *Cattle Co. v. United States Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010); *see also Lands*

8 *Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

9    The "bad faith" standard of *Overton Park* applies where, though an administrative

10 record exists, plaintiffs ask to go beyond the record that was before the agency and inquire into

11 the thought processes of decision-makers — in *Overton Park*, by taking the testimony of

12 agency officials.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)

13 *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

14    Our plaintiffs are not seeking materials beyond what were already considered, directly

15 or indirectly, by the decision-maker, and therefore need not show bad faith.  Supplementation

16 is appropriate if they show, by clear evidence, that the agency relied on materials not already

17 included in the record.  *See Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d

18 1534, 1548 (9th Cir. 1993) (distinguishing between materials "never presented to the agency"

19 and materials that were "allegedly [] before the agency"); *Fence Creek Cattle Co.*, 602 F.3d at

20 1131.

21    Nor is defendants' contention that it need only produce documents directly considered

22 by the Acting Secretary correct.  Documents reviewed by subordinates, or other agencies

23 who informed her on the issues underlying the decision to rescind DACA, either verbally or

24 in writing, should be in the administrative record.  *See Lockyer*, 2006 WL 708914, at *2.

25 The threshold question is whether plaintiffs have shown, by clear evidence, that the record

Case 17-3345, Document 55-2, 11/06/2017, 2165308, Page 239 of 256

1    defendants produced is missing documents that were considered, directly or indirectly, by DHS

2    in deciding to rescind DACA.[4]

3       **2.    PLAINTIFFS' SHOWING OF INCOMPLETENESS.**

4       Here, the tendered administrative record consists merely of fourteen documents

5    spanning 258 pages, which defendants contend constitute the entire record considered in

6    making the decision to rescind DACA. These are plainly pertinent materials, although all were

7    publicly known and already part of the pleadings herein.

8       Plaintiffs seek additional materials including emails, departmental memoranda, policy

9    directives, meeting minutes, materials considered by Secretary Duke's subordinates,

10   communications from White House officials or staff, communications from the Department of

11   Justice, and communications between DHS and state authorities, which they contend should

12   necessarily be part of the administrative record (Br. at 9–10).

13      Plaintiffs drew this list, in part, from a United States Department of Justice Guidance,

14   which sets forth non-binding recommendations for how to compile an administrative record and

15   what to include. United States Dep't of Justice, Env't and Nat. Res. Div., Guidance to Federal

16   Agencies on Compiling the Administrative Record (Jan. 1999). Specifically, the Guidance

17   states that the administrative record should "[i]nclude all documents and materials prepared,

18   reviewed, or received by agency personnel and used by or available to the decision-maker,

19   even though the final decision-maker did not actually review or know about the documents

20   and materials." *Id.* at 3. It further provides that the record should include "communications

21   the agency received from other agencies . . . documents and materials that support *or* oppose

22   the challenged agency decision . . . minutes of meetings or transcripts thereof . . . [and]

---

25      [4] Defendants also argue that they should not be required to produce any administrative record
26   whatsoever because the Department of Homeland Security's decision to end DACA was an exercise of
     prosecutorial discretion not subject to judicial review (Opp. at 1). Earlier in these actions, our defendants
27   agreed to produce the administrative record by October 6, and were then ordered to do so. They may not now
     renege on that commitment. At this stage, defendants are required to produce an administrative record. Should
28   they prevail on this argument on their eventual motion to dismiss, it will be with the benefit of a proper
     administrative record.

United States District Court
For the Northern District of California

5

United States District Court

For the Northern District of California

1    memorializations of telephone conversations and meetings, such as memorandum or

2    handwritten notes."[5]

3          Plaintiffs contend that communications from DOJ and the White House are a critical

4    part of "the whole record" due to their significant public participation in the process of

5    rescinding DACA.  Plaintiffs first point to Attorney General Sessions' September 4 letter,

6    which DHS expressly relied upon in its memorandum terminating the program (*see* Dkt. No.

7    64-1 at 251, 255).  Despite this critical and publicly disclosed role in the decision, the only DOJ

8    document defendants include in the record is this one-page September 4 letter.  This, plaintiffs

9    contend, is clear evidence that defendants omitted documents supporting (or contradicting) the

10   opinions set forth in Attorney General Sessions' letter, in particular the opinion that DACA was

11   unlawfully implemented.

12         Additionally, the White House has repeatedly emphasized the President's direct role

13   in decisions concerning DACA.  For example, a September 5 White House press release

14   announced "President Donald J. Trump Restores Responsibility and the Rule of Law to

15   Immigration" by rescinding DACA, and repeatedly stated that "President Trump" had acted to

16   end the program.   Press Release, The White House Office of the Press Secretary, President

17   Donald J. Trump Restores Responsibility and the Rule of Law to Immigration (Sept. 5, 2017),

18   https://www.whitehouse.gov/thepress-office/2017/09/05/president-donald-j-trump-restores-

19   responsibility-and-rule-law.  Other articles likewise emphasize White House officials' roles

20   in decision-making regarding DACA.  *See, e.g.*, Michael D. Shear & Julie Hirschfeld Davis,

21   Trump Moves to End DACA and Calls on Congress to Act, *New York Times* (Sept. 5, 2017).

22   Moreover, defendants concede in their response that Secretary Duke "received advice from

23   other members of the executive branch" in making her decision (Opp. at 17) and refer to "White

24   House memorandum" in their privilege log (Dkt. No. 71-2).  And at oral argument, counsel for

25

26         [5] A 2008 DOJ memorandum specifically notes that the 1999 Guidance is a non-binding internal
     document, which does not "limit the otherwise lawful prerogatives of the Department of Justice or any other
27   federal agency" (Dkt. No. 71-1 at 3).  In particular, the 2008 memorandum takes issue with outside parties' use
     of the Guidance in litigation to advocate for a particular composition of the administrative record or process for
28   its assembly (*ibid.*).  Recognizing that the 1999 Guidance is not binding upon agencies, this order finds that the
     Guidance nevertheless provides helpful insight into the types of documents and materials an agency should
     consider when assembling an administrative record.

