# No. 17-3345

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————————

*In re* ELAINE DUKE, Acting Secretary of Homeland Security, *et al.*,

Petitioners

———————————————

**BRIEF OF THE CITY OF LOS ANGELES, 24 ADDITIONAL
CITIES AND COUNTIES AND THE UNITED STATES
CONFERENCE OF MAYORS AS *AMICI CURIAE* IN
OPPOSITION TO PETITION FOR A WRIT OF MANDAMUS**

———————————————

MICHAEL N. FEUER
City Attorney, City of Los Angeles
JAMES P. CLARK
LEELA A. KAPUR
VALERIE L. FLORES
MICHAEL DUNDAS
ALEXANDER FREEDMAN
200 N. Main Street, CHE 8th Floor
Los Angeles, CA 90012
(213) 978-8130
mike.dundas@lacity.org

*Attorneys for Amicus Curiae,*
    City of Los Angeles

## ADDITIONAL COUNSEL FOR *AMICI CURIAE*

ANNE L. MORGAN
City Attorney, City of Austin
MICHAEL SIEGEL
Assistant City Attorney, City of Austin
PO Box 1546
Austin, TX 78767
Attorneys for the City of Austin

EUGENE O'FLAHERTY
Corporation Counsel for the City of
Boston
One City Hall Square, Room 615
Boston, MA 02201
Attorney for the City of Boston

NANCY E. GLOWA
City Solicitor
795 Massachusetts Avenue
Cambridge, MA 02139
Attorney for the City of Cambridge

CHERYL WATSON FISHER
City Solicitor of the City of Chelsea
500 Broadway, Room 307
Chelsea, MA 02150
Attorney for the City of Chelsea

EDWARD N. SISKEL
Corporation Counsel of the City of
Chicago
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
Attorney for the City of Chicago

KIMBERLY M. FOXX
States Attorney for Cook County
69 W. Washington, 32nd Floor
Chicago, IL 60602
Attorney for Cook County

DONNA Y. L. LEONG
Corporation Counsel
530 S. King St., Room 110
Honolulu, HI 96813
Attorney for City and County of
Honolulu

RONALD C. LEWIS
City Attorney of the City of Houston
900 Bagby, 4th Floor
Houston, Texas 77002
Attorney for the City of Houston

MARGARET L. CARTER
O'Melveny & Myers LLP
400 S. Hope Street
Los Angeles, CA 90071
Attorney for the County of Los Angeles

SUSAN SEGAL
Minneapolis City Attorney
350 S. Fifth St. - Room #210
Minneapolis, MN 55415
Attorney for the City of Minneapolis

ZACHARY W. CARTER
Corporation Counsel of the City of New
York
100 Church Street
New York, NY 10007
Attorney for the City of New York

BARBARA J. PARKER
City Attorney, City of Oakland
One Frank H. Ogawa Plaza, Sixth Floor
Oakland, CA 94612
Attorney for the City of Oakland

SOZI PEDRO TULANTE
City Solicitor of the City of
Philadelphia
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
Attorney for the City of Philadelphia

JEFFREY DANA
City Solicitor of the City of Providence
444 Westminster Street, Suite 220
Providence, RI 02903
Attorney for City of Providence

MATTHEW D. RUYAK
Interim City Attorney of the City of
Sacramento
915 I Street, Fourth Floor
Sacramento, CA 95814
Attorney for the City of Sacramento

JAMES R. WILLIAMS
County Counsel, County of Santa Clara
70 W. Hedding Street, East Wing, 9th
Floor
San Jose, CA 95110
Attorney for the County of Santa Clara

PETER S. HOLMES
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Attorney for the City of Seattle

MIKE RANKIN
City Attorney of the City of Tucson
P.O. Box 27210
Tucson, AZ 85726
Attorney for the City of Tucson

TRACY P. REEVE
City Attorney of the City of Portland
1221 SW Fourth Avenue, Suite 430
Portland, OR 97240
Attorney for the City of Portland

BRIAN F. CURRAN
Corporation Counsel of the City of
Rochester
30 Church Street, Room 400A
Rochester, NY 14614
Attorney for the City of Rochester

