# ADDENDUM

# TABLE OF CONTENTS

**Page**

First Amended Complaint for Declaratory and Injunctive Relief,
dated Oct. 4, 2017 .......................................................................... 1

*Selected Exhibits to Complaint*

Ex. 1 .............................................................................. 89

Ex. 13 ........................................................................... 92

Ex. 23 ........................................................................... 96

Ex. 39 ........................................................................... 99

Ex. 40 ......................................................................... 101

Ex. 41 ......................................................................... 108

Ex. 42 ......................................................................... 130

Ex. 43 ......................................................................... 138

Ex. 46 ......................................................................... 149

Ex. 74 ......................................................................... 158

Ex. 75 ......................................................................... 163

Ex. 89 ......................................................................... 166

Ex. 177 ....................................................................... 170

Case Management & Scheduling Order (Orenstein, M.J.),
dated Sept. 27, 2017 ............................................................ 174

Memorandum & Order (Garaufis, M.J.), dated Oct. 3, 2017 .................. 179

Memorandum & Order (Garaufis, M.J.), dated Oct. 17, 2017 ................ 183

Memorandum & Order (Orenstein, M.J.), dated Oct. 19, 2017 .............. 194

Memorandum & Order (Garaufis, D.J.), dated Oct. 19, 2017 ................ 197

Memorandum & Order (Garaufis, D.J.), dated Nov. 9, 2017 .................. 209

Letter from Defendants to the Court, dated Oct. 16, 2017 ...................... 257

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, MASSACHUSETTS, WASHINGTON, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, IOWA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, and VIRGINIA, | CIVIL ACTION NO. 1:17-cv-05228 (NGG) (JO) |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## INTRODUCTION

1.     The States of New York, Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and the District of Columbia (the "States") bring this action to protect the States—including their residents, employers, small governmental jurisdictions, regulatory systems, and educational institutions—against the unlawful actions of the President of the United States and the federal government.

2.      Since 2012, the Deferred Action for Childhood Arrivals ("DACA") program has protected from deportation and extended work authorization to approximately 800,000 young people who grew up in this country, most of whom have known no home other than the United States.

3.      DACA has allowed these young people to live, study, and work in the States (and throughout the country) as contributors and leaders in their communities. DACA grantees attend public and private universities, and are employed by companies, nonprofit organizations, and governmental agencies and institutions, all of which benefit from their skills and productivity. DACA grantees also provide financial support to their families, help to grow the economy, and contribute significantly to State and local revenues and tax bases.

4.      On September 5, 2017, the Defendants definitively and categorically terminated the DACA program, as detailed in a U.S. Department of Homeland Security ("DHS") Memorandum ("DHS Memorandum").  *See* Ex. 74 (Memorandum from Acting Secretary Elaine Kelly to James McCament, Acting Director of U.S. Citizenship and Immigration Services, *Rescission of Deferred Action for Childhood Arrivals*, September 5, 2017).

5.      Pursuant to the DHS Memorandum, the federal government will only issue renewals for grantees whose benefits expire before March 5, 2018, provided they apply for renewal by October 5, 2018. DHS immediately ceased accepting all new applications under DACA.

6.      Ending DACA is a culmination of President's Trump's oft-stated commitments— whether personally held, stated to appease some portion of his constituency, or some combination thereof—to punish and disparage immigrants, especially those with Mexican roots, who make up more than 78 percent of DACA grantees. *See* Ex. 1 (Updated USCIS, *Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017*, June 8, 2017).

7. The consequence of the President's decision is that hundreds of thousands of young people who have availed themselves of the program will ultimately lose its protections, and will be exposed to removal when their authorizations expire.

8. Individuals who have relied on DACA are now even more vulnerable to removal than before the program was initiated, as they turned over sensitive information to the federal government in their applications. Despite the federal government's repeated promises that it would not use such information to conduct enforcement measures, the DHS Memorandum does not explain how the government will keep that information secure, nor does it provide any assurances that immigration enforcement agents will not use such information to find and remove those who applied for DACA.

9. Terminating DACA will harm hundreds of thousands of the States' residents, injure State-run colleges and universities, upset the States' workplaces, damage the States' economies, hurt State-based businesses and nonprofits, negatively affect the States' small governmental jurisdictions, and disrupt the States' statutory and regulatory interests.

10. The States respectfully request that the Court invalidate the portions of the DHS Memorandum challenged here. Further, the States ask that the Court enjoin the federal government from using personal information gathered for the DACA program in immigration enforcement.

## JURISDICTION AND VENUE

11. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Eastern District of New York.

13.     The States bring this action to redress harms to their proprietary and sovereign interests and their interests as *parens patriae*.

## PARTIES

### PLAINTIFFS

14.     The Plaintiff States of New York,[1] Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and the District of Columbia, represented by and through their Attorneys General,[2] are sovereign states[3] of the United States of America.

15.     The States are aggrieved and have standing to bring this action because of the injuries to the States caused by the termination of DACA, including immediate and irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests.

### DEFENDANTS

16.     Defendant Donald Trump is the President of the United States, and authorized the issuance of the DHS Memorandum that purports to terminate DACA. He is sued in his official capacity.

17.     Defendant DHS is a federal cabinet agency responsible for implementing the DACA program. DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

---

[1] The State of New York is represented by and through its Attorney General, Eric T. Schneiderman. Governor Andrew M. Cuomo is the chief executive officer of the State of New York and is responsible for overseeing the operations of the State of New York and ensuring that its laws are faithfully executed.

[2] Colorado is represented by and through Governor John W. Hickenlooper's Chief Legal Counsel, who has been designated a Special Assistant Attorney General for purposes of representing Colorado in this matter.

[3] The District of Columbia, which is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government of the United States, shall be included herein as a "State" for ease of reference.

18.     Defendant United States Citizenship and Immigration Services ("USCIS") is an Operational and Support Component agency within DHS. USCIS is the sub-agency responsible for administering the DACA program.

19.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is an Operational and Support Component agency within DHS. ICE is responsible for enforcing federal immigration law, including identifying, apprehending, detaining, and removing non-citizens.

20.     Defendant Elaine C. Duke is the Acting Secretary of the DHS. She is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees USCIS and ICE. She is sued in her official capacity.

21.     Defendant the United States of America includes all government agencies and departments responsible for the implementation and termination of the DACA program.

## GENERAL ALLEGATIONS

**Establishment of the DACA Program**.

22.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum"). *See* Ex. 13 (2012 DACA Memorandum). Under DACA, "certain young people who were brought to this country as children and know only this country as home" could request deferred action for a period of two years, subject to renewal. *Id.* at 1-2. DACA grantees also were eligible for work authorizations so that they could work legally in the United States during the deferred action period, pursuant to long-standing federal regulation. *See id.*; 8 C.F.R. § 274a.12(c)(14) (providing that "an alien who has been granted deferred action" may obtain work authorization upon demonstrating economic necessity).

23.     Deferred action is a well-established form of prosecutorial discretion under which the federal government forbears from taking removal action against an individual for a designated period of time. According to the 2012 DACA memorandum, it was appropriate for the government to exercise such discretion for DACA grantees because immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *See* Ex. 13 at 1.

24.     The 2012 DACA Memorandum provided that an applicant could be considered for an exercise of prosecutorial discretion only if he or she:

    a.  came to the United States before the age of sixteen;

    b.  continuously resided in the United States for at least five years preceding June 15, 2012, and was present in the United States on that date;

    c.  was in enrolled in school on the date of his/her application, had graduated from high school, had obtained a general education development certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

    d.  had not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and did not otherwise pose a threat to national security or public safety; and

    e.  was not over the age of thirty on June 15, 2012.

*Id.* at 1.

25.     USCIS described DACA as follows: "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon unlawful presence, an individual whose case has

**6**

been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence." *See* Ex. 14, Question 1 (USCIS Help Center, *DACA FAQs*).

**The DACA Application Process.**

26.     Under DACA, "[a]ll individuals who believe[d] they [met] the guidelines" could "affirmatively request consideration of DACA from USCIS" through an established process. After receiving the applicant's forms, evidence, supporting documents and application fee, USCIS "review[ed] them for completeness," considered complete applications "on an individual, case-by-case basis," and notified applicants of its determination in writing. *See* Ex. 16 (USCIS Help Center, *How do I request consideration of DACA?*).

27.     In order to apply for the DACA program, applicants had to submit extensive documentation establishing that they met the eligibility criteria. Applicants also had to submit a Form I-765 Application for Employment Authorization, and pay a $495 fee. *See* Ex. 14 at Questions 28-41; *see also* Ex. 17 (USCIS, I-821D, *Consideration of Deferred Action for Childhood Arrivals*) (explaining that the filing fee for a DACA application could not be waived).

28.     DACA applicants were required to undergo biometric and biographic background checks. When conducting these checks, DHS reviewed the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies." *See* Ex. 14 at Question 23. If any information "indicate[d] that [the applicant's] presence

in the United States threaten[ed] public safety or national security," the applicant was ineligible for DACA absent "exceptional circumstances." *Id.* at Question 65.

29.     Once individuals were admitted into the DACA program, internal USCIS "Standard Operating Procedures" dictated that, absent an "Egregious Public Safety" issue, DACA grantees were not to be terminated from the program until the government provided a "Notice of Intent to Terminate" which "thoroughly explain[ed]" the grounds for the termination." *See* Ex. 18 at 132, Appendix I (DHS, *National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals*, Apr. 4, 2013). DHS policy further provided that recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of participation in the DACA program. *Id.*

30.     At the expiration of their two-year DACA term, grantees could seek renewal, and were considered for renewal if they met the guidelines for consideration as well as other specified criteria. *See* Ex. 19 (USCIS Help Center, *How will USCIS evaluate my request for renewal of DACA?*).

**Benefits Provided Under the DACA Program.**

31.     DACA confers numerous benefits on its grantees.

32.     Notably, DACA grantees are granted the right not to be arrested or detained based solely on their immigration status during the time period during which their deferred action is in effect. *See* Ex. 14 at Question 9.

33.     DACA grantees also are granted eligibility for work authorization. As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action . . . .'" *Id.* at Question 1.

34.    DACA grantees are eligible to receive certain public benefits. These include Social Security, retirement, and disability benefits. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d).

35.    DACA enables grantees to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants. *See* Ex. 5 ¶¶ 12, 16, 22 (Decl. Wong).

36.    DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs— all on the books." *See* Ex. 15 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu, Dec. 30, 2016).

37.    These positive effects have rippled throughout the States' economies. As DHS recognized more than four years after the implementation of DACA, our nation "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future." *Id*.

38.    Terminating DACA would not only rip away the life-changing benefits to individual DACA grantees, but would also reverse the benefits to the community at large, including to innumerable small businesses, non-profits, and governments.[4]

---

[4] *See* e.g., Ex. 20 (Ike Brannon, *The Economic and Fiscal Impact of Repealing DACA*, the Cato Institute, Jan. 18, 2017) ("The deportation of DACA participants would cost the American economy billions of dollars, as well as billions of tax dollars foregone, while doing little to address the true concerns that Americans may have about unauthorized immigrants."); Ex. 21 (Tom Wong, *et al*., *DACA Grantees' Economic and Educational Gains Continue to Grow*, Center for American Progress, Aug. 28, 2017) (quoting multiple DACA grantees whose small businesses will suffer or even close if DACA is terminated); Ex. 22 (Tom Wong *et al*., *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Center for American Progress, Oct. 18, 2016) (study showing that 9 percent of DACA grantees work at non-profits, a significant percentage work in education, and 6 percent started their own business, including one owner who employs nine people and hopes to continue to grow and "hire even more people from the community" [internal brackets and quotation marks omitted]).

**The Government's Assurances That the Information Provided by DACA Applicants Would be Kept Confidential and Not Used for Enforcement.**

39.     When the DACA program was first implemented, many eligible young people were reluctant to voluntarily disclose information that could help facilitate their removal from the United States. To encourage applications, DHS repeatedly promised applicants that information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes." *See* Ex. 15 (Letter from Sec'y Johnson).

40.     USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]nformation provided in [a DACA request] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings." *See* Ex. 25 (USCIS Help Center, *Will the information I share in my request for DACA be used for immigration enforcement purposes?*).

41.     USCIS affirmatively represented to DACA applicants that, except in limited circumstances, their case would not be "referred to ICE for purposes of removal proceedings" even if UCSIS decided not to defer action on a case. *See* Ex. 26 (USCIS Help Center, *If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?*).

42.     In the exceptional circumstance in which USCIS referred a DACA applicant to ICE, USCIS affirmatively represented to DACA applicants that "information related to [their] family members or guardians that is contained in [their] request [would] not be referred to ICE for purposes of immigration enforcement against family members or guardians." *See* Ex. 27 (USCIS Help Center, *If my DACA case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?*).

43. USCIS affirmatively represented to employers of DACA applicants that, except in limited circumstances, if they provided an employee "with information regarding his or her employment to support a request for consideration of DACA," the information would not be "shared with ICE for civil immigration enforcement purposes." *See* Ex. 28 (USCIS Help Center, *If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?*).

44. The government's representations that, absent exceptional circumstances, information provided by a DACA grantee would not be used against him or her for later immigration enforcement proceedings were unequivocal and atypical. For example, the federal government does not make the same representations for participants in other similar programs, such as Temporary Protected Status. These assurances were key to the success of the DACA program. By making repeated, unique, and strong representations, the federal government induced persons to rely on those representations and apply to become DACA grantees despite the potential risks.

**The Government's Commitment to Continuity and Fair Treatment for DACA Grantees.**

45. Numerous public officials from both political parties have reinforced the federal government's promise to provide continuity and fair treatment to DACA grantees, and have recognized that DACA grantees have relied on the government's representations in applying for DACA. For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are hundreds of thousands of DACA grantees who have "relied on the U.S. government's representations" about DACA, and asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be

honored." *See* Ex. 15.

46.     On December 19, 2016, then-President-elect Trump stated in an interview with TIME magazine that he would find an accommodation for DACA grantees, stating, "We're going to work something out that's going to make people happy and proud." *See* Ex. 29 (Michael Scherer, *Person of the Year 2016*, TIME Magazine, Dec. 19, 2016). He further recognized, "[DACA grantees] got brought here at a very young age, they've worked here, they've gone to school here. Some were good students. Some have wonderful jobs. And they're in never-never land because they don't know what's going to happen." Id.

47.     Again, on January 18, 2017, then President-elect Trump promised in an interview with Fox & Friends that he was working on a plan to make DACA grantees "very happy." *See* Ex. 30 (Francesca Chambers, *Trump signals he's softening on immigration as he says he's 'working on a plan' that will make DREAMers 'very happy,'* Daily Mail, Jan. 18, 2017). He further stated, "We're working on a plan right now. And that plan, over the next two to three months, is going to come out. And it's a plan that's going to be very firm, but it's going to have a lot of heart." Id.

48.     In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" DACA grantees, who have "organize[d] [their] li[ves] around" the DACA program. *See* Ex. 31 (CNN, *Transcript of CNN Town Hall with Speaker Paul Ryan*, Jan. 12, 2017).

49.     On January 25, 2017, President Trump again stated in an interview with David Muir that "[DACA grantees] shouldn't be very worried. I do have a big heart." *See* Ex. 32 (ABC News, *Transcript of ABC News anchor David Muir interview with Donald Trump*, Jan. 25, 2017).

50.     In February 2017, then-Secretary of DHS John Kelly issued a memorandum relating to enforcement priorities. This memorandum terminated "all existing conflicting

directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," including prior enforcement priorities, but left DACA unchanged. *See* Ex. 2 (Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Enforcement of the Immigration Laws to Serve the National Interest*, Feb. 20, 2017); *see also* Ex. 10 (*Q&A: DHS Implementation of the Executive Order on Enhancing Public Safety in the Interior of the United States*, Feb. 21, 2017) ("Q22: Do these memoranda affect recipients of Deferred Action for Childhood Arrivals (DACA)? A22: No.").

51.     On March 29, 2017, Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer." *See* Ex. 33 (Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico, Mar. 29, 2017).

52.     On April 21, 2017, President Trump represented that his Administration's policy was not to deport DACA grantees, and suggested that they "should rest easy." *See* Ex. 34 (The Associated Press, Interview Transcript, Apr. 21, 2017).

53.     On June 15, 2017, Secretary Kelly issued a memo terminating the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program created in 2014, but keeping DACA in place. *See* Ex. 23 (Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents*, June 15, 2017).

54.     The government's commitment to the DACA program was further communicated to young people through DHS's publication entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA)" (the "DACA SOP"). *See* Ex. 18. This

document includes more than 150 pages of specific instructions for granting or denying deferred action.

55.    Moreover, the approval notice granting deferred action under DACA listed only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA. *See* Ex. 24 (USCIS, DACA Approval Notice).

56.    In reliance on these representations, hundreds of thousands of young people applied to participate in the DACA program, or sought renewal of their benefits since 2017. *See* Ex. 1.

**President Trump's Statements about Mexicans.**

57.    Despite these various and repeated promises to DACA grantees made by the federal government and by President Trump, including a recognition of DACA's continued legal viability, value, and successes, President Trump has a long history of disparaging Mexicans, who comprise the vast majority of DACA grantees.

58.    In announcing his presidential campaign, then-candidate Trump compared Mexican immigrants to rapists, stating: "When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people." *See* Ex. 35 (Washington Post, *Transcript of Donald Trump's Presidential Bid Announcement*, June 16, 2015).

59.    During the first Republican presidential debate, then-candidate Trump again stated his distaste for immigrants from Mexico: "The Mexican government is much smarter, much sharper, much more cunning. And they send the bad ones over because they don't want to pay for them. They don't want to take care of them." *See* Ex. 36 (Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News, Aug. 6, 2015).

60.     Soon after, on August 25, 2015, then-candidate Trump refused to answer questions about immigration posed by Jorge Ramos, a Mexican-American and the top news anchor at Univision, a Spanish-language news network. After sending his bodyguard to physically remove Mr. Ramos, then-candidate Trump derisively told Mr. Ramos to "Go back to Univision." *See* Ex. 37 (Phillip Rucker, *First, Trump booted Univision anchor Jorge Ramos out of his news conference. Then things got interesting*, The Washington Post, Aug. 25, 2015).

61.     In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag as "criminals" and "thugs." *See* Ex. 38 (Donald Trump, "The protestors in New Mexico were thugs who were flying the Mexican Flag," Twitter, May 25, 2016); *See* Ex. 39 (Donald Trump, "Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals," Twitter, June 4, 2016).

62.     In June 2016, then-candidate Trump impugned the integrity of a federal judge presiding over a lawsuit against one of his businesses because the judge is Hispanic. Trump commented that Judge Gonzalo Curiel's rulings against him "[H]as to do with perhaps that I'm very, very strong on the border. . . Now, he is Hispanic, I believe. He is a very hostile judge to me." *See* Ex. 40 (Jose A. DelReal and Katie Zezima, *Trump's personal, racially tinged attacks on federal judge alarm legal experts*, The Washington Post, June 1, 2016).

63.     In an interview with CBS News on June 5, 2016, then-candidate Trump again reiterated his anti-Mexican views, noting that "[Judge Curiel]'s a member of a club or society very strongly, pro-Mexican, which is all fine. But I say he's got bias." *See* Ex. 41 (CBS News, Transcript of Face the Nation, June 5, 2016). Judge Curiel is a member of the San Diego Chapter of the La Raza Lawyers Association. *See* Ex. 42 (Michelle Ye Hee Lee, *Trump supporters' false*

**15**

*claim that Trump U judge is a member of a pro-immigrant group*, The Washington Post, June 7, 2016).

64.     On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole. They later told police that "Donald Trump was right; all these illegals need to be deported." When asked about the incident, then-candidate Trump failed to condemn the men, instead describing them as "passionate." *See* Ex. 43 (Adrian Walker, *'Passionate' Trump fans behind homeless man's beating?*, The Boston Globe, Aug. 21, 2015). Specifically, Trump stated, "[i]t would be a shame . . . I will say that people who are following me are very passionate. They love this country and they want this country to be great again. They are passionate. *Id.*

65.     In October 2016, during a presidential debate, then-candidate Trump responded to a question about immigration by stating: "We have some bad hombres here and we're going to get them out." *See* Ex. 44 (Katie Zezima, *Trump on immigration: There are 'bad hombres' in the United States*, The Washington Post, Aug. 30, 2017).

66.     On January 27, 2017, newly-inaugurated President Trump and Mexico's President Peña Nieto discussed President Trump's proposal for a border wall over the phone. During that transcribed conversation, President Trump again referred to "hombres" stating: "You have some pretty tough hombres in Mexico that you may need help with, and we are willing to help you with that big-league. But they have to be knocked out and you have not done a good job of knocking them out." *See* Ex. 45 (Greg Miller *et. al.*, *Full Transcripts of Trump's Calls with Mexico and Australia*, The Washington Post, Aug. 3, 2017).

67.     On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal judge's order to stop racially profiling Latinos. *See* Ex. 46 (Julie Hirschfield Davis and Maggie

Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration*, The N.Y. Times, Aug. 25, 2017).

68.    Sheriff Arpaio had been detaining people ostensibly because they had violated the law. But in practice, his office detained huge numbers of individuals solely because they looked Latino, without any reasonable suspicion of illegal conduct. *See generally Melendres v. Arpaio*, Findings of Fact & Conclusions of Law, 2:07-cv-02513-GMS, ECF Doc. No.579 (D. Az. May 24, 2013). After a federal court enjoined that practice in 2011, Arpaio continued his unlawful and discriminatory practices unabated, "announc[ing] to the world and to his subordinates that he was going to continue business as usual no matter who said otherwise." *United States v. Arpaio*, Findings of Fact & Conclusions of Law, 2:16-cr-01012-SRB, ECF Doc. No. 210 at 13 (D. Az. July 31, 2017). On July 31, 2017, a federal court held Arpaio in criminal contempt, holding that he had willfully acted in "flagrant disregard" of the injunction. *Id.*

69.    Before issuing the pardon, President Trump asked, "Was Sheriff Joe convicted for doing his job?" *See* Ex. 46. (Davis and Haberman, *Trump Pardons Joe Arpaio*). After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio "an American patriot." *Id.*

70.    As President Trump's statements about Mexico and those with Mexican origins demonstrate, the President is willing to disparage Mexicans in a misguided attempt to secure support from his constituency.

**Trump Administration's Threatening Statements about Deporting Immigrants.**

71.    On June 13, 2017, Acting ICE Director Thomas Homan testified in front of the House Appropriations Committee's Subcommittee on Homeland Security, stating as to "every immigrant in the country without papers," that they "should be uncomfortable. You should look over your shoulder. And you need to be worried." *Hearing on the ICE and CBP F.Y. 2018 Budget*

*Before the Subcomm. on Homeland Security of the H. Comm. on Appropriations*, 115th Cong. (2017) 2017 WLNR 18737622.

72.     On April 19, 2017, United States Attorney General Jefferson B. Sessions stated in an interview on Fox News' "Happening Now," program—in response to a question regarding the deportation of a DACA recipient—that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported." Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017).

**President Trump Terminates DACA in Response to the Litigation Threats of a State Found To  Have Discriminated Against Latinos/Hispanics Nine Times Since 2012.**

73.     On June 29, 2017, the Attorneys General of ten states, led by the State of Texas, sent U.S. Attorney General Sessions a letter threatening to add claims to litigation currently pending in the Southern District of Texas "to challenge both the DACA program and the remaining expanded DACA permits," if the Executive Branch did not agree to end the DACA program by September 5, 2017. Ex. 177 (Letter from Ken Paxton *et.al.* to Attorney General Jeff Sessions, June 29, 2017).

74.     The demand that President Trump eliminate DACA is part of a history of intentional discrimination against Latinos/Hispanics by the State of Texas.

75.     Over the preceding decade, federal courts have repeatedly found the State of Texas liable for engaging in unlawful discrimination based on race and/or national origin.

76.     For example, in *Texas v. United States*, 887 F. Supp. 2d 133, 161 (D.D.C. 2012), three federal judges blocked a Congressional and State House redistricting plan after finding that it "was enacted with discriminatory purpose."

**18**

77.     The litigation eventually culminated in a ruling by a three-judge panel on August 15, 2017 finding, again, that the 2010 congressional districts had been created with "racially discriminatory intent" against Latinos and African American voters. *Perez v. Abbott*, SA-11-CV-360, 2017 U.S. Dist. LEXIS 129982, at *55 (W.D. Tex. Aug. 15, 2017).

78.     On October 9, 2014, in separate litigation challenging a state voter photo identification ("ID") law, a Texas federal district court judge found that the provision had been "imposed with an unconstitutional discriminatory purpose" and "constitute[d] an unconstitutional poll tax." *Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014).

79.     On remand from the Fifth Circuit, a federal district court concluded that the 2011 Legislature intentionally discriminated against minority voters by requiring presentation of a photo ID when casting their ballots. *Veasey v. Abbott*, 2017 U.S. Dist. LEXIS 54253, at *14-18 (S.D. Tex. Apr. 10, 2017).

80.     DHS issued the DHS Memorandum terminating DACA on September 5, 2017, in direct response to the threats of the State of Texas and the other ten states, fulfilling the demand of a State marked with a history of racial and national origin discrimination.

**President Trump Backtracks on His Promise and Terminates DACA.**

81.     Attorney General Sessions announced the termination of DACA via a live press conference. He explained, without evidence, "The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *See* Ex. 75 (DOJ, *Attorney General Sessions Delivers Remarks on DACA*, Prepared Remarks, Sept. 5, 2017).

82. Under the DHS Memorandum, which accompanied this announcement, the government's new policy provides no discretion to approve new applications on a case-by-case basis. Instead, the DHS Memorandum is a final decision that an entire class of people is no longer eligible for deferred action, employment authorization, and other benefits. Per the DHS Memorandum, DHS "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum." DHS will also reject all renewal applications it receives after October 5, 2017, and all renewal applications for authorizations that expire after March 5, 2018. *See* Ex. 74 (DHS Memorandum).

83. In issuing the DHS Memorandum, the federal government misleadingly claimed that DACA was unconstitutional, *see* Ex. 74, despite the fact that no court has made that determination, and despite previous determinations by DOJ and DHS, including under the Trump administration, that DACA is lawful and should be left in place. In fact, as recently as June 15, 2017, then-Secretary of Homeland Security John Kelly chose to allow DACA to continue (while terminating the DAPA program) "after consulting with the Attorney General." *See* Ex. 23

84. Even after the announcement, the government's position on the reasoning for the termination has been unclear and inconsistent. On the day of the termination, President Trump re-tweeted a statement that "We are a nation of laws. No longer will we incentivize illegal immigration." *See* Ex. 47 (Josh Saul, *Jeff Sessions Always Wanted to Deport Undocumented Immigrant Youth. Now He Can*, Newsweek, Sept. 5, 2017). The President appears to have deleted this tweet. Later on September 5, the President tweeted, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" *See* Ex. 48 (Donald J. Trump, Twitter, Sept. 5, 2017). On September 14, 2017, he tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have

jobs, some serving in the military? Really! .....” *See* Ex. 50 (Donald J. Trump, Twitter, Sept. 14, 2017).

85.     As a result of the DHS Memorandum, DACA grantees whose benefits expire after March 5, 2018 will immediately lose their employment authorization, as well as other vital benefits, such as social security cards, driver’s licenses, financial aid, disability and health benefits, among others.

86.     They also may lose their homes and communities if the program is allowed to expire. An internal White House memo reported on by CNN stated that DHS now is urging DACA grantees “to prepare for and arrange their departure from the United States” when their DACA terms end. *See* Ex. 88 (Tal Kopan & Jim Acosta, *Admin Memo: DACA recipients should prepare for departure from the United States*, CNN, Sept. 5, 2017).  This threat of deportation is consistent with past references to deportation of DACA grantees, such as a statement by Attorney General Sessions in response to a question regarding the deportation of a DACA grantee that “[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can’t promise people who are here unlawfully that they aren’t going to be deported.”  *See* Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported ‘DREAMer’ deportation*, Fox News, Apr. 19, 2017).

87.     President Trump also has taken affirmative steps to reduce the privacy protections applicable to DACA grantee information. In January 2017, President Trump issued an Executive Order directing all agencies, including DHS, to “ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information.” *See* Ex. 76 (Executive Order 13768,

"Enhancing Public Safety in the Interior of the United States," Jan. 25, 2017). In response to the Executive Order, DHS adopted a privacy policy that "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement." *See* Ex. 51 (DHS, *Privacy Policy 2017-01 Questions & Answers,* Apr. 27, 2017).

88.     The DHS Memorandum provides no assurance to DACA grantees, or direction to USCIS and ICE, that information contained in DACA applications cannot be used for the purpose of future immigration enforcement proceedings.

89.     To the contrary, on the same day that the DHS Memorandum was issued, DHS changed its public guidance about the use of DACA application data for immigration enforcement. DHS removed the webpage containing the assurance that, absent exceptional circumstances, DACA application data "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings." *Cf.* Ex. 25 (containing link to USCIS webpage that now contains an error alert and a message stating, "The page you are looking for may not exist or is temporarily unavailable."). The same day, DHS posted a new policy governing the use of information provided by DACA applicants. DHS now states that USCIS "[g]enerally" will not "proactively provid[e] information obtained through DACA to ICE and CBP. *See* Ex. 89 (DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals,* Sept. 5, 2017). The new policy imposes no restrictions on USCIS providing DACA data at the request of ICE, CBP, or any other law enforcement entity. *Id.* DHS also reserves the right to change its new policy "at any time without notice" and states that the policy "may not be relied upon" by any party. *Id.*

90.     DACA grantees thus immediately face the risk that information they provided to the federal government could be used against them at any time, without notice, for purposes of immigration enforcement, including detention or removal.

**The Defendants' Failure to Notify Certain DACA Grantees of the October 5, 2017 Renewal Deadline.**

91.     Before the termination of DACA, Defendants had a written policy and practice allowing DACA grantees to submit their renewal application up to one year after the date of expiration of their participation in DACA. If DACA grantees failed to renew within one year of the expiration date, they had the option to re-apply as initial applicants. *See* Ex. 14 (USCIS FAQs – Q50).

92.     In addition, USCIS and DHS had a long-standing practice of using the address information they maintain for DACA grantees to send individualized notices to those grantees regarding their renewal expiration dates. *See* Ex. 178 (DACA Renewal Notice).

93.     On information and belief, no standard renewal notices have been provided to DACA grantees whose participation in DACA expires between February 6, 2018 and March 5, 2018. Prior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120-150 days prior to expiration, i.e., by November 2017, in order to avoid a lapse in deferred action and employment authorization. *See, e.g., id.* However, since the termination, Defendants have not yet sent this group of DACA grantees any notices regarding when and how they can renew.

94.     On information and belief, the government sent standard renewal notices up until August 1, 2017 for DACA grantees whose participation in DACA expires by January 2018, informing the grantees they had the standard 120-150 days prior to the expiration date to renew if they wished to "avoid a lapse in [their] period of deferred action and employment authorization". *See, e.g., id.* However, in light of DHS's decision to impose an absolute cut-off date of October 5, 2017 for all renewal applications, the information conveyed in these notices is now incorrect.  The

notices misleadingly suggest to DACA grantees that they have several additional months beyond October 5 to renew their DACA status without a gap in employment authorization. Moreover, the faulty renewal notices were not followed with individualized corrected notices informing this group of grantees that there is a new, absolute October 5 deadline for renewal, and that DACA grantees will no longer have up to one year after the date of expiration of their DACA to submit a renewal application.

95.     As a result of Defendants' failure to provide individualized notice regarding the new October 5, 2017 renewal deadline to DACA grantees whose participation expires before March 5, 2018, individuals who received no notice or incorrect notice of the new deadline may be forever ineligible to renew their participation in DACA. These DACA grantees will no longer be protected from deportation and will lose work authorization that they may have otherwise had. They may also lose health insurance, social security cards, driver's licenses and other benefits.

96.     On October 3, 2017, DHS issued a press release stating that "[o]f the approximately 154,200 individuals whose DACA is set to expire between Sept. 5, 2017, and March 5, 2018, just over 106,000 either have renewal requests currently pending with USCIS, or have already had USCIS adjudicate their renewal request." *See* Ex. 82 (DHS Press Release *Department of Homeland Security Acting Secretary Elaine Duke Reminds Eligible DACA Recipients to File Renewal Requests,* October 3, 2017). Therefore, up to one third of DACA grantees who are eligible for renewal had not applied as of two days before the October 5, 2017 deadline.

**The Government's Failure to Notify DACA Grantees of their Inability to Renew Their DACA Status If It Expires After March 5, 2018.**

97.     On information and belief, Defendants' termination of DACA was solely communicated to DACA grantees through the publication of DHS's memorandum on September 5, 2017 on the DHS website and by a concurrent television announcement from Attorney General

Sessions. *See* Ex. 74 (DHS Memo); *See* Ex. 75 (*Attorney General Sessions Delivers Remarks on DACA*).

98.      On information and belief, the government did not and does not plan to issue individualized notices to any DACA grantees informing them of the termination of DACA and their inability to renew if their DACA status expires after March 5, 2018.

99.      Many DACA grantees relied upon their ability to apply to renew DACA in making important decisions related to their employment, education and families, among other things.

## HARM TO PLAINTIFF STATES

100.     The States will suffer harm as a result of the termination of the DACA program, including immediate and irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests.

## PLAINTIFF STATE OF NEW YORK

101.     The State of New York is home to an estimated 76,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

102.     As of June 30, 2017, USCIS had approved 42,503 initial DACA applications and 62,850 renewals for residents of New York. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 63 (Decl. Wong).

103.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of New York, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

104.     An estimated 38,848 New York DACA grantees are employed. *See* Ex. 5 ¶ 64 (Decl. Wong). An estimated 2,295 are business owners. *Id.* An estimated 19,084 are in school, and 13,645 are currently pursuing a bachelor's degree or higher. *Id.* ¶ 65.

**25**

105.     In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the New York economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $140 million annually in state and local taxes in New York—a contribution that may drop by $55 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the New York economy with $10.7 billion in budgetary costs and $38.6 billion economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF COMMONWEALTH OF MASSACHUSETTS

106.     The Commonwealth of Massachusetts is home to an estimated 19,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

107.     As of June 30, 2017, USCIS had approved 8,053 initial DACA applications and 12,857 renewals for residents of Massachusetts. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 55 (Decl. Wong).

108.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Massachusetts, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

109.     An estimated 7,360 Massachusetts DACA grantees are employed. *See* Ex. 5 ¶ 56 (Decl. Wong).  An estimated 435 are business owners. *Id.* An estimated 3,616 are in school, and 2,585 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 57.

110.     In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Massachusetts economy generally. Stripping DACA grantees of the ability to work

legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.   According to one estimate, DACA-eligible residents contribute approximately $24.2 million annually in state and local taxes in Massachusetts—a contribution that may drop by $9.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Massachusetts economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

### PLAINTIFF STATE OF WASHINGTON

111.    The State of Washington is home to an estimated 27,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

112.    As of June 30, 2017, USCIS had approved 17,937 initial DACA applications and 17,906 renewals for residents of Washington. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 87 (Decl. Wong).

113.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Washington, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

114.    An estimated 16,394 Washington DACA grantees are employed. *See* Ex. 5 ¶ 88 (Decl. Wong).  An estimated 969 are business owners. *Id.* An estimated 8,054 are in school, and 5,758 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 89.

115.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Washington economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the

State. According to one estimate, DACA-eligible residents contribute approximately $51 million annually in state and local taxes in Washington—a contribution that may drop by $19 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Washington economy with $1.8 billion in budgetary costs and $6.4 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF COLORADO

116.    The State of Colorado is home to an estimated 23,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

117.    As of June 30, 2017, USCIS had approved 17,310 initial DACA applications and 15,322 renewals for residents of Colorado. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 27 (Decl. Wong).

118.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Colorado, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

119.    An estimated 15,281 Colorado DACA grantees are employed. *See* Ex. 5 ¶ 28 (Decl. Wong).  An estimated 935 are business owners. *Id.* An estimated 7,772 are in school, and 5,557 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 29.

120.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Colorado economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $33.9 million annually in state and local taxes in Colorado—a contribution that may drop by $16.4 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that

terminating DACA would, over a ten-year period, impact the Colorado economy with $768 million in budgetary costs and $2.7 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF CONNECTICUT

121.    The State of Connecticut is home to an estimated 11,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

122.    As of June 30, 2017, USCIS had approved 4,989 initial DACA applications and 6,764 renewals for residents of Connecticut. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 31 (Decl. Wong).

123.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Connecticut, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

124.    An estimated 4,560 Connecticut DACA grantees are employed. *See* Ex. 5 ¶ 32 (Decl. Wong).  An estimated 269 are business owners. *Id.* An estimated 2,240 are in school, and 1,602 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 33.

125.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Connecticut economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.  According to one estimate, DACA-eligible residents contribute approximately $17 million annually in state and local taxes in Connecticut—a contribution that may drop by $5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).  Another estimate suggests that terminating DACA would, over a ten-year period, impact the Connecticut economy with $642 million in budgetary costs and $2.3 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF DELAWARE

126.    The State of Delaware is home to an estimated 3,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

127.    As of June 30, 2017, USCIS had approved 1,451 initial DACA applications and 1,583 renewals for residents of Delaware. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 35 (Decl. Wong).

128.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Delaware, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

129.    An estimated 1,326 Delaware DACA grantees are employed. *See* Ex. 5 ¶ 36 (Decl. Wong). An estimated 651 are in school, and 466 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 37.

130.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Delaware economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $2.4 million annually in state and local taxes in Delaware—a contribution that may drop by $1 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Delaware economy with $258 million in budgetary costs and $924 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF THE DISTRICT OF COLUMBIA

131.    The District of Columbia ("District") is home to an estimated 2,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

132.    As of June 30, 2017, USCIS had approved 773 initial DACA applications and 1,299 renewals for residents of the District. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 39 (Decl. Wong).

133.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of the District, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

134.    An estimated 707 District DACA grantees are employed. *See* Ex. 5 ¶ 40 (Decl. Wong). An estimated 347 are in school, and 248 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 41.

135.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the District's economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $2.7 million annually in state and local taxes in the District—a contribution that may drop by $946,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the District's economy $900 million in budgetary costs and $3.2 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF HAWAII

136.    The State of Hawaii is home to an estimated 2,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

137.    As of June 30, 2017, USCIS had approved 582 initial DACA applications and 2,179 renewals for residents of Hawaii. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 43 (Decl. Wong).

138.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Hawaii, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

139.    An estimated 532 Hawaii DACA grantees are employed. *See* Ex. 5 ¶ 44 (Decl. Wong). An estimated 261 are in school, and 187 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 45.

140.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Hawaii economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in a loss of tax revenue for the State.  According to one estimate, DACA-eligible residents contribute approximately $3.2 million annually in state and local taxes in Hawaii—a contribution that may drop by $870,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Hawaii economy $126 million in budgetary costs and $451.5 million economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF ILLINOIS

141.    The State of Illinois is home to an estimated 68,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

142.    As of June 30, 2017, USCIS had approved 42,537 initial DACA applications and 39,702 renewals for residents of Illinois. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 47 (Decl. Wong).

143.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Illinois, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

144.    An estimated 38,879 Illinois DACA grantees are employed. *See* Ex. 5 ¶ 48 (Decl. Wong).  An estimated 2,297 are business owners. *Id.* An estimated 19,099 are in school, and 13,656 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 49.

145.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Illinois economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $131 million annually in state and local taxes in Illinois—a contribution that may drop by $54.7 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, cost the Illinois economy $1.9 billion in lost tax revenue and $6.9 billion overall. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF IOWA

146.    The State of Iowa is home to an estimated 4,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

147.    As of June 30, 2017, USCIS had approved 2,812 initial DACA applications and 3,120 renewals for residents of Iowa. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 51 (Decl. Wong).

148.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Iowa, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

149.    An estimated 2,570 Iowa DACA grantees are employed. *See* Ex. 5 ¶ 52 (Decl. Wong).  An estimated 152 are business owners. *Id.* An estimated 1,263 are in school, and 903 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 53.

150.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Iowa economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $6.8 million annually in state and local taxes in Iowa—a contribution that may drop by $3.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Iowa economy with $258 million in budgetary costs and $924.5 million in economic costs.  *See* Ex. 4, Table 1 (Decl. Brannon). Yet another estimate predicts that the state's GDP would contract by $55.83 million if DACA is terminated. *See* Ex. 85 ¶ 9 (Decl. Swenson, Iowa St. University).

## PLAINTIFF STATE OF NEW MEXICO

151.    The State of New Mexico is home to an estimated 10,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

152.    As of June 30, 2017, USCIS had approved 6,838 initial DACA applications and 5,622 renewals for residents of New Mexico. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 59 (Decl. Wong).

153.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of New Mexico, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.  An estimated 6,250 New Mexico DACA grantees are employed. *See* Ex. 5 ¶ 60 (Decl. Wong).  An estimated 369 are business owners. *Id.* An estimated 3,070 are in school, and 2,195 currently are pursuing a bachelor's degree or higher. *Id*. ¶ 61.In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the New Mexico economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.  According to one estimate, DACA-eligible residents contribute approximately $18.8 million annually in state and local taxes in New Mexico—a contribution that may drop by $7.5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the New Mexico economy with $258 million in budget costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF NORTH CAROLINA

154.    The State of North Carolina is home to an estimated 41,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

155.    As of June 30, 2017, USCIS had approved 27,455 initial DACA applications and 23,619 renewals for residents of North Carolina. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 67 (Decl. Wong).

156.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of North Carolina, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

157.    An estimated 24,094 North Carolina DACA grantees are employed. *See* Ex. 5 ¶ 68 (Decl. Wong). An estimated 1,483 are business owners. *Id.* An estimated 12,327 are in school, and 8,814 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 69.

158.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the North Carolina economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $63.6 million annually in state and local taxes in North Carolina—a contribution that may drop by $29 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the North Carolina economy with $2.1 billion in budgetary costs and $7.8 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF OREGON

159.    The State of Oregon is home to an estimated 15,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

160.    As of June 30, 2017, USCIS had approved 11,321 initial DACA applications and 10,275 renewals for residents of Oregon. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 71 (Decl. Wong).

161.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Oregon, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, have more ready access to in-state tuition, and obtain employer-based health insurance, among other benefits.

162.    An estimated 10,347 Oregon DACA grantees are employed. *See* Ex. 5 ¶ 72 (Decl. Wong).  An estimated 611 are business owners. *Id.* An estimated 5,083 are in school, and 3,634 currently are pursuing a bachelor's degree or higher. *Id*. ¶ 73.

163.    The State of Oregon's revenue structure relies heavily on income taxes, including capital gains for investors, wages paid to workers, and corporate taxes that are directly linked to profitability. *See* Ex. 126 ¶ 9 (Decl. Read).

164.    Eliminating DACA grantee Oregonians' ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the state and impairment of the state's economic health. See, e.g., Ex. 100 ¶ 6 (Decl. Nicolas). According to one estimate, DACA-eligible residents contribute approximately $20 million annually in state and local taxes in Oregon—a contribution that may drop by $11 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period,

impact the Oregon economy with $384 million in budgetary costs and $1.3 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

165.    In addition, the inability to work legally and enjoy the other benefits of legal status such as better access to credit and the banking system will make it more difficult, if not impossible, for DACA grantee Oregonians to start businesses that contribute to the State's economy and overall financial health. *See* Ex. 126 ¶ 12 (Decl. Read).

166.    In addition to the direct benefits to state programs of increased state revenues, the State is also an investor and a borrower. *See* Ex. 126 ¶¶ 5-9 (Decl. Read). The State's credit rating, cost of borrowing, and the performance of the State's investments are all tied to the overall economic health of the State. *See* Ex. 126 ¶ 9 (Decl. Read). A reduced state tax base, and potential downward pressure on corporate performance, has the potential to adversely affect these interests as well. Many of the companies in which Oregon and Oregonians have holdings have expressed concern that the rescission of the DACA program is a threat and will be disruptive to their employees, their productivity, and their competitiveness. Any such disruption or downward pressure on corporate profits also potentially affects Oregon as a taxing entity and a shareholder.

## PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

167.     The Commonwealth of Pennsylvania is home to an estimated 15,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

168.     As of June 30, 2017, USCIS had approved 5,982 initial DACA applications and 9,875 renewals for residents of Pennsylvania. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 75 (Decl. Wong).

169.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Pennsylvania, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

170.     An estimated 5,468 Pennsylvania DACA grantees are employed. *See* Ex. 5 ¶ 76 (Decl. Wong).  An estimated 323 are business owners. *Id.* An estimated 2,686 are in school, and 1,920 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 77.

171.     In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Pennsylvania economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.   According to one estimate, DACA-eligible residents contribute approximately $20.7 million annually in state and local taxes in Pennsylvania—a contribution that may drop by $7.5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Pennsylvania economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## PLAINTIFF STATE OF RHODE ISLAND

172.    The State of Rhode Island is home to an estimated 3,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

173.    As of June 30, 2017, USCIS had approved 1,248 initial DACA applications and 2,019 renewals for residents of Rhode Island. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 79 (Decl. Wong).

174.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Rhode Island, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

175.    An estimated 1,141 Rhode Island DACA grantees are employed. *See* Ex. 5 ¶ 80 (Decl. Wong). An estimated 560 are in school, and 401 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 81.

176.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Rhode Island economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. The Rhode Island Office of Management and Budget ("RIOMB") estimates that the termination of DACA could lead to over $1 million in lost state and local income, real estate and vehicle taxes. *See* Ex. 128 ¶ 3 (Decl. Womer, RIOMB). According to one estimate, DACA-eligible residents contribute approximately $3.8 million annually in state and local taxes in Rhode Island—a contribution that may drop by $1.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). According to the Institute on Taxation and Economic Policy ("ITEP"), the State of Rhode Island alone will lose $2.6 million in state and local taxes if DACA protections are lost. *See* Ex. 54. (Misha Hill and Meg Wiehe, *State and Local Contributions of Young Undocumented*

*Immigrants*, Institute on Taxation and Economic Policy, April 25, 2017). According to the Center for American Progress, Rhode Island will lose over $61 million in annual GDP loss from removing DACA workers. *See id.*

## PLAINTIFF STATE OF VERMONT

177.    The State of Vermont is home to an estimated 100 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

178.    As of June 30, 2017, USCIS had approved 44 initial DACA applications and 199 renewals for residents of Vermont. *See* Ex. 1 (Updated USCIS Data).

179.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Vermont, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

180.    An estimated 37 DACA grantees are employed in Vermont. *See* Ex. 53 (Nicole Prchal Svajlenka, *et. al.*, *A New Threat to DACA Could Cost States Billions of Dollars*, Center for American Progress, July, 21, 2017).

181.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Vermont economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $140,000 annually in state and local taxes in Vermont—a contribution that may drop by $48,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, cost the Vermont economy $2.4 million in Gross Domestic Product. *See* Ex. 53 (Prchal Svajlenka, *et. al.*, *A New Threat to DACA*).

## PLAINTIFF COMMONWEALTH OF VIRGINIA

182.    The Commonwealth of Virginia is home to an estimated 30,000 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill).

183.    As of June 30, 2017, USCIS had approved 12,248 initial DACA applications and 15,296 renewals for residents of Virginia. *See* Ex. 1 (Updated USCIS Data); Ex. 5 ¶ 83 (Decl. Wong).

184.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Virginia, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

185.    An estimated 11,195 Virginia DACA grantees are employed. *See* Ex. 5 ¶ 84 (Decl. Wong).  An estimated 661 are business owners. *Id.* An estimated 5,499 are in school, and 3,932 currently are pursuing a bachelor's degree or higher. *Id.* ¶ 85.

186.    In addition to the many harms identified below, *see* ¶¶ 188-233, terminating DACA will hurt the Virginia economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, DACA-eligible residents contribute approximately $34.7 million annually in state and local taxes in Virginia—a contribution that may drop by $12.7 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Virginia economy with $1 billion in budgetary costs and $3.6 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).

## HARM TO PLAINTIFF STATES BY CATEGORY

***Diversity, Inclusion, and Constitutional Values.***

187.    The States have an interest in prohibiting the deprivation of life, liberty or property without due process, and in preventing any practice that denies equal protection of the laws or otherwise discriminates on the basis of race, color, or national origin. For example:

    a.    New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. And New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. *See* N.Y. Exec. Law § 290.

    b.    Washington has declared that practices that discriminate against any of its inhabitants because of race, color, or national origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code 49.60.010.

    c.    Colorado welcomes people of all backgrounds. Colorado law prohibits unlawful discrimination against people based on, among other things, race, national origin, and ancestry. *See* C.R.S. § 24-34-601; C.R.S. § 24-34-402; C.R.S. § 24-34-502.

    d.    The Illinois Human Rights Act, 775 ILCS 5/1 *et seq.*, establishes a public policy "to secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her … national origin." *See* 775 ILCS 5/1-102(A). It further establishes a public policy "to prevent discrimination based on citizenship status in employment." *See* 775 ILCS 5/1-102(C).

    e.    The Council of the District of Columbia enacted the District's Human Rights Act "to secure an end in the District of Columbia to discrimination for any reason other

than that of individual merit," including discrimination based on national origin. *See* D.C. Code Ann. § 2-1401.01. The District's Human Rights Act prohibits discrimination in a broad range of areas including employment, education, places of public accommodation, public services, housing and commercial space accommodations, the sale of motor vehicle insurance and the rental of motor vehicles.

f. Through a long tradition of including and incorporating foreign-born persons into its institutions, businesses, and governments, New Mexico has become one of the most socially and politically diverse states. New Mexico enshrined in its state constitution three provisions protecting the Spanish language and those who speak it. *See* N.M. Const. art. VII, § 3 (stating that "[t]he right of any citizen of the state to vote, hold office or sit upon juries shall never be restricted, abridged or impaired on account of . . . language . . . or inability to speak, read or write the English or Spanish languages except as otherwise provided in this constitution"); N.M. Const. art. XII, § 8 (requiring teachers to become proficient in English and Spanish); and N.M. Const. art. XII. § 10 (guaranteeing that "[c]hildren of Spanish descent in the state of New Mexico shall never be denied the right and privilege of admission and attendance in the public schools or other public educational institutions of the state, and they shall never be classed in separate schools, but shall forever enjoy perfect equality with other children in all public schools and educational institutions of the state").

g. Oregon has codified its state policy that practices of unlawful discrimination against any of its inhabitants because of religion or national origin are "a matter of state

concern," and that such discrimination "menaces the institutions and foundation of a free democratic state." *See* ORS § 659A.006.

h.   Pennsylvania's laws reflect its commitment to values of diversity, multiculturalism and openness to others of different races and nationalities. For example, Pennsylvania's Human Relations Act recognizes that an individual's opportunity to obtain employment, public accommodation, housing accommodation and commercial property without discrimination on the basis of "race, color, familial status … ancestry [and] national origin" is a "civil right" that is "enforceable" under Pennsylvania law. *See* 43 P.S. § 953. *See also* 43 P.S. § 955.

i.   In keeping with its history of freedom of conscience, equality and tolerance, Rhode Island has prohibited practices that discriminate against any of its inhabitants because of race, color, or national origin. *See* R.I. Constitution Article 1, section 2; R.I. Gen. Laws 12-19-38 (Hate Crimes Sentencing Act); R.I. Gen. Laws § 42-112-1 (The Civil Rights Act of 1990); R.I. Gen. Laws 28-5-1 (Fair Employment Practices Act); R.I. Gen. Laws 34-37-1 (Fair Housing Practices Act).

188.   The States also have an interest in ensuring that their residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

***Harm to States as Employers.***

189.    The States have an interest in maintaining qualified, trained workforces.

190.    Terminating DACA will cause the States to lose qualified State employees. Many DACA recipients work in government or at state-run institutions, and they were hired because of their specialized skills and qualifications. The States expended time and funds to hire, train, and manage DACA recipients. If these individuals become ineligible to work, the States will lose the value of their investment and the services of employees who perform important functions for the States. They will also incur the costs associated with the need to recruit, hire, and train replacements. *See, e.g.*, Ex. 52 ¶ 8 (Decl. Mostofi, NYC Mayor's Office of Immigrant Affairs); Ex. 56 ¶¶ 2-4 (Decl. Quinonez); Ex. 70 ¶ 6 (Decl. I.V.); Ex. 61 ¶ 10 (Decl. Heatwole, UMass); Ex. 62 ¶ 3 (Decl. Monroe, Wash. Dept. of Ecology); Ex. 65 ¶ 3 (Decl. Kaplan, WA Dept. of Social and Health Svcs.); Ex. 92 ¶ 3 (Decl. Jones, Wash. Treasury); Ex. 91 ¶ 3 (Decl. Garza, Big Bend Community College); Ex. 64 ¶ 3 (Decl. Glatt, Columbia Basin College); Ex. 58 ¶ 4 (Decl. Loera, Wash. State Univ.); Ex. 130 ¶ 3 (Decl. Conly, WA Dept. of Veterans Affairs); Ex. 113 ¶ 3 (Decl. Schuh, City of Anacortes, WA); Ex. 157 ¶ 9-10 (Decl. Ridder, Portland State Univ.); Ex. 154 ¶ 11 (Decl. Cuprill-Comas, Oregon Health and Science Univ.); Ex. 153 ¶¶ 6, 9 (Decl. Karpilo, Eastern Oregon Univ.); Ex. 156 ¶¶ 9-10 (Decl. Mitsui, Portland Community College); Ex. 167 ¶¶ 3-6 (Decl. Reveley, College of William & Mary); Ex. 134 ¶¶ 31, 37 (Decl. Herbst, Univ. of Conn.); Ex. 124 ¶¶ 4, 11 (Decl. Salaveria, Hawaii Dept. of Business, Economic Development and Tourism); Ex. 168 ¶¶ 3-7 (Decl. Cabrera, George Mason Univ.).

*Harm to State Colleges and Universities.*

191.     The States have an interest in the special contributions that DACA grantees make to State colleges and universities as students, employees, and alumni.

192.     Terminating DACA will harm the ability of the States' colleges and universities, including public universities, to satisfy their educational missions and prepare the States' residents for the workforce. *See* Ex. 61 ¶¶ 5-7 (Decl. Heatwole); Ex. 146 ¶¶ 12-13 (Decl. Clark *et al.,* Mass. State Univ. Pres.); Ex. 134 ¶¶ 15-38 (Decl. Herbst); Ex. 133 ¶¶ 15-24 (Decl. Pachis, Eastern Conn. State Univ.); Ex. 136 ¶¶ 1, 4 (Decl. Hardwick, Univ. of the District of Columbia); Ex. 166 ¶¶ 4-7 (Decl. Sullivan, Univ. of Vermont); Ex. 167 ¶¶ 5-6 (Decl. Reveley); Ex. 137 ¶¶ 4-10 (Decl. Straney, Univ. of Hawaii); Ex. 131 ¶¶ 4-9 (Decl. Miranda, Colorado State Univ.); Ex. 132 ¶¶ 3-10 (Decl. Allen, Univ. of Colorado); Ex. 135 ¶¶ 3-14 (Decl. Rakes, Delaware Tech. Community College); Ex. 152 ¶¶ 10-11, 21 (Decl. Mathewson & Pareja, Univ. of New Mexico School of Law); Ex. 149 (New Mexico Council of Univ. Presidents Letter); Ex. 157 ¶ 6 (Decl. Ridder); Ex 159 ¶ 5 (Decl. Galvan, Univ. of Oregon); Ex. 155 ¶ 5 (Decl. Alexander, Oregon State Univ.); Ex. 154 ¶¶ 7, 10 (Decl. Cuprill-Comas); Ex. 153 ¶ 7 (Decl. Karpilo); Ex. 160 ¶¶ 7-8 (Decl. Hagemann, Western Oregon Univ.); Ex. 158 ¶ 6 (Decl. Trueblood-Gamble, Southern Oregon Univ.); Ex. 168 ¶¶ 3-7 (Decl. Cabrera); Ex. 86 ¶¶ 7-9 (Decl. Wadhia, Penn. St. University); Ex. 142 ¶¶ 4-5 (Decl. Edgehill-Walden, Northern Illinois Univ.); Ex. 145 ¶ 15 (Decl. Kennedy, Mass. Community Colleges' Presidents' Council).

193.     DACA has made it possible for many young people to attend colleges and universities in the States, as work authorization allows DACA grantees to work both while they pursue their education and after graduation. More than 90% of DACA grantees report that DACA

allowed them to pursue educational opportunities previously unavailable to them. *See* Ex. 5 ¶ 18 (Decl. Wong).  For example:

    a.   The University of Colorado estimates that there are over 200 DACA grantees enrolled across the University. Ex. 132 ¶ 5 (Decl. Allen). Colorado State University has approximately 189 DACA grantees. Ex. 131 ¶ 8 (Decl. Miranda).

    b.   Delaware Technical and Community College ("DTCC") has at least 148 DACA students and at least another 242 graduates who are DACA grantees. *See* Ex. 135 ¶ 5 (Decl. Rakes). Many of DTCC's DACA students are nontraditional learners who support their families in addition to pursuing their education. *Id.* ¶ 8. Another approximate 75 DACA grantees currently attend Delaware State University ("DSU"). *See* Ex. 66 (Scott Gross, *DSU immigrant students fear Trump's DACA decision*, Delawareonline, Sept. 2, 2017).

    c.   Presently, there are 16 students who have reported their DACA status to the University of Hawaii and who are pursuing various degrees at multiple University campuses. Ex. 137 ¶ 6 (Decl. Straney).

    d.   In the University of Illinois System, approximately 350 of its students and 100 of its employees would be affected by the termination of DACA. Ex. 143 ¶ 8 (Decl. Wilson, Univ. of Illinois System).

    e.   In New York, both the State University of New York ("SUNY") and the City University of New York ("CUNY") have encouraged DACA grantees to apply as part of their strong commitment to diversity, equity, and inclusion. *See* Ex. 12 ¶ 10 (Decl. Milliken, CUNY); Ex. 99 (Decl. Johnson, SUNY). At CUNY, hundreds of

DACA grantees have enrolled in the university, many with the benefit of full scholarships. *See* Ex. 12 ¶ 6 (Decl. Milliken); Ex. 171 ¶8 (Decl. Park).

f.  Many of Oregon's public colleges and universities, including Portland State University, the University of Oregon, Oregon State University, Oregon Health and Science University, Eastern Oregon University, Western Oregon University, Southern Oregon University and Portland Community College enroll, and in some cases employ, DACA grantees. *See* Ex. 157 ¶ 4 (Decl. Ridder); Ex. 159 ¶ 5 (Decl. Galvan); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 154 ¶ 5 (Decl. Cuprill-Comas); Ex. 153 ¶¶ 5-6 (Decl. Karpilo); Ex. 160 ¶¶ 6-7 (Decl. Hagemann); Ex. 158 ¶¶ 4-5 (Decl. Trueblood-Gamble); Ex. 156 ¶¶ 6, 9 (Decl. Mitsui); Ex. 94 ¶¶ 5-8 8 (Decl. Ramirez Cuevas); Ex. 101 ¶¶ 1, 3 (Decl. Preciado).

g.  Many institutions of higher education in Virginia have students presently enrolled in their educational programs who are DACA grantees. According to the State Council of Higher Education for Virginia ("SCHEV"), the Commonwealth's coordinating body for higher education, there are more than 1,300 DACA students in Virginia attending institutions of higher education. *See* Ex. 127 ¶¶ 4 (Decl. Blake, SCHEV).

h.  According to the Washington Student Achievement Council ("WSAC"), the state agency that advances educational opportunities in Washington, there are more than 1,400 DACA students in Washington attending institutions of higher education. *See* Ex. 59 ¶ 9 (Decl. Thompson, WSAC). More than one hundred DACA grantees attend the University of Washington, based in Seattle. *See* Ex. 57 ¶ 4 (Decl.

Ballinger, Univ. of Wash.). More than 150 DACA grantees attend Washington State University, based in Pullman. *See* Ex. 58 ¶ 4 (Decl. Loera, Wash. State Univ.).

    i.   Many public colleges and universities in the States have diverse student populations, including a high percentage of Latino/Hispanic students and students who are first generation Americans and first in their families to attend college, as well as undocumented students. *See, e.g.*, Ex. 162 (Letter from Meghan Hughes, Community College of Rhode Island); Ex. 150 ¶ 7 (Decl. Abdallah, University of New Mexico). Although many such schools do not keep data on immigration status, they know that they have DACA grantees as alumni and current students. *See* Ex. 163 (Letter from Frank Sánchez, Rhode Island College President); Ex. 164 ¶ 6 (Decl. Farish, Roger Williams University); Ex. 161 (Letter from Richard M. Locke, Brown University Provost); Ex. 86 ¶ 6 (Decl. Wadhia); Ex. 146 ¶ 9 (Decl. Clark et al.).

194.    DACA grantees who are residents of Connecticut, Delaware, District of Columbia, Hawaii, Illinois, New Mexico, Massachusetts, Virginia, or Washington receive in-state tuition at public universities and/or are eligible for other financial assistance. *See* C.R.S. § 23-7-110; Ex. 132 ¶ 4 (Decl. Allen); Ex. 131 ¶ 7 (Decl. Miranda); Ex. 134 ¶ 8 (Decl. Herbst); Ex. 7 (Mass. Dept. of Higher Education Memorandum, *Residency Status for Tuition Classification Purposes – Deferred Action for Childhood Arrivals*, Nov. 21, 2012); Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 146 ¶ 7 (Decl. Clark et al.); Ex. 133 ¶¶ 8-12 (Decl. Pachis); Conn. Gen. Stat. § 10a-29; Ex. 135 ¶¶ 11-12 (Decl. Rakes); Ex. 136 ¶ 6 (Decl. Hardwick); Ex. 150 ¶ 12 (Decl. Abdallah); Or. Rev. Stat. § 352.287; Ex. 167 ¶ 4 (Decl. Reveley); Ex. 106 ¶ 5 (Decl. Suria); Ex. 137 ¶ 5 (Decl. Straney); Ex. 157 ¶ 4 (Decl. Ridder); Ex. 94 ¶ 7 (Decl. Ramirez Cuevas).

195.     Without the DACA program, talented young immigrants will be less likely to apply to and attend State schools because they will not be able to afford tuition given the loss of available financial assistance (in some of the States) and the likelihood that they will not be able to work legally upon graduation (in all the States). Those already enrolled will be less likely to finish their education at State schools due to the loss of current and future earning potential. *See* Ex. 12 ¶ 7-8 (Decl. Milliken); Ex. 56 ¶ 7 (Decl. Quinonez); Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 146 ¶¶ 8, 12 (Decl. Clark *et al.*); Ex. 72 ¶ 5 (Decl. Teodoro); Ex. 132 ¶ 7 (Decl. Allen); Ex. 131 ¶ 8 (Decl. Miranda); Ex. 136 ¶ 6 (Decl. Hardwick); Ex. 69 ¶¶ 8, 10 (Decl. Mendes); Ex. 60 ¶¶ 6, 9 (Decl. Guevara); Ex. 145 ¶ 8 (Decl. Kennedy); Ex. 135 ¶¶ 7-10 (Decl. Rakes); Ex. 139 ¶ 6 (Decl. Dietz, Illinois State Univ.); Ex. 143 ¶ 8 (Decl. Wilson); Ex. 106 ¶ 7 (Decl. Suria); Ex. 105 ¶ 5 (Decl. Oduyoye); Ex. 134 ¶¶ 16-17 (Decl. Herbst); Ex. 137 ¶ 7 (Decl. Straney); Ex. 152 ¶¶ 18-20 (Decl. Mathewson & Pareja); Ex. 101 ¶ 4 (Decl. Preciado); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 168 ¶ 6 (Decl. Cabrera); Ex. 160 ¶¶ 7-8 (Decl. Hagemann); Ex. 153 ¶¶ 7-8 (Decl. Karpilo); Ex. 95 ¶ 8 (Decl. Solano); Ex. 157 ¶¶ 6-7 (Decl. Ridder); Ex. 159 ¶¶ 5-6 (Decl. Galvan);  Ex. 158 ¶¶ 6, 8, 11 (Decl. Trueblood-Gamble); Ex. 154 ¶¶ 7-10 (Decl. Cuprill-Comas); Ex. 133 ¶ 13 (Decl. Pachis); Ex. 57 ¶ 4 (Decl. Ballinger); Ex. 58 ¶ 5 (Decl. Loera); Ex. 163 (Sánchez Letter, Rhode Island College); Ex. 165 ¶ 4 (Decl. Linde, Rhode Island College); Ex. 166 ¶ 6 (Decl. Sullivan); Ex. 167 ¶¶ 4-5 (Decl. Reveley); Ex. 164 ¶ 7 (Decl. Farish); Ex. 171 ¶¶ 7-9 (Decl. Park).

196.     Additionally, DACA students enrolled in programs that require employment authorization or entail licensing requirements to complete elements of the program—such as paid internships, clinical placement, residency training, or programs that require significant lab or field work—will be severely and adversely impacted if DACA is terminated. Indeed, these students may not be able to complete the academic requirements of their degrees. *See, e.g.*, Ex. 12 ¶ 8 (Decl.

Milliken); Ex. 61 ¶ 6 (Decl. Heatwole); Ex. 135 ¶ 9 (Decl. Rakes); Ex. 136 ¶ 7 (Decl. Hardwick); Ex. 166 ¶¶ 6-7 (Decl. Sullivan); Ex. 134 ¶ 33 (Decl. Herbst); Ex. 132 ¶ 7 (Decl. Allen); Ex. 131 ¶ 8 (Decl. Miranda); Ex. 152 ¶ 19 (Decl. Mathewson & Pareja); Ex. 145 ¶ 9 (Decl. Kennedy); Ex 6 ¶¶ 13-15 (Decl. C. Andrade).

197.    DACA students in graduate programs at public universities in the States will be significantly affected because the loss of employment authorization needed for graduate assistantship (research or teaching) will likely mean the loss of tuition waivers and other benefits such as subsidized health, dental, and vision insurance for the students and their families. The loss of graduate assistants also is a significant harm to the States because of the services they provide in assisting faculty and instructing students. *See* Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 134 ¶¶ 31-32 (Decl. Herbst).

198.    Losing these talented young immigrants will deprive the States' schools of the special and unique contributions and perspectives they bring to campus communities, both as students and alumni. *See, e.g.*, Ex. 57 ¶¶ 4-6 (Decl. Ballinger); Ex. 58 ¶¶ 4-8 (Decl. Loera); Ex. 61 ¶ 7 (Decl. Heatwole); Ex. 132 ¶¶ 6-7 (Decl. Allen);  Ex. 131 ¶ 9 (Decl. Miranda); Ex. 134 ¶¶ 19-26, 36-38 (Decl. Herbst); Ex. 133 ¶¶ 23-24 (Decl. Pachis); Ex. 135 ¶¶ 3, 13 (Decl. Rakes); Ex. 137 ¶¶ 7-8, 10 (Decl. Straney); Ex. 139 ¶¶ 3, 4, 7 (Decl. Dietz); Ex. 152 ¶¶ 10, 18, 21 (Decl. Mathewson & Pareja); Ex. 157 ¶ 11 (Decl. Ridder); Ex. 159 ¶¶ 8-9 (Decl. Galvan); Ex. 155 ¶¶ 6, 8 (Decl. Alexander); Ex. 154 ¶ 7 (Decl. Cuprill-Comas); Ex. 153 ¶ 10 (Decl. Karpilo); Ex. 160 ¶ 5 (Decl. Hagemann); Ex. 158 ¶ 9 (Decl. Trueblood-Gamble); Ex. 163 (Sánchez Letter); Ex. 165 ¶ 4 (Decl. Linde); Ex. 166 ¶¶ 6-7 (Decl. Sullivan); Ex. 167 ¶¶ 4-5 (Decl. Reveley); Ex. 136 ¶ 8 (Decl. Hardwick); Ex. 145 ¶¶ 10-11 (Decl. Kennedy).

199.     The States' public universities and colleges will also suffer direct financial harm, including lost tuition revenue and scholarship funds, if DACA students are forced to withdraw or are unable to enroll. *See, e.g.*, Ex. 57 ¶¶ 4-6 (Decl. Ballinger); Ex. 58 ¶¶ 4-8 (Decl. Loera,); Ex. 61 ¶ 7 (Decl. Heatwole); Ex. 134 ¶¶ 27-28 (Decl. Herbst); Ex. 133 ¶¶ 17-18 (Decl. Pachis); Ex. 136 ¶ 8 (Decl. Hardwick); Ex. 137 ¶ 9 (Decl. Straney); Ex. 157 ¶¶ 6-7 (Decl. Ridder); Ex. 159 ¶ 5 (Decl. Galvan); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 154 ¶ 8 (Decl. Cuprill-Comas); Ex. 153 ¶¶ 7-8 (Decl. Karpilo); Ex. 160 ¶¶ 6-8 (Decl. Hagemann); Ex. 158 ¶ 6 (Decl. Trueblood-Gamble); Ex. 163 (Sánchez Letter); Ex. 164 ¶ 9 (Decl. Farish); Ex. 132 ¶ 10 (Decl. Allen); Ex. 131 ¶ 9 (Decl. Miranda); Ex. 145 ¶¶ 10-14 (Decl. Kennedy). In at least one state (Oregon), current demographic and enrollment trends and other factors suggest that this lost revenue will not be replaced by other students for many universities, and will represent an absolute loss of revenue. *See* Ex. 160 ¶ 8 (Decl. Hagemann); Ex. 158 ¶ 7 (Decl. Trueblood-Gamble); Ex. 157 ¶ 7 (Decl. Ridder).

200.     Terminating DACA also will impose additional tangible costs on our public colleges and universities, which already have begun to experience disruption as a result of uncertainty over the future of the program and are preparing for the likelihood of expending additional resources to address the detrimental effects of DACA termination. *See, e.g.*, Ex. 61 ¶¶ 8-9 (Decl. Heatwole); Ex. 134 ¶¶ 35, 38 (Decl. Herbst); Ex. 136 ¶¶ 8-9 (Decl. Hardwick); Ex. 157 ¶ 12 (Decl. Ridder); Ex. 155 ¶ 7 (Decl. Alexander); Ex. 153 ¶ 11 (Decl. Karpilo); Ex. 160 ¶ 9 (Decl. Hagemann); Ex. 158 ¶¶ 10, 12 (Decl. Trueblood-Gamble); Ex. 132 ¶ 9 (Decl. Allen); Ex. 167 ¶ 6 (Decl. Reveley).

201.     Terminating DACA will further deprive the States of the earning potential of graduates from public colleges and universities who are most likely to stay in-State and join the States' workforces. *See, e.g.*, Ex. 132 ¶ 9 (Decl. Allen). For example:

    a. Nine out of ten Massachusetts public higher education graduates remain in the State, working or pursuing further education. *See* Ex. 93 (Mass. Dept. of Higher Education, *Time to Lead, The Need for Excellence in Public Higher Education*, Sept. 2012).

    b. The majority of Iowa public higher education graduates remain in Iowa, working or pursuing further education. *See* Ex. 67 at 26 (The University of Iowa Pomerantz Career Center, 2015-2016 Annual Report); Ex. 68 (Iowa State University 6-Month Post Graduation Status, 2014-2015; Ex. 73 at 2 (Career Ready, University of Northern Iowa Career Services, 2016).

    c. Nearly 90% of Community College of Rhode Island graduates stay in Rhode Island after graduation to live and raise their families. Ex. 162 (Hughes Letter).

    d. Approximately 85 to 87 percent of Eastern Connecticut State University graduates stay in Connecticut after graduation to "contribute[] to the growth and vitality of Connecticut's economy." Ex. 133 ¶ 16 (Decl. Pachis).

202. Terminating DACA will also undermine the investment in and efforts to develop a well-educated workforce that can contribute to the States' overall economies and competitiveness, and the States' ability to meet certain critical workforce needs such as healthcare in rural areas. *See, e.g.*, Ex. 159 ¶ 6 (Decl. Galvan); Ex. 154 ¶¶ 6, 10 (Decl. Cuprill-Comas); Ex. 156 ¶ 11 (Decl. Mitsui). Currently, 100 DACA grantees are medical students and medical resident physicians at schools that are members of the Association of American Medical Colleges, and approximately two-thirds of these DACA grantees are pursuing their medical education in one of the States. *See* Ex. 114 ¶ 4 (Decl. Prescott, Association of American Medical Colleges). Aspiring DACA-grantee physicians contribute to a diverse and culturally responsive workforce to meet the needs of

underserved populations. *See id.* ¶¶ 5-6. Terminating DACA will cause the States to lose specific

investments that they have made in this workforce and will leave significant gaps in the States'

healthcare workforce. *See id.* ¶ 7; Ex. 85 ¶¶ 5-6 (Decl. Swenson).  For example:

     a.   In Illinois, DACA grantees have participated in a loan program, through the Illinois

        Finance Authority, in which students receive interest-free loans so long as they

        agree to repay the principal and commit to four years of work in an underserved

        Illinois community following their graduation. Ex. 141 ¶ 6 (Decl. Pelissero &

        Callahan, Loyola Univ. of Chicago). Without DACA, underserved Illinois

        communities will lose access to these committed medical professionals.  *Id.* ¶ 8.

     b.   Oregon's legislature has established a program to provide scholarships to health

        professional students who commit to practicing in rural and underserved areas of

        the state for a period of time following graduation. *See* ORS 348.303. At least one

        dental student participant in this program is a DACA recipient who will likely not

        be able to complete his commitment to practice dentistry in an underserved area of

        Oregon.  *See* Ex. 94 ¶¶ 4, 9-18 (Decl. Ramirez Cuevas).

    203.    The nation's leading private universities will suffer harms if DACA is terminated.

Harvard University, for example, has more than 50 DACA students currently enrolled.  *See* Ex. 96

¶ 6 (Decl. Madsen, Harvard Univ.).  Tufts University has more than 25 DACA students.  *See* Ex.

97 ¶ 8 (Decl. Jeka, Tufts Univ.). Brown University has approximately 12 DACA students.  *See* Ex.

161 (Locke Letter). Roger Williams University, home to Rhode Island's only law school, has at

least six DACA students. *See* Ex. 164 ¶ 6 (Decl. Farish). These students often have had to

overcome significant challenges in order to gain acceptance and bring critical perspectives,

insights, and experiences to their universities. They make important and lasting contributions,

including through their classroom participation, their extracurricular engagements, and their commitment to independent study and research. *See, e.g.*, Ex. 97 ¶ 5 (Decl. Jeka); Ex. 96 ¶¶ 5, 7, 12 (Decl. Madsen); Ex. 144 ¶¶ 4-5 (Decl. Martin, Amherst College); Ex. 147 ¶ 7 (Decl. Stephens, Mount Holyoke College); Ex. 140 ¶¶ 4, 6, 9 (Decl. Jensen, Illinois Wesleyan Univ.); Ex. 141 ¶¶ 4, 5, 6, 7,8 (Decl. Pelissero & Callahan); Ex. 138 ¶¶ 6, 11 (Decl. Salgado, City Colleges of Chicago); Ex. 164 ¶¶ 8-9 (Decl. Farish); Ex. 161 (Locke Letter).

204.    Employment authorization gives these students and their universities an assurance that they may put their talents to use in the United States job market after graduation, benefitting the States and the nation as a whole. *See, e.g.*, Ex. 96 ¶¶ 12-15 (Decl. Madsen); Ex. 161 (Locke Letter); Ex. 144 ¶ 9 (Decl. Martin, Amherst); Ex. 147 ¶¶ 8-9 (Decl. Stephens).

205.    DACA has allowed these students to step outside the shadow of their immigration status and to participate fully as members of academic and campus communities in ways that likely would not be possible otherwise. *See, e.g.*, Ex. 140 ¶¶ 7, 8 (Decl. Jensen); Ex. 97 ¶ 7 (Decl. Jeka); Ex. 96 ¶ 12 (Decl. Madsen); Ex.  ¶ 7 (Decl. Martin, Amherst).  Terminating  DACA will take important opportunities away from DACA students and reintroduce fear and uncertainty into their lives, with significant adverse effects on these students, their universities, and the broader community.  *See* Ex. 140 ¶¶ 7, 8 (Decl. Jensen); Ex. 97 ¶¶ 8-10 (Decl. Jeka); Ex. 96 ¶ 13 (Decl. Madsen); Ex. 144 ¶ 10 (Decl. Martin, Amherst); Ex. 148 ¶ 6 (Decl. Martin, Northeastern Univ.); Ex. 147 ¶ 10 (Decl. Stephens); Ex. 161 (Locke Letter); Ex. 103 ¶ 8 (Decl. Perla); Ex. 106 ¶ 7 (Decl. Suria); Ex. 105 ¶ 5 (Decl. Oduyoye); Ex. 104 ¶ 7 (Decl. G.L.); Ex. 102 ¶¶ 12-14 (Decl. Juarez); Ex. 152 ¶ 19 (Decl. Mathewson & Pareja); Ex. 151 ¶¶ 14, 16 (Decl. Roth, UNMHSC); Ex. 107 ¶¶ 7-8 (Decl. Torrez).

*Harm to State Law, Regulation, and Policy.*

206.   The States have an interest in preserving their legal, regulatory, and policy frameworks that take the DACA program into account.

207.   Many of the States have enacted laws, promulgated regulations, and/or established policies that contemplate and rely on the DACA program.  If DACA is terminated, these legal, regulatory, and policy regimes will be harmed.  For example:

   a.  Since 2012, Connecticut has granted driver's licenses to approximately 5,000 DACA grantees who are Connecticut residents, many of whom have also purchased and registered vehicles in Connecticut. *See* Ex. 121 ¶¶ 6-7 (Decl. Bzdyra).  DACA grantees who have purchased and registered vehicles will have paid Connecticut sales tax and local property taxes for such vehicles.  *Id.* ¶¶ 8-9.

   b.  Illinois has enacted laws to enable DACA grantees to participate in the economy professionally. These include providing that no person in Illinois shall be prohibited from receiving a law license solely because he or she is not a citizen and explicitly allowing DACA grantees to apply for a license to practice law. *See* 705 Ill. Comp. Stat. 205/2. DACA grantees are also eligible to receive state-issued identification cards and drivers' licenses; own motor vehicles which are registered, titled and licensed in the state of Illinois; and own businesses and property in Illinois. *See* Ex. 125 ¶ 6 (Decl. White, Illinois Secretary of State). The Office of the Illinois Secretary of State will be adversely impacted if DACA is terminated by the loss of revenue from licensing fees and taxes, as well as costs and system disruptions related to eligibility determinations of license renewals for DACA recipients. *Id.* ¶

**57**

7. Illinois administrative rules, regulations and laws will also need to be amended to conform to the changes in the DACA program. *Id.*

c.  Under DACA, thousands of young Massachusetts and Oregon residents are able to receive social security cards and thereby have access to driver's licenses, which they depend on to attend heath care appointments, to commute to work and school, and to attend to other necessities for themselves and their family members. *See* Ex. 9 (Mass. Registry of Motor Vehicles, *Social Security Number (SSN) Requirements*); ORS 807.021 (proof of legal presence required to issue, renew or replace driver license); Ex. 175  (Attorney General Advisory Letter to Acting Commissioner J. Eric Boyette, Jan.17, 2013); Ex. 101 ¶ 3 (Decl. Preciado); Ex. 71 ¶¶ 5-7, 9 (Decl. I.T.); Ex. 69 ¶¶ 7-8 (Decl. Mendes); Ex. 70 ¶¶ 5, 8 (Decl. I.V.).  Terminating DACA will make it impossible for these individuals to apply for new licenses or renew the licenses they have, leading to a number of adverse outcomes, including a decrease in licensing fees paid to the States, a decrease in productivity of these residents, and an increase in unlicensed drivers on the road.

*Harm to Public Health and Health Care Costs.*

208.    The States have an interest in protecting the public health and in minimizing health care costs expended by the States.

209.    Terminating DACA will harm public health and impose additional health care costs on the States. Work authorization allows DACA grantees to access employer-sponsored health benefits. *See, e.g.*, Ex. 72 ¶ 4 (Decl. Teodoro); Ex. 69 ¶¶ 6, 10 (Decl. Mendes); Ex. 171 ¶18 (Decl. Park); Ex. 172 ¶8 (Decl. Morales); Ex. 110 ¶ 8 (Decl. Schlosberg, District of Columbia Department of Health Care Finance).  In fact, more than 50% of DACA grantees have obtained employer-provided insurance. *See* Ex. 5 ¶ 12 (Decl. Wong). Without these benefits, more of the States' residents are likely to forgo needed health care, including preventive care, which will create more costly health problems in the long run. It also will cause more people to rely on state-funded and/or state-administered public health care and other benefits and thus impose additional costs on the States. For example:

   a.    Colorado provides emergency Medicaid regardless of immigration status, which covers the hospital delivery of children for qualified undocumented immigrants. *See* Ex. 78 at 1-2 (Colorado Department of Health Care Policy and Financing letter dated June 28, 2005).

   b.    Delaware provides limited emergency and labor/delivery services to residents whose immigration status otherwise keeps them from accessing health care benefits and services.  *See* Ex. 122 ¶¶ 6-7 (Decl. Groff).

   c.    The D.C. HealthCare Alliance is the District of Columbia's state-sponsored insurance program of last resort. *See* Ex. 110 ¶¶ 6, 9 (Decl. Schlosberg); *see also* D.C. Code § 7-771.07(2).  The placement of all of the individuals in the District

participating in the DACA program in 2017 onto the D.C. HealthCare Alliance would require the District to spend additional money on that program, harm District finances, and prevent the District from spending that money on other public health priorities. *See* Ex. 110 ¶ 10 (Decl. Schlosberg). In fact, the placement of these individuals onto the D.C. HealthCare Alliance could cost the District an additional $283,000 per month in District of Columbia Fiscal Year 2018. *See id.* ¶ 12.

d. Under Hawaii's Prepaid Health Care Act, Haw. Rev. Stat. ch. 393, Hawaii employers are required to provide regular employees who meet wage requirements with coverage under a qualifying prepaid group health care plan. *See* Haw. Rev. Stat. § 393-11. The termination of DACA will likely cause more people to rely on Hawaii's state-administered Medicaid One-Time Emergency services. Hawaii reimburses hospitals for emergency and urgent services provided to qualifying uninsured Hawaii patients, including undocumented immigrants. Ex. 123 ¶¶ 5-6 (Decl. Peterson, Med-QUEST Division, Hawaii Department of Human Services).

e. In Massachusetts, DACA grantees who lose employer-based coverage may be eligible for MassHealth, a state-funded health insurance program. *See* Ex. 83 ¶¶ 5-7 (Decl. Caplan, Mass. Executive Office of Health and Human Services). In addition, Massachusetts will very likely have to cover some, if not all, of the costs of health care visits for these individuals through its state-administered Health Safety Net program or other programs. *Id.* ¶¶ 8-9. Finally, some DACA grantees who lose employer-based coverage will likely use providers, like community based health centers, that are funded in part by grants and other funding streams available through the state. *Id.* ¶¶ 10-14.

210.    New York State currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 (Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013). Terminating DACA may reduce access to Medicaid for current DACA grantees. New York State currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See Id.* Individuals in New York who are not DACA grantees may only qualify for Medicaid coverage of care and services necessary to treat an emergency condition. Terminating DACA will require New York to either seek a State legislative change to maintain current Medicaid coverage formerly DACA-eligible immigrants with state dollars only or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

*Harm to Small Cities, Counties, and Towns.*

211.    The States have an interest in preventing economic and other harm to their small cities, towns, counties, and other small governmental jurisdictions.

212.    Terminating DACA will harm small governmental jurisdictions in the States. If DACA is terminated, small governmental jurisdictions will lose talented and trained employees, adversely affecting operations and costing time, money, and effort to replace and retrain these employees. *See, e.g.*, Ex. 111 ¶¶ 10-11 (Decl. Ambrosino & Bourque, City of Chelsea, MA and Chelsea Public Schools); Ex. 113 ¶¶ 4-6 (Decl. Schuh). Many of these employees are highly skilled workers, including in critical fields such as nursing. *See, e.g.*, Ex. 135 ¶¶ 10, 13 (Decl. Rakes); Ex. 98 ¶ 7, 10-11 (Naveed).

213.    Terminating DACA will have a direct, adverse effect on economies and sales tax revenues of small cities and towns, as DACA grantees will lose their jobs and refrain from buying goods and services from local vendors. *See, e.g.*, Ex. 111 ¶ 16 (Decl. Ambrosino & Bourque); Ex. 176 ¶¶ 8-10, 13 (Decl. Kennedy, City of Newburgh).

214.    DACA grantees average higher earning capacities than their undocumented peers and are able to better participate in the States' economies, for example by purchasing homes and cars that are taxed by our state and local authorities. *See* Ex. 5 ¶ 16 (Decl. Wong). If DACA is terminated, cities and towns will lose other local tax revenue, including real estate taxes and motor vehicle excise taxes, from DACA grantees who can no longer access lines of credit or afford to buy cars or homes.

215.    If DACA is terminated, small governmental jurisdictions will lose the benefits that full access by and participation of a diverse community fosters through community activities, including, for example, activities in libraries and local government-sponsored recreational camps or sports leagues. *See, e.g*, Ex. 109 ¶¶ 5-6 (Decl. Meyer, New Castle County, Del.).  The termination of DACA will also have a destructive effect on local industries of small governmental jurisdictions that rely on the work of highly qualified and trained DACA recipients.    Ex. 176 ¶¶ 4, 8-10, 13 (Decl. Kennedy, City of Newburgh).

216.    Terminating DACA will also adversely affect public safety, health, and wellbeing in the States' cities, towns, and schools. Without DACA status, DACA grantees afraid of deportation will be less likely to report violence, abuse, crimes or other harms to the community. If DACA is terminated, 53% of current DACA grantees may be less likely to report a crime they witnessed; 47% may be less likely to report a crime even if they were the victim; 48% may be less likely to go to the hospital if they suffered an injury, and 60% may be less likely to report wage

theft by their employer. *See* Ex. 5 ¶ 24 (Decl. Wong). This will make it harder for local police and other officials to provide for the public safety and welfare. *See, e.g.*, Ex. 111 ¶ 15 (Decl. Ambrosino & Bourque); Ex. 108 ¶¶ 7-10 (Decl. Hughes); Ex. 109 ¶ 6 (Decl. Meyer); Ex. 116 ¶¶ 10-13 (Decl. Graham, Delaware Community Legal Aid Society, Inc.). For example, since the Trump Administration announced plans to end DACA, Delaware law enforcement and legal aid have recognized an increased reluctance among Delaware immigrants to engage with aspects of the criminal justice system—even when that interaction would have been to protect their own victim rights. *See, e.g.*, Ex. 108 ¶¶ 7-10 (Decl. Hughes); Ex. 116 ¶¶ 10-13 (Decl. Graham).

***Harm to School Districts, Including Small School Districts.***

217.    The States have an interest in effectively educating elementary and secondary students and in preventing economic harm to small and large school districts.

218.    If DACA is terminated, public school districts will suffer financial harm as well as harm to their educational missions.

219.    The termination of DACA will cause school districts to lose talented and experienced teachers and other staff members who are DACA grantees, adversely affecting student education and costing time, money, and effort to replace and retrain these employees.  *See* Ex. 111 ¶ 11 (Decl. Ambrosino & Bourque); Ex. 79 (Whaley, *Denver Public Schools say ending DACA would have "catastrophic" effect*, Denver Post, Aug. 31, 2017).

220.    In Connecticut, Colorado, Illinois, Massachusetts, New Mexico, and New York, Teach for America has placed teachers who are DACA grantees in shortage-area subjects and hard-to-staff schools in low-income communities. *See* Ex. 11 ¶¶ 3, 11 (Decl. Carrizales, Teach For America). Terminating DACA will not only deprive schools of their employees, but also deprive students of teachers whose live experiences may mirror their own lives. *Id.* ¶¶ 10, 11.

221.    Public elementary and secondary schools have a constitutional obligation to educate students irrespective of immigration status. *See Plyler v. Doe*, 457 U.S. 202 (1982). The termination of DACA will harm the States' ability to educate DACA-eligible students as required by federal law. *See* Ex. 111 ¶¶ 12,14 (Decl. Ambrosino & Bourque); Ex. 112 ¶ 3-4 (Decl. Kanninen, Arlington, VA Public Schools).

222.    If DACA-eligible students are no longer able to work legally after high school or cannot afford to go to college, these students will be less motivated to achieve in school. *See* Ex. 111 ¶ 12 (Decl. Ambrosino & Bourque); Ex. 112 ¶ 3 (Decl. Kanninen). This will result in lower scores and higher dropout rates for these students. *See* Ex. 111 ¶ 12 (Decl. Ambrosino & Bourque).

223.    Poorer performance will impact school districts' accountability ratings and could require removal of administrators and teachers as well as increased state funding to flow to these school districts. *See, e.g.*, Ex. 179 (Mass. Dep't of Early and Secondary Educ., *School Leader's Guide to the 2017 Accountability Determinations*, Sept. 2017). Decreased school performance will also negatively impact the community, with families not wanting to buy homes in a lower-performing district. *See* Ex. 111 ¶ 13 (Decl. Ambrosino & Bourque).

224.    Finally, DACA-eligible students will experience higher levels of anxiety about their futures and their families' futures, and will require additional counseling and support from guidance counselors and other school personnel, costing school districts time and money. *See* Ex. 111 ¶ 14 (Decl. Ambrosino & Bourque).

***Harm to Businesses and Nonprofits.***

225.    The States have an interest in their tax revenues, economies, and the financial well-being of their businesses and nonprofits.

226.    Immigration is an important economic driver in the States.  Many of the States' workers are immigrants, and many of those immigrant workers are DACA grantees. *See, e.g.*, Ex. 5  ¶ ¶  28, 32, 36, 40, 44, 48, 52, 56, 60, 64, 68, 72, 76, 80, 84, 88 (Decl. Wong); Ex. 126 ¶ 11 (Decl. Read, Oregon State Treasurer); Ex. 95 ¶ 7 (Decl. Solano); Ex. 101 ¶ 4 (Decl. Preciado); Ex. 100 ¶ 6 (Decl. Nicolas); Ex. 124 ¶¶ 4, 10-11 (Decl. Salaveria); Ex. 168 ¶ 3 (Decl. Cabrera); Ex. 120 ¶ 4 (Decl. Romero, Barrera Legal Group, PLLC); Ex. 174 ¶¶ 4,6,8 (Decl. Wylde, Partnership for NYC); Ex. 81 ¶¶ 2-3, 5-6 (Decl. Pinsky, ABNY).  Many companies in the States are dependent on DACA grantees to operate and grow their businesses. The market for highly skilled workers and employees is extremely competitive.  Terminating DACA grantees' work authorization will inhibit the States' companies' ability to adequately staff their organizations, develop their workforces, recruit talent, and maintain trained employees. The Center for American Progress estimates that it costs businesses roughly one-fifth of a worker's salary to replace a worker due to productivity loss, the cost of hiring and training a new employee, and ramp-up periods for new employees. *See* Ex. 80 (Heather Boushey and Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Center for American Progress, November 16, 2012).

227.    If companies lose employees and recruiting efforts are less successful, their ability to develop and deliver successful products and services may be adversely affected. *See e.g.*, Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90 ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks); Ex. 84 ¶¶ 4-11 (Decl. Kalvert, TripAdvisor); Ex. 119 ¶¶ 5-6 (Decl. Tingen, Tingen & Williams, PLLC); Ex. 174 ¶¶ 5-8 (Decl. Wylde, Partnership for NYC). For example:

a.  Colorado's talented workforce has attracted major industries to the State, including aerospace, high-tech, start-ups, and STEM-based employers. Many companies in Colorado rely heavily on immigrants to operate their business. Terminating DACA will disrupt these companies with DACA employees that are forced to terminate qualified and talented employees.

b.  In Hawaii, businesses rely heavily on immigrants who bring their talent, knowledge, and expertise to Hawaii's labor force. *See* Ex. 124 ¶ 4 (Decl. Salaveria). Because of Hawaii's low unemployment rate, the state's businesses have had difficulty filling their vacant positions. *Id.* ¶ 8. The departure of the DACA population from Hawaii's workforce will cause even greater difficulty for Hawaii employers, and have a negative impact on Hawaii's economy. *Id.* ¶ 11. Agriculture and forestry are two of Virginia's largest private industries. The Virginia Department of Agriculture and Consumer Services estimates that approximately 1,944 of Virginia's DACA grantees employed in primary agricultural production. *See* Ex. 129 ¶ 3 (Decl. Gooden, Virginia Sec'y of Agriculture and Forestry). Further, a percentage of DACA recipients are also likely to be regulated pesticide applicators. The loss of DACA status for these individuals would harm agricultural

production and reduce income to Virginia from pesticide applicator licensing fees. *See id.* ¶ 7.

c. In Washington, DACA grantees work for the largest companies as software engineers, finance professionals, and retail and sales associates, including for Amazon, Microsoft and Starbucks. *See* Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90 ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks).

d. In New York, businesses depend on the work of DACA grantees. *See* Ex. 170 ¶¶ 3, 7-8, 10 (Decl. Schwartz, Univision); Ex. 169 ¶ 7 (Decl. Greenberg, Warby Parker); Ex. 172 ¶¶ 4-5 (Decl. Morales); Ex. 174 ¶¶ 4-8 (Decl. Wylde, Partnership for NYC). DACA recipients are the consumer base for many New York businesses. Ex. 170 ¶¶ 5-6 (Decl. Schwartz, Univision); Ex. 169 ¶¶ 6-7 (Decl. Greenberg, Warby Parker). DACA grantees also provide diverse perspectives, and promote inclusiveness. Ex. 170 ¶¶ 3-9 (Decl. Schwartz, Univision); Ex. 169 ¶¶ 8-11 (Decl. Greenberg, Warby Parker); Ex. 174 ¶¶ 5,8 (Decl. Wylde, Partnership for NYC); ; Ex. 81 ¶¶ 2-8 (Decl. Pinsky, ABNY).

228. The impact on small businesses and nonprofit organizations will be especially stark. For entities with limited staff and operating budgets, losing even one skilled and trained DACA grantee employee will place an economic strain on operations, hiring, and training. *See, e.g*, Ex. 118 ¶¶ 9-11 (Decl. Igneri); Ex. 117 ¶¶ 5-8 (Decl. Tracy); Ex. 120 ¶ 4 (Decl. Romero); Ex. 119 ¶¶ 5-6 (Decl. Tingen). Further, many DACA grantees contribute their talents to nonprofits in a range of fields, including education and civic engagement. *See, e.g*, Ex. 55 ¶¶ 8-9 (Decl. Perez); Ex 98 ¶ 12 (Decl. 98 Naveed).

229.    The mission of nonprofit organizations in the States will also be adversely affected. Ex. 174 ¶¶ 3-8 (Decl. Wylde, Partnership for NYC). Many nonprofit organizations in the States serve immigrant communities, including by providing legal services and advocacy. Termination of DACA will throw families into crisis, creating higher demand for services from organizations with limited resources. *See* Ex. 117 ¶¶ 12-14 (Decl. Tracy, Brazilian Worker Center); Ex. 115 ¶¶ 2-7 (Decl. Tack-Hooper, Am. Civil Liberties Union of Delaware); Ex. 116 ¶¶ 2-8 (Decl. Graham).

**Harm to Families.**

230.    The States have an interest in protecting the welfare of all of their residents, including the families of DACA grantees.

231.    Terminating DACA will harm the general welfare of the States' DACA grantees and their families in profound ways. Most DACA grantees live in households with family members who are American citizens. One expert survey estimates that 73% percent of DACA grantees in the country live with a citizen sibling, spouse, or child. *See* Ex. 5 ¶ 34 (Decl. Wong). Terminating DACA will lead to increased uncertainty in these mixed-status families, and it will increase the likelihood of splitting DACA grantees from their citizen family members. *See e.g.*, Ex. 176 ¶ 12 (Decl. Kennedy, City of Newburgh). Moreover, many of these families rely on the income of a DACA grantee, and DACA termination will threaten their financial and housing security. *See, e.g.*, Ex. 87 ¶ 8 (Decl. Rubin); Ex. 135 ¶ 8 (Decl. Rakes); Ex. 157 ¶¶ 12-13 (Decl. Ridder); Ex. 172 ¶¶ 4-5, 7-8 (Decl. Morales); Ex. 173 ¶¶ 3, 5-6 (Decl. Hidalgo Hernandez).

232.    Many DACA grantees also have families overseas, including parents and siblings. DACA had made it possible for these grantees to visit family members, often for the first time in years. *See, e.g.*, Ex. 72 ¶ 7 (Decl. Teodoro); Ex. 70 ¶ 5 (Decl. I.V.). Terminating DACA will cause DACA grantees to lose touch with these family members and become further estranged

68

from their countries of origin, making the prospect of deportation even more injurious to DACA grantees and their families.

## FIRST CAUSE OF ACTION

### (Fifth Amendment – Equal Protection)

233. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

234. The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

235. The DHS Memorandum target individuals for discriminatory treatment, without lawful justification.

236. The DHS Memorandum was motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group.

237. The discriminatory terms and application of the DHS Memorandum cannot be sufficiently justified by federal interests, under any standard of review.

238. Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

239. Defendants' violation causes ongoing harm to the States and their residents.

## SECOND CAUSE OF ACTION

### (Fifth Amendment – Due Process – Information Use)

240. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

241. The Due Process Clause of the Fifth Amendment requires that actions taken by the federal government be fundamentally fair.

242.     Given the federal government's prior representations about the allowable uses of information provided by DACA applicants, the change to DHS's policy of protecting against the disclosure of information in DACA applications and renewal requests is fundamentally unfair.

243.     Also given the federal government's prior representations about the allowable uses of information provided by DACA applicants, the new policy's refusal to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement—including identifying, apprehending, detaining, or deporting non-citizens—is fundamentally unfair.

244.     Through their actions above, Defendants have violated the due process guarantee of the Fifth Amendment.

245.     Defendants' violation causes ongoing harm to the States and their residents.

## THIRD CAUSE OF ACTION

### (Equitable Estoppel)

246.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

247.     The doctrine of equitable estoppel prevents injustice where the government has made representations on which individuals have reasonably and detrimentally relied.

248.     In order to encourage DACA applications, Defendants made repeated, affirmative statements about the protections that would be given to the personal information provided by DACA applicants. Defendants also placed affirmative restrictions on the use of such information for purposes of immigration enforcement.

249.     In submitting DACA applications and renewal requests, DACA applicants reasonably and detrimentally relied on Defendants' affirmative representations and conduct.

250. Defendants should be equitably estopped from revoking DHS's longstanding, affirmative policy of protecting against the disclosure of information in DACA applications and renewal requests.

251. Equitable estoppel should also bar Defendants from implementing DHS's new policy of refusing to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement, including to identify, apprehend, detain, or deport non-citizens.

252. Failure to estop Defendants from revoking DHS's previous policy and imposing the new policy will harm the States and their residents.

## FOURTH CAUSE OF ACTION

**(Administrative Procedure Act – Substantively Arbitrary and Capricious, Abuse of Discretion, Contrary to Constitution or Statute)**

253. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

254. The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute. In implementing the DHS Memorandum and terminating DACA with minimal formal guidance, federal agencies have taken unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

255. In promulgating and implementing the DHS Memorandum, federal agencies have abused their discretion, and acted arbitrarily and capriciously and otherwise not in accordance with law, in violation of the APA.

256. Defendants' violation causes ongoing harm to the States and their residents.

## **FIFTH CAUSE OF ACTION**

### **(Administrative Procedure Act – Procedurally Arbitrary and Capricious,
Notice and Comment)**

257.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

258.     The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

259.     DHS is an "agency" under the APA. 5 U.S.C. § 551(1).

260.     The actions that DHS has taken to implement the DHS Memorandum are "rules" under the APA. 5 U.S.C. § 551(4).

261.     In promulgating and implementing the DHS Memorandum, federal agencies have categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States. Federal agencies did not follow the procedures required by the APA before taking action impacting these substantive rights.

262.     With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking. 5 U.S.C. § 553.

263.     The Defendants promulgated and relied upon the rules established by the DHS Memorandum without authority and without notice-and-comment rulemaking in violation of the APA.

264.     The States will be impacted because they have not had the opportunity to comment on the termination of DACA.

265.     Defendants' violation causes ongoing harm to the States and their residents.

## SIXTH CAUSE OF ACTION

### (Regulatory Flexibility Act – Failure to Issue Regulatory Flexibility Analyses)

266.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

267.     The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment. 5 U.S.C. §§ 603-604.

268.     "Small entities" for purposes of the RFA includes small businesses, small nonprofits, and small governmental jurisdictions.  5 U.S.C. § 601(6).

269.     The promulgation and implementation of the DHS Memorandum established "rules" under the RFA. 5 U.S.C. § 601(2).

270.     Implementation of the DHS Memorandum is likely to have a significant economic impact on a substantial number of small entities.  5 U.S.C. § 602(a)(1).

271.     Defendants have not issued the required analyses of DHS's new rules.

272.     Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

273.     Defendants' violation causes ongoing harm to the States, their small governmental jurisdictions, nonprofits, and businesses, and their residents.

## SEVENTH CAUSE OF ACTION

### (Fifth Amendment-Procedural Due Process)

274.     The Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

275.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests or property interests without due process of law.

276.    Defendants have failed to provide DACA grantees with the due process to which they are entitled, by failing to provide them with adequate notice about the procedures and timeline for renewing their DACA status.

277.    Defendants have failed to provide DACA grantees with the due process to which they are entitled, by failing to give them adequate notice about the general termination of the DACA program after March 5, 2018 and by failing to provide DACA grantees adequate notice of their inability to apply for renewal of their DACA status after March 5, 2018.

278.    Defendants are thus depriving Plaintiff States' residents of their liberty and property interests in living and working in the United States without providing them adequate notice or opportunity to be heard.

279.    Defendants' conduct violates the Due Process Clause of the Fifth Amendment.

280.    Defendants' violations cause ongoing harm to the States and their residents.

## **PRAYER FOR RELIEF**

281.    Wherefore, the States pray that the Court:

a.      Declare that the DHS Memorandum terminating the DACA program is unauthorized by and contrary to the Constitution and laws of the United States;

b.      Declare that the actions that DHS has taken to implement the DHS Memorandum terminating  the DACA program are procedurally unlawful under the APA;

c.      Declare that the actions that DHS has taken to implement the DHS Memorandum terminating the DACA program are substantively unlawful under the APA;

d.      Declare that the actions that DHS has taken to implement the DHS Memorandum terminating the DACA program are unlawful under the RFA;

e.      Enjoin Defendants from terminating the DACA program, including enjoining the Defendants from limiting rights to submit applications to renew DACA benefits, pending further orders from this Court;

f.      Enjoin Defendants from revoking the DHS policy protecting DACA application and renewal data from disclosure to ICE, CBP, or any other agency for purposes of immigration enforcement;

g.      Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA applicant or member of any DACA applicant's family, or take any action against a DACA applicant's current or former employer; and

h.      Award such additional relief as the interests of justice may require.

DATED: October 4, 2017

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By:    */s Lourdes M. Rosado*
      Lourdes M. Rosado, Bureau Chief
      Sania Khan, Assistant Attorney General
      Diane Lucas, Assistant Attorney General
      Ajay Saini, Assistant Attorney General
      Civil Rights Bureau
      Office of the New York State Attorney
      General
      120 Broadway, 23rd Floor
      New York, NY 10271
      Lourdes.Rosado@ag.ny.gov
      Sania.Khan@ag.ny.gov
      Diane.Lucas@ag.ny.gov
      Ajay.Saini@ag.ny.gov
      Tel. (212) 416-6348
      Fax (212) 416-8074

MAURA HEALEY
Attorney General for the Commonwealth of
Massachusetts

By:    */s Abigail B. Taylor*
      Jonathan B. Miller
      Genevieve C. Nadeau (*pro hac vice*)
      Abigail B. Taylor (*pro hac vice*)
      Assistant Attorneys General
      Office of the Attorney General
      One Ashburton Place
      Boston, MA 02108
      Jonathan.Miller@state.ma.us
      Genevieve.Nadeau@state.ma.us
      Abigail.Taylor@state.ma.us
      Tel. (617) 727-2200

BOB FERGUSON
Attorney General of the State Washington

By:    */s/ Robert W Ferguson*
      Robert W. Ferguson (*pro hac vice*)
      Attorney General
      Colleen M. Melody (*pro hac vice*)
      Civil Rights Unit Chief
      Marsha Chien (*pro hac vice*)
      Assistant Attorney General
      Office of the Attorney General
      800 Fifth Avenue, Suite 2000
      Seattle, WA 98104
      ColleenM1@atg.wa.gov
      MarshaC@atg.wa.gov
      Tel. (206) 464-7744

**76**

**GEORGE JEPSEN**
Attorney General of the State of Connecticut

By:    */s Mark K. Kohler*
Mark F. Kohler (*pro hac vice*)
Assistant Attorney General
Connecticut Office of the Attorney
General
55 Elm Street, P.O. Box 120
Hartford, CT 06106
Mark.Kohler@ct.gov
Tel. (860) 808-5020

**KARL A. RACINE**
Attorney General for the District of Columbia

By:    */s Robyn R. Bender*
Robyn R. Bender*
Deputy Attorney General
Public Advocacy Division
441 4th Street, NW
Suite 650 North
Washington, DC 20001
Robyn.Bender@dc.gov
Tel. (202) 724-6610
Fax (202) 730-0650

**DOUGLAS S. CHIN**
Attorney General of the State of Hawaii

By:    */s Donna H. Kalama*
Donna H. Kalama (*pro hac vice*)
Deputy Attorney General
State of Hawaii, Department of the
Attorney General
425 Queen Street
Honolulu, HI 96813
Donna.H.Kalama@hawaii.gov
Tel. (808) 586-1224

**LISA MADIGAN**
Attorney General of the State of Illinois

By:    */s Anna P. Crane*
Anna P. Crane, Assistant Attorney
General (*pro hac vice*)
Karyn L. Bass Ehler,
Chief, Civil Rights Bureau
Harpreet Khera, Deputy Bureau Chief,
Special Litigation Bureau
Caitlyn McEllis, Assistant Attorney
General
Jeff VanDam, Assistant Attorney Genera
Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Anna.Crane@atg.state.il.us
Tel. (312) 814-3400
Fax (312) 814-3212

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By:    */s Nathan Blake*
Nathan Blake (*pro hac vice*)
Deputy Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut Street
Des Moines, IA 50319
Nathan.Blake@iowa.gov
Tel. (515) 281-4325
Fax (515) 281-4209

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By:    */s Tania Maestas*
Tania Maestas, (*pro hac vice*)
Deputy Attorney General
Ari Biernoff, Assistant Attorney General
Jennie Lusk, Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87501
ABiernoff@nmag.gov
Tel. (505) 490-4060
Fax (505) 490-4883

**MATTHEW DENN**
Attorney General of the State of Delaware

By:   *s/ Aaron Goldstein*
      Aaron Goldstein*
      State Solicitor
      Aleine Cohen*
      Deputy Attorney General
      Delaware Department of Justice
      820 N. French St.
      Wilmington, DE 19801
      Aaron.Goldstein@state.de.us
      Aleine.Cohen@state.de.us
      Tel. (302) 577-8400

**PETER KILMARTIN**
Attorney General of the State of Rhode Island

By:   */s Rebecca T. Partington*
      Rebecca T. Partington (*pro hac vice*)
      Chief, Civil Division
      Michael W. Field (*pro hac vice*)
      Assistant Attorney General
      Adam D. Roach (*pro hac vice*)
      Special Assistant Attorney General
      RI Office of the Attorney General
      150 South Main Street
      Providence, RI 02903
      RPartington@riag.ri.gov
      MField@riag.ri.gov
      ARoach@riag.ri.gov
      Tel. (401) 274-4400

**JOSH STEIN**
Attorney General of the State of North Carolina

By:   */s Sripriya Narasimhan*
      Sripriya Narasimhan*
      North Carolina Department of Justice
      114 W. Edenton Street
      Raleigh, NC 27603
      SNarasimhan@ncdoj.gov
      Tel. (919) 716-6400

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By:   */s Brian De Haan*
      Brian De Haan*
      Assistant Attorney General
      Trial Attorney
      Brian.A.DeHaan@doj.state.or.us
      Tel. (971) 673-1880
      Fax (971) 673-5000

**JOSH SHAPIRO**
Attorney General of the Commonwealth of Pennsylvania

By:   */s Jonathan Scott Goldman*
      Jonathan Scott Goldman*
      Executive Deputy Attorney General,
      Civil Law Division
      Michael J. Fischer, (*pro hac vice*)
      Chief Deputy Attorney General, Impact
      Litigation Section
      Office of Attorney General
      16th Floor, Strawberry Square
      Harrisburg, PA 17120
      MFischer@attorneygeneral.gov
      Tel. (717) 787-3391

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

By:   */s Benjamin D. Battles*
      Benjamin D. Battles, (*pro hac vice*)
      Solicitor General
      Julio A. Thompson*, Assistant Attorney
      General, Civil Rights Unit
      Office of the Vermont Attorney General
      109 State Street
      Montpelier, VT 05609
      Benjamin.Battles@vermont.gov
      Tel. (802) 828-5500
      Fax (802) 828-3187

**78**

**MARK R. HERRING**
Attorney General of the Commonwealth of Virginia

By:   */s Matthew R. McGuire*
        Matthew R. McGuire (*pro hac vice*)
        Acting Deputy Solicitor General
        202 North Ninth Street
        Richmond, VA 23219
        MMcguire@oag.state.va.us
        Tel. (804) 786-7773

**JOHN W. HICKENLOOPER**
Governor of the State of Colorado

By:   */s Jacki Cooper Melmed*
        Jacki Cooper Melmed
        Special Assistant Attorney General*
        Chief Legal Counsel
        136 State Capitol Building
        Denver, Colorado 80203
        Jackic.Melmed@state.co.us
        Tel. (303) 866-3788
        (* Limited Appointment)

# DECLARATIONS AND EXHIBIT LIST (INDIVIDUAL EXHIBITS WILL BE UPLOADED IN SEPARATE FILING)

| Exhibit # | Title |
|---|---|
| 1 | Updated USCIS, Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017, June 8, 2017 |
| 2 | Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Enforcement of the Immigration Laws to Serve the National Interest*, Feb. 20, 2017 |
| 3 | Decl. Essig, Wiehe and Hill (Expert; Institute on Taxation and Economic Policy) |
| 4 | Decl. Ike Brannon (Expert; CATO Institute) |
| 5 | Decl. Tom Wong (Expert; Associate Professor UCSD) |
| 6 | Decl. Cesar Andrade (DACA Grantee; NY) |
| 7 | Mass. Dept. of Higher Education Memorandum, *Residency Status for Tuition Classification Purposes – Deferred Action for Childhood Arrivals*, Nov. 21, 2012 |
| 8 | Decl. Paul Mutty (Starbucks) |
| 9 | Mass. Registry of Motor Vehicles, *Social Security Number (SSN) Requirements* |
| 10 | *Q&A: DHS Implementation of the Executive Order on Enhancing Public Safety in the Interior of the United States*, Feb. 21, 2017 |
| 11 | Decl. Viridiana Carrizales (Teach for America) |
| 12 | Decl. James B. Milliken (CUNY) |
| 13 | Memorandum from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Servs., *Exercising* |

| | |
|---|---|
| | *Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012 |
| 14 | USCIS Help Center, *DACA FAQs* |
| 15 | Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu, Dec. 30, 2016 |
| 16 | USCIS Help Center, *How do I request consideration of DACA?* |
| 17 | USCIS, I-821D, *Consideration of Deferred Action for Childhood Arrivals* |
| 18 | (DHS, *National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals*, Apr. 4, 2013 |
| 19 | USCIS Help Center, *How will USCIS evaluate my request for renewal of DACA?* |
| 20 | Ike Brannon, *The Economic and Fiscal Impact of Repealing DACA*, the Cato Institute, Jan. 18, 2017 |
| 21 | Tom Wong, *et al.*, *DACA Grantees' Economic and Educational Gains Continue to Grow*, Center for American Progress, Aug. 28, 2017 |
| 22 | Tom Wong *et al.*, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Center for American Progress, Oct. 18, 2016 |
| 23 | Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents*, June 15, 2017 |
| 24 | USCIS, DACA Approval Notice |
| 25 | USCIS Help Center, *Will the information I share in my request for DACA be used for immigration enforcement purposes?* |
| 26 | USCIS Help Center, *If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?* |
| 27 | USCIS Help Center, *If my DACA case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?* |

| | |
|---|---|
| 28 | USCIS Help Center, *If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?* |
| 29 | Michael Scherer, *Person of the Year 2016*, Time Magazine, Dec. 6, 2016 |
| 30 | Francesca Chambers, *Trump signals he's softening on immigration as he says he's 'working on a plan' that will make DREAMers 'very happy,'* Daily Mail, Jan. 18, 2017 |
| 31 | CNN, *Transcript of CNN Town Hall with Speaker Paul Ryan*, Jan. 12, 2017 |
| 32 | ABC News, *Transcript of ABC News anchor David Muir interview with Donald Trump*, Jan. 25, 2017 |
| 33 | Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico, Mar. 29, 2017 |
| 34 | The Associated Press, Interview Transcript, Apr. 21, 2017 |
| 35 | Washington Post, *Transcript of Donald Trump's Presidential Bid Announcement*, June 16, 2015 |
| 36 | Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News, Aug. 6, 2015 |
| 37 | Phillip Rucker, *First, Trump booted Univision anchor Jorge Ramos out of his news conference. Then things got interesting*, The Washington Post, Aug. 25, 2015 |
| 38 | Donald Trump, "The protestors in New Mexico were thugs who were flying the Mexican Flag," Twitter, May 25, 2016 |
| 39 | Donald Trump, "Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals," Twitter, June 4, 2016 |
| 40 | Jose A. DelReal and Katie Zezima, *Trump's personal, racially tinged attacks on federal judge alarm legal experts*, The Washington Post, June 1, 2016 |

| 41 | CBS News, Transcript of Face the Nation, June 5, 2016 |
|----|---|
| 42 | Michelle Ye Hee Lee, *Trump supporters' false claim that Trump U judge is a member of a pro-immigrant group*, The Washington Post, June 7, 2016 |
| 43 | Adrian Walker, *'Passionate' Trump fans behind homeless man's beating?*, The Boston Globe, Aug. 21, 2015 |
| 44 | Katie Zezima, *Trump on immigration: There are 'bad hombres' in the United States*, The Washington Post, Aug. 30, 2017 |
| 45 | Greg Miller *et. al.*, *Full Transcripts of Trump's Calls with Mexico and Australia*, The Washington Post, Aug. 3, 2017 |
| 46 | Julie Hirschfield Davis and Maggie Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration*, The N.Y. Times, Aug. 25, 2017 |
| 47 | Josh Saul, *Jeff Sessions Always Wanted to Deport Undocumented Immigrant Youth. Now He Can*, Newsweek, Sept. 5, 2017 |
| 48 | Donald J. Trump, "Congress now has 6 months to legalize DACA," Twitter, Sept. 5, 2017 |
| 49 | Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017 |
| 50 | Donald J. Trump, "Does anybody really want to throw out good, educated and accomplished young people who have jobs," Twitter, Sept. 14, 2017 |
| 51 | DHS, *Privacy Policy 2017-01 Questions & Answers,* Apr. 27, 2017 |
| 52 | Decl. Mostofi (NYC Mayor's Office of Immigrant Affairs) |
| 53 | Nicole Prchal Svajlenka, et. al., *A New Threat to DACA Could Cost States Billions of Dollar*, Center for American Progress (July 21, 2017) |
| 54 | Misha Hill and Meg Wiehe, *State & Local Contributions of Young Undocumented Immigrants*, Institute on Taxation & Economic Policy (April 25, 2017) |

| 55 | Decl. Alejandra Perez (DACA Grantee; WA) |
|----|-------------------------------------------|
| 56 | Decl. Paul Quinonez (DACA Grantee; WA) |
| 57 | Decl. Phil Ballinger (University of Washington) |
| 58 | Decl. Lucila Loera (Washington State University) |
| 59 | Decl. Rebecca Thompson (Washington Student Achievement Council) |
| 60 | Decl. Reina Guevara (DACA Grantee; MA) |
| 61 | Decl. Heatwole (University of Massachusetts) |
| 62 | Decl. Alexandra Monroe (Washington State Department of Ecology) |
| 63 | Decl. Ayesha-Blackwell Hawkins (Amazon) |
| 64 | Decl. Camilla Glatt (Columbia Basin College) |
| 65 | Decl. Kaplan (Washington State Department of Social and Health Services) |
| 66 | Scott Gross, *DSU immigrant students fear Trump's DACA decision*, Delawareonline, Sept. 2, 2017 |
| 67 | The University of Iowa Pomerantz Career Center, 2015-2016 Annual Report |
| 68 | Iowa State University 6-Month Post Graduation Status, 2014-2015 |
| 69 | Decl. Cairo Mendes (DACA Grantee; MA) |
| 70 | Decl. I.V. (DACA Grantee; MA) |
| 71 | Decl. I.T. (DACA Grantee; MA) |
| 72 | Decl. Renata Teodoro (DACA Grantee; MA) |
| 73 | Career Ready, University of Northern Iowa Career Services, 2016 |
| 74 | Memorandum from Acting Secretary Elaine Kelly to James McCament, Acting Director of U.S. Citizenship and Immigration Services, *Rescission of Deferred Action for Childhood Arrivals*, September 5, 2017 |
| 75 | DOJ, *Attorney General Sessions Delivers Remarks on DACA*, Prepared Remarks, Sept. 5, 2017 |
| 76 | (Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," Jan. 25, 2017 |
| 77 | Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013 |
| 78 | Colorado Department of Health Care Policy and Financing letter dated June 28, 2005 |

| 79 | Whaley, *Denver Public Schools say ending DACA would have "catastrophic" effect*, Denver Post, Aug. 31, 2017 |
|----|----|
| 80 | Heather Boushey and Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Center for American Progress, November 16, 2012 |
| 81 | Decl. Pinsky (Association for a Better New York) |
| 82 | DHS Press Release, *Department of Homeland Security Acting Secretary Elaine Duke Reminds Eligible DACA Recipients to File Renewal Requests,* October 3, 2017 |
| 83 | Decl. Caplan (Massachusetts Executive Office of Health and Human Services) |
| 84 | Decl. Seth Kalvert (TripAdvisor) |
| 85 | Decl. David Swenson (Expert; Iowa State University) |
| 86 | Decl. Shoba Sivaprasad Wadhia (Expert; Penn. State University) |
| 87 | Decl. Dana Rubin (DACA Grantee; MA) |
| 88 | Tal Kopan & Jim Acosta, *Admin Memo: DACA recipients should prepare for departure from the United States*, CNN, Sept. 5, 2017 |
| 89 | DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals,* Sept. 5, 2017 |
| 90 | Decl. Martin Shively, Microsoft |
| 91 | Decl. Kim Ann Garza (Big Bend Community College)) |
| 92 | Decl. Rich Jones (Washington State Office of the Treasurer) |
| 93 | Mass. Dept. of Higher Education, *Time to Lead, The Need for Excellence in Public Higher Education*, Sept. 2012 |
| 94 | Decl. Milton Eduardo Ramirez Cuevas (DACA Grantee; OR) |
| 95 | Decl. Aldo Alan Solano Mendez (DACA Grantee; OR) |
| 96 | Decl. Lars Peter Knoth Madsen (Harvard) |
| 97 | Decl. Mary R. Jeka (Tufts) |
| 98 | Decl. Hina Naveed (DACA Grantee; NY) |

| 99 | Decl. Kristin M. Johnson (SUNY) |
|---|---|
| 100 | Decl. Hugo Nicolas (DACA Grantee; OR) |
| 101 | Decl. Fatima Preciado (DACA Grantee; OR) |
| 102 | Decl. Javier Juarez (DACA Grantee; RI) |
| 103 | Decl. Krissia Perla (DACA Grantee; RI) |
| 104 | Decl. G.L. (DACA Grantee; VA) |
| 105 | Decl. Gloria Oduyoye (DACA Grantee; VA) |
| 106 | Decl. Allyson Suria (DACA Grantee; VA) |
| 107 | Decl. Danielis Andrea Dos Santos Torrez (DACA Grantee; VA) |
| 108 | Decl. R.L. Hughes (Georgetown Police Department) |
| 109 | Decl. Matthew Meyer (New Castle County, DE) |
| 110 | Decl. Claudia Schlosberg (D.C. Dept of Health Care Finance) |
| 111 | Decl. Thomas Ambrosino and Mary Bourque (City of Chelsea, MA) |
| 112 | Decl. Barbara Kanninen (Arlington School Board, VA) |
| 113 | Decl. Emily Schuh (City of Anacortes, WA) |
| 114 | Decl. John Prescott (Association of American Medical Colleges) |
| 115 | Decl. Ryan Tack-Hooper (ACLU of Delaware) |
| 116 | Decl. Laura Carothers Graham (Delaware Community Legal Aid Society, Inc.) |
| 117 | Decl. Natalicia Tracy (Brazilian Workers Center) |
| 118 | Decl. Jeffrey Igneri (Local Burger) |
| 119 | Decl Jacob Tingen (Tingen & Williams, PLLC) |
| 120 | Decl. Luis Cortes Romero (Barrera Legal Group, PLLC) |
| 121 | Decl. Michael Bzdyra (Connecticut Department of Motor Vehicles) |
| 122 | Decl. Stephen Groff (Delaware Division of Medicaid and Medical Assistance) |
| 123 | Decl. Judy Mohr Peterson (Hawaii Department of Human Services) |
| 124 | Decl. Luis P. Salaveria (Hawaii Department of Business, Economic Development and Tourism) |
| 125 | Decl. Jesse White (Secretary of State of the State of Illinois) |
| 126 | Decl. Tobias Read (Treasurer of the State of Oregon) |

| 127 | Decl. Peter Blake (State Council of Higher Education for Virginia) |
|---|---|
| 128 | Decl. Jonathan Womer (Rhode Island Office of Management and Budget) |
| 129 | Decl. Basil I. Gooden (Secretary of Agriculture and Forestry for the Commonwealth of Virginia) |
| 130 | Decl. Sarah Conly (Washington Department of Veterans Affairs) |
| 131 | Decl. Rick Miranda (Colorado State University) |
| 132 | Decl. Brenda Allen (University of Colorado Denver) |
| 133 | Decl. Dimitrios Pachis (Eastern Connecticut State University) |
| 134 | Decl. Susan Herbst (University of Connecticut) |
| 135 | Decl. Melissa Rakes (Delaware Technical Community College) |
| 136 | Decl. Karen Hardwick (University of the District of Columbia) |
| 137 | Decl. Donald Straney (University of Hawaii) |
| 138 | Decl. Juan Salgado (City Colleges of Chicago) |
| 139 | Decl. Larry Dietz (Illinois State University) |
| 140 | Decl. Eric Jensen (Illinois Wesleyan University) |
| 141 | Decl. Margaret Callahan (Loyola University of Chicago) |
| 142 | Decl. Vernese Edghill-Walden (Northern Illinois University) |
| 143 | Decl. Barbara Wilson (University of Illinois System) |
| 144 | Decl. Biddy Martin (Amherst College) |
| 145 | Decl. Ellen Kennedy (Massachusetts Community Colleges' Presidents' Council) |
| 146 | Decl. Clark, et al. (Massachusetts State University Presidents) |
| 147 | Decl. Sonya Stephens (Mount Holyoke College) |
| 148 | Decl. Ralph Martin II (Northeastern University) |
| 149 | Garry Carruthers and Rebecca Rowley, Letter from the New Mexico Council of University Presidents, New Mexico Association of Community Colleges, and the New Mexico Independent Community Colleges regarding the DACA program (Sept. 8, 2017) |
| 150 | Decl. Chaouki Abdallah (University of New Mexico) |
| 151 | Decl. Paul Roth (University of New Mexico Health Sciences Center) |

| 152 | Decl. Alfred Mathewson and Sergio Pareja (University of New Mexico School of Law) |
| 153 | Decl. Lacy Karpilo (Eastern Oregon University) |
| 154 | Decl. Alice Cuprill-Comas (Oregon Health and Science University) |
| 155 | Decl. Charlene Alexander (Oregon State University) |
| 156 | Decl. Mark Mitsui (Portland Community College) |
| 157 | Decl. Christina Ridder (Portland State University) |
| 158 | Decl. Marjorie Trueblood-Gamble (Southern Oregon University) |
| 159 | Decl. Dennis Galvan (University of Oregon) |
| 160 | Decl. Ryan James Hagemann (Western Oregon University) |
| 161 | Decl. Richard M. Locke (Brown University) |
| 162 | Meghan Hughes, Letter on behalf of Community College of Rhode Island, Sept. 28, 2017 |
| 163 | Decl. Frank Sanchez (Rhode Island College) |
| 164 | Decl. Donald Farish (Roger Williams University) |
| 165 | Decl. Robyn Linde (Rhode Island College) |
| 166 | Decl. Thomas Sullivan (University of Vermont) |
| 167 | Decl. Taylor Reveley III (College of William and Mary) |
| 168 | Decl. Angel Cabrera (George Mason University) |
| 169 | Decl. Adam Greenberg (Warby Parker) |
| 170 | Decl. Jonathan Schwartz (Univision) |
| 171 | Decl. Stephanie Park (DACA Grantee, NY) |
| 172 | Decl. Anarelly Morales (DACA Grantee, NY) |
| 173 | Decl. Hidalgo Hernandez (DACA Grantee; NY) |
| 174 | Decl. Kathryn Wylde (Partnership for New York City) |
| 175 | Attorney General Advisory Letter to Acting Commissioner J. Eric Boyette (Jan.17, 2013) |
| 176 | Decl. Judy Kennedy (City of Newburgh, NY) |
| 177 | Letter from Ken Paxton *et.al.* to Attorney General Jeff Sessions, June 29, 2017 |
| 178 | DACA Renewal Notice |
| 179 | Mass. Dep't of Early and Secondary Educ., *School Leader's Guide to the 2017 Accountability Determinations*, Sept. 2017 |

88

# EXHIBIT 1

U.S. Citizenship
and Immigration
Services

Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status
Fiscal Year 2012-2017 (June 30)

Case 1:17-cv-05228-NGG-JO   Document 55-1   Filed 10/04/17   Page 3 of 3 PageID #: 1719



# EXHIBIT 13

*Secretary*

U.S. Department of Homeland Security
Washington, DC 20528

 **Homeland Security**

June 15, 2012

MEMORANDUM FOR:    David V. Aguilar
                   Acting Commissioner, U.S. Customs and Border Protection

                   Alejandro Mayorkas
                   Director, U.S. Citizenship and Immigration Services

                   John Morton
                   Director, U.S. Immigration and Customs Enforcement

FROM:              Janet Napolitano
                   Secretary of Homeland Security

SUBJECT:           Exercising Prosecutorial Discretion with Respect to Individuals
                   Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the
Department of Homeland Security (DHS) should enforce the Nation's immigration laws against
certain young people who were brought to this country as children and know only this country as
home. As a general matter, these individuals lacked the intent to violate the law and our ongoing
review of pending removal cases is already offering administrative closure to many of them.
However, additional measures are necessary to ensure that our enforcement resources are not
expended on these low priority cases but are instead appropriately focused on people who meet
our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of
prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of
  this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education
  development certificate, or is an honorably discharged veteran of the Coast Guard or
  Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple
  misdemeanor offenses, or otherwise poses a threat to national security or public safety;
  and
- is not above the age of thirty.

www.dhs.gov

**93**

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

**94**

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

3

**95**

# EXHIBIT 23

 Official website of the Department of Homeland Security

 U.S. Department of
Homeland Security

# Rescission of Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")

**Release Date:** June 15, 2017

On June 15, Department of Homeland Security Secretary John F. Kelly, after consulting with the Attorney General, signed a memorandum rescinding the November 20, 2014 memorandum that created the program known as Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") because there is no credible path forward to litigate the currently enjoined policy.

The rescinded memo purported to provide a path for illegal aliens with a U.S. citizen or lawful permanent resident child to be considered for deferred action. To be considered for deferred action, an alien was required to satisfy six criteria:

(1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident;

(2) have continuously resided here since before January 1, 2010;

(3) have been physically present here on November 20, 2014, and when applying for relief;

(4) have no lawful immigration status on that date;

(5) not fall within the Secretary's enforcement priorities; and

(6) "present no other factors that, in the exercise of discretion, make [ ] the grant of deferred action inappropriate."

Prior to implementation of DAPA, twenty-six states challenged the policies established in the DAPA memorandum in the U.S. District Court for the Southern District of Texas. The district court enjoined implementation of the DAPA memorandum, the United States Court of Appeals for the Fifth Circuit affirmed the district court's decision, and the Supreme Court allowed the district court's injunction to remain in place.

The rescinded policy also provided expanded work authorization for recipients under the DACA program for three years versus two years. This policy was also enjoined nationwide and has now been rescinded.

The June 15, 2012 memorandum that created the Deferred Action for Childhood Arrivals (DACA) program will remain in effect.

For more information, see our frequently asked questions (/news/2017/06/15/frequently-asked-questions-rescission-memorandum-providing-deferred-action-parents) and signed memo (/publication/deferred-action-parents-americans-and-lawful-permanent-residents-recession-memo-dapa) .

# # #

Topics: Immigration and Citizenship Services (/topics/immigration-and-citizenship-services) , Immigration Enforcement (/topics/immigration-enforcement)

Keywords: DAPA (/keywords/dapa)

Last Published Date: June 16, 2017

# EXHIBIT 39

9/4/2017    Donald J. Trump on Twitter: "Many of the thugs that attacked the peaceful Trump supporters in San Jose were illegals. They burned the America…
Case 1:17-cv-05228-NGG-JO   Document 55-39   Filed 10/04/17   Page 2 of 24 PageID #: 2401

✕

 **Donald J. Trump** ✔
@realDonaldTrump

Follow ⌄

## Many of the thugs that attacked the peaceful Trump supporters in San Jose were illegals. They burned the American flag and laughed at police

6:04 AM - 4 Jun 2016

**12,246** Retweets **27,364** Likes   

💬 3.9K   ⟲ 12K   27K

 **Sean Keats** @seankeats · 4 Jun 2016 ⌄
Replying to @realDonaldTrump
@KazmierskiR Trump is being blamed for the violence perpetrated by the other side.

💬 3   ⟲ 5   8

 **BEAR** @streetbear57 · 4 Jun 2016 ⌄
Yeah, that's just hilarious. Like a fat person blaming the fork.

💬 2   ⟲ 2   6

 **RedeemedPatriot6** @HRClintonPrison · 4 Jun 2016 ⌄
That damn fork. & last week my car backed out of the garage all by itself, went out & got drunk&now I have a DWI.

💬 3   ⟲ 4   5

 **BEAR** @streetbear57 · 4 Jun 2016 ⌄
indeed. I was raised to be responsible for my own actions. But, when you have a LEADER that always blames. 🤷

💬 2   ⟲ 2   2

 **RedeemedPatriot6** @HRClintonPrison · 4 Jun 2016 ⌄
He said "not my fault" same week TEN US servicemembers lost, then blamed a general for his ISIS FUBAR.

💬 2   ⟲ 1   3

# EXHIBIT 40

# The Washington Post

**Politics**

# Trump's personal, racially tinged attacks on federal judge alarm legal experts

**By Jose A. DelReal and Katie Zezima** June 1, 2016

Donald Trump's highly personal, racially tinged attacks on a federal judge overseeing a pair of lawsuits against him have set off a wave of alarm among legal experts, who worry that the Republican presidential candidate's vendetta signals a remarkable disregard for judicial independence.

That attitude, many argue, could carry constitutional implications if Trump becomes president.

U.S. District Judge Gonzalo Curiel, who is handling two class-action lawsuits against Trump University in San Diego, has emerged as a central target for Trump and his supporters in recent weeks. The enmity only escalated after Curiel ordered the release of embarrassing internal documents detailing predatory marketing practices at the for-profit educational venture; that case is set to go to trial after the November election.

"I have a judge who is a hater of Donald Trump, a hater. He's a hater,"

Trump said at a campaign rally in San Diego, adding that he believed the
Indiana-born judge was "Mexican."

He also suggested taking action against the judge after the election: "They
ought to look into Judge Curiel, because what Judge Curiel is doing is a total
disgrace. Okay? But we will come back in November. Wouldn't that be wild if
I am president and come back and do a civil case? Where everybody likes it.
Okay. This is called life, folks."

The courtroom proceedings come with high stakes for Trump, whose likely
tough general-election fight against Hillary Clinton will leave him open to
intense scrutiny of his character, business practices and temperament.
Clinton said Wednesday that the Trump University allegations are "just
more evidence that Donald Trump himself is a fraud."

Trump's strikingly personal attacks on Curiel are highly unusual and have
prompted questions about how he would react to adverse judicial decisions
should he become president. Trump's remarks also stand out because he has
a personal financial stake in the case.

"Having a presidential candidate embroiled in litigation totally unrelated to
the political system ... that is what is so novel about this. And then you add
to this the personal criticism," said Arthur Hellman, a law professor at the
University of Pittsburgh. "It's personal all the way, and that's what makes
this different."

Conflicts between the courts and the political branches are common and, to
some degree, expected. The Constitution mandates lifetime tenure for
federal judges who serve in "good behavior" and protects them against
recrimination by forbidding that their salaries be diminished.

Judicial appointments are among a president's most lasting legacies, and in
the current presidential campaign, candidates from both parties have gone
beyond the comfort level of many legal experts by issuing litmus tests. On

the Democratic side, Clinton and Sen. Bernie Sanders (Vt.) have said
overturning the Supreme Court's controversial *Citizens United* ruling should
be a priority, while Republican candidates went after Chief Justice John G.
Roberts Jr. for his votes upholding the Affordable Care Act.

President Obama prompted outrage among conservatives in 2010 when he
blasted the *Citizens United* ruling in his State of the Union address.
Republican members of Congress criticized the president for attacking the
decision with members of the court seated just feet away from him, while
Democrats defended the comments as within the bounds of policy debate.

Trump's attacks on Curiel stand out for their personal nature, for the racial
remarks and for the suggestion by a potential president that someone "ought
to look into" the judge.

Charles Gardner Geyh, a professor at Indiana University's Maurer School of
Law, said he has no problem with presidents or presidential candidates
criticizing judges or judicial decisions. But, he said, "there's a line between
disagreement and sort of throwing the judiciary under the bus that I think is
at issue here."

One of Trump's earlier jeremiads came in February, when he told Fox News
that Curiel was biased against him because of his controversial immigration
comments and proposals, including his promises to build a giant wall on the
U.S.-Mexico border and deport 11 million illegal immigrants.

"I think it has to do with perhaps the fact that I'm very, very strong on the
border," Trump said then. "Now, he is Hispanic, I believe. He is a very
hostile judge to me."

Trump returned to ethnicity at last week's San Diego rally, where he
erroneously suggested Curiel was from Mexico: "The judge, who happens to
be, we believe, Mexican, which is great. I think that's fine. You know what? I
think the Mexicans are going to end up loving Donald Trump when I give all

these jobs, okay?"

Curiel, who through his office declined to comment, was born in East
Chicago, Ind., and is a 1979 graduate of the Indiana University law school.
He gained acclaim prosecuting drug traffickers along the Tijuana corridor
and was reportedly targeted for assassination by the Felix cartel; he joined
the federal bench in 2012 after being nominated by Obama.

Katrina Pierson, a spokeswoman for Trump, has expanded on the
accusations of bias, wrongly suggesting Curiel is part of a group organizing
protests at Trump rallies around California. Curiel is a member of the San
Diego La Raza Lawyers Association, a professional group that she appeared
to confuse with the National Council of La Raza, an advocacy group.

Luis Osuna, the president of the lawyers association, said the group is not an
advocacy group and supports candidates on both sides of the aisle. He said
Trump's attempts to discredit Curiel should give voters serious pause, not
least because his comments reduce Hispanics in the legal profession to their
heritage.

"Every time there is a comment like this, it is disheartening," Osuna said. "It
is not, unfortunately, surprising, given the source of the comments. But it
displays a complete lack of understanding of the role that we have as
attorneys and judges and the role that we have in upholding the
Constitution."

"He's definitely using it as a dog whistle to his supporters," he added.
"Obviously, I don't know what is in his heart. I can only judge based on the
way he has acted in the past, but this has been a recurring theme in his
campaign."

Trump is not without recourse if he thinks that Curiel has engaged in
misconduct. Russell Wheeler, a visiting fellow at the Brookings Institution,
said Trump could file a complaint with the federal court of appeals. He said

Trump would have to provide evidence that Curiel was biased in his behavior against the real estate mogul and could then proceed with a disqualification motion. Wheeler said Trump could also ask Curiel to recuse himself from the case because of a lack of impartiality. If Curiel declined, Trump could file an appeal.

But Wheeler added that, based on what he has seen, Curiel "has been nothing but fair in this case."

As part of the ongoing class-action lawsuit against Trump University that he is overseeing, Curiel ordered the release of internal documents that showed Trump played a key role in the marketing for the business and how staff members were guided to push customers to purchase expensive follow-ups costing up to $35,000 after taking free introductory courses.

The order came in response to a request by The Washington Post, which argued that Trump's presidential bid made the documents a matter of public interest. In the order, Curiel said that Trump had "placed the integrity of these court proceedings at issue."

*Robert Barnes contributed to this report.*

Jose DelReal is a national correspondent covering America's rural-urban divide, the USDA, and HUD. During the 2016 presidential election, he traveled to over 40 states while chronicling Donald Trump's astonishing political rise. Jose grew up in Anchorage, Alaska, and graduated from Harvard College. He lives in Washington, D.C. 🐦 Follow @jdelreal

Katie Zezima is a national correspondent covering drugs, guns, gambling and vice in America. She covered the 2016 election and the Obama White House for The Post. 🐦 Follow @katiezez

# EXHIBIT 41

CBS News / CBS Evening News / CBS This Morning / 48 Hours / 60 Minutes / Sunday Morning / **Face The Nation** / CBSN Originals    Log In   Search

Home   Local Listings   Archives   Full Episodes   About Us   Sunday Line-up

*By* **CBS NEWS** / **CBS NEWS** / *June 5, 2016, 12:57 PM*

# Face the Nation transcripts June 5, 2016: Trump



Donald Trump, the presumptive Republican presidential nominee gestures to a his camouflaged "Make America Great" hat as he discuses his support by the National Rifle Association at a campaign rally at the Redding Municipal Airport Friday, June 3, 2016, in Redding, Calif. (AP Photo/Rich Pedroncelli) / **RICH PEDRONCELLI, AP**

Comment /   Share /   Tweet /   Stumble /   Email

## Follow Us

## Our Podcast



*Subscribe for free to our Face the Nation Diary, hosted by John Dickerson*

## Popular on CBS News

**01** Officials on East Coast cast wary eye on Hurricane Irma
365359 *views*

**02** Hurricane Irma could threaten Caribbean islands
273377 *views*

**03** Irma expected to be a "major hurricane"
222898 *views*

**04** Best intentions: When disaster relief brings anything but relief
198661 *views*

**05** Black smoke pours from chimney at Russian consulate
191156 *views*

JOHN DICKERSON, HOST: Today on <FACE> THE <NATION>: Donald Trump gives no ground, as we go one on one. And we will look back at <the>life of <the> greatest, Muhammad Ali.

As she closes in on Democratic nomination, Hillary Clinton changes course and launches a withering round of attacks against Donald Trump.

(BEGIN VIDEO CLIP)

HILLARY RODHAM CLINTON (D), PRESIDENTIAL CANDIDATE: This is not just another outlandish, insulting comment from Donald Trump. And it is not normal politics. This is something much, much more dangerous.

(END VIDEO CLIP)

DICKERSON: We sat down with <the> presumptive Republican nominee in California ahead of Tuesday`s primary and asked him about <the> growing controversy over Trump University and <the> judge presiding over <the> case against him.

(BEGIN VIDEO CLIP)

DICKERSON: How does -- his Mexican parents have to do with him not...

(CROSSTALK)

DONALD TRUMP (R), PRESIDENTIAL CANDIDATE: He`s member of a club or society very strongly pro-Mexican, which is all fine. But I say he`s got bias. I want to build a wall. I`m going to build a wall.

(END VIDEO CLIP)

DICKERSON: We will have plenty of analysis on all <the> political news.

Plus, we will talk about <the> legacy of Muhammad Ali, who died Friday at<the> age of 74.

It`s all coming up on <FACE> THE <NATION>.

Good morning, and welcome <FACE> THE <NATION>. I`m John Dickerson.

Less than a month ago, we traveled to California to sit down with Democratic front-runner Hillary Clinton and asked her about her strategy in <the> fall campaign.

(BEGIN VIDEO CLIP)

CLINTON: I am going to run a race based on issues and what my agenda is for<the> American people. I don`t really feel like I`m running against Donald Trump.

(END VIDEO CLIP)

DICKERSON: Just to underscore how quickly this campaign is changing, she reversed course against Trump late last week.

(BEGIN VIDEO CLIP)

CLINTON: Donald Trump`s ideas aren`t just different. They are dangerously incoherent.

(APPLAUSE)

CLINTON: He is not just unprepared. He is temperamentally unfit to hold an office that requires knowledge, stability and immense responsibility.

(CHEERING AND APPLAUSE)

DICKERSON: We sat down with Mr. Trump at his home in Beverly Hills on Friday. And that`s where our interview began.

(BEGIN VIDEOTAPE)

DICKERSON: Mr. Trump, on Thursday, Hillary Clinton gave a speech very tough on you, said that you wanted to bring back water-boarding, go after <the>families of terrorist, allow Saudi Arabia to have a nuclear weapons. She says you have said that you know more about ISIS than <the> generals.

But what policy of yours did she mischaracterize?

TRUMP: Number one, it was a whole -- written out by professionals and just shot after shot. It was supposed to be foreign policy, and it was really Trump policy. And she got it all wrong.

First of all, she talked about that I want to nuke all of these countries. It is ridiculous. No, I want these countries to pay for protection. We are protecting them. We have $19 trillion in debt, very soon going to $21 trillion, John, in debt. And I want these countries to reimburse us at least for our costs.

She made many statements that she knows were wrong.



*Sponsored by The Make-A-Wish Foundation*

**One Moment Changes Everything.**

Five-year-old McClain wished to play football with the USC Trojans. Watch his touchdown wish experience and see how it impacted the team and family.

## Watch CBSN Live



**Watch CBS News Live**

*Watch CBS News anytime, anywhere with the new 24/7 digital news network. Stream CBSN live or on demand for FREE on your TV, computer, tablet, or smartphone.*

DICKERSON: Do you still feel like you know more about ISIS than <the>generals?

Watch Now

TRUMP: Well, they don't know much, because they're not winning. That, I can tell you.

Now, I think they're not winning for a different reason. I think Obama is hurting them.

DICKERSON: How so?

TRUMP: It's being run -- well, from what I hear, it's being run from <the>White House. It's all being run from <the> White House.

I have spoken to certain generals. I will keep it quiet as to who, but highly respected people. They say we could knock them out fast.

DICKERSON: In office now generals or retired generals?

TRUMP: In one case, in office, and, in one case, out of office.



*192* PHOTOS
**FTN: Behind the scenes**

And they said -- both of them said <the> same thing. If we had <the>leadership, meaning <the> go-ahead, you could knock them out fast. For some reason, Obama is not doing that.

DICKERSON: Let me ask you about Libya. You have been highly critical of Libya and Hillary Clinton. You were also for military action to oust Gadhafi and military action to take care of <the> humanitarian situation in Libya. You supported that.

TRUMP: When you say supported it, I supported Libya?

DICKERSON: Yes, you supported <the> intervention in Libya.

TRUMP: I did? Where do you see that?

DICKERSON: In a video blog from 2011, you said:

(BEGIN VIDEO CLIP)

TRUMP: Now, we should go in. We should stop this guy, which would be very easy and very quick. We could do it surgically, stop him from doing it and save these lives.

(END VIDEO CLIP)

TRUMP: That's a big difference from what we're talking about.

DICKERSON: But you were for intervention.

(CROSSTALK)

## Face on Twitter
Tweets from @FaceTheNation/team

TRUMP: Again, I'm <the> only one. I made lot of money with Gadhafi. If you remember, he came to <the> country and he had to make a deal with me because he needed a place to stay, and he paid me a fortune, never got to stay there. And it became sort of a big joke.

But <the> fact is that Libya was a disaster from <the> standpoint of <the>way it was handled.

## New Fire TV App

DICKERSON: But you were for intervention, just to clear that up?

TRUMP: I was for doing something, but I wasn't for what you have right now.

And right now, ISIS has their oil, John. ISIS is selling -- that is among <the>finest oil in <the> world. ISIS has taken over <the> Libyan oil. And we don't do blockades. We don't do anything. They're selling it. They're making a fortune with it.

So, we go out, we do Libya, we do it poorly, as poorly as you can do it. You can`t do worse. And then now, if you look at what`s happened, <the> end result is, ISIS selling <the> oil and it`s a total mess.

DICKERSON: This is one of <the> things that confuses some people about your positions. You said you weren`t for intervention, but you were for intervention in Libya.

TRUMP: I didn`t mind surgical. And I said surgical. You do a surgical shot and you take them out.

But I wasn`t for what happened. Look at <the> way it`s -- look at -- with Benghazi and with all of <the> problems that you have had. It was handled horribly.

(CROSSTALK)

DICKERSON: But you said you were never for intervention.

TRUMP: I was never for a strong intervention. I could have seen surgical, where you take out Gadhafi and his group.

DICKERSON: You said Hillary Clinton should go to jail. If <the> FBI, which is investigating, if there`s no indictment, will your attorney general go after her?

TRUMP: OK.

So, I have spoken to, and I have watched and I have read many, many lawyers on <the> subject, so-called neutral lawyers, OK, not even on one side or <the> other, neutral lawyers. Everyone of them, without a doubt, said that what she did is far worse than what other people did, like General Petraeus, who essentially got a two-year jail term.

General Petraeus and others have been treated -- their lives have been in a sense destroyed. She keeps campaigning. What she did is a criminal situation. She wasn`t supposed to do that with <the> server and <the> e-mails all of<the> other.

Now, I rely on <the> lawyers. These are good lawyers. These are professional lawyers. These are lawyers that know what they`re talking about and know -- are very well-versed on what they did. They say she`s guilty as hell.

DICKERSON: But it sounds like you were making promise for your attorney general that, if you were elected, this is one of <the> things -- this is a commitment you were making.

TRUMP: That`s true, yes. DICKERSON: It`s a commitment to have your attorney general...

TRUMP: Certainly have my -- very fair, but I would have my attorney general look at it.

DICKERSON: Even if <the> investigation...

(CROSSTALK)

TRUMP: You know you have a five and maybe even a six-year statute of limitation.

DICKERSON: But even if <the> current investigations don`t find anything, you would have your attorney general go back at it?

TRUMP: Yes, I would, because everyone knows that she`s guilty.

Now, I would say this. She`s guilty. But I would let my attorney general make that determination. Maybe they would disagree. And I would let that person make <the> determination.

DICKERSON: And what for you exactly is she guilty of?



**CBSNEWS**
ON
**amazon** fireTV

Install the new free app to stream
live 24/7 news with CBSN

GET IT NOW

TRUMP: She`s guilty of <the> servers. She`s guilty of -- you look at confidential information, I mean, all of <the> information that probably has gotten out all over <the> world.

And then you know what she`s also guilty of? Stupidity and bad judgment.

DICKERSON: But that`s not a -- if that were criminal, we would all be in jail.

TRUMP: No, no, I`m not even saying that part is criminal. But she`s certainly guilty of that.

In terms of this country, she is guilty of having just bad, bad -- how could she do a thing like this?

DICKERSON: But what do you get -- what gets them to jail, though? This is -- what`s <the> difference here between rhetoric and law?

TRUMP: What <the> lawyers are saying is what she did in terms of national security, we have very strict rules and regulations -- she`s broken all of them.

DICKERSON: So, <the> classification issue?

TRUMP: She`s broken all of them. Of course it is. But she`s broken so much.

But she`s so -- if you look at this from <the> standpoint of why did she do it, judgment, <the> word judgment. This is not criminal judgment. You make bad judgment, although, actually, under those rules and regulations, judgment is even criminal. You`re not supposed to do it. If you make a mistake, they don`t take that into account.

Why would a person and how can a person with this kind of judgment become<the> president of <the> United States? Now, think of this. We`re in a cyber-world. It`s a cyber-world. This is a very complex -- we`re in world like we have never been in before.

If we are in a cyber-world and she can`t even handle her e-mails, how can she be president? And we`re being hacked all over <the> place by Russia, by China probably. I mean, to <the> best of everyone`s knowledge, it seems to be.

But listen to this. So, we`re in a cyber-world, and she`s playing around with servers and e-mails. How can she be running this country? She doesn`t know what she`s doing.

DICKERSON: I want to make -- move on to another development this week.

Paul Ryan has now come out and endorsed you. You have talked to him several times.

TRUMP: Yes.

DICKERSON: Which of his ideas, <the> famous Ryan ideas, is -- are most appealing to you?

TRUMP: He`s most appealing. He`s a good man. He wants good things for<the> country.

We will agree on many things. We`re not going to agree on all things. But we`re going to agree on many things.

DICKERSON: For instance?

TRUMP: But Paul -- Paul Ryan -- well, I think we will agree on -- as an example, he really focuses on poverty. He wants to take people out of poverty. So do I. And we`re going to come up with a plan.

DICKERSON: Why do you think people are poor, by <the> way?

TRUMP: They`re poor because they don`t have jobs. They`re poor in many cases because they don`t have jobs.

And I will tell you will bring jobs back to this country like nobody has ever seen before. And people like Carrier and Ford and Nabisco leaving Chicago and moving to Mexico, they`re all moving to Mexico. I will stop that very quickly.

DICKERSON: Do you see yourself as implementing Paul Ryan`s agenda as president, or is Paul Ryan implementing <the> Donald Trump agenda?

TRUMP: I think it`s going to be a compromise, honestly. I can see a compromise.

DICKERSON: Because, on issues of trade, entitlements, you and he -- immigration -- so, trade, entitlements, immigration, those are no small issues. You are on exactly <the> opposite end of <the> -- those aren`t differences. You are on <the> opposite end of <the>...

(CROSSTALK)

TRUMP: Well, I don`t know. To be honest, we have spoken about it very briefly. They are big subjects.

You know what my deal is on trade? I want good deals. That`s what I`m going to do. Somebody said, what is your position on trade? I said, I want good deals. Whether it`s free trade, not free trade, I don`t care what kind of trade it is. I want good deals for our country.

We don`t make good deals. We have a trade deficit with China that is through<the> roof. We have a trade deficit with Mexico. We have a trade deficit with Japan. We make bad deals, whether it`s <the> military, whether it`s trade. We only make bad deals.

DICKERSON: Let me ask you about Mitch McConnell on <the> Senate side.

He was asked by CNN two things, one about deporting <the> 11 million undocumented immigrants, which <the> president, by <the> way, called a fantasy. He said, if you asked him to do that, he would say, no, don`t do it. He also said about <the> temporary ban on Muslim integration, no, don`t do it.

These are two big promises.

(CROSSTALK)

DICKERSON: You got millions of votes based on these promises. How are you going to get past <the> establishment to keep those promises?

TRUMP: You are going to have to watch and are going to have to see.

I have done a lot of things that nobody thought I could do.

(CROSSTALK)

DICKERSON: But you`re not backing down on those promises, based on a no from <the> Senate?

TRUMP: No, I`m not backing down. We have to do something.

We have a problem in this country. We have a radical Islamic terrorism problem in this country, and, by <the> way, throughout <the> world, throughout <the> world. It`s a problem. And it`s a temporary ban. I`m not talking permanent. It`s a temporary ban. We have to find out what is going on.

DICKERSON: Let me ask you about, what does <the> Mexican heritage of<the> judge in <the> Trump University case have to do with anything?

TRUMP: I think it has a lot to do with it.

First of all, I have had terrible rulings forever. I had a judge previous to him, and it would have been a very quick case. This is a case I should have won on summary judgment. This is a case -- and nobody writes this, and they all know it, but they don`t like to write it -- <the> plaintiff in <the> case was a woman.

She was so bad that, under deposition, it was over. She couldn`t have been<the> plaintiff. It was a disaster. They went before <the> judge. They said, we don`t want her to be <the> plaintiff. We want to put somebody else in. So, we said, well, that`s fine. Dismiss <the> case. You have to dismiss <the>case.

Wait a minute. She gave letters, <the> most incredible reviews of <the>college you have ever seen, of <the> university. She gave <the> most incredible. Then, on top of it, we have a tape where she`s talking about it in<the> most glowing terms. You wouldn`t speak about your college...

DICKERSON: Mr. Trump, what does this have to do with his parents before from Mexico? How is that...

(CROSSTALK)

TRUMP: No, no, excuse me, excuse me. I`m just saying, we`re getting terrible rulings.

We go to <the> judge, we say to <the> judge, hey, you can`t let her out of<the> case. He let her out of <the> case. We said, well, if you`re going to let her out of <the> case, she`s <the>`plaintiff. If you`re going to let her out of<the> case, <the> case is over. No, <the> case isn`t over. OK?

Now, give me...

(CROSSTALK)

DICKERSON: No, no, for him, how does -- his Mexican parents have to do with him not...

(CROSSTALK)

TRUMP: He`s member of a club or society very strongly pro- Mexican, which is all fine. But I say he`s got bias. I want to build a wall.

I`m doing very well with <the> Latinos, with Hispanics, with <the> Mexicans. I`m doing very well with them, in my opinion. And we`re going to see, you`re going to see, because you know what? I`m providing jobs. Nobody else is giving jobs.

But just so you understand, this judge has treated me very unfairly. He`s treated me in a hostile manner. And there`s something going on. When a woman can be a plaintiff in a case and then say, I don`t want to be -- and you know why they don`t want to be a plaintiff? They didn`t want her. <The>lawyers asked that she not be a plaintiff because they would have lost <the>case immediately.

DICKERSON: So, I`m trying to figure out your thinking here, though.

If his Mexican heritage, <the> fact that his parents were Mexican immigrants, is a barrier to him doing his job, why would any Mexican voter vote for you? Wouldn`t they be -- <the> same barrier, <the> same problem?

TRUMP: No, no, that`s a whole different thing. No, they`re going to vote for me because I`m going to bring jobs into <the> country.

DICKERSON: But isn`t it <the> same problem, because you want to build a wall and all <the> ?

TRUMP: No.

(CROSSTALK)

DICKERSON: So, what if it was a Muslim judge?

TRUMP: By <the> way, I have so many Hispanics.

I made a speech last night. I saw hundreds of signs, Latinos for Trump, Latinos for Trump all over <the> place. And you know what? They are here legally. They don`t want their homes taken away. They don`t want their job taken away. They like what I`m doing.

Now, people can come in, but they have to come in legally.

DICKERSON: You have -- on <the> Muslim -- but what if he was a Muslim, though? You have had -- been very tough on temporary Muslim immigration ban. Would a Muslim judge be also out of <the> question here?

(CROSSTALK)

TRUMP: We are allowing tremendous numbers of people coming into this country that we know nothing about.

We are -- we have a problem in this country. We`re going to have big problems. I have been pretty good at predicting things, John. We are going to have big problems. We have people coming into this country totally undocumented. They don`t know anything about them.

They don`t have paperwork. I interviewed and talked to <the> best law enforcement people in <the> business. There`s no way of knowing where they come from. And we`re taking them in from <the> so-called migration. They are being sent all over <the> country. We have people that don`t know what they`re doing. And we have to stop it.

DICKERSON: My question is, if it were a Muslim judge, would you also feel like they wouldn`t be able to treat you fairly because of that policy of yours? TRUMP: It`s possible, yes. Yes. That would be possible, absolutely.

DICKERSON: Isn`t there sort of a tradition, though, in America that we don`t judge people by who their parents were and where they came from?

TRUMP: I`m not talking about tradition. I`m talking about common sense. OK? He`s somebody -- he is proud of his heritage. And I think that`s great that he`s proud of his heritage.

DICKERSON: But you`re saying it`s a barrier to him doing his job.

TRUMP: He`s not treating me fair. He`s not treating me fairly.

DICKERSON: And you think it`s not because -- you think it`s because of where his parents came from?

TRUMP: I have had numerous lawyers.

Look, I have a case where thousands of people have said it was a great school. They have written reviews where they say it`s a great school. Not a good school, like great. They gave it <the> highest marks. I have thousands of these papers.

It should have been a summary judgment case, meaning <the> case should have been dismissed. And I had a judge who was very fair. I have a lawyer that came in when he came in. <The> lawyer on other side sort of entered <the> case when entered <the> case. And we`re trying to figure out what that is all about.

DICKERSON: Would you have your lawyers say, hey, throw this out because<the> judge...

(CROSSTALK)

TRUMP: Well, I may do that now. Look, we`re finding things out now that we didn`t know before.

(CROSSTALK)

DICKERSON: Because of his Mexican heritage, though?

(CROSSTALK)

TRUMP: No, because of other things, I mean, because of other things.

DICKERSON: You have said you want to reopen...

TRUMP: How do you allow a case to proceed when <the> plaintiff asks to be dismissed from <the> case?

<The> plaintiff, <the> one that brought <the> suit, said, I don`t want to sue anymore. I don`t want to sue anymore. They didn`t want to sue.

You know why they didn`t want to? Because she can`t win <the> case, because she was a disaster.

DICKERSON: Yes.

TRUMP: So, <the> lawyers want her dismissed from <the> case. They go before <the> judge and he lets her out?

Well, he can let her out, but you have to dismiss <the> case.

DICKERSON: Yes, I guess I`m just confused how that -- what his Mexican parents have to do with that.

Let me...

TRUMP: Excuse me. I want to build a wall. I can -- I don`t think it`s very confusing.

DICKERSON: Well...

TRUMP: It has nothing to do with anything except common sense.

We have to stop being so politically correct in this country. And we need a little more common sense, John. And I`m not blaming. I`m proud of my heritage. We`re all proud of our heritage. And I want to build a wall.

Now, <the> Hispanics, many of them like what I`m saying. They`re here legally. They don`t want people coming and taking their jobs and taking their house and everything else. They don`t want that.

DICKERSON: Let me ask you about Trump University. You`re going to reopen it. Anything you would do differently when you reopen it?

TRUMP: Look, I guess, in life, you always do things differently.

I`ll tell you, <the> thing that we did very well is, we had evaluation reports done by all of <the> students. Without that, it would be my word against their word, I guess, or somebody`s word against their word.

We have evaluation reports where we have thousands of them, thousands of them. And these reports, they`re very detailed reports. What did you think of <the> instructors? What do you think of this? What do you think of <the> questions? One to five. Mostly five, five being excellent, right? It`s from one to five, five being <the> best.

And people circled. I`m being sued by people that have given these tremendous reports. Now, they`re going to say, oh, but they were forced. Who forced them?

**117**

Nobody forced them. You mean they forced thousands of people to sign reports? Nobody forced them to sign <the> report.

And many, it says remarks on them. Many have been -- handwriting, beautiful statements about <the> school. Look, it`s very simple. It`s called, if I have chance to get my money back, let me get my money back.

DICKERSON: Last question. Should <the> U.S. go to <the> Olympics still with<the> threat of Zika in Brazil?

TRUMP: <The> answer is, yes, but certainly, if an athlete wouldn`t want to do it, they should <the> right not to do it, but I would say yes.

DICKERSON: All right, Mr. Trump, thank you very much.

TRUMP: Thank you very much.

(END VIDEOTAPE)

DICKERSON: We will be back in one minute with a look back at <the> life of Muhammad Ali.

(COMMERCIAL BREAK)

DICKERSON: We lost Muhammad Ali on Friday, a man whose impact went far beyond his sport.

(BEGIN VIDEOTAPE)

DICKERSON (voice-over): Ali was a boxer and, as he let <the> world know, so much more.

MUHAMMAD ALI, BOXING HEAVYWEIGHT CHAMPION: That`s why I say I`m<the> greatest. I`m a poet. I`m a movie star. I`m an actor. I`m a fighter. And most of all, I`m pretty.

DICKERSON: A three-time heavyweight champion of <the> world, Ali was known for his unorthodox style, rolling along <the> ropes to avoid a flurry of blows.

ALI: I`m going to float like a butterfly and sting like a bee. His hands can`t hit what his eyes can`t see.

DICKERSON: But for a man who made his living dancing around <the> ring, he became a legend when he took a stand. In 1964, he announced he was giving up what he called his slave name of Cassius Clay and converting to Islam.

QUESTION: Cassius Clay is a name no more. Is that?

ALI: Yes, sir. It`s Muhammad Ali. Muhammad means worthy of all praise, and Ali means most high.

DICKERSON: Ali was a militant in <the> debate over what it meant to be black and live in America.

He asserted his greatness when in some parts of <the> country a black man who did that could be killed for it. By 1967, Ali became a pariah, refusing to join<the> Army on religious grounds during <the> Vietnam War. At <the> height of his talent, he sacrificed his fame, title and liberty for his beliefs, marking a new era in political activism by a star athlete. His comeback bouts with George Foreman and Joe Frazier in <the> 1970s made him a global celebrity. And, in 1981, he even put his fame to use.

UNIDENTIFIED MALE: <The> former heavyweight champion went to a window and reportedly yelled, "I`m your brother, I want to help you."

DICKERSON: By talking a suicidal man back from <the> brink.

For <the> last half of his life, Ali battled Parkinson's disease, rallying in 1996 to carry <the> Olympic torch. Once scorned, he was now a hero.

Ali hadn't changed. <The> times had. Writing in his autobiography, Ali said he wanted to be remembered -- quote -- "as a man who stood up for his beliefs no matter what, as a man who tried to unite all humankind through faith and love. I wouldn't even mind," he wrote, "if folks forgot how pretty I was."

Muhammad Ali was 74.

(END VIDEOTAPE)

DICKERSON: Joining us now is "New York Times" sports columnist William Rhoden and, in New York, Muhammad Ali biographer Thomas Hauser, author of "His Life and Times" and a new book out today, "Muhammad Ali: A Tribute to<the> Greatest."

Bill, I want to start with you.

Explain for people who may not have seen <the> whole course of Muhammad Ali's life where do you put your finger on <the> greatness of Muhammad Ali? Was it boxer, civil rights, humanitarian, what?

WILLIAM C. RHODEN, "<THE> NEW YORK TIMES": So much, John, because you covered every one.

For me, <the> first thing was -- I never thought I would feel this sad. I knew this was coming. And I find myself feeling sadder than I thought I would. But remember <the> first -- this guy has been in my life since I was like 13 years old.

And it was through boxing. I was <the> only black kid in my -- in Harvey, Illinois, Catholic school. I was <the> only black guy. Leading up to it, everybody was talking all this trash about Ali and Ali.

So, I remember getting ready to watch <the> fight. My father was a Joe Louis guy, which means he was kind of a Sonny Liston guy. Remember, it was February. And so, just before <the> fight went on, my dad put on his coat, his overcoat. And he was going. I said, where are you going? He said, I'm going out to catch Clay.

And so -- and that was <the> first time we find ourselves competitively on sort of <the> opposite ends of sort of <the> fence, but...

DICKERSON: Catch him, meaning he's going to get knocked out.

RHODEN: Oh, no, no. He thought -- yes, he thought that Liston was going to knock him in <the> middle, so he was going to <the> yard and catch him. That was my dad's humor.

And so -- but for every phase of my life, when I'm 16, 17, and <the> war was real. As you know, I'm like -- this is '67. <The> war is real. And we're thinking, what are we going to do about -- so, at every phase of my life, including now, Ali sort of was there as this...

DICKERSON: Thomas, tell me about -- let's -- about Muhammad Ali as a boxer. Why was he so good?

THOMAS HAUSER, AUTHOR, "MUHAMMAD ALI: HIS LIFE AND TIMES": Well, let me just get one thing off my chest.

I was listening to Donald Trump at <the> top of this telecast. And it brought back a memory of a dinner that I had attended at <the> Taj Mahal, <the> Trump Taj Mahal, as it was called then, in <the> mid-1990s. It was one of those dinners where Muhammad was given an award, one of these big gala events.

Donald Trump was sitting at <the> same table as Muhammad. And at one point in <the> evening, Muhammad leaned over and whispered to me, "He`s not as big as he thinks he is."

That was one of many times when Muhammad was right.

Now, in terms of Muhammad, why he was great, he was arguably <the>greatest fighter of all time. He was a beacon of hope for oppressed people all over <the> world. Every time he looked in <the> mirror and said, "I`m so pretty," what he was saying, before it became fashionable was, black is beautiful.

When he refused induction into <the> United States Army, he stood up for<the> proposition that, unless you have a very good reason for killing people, war is wrong. That`s a lesson we still haven`t learned. People all over <the>world haven`t learned it.

But I think in <the> end his greatest contribution might have been that there was an aura of pure goodwill and love about him. He taught us how to love.

DICKERSON: All right.

And we`re going to take a quick break right here, be back with more of our conversation. So, stay with us.

(COMMERCIAL BREAK)

DICKERSON: Don`t go away. We will be right back.

And be sure to tune in next week, when we sit down with Speaker Paul Ryan in his first interview since his decision to endorse Donald Trump.

(COMMERCIAL BREAK)

DICKERSON: Some of our CBS stations are leaving us now, but, for most of you, we will be right back with a lot more <FACE> THE <NATION>, including a look back at <the> legendary life of Muhammad Ali, a conversation with Democratic consultant David Axelrod, and our panel, plus a look at surprises in<the> news.

Stay with us.

(COMMERCIAL BREAK)

DICKERSON: Welcome back to <FACE> THE <NATION>.

We want to continue our conversation with "New York Times" columnist William Rhoden and Muhammad Ali biography Thomas Hauser.

Bill, I want to ask you about Muhammad Ali`s famous poetry, his mouth, his taunting. Was that an act or was that a part of his character?

WILLIAM RHODEN, "NEW YORK TIMES": Well, you know, part of it was an act. You know, gorgeous George was sort of his - his model. But it - it was - it became part of him. I mean, you know, one of <the> famous things, even in<the> street, you know, and, you know, he was talking about early Torell (ph), and, you know, a lot of people not calling him by his name and he really gave him a hard time. And, actually, when he was on <the> mat he was - what`s my name? What`s my name? And so that almost became, you know, in<the> - in <the> street where we were playing around and wrestling people and throwing them down, that became sort of <the> thing like, what`s my name? What`s my name?

Now, that went completely against <the> - sort of <the> orthodoxy of what was supposed to be sportsmanship at that time. You know, so I think it was - it was an act to <the> extent that it was show business, but it was - also came out of <the> (INAUDIBLE) of style which really, to me, helped define sort of<the> young, black community.

DICKERSON: Thomas, when Muhammad Ali is - has <the> clash over Vietnam, how did he come back to become <the> boxing hero, <the> - <the> legend he was at <the> end of his boxing career?

THOMAS HAUSER, "MUHAMMAD ALI: A TRIBUTE TO <THE> GREATEST": People began to root for Muhammad very early on in <the> liberal community and also segments of <the> black community. After he came back from <the>exile, a number of people looked at Muhammad and said, well, we don`t necessarily agree with his principles, but he lived up for them, he sacrificed a lot for them. Also, <the> nation turned against <the> war in Vietnam. People began to think, well, maybe Muhammad was right about this one. And it`s also worth noting that while Muhammad sacrificed a lot, he said many times, look, there were young men who believe that this war is right. They went to Vietnam, they fought and they were killed and they sacrificed a lot more than I did.

DICKERSON: William, when you - when you think of Ali, you think of Ali and Frazier, like <the> twin people together.

RHODEN: Right.

DICKERSON: But Joe Frazier returned to his boxing club by <the> railroad tracks. I mean two very different courses in life.

RHODEN: Yes. You know, and again, that was - that was very interesting too because, again, you know, <the> black community is complex. There are a lot of ways to be black. Well, actually, <the> range isn`t that great. There are a lot of ways to be black, but at <the> end of <the> day I think what Ali stood for is that at <the> end of <the> day it`s about - it`s about defending black people, caring for black people, fighting for black people. And - and I think<the> thing that`s going to live on for me in <the> spirit of Ali lives, is that early on, when I was 17, he said, listen, you live in a country of trinkets and they`re going to throw a lot of trinkets at you. There`s so much wealth here. You choose between wealth and principle. And to have somebody you admire so much at an early age tell you about <the> essence of this country, and that as you grow up they`re going to throw a lot of wealth at you and you`ve got to make a choice, it`s going to be <the> belt or principle.

DICKERSON: Thomas, let me ask you, as a final question, about Muhammad Ali after - with Parkinson`s, <the> final stage of his life. Tell us about that stage.

HAUSER: It was sad to watch, this long, sad goodbye. I can`t think of a parallel, really, for 30 years <the> whole world watched this man become more and more debilitated. He did it very publicly. What`s happening now is a time of mourning is moving into a time of celebration. So to everybody who loved Ali, I would say, don`t cry because he`s gone, smile because we had him.

DICKERSON: All right, Thomas Hauser, on that note, thanks so much.

We`ll be back in a moment with our new battleground tracker polls in Tuesday`s Democratic primary states. Stay with us.

(COMMERCIAL BREAK)

DICKERSON: Turning now to <the> Democratic race ahead of Tuesday`s primaries. CBS News battleground tracker polls show a lopsided lead for Hillary Clinton in New Jersey. She has 61 percent to Bernie Sanders at 34 percent. In California, there is a much closer race. Bernie Sanders has closed <the> gap and is now only two points down with Clinton at 49 and Sanders at 47 percent.

We turn now to Democratic strategist and CNN`s senior political consultant David Axelrod.

David, it looks like on Tuesday Hillary Clinton is going to lock things up, but Bernie Sanders says there is going to be a contested convention. Explain how those

https://www.cbsnews.com/news/face-the-nation-transcripts-june-5-2016-trump/

**121**

two things can happen and what that means? DAVID AXELROD, CNN SENIOR POLITICAL CONSULTANT: Yes, I think we need a little reality check here. <The> fact is, she needs about 60 delegates to clinch <the>nomination. There are 781 at stake in <the> next few days. And so she will probably - she will almost certainly clinch <the> nomination before <the> polls close in California. She will have led <the> primary season in delegates by pledged delegates, elected delegates, by about 300 delegates or more. And<the> popular vote by three million. And now Bernie Sanders is in <the>ironic position of turning to these super delegates, these party officials, these -<the> party elite, to overturn <the> verdict of voters. And I think that that`s a very awkward position to be if you`re trying to lead a political revolution.

DICKERSON: Let me ask you about Hillary Clinton`s speech this week, <the>very tough attack on Donald Trump. We talked to her a month ago and she said, I`m not going to bother with Donald Trump. I`m going to talk about my campaign. Then she gave a kind of Trump-like, sustained, long speech with attack after attack on policy but also calling him a whole series of names. What do you make of that switch?

AXELROD: Well, I thought it was imprudent when she made <the> first comment because, obviously, you can`t - you can`t deal with Donald Trump by ignoring him. He insists that you not ignore him. And, you know, one of<the> mistakes Republicans made in <the> primaries was, they didn`t take him on vigorously from <the> start. She clearly can`t make that mistake. And I think Thursday was probably her best day in <the> whole campaign.

First of all, that`s her event, standing in front of those flags, giving a very sober speech, as she did, is what she feels comfortable with. But, secondly, it was a very lacerating speech and it provoked <the> kind of response that almost - almost reinforced <the> point she was trying to make, which is, temperamentally, Donald Trump isn`t suited for <the> presidency.

And for Trump <the> challenge is, can he change in any way and - and - and demonstrate to people that he has that element of discipline that`s necessary when you`re in a job that involves mortal power.

DICKERSON: She also suggested Donald Trump likes to throw up shiny objects when he doesn`t want to talk about something else, but she`s, obviously, got something she doesn`t want to talk about, that inspector general`s reports,<the> bad reviews she`s gotten in terms of <the> answers to <the>inspector general`s report. So should we read anything into that, that this was her own shiny object?

AXELROD: Well, I think this is her core case and I think anybody who would be running against Donald Trump would be making <the> same case. There`s no doubt that <the> e-mail situation continues to nag at her. I think it was very damaging and I think it - it was poor judgment, as -as she and others have acknowledged. She hasn`t handled it particularly well. But her hope is, and expectation I assume, is that it will pass. But for her setting up this stark contrast is absolutely essential in part because she wants to make that case for voters, but in part because every time she does it, she draws a response from Trump that only reinforces her case. DICKERSON: Is this a shot in <the> arm for Democrats too? There were some people worried about kind of <the>Clinton campaign.

AXELROD: Oh, I absolutely - you know, my - my soundings around <the>country were such that, you know, Democrats were dispirited by <the>campaign that she had run to date. It seemed a little flaccid. She seemed more restrained.

This was - this - this speech was a shot of adrenaline for her. My - my - my guess is it may help her Tuesday in <the> California primary. This is what a lot of Democrats were hoping to see.

DICKERSON: All right, David Axelrod, thanks so much for being with us.

AXELROD: Good to see you, John.

DICKERSON: And we`ll be right back with our panel.

(COMMERCIAL BREAK)

DICKERSON: Joining us now for some political analysis is "USA Today`s" Washington bureau chief Susan page, chief Washington correspondent for "<The> Washington Post," Dan Balz, plus national editor of <the> "Cook Political Report," Amy Walter, and executive editor of "<The> National Review, Reihan Salam.

Reihan, let me start with you. How much of a big deal are Donald Trump`s comments and his - you know, he`s not backing down on this question of Judge Gonzalo Curiel. Newt Gingrich said it was a huge mistake for him to hold this position. Does it matter?

REIHAN SALAM, NATIONAL REVIEW INSTITUTE: It`s hard to say because what Donald Trump does, and as he did in his interview with you is, he will take one of your questions, he won`t exactly answer it. He will take words that you brought up in your question and he will say them again and again without actually addressing <the> substance of your question. And <the> reason he does that is to make it appear as though he`s responding. And, frankly, that`s been decently effective so far. He doesn`t address <the> actual charge. and<the> question is, do people actually believe that he`s bigoted or not? If they believe he`s bigoted, and, of course, much of <the> country already does, they`ll accept that this reinforces that view. If they simply don`t believe it, if they believe he`s basically a decent guy who`s being hounded by <the>media in unfair way, they`ll believe that. And he recognizes that uncertainty and he plays to it.

DICKERSON: Dan, what do you make of - I mean Speaker Paul Ryan also spoke out about - in opposition after having just endorsed Donald Trump. So you`ve got Speaker Paul Ryan, Newt Gingrich, Senator Flake. Where does this leave things?

DAN BALZ, "WASHINGTON POST": John, it`s almost <the> classic example of what we`ve seen throughout <the> entire year. Things he does and says give terrible heart burn to Republican establishment people. And over <the> last month since he effectively became <the> nominee, more and more of them have in one way or another said, I will be for him in November and yet he does these things and they react. Their concern is that it`s going to cost him <the>presidency and that it`s going to cost <the> party, both short term and long term. But we`ve also seen there is another audience out there that responds in a different way to that. And so I think you always have to be careful about predicting just how bad something that seems bad is going to be.

DICKERSON: That`s right.

Amy, <the> audience Dan is talking about is <the> common sense audience. <The> one that looks at all of <the> things -

AMY WALTER, "COOK POLITICAL REPORT": Right.

DICKERSON: We get all wound up about.

WALTER: Right.

DICKERSON: And that elites get, you know, spun up about. And, you know, just let`s have some common sense in Washington, that`s <the> pitch Donald Trump is making.

WALTER: That`s right. It`s hard to make that pitch, though. I mean this is<the> whole point, which is, what we should really be talking about today, if you were <the> Republicans, if you were <the> Trump campaign, is <the>terrible jobs report that came out on Friday. That should be <the> entire focus of this. We have an economy that has not recovered for a whole lot of people who are attracted to

Case 17-3345, Document 93-2, 11/14/2017, 2172210, Page126 of 267

9/4/20 Case 1:17-cv-05228-NGG-JO Face the Nation 55 Transcripts - June 5 2006 04/17 17 - CBS News 17 of 22 PageID #: 2425

Donald Trump, who`s saying I`m going to bring jobs back. That would have been a message that would break through, I think, to a whole bunch of people. Instead, what we`re talking about are all of these things that seem to have nothing to do with whether or not jobs are going to come back or <the> economy is going to recover.

<The> other thing that`s remarkable, I went back and went through <the>2013 autopsy that <the> Republican Party did after their loss in 2012. And literally everything he`s doing right now is <the> opposite of what Republicans thought <the> next presidential candidate needed to do, specifically on tone. It wasn`t just, he needs to come out and support immigration, or do better with these groups. It said, if we have a tone that suggests that we don`t like these people, it doesn`t matter who our policies are. So when Trump says, I`m going to bring jobs back, it doesn`t matter what I say about walls or about Mexicans not being able to take my case, that`s exactly <the> opposite of what they learned from <the> last time.

DICKERSON: And yet, Susan, Republicans are lining up smartly behind Donald Trump, despite <the> tone. I mean, you know, it`s not just Paul Ryan. It`s Marco Rubio. And you look at <the> distance some of them have travel. I mean Rick Perry called him a cancer. Now he`s saying he`s wonderful. He is - they are, in a sense, and people have written this, they are basically affirming everything he said about them and how quickly politicians will fishtail to get to<the> - to <the> right place. So <the> Republican Party is - is getting behind this candidate.

SUSAN PAGE, "USA TODAY": I think senior Republicans decided they didn`t have an alternative. He had won <the> nomination. He`s going to be nominated at <the> - at <the> convention. I think one thing we`re seeing is a battle for <the> post Trump GOP. I mean I think that`s why you see them come out and say, I`m going to - Paul Ryan among - among them saying, I`m going to vote for him, I`m endorsing him. But I have a totally different vision on all these issues, like immigration or <the> Muslim judge or <the> Mexican judge or <the> Muslim ban, because they want to define - they want to have an alternative vision of <the> Republican Party to offer once this election is over and that is on <the> assumption that Trump is going to lose.

WALTER: Right.

PAGE: Because winning <the> nomination is a different electorate -

WALTER: Yes.

PAGE: Than they <face> now in <the> - in <the> general election. This is a much more diverse electorate. It`s a much younger electorate. It`s people who are going to be, I think, quite concerned, voters, not just elites, voters concerned about <the> positions that he`s taking.

DICKERSON: Reihan.

SALAM: There`s a version of what Trump is saying. Even actually when he`s talking about nuclear proliferation, there`s actually a version of what he`s saying that is, in my view, defensible. He does not make that case. Time and again rather than making, you know, an affirmative case for his use on immigration and trade, he actually keeps getting drawn in to talking about his personal business affairs rather than talking about <the> unemployment rate. So when you`re looking at Republicans, as Susan is saying, there is this jockeying for position, what do we do now that we know <the> Republican Party has changed in this meaningful, material way? And you see some smart people, like Tom Cotton, <the> senator from Arkansas, he is looking around<the> bend and he`s actually trying to be very cautious. Being a good solder for Trump, but also recognizing there is this national constituency in <the>country, how do I speak to it in a coherent and defensible way? But that`s all going to happen - that`s all going to happen after Trump because, frankly, Trump, because of his obsession with his own personal business

9/4/20 Case 1:17-cv-05228-NGG-JO Document 55-4 CBS News June 5 2016/04/17 CBS News 18 of 22 PageID #: 2426

affairs, rather than really laying out a distinctive ideological direction for <the> Republican Party, he`s actually not making that case.

BALZ: John, I wanted to pick up on something that Amy said about <the> -<the> economic situation. If you look what Donald Trump has done since he became <the> presumptive nominee, it has almost entirely been backward looking. It is not forward looking.

WALTER: Yes.

BALZ: He`s settling old scores. He can`t let go of things that still bother him from his successful campaign for <the> nomination. He needs to be reaching to a different audience. That message on jobs is something that would reach people who might not necessarily have been for him, or were still on <the>fence. But, instead, he`s ignoring that part of <the> electorate that he really would need to. become president. DICKERSON: Amy, what do you make of Hillary Clinton`s speech this week? Is this a change in strategy? Is this what we`re in for, for <the> next many months?

WALTERS: Well, campaigns are pretty simple, right? It`s - their choice is between this or that. And it`s also a referendum. Now, this, again, this is an election that, on its <face>, should be an election that Republicans should win, if it is a choice between going in <the> same direction that this president has been going in for <the> last eight years, many Americans saying we want to take a different direction.

However, what she`s saying is, that direction is going to be led by Donald Trump, who`s unstable and is going to lead us into more trouble. So <the>change is too dangerous. It`s better to be stable than it is to have change. And that is really <the> only way I think that she wins an election in a time when people are saying they want change more than anything.

SALAM: One opportunity that Trump has in a funny way is that, in theory at least, he could run to Hillary Clinton`s right, as well as to his left. And so if you`re a Democrat, <the> campaign you`re used to running is a grind it out, this person is a right wing extremist, and, you know, there`s certainly some reason to believe that with Donald Trump. <The> trouble is that he wears those positions so lightly. He abandons them one after another.

Whereas, when you go in <the> route that she`s taking now, in <the>speech that she made on Thursday, by saying that he is dangerous, and actually by saying that, look, this guy attacked Ronald Reagan in <the> `80s. It`s very interesting because it kind of lowers <the> temperature on that left-right ideological contest and it`s saying to a lot of independents who have lots of doubts about her, have lots of doubts about Barack Obama, to say that, look, this is very simple. You might actually find one thing or another that he says interesting or appealing, but then there`s seven other things that he said that are less so.

And I`ve got to say, I wonder if she`s going to stick with this overtime. And I wonder if Donald Trump will maybe be able to reach out to some of that Sanders` vote. But I think that that`s <the> danger. But at this point, right now, Donald Trump`s obsession with himself and with his own business affairs, with his own past, makes it very hard to see him breaking out of that dynamic and actually reaching out to those left wing voters that maybe could deliver him <the> election in some strange world.

PAGE: But pity <the> voter.

WALTER: That`s right.

PAGE: Pity - pity Americans. You`ve got <the> - he`s saying she should go to jail for stupidity, which is a hard standard. That`s - that`s too low a bar, I think, (INAUDIBLE).

DICKERSON: Yes. Right, as he does also <the> classification. PAGE: As you - as you pointed out. Yes. And she says he`s unstable and - and - she`d leave it to<the> psychiatrists to talk about why he`s so drawn to tyrants.

And one thing he said in your interview I thought was interesting, he said, she was supposed to give a foreign policy speech and she gave a Trump speech. And that is true. She gave a speech that was really devoted to savaging Trump in a really effective way. But are we going to have a campaign that`s - that turns totally on other person is even more unacceptable than I am with - with no serious discussion about some of <the> big challenges that are in American`s own lives?

DICKERSON: I think - well, I think that`s right.

PAGE: I think <the> answer is yes.

DICKERSON: I see no other reason. Also because she was trying not to talk about <the> e-mails -

WALTER: That`s right.

DICKERSON: Which is another topic.

WALTER: And she was trying not to talk, too, about - I mean, again, his response to her speech should have been, her decisions that she`s made and that <the> Obama administration has made on foreign policy have not made us safer.

DICKERSON: Right.

WALTER: And went through <the> litany of issues. And instead it was back on all these other things that we just have been talking about.

DICKERSON: Let`s switch to <the> Democrats here at <the> end.

Dan, Bernie Sanders says there`s going to be a contested convention. What does that really mean, do you think?

BALZ: I don`t know what that means, John, and I think we`re going to have to wait until we get through Tuesday night to see how Senator Sanders actually responds to a conclusion in this. There is a D.C. primary <the> week after that. But for all practical purposes, it`s over Tuesday night. She will have, as David Axelrod said, more votes, more pledged delegates, more superdelegates, more states won. She will have won across <the> board. He`s going to try to make an argument. <The> questions is, does he persist in that? Does he carry that fight forward? If he does, it`s going to be messy in Philadelphia.

WALTER: I`m looking for President Obama and what he does right after this primary is over. I mean I think it`s not going to necessarily happen on Tuesday or on Wednesday, but when all <the> votes are tallied, when all <the>delegates comes out, does President Obama come out and say, this has been great, good job, everybody, Hillary Clinton`s our nominee and that I think helps move <the> - <the> dialogue in a different direction. BALZ: But does Senator Sanders respond to that? That`s <the> question.

WALTER: Well, that`s <the> question.

PAGE: And <the> results in California matter. Your poll shows it`s just a two-point race. We know it`s really close. But it may - it matters not in terms of who gets <the> nomination, it matters on kind of <the> tone at <the> end of these contests and what <the> context is for trying to get Bernie Sanders to endorse Hillary Clinton.

SALAM: I say Bernie Sanders has already won because Barack Obama came out and said that we should increase Social Security payments for everybody and this is a good and sensible policy. He would not have said that a year ago, two years ago. Certainly not, you know, seven years ago. That is a very big deal.

DICKERSON: Why a big deal? That Obama came out or <the> position on social security?

SALAM: It`s a big deal that Barack Obama has come out and repudiated some of <the> kind of centrist, goo-goo, Social Security reforms that he had before and embraced a central plank of <the> Bernie Sanders` campaign. He sees where <the> future is for <the> Democratic Party. You know, whether or not he could defend that position to <the> Barack Obama of three or four years ago, I can`t say, but he sees where <the> window is blowing and it`s blowing in Bernie Sanders` direction.

DICKERSON: Goo-goo being a term for good government, not - not what your toddler says in <the> morning. That`s it for all of us. We`ll be back in a moment.

(COMMERCIAL BREAK)

DICKERSON: When we started a new chapter of <FACE> THE <NATION>, only half of <the> 17 Republican presidential candidates had officially joined <the>campaign. And it was two weeks later that Donald Trump took that escalator ride into <the> race.

Weeks before he did, House Speaker John Boehner told us that Trump could surprise everyone. He sure did. And Boehner would <face> his own surprise, his career, a casualty of <the> forces that elevated Trump.

In our first meeting last spring, Bernie Sanders was concerned his campaign message wouldn`t get much coverage. News is what surprises us, but this year some of <the> surprises have felt more suited to fiction. And some of<the> news has felt too real. <The> terrorism in Charleston, Paris, San Bernardino and Brussels. Awful news to report, but also stories of courage and grit and amazing grace.

(BEGIN VIDEO CLIP)

BARACK OBAMA, PRESIDENT OF <THE> UNITED STATES (singing): Amazing grace, how sweet <the> sound.

(END VIDEO CLIP)

DICKERSON: A host has a license to ask questions, but it`s your questions in airports or diners or wherever we`re rushing that renew that license. Your thoughts, your concerns about <the> world and even <the> stories of how and where you watch <FACE> THE <NATION> remind us of <the> place you give us in your life and of our obligation. We are grateful. To my CBS colleagues who let me be <the> public <face> of <the> show, I am grateful for all of your hard work, though I`m not surprised.

And with that, we`ll see you next week. For <FACE> THE <NATION, I`m John Dickerson.

END

© 2016 CBS Interactive Inc. All Rights Reserved.

Comment /   Share /   Tweet /   Stumble /   Email

SHOW COMMENTS +

Cops: Mom and twin girls, 5, dead in apparent murder-suicide

Hurricane Irma now a Category 3 storm

### Trending on The Web
Sponsored Links by Taboola

**Her Dad Refused to Let Her Marry, 50 Years Later She Discovers The Reason Why**
The Funny Beaver

**Thinking of Buying a Sedan? Browse the Top Deals Here**
Sedans | Search Links

Preliminary autopsy results released in Savanna Greywind's death

Teen charged after mom found dead beneath second-story window

### Trending on The Web .
Sponsored Links by Taboola

**What Tiger Woods' Ex-Wife Looks Like Now Left Us With No Words**
Hyperactivz

**Best 55+ Senior Living Apartments in Brooklyn**
Luxury Senior Living | Search Links

Family meets newborn that is likely the daughter of homicide victim Savanna Greywind

Forecasting Hurricane Irma's possible paths

### Trending on The Web
Sponsored Links by Taboola

**Quiz: Is Grocery Delivery Right For You? - 1st Delivery Free**
Instacart

**She Had No Idea Why The Crowd Started Cheering**
Journalistate

| CBSNews.com | CBS Interactive | Follow Us |
| --- | --- | --- |
| Site Map | Privacy Policy | Facebook |
| Help | Ad Choice | Twitter |
| Contact Us | Terms of Use | RSS |
| CBS Bios | Mobile User Agreement | Email Newsletters |
| Careers | About CBS | YouTube |
| CBSi Careers | Advertise | CBS Radio News |
| Internships | Closed Captioning | CBS Local |
| Development Programs | CBS News Store | |

Copyright © 2017 CBS Interactive Inc.
All rights reserved.

Search...

# EXHIBIT 42

# The Washington Post

**Fact Checker**

# Trump supporters' false claim that Trump U judge is a member of a pro-immigrant group

**By Michelle Ye Hee Lee**  June 7, 2016

*"Trump's complaints about the judge and the law firm in the Trump University case are valid and reflect a growing pattern of politicized 'justice.' Criticizing the judge for his membership in a radical La Raza San Diego group would have been legitimate. Focusing on ethnicity was not."*

**— Former House speaker Newt Gingrich (R-Ga.), interview with The Washington Post, June 6**

Gingrich, a Donald Trump supporter, has been critical of the Republican presidential candidate's racially charged remarks about the federal judge presiding over the Trump University case. Trump continues to say that U.S. District Judge Gonzalo Curiel, who was born in Indiana, is biased against him because of Curiel's Mexican heritage and Trump's border security proposals, including building a wall. Gingrich has called such claims "inexcusable" and "one of the worst mistakes Trump has made."

Case 17-3345, Document 93-2, 11/14/2017, 2172210, Page134 of 267

Trump supp... Case 1:17-cv-05228-NGG-JO Document 55-42 ... group ... Filed 10/04/17 Page 3 of 8 PageID #: 2488 ... 10:39 AM

In an interview with The Post, the former House speaker repeated a widely debunked claim perpetrated by Trump's supporters and surrogates to argue that Curiel is a liberal judge playing identity politics through the Trump University case. Gingrich described Curiel's membership in a "radical" La Raza group in San Diego, suggesting that the group is affiliated with a well-known pro-immigrant group with a similar name.

So let's debunk this once and for all — and along the way, check out some of the new claims about this group's alleged connections to illegal immigration advocacy.

# The Facts

As The Post and other media outlets have pointed out repeatedly, Curiel is a member of the San Diego La Raza Lawyers Association, which is a professional organization for Latino lawyers. The group is the San Diego local affiliate of the California La Raza Lawyers Association, whose membership comprises lawyers practicing in California, and is a 501(c)(6) nonprofit trade organization. It has an affiliated 501(c)(3) scholarship fund that awarded 22 scholarships totaling $34,000 in 2014. More on that later.

This group is not the National Council of La Raza, the Hispanic civil rights nonprofit organization that has pushed for comprehensive immigration reform in Congress with a pathway to citizenship and legalization for undocumented immigrants. It's often referred to as simply "La Raza," especially in the context of the immigration debate.

To recap this simple fact: San Diego La Raza Lawyers Association ≠ National Council of La Raza.

When Trump began his public tirade against Curiel, Trump campaign spokeswoman Katrina Pierson and other supporters conflated the two groups, which both use "La Raza." But now, even conservative groups have acknowledged that they are separate organizations.

A literal translation for "La Raza" is "the race," but it's interpreted as a broader term describing the Latino community. Opponents of immigration note that the term has roots in the Chicano nationalization movement of the 1960s. But "La Raza" is a common name incorporated throughout the community and often used by Latino organizations and businesses, including restaurants and medical clinics. A search for "la raza" on yellowpages.com turned up more than 3,000 results in California alone.

"The only tie that we have is that we serve the Latino community, and they do as well," said Luis Osuna, president of the lawyers association. "But they're a politically driven advocacy group, and we're just a local diversity Bar association that focuses on both diversity and equality in the legal field, but particularly among Latinos."

Lisa Navarette, a spokeswoman for the National Council of La Raza, confirmed this, saying: "The two organizations know of each other but are two completely separate organizations, and nothing wrong with either organization. The judge is not a member of NCLR, but there wouldn't be any issue if he was."

Still, Trump's supporters and surrogates continue to draw misleading ties between the lawyers organization and the National Council of La Raza and advocacy for legalizing undocumented immigrants.

The latest criticism is that the group considers the National Council of La Raza and other pro-immigrant organizations a part of its "community," as evidenced by a list of organizations on its website under the heading "Community." But that's a real stretch. Another misleading claim is that the organization gave a scholarship to an undocumented student in 2014, when Curiel served on the scholarship selection committee. In reality, the student identified himself as undocumented only after he was selected for a scholarship.

The list of Web links is a resource to people who visit the website looking for

information and services the organization doesn't provide, Osuna said. It includes links to groups, such as the San Diego Latino Film Festival, a domestic violence program, legal aid society, the San Diego Superior Court and resources for victims of human trafficking.

As for the scholarship, one of the recipients of a 2014 scholarship from the San Diego La Raza Lawyers Association Scholarship Fund was a part-time law student who identified himself as undocumented — after he received the award. The student received a $1,500 scholarship and wrote in his bio that he emigrated to America at age 11, and that he "wishes to someday tell any student struggling with higher education, 'Look, a boy from Oaxaca, who did not know English and is undocumented has now graduated from law school and is an attorney.'" Curiel was one of 10 people on the scholarship selection committee.

The California Supreme Court has ruled that undocumented immigrants can be admitted to the state bar as long as they have fulfilled requirements to practice law in the state, effective January 2014. The organization does not ask applicants for their citizenship status, and the student identified as undocumented when he wrote his bio for an event program, Osuna said.

"We give [scholarships] to Latino students. It's not as if being undocumented is a prerequisite or a question asked in the application," he said.

[**Update**: After the fact-check published, a spokesman for Gingrich responded to our request for explanation, saying Gingrich did not conflate National Council of La Raza with the San Diego La Raza Lawyers Association "because there is no need," as both groups are "radical."

We asked what constituted "radical" activities, and the spokesman said the lawyer group was affiliated with two groups that have advocated for pro-immigrant policies (Hispanic National Bar Association and the Mexican American Legal Defense), as shown by their names appearing on the "Community" section online. The lawyer group also linked to those two

organization's news releases and hosted events featuring their leaders, he said.

Neither the Hispanic National Bar Association nor the Mexican American Legal Defense has an official affiliation directly with the San Diego La Raza Lawyers Association. However, the lawyers group has paid to be an affiliate member of the Hispanic National Bar Association in the past. Still, as we noted, listing other pro-immigrant organizations under the San Diego lawyers association's "Community" section as a resource doesn't prove that the lawyers group itself is "radical."

In a statement released June 7, Trump called Curiel's professional memberships into question but also announced he does not "intend to comment on this matter any further": "Due to what I believe are unfair and mistaken rulings in this case and the Judge's reported associations with certain professional organizations, questions were raised regarding the Obama appointed Judge's impartiality. It is a fair question. I hope it is not the case."]

# The Pinocchio Test

It's time to drop this false accusation that Curiel is a member of a "radical" group that advocates for immigrant rights, or for legalization of undocumented immigrants. Trump's supporters continue to mischaracterize this group as either the same, or comparable, to a Hispanic civil rights group.

Yet Curiel is a member of the San Diego La Raza Lawyers Association, which is a professional organization for Latino lawyers. There's no evidence the organization is advocating for giving law scholarships to undocumented immigrants. And the new attack that the group lists the National Council of La Raza as a member of its "community" on its website is just a red herring that says nothing substantive about the lawyers group's activities or merits as a professional organization.

# Four Pinocchios

(About our rating scale)

**Send us facts to check by filling out this form**

**Check out our 2016 candidates fact-check page**

**Sign up for The Fact Checker weekly newsletter**

▬

**fact checker rating - copy trump la raza**

How would you rate this claim? (The check mark means you think the statement is true, not that you agree with the rating.)

View Results

*This is a non-scientific user poll. Results are not statistically valid and cannot be assumed to reflect the views of Washington Post users as a group or the general population.*

Share The Facts

## Newt Gingrich

Former speaker of the House

"Criticizing the judge [Gonzalo Curiel] for his membership in a radical La Raza San Diego group would have been legitimate."

Interview with The Washington Post – Monday, June 6, 2016

SHARE     READ MORE

Michelle Ye Hee Lee reports for The Fact Checker. Send her statements to dig into via e-mail, Twitter or Facebook. ✔ Follow @myhlee

**137**

# EXHIBIT 43

Comments

**Subscribe**
Starting at 99 cents

Members
**Sign In**

ADRIAN WALKER

# 'Passionate' Trump fans behind homeless man's beating?

162

 

SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE

**Scott Leader (left) and Steve Leader (right).**

 **By Adrian Walker** | GLOBE COLUMNIST  AUGUST 21, 2015

The anti-immigrant sentiments at the heart of Donald Trump's presidential campaign hit home for Boston early Wednesday, and the leading GOP candidate wasn't nearly as

**One free article left. Subscribe now →**

contrite about it as he should have been.

Comments

According to police, a 58-year-old Mexican immigrant sleeping outside the JFK/UMass MBTA station was attacked by two South Boston brothers who were on their way home from a Red Sox game. State Police say Steven and Scott Leader both urinated on the man and beat him with a metal pole.

After they were arrested, one of them admiringly quoted his political hero. "Donald Trump was right; all these illegals need to be deported," Scott Leader said.

MASTER THE PANTRY FILL.
jam
milk
zipcar
STOCK 'N' ROLL

Obviously, Trump isn't personally responsible for the alleged behavior of two men in another state. But his reaction to hearing of the alleged beating of a Hispanic man was hardly worthy of a candidate for the Oval Office.

Get **Fast Forward** in your inbox:
Forget yesterday's news. Get what you need today in this early-morning email.
Enter email address
Sign Up

"It would be a shame. . . . I will say that people who are following me are very passionate. They love this country and they want this country to be great again. They are passionate."

**One free article left.** Subscribe now →

Comments



View Story

# South Boston brothers allegedly beat homeless man

One of the South Boston brothers accused of beating and urinating on the victim said he was inspired in part by Donald Trump.

### Mexico condemns beating of citizen

---

Got that? They're passionate. But allegedly urinating on a homeless, sleeping man and breaking his ribs has nothing to do with making America great again. Quite the opposite, actually.

Nor would "passion" excuse such heinous behavior. But such distinctions might be too nuanced for the hard-charging Trump campaign.

In post-arrest interviews with the police, one of the men also whined that he and his brother were arrested because they are white, while immigrants are never arrested. In that, they echoed the twisted sense of victimization one hears from immigrant-bashers everywhere. Foreigners are taking over our country. They get to break the law. We're victims. Trump should be embarrassed to be the hero of such people, but his has been a shame-free campaign.

As it happens, it is the Leader brothers who may have been skirting the law. When

**One free article left. Subscribe now →**

McCormack housing development. Their name does not appear on any lease, but they were apparently living with their mother, a tenant there who hadn't disclosed their residence.

Boston Housing Authority administrator Bill McGonagle said Thursday the agency will begin proceedings to evict their mother — and, by extension, her sons — from public housing.



That decisive action is commendable. But it won't do much to stem the tide of anti-immigrant feeling that is being legitimized in the course of this hideous presidential campaign. Trump entered the race pledging to purge the country of Mexican criminals and rapists, and his rhetoric has gotten no less strident since then. Among other ideas, he has called for doing away with citizenship as a birthright, which he says will make it easier to deport families. He wants to build a fence at the US-Mexico border, though he has waffled on his initial declaration that he would somehow force Mexico to pay for it.

Much of this is plainly ridiculous, but he has struck a chord with people looking for someone to give voice to their rage and hate. Resentment has a way of finding an audience.

"The words that people use on the campaign trail, on the floors of Congress, on the nightly news, and in their living rooms have consequences," said Robert Trestan of the Anti-Defamation League. "The climate of bias and hostility against immigrants that has emerged in recent weeks is unproductive for the immigration debate and can pave the way for people to act on bigotry and prejudice."

Trump isn't likely to become president, but that doesn't make his brand of politics any less disgraceful. He doesn't seem to care much, but far from the spotlight Trump finds so addictive, some of his passionate supporters seem emboldened to act on long-simmering

**One free article left.** Subscribe now →

*Adrian Walker is a Globe columnist. He can be reached at walker@globe.com. Follow him on*
Comments
*Twitter @Adrian_Walker.*

SHOW 162 COMMENTS

**One free article left. Subscribe now →**

Comments

## Most Popular In Metro



### When do you pay $13.45 for a $7.66 McDonald's meal? When you're a millennial.

Millennials are spending big to have burgers, sushi, rice bowls, etc. delivered. Cooking? Who can be bothered? MORE...



### BC grad breaks Appalachian Trail record with final push of 37 sleepless hours

Joe McConaughy completed the 2,190-mile trail in 45 days, 12 hours, 15 minutes. That's an average of about 48 miles a day. MORE...



### Kitten rescued from Ted Williams Tunnel

State Police shut down traffic on the Interstate 90 tunnel Sunday while the Animal Rescue League of Boston worked to rescue the cat. MORE...



### Trump was on the menu at annual Labor Day breakfast in Boston

The breakfast is the traditional start of the fall campaign season in Boston. MORE...



### How worried should New England be about Hurricane Irma?

As of Friday morning, Irma is a Category 2 hurricane. MORE...



### Mass. Maritime Academy training ship to join Texas recovery effort

The school's training ship will serve as temporary housing for between 400 to 600 federal workers. MORE...

**One free article left.** Subscribe now →



Comments

### A class on civil discourse aims to teach us to be nice

More than 100 people were at a forum in Maine about how to be civil while discussing politics, a notion that may seem to be fanciful in today's atmosphere. MORE...



### Boston police arrest Stow teen in crash that injured two

A 17-year-old from Stow faces multiple charges in connection with a crash in Brighton Sunday night that sent two pedestrians to area hospitals with non-life threatening injuries, police said. MORE...



### BU lecturers strive for higher wages and better working conditions

About 250 instructors unionized through Service Employees International Union Local 509 earlier this year. MORE...



### Sometimes joking around is serious business

Dorchester's own Paul Elwell does stand-up comedy and writes jokes. Here's one about the eclipse: "Just what the country needed, another cover-up." MORE...



### Mayan Queen IV superyacht pulls into Boston Harbor

For the second time this summer, a billionaire boater has pulled his superyacht into Boston Harbor for a little R&R. MORE...



### Robert F. Kennedy saw conspiracy in JFK's assassination

Robert F. Kennedy took on some of the Kennedy Administration's hardest tasks, ones that created dangerous foes, and after the assassination, RFK wondered if one of them had done it. MORE...

**One free article left. Subscribe now →**



### critics   Comments

The Pioneer Valley Chinese Immersion Charter School's new expansion application is the latest salvo in a nearly decade-long drive. MORE...



### 13 years later, a family's heartbreaking search continues

Thirteen winters ago, Maura Murray crashed her car on a sharp turn in N.H. When a cruiser arrived shortly after, she was gone. MORE...



### How bad is Harvey, compared to Katrina?

Whether Harvey will have the same far-reaching impact on the American psyche depends a lot on how the aftermath is handled. MORE...



### Most Boston charter schools reject performance-based pay for teachers

Most of the schools now use traditional pay scales, according to University of Washington research. MORE...



### Bernie Sanders blasts Trump over DACA

The Vermont senator spoke at a Labor Day breakfast in New Hampshire. MORE...

### Dorsal fin sighting forces 3 beach closures in Westport

Three beaches in Westport are closed until further notice on Labor Day after two fishermen reported seeing a large dorsal fin near Gooseberry Island. MORE...



### Infectious-disease doctors join fight against opioid addiction

Traditionally, doctors have focused on getting rid of the infection, while paying little heed to the chronic illness that led to it — opioid use disorder. MORE...

One free article left. Subscribe now →

**Most Viewed**Comments          **Most Commented**          **Most Shared**

A hockey pro dies, and the coach he said raped him is free

Cruise ships elicit fear of paradise lost in Bar Harbor

NFL season offers a lot to look forward to

Giancarlo Stanton is just what the Red Sox need

Religion is constant part of Elizabeth Warren's life

How do you like the Red Sox' chances come October?

Gary Washburn: Kyrie Irving is confident in his decision and himself

Patriots trade quarterback Jacoby Brissett to Colts

Brandon Bolden, D.J. Foster among Patriots' cuts

North Korea says it's conducted a nuclear test

## Real journalists. Real journalism.  Subscribe to The Boston Globe today.

**Subscribe Now**          **Contact**          **Social**          **More**

Digital Access          Help          Facebook          ePaper
Home Delivery          FAQs          Twitter          News in Education
                       Globe newsroom          Google+          Archives
**My Account**          Advertise          Privacy policy
                       Order Back Issues          Terms of service
Log in                                           Terms of purchase
Manage my Account                                Your Ad Choices
Mobile Customer Service                          Work at Boston Globe Media
Sign Up For Newsletters

**One free article left. Subscribe now →**

Comments    © 2017 Boston Globe Media Partners, LLC

**One free article left. Subscribe now →**

# EXHIBIT 46

**The New York Times**  https://nyti.ms/2vwEQx7

POLITICS

# Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration

By JULIE HIRSCHFELD DAVIS and MAGGIE HABERMAN   AUG. 25, 2017

WASHINGTON — President Trump on Friday pardoned Joe Arpaio, the former Arizona sheriff whose aggressive efforts to hunt down and detain undocumented immigrants made him a national symbol of the divisive politics of immigration and earned him a criminal contempt conviction.

In a two-paragraph statement, the White House said that Mr. Arpaio gave "years of admirable service to our nation" and called him a "worthy candidate for a presidential pardon."

Mr. Trump called Mr. Arpaio "an American patriot" in a tweet later Friday. "He kept Arizona safe!" the president said.



**Donald J. Trump**
@realDonaldTrump

( Follow )

I am pleased to inform you that I have just granted a full Pardon to 85 year old American patriot Sheriff Joe Arpaio. He kept Arizona safe!

9:30 PM - Aug 25, 2017

32,508     86,504     149,130

**150**

Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration - The New York Times 10/04/17, 10:41 AM

In his own tweets, Mr. Arpaio thanked Mr. Trump and called his conviction "a political witch hunt by holdovers in the Obama justice department." He also pointed his supporters to a website that was accepting donations to help him pay off his legal fees.



**Joe Arpaio**
@RealSheriffJoe

Follow

Thank you @realdonaldtrump for seeing my conviction for what it is: a political witch hunt by holdovers in the Obama justice department!

8:07 PM - Aug 25, 2017

14,926    18,551    43,248

**Joe Arpaio**
@RealSheriffJoe

Follow

I also thank my loyal supporters, who stood shoulder to shoulder w/ me in this fight, and throughout my career. For those who are asking . .

8:09 PM - Aug 25, 2017

2,267    4,728    14,265



**Joe Arpaio**
@RealSheriffJoe

Follow

..how they can con't to help, a donation to my Legal
fund go directly to paying off legal fees from this fight
bit.ly/2gcrd4n

7:00 PM · Aug 25, 2017

**Help the Sheriff Joe Legal Defense Fund Now!**
I just donated to the Sheriff Joe Legal Defense Fund.
Help Today!
secure.campaignsolutions.com

1,598        1,818        2,827

Mr. Trump, who made cracking down on illegal immigration a signature
campaign issue and had pressed for local officials to do more to assist federal
authorities in rounding up undocumented people, had been openly flirting with the
idea of pardoning Mr. Arpaio.

"I won't do it tonight because I don't want to cause any controversy," the president
said Tuesday night at a campaign-style rally in Phoenix, after asking, "Was Sheriff
Joe convicted for doing his job?"

"I'll make a prediction: I think he's going to be just fine," Mr. Trump said.

Mr. Arpaio, 85, served for 24 years as sheriff of Maricopa County — which
includes Phoenix — building a national reputation for harsh conditions in his

county jail, and for his campaign against undocumented immigrants.

Mr. Arpaio had touted himself as "America's toughest sheriff," making inmates wear pink underwear and serving jail food that at least some prisoners called inedible. He was also at the forefront of the so-called birther movement that aimed to investigate President Barack Obama's birth certificate.

The criminal conviction grew out of a lawsuit filed a decade ago charging that the sheriff's office regularly violated the rights of Latinos, stopping people based on racial profiling, detaining them based solely on the suspicion that they were in the country illegally and turning them over to the immigration authorities.

A federal district judge hearing the case ordered Mr. Arpaio in 2011 to stop detaining people based solely on suspicion of their immigration status, when there was no evidence that a state law had been broken. But the sheriff insisted that his tactics were legal and that he would continue employing them.

He was convicted last month of criminal contempt of court for defying the order, a misdemeanor punishable by up to six months in jail.

The pardon was swiftly condemned on Twitter by Democrats in Congress as "outrageous and completely unacceptable" and a "disgrace."

Its timing also raised eyebrows, coming on the eve of Hurricane Harvey, a Category 4 storm, barreling down on coastal Texas. Senator Chuck Schumer, Democrat of New York and the minority leader, accused Mr. Trump of "using the cover of the storm" to pardon Mr. Arpaio and to issue a formal ban on transgender people from joining the military. (The ban also gives the secretary of defense wide latitude to decide whether currently serving transgender troops should remain in the military.)

"The only reason to do these right now is to use the cover of Hurricane Harvey to avoid scrutiny," Mr. Schumer said in a series of tweets late Friday. "So sad, so weak."

Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration - The New York Times 10/4/17, 10:41 AM



**Chuck Schumer**
@SenSchumer

Follow

Then he ran to Camp David.

The only reason to do these right now is to use the
cover of Hurricane Harvey to avoid scrutiny 4/

8:17 PM - Aug 25, 2017

2,133     4,953     14,824

Mr. Trump's supporters hailed the pardon as a sign the president was keeping
his word on his campaign pledge to crack down on illegal immigration.

Kelli Ward, a former Arizona state senator who is challenging Senator Jeff
Flake in a Republican primary for his seat in 2018, called Mr. Arpaio "a patriot who
did the job the Feds refused to do." Mr. Trump has endorsed Ms. Ward's
candidacy.

**154**

Trump Pardons Arpaio, Who Became Face of Crackdown on Illegal Immigration 2534 7, 10:41 AM



**Dr. Kelli Ward**
@kelliwardaz

( Follow )

Thank you, @realDonaldTrump so glad you
#pardoned @RealSheriffJoe - a patriot who did the
job the Feds refused to do #StopIllegalImmigration

7:20 PM - Aug 25, 2017

1,400      6,185      13,252

Meanwhile Senator John McCain, also an Arizona Republican, denounced the
pardon of Mr. Arpaio.

**155**

"No one is above the law," he said, "and the individuals entrusted with the privilege of being sworn law officers should always seek to be beyond reproach in their commitment to fairly enforcing the laws they swore to uphold."

The discussion about pardoning Mr. Arpaio had begun weeks ago, while Mr. Trump's chief strategist, Stephen K. Bannon, was still in the administration, according to two people briefed on the matter.

But the decision to make the announcement during a national news blackout related to the impending hurricane was not accidental. Some in the Trump administration had cautioned against it as too controversial, and had urged waiting, if it were going to be done.

Mr. Bannon had favored the move, as had Mr. Trump's policy adviser, Stephen Miller, a former adviser to Jeff Sessions, the attorney general and a former senator for whom Mr. Miller served as press secretary.

Mr. Sessions and Mr. Miller share a hard-line view on curtailing immigration levels, and Mr. Arpaio had become a national avatar for Mr. Trump, who had a good relationship with the sheriff during the 2016 presidential campaign. Mr. Trump had once told Mr. Arpaio that he would try to help him if he could down the road.

But that was before Mr. Trump was closing in on Hillary Clinton in the presidential race. Still, he was fond of Mr. Arpaio, and was sold on the pardon as a way of pleasing his political base. Additionally, Mr. Miller fought hard for the pardon, according to a senior administration official.

Julie Hirschfeld Davis reported from Washington, and Maggie Haberman from New York.

*Get politics and Washington news updates via Facebook, Twitter and the Morning Briefing newsletter.*

A version of this article appears in print on August 26, 2017, on Page A1 of the New York edition with the headline: Trump Pardons Ex-Sheriff Seen As Migrant Foe.

© 2017 The New York Times Company

# EXHIBIT 74

 Official website of the Department of Homeland Security

 U.S. Department of
Homeland Security

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

Release Date: September 5, 2017

MEMORANDUM FOR:

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

FROM:

Elaine C. Duke
Acting Secretary

SUBJECT:

Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

## Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] (#_ftn1) Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (#_ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] (#_ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (#_ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] (#_ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] (#_ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7] (#_ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

[1] (#_ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (#_ftnref2) Texas v. United States, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (#_ftnref3) Texas v. United States, 809 F.3d 134 (5th Cir. 2015).

[4] (#_ftnref4) Id.

[5] (#_ftnref5) United States v. Texas, 136 S. Ct. 2271 (2016) (per curiam).

[6] (#_ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (#_ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics: Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords: DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

# EXHIBIT 75

JUSTICE NEWS

**Attorney General Sessions Delivers Remarks on DACA**

Washington, DC ~ Tuesday, September 5, 2017

---

**Remarks as prepared for delivery**

Good morning. I am here today to announce that the program known as DACA that was effectuated under the Obama Administration is being rescinded.

The DACA program was implemented in 2012 and essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program, to 800,000 mostly-adult illegal aliens.

This policy was implemented unilaterally to great controversy and legal concern after Congress rejected legislative proposals to extend similar benefits on numerous occasions to this same group of illegal aliens.

In other words, the executive branch, through DACA, deliberately sought to achieve what the legislative branch specifically refused to authorize on multiple occasions. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens.

We inherited from our Founders—and have advanced—an unsurpassed legal heritage, which is the foundation of our freedom, safety, and prosperity.

As the Attorney General, it is my duty to ensure that the laws of the United States are enforced and that the Constitutional order is upheld.

No greater good can be done for the overall health and well-being of our Republic, than preserving and strengthening the impartial rule of law. Societies where the rule of law is treasured are societies that tend to flourish and succeed.

Societies where the rule of law is subject to political whims and personal biases tend to become societies afflicted by corruption, poverty, and human suffering.

To have a lawful system of immigration that serves the national interest, we cannot admit everyone who would like to come here. That is an open border policy and the American people have rightly rejected it.

Therefore, the nation must set and enforce a limit on how many immigrants we admit each year and that means all can not be accepted.

This does not mean they are bad people or that our nation disrespects or demeans them in any way. It means we are properly enforcing our laws as Congress has passed them.

It is with these principles and duties in mind, and in light of imminent litigation, that we reviewed the Obama Administration's DACA policy.

Our collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program, which was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit.

The Fifth Circuit specifically concluded that DACA had not been implemented in a fashion that allowed sufficient discretion, and that DAPA was "foreclosed by Congress's careful plan."

In other words, it was inconsistent with the Constitution's separation of powers. That decision was affirmed by the Supreme Court by an equally divided vote.

If we were to keep the Obama Administration's executive amnesty policy, the likeliest outcome is that it would be enjoined just as was DAPA. The Department of Justice has advised the President and the Department of Homeland Security that DHS should begin an orderly, lawful wind down, including the cancellation of the memo that authorized this program.

Acting Secretary Duke has chosen, appropriately, to initiate a wind down process. This will enable DHS to conduct an orderly change and fulfill the desire of this administration to create a time period for Congress to act—should it so choose. We firmly believe this is the responsible path.

Simply put, if we are to further our goal of strengthening the constitutional order and the rule of law in America, the Department of Justice cannot defend this type of overreach.

George Washington University Law School Professor Jonathan Turley in testimony before the House Judiciary Committee was clear about the enormous constitutional infirmities raised by these policies.

He said: "In ordering this blanket exception, President Obama was nullifying part of a law that he simply disagreed with.....If a president can claim sweeping discretion to suspend key federal laws, the entire legislative process becomes little more than a pretense...The circumvention of the legislative process not only undermines the authority of this branch but destabilizes the tripartite system as a whole."

Ending the previous Administration's disrespect for the legislative process is an important first step. All immigration policies should serve the interests of the people of the United States—lawful immigrant and native born alike.

Congress should carefully and thoughtfully pursue the types of reforms that are right for the American people. Our nation is comprised of good and decent people who want their government's leaders to fulfill their promises and advance an immigration policy that serves the national interest.

We are a people of compassion and we are a people of law. But there is nothing compassionate about the failure to enforce immigration laws.

Enforcing the law saves lives, protects communities and taxpayers, and prevents human suffering. Failure to enforce the laws in the past has put our nation at risk of crime, violence and even terrorism.

The compassionate thing is to end the lawlessness, enforce our laws, and, if Congress chooses to make changes to those laws, to do so through the process set forth

**164**

Attorney General Sessions Delivers Remarks on DACA | OPA | Departm... 11/14/2017, 2172210 Page167 of 267 general-sessions-delivers-r...

Case 1:17-cv-05228-NGG-JO   Document 55-75   Filed 10/04/17   Page 3 of 3 PageID #: 2705

by our Founders in a way that advances the interest of the nation.

That is what the President has promised to do and has delivered to the American people.

Under President Trump's leadership, this administration has made great progress in the last few months toward establishing a lawful and constitutional immigration system. This makes us safer and more secure.

It will further economically the lives of millions who are struggling. And it will enable our country to more effectively teach new immigrants about our system of government and assimilate them to the cultural understandings that support it.

The substantial progress in reducing illegal immigration at our border seen in recent months is almost entirely the product of the leadership of President Trump and his inspired federal immigration officers. But the problem is not solved. And without more action, we could see illegality rise again rather than be eliminated.

As a candidate, and now in office, President Trump has offered specific ideas and legislative solutions that will protect American workers, increase wages and salaries, defend our national security, ensure the public safety, and increase the general well-being of the American people.

He has worked closely with many members of Congress, including in the introduction of the RAISE Act, which would produce enormous benefits for our country. This is how our democratic process works.

There are many powerful interest groups in this country and every one of them has a constitutional right to advocate their views and represent whomever they choose.

But the Department of Justice does not represent any narrow interest or any subset of the American people. We represent all of the American people and protect the integrity of our Constitution. That is our charge.

We at Department of Justice are proud and honored to work to advance this vision for America and to do our best each day to ensure the safety and security of the American people.

Thank you.

---

**Speaker:**
Attorney General Jeff Sessions

**Attachment(s):**
Download ag_letter_re_daca.pdf

**Topic(s):**
Immigration

**Component(s):**
Office of the Attorney General

*Updated September 5, 2017*

# EXHIBIT 89



Official website of the Department of Homeland Security



U.S. Department of
Homeland Security

# Frequently Asked Questions: Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

En español (https://www.dhs.gov/news/2017/09/05/preguntas-frecuentes-anulaci-n-de-la-acci-n-diferida-para-los-llegados-en-la)

The following are frequently asked questions on the September 5, 2017 Rescission of the Deferred Action for Childhood Arrivals (DACA) Program.

## Q1: Why is DHS phasing out the DACA program?

A1: Taking into consideration the federal court rulings in ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that program should be terminated. As such, the Acting Secretary of Homeland Security rescinded the June 15, 2012 memorandum establishing the DACA program. Please see the Attorney General's letter and the Acting Secretary of Homeland Security's memorandum for further information on how this decision was reached.

## Q2: What is going to happen to current DACA holders?

A2: Current DACA recipients will be permitted to retain both the period of deferred action and their employment authorization documents (EADs) until they expire, unless terminated or revoked. DACA benefits are generally valid for two years from the date of issuance.

## Q3: What happens to individuals who currently have an initial DACA request pending?

A3: Due to the anticipated costs and administrative burdens associated with rejecting all pending initial requests, USCIS will adjudicate—on an individual, case-by-case basis—all properly filed DACA initial requests and associated applications for EADs that have been accepted as of September 5, 2017.

## Q4: What happens to individuals who currently have a request for renewal of DACA pending?

A4: Due to the anticipated costs and administrative burdens associated with rejecting all pending renewal requests, USCIS adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of September 5, 2017, and from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017. USCIS will reject all requests to renew DACA and associated applications for EADs filed after October 5, 2017.

## Q5: Is there still time for current DACA recipients to file a request to renew their DACA?

A5: USCIS will only accept renewal requests and associated applications for EADs for the class of individuals described above in the time period described above.

## Q6: What happens when an individual's DACA benefits expire over the course of the next two years? Will individuals with expired DACA be considered illegally present in the country?

A6: Current law does not grant any legal status for the class of individuals who are current recipients of DACA. Recipients of DACA

are currently unlawfully present in the U.S. with their removal deferred. When their period of deferred action expires or is terminated, their removal will no longer be deferred and they will no longer be eligible for lawful employment.

Only Congress has the authority to amend the existing immigration laws.

## Q7: Once an individual's DACA expires, will their case be referred to ICE for enforcement purposes?

A7: Information provided to USCIS in DACA requests will not be proactively provided to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA (http://www.uscis.gov/NTA) ). This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

## Q8: Will USCIS share the personal information of individuals whose pending requests are denied proactively with ICE for enforcement purposes?

A8: Generally, information provided in DACA requests will not be proactively provided to other law enforcement entities (including ICE and CBP) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security or public safety, or meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

## Q9: Can deferred action received pursuant to DACA be terminated before it expires?

A9: Yes. DACA is an exercise of deferred action which is a form of prosecutorial discretion. Hence, DHS will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

## Q10: Can DACA recipients whose valid EAD is lost, stolen or destroyed request a new EAD during the phase out?

A10: If an individual's still-valid EAD is lost, stolen, or destroyed, they may request a replacement EAD by filing a new Form I-765.

## Q11: Will DACA recipients still be able to travel outside of the United States while their DACA is valid?

A11: Effective September 5, 2017, USCIS will no longer approve any new Form I-131 applications for advance parole under standards associated with the DACA program. Those with a current advance parole validity period from a previously-approved advance parole application will generally retain the benefit until it expires. However, CBP will retain the authority it has always exercised in determining the admissibility of any person presenting at the border. Further, USCIS retains the authority to revoke or terminate an advance parole document at any time.

## Q12: What happens to individuals who have pending requests for advance parole to travel outside of the United States?

A12: USCIS will administratively close all pending Form I-131 applications for advance parole under standards associated with the DACA program, and will refund all associated fees.

## Q13: How many DACA requests are currently pending that will be impacted by this change? Do you have a breakdown of these numbers by state?

A13: There were 106,341 requests pending as of August 20, 2017 – 34,487 initial requests and 71,854 renewals. We do not currently have the state-specific breakouts.

**168**

## Q14: Is there a grace period for DACA recipients with EADs that will soon expire to make appropriate plans to leave the country?

A14: As noted above, once an individual's DACA and EAD expire—unless in the limited class of beneficiaries above who are found eligible to renew their benefits—the individual is no longer considered lawfully present in the United States and is not authorized to work. Persons whose DACA permits will expire between September 5, 2017 and March 5, 2018 are eligible to renew their permits. No person should lose benefits under this memorandum prior to March 5, 2018 if they properly file a renewal request and associated application for employment authorization.

## Q15: Can you provide a breakdown of how many DACA EADs expire in 2017, 2018, and 2019?

A15: From August through December 2017, 201,678 individuals are set to have their DACA/EADs expire. Of these individuals, 55,258 already have submitted requests for renewal of DACA to USCIS.

In calendar year 2018, 275,344 individuals are set to have their DACA/EADs expire. Of these 275,344 individuals, 7,271 have submitted requests for renewal to USCIS.

From January through August 2019, 321,920 individuals are set to have their DACA/EADs expire. Of these 321,920 individuals, eight have submitted requests for renewal of DACA to USCIS.

## Q16: What were the previous guidelines for USCIS to grant DACA?

A16: Individuals meeting the following categorical criteria could apply for DACA if they:

- Were under the age of 31 as of June 15, 2012;
- Came to the United States before reaching their 16th birthday;
- Have continuously resided in the United States since June 15, 2007, up to the present time;
- Were physically present in the United States on June 15, 2012, and at the time of making their request for consideration of deferred action with USCIS;
- Had no lawful status on June 15, 2012;
- Are currently in school, have graduated, or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and
- Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

Topics: Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords: DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

**169**

# EXHIBIT 177



## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

June 29, 2017

The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

      Re:   *Texas, et al. v. United States, et al.*, No. 1:14-cv-00254 (S.D. Tex.)

Dear Attorney General Sessions:

The State plaintiffs that successfully challenged the Obama Administration's DAPA and Expanded DACA programs commend the Secretary of Homeland Security for issuing his June 15, 2017 memorandum rescinding, in large part, his predecessor's November 20, 2014 memorandum creating those DAPA and Expanded DACA programs.

As you know, this November 20, 2014 memorandum creating DAPA and Expanded DACA would have granted eligibility for lawful presence and work authorization to over four million unlawfully present aliens. Courts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. Rather, "[i]n specific and detailed provisions, the [Immigration and Nationality Act] expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." *Id.* Likewise, "[t]he INA also specifies classes of aliens eligible and ineligible for work authorization . . . with no mention of the class of persons whom DAPA would make eligible for work authorization." *Id.* at 180-81. Thus, "DAPA is not authorized by statute," *id.* at 184, and "DAPA is foreclosed by Congress's careful plan," *id.* at 186.



## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful. The original 2012 DACA program covers over one million otherwise unlawfully present aliens. *Id.* at 147. And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authorization from Congress.[1]

Nevertheless, the Secretary of Homeland Security's June 15, 2017 memorandum provided that "[t]he June 15, 2012 DACA memorandum, however, will remain in effect," and some "Expanded DACA" permits will also remain in effect.

We respectfully request that the Secretary of Homeland Security phase out the DACA program. Specifically, we request that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future. This request does not require the Executive Branch to immediately rescind DACA or Expanded DACA permits that have already been issued. This request does not require the Secretary to alter the immigration enforcement priorities contained in his separate February 20, 2017 memorandum.[2] And this request does not require the federal government to remove any alien.

If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise, the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits.

---

[1] *See, e.g.*, USCIS, DACA Frequently Asked Questions,
https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited June 29, 2017) (DACA recipients "are considered to be lawfully present").

[2] *See* DHS, Enforcement of Immigration Laws to Serve the National Interest,
https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.



## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

We appreciate the opportunity to continue working with you, and the entire Presidential Administration, to cooperatively enforce federal immigration laws.

Sincerely,

Ken Paxton
Attorney General of Texas

Steve Marshall
Attorney General of Alabama

Leslie Rutledge
Attorney General of Arkansas

Lawrence G. Wasden
Attorney General of Idaho

C.L. "Butch" Otter
Governor of Idaho

Derek Schmidt
Attorney General of Kansas

Jeff Landry
Attorney General of Louisiana

Doug Peterson
Attorney General of Nebraska

Alan Wilson
Attorney General of South Carolina

Herbert Slatery III
Attorney General and Reporter of Tennessee

Patrick Morrisey
Attorney General of West Virginia

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MARTÍN JONATHAN BATALLA VIDAL, et al.,                    CASE MANAGEMENT
                                        Plaintiffs,        AND SCHEDULING ORDER
                    -against-
ELAINE C. DUKE, et al.,                                   16-CV-4756 (NGG) (JO)
                                        Defendants.
----------------------------------------------------------------X
----------------------------------------------------------------X
STATE OF NEW YORK, et al.,                                17-CV-5228 (NGG) (JO)
                                        Plaintiffs,
                    -against-
DONALD TRUMP, et al.,
                                        Defendants.
----------------------------------------------------------------X

James Orenstein, Magistrate Judge:

       At a conference before the court on September 26, 2017, the court set a briefing schedule for dispositive motions, and, over the defendants' objection, I ordered discovery to proceed as set forth below:

I.      DEADLINES AND COURT APPEARANCES

| | |
|---|---|
| Joint proposal for schedule of bi-weekly status conferences to address outstanding discovery disputes due by: | September 29, 2017 |
| Deadline for all Rule 26(a)(1) disclosures: | October 4, 2017 |
| Deadline for defendants' production of administrative record and privilege log: | October 6, 2017 |
| Objections to discovery requests due by: | 1 week after service of requests |
| Responses to discovery requests due by: | 2 weeks after service of requests |
| Deposition errata due by: | 1 week after deposition |
| Joint status report due by: | 1 week before each status conference |
| All expert disclosures due by: | November 15, 2017 |
| All discovery to be completed by: | December 15, 2017 |

## II.   DISCOVERY

a.   <u>No stays of discovery absent an explicit court order.</u>  Discovery is not automatically stayed by the pendency of a dispositive motion, settlement discussions between the parties, referral to mediation, or an agreement between the parties to suspend discovery.  Any application for a stay of discovery must show good cause why such relief should be granted.

b.   <u>Written discovery.</u>  Unless otherwise agreed to by the parties or so ordered by the court, responses to any request for written discovery pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure are due no later than 14 days after service of the request.  All such requests and responses must conform to Local Civil Rules 26.3 (uniform definitions in discovery requests), 26.5 (cooperation among counsel in discovery), 26.6 (attorney review of form discovery requests), and 26.7 (discovery requests to be read reasonably).

c.   <u>Privilege</u>. The privilege log to be produced by October 6, 2017, shall include a description of every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such that record to be part of the official administrative record. Failure to describe a pertinent document in the privilege log due on October 6, 2017, will waive any later assertion of privilege absent a showing of good cause. *See* Loc. Civ. R. 26.2, 26.3.

d.   <u>Depositions.</u>  Pursuant to Local Civil Rule 26.5, counsel should cooperate, consistent with their clients' legitimate interests, in scheduling and conducting depositions.

i.   If counsel cannot agree on a schedule for a given deposition, the deponent must appear at the date, time, and place set forth in a notice properly served pursuant to Fed. R. Civ. P. 30 unless excused by the party that served the notice or by the court.

ii.   Counsel are obligated to attempt in good faith to resolve any dispute that arises during a deposition before seeking judicial intervention.

e.   <u>Expert discovery.</u>  Unless specific deadlines for expert discovery are set forth above, the deadline for completing all discovery includes the production of all expert reports, including any rebuttal reports.  The parties must ensure that they have completed underlying fact discovery, and that they have produced initial expert reports, in sufficient time for any rebuttal reports to have been served by the deadline.  Unless otherwise ordered, or unless the parties agree to proceed otherwise, expert depositions may take place at any time before trial.

f.   <u>Discovery disputes.</u>  Parties are obligated to attempt in good faith to resolve discovery disputes before seeking judicial intervention.  Any unresolved dispute must be brought to my attention in sufficient time for the dispute to be resolved and discovery to be completed according to the deadlines set forth above.  Motions to resolve discovery disputes shall be litigated in accordance with my Individual Practice Rules and Local Civil Rules 37.3 and 6.4.  Failure to submit a timely opposition in compliance with applicable rules may result in the motion being granted as unopposed.

g.      Timeliness of requests.  To be timely, a request for written discovery, deposition notice, or subpoena must be served in sufficient time for the responding party to comply with the request in full before the relevant discovery deadline.  In the event that any such discovery demand is untimely, I may decide not to enforce it.

## III.      REQUIREMENTS FOR STATUS CONFERENCES

a.      No later than seven days before each status conference, the parties are directed to file a joint report on the status of the case, the nature of any pending disputes (including the parties respective arguments on such disputes), and whether discovery is proceeding on schedule.  If there are no pending disputes requiring court intervention, I will entertain a joint application to adjourn or cancel the conference.  If the parties agree to discuss settlement at the status conference, the parties should also submit *ex parte* statements of their respective settlement positions.

b.      All conferences will be in person unless otherwise ordered.  Any request to conduct a conference by telephone must be made at least 48 hours before the scheduled start of the conference.

c.      All conferences will start on time.  Any attorney who does not arrive on time may be directed to obtain a transcript of the proceeding and provide it to the represented party to avoid prejudice to that party arising from proceedings conducted in its absence.

d.      Counsel for each party must be fully familiar with the case and prepared to discuss the status of discovery, the party's current settlement position, and any unresolved issue in the case. A party's counsel of record may send substitute counsel only if the latter is fully prepared to discuss all of the matters described above.

e.      If a conference cannot proceed due to counsel's failure to appear on time or unpreparedness to discuss the case, I will reschedule the conference and consider an order requiring the attorney responsible for the delay to reimburse the other participants' costs, including reasonable attorneys' fees.

f.      Only a party's counsel of record, or an attorney personally authorized to appear by the party (and not simply by the party's counsel of record) may appear on behalf of a party. If a law firm has appeared as counsel of record for a party, any attorney actually employed by that law firm may appear. An attorney acting "of counsel" for a party's counsel of record may not appear without the represented party's explicit authorization, as such an attorney has no authority to make binding representation on behalf of any party. *See* N.Y. Rules of Prof'l Conduct 1.2(c), 22 N.Y.C. R.R. § 1200 (requiring client to give "informed consent" before an attorney may make a limited appearance on the client's behalf).

## IV.      POST-DISCOVERY MATTERS

a.      Dispositive Motions Deadline.  The deadline for commencing dispositive motions is the date by which the first action must be taken to commence such a motion pursuant to the individual practices of the district judge to whom this case is assigned.  As specified in the individual

practice rules of the assigned district judge (available at www.nyed.uscourts.gov), that action will be either (a) submitting a letter requesting a pre-motion conference, (b) requesting an oral argument date from the district judge, (c) initiating the exchange of statements pursuant to Local Civil Rule 56.1, or (d) filing the notice of motion together with supporting papers.

b.   <u>Joint Pretrial Order Deadline.</u>  The deadline for submitting a joint pretrial order is the date by which the parties must file a single document that reflects input from all parties and that fully complies with the individual practice requirements of the district judge to whom the case is assigned (not my individual practice requirements, unless the parties have unanimously agreed to refer the case to a magistrate judge for all purposes including the entry of judgment pursuant to 28 U.S.C. § 636(c)).  If one party has completed its portion of the proposed pretrial order but cannot obtain input from an adversary, it must so advise me before the deadline.

c.   <u>Generally, no extension due to the pendency of summary judgment motions.</u>

i.   In cases that are assigned to a district judge whose individual practice rules require the submission of a joint pretrial order no later than 60 days after the close of discovery (as do most judges in this district, *see* www.nyed.uscourts.gov), I will <u>not</u> extend this deadline based on the anticipation or pendency of a summary judgment motion absent an order from the assigned district judge.

ii.   The fact that a party intends to seek summary judgment will not be considered good cause to postpone a discussion of settlement at the pretrial conference or the submission of *ex parte* statements of the parties' respective settlement positions in advance.

V.   <u>EXTENSIONS OF DEADLINES.</u>

a.   <u>The deadlines in this order will be enforced, and in light of the history and circumstances of these actions will be modified only upon a timely showing of the most compelling and unforeseeable of extraordinary circumstances.</u>  Failure to comply with a deadline may result in the imposition of appropriate sanctions pursuant to Rules 16 and 37 of the Federal Rules of Civil Procedure, including a recommendation of dispositive relief.

b.   While the parties are encouraged to cooperate with each other in conducting discovery, they must not agree among themselves to any extensions or suspensions of discovery that will render them unable to meet any deadline set forth above; any such agreement requires court approval.  Similarly, an agreement among the parties to discuss settlement will not excuse failure to comply with any deadline set forth above.  Parties wishing to suspend discovery or adjourn a deadline to promote settlement discussions must seek permission from the court.

c.   A request for an extension of any deadline submitted less than 14 days before that deadline will be considered untimely and will not be granted, absent extraordinary circumstances.

d.   A request for modification of any deadline in this scheduling order must be in writing, and submitted in accordance with Rule II.A of my individual practice rules.

## VI.    ELECTRONIC FILING AND CONTACT INFORMATION

a.    <u>Mandatory electronic filing.</u>  Pursuant to Administrative Order 2004-08, <u>all documents must be submitted electronically.</u>  Except as set forth in my Individual Practice Rules or in an order, any document submitted to chambers by mail or fax will be discarded.

b.    <u>Attorney appearance and registration.</u>  The attorney for each party with primary responsibility for the matter must, as soon as possible and in no event later than the attorney's first appearance in court:

i.    file a Notice of Appearance on behalf of <u>each</u> represented party; and

ii.    register to receive electronic notification of every filing in the case via the court's ECF docketing system.

c.    <u>Current contact information.</u>  The attorney representing each party is under a continuing obligation to keep the court apprised of any changes in contact information – including mailing addresses, email addresses, and daytime telephone numbers – by filing the appropriate Notice on ECF.

d.    <u>Redaction or deletion of personal data identifiers.</u>  All public filings on the electronic docket must omit or redact personal data identifiers, pursuant to Fed. R. Civ. P 5.2.  Where an otherwise public document must include such information, the filing party must file a redacted version on the public docket and an unredacted version under seal.

SO ORDERED:

Dated: Brooklyn, New York
       September 27, 2017

                                        _____/s/_____
                                        JAMES ORENSTEIN
                                        U.S. Magistrate Judge

**178**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

MARTIN JONATHAN BATALLA VIDAL et al.,

                Plaintiffs,

      -against-

ELAINE C. DUKE, Acting Secretary, Department of
Homeland Security, et al.,

                Defendants.
---------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                Plaintiffs,

      -against-

DONALD TRUMP, President of the United States, et al.,

                Defendants.
---------------------------------------------------------------------X

**ORDER**

**16-CV-4756 (NGG) (JO)**

**ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

On September 27, 2017, Magistrate Judge James Orenstein issued an order setting a

schedule for discovery in above-captioned cases challenging the Department of Homeland

Security's decision to terminate the Deferred Action for Childhood Arrivals ("DACA") program.

(Sept. 27, 2017, Scheduling and Case Management Order (the "Order") (Batalla Vidal Dkt.

67).[1]) Defendants have moved to vacate Paragraph II(c) of the Order, which directs them to

compile, by October 6, 2017, a privilege log identifying documents that they are not producing

---

[1] Except as otherwise specified, citations are to the docket in Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.).

1

**179**

and with respect to which they are asserting a claim of privilege.[2] (Order ¶ II(c); Defs. Mot. to Vacate the Order (the "Motion") (Dkt. 69).)

In addition to arguing that discovery is generally inappropriate in this case, Defendants also contend that Paragraph II(c) of the Order (1) raises "substantial separation-of-powers concerns" (Mot. at 2-3); (2) is vague and improperly requires Defendants to log and to claim privilege with respect to documents outside the administrative record (id. at 3-5); and (3) imposes a timeline for producing a privilege log that Defendants cannot possibly meet (id. at 5). Defendants also maintain that discovery is inappropriate because the decision to end the DACA program is not subject to judicial review. (Id. at 5-6.)

Because the Order is not dispositive, the court reviews whether it is "clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); see also 28 U.S.C. § 636(b)(1)(A). "[A] magistrate judge's decision is contrary to law only where it runs counter to controlling authority." Pall Corp. v. Entegris, Inc., 655 F. Supp. 2d 169, 172 (E.D.N.Y. 2008).

Under the APA, judicial review of agency action is generally limited to the administrative record that the agency provides to the court. Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate

---

[2] The disputed paragraph of the Order reads in full as follows:

> The privilege log to be produced by October 6, 2017, shall include a description of every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such that record to be part of the official administrative record. Failure to describe a pertinent document in the privilege log due on October 6, 2017, will waive any later assertion of privilege absent a showing of good cause. See Loc. Civ. R. 26.2, 26.3.

(Order ¶ II(c).)

2

**180**

the challenged agency action on the basis of the record before it, the proper course, except in rare

circumstances, is to remand to the agency for additional investigation or explanation." Id. at

744. The agency's designation of the administrative record "is generally afforded a presumption

of regularity." Comprehensive Cmty. Dev. Corp. v. Sebelius, 890 F. Supp. 2d 305, 309

(S.D.N.Y. 2012) (quoting Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of

Eng'rs, 722 F. Supp. 2d 535, 542 (D. Del. 2010)). The court may inquire beyond the

administrative record, however, "when there has been a strong showing in support of a claim of

bad faith or improper behavior on the part of agency decisionmakers or where the absence of

formal administrative findings makes such investigation necessary in order to determine the

reasons for the agency's choice." Nat'l Audubon Soc. v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997)

(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), overruled on

other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977)); see also Hill Dermaceuticals,

Inc. v. Food & Drug Admin., 709 F.3d 44, 47 (D.C. Cir. 2013) (consultation of evidence outside

the administrative record appropriate "to challenge gross procedural deficiencies—such as where

the administrative record itself is so deficient as to preclude effective review").

The court agrees that the October 6, 2017, deadline for producing a privilege log imposed

by the Order should be modified. The Order currently requires Defendants to produce the

administrative record and a privilege log on the same day. (Order ¶ I.) But without reviewing

the administrative record, the court cannot assess whether that record is sufficient to permit

review of Defendants' decision to rescind the DACA program, or whether Plaintiffs have shown

that Defendants acted in bad faith in designating the record. See Nat. Ass'n of Chain Drug

Stores v. U.S. Dep't of Health & Human Servs., 631 F. Supp. 2d 23, 27 (D.D.C. 2009). Only

once the court has reviewed the administrative record will it be able to assess whether

3

**181**

Defendants should be required to produce a privilege log, and what the scope of that log should

be. Accordingly, the court MODIFIES the Order by extending Defendants' deadline to submit a

privilege log by two weeks, to October 20, 2017.[3]

The court will address Defendants' remaining objections to Paragraph II(c) by separate

order, which will follow before October 20, 2017. Defendants are invited to file a reply, not to

exceed five pages, to Plaintiffs' oppositions no later than October 10, 2017. Defendants'

arguments that courts cannot review the decision to end DACA are properly raised in

Defendants' forthcoming dispositive motion and will be considered then.

SO ORDERED.

/s Nicholas G. Garaufis

Dated: Brooklyn, New York                        NICHOLAS G. GARAUFIS
       October 3, 2017                           United States District Judge

---

[3] The Batalla Vidal Plaintiffs have expressly consented to a "brief extension" to the deadline for Defendants to provide a privilege log. (Batalla Vidal Pls. Resp. in Opp'n to Mot. (Dkt. 70) at 1, 3.) The court is mindful that Defendants would find the task of compiling a privilege log by October 6, 2017, to be difficult, if not outright "impossible." (Mot. at 5.) The court notes, however, that it appears that Defendants could have spared themselves some trouble by seeking to clarify the Order with Judge Orenstein and with Plaintiffs; while Defendants object to the purported scope of the materials required to be identified in the privilege log (id.), Plaintiffs in both actions have taken the position that the Order only requires the Defendants to identify documents considered by the Department of Justice and the Department of Homeland Security—not the entire Executive Branch—in deciding to rescind the DACA program. (New York v. Trump Pls. Resp. in Opp'n to Mot. (New York v. Trump Dkt. 49) at 7-8 & n.6; Batalla Vidal Pls. Resp. in Opp'n to Mot. at 2-3 & n.2.) The court also notes that this urgency is the result of Defendants' decision to terminate the DACA program on short notice, requiring this court to expedite consideration of these actions.

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MARTIN JONATHAN BATALLA VIDAL et al.,

                    Plaintiffs,

        -against-                                                    **MEMORANDUM & ORDER**

                                                                     **16-CV-4756 (NGG) (JO)**

ELAINE C. DUKE, Acting Secretary, Department of
Homeland Security, et al.,

                    Defendants.
-------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                    Plaintiffs,

        -against-                                                    **MEMORANDUM & ORDER**

                                                                     **17-CV-5228 (NGG) (JO)**

DONALD TRUMP, President of the United States, et al.,

                    Defendants.
-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

On September 27, 2017, Magistrate Judge James Orenstein issued a case management

and scheduling order that authorized and set a schedule for discovery in the above-captioned

actions, which challenge the Government's decision to end the Deferred Action for Childhood

Arrivals ("DACA") program. (Sept. 27, 2017, Case Management and Scheduling Order (the

"Order") (Dkt. 67)[1].) Defendants timely objected, arguing that (1) discovery is inappropriate in

---

[1] Except as otherwise noted, all docket citations refer to the docket in Batalla Vidal v. Duke, No. 16-CV-4756
(E.D.N.Y.), and all record citations refer to the Administrative Record ("A.R.") (Dkt. 77-1). For convenience, the court
refers to the Plaintiffs in Batalla Vidal v. Duke as the "Batalla Vidal Plaintiffs," the Plaintiffs in New York v. Trump, No.
17-CV-5228, as the "State Plaintiffs," and the Department of Homeland Security as "DHS."

1

**183**

this case because the court's review is limited to the administrative record ("A.R.") (Dkt. 77-1);
(2) discovery should be stayed pending resolution of their anticipated motion to dismiss; (3) the
court should vacate Paragraph II(c) of the Order, which requires them to compile a privilege log
with respect to documents withheld from the administrative record on privilege grounds, because
that paragraph is vague, overbroad, and raises separation-of-powers concerns;[2] and (4) they
could not possibly compile a privilege log within nine days, as the Order required. (Defs. Sept.
22, 2017, Ltr. Regarding Discovery ("Defs. Sept. 22 Ltr.") (Dkt. 65); Defs. Sept. 29, 2017, Mot.
to Vacate the Case Management Order ("Defs. Mot.") (Dkt. 69).)

In order to give the court the opportunity to review the administrative record before
ruling on Defendants' remaining objections, and in light of Defendants' protests that they could
not compile the privilege log before it was due, the court ordered the deadline for producing the
privilege log extended by two weeks. (Oct. 3, 2017, Order (Dkt. 72) at 3-4.) The court
otherwise reserved ruling on the motion. (Id. at 4.) After the court issued this order, Defendants
submitted a 256-page administrative record, composed of documents "actually considered by
Elaine C. Duke, the Acting Secretary of Homeland Security, in connection with her September 5,
2017 decision" to rescind the 2012 memorandum that created the DACA program. (Notice of
Filing of A.R. (Dkt. 77), ECF at p.3; A.R.) Plaintiffs have moved Judge Orenstein to compel

---

[2] The disputed paragraph reads in full as follows:

> The privilege log to be produced by October 6, 2017, shall include a description
> of every document considered within any component of the executive branch as
> part of the process of determining the policy and actions at issue in these action
> that are not being produced and as to which the defendants would assert a clain
> of privilege, regardless of whether the defendants deem such that [sic] record to
> be part of the official administrative record. Failure to describe a pertinent
> document in the privilege log due on October 6, 2017, will waive any later
> assertion of privilege absent a showing of good cause. See Loc. Civ. R. 26.2,
> 26.3.

Order ¶ II(c).

2

**184**

Defendants to complete production of the administrative record. (Oct. 11, 2017, Order (Dkt. 81);

Oct. 13, 2017, Pls. Mot. to Compel Defs. to Produce a Complete A.R. (Dkt. 84).)

## I.   EXTRA-RECORD DISCOVERY

The bulk of Defendants' objections turn at least in part on whether the administrative

record is complete. Defendants argue that the "thrust" of Plaintiffs' suits are challenges to

DHS's decision to end the DACA program, and thus that judicial review of these actions is

limited to the administrative record compiled by the agency, which the court must presume is

complete. See Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997). (Defs. Sept. 22

Ltr. at 1-2; Defs. Reply (Dkt. 80).) This argument is unavailing for two reasons.

First, in addition to asserting claims under the Administrative Procedure Act, 5 U.S.C.

§ 500 et seq., Plaintiffs also assert (among other claims) constitutional and equitable claims

challenging certain collateral decisions affecting DACA beneficiaries. Plaintiffs contend that

Defendants violated the Due Process Clause of the Fifth Amendment by failing to provide

individualized notice to DACA recipients who were eligible to renew their deferred action and

work authorization that they needed to do so prior to October 5, 2017, not just "as soon as

possible."[3] (Second Am. Compl. (Dkt. 60) ¶¶ 103-105, 160-66; Am. Compl. ("State Pls. Am.

Compl.") (New York v. Trump Dkt. 54) ¶¶ 91-99, 274-80.) Those claims do not challenge the

decision to end the DACA program, but instead challenge how Defendants communicated that

decision to DACA beneficiaries. The State Plaintiffs also contend that Defendants violated the

---

[3]  The State Plaintiffs also contend that Defendants violated the Due Process Clause by failing to provide
individualized notice to DACA recipients who, under Acting Secretary Duke's September 5, 2017, memorandum
terminating the DACA program, were ineligible to renew their deferred action and work authorization, that they
were ineligible to renew their DACA benefits. (Memorandum from Elaine C. Duke, Acting Sec'y, DHS, to James
W. McCament et al., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion
with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (AR 252); Am. Compl.
("State Pls. Am. Compl.") (New York v. Trump Dkt. 54) ¶¶ 97-99, 276-77.)

Fifth Amendment Due Process Clause and principles of equitable estoppel by changing the

Government's policy regarding how information derived from DACA applications would be

used for immigration-enforcement purposes. (State Pls. Am. Compl. ¶¶ 39-44, 87-90, 240-52.)

Those claims, too, do not challenge the decision to end the DACA program itself but challenge

the Government's alleged withdrawal of protections against the use of DACA beneficiaries'

personal information to facilitate deportations. So far, Defendants have provided no reason why

the court's review of these claims, all of which challenge agency actions other than the decision

to end the DACA program, should be limited to an administrative record that documents the

decision to end the DACA program and sheds no light on why the Government allegedly made

these collateral decisions. Accordingly, the court finds no error in Magistrate Judge Orenstein's

decision that discovery should proceed with respect to these claims, and it denies Defendants'

motion to permanently stay discovery with respect to those claims.[4]

   Second, the general rule that review of agency action is limited to the administrative

record compiled by the agency is not absolute. Inquiry outside the administrative record is

appropriate in certain circumstances, including when plaintiffs make a "strong showing in

support of a claim of bad faith or improper behavior on the part of agency decisionmakers or

where the absence of formal administrative findings makes such investigation necessary in order

---

[4] Because the court concludes that discovery is not inappropriate with respect to Plaintiffs' individualized-notice
and information-policy claims, it need not decide at this point whether its review of constitutional challenges to
agency action is, like its review of challenges under the APA that an agency acted arbitrarily and capriciously,
necessarily limited to the administrative record prepared by the agency. See 5 U.S.C. § 706 (permitting review of
agency action "contrary to constitutional right" and limiting review to "the whole record or those parts of it cited by
a party"). Compare Chiayu Chang v. U.S. Citizenship & Immigration Servs., ___ F. Supp. 3d. ___, 2017 WL
2480749 (D.D.C. 2017) (constitutional challenges to agency action not necessarily exempt from the rule that review
of agency action is limited to the administrative record), and Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest
Service, 58 F.Supp.3d 1191, 1237-41 (D.N.M. Oct. 22, 2014) (same), with Tafas v. Dudas, 530 F. Supp. 2d 786, 802
(E.D. Va. 2008) (noting that "in adjudicating constitutional claims under the APA, courts have permitted plaintiffs
to submit evidence that was not part of the administrative record"), and Puerto Rico Pub. Hous. A min. v. U.S.
Dep't of Hous. & Urban Dev., 59 F. Supp. 2d 310, 328 (D.P.R. 1999) (authorizing discovery on constitutional
claims brought alongside APA claims). (Batalla Vidal Pls. Sept. 22, 2017, Ltr. Regarding Discovery (Dkt. 66) at 3,
5.)

to determine the reasons for the agency's choice." Nat'l Audubon, 132 F.3d at 14; see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (per curiam) (inquiry outside the administrative record appropriate when "there was such failure to explain administrative action as to frustrate effective judicial review"); cf. Am. Wildlands v. Kempthorne, 530 F.3d 991, 1002 (D.C. Cir. 2008) (identifying circumstances in which supplementation of the administrative record is appropriate). Moreover, the presumption that the agency produced the complete administrative record may be rebutted by "clear evidence" that the record omits relevant materials, see Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993), and does not apply where there is a "strong suggestion that the record before the [c]ourt [is] not complete," in which case limited discovery may be authorized as to the completeness of the administrative record, see Dopico v. Goldschmidt, 687 F.2d 644, 654 (2d Cir. 1982).

Whether the administrative record is complete is clearly relevant to the question of whether discovery relating to Plaintiffs' challenges to the decision to end the DACA program should be stayed. In light of the ongoing dispute before Judge Orenstein as to whether Defendants should be compelled to produce a complete administrative record, the court declines to address in the first instance the question of whether the administrative record is complete. Accordingly, pending Judge Orenstein's resolution of Plaintiffs' motion to compel, the court reserves ruling on whether discovery relating to Plaintiffs' challenges to the decision to end the DACA program should be temporarily or permanently stayed, except as noted above.

## II.    THE PRIVILEGE-LOG REQUIREMENT

Relatedly, Defendants also argue that they should not be required to compile a privilege log because privileged documents are not part of the administrative record. (Defs. Mot. at 4-5; Defs. Reply at 2-3.) That contention, too, is premised on the presumption that the agency correctly designated the administrative record. See Nat'l Ass'n of Chain Drug Stores v. U.S.

5

**187**

Dep't of Health & Human Servs., 631 F. Supp. 2d 23, 28 (D.D.C. 2009) (rejecting plaintiffs'

argument that defendants should be required to produce a privilege log so that plaintiffs and the

court could test defendants' claims of privilege as inconsistent with the "standard presumption

that the agency properly designated the [a]dministrative [r]ecord" (quoting Amfac Resorts,

L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001))); Tafas v. Dudas, 530

F. Supp. 2d 786, 800 (E.D. Va. 2008) ("Once a court has determined that a plaintiff has provided

enough evidence for the court to conclude that the agency has omitted otherwise relevant

material from the administrative record, the agency must explain its decision to do so.").[5]  (Defs.

Mot. at 4-5 (arguing that the requirement that Defendants produce a privilege log "upends the

presumption of regularity that typically applies to the question of whether an administrative

record has been properly compiled").)  If Defendants did not produce a complete administrative

record in the first instance, however, the court does not see why it should presume that they

correctly withheld privileged materials from the record; if the administrative record is

incomplete, Defendants will be required to assert privilege specifically with respect to any such

materials. See Gill v. Dep't of Justice, No. 14-CV-03120-RS (KAW), 2015 WL 9258075, at *6

(N.D. Cal. Dec. 18, 2015).

Again, the court declines to address this question in the first instance while the dispute

over the completeness of the administrative record is before Judge Orenstein. The court

therefore also reserves ruling on Defendants' motion to vacate Paragraph II(c) of the Order in its

entirety.

---

[5] Additionally, the court notes that, although the U.S. District Court for the District of Columbia has held that
agencies do not need to provide a privilege log in Administrative Procedure Act cases because, absent a "strong
showing of bad faith or improper behavior," pre-decisional and deliberative documents are legally immaterial, see,
e.g., Oceana, Inc. v. Pritzker, 217 F. Supp. 3d 310, 318-19 (D.D.C. 2016), not all courts have reached the same
conclusion, see, e.g., Inst. for Fisheries Res. v. Burwell, No. 16-CV-01574 (VC), 2017 WL 89003, at *1 (N.D. Cal.
Jan. 10, 2017).

6

## III.    THE SCOPE OF THE PRIVILEGE-LOG REQUIREMENT

The court will, however, narrow the scope of Paragraph II(c) of the Order. The Order requires Defendants to identify and assert privilege with respect to any documents "considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege." (Order ¶ II(c) (emphasis added).) Defendants raise two objections to the scope of this part of the Order. First, they argue that, on its face, the Order requires the identification and assertion of privilege with respect to White House communications that are "likely subject to a strong claim of executive privilege," which "raises substantial separation-of-powers concerns." (Defs. Mot. at 3.) Second, they argue that, notwithstanding the two-week extension previously granted by the court, compliance with the Order remains impossible "if [the Order is] taken literally." (Reply at 2.) Accordingly, Defendants request that, if the court does not vacate Paragraph II(c) of the Order in its entirety, it should at least narrow that paragraph to "apply only to records that were actually considered by the Acting Secretary of Homeland Security as part of her decision to rescind the DACA policy but were omitted from the administrative record because they are privileged." (Id. at 3.) The court will limit the privilege-log requirement to DHS and the Department of Justice ("DOJ"), but it sees no reason to narrow that requirement further at this time.

### A.    The Privilege-Log Requirement Only Applies to DHS and the DOJ

The court agrees that, on its face, Paragraph II(c) of the Order raises potential separation-of-powers problems. As the Supreme Court observed in Cheney v. U.S. District Court for the District of Columbia, 542 U.S. 367 (2004), courts must narrow overly broad and intrusive discovery requests directed at the highest levels of the Executive Branch, lest "vexatious litigation . . . distract [the Executive Branch] from the energetic performance of its constitutional

7

**189**

duties." Id. at 382; see id. at 381-85. In Cheney, the Court specifically rejected the D.C.

Circuit's reasoning that mandamus was unwarranted because the defendants could invoke

privilege with respect to specific documents. See id. at 383, 388-89. By requiring the White

House to identify and assert privilege with respect to specific documents or risk waiving

privilege over those documents, Paragraph II(c) of the Order potentially raises constitutional

concerns akin to those at issue in Cheney.

     The court need not consider the full scope of these constitutional concerns, or whether

these concerns are offset by the court's need to obtain information necessary to fulfill its own

"constitutional responsibility to resolve cases and controversies within its jurisdiction." Id. at

385. At this point, Plaintiffs only seek materials considered by DHS and DOJ in connection with

the decision to end the DACA program, and argue that the Order's reference to the "executive

branch" need not be read to include other agencies or the White House. (Batalla Vidal Pls. Resp.

in Opp'n to Defs. Mot. to Vacate ("Batalla Vidal Pls. Opp'n") (Dkt. 70), at 2 & n 2; State Pls.

Resp. in Opp'n to Defs. Mot. to Vacate (New York v. Trump Dkt. 49) at 6-8 & n.6.) Indeed, the

Batalla Vidal Plaintiffs specifically suggest, without conceding that the Order is inappropriate as

written, that the reference to "any component of the executive branch" could be replaced with

"the Department of Homeland Security and the Department of Justice." (Batalla Vidal Pls.

Opp'n at 2 n.2.) Because Defendants have raised separation-of-powers objections only with

respect to the discovery of White House documents (Defs. Mot. at 3; Defs. Reply at 3-4), the

court sees no reason why limiting Paragraph II(c) of the Order to require Defendants to compile

a privilege log only with respect to DHS and DOJ documents would not cure any separation-of-

powers problems with the original Order.

The court therefore grants Defendants' motion in part by limiting Paragraph II(c) of the Order to relevant documents considered within DHS or DOJ as part of the process of determining the policy and actions at issue in these cases.

**B.     The DOJ Is Not Exempt from the Privilege-Log Requirement**

The court rejects Defendants' contention, however, that Paragraph II(c) should be limited to only those materials that Acting Secretary Duke "actually considered . . . as part of her decision to rescind the DACA policy but were omitted from the administrative record because they are privileged."[6] (Defs. Reply at 3.) Defendants argue that DOJ materials pertaining to the decision to rescind the DACA program are irrelevant, because DHS has sole responsibility for ending the program. (Id. at 4.) Indeed, while Defendants acknowledge that DOJ "participated in deliberations regarding the rescission of DACA (most, but not all of which remain privileged)," they aver that it is "nonsensical as a matter of law" to suggest that DOJ was even partially legally responsible for the decision to end the DACA program. (Id.)

Ordinarily, Defendants' argument might have some force. Regardless of which Executive Branch officials played a role in ending the DACA program, Acting Secretary Duke implemented that decision by issuing the memorandum that rescinded the 2012 memorandum that created the DACA program. (Memorandum from Elaine C. Duke, Acting Sec'y, DHS, to James W. McCament et al., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as

---

[6] As an initial matter, it is not clear that Defendants correctly define the scope of the administrative record, which includes, at the very least, all materials that Acting Secretary Duke considered "directly or indirectly," Comprehensive Cmty. Dev. Corp. v. Sebelius, 890 F. Supp. 2d 305, 309 (S.D.N.Y. 2012) (quoting Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps. of Eng'rs, 448 F.Supp.2d 1, 4 (D.D.C. 2006)), including any non-privileged "work and recommendations of subordinates" on which [she] based . . . her decision," Amfac Resorts, 143 F. Supp. 2d at 2. The court will reserve ruling on the adequacy of Defendants' certification of the administrative record, however, pending the resolution of Plaintiffs' motion to compel Defendants to complete the administrative record.

9

Children" (Sept. 5, 2017) (AR 252).) The problem with Defendants' argument, however, is that they have repeatedly represented to this court that Attorney General Jeff Sessions and Acting Secretary Duke jointly decided to rescind the DACA program. As Defendants explained at the September 14, 2017, status conference, "[t]he Attorney General and DHS both decided that [DACA] is an unlawful program, and what they decided was—it was a decision based on litigation risk. . . . So in their judgment, what they decided to do is . . . have a responsible way to wind this program down . . . ." (Sept. 14, 2017, Hr'g Tr. (Docket Number Pending) 13:17-14:06 (emphasis added).) Likewise, when Judge Orenstein probed Defendants' position that the DACA program was unconstitutional but that they nonetheless had authority to continue renewing certain individuals' DACA status, Defendants explained that "the Attorney General decided that it would be harsh—we'd be in a much different situation if the Attorney General had decided we need to end this program now" (id. 24:21-24) (emphasis added), later adding that "[t]hese are decisions that are committed to the executive branch[,] and the Attorney General and DHS decided that, in the exercise of their discretion, they're going to wind down this program that had substantial litigation risk" (id. 26:1-6) (emphasis added). Neither the Government's Motion nor its Reply acknowledge—let alone explain—this apparent reversal in position.

In light of the Defendants' conflicting statements about which agencies were responsible for ending the DACA program, the court declines, at this point in the proceedings, to narrow Paragraph II(c) of the Order to only materials considered within DHS.[7]

---

[7] Indeed, it is not clear that, even if DHS were exclusively legally responsible for the decision to end the DACA program, DOJ materials could properly be excluded from the administrative record and associated privilege log. As discussed above, the whole administrative record considers all materials "directly or indirectly" considered by the agency decisionmaker. Because Acting Secretary Duke's stated rationale for rescinding the DACA program relied heavily on Attorney General Sessions's recommendations that she do so, materials on which the Attorney General relied in formulating his recommendation may be properly included in the administrative record on the grounds that Acting Secretary Duke "indirectly" considered them. The court need not decide this question in the first instance and without the benefit of fuller briefing by the parties or reference to specific documents.

10

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part, DENIES in part, and RESERVES

RULING in part on Defendants' motion to vacate the Order (Dkt. 69).

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
   October 17, 2017

NICHOLAS G. GARAUFIS
United States District Judge

11

**193**



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARTÍN JONATHAN BATALLA VIDAL, et al.          MEMORANDUM
                              Plaintiffs,                     AND ORDER
            - against -
ELAINE C. DUKE, et al.,                                      16-CV-4756 (NGG) (JO)
                              Defendants.
------------------------------------------------------------X
------------------------------------------------------------X
STATE OF NEW YORK, et al.                                    17-CV-5228 (NGG) (JO)
                              Plaintiffs,
            - against -
DONALD TRUMP, et al.,
                              Defendants.
------------------------------------------------------------X

James Orenstein, Magistrate Judge:

      In a letter motion filed on October 13, 2017, the plaintiffs seek to compel the defendants to

complete their production of the administrative record. *See* Docket Entry ("DE") 84 ("Motion").[1]

The defendants submitted a letter opposing the motion on October 16, 2017. DE 85 ("Opp."). On

October 17, 2017, the Honorable William Alsup, United States District Judge, granted a similar

motion in a series of parallel cases pending in the Northern District of California. *See Regents of the*

*University of California, et al. v. United States Department of Homeland Security, et al.*, 17-CV-5235 (WHA)

("*Regents*"), DE 79 (Order re Motion to Complete Administrative Record) (N.D. Cal. Oct. 17, 2017)

("*Regents* Opinion"). As briefly explained below, and for essentially the same reasons as those set

forth in Judge Alsup's opinion, I grant the motion to compel.

      I assume the reader's familiarity with the proceedings in this case, as well as with Judge

Alsup's opinion in *Regents*. In short, the plaintiffs contend that the defendants have applied the

wrong legal standard to define the contours of the administrative record; that the record before the

---

[1] Unless otherwise noted, citations to docket entry numbers refer to the docket in *Batalla Vidal*.

court suffices to rebut the presumption of regularity normally afforded the government in reviewing

an administrative decision, thereby warranting an order to complete the record over the defendants'

protestation of completeness; and that the defendants improperly conflate distinct legal standards in

opposing an order to complete the record rather than to supplement it. Motion at 2-6. The

defendants do not quibble with the plaintiffs' unassailable identification of the legal standard for

defining the record, but contend that the unquestionably different formulation that they used in

compiling the record is its functional equivalent; that they have adhered to that standard, and that

notwithstanding the explicit request for relief to the contrary, the plaintiffs are actually seeking

discovery beyond the record, rather than merely all of what is properly within it. In each instance,

the facts before the court and applicable law plainly support the plaintiffs' arguments and refute

those proffered by the defendants.

The parties now agree that the administrative record includes all information "*directly or

indirectly* considered by the final decision makers in making their decision." Motion at 2 (citing, *inter

alia*, *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012) (internal

citations omitted) (emphasis in original), Opp. at 2 (quoting Motion at 2). That standard goes well

beyond the specific documents that Acting Secretary Duke personally reviewed before issuing the

memorandum that formally effected the administrative decision at issue in this litigation. To the

contrary, it also encompasses all documents and materials that were before the decision makers'

agencies and the non-privileged work and recommendations' of the decision makers' subordinates.

*See, e.g.*, *Regents* Opinion at 3; *Bar MK Ranches v. Yuetter*, 994 F.2d 735 (10th Cir. 1993); *Amfac Resorts,

L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).[2]

---

[2] I refer to "decision makers" in the plural, rather than to Acting Secretary Duke alone, because as
the Honorable Nicholas G. Garaufis, United States District Judge, observed in his Memorandum
and Order dated October 17, 2017, DE 86, the defendants "have repeatedly represented to this

The plaintiffs, like their counterparts in *Regents* (where the defendants produced the same materials as the purported administrative record), have adequately established that the administrative record produced to date is manifestly incomplete. *See generally Regents* Opinion at 5-8. I concur with Judge Alsup's conclusion that the defendants have "excluded highly relevant materials from the administrative record[.]" *Id.* at 7. Even if Acting Secretary Duke can properly be considered the sole relevant decision maker, "[i]t is evident that [she] considered information directly, or indirectly, through the advice of other agencies and others within her own agency." *Id.* at 8; *see also* DE 86 (Judge Garaufis's Memorandum and Order) at 10.

Accordingly, for the reasons set forth above, I grant the motion to compel and respectfully direct the defendants to complete production of the administrative record by 3:00 p.m., Eastern Daylight Time, on October 27, 2017.

SO ORDERED.

Dated: Brooklyn, New York
October 19, 2017

_____/s/_____
James Orenstein
U.S. Magistrate Judge

court that Attorney General Jeff Sessions and Acting Secretary Duke jointly decided to rescind the DACA program." *See* DE 86 at 10 (citing examples). Moreover, as Judge Alsup pointed out in *Regents*, the White House has issued official statements that "repeatedly emphasized the President's direct role in decisions concerning DACA." *Regents* Opinion at 6 (citing examples). In addition, the President himself has taken time away from his official duties to make public statements about the decision at issue here in which he unambiguously characterized himself as the decision maker. *See, e.g.*, Donald J. Trump, status update dated September 5, 2017 (the same day as the administrative decision challenged here) ("Congress now has 6 months to legalize DACA …. If they can't, *I will revisit this issue!*"), https://twitter.com/realDonaldTrump/status/905788459301908480 (emphasis added).

196

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MARTIN JONATHAN BATALLA VIDAL et al.,

                Plaintiffs,

    -against-

ELAINE C. DUKE, Acting Secretary, Department of
Homeland Security, et al.,

                Defendants.
-----------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                Plaintiffs,

    -against-

DONALD TRUMP, President of the United States, et al.,

                Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-4756 (NGG) (JO)**

**MEMORANDUM & ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

    Before the court is Defendants' renewed motion to stay discovery and the requirement

that it compile a privilege log with respect to documents omitted from the administrative record

in the above-captioned actions, which challenge various aspects of the Government's decision to

end the Deferred Action for Childhood Arrivals ("DACA") program. (Defs. Oct. 18, 2017,

Motion to Stay ("Defs. Oct. 18 Stay Mot.") (Dkt. 87) at 1.[1])  For the reasons described below, the

court GRANTS in part and DENIES it in part Defendants' October 18 Stay Motion.

---

[1] Except as noted, all docket citations refer to the docket in Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.).
For convenience, the court refers to the Plaintiffs in Batalla Vidal v. Duke as the "Batalla Vidal Plaintiffs," the

1

## I.    BACKGROUND

Following the Government's well-publicized September 5, 2017, decision to end the

DACA program, Plaintiffs filed these suits, which challenge that decision and certain other

decisions made by Defendants in connection therewith.[2] The court anticipates providing a fuller

description of that program, along with the actions taken by Defendants to end it, in a later order.

For now, the court provides only a brief summary of the procedural history of the case, to the

extent it is relevant to Defendants' October 18 Stay Motion.

On September 22, 2017, Magistrate Judge James Orenstein entered a case management

and scheduling order, which authorized discovery to proceed over Defendants' objections and set

a schedule for discovery. (Sept. 22, 2017, Case Management and Scheduling Order (the "Case

Management Order") (Dkt. 67).) As part of that schedule, the Case Management Order required

Defendants, by October 6, 2017, to produce both an administrative record and a privilege log

identifying and asserting privilege with respect to documents "considered within any component

of the executive branch as part of the process of determining the policy and actions at issue in

these actions that are not being produced and as to which the defendants would assert a claim of

privilege, regardless of whether the defendants deem such . . . record to be part of the official

administrative record." (Case Management Order ¶ II(c) (the "Privilege-Log Requirement").)

Defendants promptly objected to the Case Management Order. (Defs. Sept. 29, 2017,

Mot. to Vacate ("Defs. Sept. 29 Mot.") (Dkt. 69).)  In doing so, Defendants reprised their

---

Plaintiffs in New York v. Trump, No. 17-CV-5228 (E.D.N.Y.) as the "State Plaintiffs," the U.S. Department of Homeland Security as "DHS," and the U.S. Department of Justice as "DOJ."

[2] Technically, the State Plaintiffs filed suit after the Government initiated the rescission of the DACA program (Compl. (New York v. Trump Dkt. 1), while the Batalla Vidal Plaintiffs amended their existing complaint, which had previously challenged the nationwide injunction issued by Judge Andrew Hanen of the U.S. District Court for the Southern District of Texas, see Texas v. United States, 86 F. Supp. 3d 591 (S.D. Tex. 2015), to instead challenge the decision to end the DACA program and the means by which Defendants communicated that decision to DACA recipients (Compl. (Dkt. 1); Am. Compl. (Dkt. 29); Second Am. Compl. (Dkt. 60)).

2

previous objections to discovery in these cases (Defs. Sept. 22, 2017, Ltr. Regarding Discovery

("Defs. Sept. 22 Ltr.") (Dkt. 65); Defs. Sept. 29 Mot. at 1) and specifically objected to the

Privilege-Log Requirement, which they argued (1) raised "substantial separation-of-powers

concerns," to the extent it applied to White House communications; (2) was vague and

overbroad, and required the logging of documents outside the scope of the administrative record;

(3) and could not possibly be compiled before the deadline set by the Case Management Order.

(Defs. Sept. 29 Mot. at 1-5.) Defendants also argued that these cases should be dismissed

because their actions are not subject to judicial review. (Id. at 5-6.)

In response to these concerns, the court issued two orders modifying the Case

Management Order. The first order, recognizing that the propriety of the Privilege-Log

Requirement might depend in part on the adequacy of the administrative record, extended the

deadline for complying with that requirement by two weeks, to October 20, 2017, to permit the

court to review the administrative record prior to ruling on Defendants' objections to discovery

and the Privilege-Log Requirement. (Oct. 3, 2017, Order (Dkt. 72).) The second order, in light

of Defendants' well-founded separation-of-powers arguments and Plaintiffs' corresponding

concessions, limited the Privilege-Log Requirement to DHS and DOJ materials. (Oct. 17, 2017,

Mem. & Order ("Oct. 17 M&O") (Dkt. 86) at 7-9.) The court denied, however, Defendants'

motion to stay discovery relating to Plaintiffs' challenges to actions collateral to the decision to

end the DACA program (namely, Defendants' alleged changes to the policy regarding the use of

information obtained from DACA applications for immigration-enforcement purposes (the

"information-policy claims") and Defendants' alleged failure to provide individualized notice of

the change in renewal eligibility and deadlines to DACA recipients (the "individualized-notice

claims")). (Id. at 3-4.) The court concluded that Defendants had offered no reason why the

3

court's review of these collateral claims should be confined to an administrative record

documenting the decision to end the DACA program. (Id. at 3-4.) The court reserved ruling on

Defendants' objections to discovery regarding Plaintiffs' direct challenges to the decision to end

the DACA program and to the Privilege-Log Requirement pending Judge Orenstein's resolution

of Plaintiffs' challenges to the adequacy of the administrative record. (Id. at 4-6.) Lastly, the

court declined to narrow the scope of the Privilege-Log Requirement to exclude DOJ documents,

in light of Defendants' unexplained reversal of their previously stated position that Attorney

General Sessions and Acting Secretary Duke jointly decided to end the DACA program. (Oct.

17 M&O at 9-10.)

Defendants again move the court to stay all discovery and the Privilege-Log Requirement

until the court rules on whether the administrative record is complete, or, alternatively, pending

the filing and disposition of a mandamus petition or stay motion in the Second Circuit. (Defs.

Oct. 18 Stay Mot. at 1.) Defendants argue that the court's orders have left them in limbo,

exposed to discovery but lacking the certainty of a final order. (Id. at 1, 3.) Defendants also

contend that compliance with the Privilege-Log Requirement remains impossible in the time

period specified, notwithstanding the court's previously ordered extension of time and the

narrowing of that requirement to DHS and DOJ materials. (Id. at 3-5.)

## II.     THE COURT WILL NOT STAY DISCOVERY OR THE PRIVILEGE-LOG REQUIREMENT

The court first considers whether Defendants are entitled to a temporary or permanent

stay of discovery and the Privilege-Log Requirement. Defendants argue variously that discovery

should be stayed pending resolution of the parties' dispute over the adequacy of the

administrative record (Defs. Oct. 18 Stay Mot. at 1), that discovery should be stayed pending

resolution of Defendants' anticipated dispositive motions (id. at 2; Defs. Sept. 22 Ltr. at 2-3), and

4

that discovery is generally inappropriate in these cases because the court's review is confined to the administrative record prepared by DHS (Defs. Sept. 22 Ltr. at 1; Defs. Sept. 29 Mot. at 1-2). Defendants raise similar arguments with respect to the Privilege-Log Requirement, which they contend they should not be required to compile absent some showing that they acted in bad faith in compiling the administrative record. (Defs. Oct. 10, 2017, Reply in Supp. of Sept. 29 Mot. (Dkt. 80) at 2.)

Discovery will proceed with respect to Plaintiffs' information-policy and individualized-notice claims. Defendants suggest that the court has left them on uncertain footing by reserving decision on whether discovery should proceed pending resolution of the parties' dispute over the adequacy of the administrative record. (Defs. Oct. 18 Stay Mot. at 1.) To the contrary, the court expressly denied Defendants' motion for a temporary or permanent stay with respect to discovery regarding Plaintiffs' information-policy and individualized-notice claims. (Oct. 17 M&O at 3-4.) Defendants still have yet to offer any reason why the court's review of these claims should be confined to an administrative record that only purports to document Acting Secretary Duke's decision to rescind the DACA program. The administrative record, the court notes, also sheds no light on whether or why Defendants allegedly (1) removed protections on the use of DACA beneficiaries' information for immigration-enforcement purposes; and (2) failed to provide DACA beneficiaries with written notice that they had only a narrow window within which to reapply for deferred action or work authorization, or that they were no longer entitled to do so. (Id.)

The court also denies Defendants' motion for a stay of discovery and the Privilege-Log Requirement with respect to Plaintiffs' direct challenges to the decision to end the DACA program. As for Defendants' argument that discovery should be stayed pending resolution of

5

their anticipated dispositive motion, the court observes that courts in this district do not
automatically stay discovery pending resolution of a motion to dismiss. Doe v. New York City
Dep't of Educ., No. 16-CV-1684 (NGG) (RLM), 2016 WL 7165953, at *1 (E.D.N.Y. Dec. 7,
2016). Courts will, however, stay discovery, when the party seeking the stay shows "good
cause." Fed. R. Civ. P. 26(c)(1). In considering whether such party has shown good cause, the
court considers "1) whether a defendant has made a strong showing that the plaintiff's claim is
unmeritorious, 2) the breadth of discovery and the burden of responding to it, and 3) the risk of
unfair prejudice to the party opposing the stay." Negrete v. Citibank, N.A., No. 15-CV-7250
(RWS), 2015 WL 8207466, at *1 (S.D.N.Y. Dec. 7, 2015). Based on its consideration of these
factors, the court concludes that Defendants have not carried their burden of showing that
discovery should be stayed.

    First, Defendants have not shown that Plaintiffs' claims are unmeritorious. In their
September 22 Letter and their September 29 Motion, Defendants argued, in a combined total of
eight sentences, that the decision to end the DACA program was a presumptively unreviewable
exercise of prosecutorial discretion and that it was reasonable in light of the litigation risk posed
by maintenance of the DACA program.[3] (Defs. Sept. 22 Ltr. at 2-3; Mot. at 5-6.) The court does
not fault Defendants for this cursory briefing at this point in the proceedings—Defendants'
dispositive motion is not due for several months. (Oct. 2, 2017, Min. Entry.) But it cannot be
said that, at this point in the proceedings, Defendants have made a "strong showing" that
Plaintiffs' claims lack merit. To the extent that Defendants can argue that certain of Plaintiffs'
claims are unmeritorious, and thus that discovery with respect to those claims is unwarranted,
Defendants are free to raise those arguments with Judge Orenstein in the first instance.

---

[3] By the court's count, these arguments amount to three sentences in the September 22 Letter and five sentences in
the September 29 Motion.

6

**202**

Nor have Defendants established that discovery should be stayed because the court's review is limited to the administrative record produced on October 6, 2017. First, Defendants have still not explained why the court's review of Plaintiffs' information-policy and individualized-notice claims should be restricted to an administrative record that documents the decision to rescind DACA without addressing those collateral decisions. Second, although Plaintiffs' motion to compel is not properly presented here, the court notes that it is not at all clear that Defendants applied the correct standard when compiling the administrative record, which properly includes all documents "directly or indirectly" considered by the relevant agency decisionmaker(s) when deciding to end the DACA program. See Comprehensive Cmty. Dev. Corp. v. Sebelius, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012). (Oct. 17 M&O at 3-5.)

Second, Defendants have not shown that Plaintiffs' requested discovery is especially broad or burdensome, particularly in light of the stakes of this case. Although Defendants have indicated they will oppose deposition discovery targeting cabinet-level officials and any discovery requests directed at the White House (Defs. Sept. 22 Ltr. at 3), Plaintiffs have indicated that they intend to seek only limited deposition discovery, which does not target cabinet-level officials (Batalla Vidal Pls. Sept. 22 Ltr. Regarding Discovery (Dkt. 66) at 3; State Pls. Oct. 3, 2017, Resp. in Opp'n to Defs. Mot. to Vacate (New York v. Trump Dkt. 49) at 7 n.6; Oct. 6, 2017, Joint Status Report (Dkt. 78); Oct. 18, 2017, Joint Status Report (Dkt. 88)). The court is sensitive to Defendants' concerns about subjecting senior government officials to discovery and the prospect that Plaintiffs may burden the government with open-ended requests for production. (See Defs. Oct. 18 Stay Mot. at 2-3.) At this point in the proceedings, however, Defendants have not shown that the discovery sought by Plaintiffs warrants a stay (particularly in

7

**203**

light of the prejudice that Plaintiffs would experience as a result of a stay, discussed in the following section).[4]

Defendants' arguments are particularly unavailing when considering the third and most important factor, the prejudice that Plaintiffs would suffer as a result of a stay. Defendants ask the court to stay all discovery (as well as the Privilege-Log Requirement) pending the resolution of their forthcoming dispositive motion. (Pls. Sept. 29 Mot. to Vacate at 5.) The court will not, however, receive Defendants' fully briefed dispositive motion until January 13, 2018. Even if the court were to resolve that motion immediately, less than two months would remain before the March 5, 2018, deadline, on which existing DACA benefits not subject to renewal would begin to expire. If Defendants' arguments for dismissal were unmeritorious, and Plaintiffs' suits were to proceed, insufficient time would remain for Plaintiffs to conduct any necessary discovery and to seek relief from this court, and for this court to rule on such a motion for relief, prior to the March 5 deadline. While the court is mindful of the burden that the expedited discovery schedule may place on the Government, this urgency is the unavoidable result of Defendants' own decision to terminate, on relatively short notice, a program directly benefiting hundreds of thousands of individuals. Discovery must proceed in advance of the resolution of Defendants' anticipated dispositive motions for the court to effectively adjudicate these cases in an appropriately expedition manner, if Defendants' motions are unavailing.

The court is also mindful that allowing discovery to proceed pending resolution of the parties' dispute about the adequacy of the administrative record may cause Defendants some discomfort. Defendants may be required, as a result of this discovery schedule, to disclose

---

[4] As discussed below, the court will, however, narrow the scope of the Privilege-Log Requirement in order to address Defendants' objection that the requirement applies to documents outside the scope of the administrative records and cannot be complied with in any reasonable amount of time.

8

**204**

information that may not be relevant to the adjudication of certain of Plaintiffs' claims, if the

administrative record that they have already produced is ultimately determined to be complete.

Defendants' complaints that allowing discovery to proceed in the interim places them "in an

untenable position" and "forecloses any realistic chance of success on these arguments in district

court," are, however, overstated. (Defs. Oct. 18 Stay Mot. at 3.)  If the court concludes that the

administrative record is complete, and thus that discovery outside the record is unwarranted, it

can confine its review to that record.  Likewise, if the court concludes that no privilege log is

required with respect to documents withheld from the administrative record, the court can simply

disregard that log.  The court is, however, mindful that overbroad discovery could

inappropriately interfere with agencies' day-to-day workings, and thus will narrow the Privilege-

Log Requirement as stated in the following section.

## III.    THE COURT WILL NARROW THE SCOPE OF THE PRIVILEGE-LOG REQUIREMENT

In addition to arguing generally that they should not be required to compile a privilege

log, Defendants also argue that the Privilege-Log Requirement remains overbroad, and imposes

an impossible-to-meet deadline. (Defs. Oct. 18 Stay Mot. at 3-4.)  They contend that the

Privilege-Log Requirement improperly covers documents that would not have been included

within the administrative record (id. at 4) and—offering some substantiation to their heretofore-

conclusory claims that the requirement imposes an impossible burden on the Government—

assert that approximately 1.2 million DHS documents and another 90,000 DOJ documents may

fall within the scope of the Privilege-Log Requirement.  (Id. at 4.)  In light of these concerns,

which Defendants have also presented in affidavits submitted to the U.S. District Court for the

Northern District of California in connection with related challenges pending there before Judge

William Alsup, the court agrees that the Privilege-Log Requirement should be narrowed further.

9

**205**

Defendants are required to identify and assert privilege with respect to documents

withheld from the administrative record on privilege grounds. The "full" or "whole"

administrative record includes all materials "directly or indirectly" considered by an agency

decisionmaker at the time he or she made the challenged decision. See Comprehensive Cmty.

Dev., 890 F. Supp. 2d at 308. Thus, the administrative record considers not only materials

directly considered by the agency decisionmaker, but also "all materials that 'might have

influenced the agency's decision,'" including any "work and recommendations of subordinates"

on which the agency decisionmaker based his or her decision. Amfac Resorts, L.L.C. v. U.S.

Dep't of the Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (quoting Bethlehem Steel v. EPA, 638

F.2d 994, 1000 (7th Cir. 1980)); see also Order re Motion to Complete Administrative Record

(Dkt. 12) at 3-8, 11-12, Regents of the University of California v. U.S. Dep't of Homeland Sec.,

No. C-17-05211 (Oct. 17, 2017). While Defendants appear to argue that the administrative

record includes only materials immediately before the top-level administrative decisionmaker,

this reading fails to account for cases holding that the administrative record also includes

materials that the agency decisionmaker "indirectly" or "constructively" considered. See

Wildearth Guardians v. U.S. Forest Serv., 713 F. Supp. 2d 1243, 1256 (D. Colo. 2010)

(administrative record includes materials "so heavily relied on in . . . recommendations that the

decision maker constructively considered" them).

To clarify that the Privilege-Log Requirement aligns with the proper scope of the

administrative record, the court narrows that requirement as follows: Defendants are required to

produce a privilege log that identifies and asserts privilege with respect to materials withheld

from the administrative record on privilege grounds that (1) Attorney General Sessions or Acting

Secretary Duke actually considered, as part of their decision to terminate the DACA program;

10

**206**

and (2) their first-tier subordinates—i.e., anyone who advised them on the decision to terminate the DACA program—considered in connection with formulating those recommendations. If Defendants correctly designated the administrative record, Defendants presumably already identified and analyzed claims of privilege with respect to those documents prior to the October 6, 2017, deadline for submitting the administrative record, minimizing the burden associated with the production of this privilege log. By Monday, October 23, 2017, the parties are directed to file supplemental letter briefs, not to exceed five pages each, discussing whether Defendants should be required to identify and assert privilege with respect to any materials considered by second-tier subordinates (i.e., anyone who advised any first-tier subordinates to Attorney General Sessions or Acting Secretary Duke) in this matter.

The court reiterates that DOJ documents fall within the scope of the Privilege-Log Requirement. Defendants have not explained their conflicting representations to the court as to whether Attorney General Sessions was partly responsible for the decision to end the DACA program. Until they do so, forthrightly and with citations to legal authority, the court will continue to treat DHS and DOJ as joint decisionmakers for these purposes.

## IV.    THE COURT DENIES DEFENDANTS' MOTION FOR A STAY PENDING MANDAMUS

Lastly, the court denies Defendants' motion for a stay pending mandamus. In considering a motion for a stay pending mandamus, the court considers the same factors as it considers on a motion for a stay pending appeal. Hoop v. Andrews, No. 1:06-CV-603, 2009 WL 2431285 (S.D. Ohio Aug. 6, 2009). In this circuit, those are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

11

**207**

other parties interested in the proceeding; and (4) where the public interest lies." In re World Trade Ctr. Disaster Site Litig., 503 F.3d 167, 170 (2d Cir. 2007) (footnote omitted).

Balancing those factors, the court finds that a stay pending mandamus is not warranted. With respect to the first factor, Defendants offer no separate grounds for that stay, nor do they cite any controlling or persuasive case law in support of a stay. It is thus difficult to say that they have made any showing of likelihood of success on the merits. Nor does the court find that they are likely to succeed on the merits of their argument that they should not be subject to discovery or required to produce a privilege-log, for the reasons stated in this order, the court's prior orders, and Judge Alsup's well-reasoned order granting plaintiffs' motion to compel completion of the administrative record in Regents of the University of California v. U.S. Department of Homeland Security, No. C-17-05211 (N.D. Cal. Oct. 17, 2017). With respect to the third factor, in light of the expedited discovery schedule for this case, the court finds that any delay of discovery would prejudice plaintiffs, for the reasons discussed above. The court concludes that these factors, taken together, outweigh the relatively minor harm to Defendants of permitting discovery to continue and considerations of public interest, some version of which both sides in this case have claims to advance.

**V.   CONCLUSION**

For the foregoing reasons, Defendants' motion for a stay of discovery and the Privilege-Log Requirement is GRANTED in part and DENIED in part, and Defendants' motion for a stay pending mandamus is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
     October 19, 2017

/s Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MARTIN JONATHAN BATALLA VIDAL et al.,

                Plaintiffs,

     -against-

ELAINE C. DUKE, Acting Secretary, Department of
Homeland Security, et al.,

                Defendants.
-----------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                Plaintiffs,

     -against-

DONALD TRUMP, President of the United States, et al.,

                Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-4756 (NGG) (JO)**

**MEMORANDUM & ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

     Plaintiffs in the above-captioned cases challenge the rescission of the Deferred Action for

Childhood Arrivals ("DACA") program, as well as other actions that Defendants are alleged to

have taken in connection with the rescission of that program.  Defendants have moved to dismiss

these cases for lack of subject-matter jurisdiction and for failure to state a claim.  (See Defs. Mot.

1

to Dismiss (Dkt. 95)[1]; Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mem.") (Dkt. 95-

1).) For the reasons that follow, the court GRANTS IN PART and DENIES IN PART

Defendants' motion to dismiss for lack of subject-matter jurisdiction and RESERVES RULING

on Defendants' motion to dismiss for failure to state a claim.

## I.   BACKGROUND

The court begins by providing some background on the DACA program, the steps

Defendants have taken to end it, and the increasingly complicated procedural history of these

cases.

### A. Factual Background

#### 1. Deferred Action

The DACA program originates in a mismatch between the number of individuals

unlawfully present in the United States and DHS's ability to remove these individuals from the

country. As of 2014, for example, approximately 11.3 million removable individuals were

present in the United States.[2]  (The Department of Homeland Security's Authority to Prioritize

Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of

Others, 38 Op. O.L.C. at 1 (2014) ("OLC Op.") (Admin. R. ("AR") (Dkt. 77-1) at 4).)  DHS has

the resources to remove only a small percentage of these individuals—specifically, about

400,000 per year, or less than four percent of the total, as of 2014. (Id. at 1; DHS, 2015

---

[1] Except as noted, all docket citations refer to the docket in Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.).
For convenience, the court refers to the Plaintiffs in Batalla Vidal v. Duke as the "Batalla Vidal Plaintiffs"; Plaintiff
Make the Road New York as "MRNY"; the Plaintiffs in New York v. Trump, No. 17-CV-5228 (E.D.N.Y.), as the
"State Plaintiffs"; the U.S. Department of Homeland Security as "DHS"; U.S. Customs and Border Protection as
"CBP"; U.S. Citizenship and Immigration Services as "USCIS"; U.S. Immigration and Customs Enforcement as
"ICE"; and the U.S. Department of Justice as "DOJ."

[2] "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or
meet other criteria set by federal law." Arizona v. United States, 567 U.S. 387, 396 (2012) (citing 8 U.S.C. § 1227).

2

**210**

Yearbook of Immigration Statistics tbl. 39 (2016) (listing 333,341 removals and 129,122

"returns" for the year 2015).)  Because of the "practical fact" that it cannot deport all these

individuals, the Executive Branch has significant discretion to prioritize the removal of some and

to deprioritize the removal of others.  See Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred

action,' which entails temporarily postponing the removal of individuals unlawfully present in

the United States."  Id.  "Deferred action," sometimes referred to as "nonpriority status," is "in

effect, an informal administrative stay of deportation," Lennon v. INS, 527 F.2d 187, 191 n.7

(2d Cir. 1975), by which immigration authorities decide not to initiate, or decide to halt, removal

proceedings "for humanitarian reasons or simply for . . . convenience," Reno v. Am.-Arab Anti-

Discrimination Comm., 525 U.S. 471, 484 (1999) ("AAADC").  Immigration authorities have

used deferred action and similar policies on numerous occasions since at least the early 1960s.

Arpaio, 797 F.3d at 16 (citing OLC Op. at 7-8, 12-13).  Although deferred action was initially

"developed without express statutory authorization," AAADC, 525 U.S. at 484 (quoting 6 C.

Gordon et al., Immigration Law and Procedure § 72.03(2)(h) (1998)), it has since been

referenced in the Immigration and Nationality Act ("INA") and in DHS regulations, see 8 U.S.C.

§ 1154(a)(1)(D)(i)(II), (IV) (making certain individuals "eligible for deferred action and work

authorization"); 8 C.F.R. § 274a.12(c)(14) (authorizing certain recipients of deferred action to

apply for work authorization).

## 2. DACA and DAPA

In 2012, the Obama Administration created the DACA program by issuing a

memorandum stating that DHS would consider according deferred action to certain

undocumented immigrants who entered the United States as children. (Mem. from Janet

Napolitano, Sec'y of DHS, to David V. Aguilar, Acting Comm'r, CBP, et al., Exercising

3

**211**

Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children

(June 15, 2012) (the "2012 DACA Memo") (AR 1).)  The 2012 DACA Memo directed CBP,

USCIS, and ICE to consider exercising prosecutorial discretion with respect to individuals

without lawful immigration status who (1) were under the age of sixteen when they entered the

United States; (2) had been continuously present in the United States for at least the five years

leading up to June 15, 2012; (3) were currently in school, had graduated from high school or

obtained GEDs, or were honorably discharged veterans; (4) had not been convicted of felonies,

significant misdemeanors, or multiple misdemeanors, and did not "otherwise pose[] a threat to

national security or public safety"; and (5) were not above the age of thirty.  (Id.)  Individuals

who met these criteria, passed a background check, and were granted relief "on a case by case

basis" were shielded from removal and eligible to apply for work authorization, subject to

renewal every two years.  (Id. at 2-3.)  The 2012 DACA Memo made clear, however, that it

"confer[red] no substantive right, immigration status or pathway to citizenship," but only "set

forth policy for the exercise of discretion within the framework of the existing law."  (Id. at 3.)

Following the issuance of the 2012 DACA Memo, approximately 800,000 individuals have been

granted deferred action and work authorization under the program.  (Second Am. Compl.

("SAC") (Dkt. 60) ¶ 73; USCIS, Number of Form I-821D, Consideration of Deferred Action for

Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status, Fiscal Year

2012-2017 (June 30, 2017) (Am. Compl. ("State Pls. Am. Compl."), Ex. 1 (No. 17-CV-5228,

Dkt. 55-1)).)

In 2014, the Obama Administration announced a new deferred action program for the

parents of U.S. citizens and lawful permanent residents, Deferred Action for Parents of

Americans and Lawful Permanent Residents ("DAPA").  (Mem. from Jeh Charles Johnson,

4

**212**

Sec'y of DHS, to León Rodríguez, Dir., USCIS., et al, Exercising Prosecutorial Discretion with

Respect to Individuals Who Came to the United States as Children and with Respect to Certain

Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (the

"2014 DAPA Memo") (AR 37).)  The 2014 DAPA Memo also expanded the DACA program by

(1) permitting individuals born before June 15, 1981, to apply for deferred action; (2) extending

the term of the benefits obtained under the DACA program from two to three years; and

(3) adjusting the date-of-entry requirement so that individuals who entered the United States

before January 1, 2010, could obtain deferred action and work authorization.  (Id. at 3-4.)  The

court refers to these changes to the DACA program as the "DACA Expansion."

      Following the issuance of the 2014 DAPA Memo, twenty-six states, led by Texas, filed

suit in the U.S. District Court for the Southern District of Texas, claiming that the DAPA

program violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 550 et seq., and the

Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 3.  See Texas v. United States,

86 F. Supp. 3d 591, 598 (S.D. Tex. 2015).  On February 16, 2015, the district court concluded

that those states had standing to sue and were likely to succeed on the merits of their procedural

APA claim that the 2014 DAPA Memo was invalid because it constituted a "substantive rule,"

not a "general statement of policy," and thus should have been promulgated through notice-and-

comment rulemaking.  Id. at 671-72.  The court issued a nationwide injunction against the

implementation of the DAPA program, id. at 677-78, and the DACA Expansion, id. at 678 n.111.

The Fifth Circuit affirmed that decision, finding that the plaintiff states were likely to succeed

both on their claim that the 2014 DAPA Memo should have been made through notice-and-

comment procedures and on their claim that the memo was substantively contrary to the INA.

Texas v. United States, 809 F.3d 134, 178, 186 (5th Cir. 2015) (as revised).  The Fifth Circuit

declined to reach the plaintiff states' Take Care Clause claim. Id. at 146 n.3. The decision was

affirmed by an equally divided Supreme Court. See 136 S. Ct. 2271 (Mem.).

### 3. DAPA Rescission

The Executive Branch's immigration-enforcement priorities shifted with the election of

President Donald Trump. Shortly after his Inauguration, President Trump issued an executive

order that cast doubt on the exemption of "classes or categories of removable aliens from

potential enforcement." Exec. Order 13,768, Enhancing Public Safety in the Interior of the

United States, 82 Fed. Reg. 8799 (Jan. 25, 2017). The following month, then-Secretary of DHS

John Kelly implemented that order by issuing a memorandum rescinding "all existing conflicting

directives, memoranda, or field guidance regarding enforcement of our immigration laws and

priorities for removal," except for the DACA and DAPA programs, which he left in place.

(Mem. from John Kelly, Sec'y, DHS, to Kevin McAleenan, Acting Comm'r, CBP, et al.,

Enforcement of the Immigration Laws to Serve the National Interest at 2 (Feb. 20, 2017) (AR

230).) Four months later, Secretary Kelly issued another memorandum, which rescinded the

DAPA program and the DACA Expansion based on "the preliminary injunction in this matter,

the ongoing litigation, the fact that DAPA never took effect, and our new immigration

enforcement priorities." (Mem. from John F. Kelly, Sec'y, DHS, to Kevin K. McAleenan,

Acting Comm'r, CBP, et al., Rescission of November 20, 2014, Memorandum Providing for

Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") at 3 (June

15, 2017) (AR 235).) That memorandum did not, however, rescind the original DACA program

or revoke the three-year-long deferred action and work authorization issued between the

announcement of the DACA Expansion and the Southern District of Texas's issuance of a

preliminary injunction against that program. (Id. at 2 & n.3).

6

#### 4. DACA Rescission

Following the rescission of the 2014 DAPA Memo, Texas Attorney General Ken Paxton

wrote on behalf of eleven states to Attorney General Jeff Sessions to demand that the "Executive

Branch" rescind the 2012 DACA Memo. (Ltr. from Ken Paxton, Att'y Gen. of Texas, to Hon.

Jeff Sessions, Att'y Gen. of the U.S. (June 29, 2017) at 2 (AR 239).) Paxton warned that, if DHS

did not act to end the DACA program, the plaintiff states would amend their complaint in Texas

v. United States to challenge the DACA program and the remaining work permits issued under

the DACA Expansion. (Id. at 2.)

Thereafter, Attorney General Sessions wrote to Acting DHS Secretary Elaine Duke to

"advise that [DHS] should rescind" the 2012 DACA Memo.[3] (Letter from Jefferson B. Sessions,

III, Att'y Gen. of the U.S., to Elaine C. Duke, Acting Sec'y, DHS (the "Sessions Letter") (AR

251).) The Attorney General opined that DACA was unconstitutional and that the Texas

plaintiffs would likely prevail in their anticipated challenge to the program:

> DACA was effectuated by the previous administration through
> executive action, without proper statutory authority and with no
> established end-date, after Congress' repeated rejection of proposed
> legislation that would have accomplished a similar result. Such an
> open-ended circumvention of immigration laws was an
> unconstitutional exercise of authority by the Executive Branch. The
> related Deferred Action for Parents of Americans and Lawful
> Permanent Residents (DAPA) policy was enjoined on a nationwide
> basis in a decision affirmed by the Fifth Circuit on the basis of
> multiple legal grounds and then by the Supreme Court by an equally
> divided vote. Then-Secretary of Homeland Security John Kelly
> rescinded the DAPA policy in June. Because the DACA policy has
> the same legal and constitutional defects that the courts recognized
> as to DAPA, it is likely that potentially imminent litigation would
> yield similar results with respect to DACA.

(Id. (citation omitted).)

---

[3] While the letter is not dated, the PDF of the AR dates the letter September 4, 2017. (See also Defs. Mem. at 9.)

7

**215**

On September 5, 2017, Defendants rescinded the DACA program.[4] The Attorney

General announced the decision at a press conference, and Acting Secretary Duke implemented

the decision by issuing a memorandum (the "DACA Rescission Memo") to her subordinates.

(DOJ, Press Release, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017),

https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca; Mem.

from Elaine C. Duke, Acting Sec'y, DHS, to James W. McCament, Acting Dir., USCIS, et al.,

Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with

Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (AR 252).)

Duke pointed to the rulings of the Fifth Circuit and the Supreme Court in the Texas litigation, as

well as to the Attorney General's "legal determination" that DACA was "'an open-ended

circumvention of immigration laws'" and "'an unconstitutional exercise of authority'":

> Taking into consideration the Supreme Court's and the Fifth
> Circuit's rulings in the ongoing litigation, and the September 4, 2017
> letter from the Attorney General, it is clear that the June 15, 2012[,]
> DACA program should be terminated.  In the exercise of my
> authority in establishing national immigration policies and
> priorities, except for the purposes explicitly identified below, I
> hereby rescind the June 15, 2012 memorandum.

(Id. at 3-4 (quoting Sessions Letter).)

Rather than terminating the DACA program outright, the DACA Rescission Memo

provided for a phased "wind down" of the program.  First, DHS would consider initial

---

[4] Defendants maintain that, as a legal matter, Acting Secretary Duke is solely responsible for the decision to rescind the DACA program. (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate (Dkt. 80) at 3-4.)  As the court has noted, however, Defendants previously represented to the court that the Attorney General and Acting Secretary Duke jointly decided to end the DACA program. (Tr. of Sept. 14, 2017, Hr'g (Docket Number Pending) 13:17-14:06, 24:21-24, 26:1-6; Oct. 17, 2017, Mem. & Order (Dkt. 86) at 9-10.)  Defendants had not then, and still have not, presented this court with any reason why it should disregard their earlier representations as to who decided to end the DACA program. (See Oct. 17, 2017, Mem. & Order at 10; Oct. 19, 2017, Mem. & Order at 10-11.)  For purposes of this motion, however, nothing turns on the question of whether Acting Secretary Duke acted alone or with the Attorney General and the President when terminating the DACA program, so the court simply refers to the actions of "Defendants" in this regard.

8

applications for deferred action and work authorization that it had received as of September 5,
2017. (DACA Rescission Memo at 4.) Second, DHS would "adjudicate—on an individual, case
by case basis" requests for renewal of deferred action and work authorization "from current
beneficiaries whose benefits will expire between [September 5, 2017,] and March 5, 2018 that
have been accepted by [DHS] as of October 5, 2017." (Id.) DHS would not consider other
applications for deferred action or work authorization under the DACA program. (Id.) Existing
grants of deferred action and work authorization would remain in effect "for the remaining
duration of their validity periods," though DHS would retain the authority to terminate or deny
deferred action when it deemed appropriate. (Id.) Under the DACA Rescission Memo, the
benefits granted as part of the DACA program will therefore expire gradually over the next two
years.

### B. Procedural Background

#### 1. Prior to the DACA Rescission

The first of the above-captioned cases, Batalla Vidal v. Duke, No. 16-CV-4756
(E.D.N.Y.), predates the Trump Administration's decision to rescind the DACA program. In
that case, Plaintiff Martín Batalla Vidal initially challenged DHS's compliance with the
nationwide injunction issued by the Southern District of Texas in Texas v. United States. Batalla
Vidal applied for deferred action and work authorization in November 2014 and, in February
2015, was notified that he had received deferred action and work authorization for the next three
years under the terms of the DACA Expansion. (Compl. (Dkt. 1) ¶ 32.) On May 14, 2015,
however, DHS revoked his three-year work authorization, citing the Texas injunction, and
replaced it with a two-year permit. (Id. ¶¶ 34-36.) Batalla Vidal challenged that decision,
contending that the Texas plaintiffs lacked standing to seek, and the Southern District of Texas
lacked jurisdiction to issue, a nationwide injunction. (Id. ¶¶ 43-47.) Batalla Vidal subsequently

9

**217**

amended his complaint to add the nonprofit organization MRNY as a plaintiff and name then-Director of USCIS León Rodríguez as a defendant. (Am. Compl. (Dkt. 29).) In November 2016, the Batalla Vidal Plaintiffs moved with Defendants' consent to stay briefing in the case "[d]ue to uncertainty regarding the future of the [DACA] program." (Pls. Nov. 21, 2016, Mot. to Stay (Dkt. 35); Apr. 4, 2017, Joint Mot. to Stay (Dkt. 40).)

2. Following the DACA Rescission

Following Defendants' announcement of the decision to rescind the DACA program, Plaintiffs brought these actions challenging that decision and certain other actions that Defendants have taken relating to that decision. On September 6, 2017, fifteen states and the District of Columbia[5] filed suit challenging both the rescission of the DACA program and DHS's alleged changes in its policy regarding the use of DACA applicants' information for immigration-enforcement purposes. (State Pls. Compl. (No. 17-CV-5228, Dkt. 1) ¶¶ 269-301.) The State Plaintiffs asserted claims under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the APA, and the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12 (the "RFA"). (Id.) Two weeks later, the Batalla Vidal Plaintiffs again amended their complaint to assert certain claims similar to those brought by the State Plaintiffs, as well as a claim that Defendants violated the Due Process Clause by failing to notify DACA recipients that they needed to renew their deferred action and work authorization by October 5, 2017. (SAC ¶¶ 160-66.) Finally, the State Plaintiffs amended their complaint to add claims (1) challenging the notice provided to DACA recipients of the rescission of the DACA program; and (2) further challenging the change

---

[5] The State Plaintiffs were initially comprised of the States of North Carolina, Hawaii, New York, Washington, Iowa, Oregon, Rhode Island, Vermont, Illinois, Connecticut, New Mexico, and Delaware; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the District of Columbia. (State Pls. Compl. (No. 17-CV-5228, Dkt. 1).) Colorado has since joined the case. (State Pls. Am. Compl. (No. 17-CV-5228, Dkt. 54).)

10

in DHS's information-use policy. (State Pls. Am. Compl. (No. 17-CV-5228, Dkt. 54) ¶¶ 246-52, 274-80.) Together, Plaintiffs now assert the following claims:

**Equal Protection.** Both sets of Plaintiffs allege that the decision to rescind the DACA program violated the equal-protection principles incorporated in the Due Process Clause of the Fifth Amendment to the U.S. Constitution, see Bolling v. Sharpe, 347 U.S. 497, 498-500 (1954), because that decision was motivated by improper considerations. (SAC ¶¶ 167-70; State Pls. Am. Compl. ¶¶ 233-39.) The State Plaintiffs allege that the DACA Rescission Memo "target[s] individuals for discriminatory treatment, without lawful justification" and that it was "motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group." (State Pls. Am. Compl. ¶¶ 235-36.) The Batalla Vidal Plaintiffs allege that President Trump, Attorney General Sessions, and Acting Secretary Duke violated the Due Process Clause in deciding to rescind the DACA program because that decision "targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups," and "was substantially motivated by animus toward Latinos and, in particular, Mexicans." (SAC ¶¶ 169-70.)

**Due Process—Individualized Notice.** Both sets of Plaintiffs also contend that Defendants violated the Fifth Amendment's Due Process Clause by failing to provide DACA recipients with adequate notice of the decision to rescind the DACA program. (SAC ¶¶ 160-66; State Pls. Am. Compl. ¶¶ 274-80.) In particular, the Batalla Vidal Plaintiffs allege that, prior to the DACA Rescission Memo, DHS advised DACA recipients to submit applications to renew their deferred action and work authorization "as soon as possible" and, in particular, 120-150 days before expiration, to ensure that those benefits did not expire before DHS could process the renewal applications. (SAC ¶ 164.) Following the issuance of the DACA Rescission Memo, Defendants did not send individual revised notices to alert DACA recipients who were eligible to

11

**219**

renew their deferred action and work authorization (i.e., individuals whose benefits expired

before March 5, 2018) that they only had until October 5, 2017, to do so. (Id. ¶ 165.) The State

Plaintiffs allege that Defendants violated the Due Process Clause of the Fifth Amendment by

failing to provide DACA recipients with "adequate notice" about "the procedures and timeline

for renewing their DACA status," "the general termination of the DACA program after March 5,

2018," or "their inability to apply for renewal of their DACA status after March 5, 2018." (State

Pls. Am. Compl. ¶¶ 276-77.)

**Due Process—Information-Use Policy.** Both sets of Plaintiffs assert that DHS

impermissibly backtracked on its representations that it would use information gleaned from

DACA applications for immigration-enforcement purposes only in limited circumstances. (SAC

¶¶ 151, 153; State Pls. Am. Compl. ¶¶ 240-45.) While, as discussed below, the Batalla Vidal

Plaintiffs fold this challenge into their substantive APA claim, the State Plaintiffs challenge this

decision as "fundamentally unfair," in violation of the Due Process Clause of the Fifth

Amendment. (State Pls. Am. Compl. ¶ 243.)

**Equitable Estoppel—Information-Use Policy.** The State Plaintiffs argue that the

doctrine of equitable estoppel bars DHS from changing its policy regarding the use of DACA

applicants' information. (Id. ¶¶ 246-52.) The State Plaintiffs allege that Defendants, having

"made repeated affirmative statements about the protections that would be given to the personal

information provided by DACA applicants" and "placed affirmative restrictions on the use of

such information for purposes of immigration enforcement" (id. ¶ 248), are now estopped from

using that information for immigration-enforcement purposes (id. ¶¶ 250-51). The court refers to

this claim, together with Plaintiffs' constitutional information-use policy claims, as Plaintiffs'

"information-use policy claims."

12

**APA—Arbitrary and Capricious.** Both sets of Plaintiffs challenge the decision to end the DACA program under the APA as substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). (SAC ¶¶ 149-54; State Pls. Am. Compl. ¶¶ 253-56.) The Batalla Vidal Plaintiffs contend that Attorney General Sessions and Acting Secretary Duke acted arbitrarily and capriciously by deciding to end the DACA program and by changing DHS's policy regarding the confidentiality of DACA applicants' information because those decisions "(a) lack a rational explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors." (SAC ¶ 151.) The State Plaintiffs argue that the implementation of the DACA Rescission Memo and termination of the DACA program "with minimal formal guidance" constituted arbitrary, capricious, and unlawful action in violation of Section 706 of the APA. (State Pls. Am. Compl. ¶ 254-55.) The court refers to these claims together as Plaintiffs' "substantive APA claims."

**APA—Notice and Comment.** Both sets of Plaintiffs also contend that DHS's implementation of the DACA Rescission Memo constitutes a substantive or legislative "rule" for purposes of the APA, and thus needed to be made through notice-and-comment rulemaking procedures. See 5 U.S.C. § 553. (SAC ¶¶ 144-48; State Pls. Am. Compl. ¶¶ 257-65.) In particular, the Batalla Vidal Plaintiffs argue that the DACA Rescission Memo is a substantive rule, "as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria." (SAC ¶ 146.) The State Plaintiffs, on the other hand, argue that the promulgation and implementation of the DACA Rescission Memo "categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States," impacting those beneficiaries'

13

"substantive rights." (State Pls. Am. Compl. ¶ 261.) The court refers to these claims together as

Plaintiffs' "procedural APA claims."

**RFA.** Finally, both sets of Plaintiffs assert claims under the RFA. Plaintiffs claim that

Defendants violated the RFA by issuing the DACA Rescission Memo without conducting an

analysis of the rescission's impact on "small entities." (SAC ¶¶ 155-59; State Pls. Am. Compl.

¶¶ 266-73.) MRNY alleges that it is a "small organization" that is directly affected by the

DACA Rescission Memo and thus has a cause of action under the RFA. (SAC ¶ 156.) The State

Plaintiffs assert that they and their "small governmental jurisdictions, nonprofits, and businesses,

and their residents" are harmed by Defendants' failure to conduct such a regulatory impact

analysis. (State Pls. Am. Compl. ¶ 273.) The court refers to these claims as Plaintiffs "RFA

claims."

The following chart summarizes these claims:

a. *Table: Claims Presented*

| Challenged Action | Cause of Action | Batalla Vidal v. Duke[6] | New York v. Trump[7] |
|---|---|---|---|
| Termination of the DACA program | Due Process Clause | Fifth claim, ¶¶ 167-70 | First claim, ¶¶ 233-39 |
| | APA (substantive) | Second claim, ¶¶ 149-54 | Fourth claim, ¶¶ 253-56 |
| | APA (procedural) | First claim, ¶¶ 144-48 | Fifth claim, ¶¶ 257-65 |
| | RFA | Third claim, ¶¶ 155-59 (MRNY only) | Sixth claim, ¶¶ 266-73 |
| Notification of DACA recipients of (1) the termination of the DACA program and (2) revised renewal deadlines | Due Process Clause | Fourth claim, ¶¶ 160-66 (notice of revised renewal deadlines only) | Seventh claim, ¶¶ 274-80 |
| Changes to DHS policy regarding the use of DACA applicants' information for immigration-enforcement purposes | Due Process Clause | | Second claim, ¶¶ 240-45 |
| | APA (substantive) | Second claim, ¶¶ 149-51, 153-54 | |
| | Equitable estoppel | | Third claim, ¶¶ 246-52 |

---

[6] All citations refer to the SAC.

[7] All citations refer to the State Plaintiffs' Amended Complaint.

14

### 3. District Court Proceedings

The parties have vigorously litigated these actions before this court. Although the full procedural history can be discerned from the relevant dockets, the court provides the following limited summary of the proceedings to date.

Consistent with the regular practice of courts in this district in civil cases, discovery matters were referred to the magistrate judge assigned to the case, Magistrate Judge James Orenstein, to decide in the first instance. See 28 U.S.C. § 636(b)(1)(A); Local Civ. R. 72.2. After soliciting the views of the parties as to whether discovery should proceed (Sept. 15, 2017, Order (Dkt. 58)), Judge Orenstein authorized discovery to proceed over Defendants' objections (Tr. of Sept. 26, 2017, Hr'g (Docket Number Pending) 26:21-27:22). Judge Orenstein then issued a case management and scheduling order (the "Case Management Order"), which confirmed the previously announced discovery schedule. (Sept. 27, 2017, Order (Dkt. 67).) Of particular relevance to these proceedings, the Case Management and Scheduling Order required Defendants to produce, by October 6, 2017, an administrative record as well as a privilege log describing "every document considered within any component of the executive branch as part of the process of determining the policy and actions at issue in these actions that are not being produced and as to which the defendants would assert a claim of privilege, regardless of whether the defendants deem such . . . record to be part of the official administrative record." (Id. ¶¶ II(c) (the "Privilege Log Requirement").)

Defendants promptly challenged the Case Management Order. On September 29, 2017, Defendants filed a motion before this court "seek[ing] relief from" the Privilege Log Requirement, which, they argued, "raise[d] substantial separation-of-powers concerns," to the extent it could be read as applying to White House communications, and required Defendants to assert privilege with respect to documents that were not properly included in the administrative

15

**223**

record. (Sept. 29, 2017, Defs. Mot. to Vacate (Dkt. 69) ("Defs. Sept. 29 Mot.") at 2-5.)

Defendants also argued that it would be impossible to comply with the Privilege Log

Requirement within the deadline set by the Case Management Order (id. at 5), and that the court

should consider threshold arguments for dismissal of these cases before allowing discovery to

proceed (id. at 5-6). Defendants did not specifically argue that discovery was inappropriate,

although they reincorporated arguments against discovery by reference to a letter they had filed

with Judge Orenstein a week earlier and briefly outlined three "threshold dismissal arguments."

(Id. at 1, 5-6; see also Defs. Sept. 22, 2017, Ltr. Regarding Discovery (Dkt. 65).)

The court issued two orders in response to Defendants' objections. The first order

extended the deadline for complying with the Privilege Log Requirement by two weeks, so that

the court could consider whether the as-yet-unproduced administrative record was adequate and

whether Defendants retained the presumption that they had correctly compiled the record.

(Oct. 3, 2017, Order (Dkt. 72).) Defendants subsequently asked the court to narrow the Privilege

Log Requirement or vacate it entirely. (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate

(Dkt. 80) at 2.) At the same time, Defendants also asked the court to stay discovery pending

resolution of Defendants' anticipated dispositive motions, which Defendants averred would

"raise arguments that are strong, purely legal, and completely dispositive of Plaintiffs' claims."

(Id. at 4.) Defendants did not, however, specifically identify what those arguments were (instead

cross-referencing their September 29 Motion and string-citing to authority discussed below) or

address any of the factors that courts in this district consider in analyzing whether a party has

demonstrated "good cause" to stay discovery. See Fed. R. Civ. P. 26(c); Richards v. N. Shore

Long Island Jewish Health Sys., No. 10-CV-4544 (LDW) (ETB), 2011 WL 4407518, at *1

(E.D.N.Y. Sept. 21, 2011).

16

**224**

The court then issued its second order, which narrowed the scope of the Privilege Log Requirement but denied Defendants' request to stay discovery. (Oct. 17, 2017 Mem. & Order (the "Oct. 17 M&O") (Dkt. 86).) With respect to Defendants' arguments that discovery outside the administrative record was inappropriate, the court noted that Defendants had not identified any reason why its review of Plaintiffs' information-use policy and notice claims should be limited to an administrative record that only purported to document the decision to rescind the DACA program. (Id. at 3-5.) The court declined to vacate the Privilege Log Requirement before Judge Orenstein decided whether the administrative record was complete. (Oct. 17 M&O at 5-6.) The court agreed, however, that the Privilege Log Requirement should be narrowed to exclude materials other than DHS and DOJ communications. (Id. at 7-9.) Finally, the court declined to exempt DOJ from the Privilege Log Requirement, as Defendants had failed to explain their apparent reversal in position regarding whether Attorney General Sessions was responsible for the decision to rescind the DACA program. (Id. at 9-10.)

The following evening, Defendants renewed their motion to stay discovery, this time threatening to seek mandamus review if the court did not address their objections by 2 p.m. the following day. (Defs. Oct. 18, 2017, Mot. to Stay (Dkt. 87).) The court ruled expeditiously on these requests. On October 19, 2017, Judge Orenstein issued an order granting Plaintiffs' motion to compel Defendants to produce a complete administrative record. (Oct. 19, 2017, Order Granting Motion to Produce (Dkt. 89).) The same day, this court issued another memorandum and order, granting in part and denying in part Defendants' motion for a stay. (Oct. 19, 2017, Mem. & Order (the "Oct. 19 M&O") at 9-11.) In light of Defendants' ongoing (and, this time, factually substantiated) concerns about the burdens of complying with the Privilege Log Requirement, the court agreed to stay the Privilege Log Requirement except with respect to

17

**225**

documents directly considered by the Attorney General, Acting Secretary Duke, and their subordinates who directly advised them on the decision to end the DACA program. (Id.) The court concluded, however, that Defendants had not demonstrated "good cause" warranting a stay of discovery (id. at 4-9), nor that they were entitled to a stay pending mandamus review (id. at 11-12).

On October 20, 2017, the U.S. Court of Appeals for the Second Circuit issued an emergency stay of discovery and record supplementation in proceedings before this court, contingent on Defendants' filing a full petition for a writ of mandamus by 3 p.m. on October 23, 2017. (Oct. 20, 2017, USCA Order (Dkt. 91).) Four days later, the Second Circuit issued a second order, which extended the stay pending determination of the mandamus petition but deferred ruling on that petition "until such time as the district court has considered and decided expeditiously issues of jurisdiction and justiciability." (Oct. 24, 2017, USCA Order (Dkt. 99).) In light of that order, the court directed the parties to file supplemental briefs as to whether the court "lacks jurisdiction to consider the claims raised in [these cases] or why such claims are otherwise non-justiciable." (Oct. 24, 2017, Order.) In response to that order, Defendants filed the motion to dismiss currently before the court. That motion not only argues that the court lacks jurisdiction to hear these cases, but also contends that Plaintiffs fail to state a claim upon which relief should be granted and that the court should not grant a nationwide injunction, should it decide that Plaintiffs are entitled to relief.[8]

---

[8] Prior to filing their Motion to Dismiss, Defendants requested and received leave to file an overlong brief "in order . . . to fully present their dismissal arguments in these cases." (Defs. Oct. 25, 2017, Appl. for Leave to File Excess Pages (Dkt. 94); Oct. 26, 2017, Order Granting Defendants' Application for Leave to File Excess Pages.) That application did not expressly indicate that Defendants intended to present arguments for dismissal for failure to state a claim under Rule 12(b)(6), as opposed to just the "jurisdiction and justiciability" arguments specifically referenced by the Second Circuit's and this court's October 24, 2017, orders. Defendants would not have required these excess pages had they confined their briefing to those issues. (See Oct. 27, 2017, Order (Dkt. 98).)

18

**226**

## II. LEGAL STANDARDS

Pursuant to the Second Circuit's direction, the court addresses only "issues of jurisdiction and justiciability" at this point in the proceedings. (Oct. 24, 2017, USCA Order; Oct. 27, 2017, Order (Dkt. 98).) Accordingly, the court will consider only those portions of Defendants' motion to dismiss that challenge the court's subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Under Rule 12(b)(1), the court must dismiss a claim "for lack of subject matter jurisdiction . . . when the . . . court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). When considering a Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). Nevertheless, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" Id. (quoting Makarova, 201 F.3d at 113). "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." Id. (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)).

## III. DISCUSSION

Defendants raise four challenges to the court's authority to hear the above-captioned cases. First, Defendants argue, these cases are not justiciable under the APA because the decision to rescind the DACA program was "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2). (Defs. Mem. at 12-17.) Second, Defendants contend that the decision to terminate the DACA program constitutes a denial of deferred action, judicial review of which is barred by Section 1252(g) of the INA. See 8 U.S.C. § 1252(g). (Id. at 17-19.) Third, they

19

maintain, the Batalla Vidal Plaintiffs lack standing to bring certain claims (id. at 28-29, 34-35,

37), and the State Plaintiffs lack Article III standing to bring any claims (id. at 19-21). Fourth,

Defendants assert, the State Plaintiffs and MRNY cannot bring claims under the APA because

they assert interests that fall outside the "zone of interests" protected by the INA. (Id. at 19-20.)

The court addresses each argument in turn.

### A. Committed to Agency Discretion by Law

Defendants first argue that these cases are non-justiciable because the decision to end the

DACA program was committed to DHS's exclusive discretion by law. The court disagrees.

Certain agency decisions, including decisions not to institute enforcement action, are

presumptively immune from judicial review under the APA because they are "committed to

agency discretion by law." See 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821 (1985).

But the rescission of the DACA program was not such a decision, nor have Defendants explained

why Section 701(a)(2) precludes review of Plaintiffs' constitutional claims or other claims

challenging actions other than the decision to rescind the DACA program.[9]

### 1. Statutory and Equitable Claims

Section 701(a)(2) of the APA does not preclude judicial review of Plaintiffs' statutory

and equitable claims. "Under the APA, a party aggrieved by agency action is generally 'entitled

to judicial review thereof.'" Westchester v. U.S. Dep't of Hous. and Urban Dev., 778 F.3d 412,

418 (2d Cir. 2015) (quoting 5 U.S.C. § 702). "There is a strong presumption favoring judicial

review of administrative action." Salazar v. King, 822 F.3d 61, 75 (2d Cir. 2016). Judicial

review is not available, however, "to the extent that . . . statutes preclude judicial review,"

---

[9] It is not clear whether Section 701(a)(2) limits the court's jurisdiction or instead forms an "essential element" of a claim for relief under the APA. Sharkey v. Quarantillo, 541 F.3d 75, 87-88 (2d Cir. 2008); accord Conyers v. Rossides, 558 F.3d 137, 143 n.8 (2d Cir. 2009). Nothing turns on this distinction here, however, because Section 701(a)(2) does not shield Defendants' actions from judicial review.

5 U.S.C. § 701(a)(1), or "agency action is committed to agency discretion by law," § 701(a)(2).

The latter is "a very narrow exception" to the presumption of reviewability of agency action

under the APA, and it applies "in those rare instances where 'statutes are drawn in such broad

terms that in a given case there is no law to apply.'" Citizens to Pres. Overton Park, Inc. v.

Volpe, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)),

abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also Chaney, 470

U.S. at 830 (agency action is unreviewable "if a statute is drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion"). "To determine

whether there is 'law to apply' that provides 'judicially manageable standards' for judging an

agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and

informal agency guidance that govern the agency's challenged action." Salazar, 822 F.3d at 76

(quoting Chaney, 470 U.S. at 830). These enactments supply "law to apply" because they may

govern the agency's exercise of its own discretion. See id. at 76-77 (citing INS v. Yueh-Shaoi

Yang, 519 U.S. 26, 32 (1996)); Sec'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 158-59

(D.C. Cir. 2006).

    *a.  "Law to Apply"*

    Here, there is "law to apply," permitting meaningful judicial review of Plaintiffs'

statutory claims. Plaintiffs assert statutory claims under the APA and RFA. With respect to

Plaintiffs' procedural APA and RFA claims, the relevant "law to apply" is found in the APA and

RFA themselves, both of which specify procedures that agencies must follow when engaging in

"substantive" or "legislative" rulemaking. See 5 U.S.C. §§ 553, 604. The process by which an

agency makes a rule may be reviewed for compliance with applicable procedural requirements

regardless of whether the substance of the rule is itself reviewable. See Lincoln v. Vigil, 508

21

**229**

U.S. 182, 195-98 (1993); Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1134 (D.C. Cir. 1995); N.Y.C. Employees' Ret. Sys. v. SEC, 45 F.3d 7, 11 (2d Cir. 1995).

There is also "law to apply" permitting meaningful judicial review of Plaintiffs' substantive APA claims. In order to satisfy Section 706(2)(a), Plaintiffs must identify some source of law, other than the APA's "arbitrary and capricious" standard, against which the court can review their claims: "If agency actions could be challenged as 'arbitrary and capricious,' without reference to any other standard, then § 701(a)(2)'s limitation on APA review would amount to no limitation at all, and nothing would ever be 'committed to agency discretion by law.'" Lunney v. United States, 319 F.3d 550, 559 n.5 (2d Cir. 2003). The court agrees that Plaintiffs have identified "law to apply" to these claims. In deciding to rescind the DACA program, Defendants expressly and exclusively relied on a legal determination that the program was unlawful and could not be sustained in court. (Sessions Letter, AR 251; DACA Rescission Memo, AR 253-55.) The court may review that rationale in light of, among other sources, the text of the INA and other statutes, the history of the use of deferred action by immigration authorities, and the OLC Opinion.[10] While Defendants attempt to recast the decision to rescind the DACA program as the product of a discretionary "balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of 'potentially imminent litigation' that could throw DACA into immediate turmoil" (Defs. Mem. at 15), that argument is unsupported by the text of the Sessions Letter and the DACA Rescission Memo.

---

[10] The State Plaintiffs also assert a claim for equitable estoppel. (State Pls. Am. Compl. ¶¶ 246-52.) With respect to the State Plaintiffs' equitable estoppel claim, the court assumes for the sake of argument that the relevant "law to apply" may be found in DHS's past statements and practices regarding the use of DACA applicants' information. See Salazar, 822 F.3d at 76-77. (See State Pls. Am. Compl. ¶¶ 39-44.) The court need not decide this question, however, because, as discussed below, the State Plaintiffs lack standing to assert this claim. (See infra Section III.C.2.b.)

22

Defendants' argument that the <u>decision</u> to rescind the DACA program is unreviewable,
notwithstanding the "substantive legal" <u>rationale</u> given for that decision (Defs. Mem. at 15), is
unpersuasive. Defendants correctly note that unreviewable agency action does not become
reviewable simply because "the agency gives a reviewable reason for otherwise unreviewable
action." (Defs. Mem. at 13 (quoting <u>ICC v. Bhd. of Locomotive Eng'rs</u>, 482 U.S. 270, 283
(1987) ("<u>BLE</u>")).) <u>See</u> <u>BLE</u>, 482 U.S. at 283 ("[A] common reason for failure to prosecute an
alleged criminal violation is the prosecutor's belief . . . that the law will not sustain a conviction.
That is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to
consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of
judicial review."). That argument simply begs the question, however, of whether the decision to
rescind DACA is actually unreviewable. While it may be true that a presumptively unreviewable
decision does not become subject to judicial review simply because the decisionmaker expresses
a "reviewable" rationale," <u>see id.</u>, the decision to rescind the DACA program was not inherently
such a decision, as the following section discusses in detail.

   *b.  Prosecutorial Discretion*

      Nor does the decision to end the DACA program fall within a class of decisions
traditionally regarded as presumptively immune from judicial review under Section 701(a)(2) of
the APA. (Defs. Mem. at 12-14.) Defendants assert that the decision to rescind the DACA
program constitutes "an exercise of enforcement discretion" that is "entrusted to the agency
alone" and immune from judicial review. (<u>Id.</u> at 15.) The court concludes, however, that the
decision to eliminate the DACA program—a program by which certain undocumented
immigrants could request immigration authorities to exercise prosecutorial discretion with
respect to them—was not itself a presumptively unreviewable exercise of enforcement
discretion.

<div align="center">23</div>

<div align="center">**231**</div>

Defendants rely in particular on <u>Chaney</u>, which held that decisions <u>not</u> to take enforcement action were presumptively not subject to judicial review under the APA. In <u>Chaney</u>, the Court rejected an attempt by a group of prisoners awaiting execution by lethal injunction to force the Food and Drug Administration to take enforcement action to prevent the use of certain drugs for capital punishment. <u>See</u> <u>Chaney</u>, 470 U.S. at 823-25, 830-33. The Court held that a regulator's refusal to take enforcement action was presumptively unreviewable, because decisions not to take enforcement action typically "involve[]a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," <u>id.</u> at 831, and do not implicate the agency's exercise of "<u>coercive</u> power over an individual's liberty or property rights, and thus do[] not infringe upon areas that courts often are called to protect," <u>id.</u> at 832.

The decision to rescind DACA is unlike the non-enforcement decision at issue in <u>Chaney</u>. First, Plaintiffs do not challenge an agency's failure or refusal to prosecute or take enforcement actions with respect to certain violations of law. Instead, they challenge Defendants' affirmative decision to eliminate a program by which DHS exercised prosecutorial discretion with respect to a large number of undocumented immigrants. The DACA Rescission Memo curtails (if it does not eliminate outright) DHS's ability to exercise prosecutorial discretion with respect to individuals previously eligible to request deferred action. Although the DACA Rescission Memo notes that it does not limit DHS's "otherwise lawful enforcement or litigation prerogatives," it makes clear that DHS "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after [September 5, 2017]" and "[w]ill reject all DACA renewal requests and associated applications for Employment Authorization Documents" inconsistent with the terms of the Memo. This affirmative decision to constrain DHS's prosecutorial discretion cannot be analogized to an exercise of prosecutorial

24

**232**

discretion, which would be presumptively immune from judicial review. Cf. Texas, 809 F.3d at

165-69 (creation of the DAPA program was reviewable because it was a "affirmative agency

action," not an exercise of enforcement discretion). Second, Plaintiffs do not challenge non-

enforcement decisions, which do not subject individuals to the "coercive power" of the state.

Chaney, 470 U.S. at 831. To the contrary, the rescission of the DACA program subjects

individuals who previously enjoyed some protection from removal to coercive state authority.

Third, Defendants' decision to rescind the DACA program does not appear to have been

motivated by a "complicated balancing of a number of factors which are peculiarly within [the

agency's] expertise." See id. Instead, Defendants stated that they were required to rescind the

DACA program because it was unlawful, which suggests both that Defendants did not believe

that they were exercising discretion when rescinding the program and that their reasons for doing

so are within the competence of this court to review. (Sessions Letter; DACA Rescission Memo

at 4.) The decision to rescind the DACA program is thus manifestly unlike the non-enforcement

decision at issue in Chaney. While courts have also held that agency decisions to take (as

opposed to refrain from taking) enforcement action are also unreviewable under the APA when

there are no judicially manageable standards for reviewing the agency's discretion in choosing to

bring an enforcement action, see Speed Mining, Inc. v. Fed. Mine Safety & Health Rev.

Comm'n, 528 F.3d 310, 316-19 (4th Cir. 2008); Twentymile Coal, 456 F.3d at 155-59, those

cases are inapposite because there is "law to apply" to review the decision to rescind DACA.

Finally, Defendants' arguments that Section 701(a)(2) precludes judicial review of

Plaintiffs' suits focus on the decision to rescind the DACA program. Defendants do not explain

why the alleged decision to change DHS's policy regarding the use of DACA applicants'

information should be immune from judicial review. To the contrary, there is "law to apply" in

25

**233**

reviewing that decision (namely, DHS's prior statements about the uses of DACA applicants'

information), and the court does not understand how the change in that policy can be analogized

to the sorts of decisions, such as enforcement and non-enforcement decisions, that courts have

recognized as presumptively exempt from judicial review.  Accordingly, to the extent the Batalla

Vidal Plaintiffs also challenge DHS's alleged change in information-use policy as part of their

substantive APA claim, that claim is reviewable.  (SAC ¶¶ 151, 153-54.)

        2.  Constitutional Claims

Nor does Section 701(a)(2) preclude judicial review of Plaintiffs' constitutional claims.

It is well-established that "even where agency action is 'committed to agency discretion by law,'

review is still available to determine if the Constitution has been violated."  Padula v. Webster,

822 F.2d 97, 101 (D.C. Cir. 1987); accord Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 347

(4th Cir. 2001); Woodward v. United States, 871 F.2d 1068, 1072-73 (Fed. Cir. 1989).

In Webster v. Doe, 486 U.S. 592 (1988), the Court rejected the Government's argument

that Section 701(a)(2) barred a former CIA employee from bringing constitutional claims

challenging his termination from the agency.  Because the National Security Act of 1947 vested

the CIA Director with authority over firing decisions, the decision to fire the plaintiff because of

his sexual orientation had been "committed to agency discretion by law," and he could not

challenge that decision under the APA.  Id. at 594-95, 599-601.  The National Security Act did

not expressly preclude review of constitutional claims, however, so the Court would not presume

that such claims were unreviewable.  Id. at 603-04 (noting that the Court has held that "where

Congress intends to preclude judicial review of constitutional claims its intent to do so must be

clear," in order to "avoid the 'serious constitutional question' that would arise if a federal statute

were construed to deny any judicial forum for a colorable constitutional claim" (quoting Bowen

v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n.12 (1986))).  Similarly, Defendants

26

**234**

identify no express indication that Congress intended to preclude judicial review of the actions at issue in these cases. While DHS undoubtedly exercises "wide discretion . . . in the enforcement of the immigration laws" (Defs. Mem. at 16), that is insufficient to preclude review of Plaintiffs' constitutional claims.

### 3. Deference to the Executive Branch on Immigration Matters Does Not Counsel a Different Result

Lastly, Defendants contend that the court should read Section 701(a)(2) broadly in light of the Executive Branch's wide discretion to enforce the immigration laws. (Id. at 16-17.) The Supreme Court, however, has applied the "strong presumption in favor of judicial review of administrative action" in the immigration context. See INS v. St. Cyr, 533 U.S. 289, 299 (2001). Defendants' specific arguments for a broad reading of Section 701(a)(2) likewise unavailing. While Defendants argue that judicial review of these cases is inappropriate because review could slow down the Executive Branch's removal of undocumented immigrants from this country, 8 U.S.C. § 1252(g) already precludes individuals in removal proceedings from delaying those proceedings by claiming that they were improperly denied deferred action. See AAADC, 525 U.S. at 485. In any event, those concerns do not apply to these cases, as the court discusses in Section III.B below. Defendants also argue that judicial review of immigration decisions is inappropriate because judicial review "may involve 'not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives' or other sensitive matters." (Defs. Mem. at 16 (quoting AAADC, 525 U.S. at 490).) Defendants' stated rationale for rescinding the DACA program, however, turns wholly on questions of U.S. constitutional and administrative law, not sensitive law-enforcement, intelligence, or foreign-policy issues. In any event, vague speculation that judicial review might somehow implicate foreign-policy concerns is insufficient to justify a presumption that

27

immigration cases are not subject to judicial review.  See Washington v. Trump, 847 F.3d 1151,

1161 (9th Cir. 2017) ("[T]he Supreme Court has repeatedly and explicitly rejected the notion that

the political branches have unreviewable authority over immigration . . . ."), reconsid. en banc

denied, 853 F.3d 933 (9th Cir. 2017), superseded by 858 F.3d 1168 (9th Cir. 2017).  While the

court is sensitive to the deference warranted to the Executive Branch in this sphere, Defendants'

claims for deference cannot substitute for the "clear and convincing evidence" that Congress

intended to restrict judicial review of administrative action.  Sharkey v. Quarantillo, 541 F.3d 75,

84 (2d Cir. 2008) (internal quotation marks and citation omitted).

**B.  INA Jurisdictional Bar**

Nor does the INA divest the court of jurisdiction to hear this case.  That Act contains a

provision, 8 U.S.C. § 1252(g), that limits judicial review of certain actions "by or behalf of any

alien arising from" certain deportation proceedings.  8 U.S.C. § 1252(g); see AAADC, 525 U.S.

at 472.  As explained below, that provision has no bearing on these cases, which do not arise

from one of the three specifically enumerated actions by immigration authorities that trigger

application of the statute.  Moreover, by its terms, Section 1252(g) does not apply to claims

brought by MRNY or the State Plaintiffs.

    1.  Programmatic Challenges to DACA-Related Decisions

First, the court considers whether Section 1252(g) strips the court of jurisdiction to hear

Plaintiffs' challenges to the decision to rescind the DACA program.  The court begins, as usual,

with the text of the statute.  In relevant part, Section 1252(g) provides as follows:

> Except as provided in this section and notwithstanding any other
> provision of law (statutory or nonstatutory) . . . no court shall have
> jurisdiction to hear any cause or claim by or on behalf of any alien
> arising from the decision or action by the Attorney General to
> commence proceedings, adjudicate cases, or execute removal orders
> against any alien under this chapter.

28

**236**

(emphasis added). As the Court has stated, this "provision applies only to three discrete actions
that the Attorney General make take: her 'decision or action' to 'commence proceedings,
adjudicate cases, or execute removal orders.'" AAADC, 525 U.S. at 482. Accordingly, the court
must consider whether Plaintiffs' suits "arise from [a] decision or action by [DHS[11]] to
commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C.
§ 1252(g).

They do not. Defendants' termination of the DACA program does not, by itself,
"commence proceedings, adjudicate cases, or execute removal orders against any alien." Id. By
rescinding the DACA program, Defendants eliminated a set of guidelines identifying a discrete
class of undocumented immigrants who were eligible to apply for deferred action. (See 2012
DACA Memo.) That decision, by itself, did not trigger any specific enforcement proceedings.[12]
Nor do the individual Batalla Vidal Plaintiffs attack decisions by DHS to "commence
proceedings, adjudicate cases, or execute removal orders" against them or any other specific
individuals. Each of those Plaintiffs has received deferred action (see SAC ¶¶ 3-42), and the
record does not suggest that any are currently in removal proceedings and seek to challenge the
end of the DACA program as a means of obstructing those proceedings. Instead, Plaintiffs bring
broad, programmatic challenges to Defendants' decisions (1) to end the DACA program; (2) to
provide limited notice of that decision to DACA recipients; and (3) to change DHS's

---

[11] As part of transferring many immigration-related responsibilities from the Attorney General to the Secretary of
DHS, the Homeland Security Act of 2002 provides that statutory references "to any department, commission, or
agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary [of
DHS], other official, or component of [DHS] to which such function is so transferred." 6 U.S.C. § 557; Shabaj v.
Holder, 718 F.3d 48, 51 n.3 (2d Cir. 2013).

[12] Defendants have represented publicly that no action will be taken against DACA recipients prior to March 5,
2018. (See, e.g., Donald J. Trump (@realDonaldTrump), Twitter.com (Sept. 7, 2017, 6:42 a.m.),
https://twitter.com/realdonaldtrump/status/905788459301908480 ("For all of those (DACA) that are concerned
about your status during the 6 month period, you have nothing to worry about - No action!").)

information-use policy. None of those constitutes a "decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g); cf. Texas, 809 F.3d at 164 (creation of DAPA reviewable because "decision to grant lawful presence to millions of [undocumented immigrants] on a class-wide basis" was not enumerated in the text of Section 1252(g)). Accordingly, Section 1252(g) does not bar judicial review of challenges to those decisions.

This conclusion comports with both the plain meaning of the statute and with the Supreme Court's decision in AAADC. First, AAADC makes clear that Section 1252(g) only limits judicial review with respect to suits arising from certain enumerated decisions by immigration authorities. Writing for the Court, Justice Scalia specifically rejected the notion that Section 1252(g) was "a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review." 525 U.S. at 482. Instead, "[t]he provision applies only to [the] three discrete actions" referenced above. Id. While "[t]here are of course many other decisions or actions that may be part of the deportation process," the Court stated, "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." Id. Defendants' argument that Section 1252(g) encompasses challenges to the decision to end the DACA program because "[t]he denial of continued deferred action is a necessary step in commencing enforcement proceedings at some later date" (Defs. Mem. at 18), is thus at odds with AAADC.

Second, the reasoning of AAADC does not support extending Section 1252(g) to encompass challenges to the decision to rescind DACA. In AAADC, the Court reasoned that Section 1252(g) must have been intended to limit judicial review of denials of deferred action:

> Section 1252(g) seems clearly designed to give some measure of
> protection to "no deferred action" decisions and similar

30

> discretionary determinations, providing that if they are reviewable
> at all, they at least will not be made the bases of separate rounds of
> judicial intervention outside the streamlined process that Congress
> has designed [(i.e., for judicial review of final orders of removal)].

525 U.S. at 485.  These limits were "entirely understandable" in order to prevent "the

deconstruction, fragmentation, and hence prolongation of removal proceedings" that could result

if immigrants were allowed to attack in-process removal proceedings by claiming that they were

singled out by immigration authorities for adverse treatment.  Id. at 487; see id. at 487-92.

Because the Batalla Vidal Plaintiffs challenge the programmatic decision to rescind DACA,

rather than attempting to obstruct their specific removal proceedings by claiming that they were

improperly denied deferred action, these cases do not implicate the concern raised in AAADC.

Accordingly, Section 1252(g) does not preclude review of these actions.

### 2.  Claims by MRNY and the State Plaintiffs

Moreover, Section 1252(g) does not preclude judicial review of the claims brought by

MRNY or the State Plaintiffs in particular.  Again, the court begins with the text of the statute.

Section 1252(g) only bars suits "by or on behalf of any alien arising from the decision or action

. . to commence proceedings, adjudicate cases, or execute removal orders against any alien."

(emphasis added).  But neither MRNY nor the State Plaintiffs are suing "on behalf of any alien"

in removal proceedings or subject to an order of removal.  Instead, MRNY sues in its own right,

because it claims that the rescission of DACA has interfered with its operations.  (SAC ¶¶ 54-

57.)  Likewise, the State Plaintiffs sue not "on behalf of any alien," but instead to vindicate their

31

**239**

own proprietary and quasi-sovereign interests.[13] (State Pls. Opp'n to Mot. to Dismiss ("State Pls.

Opp'n") (No. 17-CV-5228, Dkt. 82) at 19-22.) MRNY and the State Plaintiffs seek to assert

their own rights and the rights of the general public, not those of individual immigrants in

removal proceedings or subject to orders of removal. There is no reason why Section 1252(g)

would deprive the court of jurisdiction over their claims, brought on their own behalf.

### C. Standing

The court next considers whether Plaintiffs have established that they have standing to

sue. Defendants only cursorily raise Article III standing defenses. (Defs. Mem. at 19-20, 34,

37.) "Because the standing issue goes to this [c]ourt's subject matter jurisdiction," however, "it

can be raised sua sponte." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-

Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005).

Under the U.S. Constitution, federal courts may hear only certain "cases" or

"controversies." U.S. Const. art. III, § 2. This "case-or-controversy requirement" means that a

plaintiff must have "standing," or a sufficient interest in a live dispute, to sue in federal court.

See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1546-47 (2016). At its "irreducible constitutional

minimum," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), standing consists of three

elements:

> To establish Article III standing, [Plaintiffs] must demonstrate: "(1)
> injury-in-fact, which is a concrete and particularized harm to a
> legally protected interest; (2) causation in the form of a fairly

---

[13] While a parens patriae suit is in some sense brought by a state "on behalf of" its citizens, "[t]he asserted quasi-sovereign interests will be deemed sufficiently implicated to support parens patriae standing only if 'the injury alleged affects the general population of a State in a substantial way.'" Puerto Rico ex rel. Quiros v. Bramkamp, 654 F.2d 212, 215 (2d Cir. 1981) (emphasis added) (quoting Maryland v. Louisiana, 451 U.S. 725, 738 (1981)). A state cannot sue parens patriae simply to assert its citizens' personal claims. See Pennsylvania v. New Jersey, 426 U.S. 660, 665-66 ( 976) (per curiam) (collecting cases). To the extent the State Plaintiffs attempt to bring parens patriae claims based on harm to their quasi-sovereign interests, those claims are not "on behalf of" specific immigrants, but instead seek to protect the general welfare of their residents. In any event, as the court discusses below, the State Plaintiffs lack parens patriae standing to bring these claims.

32

> traceable connection between the asserted injury-in-fact and the
> alleged actions of the defendant; and (3) redressability, or a non-
> speculative likelihood that the injury can be remedied by the
> requested relief."

Allco Fin. Ltd. v. Klee, 861 F.3d 82, 95 (2d Cir. 2017) (quoting W.R. Huff Asset Mgmt. Co.,

LLC v. Deloitte & Touche LLP, 549 U.S. 100, 106-07 (2d Cir. 2008)); accord Lujan, 504 U.S. at

560-61. The "first and foremost" of these three requirements, "injury-in-fact" requires a plaintiff

to "show that he or she suffered an invasion of a legally protected interest that is 'concrete and

particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v.

Robins, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks and citation omitted) (quoting

Lujan, 504 U.S. at 560). To be "imminent," the injury must be "certainly impending";

"allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568

U.S. 398, 409 (2013) (internal quotation marks, alteration, and citation omitted). The second and

third requirements, "causation" and "redressability," require a plaintiff to demonstrate that the

"injury-in-fact" he or she suffers is "fairly traceable to the challenged action of the defendant and

likely to be redressed by a favorable decision." Lexmark Int'l, Inc. v. Static Control

Components, Inc., 134 S. Ct. 1377, 1386 (2014) (citing Lujan, 504 U.S. at 560). A plaintiff need

not, however, demonstrate that the defendant was the proximate or "but-for" cause of the injury-

in-fact. Id. at 1391 n.6; Rothstein v. UBS AG, 708 F.3d 82, 91-92 (2d Cir. 2013).

The court considers standing separately with respect to each claim raised in each case.

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006). "[T]he presence of one party with

standing is sufficient to satisfy Article III's case-or-controversy requirement" with respect to

each claim and form of relief sought. Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547

U.S. 47, 53 n.3 (2006) ("FAIR"). The court therefore considers whether, for each claim raised in

each of these two actions, at least one plaintiff has standing to sue.

33

### 1. Batalla Vidal Plaintiffs

#### a. *DACA Rescission Claims*

Defendants unsurprisingly do not contest that the Batalla Vidal Plaintiffs have standing to

challenge the decision to rescind the DACA program. If the DACA program ends, the individual

Batalla Vidal Plaintiffs almost certainly will lose their work authorization, the availability of

which turns on their status as recipients of deferred action. See 8 C.F.R. § 274a.12(c)(14). Loss

of their ability to work in the United States is clearly an "injury-in-fact" fairly traceable to the

rescission of the DACA program. Additionally, if they were to lose their deferred action, the

individual Batalla Vidal Plaintiffs would be subject to removal from the United States. There is

nothing "speculative" about the possibility that they would actually be removed. See Hedges v.

Obama, 724 F.3d 170, 195-97 (2d Cir. 2013) (to establish standing, a plaintiff who is clearly in

violation of a "recent and not moribund" statute need not affirmatively demonstrate the

government's intent to enforce the statute, absent "a disavowal by the government or another

reason to conclude that no such intent exist[s]" (quoting Doe v. Bolton, 410 U.S. 179, 188

(1973))); cf. Amnesty Int'l, 568 U.S. at 410-16 (no standing where alleged injury-in-fact rested

on a "speculative" "chain of contingencies"). Those harms are "fairly traceable" to the

termination of the DACA program and would be redressed by the vacatur of that decision. The

Batalla Vidal Plaintiffs thus have Article III standing to challenge the decision to rescind the

DACA program.

The Batalla Vidal Plaintiffs also have standing to challenge the process by which

Defendants decided to end the DACA program. Plaintiffs have standing to assert procedural

rights "so long as the procedures in question are designed to protect some threatened concrete

interest . . . that is the ultimate basis of [their] standing." Lujan, 504 U.S. at 573 n.8. "When a

litigant is vested with a procedural right, that litigant has standing if there is some possibility that

34

the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. EPA, 549 U.S. 497, 518 (2007). Here, there is "some possibility" that if Defendants had subjected the decision to rescind the DACA program to notice and comment and analyzed the impact of that decision on small entities, they would have reached a different outcome. Accordingly, the Batalla Vidal Plaintiffs also have Article III standing to assert their procedural APA claim, and MRNY has Article III standing to assert its RFA claim.

Defendants contend that Plaintiffs cannot assert procedural APA claims because, if the decision to rescind the DACA program was a "substantive" or "legislative" rule requiring notice-and-comment rulemaking, then, "a fortiori so was enacting the policy in the first place," and the DACA program itself was thus "void ab initio—leaving Plaintiffs without a remedy." (Defs. Mem. at 28-29.) It does not follow, however, that if the rescission of the DACA program required notice and comment, the program's creation necessarily required notice and comment as well. (See Defs. Mem. at 29 n.7.) While Defendants might be correct on the merits (an issue that the court does not consider or resolve at this time), all that Article III requires is that Plaintiffs show that their alleged injury would be redressed by the ruling they seek—i.e., that the decision to rescind DACA should be vacated because it was procedurally defective.

b. *Information-Use Policy Claim*

The Batalla Vidal Plaintiffs also have standing to challenge the alleged changes to DHS's information-use policy. To obtain deferred action and work authorization under DACA, an applicant was required to provide USCIS with extensive personal information, including his or her home address, height, weight, hair and eye color, fingerprints, photograph, and signature, and submit to a background check. (See USCIS, Form I-821D: Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60-1)) at ECF pp.6-8; USCIS, Instructions for

35

**243**

Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60-1)) at ECF p.3.)

The Batalla Vidal Plaintiffs also allege that DACA applicants "routinely provided" other

personal information, "including copies of school records, pay stubs, bank statements, passports,

birth certificates, and similar records," in support of their applications. (SAC ¶ 70.) They

contend that this information will enable DHS to deport them more easily once their deferred

action expires. (Id. ¶ 127.) The court agrees. It is not difficult to infer that this information

would facilitate DHS's ability to remove these individuals from the country. This increased

likelihood of removal is sufficiently concrete, imminent, and traceable to Defendants' alleged

conduct to establish standing.

Defendants argue that Plaintiffs lack standing to pursue their information-use policy

claims because "[n]o Plaintiff plausibly alleges that the agency has in fact used his DACA

information for any enforcement purpose, much less initiated enforcement proceedings against

him as a result, or that there is any imminent threat of this occurring." (Defs. Mem. at 37.) The

individual Batalla Vidal Plaintiffs need not wait, however, until they are deported to have

standing to press this claim. Once their deferred action expires, they will be subject to removal

from the United States, and the court will presume that Defendants will enforce the immigration

laws against them. See Hedges, 724 F.3d at 197. Nor will the court ignore the obvious reality

that many DACA recipients will be removed from the country when their deferred action

expires. (See, e.g., State Pls. Am. Compl. ¶ 71 (quoting a statement by Acting Director of ICE

Thomas Homan that undocumented immigrants "should be uncomfortable" and "should look

over [their] shoulder[s]" and "be worried").) The threat of removal based on information

provided to DHS is sufficiently imminent as to constitute injury-in-fact.

36

**244**

*c. Notice Claim*

The <u>Batalla Vidal</u> Plaintiffs lack standing, however, to assert their notice claim.  In their

Second Amended Complaint, the <u>Batalla Vidal</u> Plaintiffs allege that, following the enactment of

the DACA Rescission Memo, Defendants failed to send DACA recipients whose status expired

by March 5, 2018, individualized notices "advising them that they must apply to renew DACA

by October 5, 2017 or be forever ineligible to renew their status." (SAC ¶ 165; <u>see id.</u> at 3,

¶¶ 48, 103-05, 160-66.) As Defendants correctly note, however, the <u>Batalla Vidal</u> Plaintiffs have

not alleged that any of them missed the October 5, 2017, deadline or suffered other adverse

effects from not receiving such individualized notice. (Defs. Mem. at 34-35.) Nor, even

drawing all reasonable inferences in Plaintiffs' favor, does the Second Amended Complaint

show that MRNY was injured by Defendants' failure to provide DACA recipients with

individualized notice of the renewal deadline.[14]  While the Second Amended Complaint alleges

that "MRNY has not been able to reach four DACA recipients to inform them that they need to

renew now" (SAC ¶ 48), that does not support the reasonable inferences either that those

individuals failed to apply for renewal or that such failure was "fairly traceable" to Defendants'

actions.[15]  In the absence of a showing that anyone has been harmed by a failure to receive notice

---

[14]  The court also notes that the renewal deadline provided by the DACA Rescission Memo was not significantly different than that provided by existing DHS policy.  The State Plaintiffs allege that "[p]rior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120-150 days prior to expiration . . . in order to avoid a lapse in deferred action and employment authorization." (State Pls. Am. Compl. ¶ 93.)  Under the DACA Rescission Memo, a DACA recipient whose deferred action and work authorization was set to expire on March 4, 2018, was required to file an application for renewal by October 5, 2018—<u>i.e.</u>, 150 days before those benefits were set to expire.

[15]  Even if those conditions were met, it is not clear that MRNY would have organizational standing to bring this claim.  <u>See</u> <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 498 (2009) ("[O]ur prior cases . . . have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm.")

37

**245**

of the change to the application deadline, the <u>Batalla Vidal</u> Plaintiffs have not demonstrated that they have Article III standing to bring this claim.

### 2. State Plaintiffs

The court next considers whether the State Plaintiffs have Article III standing. As the Court has noted, the ordinary rules of standing are somewhat different when a state is a plaintiff. States are "not normal litigants for the purposes of invoking federal jurisdiction," and they are entitled to "special solicitude" when they seek to vindicate their "proprietary" or "quasi-sovereign" interests.[16] <u>Massachusetts v. EPA</u>, 549 U.S. at 518. This does not mean, however, that states have unbridled license to sue.

### a. *The State Plaintiffs Have Standing to Challenge the DACA Rescission*

The State Plaintiffs have Article III standing to challenge Defendants' decision to rescind the DACA program, as well as the procedures by which that decision was made and implemented, based on that decision's impacts to the State Plaintiffs' proprietary interests. States, "like other associations and private parties," may have a "variety of proprietary interests" that they may vindicate in court. <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez</u>, 458 U.S. 592, 601-02 (1982) ("Snapp"). A state has proprietary interests, for example, in its ownership of land, <u>id.</u> at 601, and in its relationships with its employees, <u>see Indiana v. IRS</u>, 38 F. Supp. 3d 1003, 1009 (S.D. Ind. 2014) ("The Defendants recognize, as they must, that a State

---

[16] The Court has categorized a state's litigation interests using the trichotomy of "sovereign," "quasi-sovereign," and "proprietary" interests. <u>See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez</u>, 458 U.S. 592, 601 (1982) ("<u>Snapp</u>"). Proprietary interests are those that a state may have akin to a private party, such as ownership of land or participation in a business venture. <u>Id.</u> at 601. Sovereign interests are interests the state has in its capacity as a state, such as "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" and "the demand for recognition from other sovereigns." <u>Id.</u> "Quasi-sovereign" interests are harder to define but "consist of a set of interests that the State has in the well-being of its populace." <u>Id.</u> at 602; <u>see also id.</u> at 607 ("[T]he articulation of [quasi-sovereign] interests is a matter for case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract . . . .").

38

and its political subdivisions may sue in their capacity as employers."). A state also has proprietary interests in its "participat[ion] in a business venture," Snapp, 458 U.S. at 601, and in the operation of state-run institutions, such as state colleges and universities, Washington, 847 F.3d at 1159-61; Aziz v. Trump, 231 F. Supp. 3d 23, 32-33 (E.D. Va. 2017).

Here, the State Plaintiffs have amply alleged and documented that the rescission of DACA would harm the states' proprietary interests as employers and in the operation of state-run colleges and universities. (State Pls. Am. Compl. ¶ 190 (states employ "[m]any DACA recipients").). For example, the State of Washington represents that it employs DACA recipients within state government (e.g., Decl. of Paul Quinonez ¶¶ 1-6 (State Pls. Am. Compl., Ex. 56 (Dkt. 55-56)); Decl. of E. Alexandra Monroe ¶ 3-4 (State Pls. Am. Compl., Ex. 62 (Dkt. 55-62))) and at state-run colleges and universities (e.g., Decl. of Lucila Loera ¶ 4 (State Pls. Am. Compl., Ex. 58 (Dkt. 55-58))). If DACA were rescinded, these employees would lose their work authorization, and the State of Washington would incur expenses in identifying, hiring, and training their replacements. (State Pls. Am. Compl. ¶ 190.) Accordingly, the State of Washington has standing to assert equal protection and substantive APA claims challenging the decision to end the DACA program. Moreover, Washington has standing to challenge the procedures by which Defendants decided to end the DACA program, because "there is some possibility" that, if DHS complied with notice-and-comment and RFA rulemaking procedures, it might "reconsider the decision." See Massachusetts v. EPA, 549 U.S. at 518. Because Washington has established its standing to assert substantive and procedural APA and RFA claims, the State Plaintiffs therefore have Article III standing to bring these claims. See FAIR, 547 U.S. at 53 n.3.

39

**247**

Defendants' arguments that State Plaintiffs lack Article III standing because they would be only "incidentally" harmed by the rescission of the DACA program are without merit. (See Defs. Mem. at 19.) Defendants protest that "[i]t would be extraordinary to find Article III standing" based on a state's assertions of "alleged harms to their residents, employees, tax bases, health expenditures, and educational experiences at their universities," as "virtually any administration of federal law by a federal agency could have such effects." (Id.) That a federal policy may have sweeping, adverse effects on states and state-run institutions is not, however, a convincing argument that states should not have standing to challenge that policy. Moreover, Defendants' position is irreconcilable with their own stated rationale for rescinding the DACA program. Defendants have stated that they rescinded the DACA program because it suffered from the same legal flaws as the DAPA program and could not be defended in court against the threatened challenge by Texas and other state plaintiffs. That necessarily assumes that at least one of the plaintiff states in the Texas litigation has standing to challenge the existence of the DACA program. Cf. Texas, 809 F.3d at 150-62 (finding standing based on the likely costs of having to issue drivers licenses to DAPA beneficiaries). Defendants offer no convincing reason why states should have standing to challenge the DACA program but not to challenge the decision to end that program.[17]

---

[17] Defendants' arguments to the contrary are unpersuasive. (Defs. Mem. at 21.) First, Defendants argue that neither the Acting Secretary nor the Attorney General "expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings." (Id.) Jurisdiction is, however, a prerequisite to a ruling on the merits, so the plaintiff states could prevail in their threatened challenge to the DACA program only if they had standing. Second, Defendants argue that "it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place," and that the Executive Branch has "an independent duty to consider the legality of . . . policies regardless of whether they are judicially reviewable." (Id.) The DACA Rescission Memo does not indicate, however, that Defendants actually considered these issues when deciding to rescind the DACA program. Finally, Defendants argue that the adoption of the DACA program could have been reviewed as an abdication of DHS's statutory responsibilities—a grounds for justiciability that would not apply to the decision to rescind the program. (Id. at 21-22.) The Fifth Circuit expressly did not rely on that theory of standing, 809 F.3d at 150, nor is there any indication that the Attorney General or Acting Secretary considered it in rescinding the DACA program.

40

b. *The State Plaintiffs Lack Standing to Bring Notice and Information-Use Policy Claims*

Whether the State Plaintiffs can assert their notice or information-use policy claims, however, is a close question. In order to assert these claims, the State Plaintiffs must identify some cognizable proprietary or quasi-sovereign interest that was harmed by Defendants' challenged conduct—i.e., (1) with respect to the notice claim, Defendants' communication of its decision to rescind the DACA program and impose an October 5, 2017, renewal deadline; and (2) with respect to the information-use policy claims, the alleged change in DHS policy regarding the use of DACA applicants' information. In the court's view, the State Plaintiffs have not identified any interests harmed by these actions that they can sue the federal government to redress, and so they lack standing to bring these claims.

i.   *Proprietary Interests*

While the State Plaintiffs allege that their proprietary interests will be harmed by the termination of DACA (State Pls. Am. Compl. ¶¶ 15, 100), they do not identify any proprietary interests that have been or will be harmed by Defendants' alleged failure to provide DACA recipients with "adequate notice" of the "procedures and timeline for renewing their DACA status," "about the general termination of the DACA program after March 5, 2018," or "of [DACA recipients'] inability to apply for renewal of their DACA status after March 5, 2018" (id. ¶¶ 276-78; cf. State Pls. Mem. at 19-21). It is certainly conceivable that many DACA recipients who were eligible to renew their deferred action and work authorization under the DACA Rescission Memo failed to do so before the October 5, 2017 deadline. (State Pls. Am. Compl. ¶ 96 (noting that "up to one third of DACA grantees who are eligible for renewal had not applied as of two days before the . . . deadline").) The State Plaintiffs' Amended Complaint does not provide a sufficient basis for the court to conclude, however, that (1) such failures to renew were "fairly traceable" to Defendants' decision not to provide each DACA recipient with

41

**249**

individualized notice of the change in application procedures and timelines; or (2) that these

failures to renew harmed any State Plaintiff's proprietary interests (for example, by depriving a

state employee of work authorization). See Amnesty Int'l, 568 U.S. at 410-16. Accordingly, the

State Plaintiffs fail to assert a proprietary interest that would give them standing to bring their

notice claim.[18]

Nor do the State Plaintiffs identify a cognizable proprietary interest harmed by the

alleged change to DHS's information-use policy. The State Plaintiffs' information-use policy

claims challenge not the decision to rescind DACA itself, but the alleged changes in DHS's

information-use policy, which, Plaintiffs allege, will facilitate the deportation of DACA

applicants. As discussed above, the court accepts that these changes (if true) will likely result in

more undocumented immigrants' removal from the United States. (See State Pls. Am. Compl.

¶ 86.) The State Plaintiffs have not, however, identified any cognizable harm to their proprietary

interests that would result from the removal of their undocumented residents. The State

Plaintiffs have proffered evidence that the removal of DACA beneficiaries would grievously

affect state economies. (See Decl. of Dr. Ike Brannon ¶¶ 12, 14 (State Pls. Am. Compl., Ex. 4

(Dkt. 55-4)) (estimating that the removal of DACA recipients from the United States "would cost

. . . the economy as a whole $215 billion in lost GDP," with impacts falling hardest on states

with the largest number of DACA recipients).) Despite the scale of these impacts, the State

Plaintiffs' own authority makes clear that states lack standing to bring a "claim . . . that actions

taken by United States Government agencies had injured a State's economy and thereby caused a

---

[18] In this circuit, the State Plaintiffs need not demonstrate, however, that the individuals they seek to protect must
themselves meet the injury-in-fact, causation, and redressability requirements of Article III. See Connecticut v. Am.
Elec. Power Co., 582 F.3d 309, 338-39 (2d Cir. 2009), aff'd in relevant part by an equally divided court, 564 U.S.
410, 420 (2011).

42

decline in general tax revenues." Wyoming v. Oklahoma, 502 U.S. 437, 448 (1992). Absent

some showing of injury to their own proprietary interests (for example, "direct injury in the form

of a loss of specific tax revenues," id.), the State Plaintiffs cannot maintain their information-use

policy claims based on alleged harms to their proprietary interests.

ii.      *Quasi-Sovereign Interests*

Accordingly, the court will consider whether the State Plaintiffs can assert these claims

parens patriae to vindicate their quasi-sovereign interests. States may bring parens patriae

(literally, "parent of the country") suits to vindicate what the Court has characterized as "quasi-

sovereign" interests. See Snapp, 458 U.S. at 600-02. There are no bright-line rules for which

interests qualify as "quasi-sovereign." See id. at 600, 607; 13B Charles A. Wright et al., Federal

Practice and Procedure § 3531.11.1, at 117 (3d ed. 2008) ("Wright & Miller"). In general,

however, the Court has recognized that a state has quasi-sovereign interests in the "health and

well-being—both physical and economic—of its residents in general," in protecting state

"residents from the harmful effects of discrimination," and in challenging the discriminatory

denial of a state's "rightful status within the federal system." Id. at 607, 609. There are,

however, at least two notable limitations on states' parens patriae standing.

First, to be "quasi-sovereign," the state's interests must be sufficiently generalized that

the state is seeking to vindicate its citizens' welfare, rather than simply pressing suit on behalf of

its individual residents. See id. at 607 ("[M]ore must be alleged than injury to an identifiable

group of individual residents . . . ."). A state cannot sue parens patriae when it is "merely

litigating as a volunteer the personal claims of its citizens." Pennsylvania v. New Jersey, 426

U.S. 660, 665 (1976).

Second, special considerations are present when a state brings a parens patriae suit

against the federal government. See 13B Wright & Miller § 3531.11.1, at 96. In Massachusetts

43

**251**

v. Mellon, 262 U.S. 447 (1923), the Court rejected Massachusetts's attempt to bring a parens

patriae suit challenging a federal statute as unconstitutional. See id. at 485-86. "While the state,

under some circumstances, may sue in [a parens patriae] capacity for the protection of its

citizens, it is no part of its duty or power to enforce their rights in respect of their relations with

the federal government. In that field it is the United States, and not the state, which represents

them as parens patriae . . . ." Id. (emphasis added); see also Snapp, 458 U.S. at 609 n.16 ("A

State does not have standing as parens patriae to bring an action against the Federal

Government."). The Court has rejected the argument, however, that Massachusetts v. Mellon

bars all state parens patriae claims against the federal government. See Ariz. State Legislature v.

Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2664 n.10 (2015) (observing that "[t]he

cases on the standing of states to sue the federal government seem to depend on the kind of claim

that the state advances" (quoting Richard Fallon et al., Hart and Wechsler's The Federal Courts

and the Federal System 263-66 (6th ed. 2009))). Compare Massachusetts v. EPA, 549 U.S. at

520 n.17, with id. at 538-39 (Roberts, C.J., dissenting). Instead, states may sue the federal

government parens patriae to enforce rights guaranteed by a federal statute. See Massachusetts

v. EPA, 549 U.S. at 520 n.17; see also New York v. Sebelius, No. 1:07-CV-1003 (GLS) (DRH),

2009 WL 1834599, at *12 (N.D.N.Y. June 22, 2009) (collecting cases). Massachusetts v. EPA

expressly did not disturb the settled rule, however, that a state may not sue parens patriae to

"protect her citizens from the operation of federal statutes." Massachusetts v. EPA, 549 U.S. at

520 n.17 (quoting Georgia v. Penn. R. Co., 324 U.S. 439, 447 (1945)).

     The court concludes that the State Plaintiffs lack standing to bring either their notice and

information-use policy claims. With respect to their notice claim, the State Plaintiffs have not

argued or demonstrated that Defendants' alleged failure to provide DACA applicants with

44

**252**

adequate notice of changes in the DACA program and renewal deadline has actually harmed "the health and well-being" of state residents or any other cognizable quasi-sovereign interest. See Snapp, 458 U.S. at 607. (Cf. State Pls. Am. Compl. ¶¶ 15, 100; State Pls. Opp'n at 21-22.) Even if they had done so, they would be challenging federal enforcement of federal immigration laws as unconstitutional, which Massachusetts v. Mellon prohibits. See Massachusetts v. EPA, 549 U.S. at 520 n.17 ("[T]here is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what Mellon prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)."). For the same reason, the State Plaintiffs also lack standing to assert their information-use policy claims. Even assuming, as discussed above, that the change in information-use policy will facilitate the removal of undocumented immigrants from these states, and that this removal will harm the "health and well-being—both physical and economic" of state residents, see Snapp, 458 U.S. at 607, the thrust of the State Plaintiffs' information-use policy claims is to challenge as fundamentally unfair a change in federal policy that will facilitate the federal government's enforcement of the immigration laws.

The State Plaintiffs' argument that they merely seek to "enforce—as opposed to overturn or avoid—application of a federal statute" is unpersuasive. (State Pls. Opp'n at 21 n.11) Plaintiffs plainly seek to invalidate federal action as unconstitutional. Such claims more closely resemble constitutional challenges to application of federal statutes, which Massachusetts v. Mellon prohibits states from asserting parens patriae, than suits to enforce compliance with federal statutory law, which Massachusetts v. EPA permits states to bring parens patriae. When challenging federal action on constitutional grounds, "it is no part of [the state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government."

45

Massachusetts v. Mellon, 262 U.S. at 485-86.  But see Aziz, 231 F. Supp. 3d at 31-32
(concluding that "a state is not be barred by the Mellon doctrine from a parens patriae challenge
to executive action when the state has grounds to argue that the executive action is contrary to
federal statutory or constitutional law" (emphasis added)).

The court concludes, therefore, that the State Plaintiffs lack standing to assert their notice
and information-use policy claims.

### D. Whether State Plaintiffs Have Cause of Action under the APA

Lastly, Defendants assert that neither MRNY's nor the State Plaintiffs' claims are
justiciable because those Plaintiffs do not assert interests that are "arguably within the zone of
interests . . . protected or regulated by the statute . . . in question." (Defs. Mem. at 21 (quoting
Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 395 (1987) (first alteration added)).)  To bring suit
under the APA, a plaintiff "must satisfy not only Article III's standing requirements, but an
additional test: [t]he interest he asserts must be 'arguably within the zone of interests to be
protected or regulated by the statute' that he says was violated."  Match-E-Be-Nash-She-Wish
Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 224 (2012) ("Match-E-Be-Nash")
(quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).  This
test "is not meant to be especially demanding'" and "forecloses suit only when a plaintiff's
'interests are so marginally related to or inconsistent with the purposes implicit in the statute that
it cannot reasonably be assumed that Congress intended to permit the suit.'"  Id. (quoting Secs.
Indus. Ass'n, 479 U.S. at 399).

Critically, for the court's current purposes, whether MRNY and the State Plaintiffs assert
interests falling within the "zone of interests" protected by the APA is not a question of
"jurisdiction" or "justiciability."  As the Supreme Court has explained, the question of whether a
plaintiff falls within the zone of interests protected by a statute is not properly classed as an issue

of "prudential standing," but is instead an issue of "whether a legislatively conferred cause of
action encompasses a particular plaintiff's claim." Lexmark Int'l, 134 S. Ct. at 1387. That issue
"goes not to the court's jurisdiction—that is, 'power'—to adjudicate a case, but instead to
whether the plaintiff has adequately pled a claim." Chabad Lubavitch of Litchfield Cnty., Inc. v.
Litchfield Historic Dist. Comm'n, 768 F.3d 183, 201 (2d Cir. 2014) (citing Lexmark Int'l, 134
S. Ct. at 1387 n.4, 1389 n.5); see also Casper Sleep, Inc. v. Mitcham, 204 F. Supp. 3d 632, 637-
38 (S.D.N.Y. 2016) (arguments for dismissal for lack of "prudential standing" were
appropriately addressed under Rule 12(b)(6), not Rule 12(b)(1), of the Federal Rules of Civil
Procedure). Because this argument does not raise an issue of "jurisdiction or justiciability," the
court does not address it here.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for lack of subject-matter
jurisdiction (Dkt. 95) is GRANTED IN PART and DENIED IN PART. The following claims
are dismissed:

- Batalla Vidal v. Duke, No. 16-CV-4756:

  o Fourth claim for relief (Due Process Clause—Notice)

- New York v. Trump, No. 17-CV-5228:

  o Second claim for relief (Due Process Clause—Information-Use Policy)

  o Third claim for relief (Equitable Estoppel—Information-Use Policy)

  o Seventh claim for relief (Due Process Clause—Notice)

47

**255**

Defendants' motion to dismiss for lack of subject-matter jurisdiction is denied with respect to all other claims. The court RESERVES RULING on Defendants' motion to dismiss for failure to state a claim.

     SO ORDERED.

                                                        s/Nicholas G. Garaufis

Dated: Brooklyn, New York                    NICHOLAS G. GARAUFIS
       November 9, 2017                  United States District Judge

48



**U.S. Department of Justice**

Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

October 16, 2017

**By ECF**
The Honorable James Orenstein
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *Batalla Vidal, et al., v. Baran, et al.*, 16-CV-4756 (NGG) (JO)
        *State of New York, et al., v. Donald Trump, et al.*, 17-CV-5228 (NGG) (JO)

Dear Magistrate Judge Orenstein:

Pursuant to the Court's October 11, 2017 order, *Vidal* ECF No. 82, and in response to Plaintiffs' October 13, 2017 letter motion to complete the administrative record ("Pls.' Ltr. Mot."), *Vidal* ECF No. 84, Defendants respectfully submit the following letter in opposition. Defendants applied the correct legal standard in certifying and compiling the administrative record in this case, which includes all documents actually considered by the Acting Secretary of Homeland Security, Elaine C. Duke, as part of her decision to institute an orderly wind-down of the Department of Homeland Security's ("DHS") DACA policy. Plaintiffs' proposed standard does not meaningfully differ from the standard applied by Defendants, and to the extent that it does, is drawn from out-of-circuit case law in significantly different administrative contexts. Finally, as for the specific documents that Plaintiffs argue are missing from the administrative record, any such omissions, perhaps, would at most provide a basis for Plaintiffs to argue, on the merits, that the agency's decision was inadequate and should therefore be set aside (assuming that decision is reviewable), but they provide no basis to challenge the agency's compilation of the record, which is legally presumed to be adequate. Accordingly, Defendants respectfully request that the Court deny Plaintiffs' motion.

**I.      Defendants Compiled The Administrative Record Using An Appropriate Legal Standard.**

Defendants certified and produced an administrative record consisting of all documents actually considered by the Acting Secretary as part of her decision to wind-down the DACA policy—a construction of the record that fully complies with the applicable standard for the sort of informal agency action challenged here. *See, e.g.*, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (judicial review of agency action must "be based on the full administrative record that was before the Secretary at the time he made his decision"), *abrogated in part on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The record includes DHS documents, Department of Justice ("DOJ") documents, and congressional correspondence with the White House; it includes formal memoranda and informal letter correspondence; it includes published legal analysis of the DACA and DAPA policies; and it includes some documents suggesting that DACA be rescinded, and other documents suggesting that the policy should continue. No more is required, and this Court should reject Plaintiffs' attempt to force the inclusion of documents that were never considered by the actual agency

decision maker or that are internal to other components of the Executive Branch that did not actually take the action Plaintiffs challenge here.

**a.**  Plaintiffs say, correctly, that judicial review of an administrative decision must "be based on the *full* administrative record that was before the Secretary at the time he made his decision," *Overton Park*, 401 U.S. at 420 (emphasis by Plaintiffs) (quoted in Pls.' Ltr. Mot. at 2).  But the *Overton Park* standard is functionally identical to the standard applied by Defendants in this case.  Defendants have produced the "full administrative record that was before the Secretary at the time [s]he made h[er] decision." *Id.*; *see also* Pls.' Ltr. Mot. at 2 ("Courts subsequently have defined the 'administrative record already in existence' for informal agency action as 'what [the decision maker] had before him when he acted.'") (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984)).

Ultimately, after citing a series of cases that are generally consistent with Defendants' understanding of the scope of an administrative record, Plaintiffs present their position as follows: "[C]ourts have required that agencies provide all documents that were *directly or indirectly* considered by the final decision makers in making their decision."  Pls.' Ltr. Mot. at 2.

At least as a matter of linguistics, this standard is substantively indistinguishable from the standard applied by Defendants.  If Plaintiffs replaced the words "directly or indirectly" with the word "actually," that sentence might have been an exact quote from undersigned counsel or Defendants' filings in this case.  But those word-choice subtleties should ultimately make no difference here.  Defendants used the modifier "actually" for purposes of transparency and fair notice, to make clear to Plaintiffs and the Court that the administrative record produced by Defendants was limited to documents considered by the "final decision maker" herself, Acting Secretary Duke—rather than including all documents related to the rescission of DACA from, say, rank-and-file personnel within DHS that were not considered by the Acting Secretary.  *See infra*, Section I(b) (explaining why that decision was legally justified).[1]

In Defendants' view, if a document was "directly or indirectly considered" by the Acting Secretary, then it was "actually considered" (or just "considered") by her too.  Put another way, if the United States Supreme Court issued an opinion that stated, with no further explanation, that an administrative record must include "all documents that were directly or indirectly considered by the final decision makers in making their decision," Pls.' Ltr. Mot. at 2 (emphasis added), Defendants would produce the same administrative record that they already produced on October 6.  For that reason alone Plaintiffs' motion can be denied.[2]

---

[1] As confirmation that Defendants do not intend to shy away from the "directly or indirectly considered" language, but instead use the phrase "actually considered" because it is more precise and clear, Defendants refer the Court (and Plaintiffs) to language in a recent filing by Defendants in another DACA-rescission case in the Northern District of California, in which Defendants also defended the "actually considered" language.  *See* Defs.' Opp'n to Pls.' Mot. to Compel at 12 n.3, *Regents of Univ. of Cal. v. DHS*, No. 17-5211-WHA (N.D. Cal. Oct. 12, 2017), ECF No. 71 (referencing "the uncontroversial principle that an administrative record generally includes material considered directly and indirectly by the decisionmaker") (citation omitted).

[2] Plaintiffs' letter says that, on a recent meet-and-confer call, "Defendants confirmed that the October 6 administrative record was limited to what Acting Secretary Duke had *directly considered* when deciding to terminate the DACA policy." Pls.' Ltr. Mot. at 1 (emphasis added).  In fact, undersigned counsel said no such thing.  Instead, undersigned counsel used the same language ("actually considered") used in this filing, previous filings, the administrative record certification filed on both coasts, and at the most recent status conference in this matter.  *See*

    **b.** Notwithstanding the fact that the standard offered by Plaintiffs appears, at least to Defendants, to be effectively indistinguishable from the standard applied by Defendants, Plaintiffs' filing does suggest that there is disagreement between the parties on one particular issue: whether the administrative record must include documents that were never considered by the Acting Secretary herself, but instead were considered *only* by her subordinates or other rank-and-file staffers at DHS. *See* Pls.' Ltr. Mot. at 2.

    The Court should begin with the Supreme Court's decision in *Overton Park*, which holds that judicial review must "be based on the full administrative record that was before *the Secretary* at the time *he* made his decision"—making no mention of a broader record based on all documents that were before the entire agency, or before the Secretary's subordinates. 401 U.S. at 420 (emphasis added); *see also, e.g., Data Processing*, 745 F.2d at 684 (the record includes "what [the decision maker] had before *him* when *he* acted") (emphases added). Plaintiffs' position finds no support in these decisions.

    For a relatively recent holding from within the Second Circuit that directly addresses this precise issue with additional specificity, Defendants respectfully refer the Court to Judge Engelmayer's cogent and well-reasoned opinion in *Comprehensive Community Development Corporation v. Sebelius*, which ultimately concludes that "the administrative record does not consist[] of materials before any employee in the agency, but rather, the agency decision-makers." 890 F. Supp. 2d 305, 314 (S.D.N.Y. 2012); *see also, e.g., Pac. Shores Subdivision, Calif. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6-7 (D.D.C. 2006) ("[I]t is not enough for Pacific Shores to state that the documents were before the entire Corps, but rather it must instead prove that the documents were before the Corps' decisionmaker(s)." (citing *Overton Park*, 401 U.S. at 420)). *Comprehensive Community Development Corporation* also quoted the "directly or indirectly considered" language on which Plaintiffs place such heavy weight—but Judge Engelmayer nonetheless rejected efforts to require documents considered only by the actual decision maker's subordinates to be included in the record:

> To rebut the presumption of administrative regularity, such a party must show that the materials sought to be added were before the agency decision-maker. It is not enough to show that these materials were somewhere within the agency, because interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency would render judicial review meaningless.

*Comprehensive Cmty. Dev. Corp.*, 890 F. Supp. 2d at 309 (internal citations and alterations omitted). This is strong support for Defendants' position: that Plaintiffs' "directly or indirectly considered" language can and should be interpreted consistently with Defendants' "actually considered" formulation—

---

Oct. 11, 2017 Tr. at 17:22-24 ("Mr. Pezzi: I believe the applicable standard are the documents that were actually considered by the relevant agency decision maker."). Counsel for Defendants promptly raised the inaccuracy and respectfully requested that Plaintiffs correct it. Counsel for Plaintiffs did not dispute undersigned counsel's recollection of the call, but nevertheless refused to correct the inaccuracy. Ultimately, Defendants do not believe this statement should have an effect on the Court's analysis of the issues at stake here, so, for that reason, and to avoid creating a mini-trial on a collateral issue, counsel has not submitted a declaration swearing to his recollection under penalty of perjury. Undersigned counsel is willing to do so, however, should the Court be inclined to place any significance on this inaccurate presentation of the parties' meet-and-confer call. *See generally* Ex. 1, Email Chain re: "EDNY DACA Rescission Litigation - Meet-and-Confer Obligations and Administrative Record."

especially where, as here, the agency action at issue is an informal, policy-based decision of the type that an agency head may properly make without needing to rely on an extensive factual or evidentiary record compiled by her subordinates or the agency at large.

In this case, the only agency decision maker was Acting Secretary Duke, which is why Defendants limited the administrative record to documents that *she* actually considered—rather than documents considered only by her subordinates or rank-and-file DHS staffers. Holding to the contrary would have the effect of imposing discovery-like burdens on administrative agencies, as a matter of course, even when defending routine and informal agency actions—notwithstanding the well-settled presumption against discovery in Administrative Procedure Act ("APA") litigation.

As for the out-of-circuit authority that does appear to attribute some significance to the requirement to include documents "indirectly" considered by the relevant agency decision maker (rather than just quoting that phrase in passing with no further explanation), those cases typically arise in the context of some *formal* agency action, or full-on notice-and-comment rulemaking, in which "the work and recommendations of subordinates" are far more likely to play an important role in the decision making process. *See, e.g., Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior,* 143 F. Supp. 2d 7, 12 (D.D.C. 2001). In other words, Plaintiffs rely on language sometimes invoked in the context of formal rulemakings, formal adjudications, or other agency actions quite unlike the informal, policy-based decision at issue here; in such cases a range of internal, predecisional materials necessarily exists, often as well as extensive factual, scientific, or evidentiary material—or even thousands of comments from the general public. Administrative records in those sorts of cases, to be sure, are often much larger than the record produced in this case.

But that should come as no surprise—none of those cases speak to the sort of informal, policy-based decision at issue here, which centered on a judgment about litigation risk and the uncertain legal footing of a purely discretionary agency policy (rather than a complicated weighing of evidentiary, factual, or scientific material). Plaintiffs cite no cases in which a court ordered "completion" of an administrative record to include materials "indirectly considered" in a challenge to an informal policy decision of the type at issue here—even assuming that that standard has any independent significance or differs in any way from the standard Defendants have already applied. And, as the Second Circuit has explained, "[w]hat will constitute an adequate record for meaningful review may vary with the nature of the administrative action to be reviewed," and "when the judgment is one of policy . . . findings of fact such as would be required in an adjudicatory proceeding or in a formal 'on the record' hearing for rulemaking need not be made." *United States v. Nova Scotia Food Products Corp.,* 568 F. 2d 240, 249 (2d Cir. 1977) (internal quotation omitted).

**c.** Plaintiffs rely on a February 2000 article, written by an attorney who formerly worked for DOJ's Environment and Natural Resources Division ("ENRD"), which adopts a broader view of what should be included in an administrative record. *See* Pls.' Ltr. Mot. at 3 (citing Joan Goldfrank, *Guidance to Client Agencies on Compiling the Administrative Record* (Feb. 2000).[3] But that article never represented any binding statement of the position of the United States with respect to the compilation of an administrative record, and subsequent authoritative DOJ guidance has made explicit that any such guidance has been superseded. *See* Mem. of Ronald J. Tenpas, Assistant Attorney General, U.S. Dep't of Justice, to Selected Agency Counsel (Dec. 23, 2008), Ex. 2 (rejecting nearly identical guidance originally issued by ENRD). In any event, the litigating position of the United States is reflected in

---

[3] *Available at* http://www.justice.gov/usao/eousa/foia_reading_room/usab4801.pdf.

Defendants' filings in these matters—not in articles or superseded internal memoranda from specific DOJ attorneys or components.

## II. Plaintiffs' Arguments About Allegedly Omitted Documents Do Not Rebut The Presumption Of Regularity, And Are Primarily Merits Arguments.

Plaintiffs also offer a host of specific documents (and categories of documents) that they claim should have been included in the administrative record. These arguments all suffer from three critical flaws: (1) they largely ignore the presumption of regularity that attaches, as a matter of law, to the administrative record compiled by the agency; (2) they generally overstate the significance of the documents in question; and (3) they are, in any event, merits arguments that (at most) go to the basis (or lack thereof) for the Acting Secretary's decision, rather than the completeness of the administrative record.

**a.** As Judge Garaufis put it, "[t]he agency's designation of the administrative record 'is generally afforded a presumption of regularity.'" *See* Oct. 3, 2017 Order at 3, *Vidal* ECF No. 72 (quoting *Comprehensive Cmty. Dev. Corp.*, 890 F. Supp. 2d at 309); *see also Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993) ("The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary."). This rule recognizes that, in APA cases, "the agency and not the court is the principal decision maker," and it discourages courts from "supplement[ing] the record . . . in the belief that they were better informed than the administrators empowered by Congress." *San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287, 1325 (D.C. Cir. 1984), *vacated in part on other grounds*, 760 F.2d 1320 (D.C. Cir. 1985). In other words, the agency officials familiar with the decision under review are presumed to have properly designated the administrative record, absent a showing by Plaintiffs that extra-record materials are necessary to reveal the agency's rationale for the decision. *See Estate of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. 2009). Here, Plaintiffs have not made such a showing—nor could they, given the existence of the September 5, 2017 rescission memo, which summarized and presented Acting Secretary Duke's reasoning. Plaintiffs may disagree with that reasoning, or find the explanation deficient, *see infra*, Section II(c), but there is no mystery as to the reasons offered by the Acting Secretary to justify this decision. Accordingly, the presumption of regularity holds, and these arguments can be rejected on that basis alone.

**b.** As for the specific documents (or categories of documents) that Plaintiffs claim are missing from the administrative record, Plaintiffs fault the agency for allegedly failing to include documents "that purport to explain Defendants' decision to slowly wind down a program they assert is unlawful" or detailing "how the agency chose crucial dates in the termination process." Pls.' Ltr. Mot. at 4. But in any event, both the Attorney General's letter to Acting Secretary Duke, AR 251, and the rescission memo itself, AR 252-56, address this topic, albeit briefly. But otherwise, documents on this subject are classic pre-decisional and deliberative communications that are protected by (at least) the deliberative-process privilege and were properly omitted from the record on that basis. *See, e.g.*, *Mothers for Peace*, 789 F.2d at 44-45 (explaining that, absent a showing of bad faith, transcripts of deliberative agency proceedings must not be considered on judicial review); *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 333 (2d Cir. 1977) (affirming district court's refusal to order production of deliberative intra-agency memoranda in a record-review case).

Plaintiffs' suggestion that internal DOJ (and perhaps even White House) documents should be included in the administrative record, even if never shared with DHS or the Acting Secretary, is similarly mistaken. It is the Acting Secretary, not the Attorney General, who is vested with the

statutory authority to enforce our nation's immigration laws, *see* 8 U.S.C. § 1103(a)(1). And, in fact, the administrative record already includes DOJ documents, to the extent they are non-privileged and were considered by the Acting Secretary as part of her decision to rescind the DACA policy. *See* Administrative Record, AR 4-36 (Office of Legal Counsel Memorandum), AR 238-40 (letter to the Attorney General), AR 251 (letter from the Attorney General).

Plaintiffs contend that "Attorney General Sessions'[s] letter contains no legal analysis to support his bare conclusion." Pls.' Ltr. Mot. at 5. Even if that were true, the validity of the underlying legal judgments embedded within the Attorney General's letter to the Acting Secretary are not at stake in this litigation—assuming it is reviewable at all, this case requires the Court to determine, at most, whether the Acting Secretary's decision is rational, for the reasons she stated and on the record that she relied upon. Defendants will ultimately argue that the Acting Secretary's decision was sound—whether or not the Attorney General's underlying legal conclusion and predictions about future litigation would have proven to be accurate if the *Texas v. United States* litigation had continued.

Similarly, Plaintiffs contend that the record is incomplete because it contained judicial decisions from the *Texas* litigation, but did not include other opinions in other cases "that actually concern the DACA program." Pls.' Ltr. Mot. at 5. First of all, contrary to Plaintiffs' suggestion, the *Texas* litigation resulted in a nationwide injunction of not just DAPA, but also an expanded version of the DACA policy.[4] And the *Texas* plaintiffs recently threatened to amend their complaint to directly challenge what remained of DACA after the *Texas* injunction, on the same legal theory that had been accepted by the Fifth Circuit and affirmed by the Supreme Court. *See* AR 238-40. In any case, this is an improper attempt by Plaintiffs to tell the agency decision maker what she *should* have considered in making her decision—it says nothing about what she actually considered, and that is the relevant question at this stage of the litigation. Plaintiffs do not assert that these other opinions were considered by the Acting Secretary as part of her decision, and there is no obligation to include every single potentially relevant legal authority as part of an administrative record for a decision of this sort—otherwise DHS would have had to, for example, include the entirety of the Immigration and Nationality Act and the United States Constitution in the administrative record.

Plaintiffs also argue that the record is incomplete because it does not contain an August 14, 2017 letter from law professors offering their views to the President (copying Acting Secretary Duke) on the legality of DACA. This example is particularly unpersuasive because it is not, as Plaintiffs argue, "the relevance of [] communications to the DACA-policy termination," Pls.' Ltr. Mot. at 5, that determines whether a document should be included in the administrative record—even accepting that an unsolicited letter from law professors is "relevant" to a decision like this one. An agency decision maker is not required to consider every communication from any member of the public in making a decision. Plaintiffs may wish that the Acting Secretary had considered that letter in making her decision, but her focus on other documents is the *reason* it was not included—it does not call into question the completeness of the record.

Plaintiffs also make much of a footnote in the Acting Secretary's September 5, 2017 memorandum, which reports that, although deferred action policies are generally "meant to be applied only on an individualized case-by-case basis," in fact, "USCIS has not been able to identify specific

---

[4] *See, e.g.*, *Texas v. United States*, 86 F. Supp. 3d 591, 678 n.111 (S.D. Tex. 2015) ("While this Court's opinion concentrates on the DAPA program, the same reasoning applies, and the facts and the law compel the same result, to the expansions of DACA contained in the DAPA Directive").

denial cases where an applicant appeared to satisfy the programmatic categorical criteria . . . but still had his or her application denied based solely on discretion." Sept. 5, 2017 Memo at 2 & n.1, AR 253. But this factual statement is about the *lack* of certain data, not its existence, and the absence of additional documentation considered by the Acting Secretary therefore raises no questions about the completeness of the administrative record—the relevant conclusion is presented in the decision memo itself. And as discussed further below, *see infra*, Section II(c), to the extent Plaintiffs believe that the Acting Secretary's decision is not supported by the record, that is ultimately a merits argument.

Finally, Plaintiffs' suggestion that the presumption of completeness ordinarily afforded an administrative record may be more easily overcome "where, as here, no formal agency proceedings have concretely determined the scope of the administrative record" is unsupported. Pls.' Ltr. Mot. at 3. Plaintiffs rely on *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982), but that case involved "a strong suggestion that the record before the Court was not complete: conspicuously absent were the . . . fundamental documents—the very basis for federal decision-making about [the challenged grants]." *Id.* No such showing of conspicuously absent, fundamental documents has been made here.

**c.** Setting aside their merit on a document-by-document basis, Plaintiffs' arguments about what they would have expected to find in the administrative record are all, ultimately, *merits* arguments—not a justification for a broader administrative record. It is a well-settled principle of administrative law that where, as here, there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam). "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citations omitted). "If that finding is not sustainable on the administrative record made, then the . . . decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp*, 411 U.S. at 143 (citation omitted). Here, Defendants have produced a 256-page administrative record that includes all of the non-privileged documents that were actually considered by the agency decision maker. If Plaintiffs believe that that record is insufficient to support the agency's decision, then their remedy is not to compel the production of a broader administrative record—it is for Plaintiffs to file a merits brief asking that the decision be set aside, to which Defendants will respond on the merits. *See id.*

### III.  Plaintiffs' Have Already Obtained Extra-Record Documents.

Plaintiffs claim that "[i]n arguing that Plaintiffs are not entitled to discovery to challenge the completeness of the administrative record, Defendants have incorrectly conflated the need to complete the record with the need to supplement the record." Pls.' Ltr. Mot. at 6. To the extent Plaintiffs are referring to Defendants' *prior* filings opposing *discovery*, Defendants have not "incorrectly conflated" anything, but instead have made straightforward arguments about the general inappropriateness of judicial review of the Executive Branch's exercise of prosecutorial discretion in the immigration context, and the importance of limiting any judicial review that does take place to the administrative record compiled by the agency—a record that is legally presumed to be regular. That is true even where, as here, Plaintiffs bring constitutional claims, because constitutional claims challenging allegedly unlawful agency action are still APA claims, because both the waiver of sovereign immunity and the source of Plaintiffs' private right of action on their constitutional claims derive from the APA. *See* 5 U.S.C. § 706(2)(B) (the reviewing court may "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity").

Similarly, Plaintiffs claim that "[a]t this time, Plaintiffs are not moving to supplement the record." Pls.' Ltr. Mot. at 6. Again, Defendants do not fully understand this statement, but to the extent it is a belated concession that judicial review in this case may be, as is typical, limited to the administrative record (either with or without the documents Plaintiffs claim should be included), Defendants welcome it. Defendants are currently expending hundreds of hours per week processing and reviewing massive numbers of extra-record documents, and responding to interrogatories and requests for admission, as a result of Plaintiffs' discovery requests that go well beyond the administrative record. Extra-record documents have already been produced to Plaintiffs at their request, so Plaintiffs' sudden disclaimer of interest in those documents is hard to understand.

## IV. Defendants' Pending Objection Letter Raises Potentially Overlapping Issues.

Finally, Defendants respectfully note that Defendants' objection letter regarding this Court's September 27, 2017 case-management and scheduling order, *Vidal* ECF No. 67, remains pending before Judge Garaufis. Although that letter focused primarily on Section II(c) of this Court's September 27, 2017 Order (which required the production of a privilege log along with the administrative record), the letter also raised broader arguments about the proper scope of judicial review in this case, including the breadth of the administrative record and any associated privilege log, and the propriety of any discovery beyond the administrative record. Judge Garaufis has stated his intent to rule on those broader objections no later than October 20, 2017, *see* Oct. 3, 2017 Order at 4, and that ruling is likely to inform this Court's analysis on at least some of the issues raised in Plaintiffs' motion to complete the administrative record. Of course, this Court has the authority to dispose of Plaintiffs' motion at any time. But in the interest of judicial efficiency, this Court may wish to await that forthcoming ruling from Judge Garaufis before addressing Plaintiffs' motion to complete the administrative record.

\*     \*     \*

Defendants thank the Court for its consideration of this matter, and respectfully request that Plaintiffs' motion be denied.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIDGET M. ROHDE
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar #995500)
KATE BAILEY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 305-8576
Fax:  (202) 616-8470
Email:  stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*