Case 17-3345, Document 55-2, 11/06/2017, 2165388, Page 241 of 256

1    defendants said it was likely Secretary Duke had received verbal input before making her

2    decision.  Despite this, defendants have failed to provide even a single document from any

3    White House officials or staff.

4         Plaintiffs further observe that not a single document from one of Secretary Dukes'

5    subordinates is in the record.  It strains credulity to suggest that the Acting Secretary of DHS

6    decided to rescind a program covering 800,000 enrollees without consulting one advisor or

7    subordinate within DHS.  Again, at oral argument, government counsel represented that she

8    had likely received verbal input.  The government's *in camera* submission confirms that she

9    did receive substantial DACA input.

10        Finally, former DHS Secretary John Kelly issued a memorandum in February 2017,

11   in which he rescinded all DHS memoranda that conflicted with newly stated immigration

12   enforcement policies — *but expressly declined to rescind DACA*  (Dkt. No. 64-1 at 229–30).

13   This decision, of course, is directly contrary to that taken by Acting Secretary Duke seven

14   months later.  The administrative record, however, omits all materials explaining the change

15   in position from February to September, with two exceptions — (1) a June 29 letter from Ken

16   Paxton, the Attorney General of Texas, to Attorney General Sessions, in which he threatens

17   to amend the suit challenging DAPA to also challenge DACA if it is not rescinded by

18   September 5, and (2) Attorney General Sessions' September 4 letter to Secretary Duke

19   expressing the opinion that DHS should rescind DACA.  Reasoned agency decision-making

20   ordinarily "demand[s] that [the agency] display awareness that it is changing position" and

21   "show that there are good reasons for the new policy."  *F.C.C. v. Fox Television Stations, Inc.*,

22   556 U.S. 502, 515 (2009).  Accordingly, "the whole record" would ordinarily contain materials

23   giving a "reasoned explanation . . . for disregarding the facts and circumstances that underlay or

24   were engendered by the prior policy."  *Ibid*.  It is simply not plausible that DHS reversed policy

25   between February and September because of one threatened lawsuit (never actually filed)

26   without having generated any materials analyzing the lawsuit or other factors militating in favor

27   of and against the switch in policy.

28

**United States District Court**
For the Northern District of California

7

United States District Court

For the Northern District of California

1   Based on the foregoing, plaintiffs have clearly shown that defendants excluded highly

2   relevant materials from the administrative record and in doing so have rebutted the presumption

3   that the record is complete.

4   Defendants' argument to the contrary is unpersuasive.  Their position that only selected

5   documents that Acting Secretary Duke personally reviewed need be part of the administrative

6   record must yield to legal authority requiring both directly and *indirectly* considered documents

7   be included in the record, *see, e.g.*, *Thompson*, 885 F.2d at 555–56, and by public statements

8   illustrating both DOJ and the White House's direct involvement in the decision to rescind

9   DACA.  The rule that government counsel advocates would allow agencies to contrive a record

10  that suppresses information actually considered by decision-makers and by those making

11  recommendations to the decision-makers, information that might undercut the claimed rationale

12  for the decision.

13  As stated, privilege log entries reveal several documents that were considered in arriving

14  at the decision to rescind DACA.  For example, at least seven entries refer to commentary in

15  media articles regarding DACA.  At oral argument, government counsel admitted that the

16  Acting Secretary had seen several media items on the issue.  There were not, however, any

17  media articles on DACA in the administrative record, but those that came to the Acting

18  Secretary should, of course, be included.[6]

19  Here, plaintiffs have rebutted the presumption of completeness.  It is evident that Acting

20  Secretary Duke considered information directly, or indirectly, through the advice of other

21  agencies and others within her own agency.  These documents, as set forth in detail below,

22  should be made part of the administrative record and must be produced by defendants in an

23  amended administrative record by **NOON ON OCTOBER 27**.

24

25  [6] Many documents were evidently excluded in their entirety based on an assertion of "deliberative-process" privilege.  Any "[f]actual portions of documents covered by the deliberative process privilege, [however], must be segregated and disclosed unless they are so interwoven with the deliberative material" that

26  they are not segregable.  *See Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir 2008) (citations and quotations omitted).  Accordingly, to the extent that media articles or other non-privileged factual materials

27  were considered, they should have been included in the administrative record, and shall be filed as part of the amended administrative record, even if passages are redacted as deliberative, and called out as such in the

28  privilege log.

### 3.   WAIVER OF ATTORNEY-CLIENT PRIVILEGE.

Plaintiffs next argue that defendants have waived attorney-client privilege because they have put their attorneys' legal opinions at issue by arguing that the rescission was required due to concerns over DACA's legality (Br. at 15–16).  Indeed, one of DHS's primary rationales for rescinding DACA was its purported illegality (*see* Dkt. No. 64-1 at 253–56 (Rescission Memorandum)).