DENNIS J. HERRERA
City Attorney for
   the City and County of San Francisco
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102
Attorney for the City and County of San
Francisco

LANE DILG
City Attorney of the City of Santa
Monica
1685 Main Street
Santa Monica, CA 90401
Attorney for the City of Santa Monica

FRANCIS X. WRIGHT, JR.
City Solicitor of the City of Somerville
93 Highland Avenue
Somerville, MA 02143
Attorney for the City of Somerville

MICHAEL JENKINS
City Attorney of the City of West
Hollywood
Jenkins & Hogin LLP
1230 Rosecrans Avenue, Ste 110
Manhattan Beach, CA 90266
Attorney for the City of West Hollywood

JOHN DANIEL REAVES
General Counsel
The U.S. Conference of Mayors
1200 New Hampshire Avenue NW,
Suite 800
Washington, DC 20036
Attorney for the U.S. Conference of
Mayors

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI CURIAE AND CONSENT TO FILE.....................................................................................................1

ARGUMENT ............................................................................................4

I.    TERMINATION OF DACA IS SUBJECT TO JUDICIAL REVIEW ..............................................................................5

A.    Respondents' Constitutional Challenges are Judicially Reviewable..............................................................5

B.    Respondents' APA Challenges Are Judicially Reviewable...6

C.    Section 1252(g) of the INA Does Not Preclude Judicial Review ..............................................................9

II.    STATE RESPONDENTS HAVE STANDING....................11

A.    State Respondents Have Article III Standing ...................11

B.    State Respondents Have Prudential Standing under the APA..............................................................17

III.    PETITIONERS' JUSTICIABILITY AND STANDING OBJECTIONS ARE INCONSISTENT WITH THEIR RELIANCE ON THE FIFTH CIRCUIT'S DECISION.......20

CONCLUSION ......................................................................................21

CERTIFICATION OF COMPLIANCE ..................................................22

CERTIFICATE OF SERVICE................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen v. Wright,*
　468 U.S. 737 (1984) ................................................................. 16

*Association of Data Processing Serv. Orgs., Inc. v. Camp,*
　397 U.S. 150 (1970) ................................................................. 18

*Autolog Corp. v. Regan,*
　731 F.2d 25 (D.C. Cir. 1984) ................................................. 16

*Bank of Am. Corp. v. City of Miami,*
　137 S. Ct. 1296 (2017) ...................................................... 13, 17

*by Califano v. Sanders,*
　430 U.S. 99 (1977) ..................................................................... 7

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield*
　*Historic Dist. Comm'n,*
　768 F.3d 183 (2d Cir. 2014) .................................................. 17

*Chrysler Corp. v. Brown,*
　441 U.S. 281 (1979) ................................................................. 19

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
　401 U.S. 402 (1971) ................................................................... 7

*City of Oakland v. Lynch,*
　798 F.3d 1159 (9th Cir. 2015) .............................................. 13

*City of Pittsburgh v. Federal Power Comm.,*
　237 F.2d 741 (D.C. Cir. 1956) .............................................. 13

*City of Sausalito v. O'Neill,*
　386 F.3d 1186 (9th Cir. 2004) .............................................. 13

*Clarke v. Securities Indus. Ass'n,*
  479 U.S. 388 (1987) ........................................................................ 18

*Federation for Am. Immigration Reform, Inc. v. Reno,*
  93 F.3d 897 (D.C. Cir. 1996) ......................................................... 18

*Fedorca v. Perryman,*
  197 F.3d 236 (7th Cir. 1999) ........................................................... 9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
  528 U.S. 167 (2000) ......................................................... 11, 15, 16

*Hawaii v. Trump,*
  859 F.3d 741 (9th Cir. 2017), *cert. granted sub nom.*
  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080
  (2017), *and cert. granted, judgment vacated as moot*, No.
  16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017) ......................... 12

*Hedges v. Obama,*
  724 F.3d 170 (2d Cir. 2013) ........................................................... 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  134 S. Ct. 1377 (2014) ................................................................... 17