Parties are not permitted to advance conclusions that favor their position in litigation, and at the same time shield the information that led to those conclusions from discovery. *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).  Put differently, "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield."  *Ibid*.  Where a party raises a claim, which in fairness to its adversary requires it to reveal the information or communication that claim is predicated upon, it has implicitly waived any privilege over that communication.

Here, defendants argue that DHS had to rescind DACA because it exceeded the lawful authority of the agency.  They cannot, therefore, simultaneously refuse to disclose the legal research that led to that conclusion.  Defendants indeed, have included the September 4 legal opinion of the Attorney General, pithy as it may be — yet they seek to conceal all other legal analysis available to the Acting Secretary and to the Attorney General.

Significantly, defendants slide into a backup argument that the agency's legal worry was "reasonable" even if wrong.  If this backup argument comes into play (as government counsel posits) then the "reasonableness" of taking an incorrect legal position would heavily turn on the underlying legal analysis so far withheld from view.   In other words, assessing the reasonableness of the Secretary's legal rationale would turn, in part, on how consistent the analysis has been in the runup to the rescission.

Defendants' arguments to the contrary are unavailing.  They first argue, without citation to any legal authority, that "[w]ere plaintiffs' argument accepted, the government would be deemed to have waived all privileges any time an assessment of the legal landscape informed an agency's decisionsmaking" (Opp. at 21).  This argument vastly exaggerates plaintiffs' position,

9

1   and misrepresents the position defendants have staked out in this litigation.  DHS specifically

2   relied upon DOJ's assessment that DACA "was effectuated . . . without proper statutory

3   authority," "was an unconstitutional exercise of authority by the Executive Branch" and "has

4   the same legal and constitutional defects that courts recognized as to DAPA" (Dkt. No. 64-1 at

5   254).  Plaintiffs are entitled to challenge whether this was a reasonable legal position and thus a

6   reasonable basis for rescission.  In making that challenge, plaintiffs are entitled to review the

7   internal analyses that led up to this change in position.

8         Defendants further argue that the decisions cited by plaintiffs are inapplicable because

9   they arose in different contexts than the present action.  True, the decisions plaintiffs cite did

10  not arise in identical circumstances.  *E.g. Chevron Corp.*, 974 F.2d at 1162 (defendant

11  prohibited from relying on legal opinion that tax position was reasonable while refusing to

12  disclose the attorney communications leading to that conclusion).  They still, however, stand for

13  the widely-accepted proposition that it is unfair for a litigant to defend his action with a

14  selective disclosure of evidence.  This principle carries no less force here.

15        In the related context of FOIA, the Court of Appeals for the Second Circuit held that

16  "the attorney-client privilege may not be invoked to protect a document adopted as, or

17  incorporated by reference into an agency's policy."  *Nat'l Council of La Raza v. Dep't of*

18  *Justice*, 411 F.3d 350, 360 (2d Cir. 2005).  There, DOJ invoked the reasoning of an OLC

19  memorandum to justify its new position on an immigration issue.  *Id.* at 357.  The court held

20  that the agency's "view that it may adopt a legal position while shielding from public view the

21  analysis that yielded that position is offensive to FOIA."  *Id.* at 360.  So too here.

22        Defendants have waived attorney-client privilege over any materials that bore on

23  whether or not DACA was an unlawful exercise of executive power and therefore should be

24  rescinded.

25       **4.**    **DELIBERATIVE-PROCESS PRIVILEGE BALANCING.**

26        Defendants further assert the deliberative-process privilege over many documents.

27        The deliberative-process privilege, however, is qualified and will yield when the need

28  for materials and accurate fact-finding "override the government's interest in non-disclosure."

United States District Court
For the Northern District of California

1   *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).  "Among factors to

2   be considered in making this determination are:  (1) the relevance of the evidence; (2) the

3   availability of other evidence; (3) the government's role in the litigation; and (4) the extent to

4   which disclosure would hinder frank and independent discussion regarding contemplated

5   policies and decisions."  *Ibid*.

6          As set forth below, the judge has personally reviewed *in camera* all materials on the

7   privilege log and applied the foregoing test to each document for which the deliberative-process

8   privilege is claimed.[7]

9          **5.      PRIVILEGE LOG REQUIREMENT.**

10          While defendants did not file a privilege log with their original production, they have

11   since, pursuant to order, filed a privilege log claiming attorney-client or deliberative-process

12   privilege over 84 documents considered by Secretary Duke but not included in the

13   administrative record (Dkt. Nos. 67; 71-2).  Nevertheless, defendants argue that privilege logs

14   are not generally required in connection with an administrative record and that one should not

15   be required here.

16          Our court of appeals has not spoken on the issue.  Every court in this district

17   considering the issue, however, has required administrative agencies to provide a privilege log.

18   *See, e.g.*, *Ctr. for Food Safety v. Vilsack*, No. 15CV01590HSGKAW, 2017 WL 1709318, at *5

19   (N.D. Cal. May 3, 2017) (Magistrate Judge Kandis Westmore) ("[C]ourts in this district have

20   required parties withholding documents on the basis of the deliberative process privilege to, at a

21   minimum, substantiate those claims in a privilege log."); *Inst. for Fisheries Res. v. Burwell*, No.

22   16-CV-01574-VC, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017) (Judge Vince Chhabria);

23   *Lockyer*, 2006 WL 708914, at *4.