*Maya v. Centex Corp.,*
  658 F.3d 1060 (9th Cir. 2011) ....................................................... 16

*McNary v. Haitian Refugee Ctr.,*
  498 U.S. 479 (1991) .......................................................................... 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ......................................................................... 19

*New York v. Fillmore Real Estate, Ltd.,*
  665 F. Supp. 178 (E.D.N.Y. 1987) ............................................... 13

*Reno v. American-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) .......................................................................... 9

*Salazar v. King,*
  822 F.3d 61 (2d Cir 2016) ............................................................. 18

iii

*Scenic Hudson Pres. Conference v. Fed. Power Com.*,
354 F.2d 608 (2d Cir. 1965) ............................................................. 13

*State of New York, et al., v. Donald Trump, et al.*,
No. 17-cv-5228-NGG-JO ..................................................... 10

*Susan B. Anthony List v. Driehaus*,
134 S. Ct. 2334 (2014) ........................................................ 11

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ............................................... 20

*United States v. Armstrong*,
517 U.S. 456 (1996) ............................................................... 6

*United States v. Davis*,
247 F.3d 322 (1st Cir. 2001) ................................................. 6

*Upstate Citizens for Equal., Inc. v. United States*,
841 F.3d 556 (2d Cir. 2016) ................................................ 12

*Villa v. United States Dep't of Homeland Sec.*,
607 F.Supp.2d 359 (N.D.N.Y. 2009) ...................................... 9

*Virginia v. American Booksellers Ass'n*,
484 U.S. 383 (1988) ............................................................. 15

*Wade v. United States*,
504 U.S. 181 (1992) ............................................................... 6

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) ............................................. 12

*Webster v. Doe*,
486 U.S. 592 (1988) ............................................................... 6

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992) ...................................................... 13, 15

*Zaigang Liu v. Novak*,
509 F.Supp.2d 1 (D.D.C. 2007) ........................................... 10

iv

## STATUTES

United States Code

Title 5 U.S.C. §§ 553 ............................................................. 18

Title 5 U.S.C. § 702 .............................................................. 18

Title 5 U.S.C. § 706(2)(D) ..................................................... 18

## OTHER AUTHORITIES

Code of Federal Regulations

Title 8 CFR § 274a.12(a)(11)................................................. 16

Federal Rule of Appellate Procedure 29(a) .............................. 4

## STATEMENT OF INTEREST OF *AMICI CURIAE* AND CONSENT TO FILE

*Amici Curiae* are located across the United States and include the City of Los Angeles, California; the City of Austin, Texas; the City of Boston, Massachusetts; the City of Cambridge, Massachusetts; the City of Chelsea, Massachusetts; the City of Chicago, Illinois; Cook County, Illinois; the City and County of Honolulu, Hawaii; the City of Houston, Texas; the County of Los Angeles, California; the City of Minneapolis, Minnesota; the City of New York, New York; the City of Oakland, California; the City of Philadelphia, Pennsylvania; the City of Portland, Oregon; the City of Providence, Rhode Island; the City of Rochester, New York; the City of Sacramento, California; the City and County of San Francisco, California; the County of Santa Clara, California; the City of Santa Monica, California; the City of Seattle, Washington; the City of Somerville, Massachusetts; the City of Tucson, Arizona; the City of West Hollywood, California; and the United States Conference of Mayors.[1]

---

[1] This brief was not authored, in whole or in part, by counsel for any party, and no such counsel or party contributed money that was intended to fund preparing or submitting the brief. No people other than *Amici* or their counsel contributed money that was intended to fund preparing or submitting the brief.

This litigation is of significant interest to *Amici Curiae*, because 40% of all currently active recipients of the Deferred Action for Childhood Arrivals (DACA) program – 276,000 of our collective residents – call *Amici*'s metropolitan areas home.[2] Of equal importance is the fact that many *Amici* cities and counties are the primary population centers of many of the State Respondents in this action, including the States of New York, Massachusetts, Washington, Hawaii, Illinois, Oregon, Pennsylvania and Rhode Island.