24

25

26

27          ───────────

          [7]  Although not addressed in the brief or at oral argument, the privilege log referenced personal privacy

28   and executive privilege objections for certain documents.  No substantial privacy interest is implicated in any of
the documents ordered to be produced below, nor do any of these documents fall within the executive privilege.

1  "If a privilege applies, the proper strategy isn't pretending the protected material wasn't

2  considered, but withholding or redacting the protected material and then logging the privilege."

3  *Inst. for Fisheries Res.*, 2017 WL 89002 at *1.[8]

4  Courts outside this district that have determined no privilege log was required have done

5  so on the grounds that the defendants' judgment of what constitutes the administrative record is

6  entitled to a presumption of correctness. *See San Luis & Delta-Mendota Water Auth. v. Jewell*,

7  No. 115CV01290LJOGSA, 2016 WL 3543203, at *19 (E.D. Cal. June 23, 2016) (Judge

8  Lawrence O'Neill); *Nat'l Ass'n of Chain Drug Stores v. United States Dep't of Health &*

9  *Human Servs.*, 631 F. Supp. 2d 23, 27 (D.D.C. 2009).  Here, however, that presumption has

10 been overcome by plaintiffs' showing that defendants failed to include documents considered in

11 arriving at the final decision to rescind DACA in the administrative record.  Therefore, even

12 applying those courts' logic, a privilege log would still be appropriate here.

13 Going forward, defendants shall comply with the standing order in this case and provide

14 a privilege log for all documents withheld on grounds of privilege, which log shall include all

15 authors and recipients of privileged documents, as well as other information set forth in the rule

16 (*see* Dkt. No. 23 ¶ 18).

17 **RELIEF ORDERED**

18 Plaintiffs' motion to complete the administrative record is **GRANTED** to the extent now

19 stated.  Defendants are directed to complete the administrative record by adding to it all emails,

20 letters, memoranda, notes, media items, opinions and other materials directly or indirectly

21 considered in the final agency decision to rescind DACA, to the following extent:  (1) all

22 materials actually seen or considered, however briefly, by Acting Secretary Duke in connection

23 with the potential or actual decision to rescind DACA (except as stated in the next paragraph

24 below), (2) all DACA-related materials considered by persons (anywhere in the government)

25 who thereafter provided Acting Secretary Duke with written advice or input regarding the

26

27 [8]  In a memorandum opinion, our court of appeals denied a plaintiff's request to require a privilege log. *See Cook Inletkeeper v. EPA*, 400 F. App'x 239, 240 (2010).  In that decision, however, our court of appeals

28 first denied a motion to supplement the record, and finding that the plaintiffs had not presented evidence that the agency had considered the documents the plaintiffs sought to compel, only then denied the accompanying motion for preparation of a privilege log without further explanation.

United States District Court
For the Northern District of California

1   actual or potential rescission of DACA, (3) all DACA-related materials considered by persons

2   (anywhere in the government) who thereafter provided Acting Secretary Duke with verbal input

3   regarding the actual or potential rescission of DACA, (4) all comments and questions

4   propounded by Acting Secretary Duke to advisors or subordinates or others regarding the actual

5   or potential rescission of DACA and their responses, and (5) all materials directly or indirectly

6   considered by former Secretary of DHS John Kelly leading to his February 2017 memorandum

7   not to rescind DACA.

8           The undersigned judge has balanced the deliberative-process privilege factors and

9   determined *in camera* that the following materials from the government's *in camera*

10   submission, listed by tab number, shall be included in the administrative record: 1–6, 7 (only

11   the header and material on pages 3–4 concerning DACA), 12, 14, 17–25, 27–30, 36, 39, 44, 47,

12   49 (only the first paragraph, and the paragraph captioned "General"), 69–70, 73–74, 77, 79, 81,

13   84. The remainder of the *in camera* submission need not be included.

14           If the government redacts or withholds any material based on deliberative-process, or

15   any other privilege in its next filing, it shall simultaneously lodge full copies of all such

16   materials, indicating by highlighting (or otherwise) the redactions and withholdings together

17   with a log justification for each. The judge will review and rule on each item.

18           Plaintiffs' insistence that defendants scour the Department of Justice and the White

19   House for documents for inclusion in the administrative record is overruled except to the

20   limited extent that DOJ or White House personnel fall within the category described in the first

21   paragraph above as someone who gave verbal or written input to the Acting Secretary. Nor do

22   defendants have to search for DACA materials below the agency levels indicated in the first

23   paragraph above. These are intended as practical limits on what would otherwise be a bone-

24   crushing expedition to locate needles in haystacks.

25           This order, however, is not intended to limit the scope of discovery (as opposed to the

26   scope of the administrative record). The scope of discovery over and above the administrative

27   record continues to be managed by Magistrate Judge Sallie Kim.

28

United States District Court

For the Northern District of California

1    The federal defendants shall file an amended administrative record in conformity with

2  this order by **NOON ON OCTOBER 27**.

3    If any party plans to seek a writ of mandate and wants a stay pending appellate review,

4  then a fresh motion to that effect must be made very promptly.