According to the United States Citizenship and Immigration Services (USCIS), as of September 4, 2017, 13% of all active DACA recipients reside in the Los Angeles metro area. Another 6.8%, 5.2% and 5% of all active recipients reside in the New York, Houston and Chicago metro regions, respectively. The San Francisco Bay Area, Austin, Seattle, Portland, Sacramento and Philadelphia together

---

[2] United States Citizenship and Immigration Services data show approximately 800,000 applicants qualified for DACA since the start of the program. About 690,000 recipients currently have active DACA status. For this brief, residency in a "metropolitan area" is defined as residency in a Core Based Statistical Area (CBSA) at the time of the DACA recipient's most recent application. CBSAs are defined by the United States Office of Management and Budget. *See* U.S. Citizenship and Immigration Services DACA Data dated "As of September 4, 2017" (USCIS DATA). Available at: http://tinyurl.com/USCIS-data

2

account for another 8.4% of the active DACA population. Collectively, more active DACA recipients reside in *Amici*'s metro areas than the combined active DACA populations of 44 states. *See* USCIS DATA, *supra*.

*Amici* rely heavily upon the economic contributions of foreign-born residents and DACA recipients make up a statistically significant portion of our foreign-born labor force. *See, infra* at 14. Moreover, the program promotes economic prosperity and benefits taxpayers, which means that *Amici* will suffer direct economic harm if DACA is rescinded.

Put plainly, ending DACA will sow an economic slowdown, as estimates show that DACA recipients will contribute $460 billion to the U.S. gross domestic product over the next ten years (a contribution of $114 billion to State Respondents' cumulative GDP alone). Center for American Progress, *A New Threat to DACA Could Cost States Billions of Dollar* (2017) Washington, D.C., http://tinyurl.com/CAPStatesGDP. In fiscal terms, this equates to $60 billion in lost federal, state and local tax revenues over the next decade. *The Economic and Fiscal Impact of*

*Repealing DACA* (2017) CATO Institute, Washington, D.C,

http://tinyurl.com/CATODACAstudy.

Of course, reduced revenues will not be the only way terminating DACA will harm *Amici*. We directly employ DACA recipients and have come to rely upon them in our daily government operations. Similarly, cities and counties operate – and our taxpayers fund – the social safety net that will be required to catch these families if the DACA recipient's work authorization is taken away and families are forced apart by removal. DACA recipients are helping to build the foundation of our economic prosperity, cultural artistry and civic society and *Amici* have a strong interest in protecting them.

Pursuant to Federal Rule of Appellate Procedure 29(a), *Amici* have obtained the consent of all parties before filing this brief.

## ARGUMENT

At the threshold, *Amici* assert that Petitioners' actions in rescinding DACA are clearly subject to judicial review and that State Respondents have both Article III and prudential standing to file the present case.

## I. TERMINATION OF DACA IS SUBJECT TO JUDICIAL REVIEW

Petitioners make the plainly erroneous argument that the Department of Homeland Security's (DHS) action to rescind DACA (Rescission Policy) is not subject to judicial review under any circumstances. As both the *Vidal* Respondents and the State Respondents (collectively Respondents) correctly argued before the district court: (1) courts may consider constitutional challenges to acts committed to an agency's discretion; (2) courts may review whether broad changes in agency policy adhere to the Administrative Procedure Act (APA); and (3) the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.,* does not prohibit judicial review of broad revisions of immigration policy, as distinguished from decisions in individual immigration proceedings.

### A. <u>Respondents' Constitutional Challenges are Judicially Reviewable</u>

Petitioners argue that Respondents' statutory causes of action are exempt from judicial review, completely ignoring Respondents' causes of action alleging constitutional violations. Petitioners presumably avoided taking the position that the district court cannot consider the

5

constitutionality of the Rescission Policy because the law precluding that position is unambiguous: an agency's exercise of discretion is subject to constitutional restraints and reviewable on that basis alone. *See United States v. Armstrong*, 517 U.S. 456, 455 (1996); *Wade v. United States*, 504 U.S. 181, 185 (1992); *Webster v. Doe*, 486 U.S. 592, 601-03 (1988).