5

6    **IT IS SO ORDERED.**

7

8  Dated: October 17, 2017.

9    WILLIAM ALSUP
     UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

U.S. Citizenship and Immigration Services

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status**
**Fiscal Year 2012-2017 (June 30)**

| Period | Intake[1] | | | | Biometrics[6] | | Case Review[9] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Biometrics Scheduled[7] | Requests Under Review[8] | Approved[10] | Denied[11] | Pending[12] |
|---|---|---|---|---|---|---|---|---|---|
| **Fiscal Year - Total[B]** | | | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 124,055 | 38,024 | 1,681 | - | 150,750 |
| 2013 | 427,616 | 16,351 | 443,967 | 1,697 | 445,013 | 77,747 | 470,354 | 10,972 | 97,040 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 209,670 | 101,568 | 158,336 | 20,991 | 156,613 |
| 2014 Initial | 122,424 | 19,127 | 141,551 | 488 | | | 136,101 | 20,988 | 62,375 |
| 2014 Renewal | 116,476 | 5,760 | 122,236 | 464 | | | 22,235 | D | 94,238 |
| 2015 | 448,856 | 35,474 | 484,330 | 1,781 | 525,499 | 48,355 | 510,118 | 21,351 | 74,000 |
| 2015 Initial | 85,304 | 7,477 | 92,781 | 338 | | | 90,667 | 19,068 | 37,944 |
| 2015 Renewal | 363,552 | 27,997 | 391,549 | 1,443 | | | 419,451 | 2,283 | 36,056 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 68,140 | | 198,827 | 14,448 | 121,426 |
| 2016 Initial | 73,383 | 1,204 | 74,587 | 291 | | | 52,863 | 11,399 | 47,065 |
| 2016 Renewal | 187,318 | 11,113 | 198,431 | 744 | | | 145,964 | 3,049 | 74,361 |
| 2017 | 337,544 | 31,985 | 369,529 | 1,795 | | | 349,284 | 10,609 | 99,077 |
| 2017 Initial | 36,447 | 31 | 36,478 | 194 | | | 41,360 | 7,854 | 34,298 |
| 2017 Renewal | 301,097 | 31,954 | 333,051 | 1,602 | | | 307,924 | 2,755 | 64,779 |
| Total Cumulative | 1,866,048 | 126,409 | 1,992,457 | 1,509 | 1,372,377 | | 1,688,600 | 74,997 | 99,077 |
| Total Cumulative Initial | 897,605 | 49,585 | 947,190 | 726 | | | 793,026 | 67,867 | 34,298 |
| Total Cumulative Renewal | 968,443 | 76,824 | 1,045,267 | 783 | - | | 895,574 | 7,130 | 64,779 |
| **Fiscal Year 2017 by Quarter[13]** | | | | | | | | | |
| Q1. October - December | 110,189 | 4,138 | 114,327 | 1,777 | | | 121,973 | 2,733 | 106,909 |
| Q1. October - December Initial | 15,325 | 15 | 15,340 | 247 | | | 18,258 | 2,097 | 42,035 |
| Q1. October - December Renewal | 94,864 | 4,123 | 98,987 | 1,530 | | | 103,715 | 636 | 64,874 |
| Q2. January - March | 132,783 | 19,267 | 152,050 | 2,108 | | | 124,743 | 4,145 | 110,804 |
| Q2. January - March Initial | 10,321 | 8 | 10,329 | 164 | | | 17,242 | 3,029 | 32,085 |
| Q2. January - March Renewal | 122,462 | 19,259 | 141,721 | 1,944 | | | 107,501 | 1,116 | 78,719 |
| Q3. April - June | 94,572 | 8,580 | 103,152 | 1,501 | | | 102,658 | 3,731 | 99,077 |
| Q3. April - June Initial | 10,801 | 8 | 10,809 | 171 | | | 5,860 | 2,728 | 34,298 |
| Q3. April - June Renewal | 83,771 | 8,572 | 92,343 | 1,330 | | | 96,708 | 1,003 | 64,779 |
| Q4. July - September | | | | | | | | | |
| Q4. July - September Initial | | | | | | | | | |
| Q4. July - September Renewal | | | | | | | | | |

D - Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.
    Each request is considered on a case-by-case basis.
    See http://www.uscis.gov/childhoodarrivals.

[2] The number of requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] Refers to capture of requestors' biometrics.

[7] The number of appointments scheduled to capture requestors' biometrics during the reporting period.

[8] Refers to consideration of deferring action on a case-by-case basis during the reporting period.

[9] The number of new requests received and entered into a case-tracking system during the reporting period.

[10] The number of requests approved during the reporting period.

[11] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[12] The number of requests awaiting a decision as of the end of the reporting period.

[13] Data on biometrics scheduled is not available past January 31, 2016. Totals reflect up to January 31, 2016.

NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.
      2. The report reflects the most up-to-date estimate available at the time the report is generated.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), June 30th, 2017