Thus, the district court most certainly may consider Respondents' constitutional challenges.  To hold otherwise would allow the federal government's discretionary acts to be free of constitutional restraints so long as they were masked under the guise of agency discretion.  *See United States v. Davis*, 247 F.3d 322, 326 (1st Cir. 2001) (government may not "cloak [] unconstitutional purposes from judicial scrutiny by saying" that prosecutorial decisions are "committed to its discretion.").

**B.** **<u>Respondents' APA Challenges Are Judicially Reviewable</u>**

Respondents correctly argue that Section 701(a)(2) of the APA does not preclude judicial review of the Rescission Policy.  The exception to APA review is very narrow, is rarely applicable, and in particular does not apply to "broad" changes to agency policy that are disconnected from enforcement action against particular individuals (i.e. when there

6

is no "law to apply"). *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (citations omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). This holds true even in the arena of federal immigration enforcement. *See, e.g., McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 483-84 (1991). Here, Respondents' claims address various aspects of the termination of the DACA program, which directly impacts all DACA recipients.

Importantly, Respondents are not challenging a discretionary action taken in any specific enforcement proceeding. Even assuming that exercising prosecutorial discretion to provide deferred action to any one individual were unreviewable by a court, the indiscriminate revocation of deferred action for all DACA recipients based upon a misguided legal determination that DACA was unlawful is reviewable. *See* DHS Memorandum titled *Memorandum on Rescission of Deferred Action For Childhood Arrivals* (Rescission Memo) (September 5, 2017), http://tinyurl.com/2017Memo (stating that because a Texas district court preliminarily enjoined a DHS program called Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), DACA must suffer from "the same legal and constitutional defects.").

7

For all intents and purposes, the Rescission Memo takes deferred action off the table for an entire class of persons, which is why the impacts of terminating DACA demonstrate the extent to which the Rescission Policy should be the poster child for justiciability of agency action.

DACA recipients have made profound economic gains *because of* receiving deferred action. In a representative survey, the Center for American Progress (CAP) found that 69% of employed recipients moved to a higher-paying job after receiving deferred action and 5% of recipients started a new business after receiving deferred action, which is a rate of business creation greater than among the general public. Center for American Progress, *DACA Recipients' Economic and Educational Gains Continue to Grow* (2017) (CAP Study) Washington, D.C., http://tinyurl.com/CAPDACAstudy. The CAP Study also found that at least half of all of the DACA recipients they surveyed reported that they have bought a car since receiving deferred action; 12% have bought their first home; and 25% have children who are American citizens.

The hundreds of thousands of DACA enrollees who received deferred action will see these gains uniformly wiped out, not because of

8

any individualized discretionary action, but because Petitioners drew the *legal* conclusion that DACA was unlawful, and, with the stroke of a pen, terminated the program. This "application of law" plainly provides justiciability for the lower court to review Respondents' APA claims.

**C.** **Section 1252(g) of the INA Does Not Preclude Judicial Review**

Section 1252(g) states, in part, that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." Respondents are correct in asserting that Petitioners seek to broadly expand the scope of Section 1252(g), despite the fact that, consistently, courts have narrowly interpreted this provision to apply only to the three actions specifically identified by Congress. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999)*; Fedorca v. Perryman*, 197 F.3d 236, 239-40 (7th Cir. 1999) (Section 1252(g) "is not a general preclusion statute; § 1252(g) precludes review of only the three listed discretionary decisions or actions of the Attorney General."); *Villa v. United States Dep't of*

9

*Homeland Sec.*, 607 F.Supp.2d 359, 365 (N.D.N.Y. 2009) (Section 1252(g) "should also be read narrowly to bar jurisdiction only in the three events Congress chose to specify.").

To squeeze within the narrow scope of Section 1252(g), Petitioners contend that the Rescission Policy is a "denial of continued deferred action [which] is a necessary step in commencing enforcement proceedings at some future date." Defs.' Oct. 27, 2017 Mem. ISO Mot. to Dismiss, *State of New York, et al., v. Donald Trump, et al.*, No. 17-cv-5228-NGG-JO (Dkt. 71-1) at pg. 18. This Court should reject this self-serving characterization of the Rescission Policy because it would, in effect, remove all broad policy changes from judicial review.