**U.S. Citizenship and Immigration Services**

**Number of Form I-821D,Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (June 30)**

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Mexico | 697,717 | 756,511 | 1,454,228 | 622,743 | 699,128 | 1,321,871 |
| El Salvador | 34,102 | 36,745 | 70,847 | 28,571 | 33,998 | 62,569 |
| Guatemala | 24,583 | 23,991 | 48,574 | 20,000 | 21,966 | 41,966 |
| Honduras | 22,383 | 23,230 | 45,613 | 18,385 | 21,149 | 39,534 |
| Peru | 9,775 | 11,794 | 21,569 | 9,102 | 11,128 | 20,230 |
| South Korea | 7,854 | 11,593 | 19,447 | 7,282 | 10,933 | 18,215 |
| Brazil | 8,529 | 8,925 | 17,454 | 7,400 | 8,273 | 15,673 |
| Ecuador | 7,728 | 8,436 | 16,164 | 6,725 | 7,818 | 14,543 |
| Colombia | 7,258 | 8,351 | 15,609 | 6,608 | 7,793 | 14,401 |
| Philippines | 5,088 | 6,156 | 11,244 | 4,674 | 5,888 | 10,562 |
| Argentina | 5,213 | 5,611 | 10,824 | 4,807 | 5,265 | 10,072 |
| India | 3,764 | 4,379 | 8,143 | 3,190 | 4,133 | 7,323 |
| Jamaica | 4,406 | 3,953 | 8,359 | 3,453 | 3,629 | 7,082 |
| Venezuela | 3,466 | 3,835 | 7,301 | 3,104 | 3,576 | 6,680 |
| Dominican Republic | 3,780 | 3,348 | 7,128 | 3,139 | 3,084 | 6,223 |
| Uruguay | 2,603 | 2,648 | 5,251 | 2,374 | 2,486 | 4,860 |
| Unknown | 2,679 | 2,596 | 5,275 | 2,014 | 2,274 | 4,288 |
| Bolivia | 2,224 | 2,685 | 4,909 | 2,069 | 2,513 | 4,582 |
| Costa Rica | 2,279 | 2,554 | 4,833 | 2,057 | 2,382 | 4,439 |
| Tobago | 2,441 | 1,709 | 4,150 | 2,094 | 1,697 | 3,791 |
| Poland | 1,970 | 2,150 | 4,120 | 1,792 | 2,025 | 3,817 |
| Chile | 1,891 | 2,185 | 4,076 | 1,749 | 2,044 | 3,793 |
| Pakistan | 1,937 | 2,156 | 4,093 | 1,690 | 1,993 | 3,683 |
| Nicaragua | 1,885 | 1,897 | 3,782 | 1,584 | 1,744 | 3,328 |
| Guyana | 1,479 | 1,567 | 3,046 | 1,273 | 1,481 | 2,754 |

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| California | 244,316 | 232,584 | 476,900 | 223,749 | 219,055 | 442,804 |
| Texas | 141,736 | 125,832 | 267,568 | 124,774 | 118,646 | 243,420 |
| New York | 50,700 | 69,427 | 120,127 | 42,503 | 62,850 | 105,353 |
| Florida | 40,803 | 56,199 | 97,002 | 33,207 | 50,021 | 83,228 |
| Missing | 15,321 | 82,227 | 97,548 | 8,295 | 71,065 | 79,360 |
| Illinois | 45,986 | 42,013 | 87,999 | 42,537 | 39,702 | 82,239 |
| Arizona | 30,850 | 26,865 | 57,715 | 27,932 | 25,315 | 53,247 |
| New Jersey | 26,143 | 32,315 | 58,458 | 22,227 | 29,277 | 51,504 |
| North Carolina | 29,741 | 24,870 | 54,611 | 27,455 | 23,619 | 51,074 |
| Georgia | 28,852 | 25,379 | 54,231 | 24,234 | 23,733 | 47,967 |
| Washington | 19,786 | 19,142 | 38,928 | 17,937 | 17,906 | 35,843 |
| Colorado | 19,242 | 16,200 | 35,442 | 17,310 | 15,322 | 32,632 |
| Virginia | 14,167 | 16,784 | 30,951 | 12,248 | 15,296 | 27,544 |
| Nevada | 14,235 | 13,391 | 27,626 | 13,116 | 12,695 | 25,811 |
| Maryland | 11,686 | 13,794 | 25,480 | 9,872 | 12,564 | 22,436 |
| Massachusetts | 9,756 | 14,310 | 24,066 | 8,053 | 12,857 | 20,910 |
| Oregon | 12,130 | 10,803 | 22,933 | 11,321 | 10,275 | 21,596 |
| Indiana | 10,789 | 9,081 | 19,870 | 9,869 | 8,645 | 18,514 |
| Utah | 10,565 | 8,376 | 18,941 | 9,732 | 7,951 | 17,683 |
| Pennsylvania | 7,324 | 11,059 | 18,383 | 5,982 | 9,875 | 15,857 |
| Tennessee | 9,374 | 7,957 | 17,331 | 8,373 | 7,518 | 15,891 |
| Michigan | 7,443 | 9,422 | 16,865 | 6,506 | 8,555 | 15,061 |
| Wisconsin | 8,219 | 7,124 | 15,343 | 7,583 | 6,742 | 14,325 |
| Minnesota | 7,006 | 7,689 | 14,695 | 6,283 | 7,023 | 13,306 |
| Oklahoma | 7,533 | 6,574 | 14,107 | 6,888 | 6,229 | 13,117 |
| Kansas | 7,354 | 6,357 | 13,711 | 6,821 | 6,029 | 12,850 |
| New Mexico | 7,449 | 5,953 | 13,402 | 6,838 | 5,622 | 12,460 |
| South Carolina | 7,209 | 6,032 | 13,241 | 6,432 | 5,724 | 12,156 |
| Connecticut | 5,768 | 7,459 | 13,227 | 4,989 | 6,764 | 11,753 |
| Ohio | 5,364 | 6,654 | 12,018 | 4,487 | 5,990 | 10,477 |