Indeed, any time the federal government implements a new policy that renders certain individuals removable, that new policy would, by nature, be a necessary step in commencing future enforcement proceedings under the policy. Congress clearly did not intend for Section 1252(g) to serve as the type of general preclusion statute into which Petitioners' interpretation would transform it. *See Zaigang Liu v. Novak*, 509 F.Supp.2d 1, 8 (D.D.C. 2007) ("[I]t is even less plausible that the mention of these discrete deportation-related events [in Section

10

1252(g)] was a shorthand way of referring to all claims brought in immigration matters.").

## II.  STATE RESPONDENTS HAVE STANDING

### A.  <u>State Respondents Have Article III Standing</u>

State Respondents have Article III standing to assert their causes of action.  To satisfy Article III standing, a party must demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).

An "allegation of future injury" satisfies the injury prong "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted).

State Respondents directly employ DACA recipients and rely on their performance and expertise in daily government operations, which provides them with Article III standing to sue in their capacity as

11

employers. Similarly, since State Respondents have DACA recipients enrolled as public university students, they have a proprietary interest in the operations of their public university systems. *See Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017); *Hawaii v. Trump*, 859 F.3d 741, 766 (9th Cir. 2017), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017), *and cert. granted, judgment vacated as moot*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017). Ending the DACA program would result in squandered work-force training and investment as well as increased university administrative costs and lost tuition income – injuries sufficient to bestow standing on the State Respondents.

Similarly, federal courts have recognized in a range of contexts that an expected loss of tax revenues can constitute a sufficient injury for purposes of Article III standing, including where governmental plaintiffs have alleged that a federal decision to take land into trust would decrease tax receipts by transforming an agricultural use into a casino use, *see Upstate Citizens for Equal., Inc. v. United States*, 841 F.3d 556, 566 (2d Cir. 2016), that installation of power lines would decrease tax revenue from privately owned land and interfere with local

12

planning, *see Scenic Hudson Pres. Conference v. Fed. Power Com.*, 354 F.2d 608, 616 (2d Cir. 1965), that predatory lending and discriminatory housing practices would lead to diminished real estate tax revenue, *see Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) and *New York v. Fillmore Real Estate, Ltd.*, 665 F. Supp. 178, 182 (E.D.N.Y. 1987), and that rehabilitation of a former military base would lessen tax revenue, *see City of Sausalito v. O'Neill*, 386 F.3d 1186, 1194 (9th Cir. 2004).

State Respondents' injuries are much more "concrete and particularized" and "actual or imminent" than many other cases in which courts found relatively low threshold injuries to be sufficient for standing. *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 447-48 (1992) (holding that a loss in coal severance tax revenues attributable legislation being challenged, which totaled less than $500,000 in annual state revenues, provided standing); *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (Oakland's loss of tax revenue from forfeiture sought by the federal government of real property used to operate a single retail marijuana store satisfied the requirements of Article III); *City of Pittsburgh v. Federal Power Comm.*, 237 F.2d 741, 748-49 (D.C.

13

Cir. 1956) (Pittsburgh had standing to challenge FPC order authorizing the abandonment of a pipeline because construction of new facilities would result in increased natural gas rates charged to Pittsburgh as a consumer).

Here, DACA recipients are an important and thriving subset of the large foreign-born populations who are critical to the economy of State Respondents and *Amici* cities and counties. Specifically, the DACA program has provided deferred action to some 800,000 applicants, 91% of whom are employed. This makes DACA recipients 1 in 33 (3%) of *all foreign-born persons* in the U.S. labor force. *See* U.S. Citizenship and Immigration Services DACA Data dated "As of September 4, 2017" (USCIS DATA), http://tinyurl.com/USCIS-data; CAP Study, *supra*; U.S. Bureau of Labor Statistics 2016 foreign-born labor force statistics, http://tinyurl.com/BLS-foreignborn.