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Arkansas | 5,640 | 4,741 | 10,381 | 5,102 | 4,479 | 9,581 |
| Alabama | 4,828 | 4,177 | 9,005 | 4,287 | 3,906 | 8,193 |
| Missouri | 3,945 | 4,187 | 8,132 | 3,549 | 3,847 | 7,396 |
| Nebraska | 3,809 | 3,501 | 7,310 | 3,384 | 3,248 | 6,632 |
| Kentucky | 3,488 | 3,308 | 6,796 | 3,079 | 3,085 | 6,164 |
| Iowa | 3,185 | 3,379 | 6,564 | 2,812 | 3,120 | 5,932 |
| Idaho | 3,405 | 3,053 | 6,458 | 3,143 | 2,878 | 6,021 |
| Louisiana | 2,454 | 2,819 | 5,273 | 2,070 | 2,529 | 4,599 |
| Rhode Island | 1,488 | 2,223 | 3,711 | 1,248 | 2,019 | 3,267 |
| Delaware | 1,621 | 1,698 | 3,319 | 1,451 | 1,583 | 3,034 |
| Mississippi | 1,712 | 1,538 | 3,250 | 1,471 | 1,451 | 2,922 |
| Hawaii | 821 | 2,463 | 3,284 | 582 | 2,179 | 2,761 |
| District of Columbia | 963 | 1,459 | 2,422 | 773 | 1,299 | 2,072 |
| Puerto Rico | 544 | 1,481 | 2,025 | 342 | 1,305 | 1,647 |
| Not Reported | 214 | 1,415 | 1,629 | 125 | 1,241 | 1,366 |
| Wyoming | 699 | 605 | 1,304 | 623 | 573 | 1,196 |
| New Hampshire | 462 | 871 | 1,333 | 374 | 752 | 1,126 |
| Alaska | 205 | 605 | 810 | 146 | 532 | 678 |
| South Dakota | 311 | 428 | 739 | 255 | 375 | 630 |
| Maine | 139 | 467 | 606 | 98 | 422 | 520 |
| Guam | 107 | 468 | 575 | 63 | 421 | 484 |
| North Dakota | 141 | 396 | 537 | 103 | 346 | 449 |
| Virgin Islands | 165 | 295 | 460 | 99 | 259 | 358 |
| West Virginia | 152 | 267 | 419 | 118 | 241 | 359 |
| Montana | 92 | 219 | 311 | 76 | 185 | 261 |
| Vermont | 63 | 233 | 296 | 44 | 199 | 243 |
| Armed Forces-Pacific | 31 | 107 | 138 | 17 | 90 | 107 |
| Armed Forces-Europe, Middle East, Africa, Canada | 26 | 80 | 106 | 16 | 70 | 86 |
| Armed Forces-Americas (except Canada) | 17 | 65 | 82 | 12 | 59 | 71 |
| Northern Mariana Isl | 31 | 23 | 54 | 11 | 16 | 27 |

D  Data withheld to protect requestors' privacy.
-  Represents zero.
[1] The number of requests that were accepted to date of the reporting period.
[2] The number of requests that were accepted to date of the reporting period.
[3] All fields with less than 10 or a blank in the state field are included in the field "not reported."
NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.
2) The report reflects the most up-to-date estimate data available at the time the report is generated.
Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR),  June 2017


Center for American Progress

☰

IMMIGRATION

# DACA Recipients' Economic and Educational Gains Continue to Grow

By Tom K. Wong, Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin   | Posted on August 28, 2017, 9:01 am



AP/Craig Ruttle

Activists supporting Deferred Action for Childhood Arrivals (DACA) and other immigration issues gather near Trump Tower in New York, August 2017.

Add. 249

*Note: The survey results can be found here. As of November 2, 2017, the survey results have been updated to include breakdowns of urban and rural DACA recipients. For more information on the survey, please contact Tom K. Wong.*

Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals (DACA) policy has provided temporary relief from deportation as well as work authorization to approximately 800,000 undocumented young people across the country. As research has consistently shown, DACA has not only improved the lives of undocumented young people and their families but has also positively affected the economy more generally, which benefits all Americans.

From August 1, 2017 to August 20, 2017, Tom K. Wong of the University of California, San Diego; United We Dream (UWD); the National Immigration Law Center (NILC); and the Center for American Progress fielded a national survey to further analyze the economic, employment, educational, and societal experiences of DACA recipients. This is the largest study to date of DACA recipients with a sample size of 3,063 respondents in 46 states as well as the District of Columbia.

The data illustrate that DACA recipients continue to make positive and significant contributions to the economy, including earning higher wages, which translates into higher tax revenue and economic growth that benefits all Americans. In addition, DACA recipients are buying cars, purchasing their first homes, and even creating new businesses. The survey's results also show that at least 72 percent of the top 25 Fortune 500 companies employ DACA recipients. Moreover, 97 percent of respondents are currently employed or enrolled in school.

# DACA's impact on employment

Work authorization is critical in helping DACA recipients participate more fully in the labor force. The data show that 91 percent of respondents are currently employed. Among respondents age 25 and older, employment jumps to 93 percent.

After receiving DACA, 69 percent of respondents reported moving to a job with better pay; 54 percent moved to a job that "better fits my education and training"; 54 percent moved to a job that "better fits my long-term career goals"; and 56 percent moved to a job with better working conditions.

We also see that 5 percent of respondents started their own business after receiving DACA. Among respondents 25 years and older, this climbs to 8 percent. As the 2016 survey noted, among the American public as a whole, the rate of starting a business is 3.1 percent, meaning that DACA recipients are outpacing the general population in terms of business creation.