Studies show that DACA recipients across the board obtain higher earnings and have a higher employment rate and higher tax compliance rate, because of the DACA program. *See* CAP Study, *supra*. For example, a 2017 study by the Institute on Taxation and Economic Policy found DACA recipients pay an estimated $1.6 billion in state and local

14

taxes annually, giving them a higher effective tax rate than the average

state and local tax rate paid by the top 1% of U.S. taxpayers. Institute

on Taxation and Economic Policy, *State & Local Tax Contributions of*

*Young Undocumented Immigrants* (2017) Washington, D.C.,

http://tinyurl.com/ITEPDACAstudy. Similarly, the CAP Study found

that the hourly wages of surveyed recipients increased by an average of

42% after obtaining DACA; that 60% of those with increased earnings

have become financially independent; and that 61% have started to

contribute to their family's finances. *See* CAP Study, *supra.* All of these

statistics demonstrate that ending DACA will result in decreased tax

contributions, reduced employment rates, and lower effective tax rates

for resident populations, thereby directly injuring State Respondents.[3]

This injury is "fairly traceable" to Petitioners' actions to terminate

DACA, satisfying the second prong of the *Friends of the Earth* test.

_____

[3] Courts should "presume" that DHS would enforce the law and proceed
with removal once a person loses DACA protection. *Hedges v. Obama*,
724 F.3d 170, 197 (2d Cir. 2013) (quoting *Virginia v. American
Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (additional citations
omitted). Therefore, State Respondents' argument (i.e. that ending
DACA will directly result in specific tax revenues lost due to job losses
and removals of a significant percentage of State Respondents' foreign-
born labor force) is distinguishable from the more abstract "injury to the
state's economy" claims found to be insufficient for standing. *See e.g.*
*Wyoming*, 502 U.S. at 448 (citations omitted).

15

Since 1981, federal regulations allow those "granted deferred action" to "apply for employment authorization."  8 CFR § 274a.12(a)(11). Consequently, DACA recipients living in State Respondents' jurisdictions and in *Amici* cities and counties openly and lawfully earn billions of dollars in taxable income for one reason: the work authorization benefit provided via the DACA program.  USCIS DACA Frequently Asked Questions, at Question 1, https://www.uscis.gov/archive/frequently-asked-questions (stating that "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate 'an economic necessity for employment.'").

Thus, a clear and direct line of causation exists between Petitioners' actions and the loss of State Respondents' (and *Amici*'s) tax revenues.  *See Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (citing *Allen v. Wright*, 468 U.S. 737, 758 (1984)); s*ee also Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984) (holding that what matters is not the "length of the chain of causation," but rather the "plausibility of the links that comprise the chain").

16

Finally, redressability is also satisfied, thus fulfilling the third prong of the *Friends of the Earth* test. If Petitioners' plan to terminate DACA is not implemented, State Respondents' proprietary interests will not be harmed. As a result, the injuries noted above indisputably would be redressed by a favorable judicial decision.

**B.** **State Respondents Have Prudential Standing under the APA**

In addition to meeting the requirements of Article III standing, a plaintiff must also satisfy the non-constitutional standing requirements of the statute under which he or she seeks to bring suit. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-87 (2014). State Respondents satisfy this requirement. Unlike Article III standing, this is "a straightforward question of statutory interpretation" that does not implicate subject matter jurisdiction. *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 201 (2d Cir. 2014) (citations omitted). The inquiry is instead directed to determining if a claimed injury is "at, the least, *arguably* within the zone of interests protected by the statute." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) (citations omitted).

17

In this instance, the APA affords standing to any party that is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To bring an APA claim, that party must assert interests that are "arguably within the zone of interests to be protected or regulated by the statute she claims was violated." *Salazar v. King*, 822 F.3d 61, 73 (2d Cir 2016) (citations omitted); *see also Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970). "The question under the zone-of-interests test of § 702 is simply whether the language of the statutes invoked by the plaintiff or the supporting legislative history suggests a congressional intent to permit the plaintiff's suit." *Federation for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996). The test "is not meant to be especially demanding; in particular there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399-400 (1987).