As one respondent stated, "I started a bookkeeping business which gives me the opportunity to help our Hispanic community be in compliance with tax law [...] If DACA ended, I will not be able to keep my small business and help my community."

Another respondent stated, "Because of DACA, I opened a restaurant. We are contributing to the economic growth of our local community. We pay our fair share of taxes and hire employees [...] It will be hard to maintain my business if DACA ended. I depend on my [social security number] for a lot of my business, such as when getting licenses, permits, leases, and credit."

## DACA's impact on earnings

The data make clear that DACA is having a positive and significant effect on wages. The average hourly wage of respondents increased by 69 percent since receiving DACA, rising from $10.29 per hour to $17.46 per hour. Among respondents 25 years and older, the average hourly wage increased by 84 percent since receiving DACA.

The data also show that respondents' average annual earnings come out to $36,232, and their median annual earnings total $32,000. Among respondents 25 years and older, the figures are $41,621 and $37,595, respectively. These higher wages are not just important for recipients and their families but also for tax revenues and economic growth at the local, state, and federal levels.

Last year, we noted that further research is needed to parse out the short- and long-run wage effects of DACA as well as whether short-run gains represent a plateau in earnings or if more robust long-run wage effects may exist. This remains true. However, as DACA recipients are now further along in their careers, and as we continue to see growth in their earnings, it is likely there is even more room for recipients' wages to grow.

The immediate impact of wage increases is evident in 69 percent of survey respondents reporting that their increased earnings have "helped me become financially independent" and 71 percent reporting that their increased earnings have "helped my family financially." Among respondents 25 years and older, these percentages rise to 73 percent and 74 percent, respectively.

## DACA's impact on the economy

The purchasing power of DACA recipients continues to increase. In the 2017 study, nearly two-thirds of respondents, or 65 percent, reported purchasing their first car. The average cost paid was $16,469. As we have noted previously, these large purchases matter in terms of state revenue, as most states collect

a percentage of the purchase price in sales tax, along with additional registration and title fees. The added revenue for states comes in addition to the safety benefits of having more licensed and insured drivers on the roads.

The data also show that 16 percent of respondents purchased their first home after receiving DACA. Among respondents 25 years and older, this percentage rises to 24 percent. The broader positive economic effects of home purchases include the creation of jobs and the infusion of new spending in local economies.

Additionally—and importantly—the data show that at least 72 percent of the top 25 Fortune 500 companies—including Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo, among others—employ DACA recipients. All told, these companies account for $2.8 trillion in annual revenue.

## DACA's impact on education

Overall, 45 percent of respondents are currently in school. Among those currently in school, 72 percent are pursuing a bachelor's degree or higher. The majors and specializations that respondents report include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few.

When it comes to educational attainment, 36 percent of respondents 25 years and older have a bachelor's degree or higher. Importantly, among those who are currently in school, a robust 94 percent said that, because of DACA, "I pursued educational opportunities that I previously could not."

## Conclusion

Our findings could not paint a clearer picture: DACA has been unreservedly good for the U.S. economy and for U.S. society more generally. Previous research has shown that DACA beneficiaries will contribute $460.3 billion to the U.S. gross domestic product over the next decade—economic growth that would be lost were DACA to be eliminated.

As our results show, the inclusion of these young people has contributed to more prosperous local, state and national economies; to safer and stronger communities through increased access to cars and home ownership; and to a more prepared and educated workforce for the future. Ending DACA now would be counterproductive at best and, at worst, cruel. At present, 800,000 lives—as well as the lives of

their families and friends—hang in the balance. At a time when the continuing existence of DACA is facing its most serious threat ever, understanding the benefits of the program for recipients; their families and communities; and to the nation as a whole is all the more important.

*Tom K. Wong is associate professor of political science at the University of California, San Diego. Greisa Martinez Rosas is advocacy and policy director, Adam Luna is senior advisor for communications, Henry Manning is research fellow, and Adrian Reyna is director of membership and technology strategies at United We Dream. Patrick O'Shea is Mellon/ACLS public fellow at the National Immigration Law Center. Tom Jawetz is vice president for Immigration Policy and Philip E. Wolgin is managing director for Immigration Policy at the Center for American Progress.*

*The authors thank all those who took the survey for their time and effort in helping to bring these stories to light.*

## Methodology

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—meaning, people responding who are not undocumented—the authors used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used. Because there is no phone book of undocumented immigrants, and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.



© 2017 - Center for American Progress



# Thousands eligible for DACA renewals failed to apply in time

Nation   Oct 19, 2017 3:24 PM EDT

WASHINGTON — About 21,000-22,000 young immigrants, many brought to the country illegally as children, did not submit their **status renewal applications** in time.

That's according to preliminary numbers released Thursday by the Department of Homeland Security.

President Donald Trump last month announced an end to the Deferred Action for Childhood Arrivals, or DACA program, which protected hundreds of thousands of young people from deportation.

But he said those whose authorizations were set to expire within six months could apply for renewals — so long as they did so by Oct. 5.

**READ MORE: Trump's decision to end DACA, explained**

DHS spokesman David Lapan says roughly 133,000 of the 154,000 people eligible for renewals submitted their paperwork by the deadline.

Advocates complain DHS didn't do enough outreach. Lapan says he'd be "hard-pressed" to think recipients weren't aware of the change.

*By –* **Jill Colvin, Associated Press**

Play Video   Show Captions   Mute   Hide Controls