The congressional intent behind the passage of INA is irrelevant to the present analysis because State Respondents are not alleging a violation of the INA. Rather, this controversy hinges on the arbitrary and capricious and the notice-and-comment provisions of the APA, 5

18

U.S.C. §§ 553, 706(2)(D). Congress' intent in creating these provisions was to ensure that DHS employs "reasoned decisionmaking" when taking a final agency action. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

Congress has never appropriated funding sufficient to remove all undocumented immigrants. Programs like DACA enable DHS to focus limited resources on removing serious criminals by deferring action on lower priorities. The claims at issue, therefore, fall clearly within the "zone of interests" of the APA provision because State Respondents bear the brunt of any changes in enforcement priorities as to their residents and they should have an opportunity to be heard. "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979).

Therefore, State Respondents' causes of action fall squarely within the "zone of interests" under the APA.

….

….

III.   PETITIONERS' JUSTICIABILITY AND STANDING OBJECTIONS ARE INCONSISTENT WITH THEIR RELIANCE ON THE FIFTH CIRCUIT'S DECISION

In the letter from Attorney General Jeff Sessions advising DHS to terminate DACA, he relied on the decision in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), in which the Fifth Circuit held that DAPA was unlawful.  The Attorney General concluded that "[b]ecause the DACA policy has the same legal and constitutional defects that *the courts recognized* as to DAPA, it is likely imminent litigation would yield similar results with respect to DACA."  Letter from Att'y Gen. Jefferson Sessions to DHS Acting Sec'y. Elaine Duke on the Rescission of DACA (September 4, 2017) (emphasis added), http://tinyurl.com/AG-Duke-Letter.

In explaining that it was "clear" DACA "should be terminated," DHS's Rescission Memo leans entirely on this 362-word letter from the Attorney General.  Thus, Petitioners' position on the merits – that the Fifth Circuit's decision enjoining DHS's exercise of prosecutorial discretion supports the agency's action – is wholly inconsistent with their position that a court may, under no circumstances, review the agency's action.  To the contrary, if Petitioners believed that no court

20

may review DHS's purported exercise of prosecutorial discretion or that

no state had standing to challenge such a decision, they should not have

advanced the Fifth Circuit's decision as the basis for terminating

DACA.

## CONCLUSION

*Amici* respectfully urge the Court to deny Petitioners' Writ of

Mandamus.


Dated:  November 14, 2017          MICHAEL N. FEUER,
                                        City Attorney
                                   JAMES P. CLARK
                                   LEELA A. KAPUR
                                   VALERIE L. FLORES
                                   MICHAEL DUNDAS
                                   ALEXANDER FREEDMAN

                                   By:  *s/ Michael Dundas*
                                        MICHAEL DUNDAS
                                    Attorneys for the City of Los
                                    Angeles

21

## CERTIFICATION OF COMPLIANCE

I hereby certify that this brief complies with the word limit of Federal Rule of Appellate Procedure 21(d)(1) because the brief contains 3867 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface, 14-point Times New Roman.

Dated:  November 14, 2017            MICHAEL N. FEUER,
                                     City Attorney
                                     JAMES P. CLARK
                                     LEELA A. KAPUR
                                     VALERIE L. FLORES
                                     MICHAEL DUNDAS
                                     ALEXANDER FREEDMAN

                                     By: *s/ Michael Dundas*
                                         MICHAEL DUNDAS
                                      Attorneys for the City of Los
                                      Angeles

22

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2017, a copy of the foregoing Amicus Brief of the City of Los Angeles, 24 additional Cities and Counties and the United States Conference of Mayors was filed with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


Dated:  November 14, 2017            MICHAEL N. FEUER,
                                                 City Attorney
                                                 JAMES P. CLARK
                                                 LEELA A. KAPUR
                                                 VALERIE L. FLORES
                                                 MICHAEL DUNDAS
                                                 ALEXANDER FREEDMAN

                                             By: *s/ Michael Dundas*
                                                MICHAEL DUNDAS
                                            Attorneys for the City of Los
                                            Angeles