# No. 17-3345

**Case Nos. 16-CV-4756 (NGG) (JO) (E.D.N.Y.), 17-CV-5228 (NGG) (JO) (E.D.N.Y.)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

*In re* ELAINE DUKE, Acting Secretary of Homeland Security; JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, DONALD J. TRUMP, President of the United States; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,
                                        Petitioners.

## REPLY IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS

CHAD A. READLER
  *Principal Deputy Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2000*

## INTRODUCTION AND SUMMARY

Pursuant to the All Writs Act, 28 U.S.C. § 1651, and Rule 21 of the Federal Rules of Appellate Procedure, the federal government has asked this Court to issue a writ of mandamus to stay the district court's orders expanding the administrative record and to halt ongoing discovery. On October 24, a three-judge panel of this Court continued a temporary stay issued on October 20 by Judge Cabranes, and delayed "[r]esolution of the mandamus petition . . . until such time as the district court has considered and decided expeditiously issues of jurisdiction and justiciability." Order, *In re Duke*, No. 17-3345 (Oct. 24, 2017). The district court has now ruled on those issues, but declined to rule on the remainder of the government's pending motion to dismiss for failure to state a claim. Reply Add. 2; Dkt. No. 95-1 (Case No. 16-4756).

For the reasons set forth in our petition, this Court should grant the petition. The sole purpose of the expanded administrative record and discovery is to allow plaintiffs and the court "to probe the mental processes" of the agency decisionmaker, *Morgan v. United States*, 304 U.S. 1, 18 (1938), and plaintiffs' responses fail to identify any other purpose that would be advanced. The D.C. Circuit recognized in *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Commission*, 789 F.2d 26, 44-45 (D.C. Cir. 1986) (en banc), that under the principles established nearly eighty years ago in *Morgan*, deliberative materials are not merely privileged—they are not part of the administrative record at all. The Ninth Circuit, in a divided opinion, has now created a

conflict on this point, but the majority decision in that case (Wardlaw and Gould, JJ.) failed to respond meaningfully to Judge Watford's dissent, which faithfully applied Supreme Court precedent. *See* Order of November 16, 2017, *In re United States*, No. 17-72917 (9th Cir.) (hereinafter "*In re U.S.* majority" and " *In re U.S.* dissent"). Notably, after the government sought a stay in the Ninth Circuit pending Supreme Court review, plaintiffs in that case sought to render further review unnecessary by moving the district court to stay the discovery and record expansion until after motions to dismiss and for preliminary relief were decided.

Plaintiffs here—like the majority decision in *In re United States*—make no serious effort to reconcile their position with the *Morgan* principle generally and with the analysis in *San Luis Obispo* in particular. Plaintiffs also urge that normal principles of administrative law are inapplicable because they have asserted an equal protection violation. The Supreme Court has made clear, however, that analogous principles restrict discovery in discriminatory-motive challenges to agency enforcement decisions. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489-90 (1999).

The burdens imposed by the district court's orders, if allowed to go back into effect, would be severe and wholly improper. And if courts were generally free to adopt the mode of judicial review undertaken by the district court here, the burdens would be overwhelming and the system essentially unworkable. The district court's

orders are clearly erroneous, and exercise of this Court's mandamus authority is warranted.

## ARGUMENT

### THE COURT SHOULD EXERCISE ITS MANDAMUS AUTHORITY TO CORRECT ORDERS THAT DISREGARD ESTABLISHED PRINCIPLES OF JUDICIAL REVIEW OF AGENCY DECISIONS.

**A.** **The District Court Has Improperly Ordered a Vast Expansion of the Administrative Record and Has Permitted Discovery That Serves No Purpose Other Than To Probe the Mental Processes of the Agency.**

As Judge Watford emphasized and the *In re U.S.* majority did not dispute (*In re U.S.* dissent 1-2), "[t]he task of the reviewing court" in a challenge to agency action "is to apply the appropriate [Administrative Procedure Act (APA)] standard of review to the agency decision based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). In carrying out that review, it is "not the function of the court to probe the mental processes" of the agency. *Morgan v. United States*, 304 U.S. 1, 18 (1938). Applying that principle, the en banc D.C. Circuit in *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Commission*, 789 F.2d 26, 44-45 (D.C. Cir. 1986) (en banc), explained that an agency's deliberative materials are not part of the administrative record.

And as Judge Watford further noted (*In re U.S.* dissent 2), omitting deliberative materials from the administrative record does not harm challengers, because if the agency's action "is not sustainable on the administrative record made," the

3

administrative "decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). It thus is particularly improper for a court to direct an inquiry into the decisionmaking process by demanding production of deliberative materials either in discovery or under the rubric of completing the administrative record. Deliberative materials reflect the mental processes of agency personnel. They are not "considered" by the agency decisionmaker in the sense relevant to APA review, just as a judge's consideration of a law clerk's bench memorandum, draft opinions, or communications with other judges does not render those materials part of the record of the court's decision. *See, e.g.*, *San Luis Obispo*, 789 F.2d at 45 ("[T]he analogy to the deliberative processes of a court is an apt one.").

In direct contravention of these principles, the district court has authorized an inquiry with no other purpose than to allow plaintiffs to "probe the mental processes" of the agency decisionmaker, the Acting Secretary of Homeland Security, notwithstanding *Morgan*, 304 U.S. at 18.[1] But as Judge Watford explained, "[a]n agency generally has no obligation to include documents that were prepared to assist the decision-maker in arriving at her decision, such as memos or emails containing

_____

[1] State plaintiffs suggest that the Attorney General was another "decisionmaker." State.Pltfs 12 n.3. To the contrary, although the Attorney General provided the Acting Secretary of Homeland Security with his opinion concerning the legal issues presented by DACA and the Acting Secretary chose to consider and rely on it in part, the Acting Secretary has the legal authority to decide whether to wind down the Department of Homeland Security's (DHS) DACA policy.

4

opinions, recommendations, or advice." *In re U.S.* dissent 2. As Judge Watford reasoned, "[t]hese pre-decisional materials are not deemed part of the administrative record because they are irrelevant to the reviewing court's task. The court's function is to assess the lawfulness of the agency's action based on the reasons offered by the agency, not to 'probe the mental processes' of agency decision-makers in reaching their conclusions." *Id.*[2] Plaintiffs here identify no other purpose that would be furthered by the district court's challenged orders, and, instead, justify the orders on the ground that such inquiry is proper. *See, e.g.,* Ind.Pltfs 19 (requested discovery and record expansion is appropriate because there were "unquestionably . . . multiple meetings" at which DACA was discussed); *see also* Ind.Pltfs 22.

Moreover, even accepting plaintiffs' premise that deliberative materials must form part of the administrative record, plaintiffs nowhere explain why that would be so for the type of legal policy decision at issue here. Insofar as plaintiffs allege that the wind-down of the DACA policy based on concerns about DACA's legality was arbitrary and capricious, that claim is properly adjudicated based on the Acting Secretary's memorandum and on the administrative record the government has provided. And plaintiffs have nowhere alleged the kind of bad faith necessary to overcome the presumption of regularity that attaches to the compiling of the administrative record or to justify discovery. *San Luis Obispo*, 789 F.2d at 44.

---

[2] Plaintiffs are thus simply wrong that Judge Watford's "principal concer[n]" was that privileged documents would be disclosed. Pltfs.Letter (Nov. 17, 2017).

Plaintiffs' request for materials they believe might be inconsistent with the Acting Secretary's determination (State.Pltfs 20-21) misunderstands the nature of the decision at issue: the decision plaintiffs challenge was a legal policy decision to wind down an exercise of enforcement discretion. Because that discretionary enforcement decision did not require any particular evidentiary basis and turned instead on legal assessment, there is no risk that the government could try "to insulate its decisions by 'withhold[ing] evidence unfavorable to its case.'" State.Pltfs 20 (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)). Indeed, "it would be implausible to think that any such material exists, given the nature of the reason asserted by the Acting Secretary for rescinding DACA. Concern over the program's vulnerability to legal challenge would rest not on factual information but on the legal analysis of lawyers." *In re U.S.* dissent 4.

The *In re U.S.* majority thus fundamentally erred in emphasizing (at 7-8) the purported omission from the administrative record of advice from DHS subordinates, Department of Justice officials, or the White House. Any advice the Acting Secretary received regarding concerns about DACA's legality does not shed light on whether her decision is arbitrary and capricious—just as a law clerk's bench memos are irrelevant to whether a judge's legal opinions should be upheld on appeal. Such deliberative materials speak only to the mental processes of the decisionmaker, not to the rationality of the actual decision. And any advice about factors other than legality concerns is irrelevant because those factors were not the basis of the Acting

Secretary's decision. If the Acting Secretary had failed to consider factors that were necessary for reasoned decisionmaking under the APA with respect to the basis on which she rested her decision, such a challenge should be directed to the face of her decision itself, whether or not her advisors raised those factors with her. Under those circumstances, her decision may be set aside on the merits without any need for record expansion or discovery. *See Judulang v. Holder*, 565 U.S. 42, 58 (2011); State.Pltfs 22, 25 n.9.

Plaintiffs' reliance on *Dopico v. Goldschmidt*, 687 F.2d 644 (2d Cir. 1982), is misplaced. State.Pltfs 19-20, 27. Plaintiffs there alleged that a federal agency had improperly funded projects. But the state plans that were being funded—"the very basis for federal decision-making" and documents that were required by regulation— were not included in the administrative record, thus creating a "strong suggestion that the record before the Court was not complete." 687 F.2d at 654. The agency action at issue here does not involve consideration of documents submitted to the government from the outside, and plaintiffs have not identified a comparable document that is missing from the record. Rather, this case involves the formulation of a policy with respect to enforcement discretion, and plaintiffs have not identified any non-deliberative extra-record materials relevant to that legal policy decision that the Acting Secretary would need to have considered. *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 249 (2d Cir. 1977) ("What will constitute an adequate record for

7

meaningful review may vary with the nature of the administrative action to be reviewed.").

Nor do plaintiffs here seek the kind of limited discovery contemplated in *Dopico*. *See infra* p. 15. And this Court has never cited *Dopico* for the proposition that discovery is appropriate when an agency's record is insufficient to support its decision; instead, this Court follows the well-established rule that "the proper course" in such situations "is to remand to the agency for additional investigation or explanation." *State of New York Dep't of Soc. Servs. v. Shalala*, 21 F.3d 485, 493 (2d Cir. 1994).

The Court's analysis in *Dopico* is also difficult to square with the principles emphasized in the Supreme Court's subsequent decision in *Florida Power & Light*. *Dopico* treated the content of an administrative record as "a disputed issue of fact" that a court could not resolve on summary judgment "without at least permitting plaintiffs some limited discovery to explore whether some portions of the full record were not supplied to the Court." 687 F.2d at 654. But *Florida Power & Light* leaves no doubt that judicial review is "based on the record the agency presents to the reviewing court." 470 U.S. at 743-44.

Plaintiffs similarly fail to support the district court's requirement that the government produce a privilege log. The state plaintiffs contend that the requirement to prepare a privilege log in an APA case is neither "unusual" nor "excessively burdensome." State.Pltfs 28-29. But plaintiffs misconceive the inquiry. The

8

government is not arguing that it does not need to produce a privilege log for "privileged documents being withheld from an administrative record." State.Pltfs 29-30. The government's point is that deliberative documents are not part of the administrative record to begin with: a point plaintiffs do not seriously dispute. *See Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 312 (S.D.N.Y. 2012) ("[C]ourts have consistently recognized that, for the purpose of judicial review of agency action, deliberative materials antecedent to the agency's decision fall outside the administrative record."). And the privilege-log requirement works an additional wrong: it puts a significant burden on the government to collect, search for, carefully review, and index vast quantities of documents, and it would unnecessarily set the Judicial and Executive Branches on a "collision course," as the Executive would be required to assert privileges that the court would need to evaluate. *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 389-90 (2004).

Plaintiffs' misunderstanding of the government's position is evident in their discussion of *San Luis Obispo Mothers for Peace*, *supra*. Plaintiffs state only that the case did not concern "whether the agency could *refuse to document* assertions of privilege in a log." State.Pltfs 30. True, but that is because the D.C. Circuit has held that deliberative materials are simply not part of the administrative record at all. *San Luis Obispo*, 789 F.2d at 44; *see also Advanced Commc'ns. Corp. v. FCC*, 376 F.3d 1153, 1156-57 (D.C. Cir. 2004). And the *In re U.S.* majority fared no better in observing (at 16-17) that the deliberative materials in *San Luis Obispo* happened to involve an internal

9

discussion among board members, rather than internal discussions between an agency head and her subordinates. Either way, those internal discussions serve no purpose other than to probe the decisionmaker's mental processes; they are irrelevant to the rationality of the publicly stated reason for the decision.

Indeed, federal agencies would grind to a halt if it became routine to demand deliberative material considered within the agency every time agency action is challenged. Such discovery demands would "chill the frank discussions and debates that are necessary to craft well-considered policy," *In re U.S.* dissent 3, place an enormous—and entirely improper—burden on agency officials, and invite the court to review agency action on grounds other than those offered by the agency.

**B.**     **The District Court's Recent Ruling Does Not Moot the Government's Petition for Writ of Mandamus; Indeed, It Underscores the Error of Permitting Expansive Discovery in This Case.**

Although the state plaintiffs contend (State.Pltfs 15-17) that the mandamus petition should be dismissed as moot in light of the district court's partial ruling on the government's motion to dismiss, that decision does not remedy or otherwise render moot the district court's legal errors. As the government explained in its petition, the district court's orders requiring expansion of the administrative record and permitting discovery to proceed contravene settled principles of administrative law and would effect an extraordinary intrusion on Executive Branch decisionmaking processes. Thus, the government continues to seek mandamus relief from "district

10

court orders refusing to stay discovery and requiring the government to file a privilege log for documents to be added to an expanded administrative record." Pet. 1; *see* Pet. 16-22.

In addition, the district court still has not resolved the question whether plaintiffs have stated a claim for which relief can be granted, specifically deferring ruling on these issues. And plaintiffs' response is not due until January 13; the court overruled the government's requests for an earlier date. *See* Reply Add. 46-47; Dkt. 90 (Case No. 17-5228). Indeed, getting matters exactly backwards, the district court has stated that until this Court resolves the government's petition, "it would be premature for this court to address Defendants' Rule 12(b)(6) arguments," because the scope of the administrative record "is still contested." Dkt. 90, at 3. The district court nowhere explained, however, why an expanded administrative record is necessary to resolve the government's motion to dismiss. Indeed, plaintiffs in the parallel litigation in the Northern District of California have belatedly acknowledged that discovery and expansion of the administrative record are not necessary to resolve a motion to dismiss. *See* Dkt. 190, Case No. 17-5211, *Regents of the University of California v. DHS* (seeking stay of record "completion" and discovery until ruling on plaintiffs' motion for provisional relief and the government's motion to dismiss).

Far from mooting the district court's error with respect to the administrative record, the district court's flawed justiciability rulings underscore that there is no need

11

to expand the record or permit discovery in this case.[3] In concluding that the decision to end the DACA policy was not unreviewable as committed to agency discretion by law, the court found several purported bases for review. Specifically, it identified the APA and the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12, as providing standards to review the plaintiffs' procedural challenges to the wind-down of the DACA policy, Reply Add. 21, and the Acting Secretary's "legal determination that the program was unlawful and could not be sustained in court" as providing the basis for review of the plaintiffs' substantive challenge, Reply Add. 22. It should be clear from this discussion that the purportedly reviewable APA claims do not require discovery to resolve. Whether the decision to wind down DACA required notice-and-comment rulemaking is a purely legal determination. And the adequacy of the agency's legal analysis can likewise be reviewed on the face of the decision alone.

---

[3] The fundamental nature of the decision as an exercise of enforcement discretion—and the correspondingly narrow scope of judicial review that would be permitted if review were not altogether barred—counsel particular respect here for APA principles limiting review to the administrative record. In any event, the government strongly disagrees with the district court's adverse justiciability rulings. As one example of how the district court erred in its justiciability analysis, the district court held that an agency enforcement decision is reviewable notwithstanding *Heckler v. Chaney*, 470 U.S. 821 (1985), when it is based on categorical legal reasoning. Reply Add. 22. But the Supreme Court has squarely held that the mere fact that the rationale for an unreviewable exercise of enforcement discretion includes legal reasons does not transform that decision into a reviewable one. *See ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987). For example, if a prosecutor decides to prosecute (or not prosecute) a category of cases based on an express evaluation of the laws at issue, that decision remains committed to agency discretion, unless the prosecutorial action *itself* violates a statute or the Constitution.

12

The district court also concluded that plaintiffs' equal protection challenge to the DACA wind-down is reviewable. Reply Add. 26-28. But even if that claim were reviewable, plaintiffs have not met the high standard required to receive discovery on a discriminatory-motive claim. *See United States v. Armstrong*, 517 U.S. 456, 463-64 (1996); *Reno v. American-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 489 (1999). Indeed, plaintiffs nowhere argue that they have satisfied this standard. And plaintiffs provide no basis upon which to conclude that the reasoning of *Armstrong* and *AADC* is not equally applicable in contexts involving policy-level enforcement discretion determinations.

Nor is discovery any more justified with respect to plaintiffs' information-sharing claims or their potential new due process claims (their prior due process claims have been dismissed). *See* Ind.Pltfs.Supp. 3.[4] With respect to the information-sharing claims, plaintiffs have pointed to no change in policy; it is not clear that plaintiffs persist in seeking discovery on these claims; and it is, in any event, entirely improper for plaintiffs to use discovery as a means to find an agency policy to challenge. And as for plaintiffs' due process claims, these claims are not yet part of the case, and present no obstacle to the grant of mandamus for the existing discovery order as to existing claims. In any event, these allegations present a legal issue that can

---

[4] The precise nature of those potential claims is in flux. *See* https://www.uscis.gov/news/alerts/uscis-guidance-daca-renewal-requests-affected-mail-service-issues.

be addressed without any discovery; the allegation certainly does not justify the intrusive discovery authorized by the district court.[5]

### C. The Burden Imposed on the Government by the Discovery Authorized by the District Court Is Severe.

As explained in our petition for writ of mandamus, the district court in this case has permitted extraordinarily burdensome and intrusive discovery as plaintiffs hunt for subjective motivations behind the challenged administrative action.

In order to comply with the district court's current order expanding the administrative record, the government would have to review and assert privilege over tens of thousands of documents, including documents within the Department of Justice, the vast majority of which are entirely privileged. Moreover, if the record were expanded in the manner contemplated by the magistrate judge and the plaintiffs, the burden would grow considerably. As described in the government's opening brief, the initial searches conducted by DHS components have resulted in the collection for potential review of over 1 million documents for these cases and those pending in California. Pet. 27-28.

---

[5] The individual plaintiffs' argument that "other adequate remedies exist" to bar mandamus review is unpersuasive. Ind.Pltfs 17. The government is not filing this mandamus petition to receive "additional time" to comply with legitimate obligations. *Id.* And the individual plaintiffs are no more successful in their puzzling assertion that the government was required to seek certification under 28 U.S.C. § 1292(b) before filing its mandamus petition. This Court has never so held. *See Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013).

Plaintiffs' attempt to obscure the burden the district court's orders have imposed on the government fails. For their part, the individual plaintiffs claim to have "served a set of targeted discovery requests that were limited in scope." Ind.Pltfs 15; *see also id.* at 31. But those requests are neither "targeted" nor "limited." For example, in but one of plaintiffs' seven production requests, plaintiffs sought "[a]ll documents considered within any component of the executive branch as part of the process of determining the policy and actions at issue." Reply Add. 55. The burden thus does not stem only—as both sets of plaintiffs mistakenly contend—from litigation in the Northern District of California, Ind.Pltfs 31; State.Pltfs 31 n.15, but rather from discovery requested by the individual plaintiffs, well within the "purview of this Court." State.Pltfs 31 n.15; *see also* Ind.Pltfs.Supp. 2 (explaining the view that "discovery continues to be appropriate in this matter").

## CONCLUSION

For the foregoing reasons, this Court, having granted an immediate stay to permit it to consider this petition for writ of mandamus, should grant that petition and stop discovery and supplementation of the administrative record, including any privilege-log requirements. At a minimum, this Court should continue the temporary stay until the district court has ruled on the entirety of the government's motion to dismiss.

15

Respectfully submitted,

CHAD A. READLER
    *Principal Deputy Assistant Attorney General*

HASHIM M. MOOPPAN
    *Deputy Assistant Attorney General*


MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
    *Attorneys, Appellate Staff*
    *Civil Division*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-2000*

NOVEMBER 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the word limit of Federal Rule of Appellate Procedure 21(d)(1) because the motion contains 3861 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface, 14-point Garamond font.


s/ Mark B. Stern
MARK B. STERN

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2017, I electronically filed the foregoing

with the Clerk of the Court by using the appellate CM/ECF system.  Service will be

accomplished automatically by the appellate CM/ECF system on all other counsel.


s/ Mark B. Stern
MARK B. STERN

# REPLY

# ADDENDUM

# TABLE OF CONTENTS

Order on Motion to Dismiss (Nov. 9, 2017) ....................................................Reply Add. 1

Request for Production (Oct. 3, 2017)........................................................... Reply Add. 49

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

MARTIN JONATHAN BATALLA VIDAL et al.,

                          Plaintiffs,

        -against-

ELAINE C. DUKE, Acting Secretary, Department of
Homeland Security, et al.,

                          Defendants.

------------------------------------------------------------------------X

STATE OF NEW YORK et al.,

                          Plaintiffs,

        -against-

DONALD TRUMP, President of the United States, et al.,

                          Defendants.

------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-4756 (NGG) (JO)**

**MEMORANDUM & ORDER**

**17-CV-5228 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiffs in the above-captioned cases challenge the rescission of the Deferred Action for

Childhood Arrivals ("DACA") program, as well as other actions that Defendants are alleged to

have taken in connection with the rescission of that program. Defendants have moved to dismiss

these cases for lack of subject-matter jurisdiction and for failure to state a claim. (See Defs. Mot.

Reply Add. 1

to Dismiss (Dkt. 95)[1]; Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mem.") (Dkt. 95-1).) For the reasons that follow, the court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss for lack of subject-matter jurisdiction and RESERVES RULING on Defendants' motion to dismiss for failure to state a claim.

## I. BACKGROUND

The court begins by providing some background on the DACA program, the steps Defendants have taken to end it, and the increasingly complicated procedural history of these cases.

### A. Factual Background

#### 1. Deferred Action

The DACA program originates in a mismatch between the number of individuals unlawfully present in the United States and DHS's ability to remove these individuals from the country. As of 2014, for example, approximately 11.3 million removable individuals were present in the United States.[2] (The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. at 1 (2014) ("OLC Op.") (Admin. R. ("AR") (Dkt. 77-1) at 4).) DHS has the resources to remove only a small percentage of these individuals—specifically, about 400,000 per year, or less than four percent of the total, as of 2014. (Id. at 1; DHS, 2015

---

[1] Except as noted, all docket citations refer to the docket in Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.). For convenience, the court refers to the Plaintiffs in Batalla Vidal v. Duke as the "Batalla Vidal Plaintiffs"; Plaintiff Make the Road New York as "MRNY"; the Plaintiffs in New York v. Trump, No. 17-CV-5228 (E.D.N.Y.), as the "State Plaintiffs"; the U.S. Department of Homeland Security as "DHS"; U.S. Customs and Border Protection as "CBP"; U.S. Citizenship and Immigration Services as "USCIS"; U.S. Immigration and Customs Enforcement as "ICE"; and the U.S. Department of Justice as "DOJ."

[2] "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." Arizona v. United States, 567 U.S. 387, 396 (2012) (citing 8 U.S.C. § 1227).

Yearbook of Immigration Statistics tbl. 39 (2016) (listing 333,341 removals and 129,122

"returns" for the year 2015).) Because of the "practical fact" that it cannot deport all these

individuals, the Executive Branch has significant discretion to prioritize the removal of some and

to deprioritize the removal of others. See Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred

action,' which entails temporarily postponing the removal of individuals unlawfully present in

the United States." Id. "Deferred action," sometimes referred to as "nonpriority status," is "in

effect, an informal administrative stay of deportation," Lennon v. INS, 527 F.2d 187, 191 n.7

(2d Cir. 1975), by which immigration authorities decide not to initiate, or decide to halt, removal

proceedings "for humanitarian reasons or simply for . . . convenience," Reno v. Am.-Arab Anti-

Discrimination Comm., 525 U.S. 471, 484 (1999) ("AAADC"). Immigration authorities have

used deferred action and similar policies on numerous occasions since at least the early 1960s.

Arpaio, 797 F.3d at 16 (citing OLC Op. at 7-8, 12-13). Although deferred action was initially

"developed without express statutory authorization," AAADC, 525 U.S. at 484 (quoting 6 C.

Gordon et al., Immigration Law and Procedure § 72.03(2)(h) (1998)), it has since been

referenced in the Immigration and Nationality Act ("INA") and in DHS regulations, see 8 U.S.C.

§ 1154(a)(1)(D)(i)(II), (IV) (making certain individuals "eligible for deferred action and work

authorization"); 8 C.F.R. § 274a.12(c)(14) (authorizing certain recipients of deferred action to

apply for work authorization).

## 2. DACA and DAPA

In 2012, the Obama Administration created the DACA program by issuing a

memorandum stating that DHS would consider according deferred action to certain

undocumented immigrants who entered the United States as children. (Mem. from Janet

Napolitano, Sec'y of DHS, to David V. Aguilar, Acting Comm'r, CBP, et al., Exercising

3

Reply Add. 3

Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) (the "2012 DACA Memo") (AR 1).) The 2012 DACA Memo directed CBP, USCIS, and ICE to consider exercising prosecutorial discretion with respect to individuals without lawful immigration status who (1) were under the age of sixteen when they entered the United States; (2) had been continuously present in the United States for at least the five years leading up to June 15, 2012; (3) were currently in school, had graduated from high school or obtained GEDs, or were honorably discharged veterans; (4) had not been convicted of felonies, significant misdemeanors, or multiple misdemeanors, and did not "otherwise pose[] a threat to national security or public safety"; and (5) were not above the age of thirty. (Id.) Individuals who met these criteria, passed a background check, and were granted relief "on a case by case basis" were shielded from removal and eligible to apply for work authorization, subject to renewal every two years. (Id. at 2-3.) The 2012 DACA Memo made clear, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship," but only "set forth policy for the exercise of discretion within the framework of the existing law." (Id. at 3.) Following the issuance of the 2012 DACA Memo, approximately 800,000 individuals have been granted deferred action and work authorization under the program. (Second Am. Compl. ("SAC") (Dkt. 60) ¶ 73; USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status, Fiscal Year 2012-2017 (June 30, 2017) (Am. Compl. ("State Pls. Am. Compl."), Ex. 1 (No. 17-CV-5228, Dkt. 55-1)).)

In 2014, the Obama Administration announced a new deferred action program for the parents of U.S. citizens and lawful permanent residents, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). (Mem. from Jeh Charles Johnson,

4

**Reply Add. 4**

Sec'y of DHS, to León Rodríguez, Dir., USCIS., et al, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (the "2014 DAPA Memo") (AR 37).) The 2014 DAPA Memo also expanded the DACA program by (1) permitting individuals born before June 15, 1981, to apply for deferred action; (2) extending the term of the benefits obtained under the DACA program from two to three years; and (3) adjusting the date-of-entry requirement so that individuals who entered the United States before January 1, 2010, could obtain deferred action and work authorization. (Id. at 3-4.) The court refers to these changes to the DACA program as the "DACA Expansion."

Following the issuance of the 2014 DAPA Memo, twenty-six states, led by Texas, filed suit in the U.S. District Court for the Southern District of Texas, claiming that the DAPA program violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 550 et seq., and the Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 3. See Texas v. United States, 86 F. Supp. 3d 591, 598 (S.D. Tex. 2015). On February 16, 2015, the district court concluded that those states had standing to sue and were likely to succeed on the merits of their procedural APA claim that the 2014 DAPA Memo was invalid because it constituted a "substantive rule," not a "general statement of policy," and thus should have been promulgated through notice-and-comment rulemaking. Id. at 671-72. The court issued a nationwide injunction against the implementation of the DAPA program, id. at 677-78, and the DACA Expansion, id. at 678 n.111. The Fifth Circuit affirmed that decision, finding that the plaintiff states were likely to succeed both on their claim that the 2014 DAPA Memo should have been made through notice-and-comment procedures and on their claim that the memo was substantively contrary to the INA. Texas v. United States, 809 F.3d 134, 178, 186 (5th Cir. 2015) (as revised). The Fifth Circuit

declined to reach the plaintiff states' Take Care Clause claim.  Id. at 146 n.3.  The decision was affirmed by an equally divided Supreme Court.  See 136 S. Ct. 2271 (Mem.).

### 3.  DAPA Rescission

The Executive Branch's immigration-enforcement priorities shifted with the election of President Donald Trump.  Shortly after his Inauguration, President Trump issued an executive order that cast doubt on the exemption of "classes or categories of removable aliens from potential enforcement."  Exec. Order 13,768, Enhancing Public Safety in the Interior of the United States, 82 Fed. Reg. 8799 (Jan. 25, 2017).  The following month, then-Secretary of DHS John Kelly implemented that order by issuing a memorandum rescinding "all existing conflicting directives, memoranda, or field guidance regarding enforcement of our immigration laws and priorities for removal," except for the DACA and DAPA programs, which he left in place. (Mem. from John Kelly, Sec'y, DHS, to Kevin McAleenan, Acting Comm'r, CBP, et al., Enforcement of the Immigration Laws to Serve the National Interest at 2 (Feb. 20, 2017) (AR 230).)  Four months later, Secretary Kelly issued another memorandum, which rescinded the DAPA program and the DACA Expansion based on "the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities."  (Mem. from John F. Kelly, Sec'y, DHS, to Kevin K. McAleenan, Acting Comm'r, CBP, et al., Rescission of November 20, 2014, Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") at 3 (June 15, 2017) (AR 235).)  That memorandum did not, however, rescind the original DACA program or revoke the three-year-long deferred action and work authorization issued between the announcement of the DACA Expansion and the Southern District of Texas's issuance of a preliminary injunction against that program.  (Id. at 2 & n.3).

6

### 4. DACA Rescission

Following the rescission of the 2014 DAPA Memo, Texas Attorney General Ken Paxton wrote on behalf of eleven states to Attorney General Jeff Sessions to demand that the "Executive Branch" rescind the 2012 DACA Memo. (Ltr. from Ken Paxton, Att'y Gen. of Texas, to Hon. Jeff Sessions, Att'y Gen. of the U.S. (June 29, 2017) at 2 (AR 239).) Paxton warned that, if DHS did not act to end the DACA program, the plaintiff states would amend their complaint in Texas v. United States to challenge the DACA program and the remaining work permits issued under the DACA Expansion. (Id. at 2.)

Thereafter, Attorney General Sessions wrote to Acting DHS Secretary Elaine Duke to "advise that [DHS] should rescind" the 2012 DACA Memo.[3] (Letter from Jefferson B. Sessions, III, Att'y Gen. of the U.S., to Elaine C. Duke, Acting Sec'y, DHS (the "Sessions Letter") (AR 251).) The Attorney General opined that DACA was unconstitutional and that the Texas plaintiffs would likely prevail in their anticipated challenge to the program:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

(Id. (citation omitted).)

---

[3] While the letter is not dated, the PDF of the AR dates the letter September 4, 2017. (See also Defs. Mem. at 9.)

Reply Add. 7

On September 5, 2017, Defendants rescinded the DACA program.[4]  The Attorney

General announced the decision at a press conference, and Acting Secretary Duke implemented

the decision by issuing a memorandum (the "DACA Rescission Memo") to her subordinates.

(DOJ, Press Release, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017),

https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca; Mem.

from Elaine C. Duke, Acting Sec'y, DHS, to James W. McCament, Acting Dir., USCIS, et al.,

Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with

Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) (AR 252).)

Duke pointed to the rulings of the Fifth Circuit and the Supreme Court in the Texas litigation, as

well as to the Attorney General's "legal determination" that DACA was "'an open-ended

circumvention of immigration laws'" and "'an unconstitutional exercise of authority'":

> Taking into consideration the Supreme Court's and the Fifth
> Circuit's rulings in the ongoing litigation, and the September 4, 2017
> letter from the Attorney General, it is clear that the June 15, 2012[,]
> DACA program should be terminated.  In the exercise of my
> authority in establishing national immigration policies and
> priorities, except for the purposes explicitly identified below, I
> hereby rescind the June 15, 2012 memorandum.

(Id. at 3-4 (quoting Sessions Letter).)

Rather than terminating the DACA program outright, the DACA Rescission Memo

provided for a phased "wind down" of the program. First, DHS would consider initial

---

[4] Defendants maintain that, as a legal matter, Acting Secretary Duke is solely responsible for the decision to rescind
the DACA program. (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate (Dkt. 80) at 3-4.)  As the court has
noted, however, Defendants previously represented to the court that the Attorney General and Acting Secretary
Duke jointly decided to end the DACA program.  (Tr. of Sept. 14, 2017, Hr'g (Docket Pending) 13:17-
14:06, 24:21-24, 26:1-6; Oct. 17, 2017, Mem. & Order (Dkt. 86) at 9-10.)  Defendants had not then, and still have
not, presented this court with any reason why it should disregard their earlier representations as to who decided to
end the DACA program.  (See Oct. 17, 2017, Mem. & Order at 10; Oct. 19, 2017, Mem. & Order at 10-11.)  For
purposes of this motion, however, nothing turns on the question of whether Acting Secretary Duke acted alone or
with the Attorney General and the President when terminating the DACA program, so the court simply refers to the
actions of "Defendants" in this regard.

Reply Add. 8

applications for deferred action and work authorization that it had received as of September 5, 2017. (DACA Rescission Memo at 4.) Second, DHS would "adjudicate—on an individual, case by case basis" requests for renewal of deferred action and work authorization "from current beneficiaries whose benefits will expire between [September 5, 2017,] and March 5, 2018 that have been accepted by [DHS] as of October 5, 2017." (Id.) DHS would not consider other applications for deferred action or work authorization under the DACA program. (Id.) Existing grants of deferred action and work authorization would remain in effect "for the remaining duration of their validity periods," though DHS would retain the authority to terminate or deny deferred action when it deemed appropriate. (Id.) Under the DACA Rescission Memo, the benefits granted as part of the DACA program will therefore expire gradually over the next two years.

### B. Procedural Background

#### 1. Prior to the DACA Rescission

The first of the above-captioned cases, Batalla Vidal v. Duke, No. 16-CV-4756 (E.D.N.Y.), predates the Trump Administration's decision to rescind the DACA program. In that case, Plaintiff Martín Batalla Vidal initially challenged DHS's compliance with the nationwide injunction issued by the Southern District of Texas in Texas v. United States. Batalla Vidal applied for deferred action and work authorization in November 2014 and, in February 2015, was notified that he had received deferred action and work authorization for the next three years under the terms of the DACA Expansion. (Compl. (Dkt. 1) ¶ 32.) On May 14, 2015, however, DHS revoked his three-year work authorization, citing the Texas injunction, and replaced it with a two-year permit. (Id. ¶¶ 34-36.) Batalla Vidal challenged that decision, contending that the Texas plaintiffs lacked standing to seek, and the Southern District of Texas lacked jurisdiction to issue, a nationwide injunction. (Id. ¶¶ 43-47.) Batalla Vidal subsequently

9

amended his complaint to add the nonprofit organization MRNY as a plaintiff and name then-Director of USCIS León Rodríguez as a defendant.  (Am. Compl. (Dkt. 29).)  In November 2016, the Batalla Vidal Plaintiffs moved with Defendants' consent to stay briefing in the case "[d]ue to uncertainty regarding the future of the [DACA] program."  (Pls. Nov. 21, 2016, Mot. to Stay (Dkt. 35); Apr. 4, 2017, Joint Mot. to Stay (Dkt. 40).)

### 2. Following the DACA Rescission

Following Defendants' announcement of the decision to rescind the DACA program, Plaintiffs brought these actions challenging that decision and certain other actions that Defendants have taken relating to that decision.  On September 6, 2017, fifteen states and the District of Columbia[5] filed suit challenging both the rescission of the DACA program and DHS's alleged changes in its policy regarding the use of DACA applicants' information for immigration-enforcement purposes.  (State Pls. Compl. (No. 17-CV-5228, Dkt. 1) ¶¶ 269-301.)  The State Plaintiffs asserted claims under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the APA, and the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12 (the "RFA").  (Id.)  Two weeks later, the Batalla Vidal Plaintiffs again amended their complaint to assert certain claims similar to those brought by the State Plaintiffs, as well as a claim that Defendants violated the Due Process Clause by failing to notify DACA recipients that they needed to renew their deferred action and work authorization by October 5, 2017.  (SAC ¶¶ 160-66.)  Finally, the State Plaintiffs amended their complaint to add claims (1) challenging the notice provided to DACA recipients of the rescission of the DACA program; and (2) further challenging the change

---

[5] The State Plaintiffs were initially comprised of the States of North Carolina, Hawaii, New York, Washington, Iowa, Oregon, Rhode Island, Vermont, Illinois, Connecticut, New Mexico, and Delaware; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the District of Columbia.  (State Pls. Compl. (No. 17-CV-5228, Dkt. 1).)  Colorado has since joined the case.  (State Pls. Am. Compl. (No. 17-CV-5228, Dkt. 54).)

in DHS's information-use policy. (State Pls. Am. Compl. (No. 17-CV-5228, Dkt. 54) ¶¶ 246-52, 274-80.) Together, Plaintiffs now assert the following claims:

**Equal Protection.** Both sets of Plaintiffs allege that the decision to rescind the DACA program violated the equal-protection principles incorporated in the Due Process Clause of the Fifth Amendment to the U.S. Constitution, see Bolling v. Sharpe, 347 U.S. 497, 498-500 (1954), because that decision was motivated by improper considerations. (SAC ¶¶ 167-70; State Pls. Am. Compl. ¶¶ 233-39.) The State Plaintiffs allege that the DACA Rescission Memo "target[s] individuals for discriminatory treatment, without lawful justification" and that it was "motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group." (State Pls. Am. Compl. ¶¶ 235-36.) The Batalla Vidal Plaintiffs allege that President Trump, Attorney General Sessions, and Acting Secretary Duke violated the Due Process Clause in deciding to rescind the DACA program because that decision "targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups," and "was substantially motivated by animus toward Latinos and, in particular, Mexicans." (SAC ¶¶ 169-70.)

**Due Process—Individualized Notice.** Both sets of Plaintiffs also contend that Defendants violated the Fifth Amendment's Due Process Clause by failing to provide DACA recipients with adequate notice of the decision to rescind the DACA program. (SAC ¶¶ 160-66; State Pls. Am. Compl. ¶¶ 274-80.) In particular, the Batalla Vidal Plaintiffs allege that, prior to the DACA Rescission Memo, DHS advised DACA recipients to submit applications to renew their deferred action and work authorization "as soon as possible" and, in particular, 120-150 days before expiration, to ensure that those benefits did not expire before DHS could process the renewal applications. (SAC ¶ 164.) Following the issuance of the DACA Rescission Memo, Defendants did not send individual revised notices to alert DACA recipients who were eligible to

renew their deferred action and work authorization (i.e., individuals whose benefits expired

before March 5, 2018) that they only had until October 5, 2017, to do so. (Id. ¶ 165.) The State

Plaintiffs allege that Defendants violated the Due Process Clause of the Fifth Amendment by

failing to provide DACA recipients with "adequate notice" about "the procedures and timeline

for renewing their DACA status," "the general termination of the DACA program after March 5,

2018," or "their inability to apply for renewal of their DACA status after March 5, 2018." (State

Pls. Am. Compl. ¶¶ 276-77.)

**Due Process—Information-Use Policy.** Both sets of Plaintiffs assert that DHS

impermissibly backtracked on its representations that it would use information gleaned from

DACA applications for immigration-enforcement purposes only in limited circumstances. (SAC

¶¶ 151, 153; State Pls. Am. Compl. ¶¶ 240-45.) While, as discussed below, the Batalla Vidal

Plaintiffs fold this challenge into their substantive APA claim, the State Plaintiffs challenge this

decision as "fundamentally unfair," in violation of the Due Process Clause of the Fifth

Amendment. (State Pls. Am. Compl. ¶ 243.)

**Equitable Estoppel—Information-Use Policy.** The State Plaintiffs argue that the

doctrine of equitable estoppel bars DHS from changing its policy regarding the use of DACA

applicants' information. (Id. ¶¶ 246-52.) The State Plaintiffs allege that Defendants, having

"made repeated affirmative statements about the protections that would be given to the personal

information provided by DACA applicants" and "placed affirmative restrictions on the use of

such information for purposes of immigration enforcement" (id. ¶ 248), are now estopped from

using that information for immigration-enforcement purposes (id. ¶¶ 250-51). The court refers to

this claim, together with Plaintiffs' constitutional information-use policy claims, as Plaintiffs'

"information-use policy claims."

12

Reply Add. 12

**APA—Arbitrary and Capricious.** Both sets of Plaintiffs challenge the decision to end the DACA program under the APA as substantively "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). (SAC ¶¶ 149-54; State Pls. Am. Compl. ¶¶ 253-56.) The <u>Batalla Vidal</u> Plaintiffs contend that Attorney General Sessions and Acting Secretary Duke acted arbitrarily and capriciously by deciding to end the DACA program and by changing DHS's policy regarding the confidentiality of DACA applicants' information because those decisions "(a) lack a rational explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors." (SAC ¶ 151.) The State Plaintiffs argue that the implementation of the DACA Rescission Memo and termination of the DACA program "with minimal formal guidance" constituted arbitrary, capricious, and unlawful action in violation of Section 706 of the APA. (State Pls. Am. Compl. ¶ 254-55.) The court refers to these claims together as Plaintiffs' "substantive APA claims."

**APA—Notice and Comment.** Both sets of Plaintiffs also contend that DHS's implementation of the DACA Rescission Memo constitutes a substantive or legislative "rule" for purposes of the APA, and thus needed to be made through notice-and-comment rulemaking procedures. <u>See</u> 5 U.S.C. § 553. (SAC ¶¶ 144-48; State Pls. Am. Compl. ¶¶ 257-65.) In particular, the <u>Batalla Vidal</u> Plaintiffs argue that the DACA Rescission Memo is a substantive rule, "as it binds DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria." (SAC ¶ 146.) The State Plaintiffs, on the other hand, argue that the promulgation and implementation of the DACA Rescission Memo "categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States," impacting those beneficiaries'

13

"substantive rights." (State Pls. Am. Compl. ¶ 261.) The court refers to these claims together as Plaintiffs' "procedural APA claims."

**RFA.** Finally, both sets of Plaintiffs assert claims under the RFA. Plaintiffs claim that Defendants violated the RFA by issuing the DACA Rescission Memo without conducting an analysis of the rescission's impact on "small entities." (SAC ¶¶ 155-59; State Pls. Am. Compl. ¶¶ 266-73.) MRNY alleges that it is a "small organization" that is directly affected by the DACA Rescission Memo and thus has a cause of action under the RFA. (SAC ¶ 156.) The State Plaintiffs assert that they and their "small governmental jurisdictions, nonprofits, and businesses, and their residents" are harmed by Defendants' failure to conduct such a regulatory impact analysis. (State Pls. Am. Compl. ¶ 273.) The court refers to these claims as Plaintiffs "RFA claims."

The following chart summarizes these claims:

a. *Table: Claims Presented*

| Challenged Action | Cause of Action | Batalla Vidal v. Duke[6] | New York v. Trump[7] |
|---|---|---|---|
| Termination of the DACA program | Due Process Clause | Fifth claim, ¶¶ 167-70 | First claim, ¶¶ 233-39 |
| | APA (substantive) | Second claim, ¶¶ 149-54 | Fourth claim, ¶¶ 253-56 |
| | APA (procedural) | First claim, ¶¶ 144-48 | Fifth claim, ¶¶ 257-65 |
| | RFA | Third claim, ¶¶ 155-59 (MRNY only) | Sixth claim, ¶¶ 266-73 |
| Notification of DACA recipients of (1) the termination of the DACA program and (2) revised renewal deadlines | Due Process Clause | Fourth claim, ¶¶ 160-66 (notice of revised renewal deadlines only) | Seventh claim, ¶¶ 274-80 |
| Changes to DHS policy regarding the use of DACA applicants' information for immigration-enforcement purposes | Due Process Clause | | Second claim, ¶¶ 240-45 |
| | APA (substantive) | Second claim, ¶¶ 149-51, 153-54 | |
| | Equitable estoppel | | Third claim, ¶¶ 246-52 |

---

[6] All citations refer to the SAC.

[7] All citations refer to the State Plaintiffs' Amended Complaint.

Reply Add. 14

3.  District Court Proceedings

The parties have vigorously litigated these actions before this court.  Although the full

procedural history can be discerned from the relevant dockets, the court provides the following

limited summary of the proceedings to date.

Consistent with the regular practice of courts in this district in civil cases, discovery

matters were referred to the magistrate judge assigned to the case, Magistrate Judge James

Orenstein, to decide in the first instance.  See 28 U.S.C. § 636(b)(1)(A); Local Civ. R. 72.2.

After soliciting the views of the parties as to whether discovery should proceed (Sept. 15, 2017,

Order (Dkt. 58)), Judge Orenstein authorized discovery to proceed over Defendants' objections

(Tr. of Sept. 26, 2017, Hr'g (Docket Number Pending) 26:21-27:22).  Judge Orenstein then

issued a case management and scheduling order (the "Case Management Order"), which

confirmed the previously announced discovery schedule.  (Sept. 27, 2017, Order (Dkt. 67).)  Of

particular relevance to these proceedings, the Case Management and Scheduling Order required

Defendants to produce, by October 6, 2017, an administrative record as well as a privilege log

describing "every document considered within any component of the executive branch as part of

the process of determining the policy and actions at issue in these actions that are not being

produced and as to which the defendants would assert a claim of privilege, regardless of whether

the defendants deem such . . . record to be part of the official administrative record."  (Id. ¶¶ II(c)

(the "Privilege Log Requirement").)

Defendants promptly challenged the Case Management Order.  On September 29, 2017,

Defendants filed a motion before this court "seek[ing] relief from" the Privilege Log

Requirement, which, they argued, "raise[d] substantial separation-of-powers concerns," to the

extent it could be read as applying to White House communications, and required Defendants to

assert privilege with respect to documents that were not properly included in the administrative

Reply Add. 15

record.  (Sept. 29, 2017, Defs. Mot. to Vacate (Dkt. 69) ("Defs. Sept. 29 Mot.") at 2-5.)

Defendants also argued that it would be impossible to comply with the Privilege Log

Requirement within the deadline set by the Case Management Order (id. at 5), and that the court

should consider threshold arguments for dismissal of these cases before allowing discovery to

proceed (id. at 5-6).  Defendants did not specifically argue that discovery was inappropriate,

although they reincorporated arguments against discovery by reference to a letter they had filed

with Judge Orenstein a week earlier and briefly outlined three "threshold dismissal arguments."

(Id. at 1, 5-6; see also Defs. Sept. 22, 2017, Ltr. Regarding Discovery (Dkt. 65).)

  The court issued two orders in response to Defendants' objections.  The first order

extended the deadline for complying with the Privilege Log Requirement by two weeks, so that

the court could consider whether the as-yet-unproduced administrative record was adequate and

whether Defendants retained the presumption that they had correctly compiled the record.

(Oct. 3, 2017, Order (Dkt. 72).)  Defendants subsequently asked the court to narrow the Privilege

Log Requirement or vacate it entirely.  (Defs. Oct. 10, 2017, Reply in Supp. of Mot. to Vacate

(Dkt. 80) at 2.)  At the same time, Defendants also asked the court to stay discovery pending

resolution of Defendants' anticipated dispositive motions, which Defendants averred would

"raise arguments that are strong, purely legal, and completely dispositive of Plaintiffs' claims."

(Id. at 4.)  Defendants did not, however, specifically identify what those arguments were (instead

cross-referencing their September 29 Motion and string-citing to authority discussed below) or

address any of the factors that courts in this district consider in analyzing whether a party has

demonstrated "good cause" to stay discovery.  See Fed. R. Civ. P. 26(c); Richards v. N. Shore

Long Island Jewish Health Sys., No. 10-CV-4544 (LDW) (ETB), 2011 WL 4407518, at *1

(E.D.N.Y. Sept. 21, 2011).

The court then issued its second order, which narrowed the scope of the Privilege Log Requirement but denied Defendants' request to stay discovery. (Oct. 17, 2017 Mem. & Order (the "Oct. 17 M&O") (Dkt. 86).) With respect to Defendants' arguments that discovery outside the administrative record was inappropriate, the court noted that Defendants had not identified any reason why its review of Plaintiffs' information-use policy and notice claims should be limited to an administrative record that only purported to document the decision to rescind the DACA program. (Id. at 3-5.) The court declined to vacate the Privilege Log Requirement before Judge Orenstein decided whether the administrative record was complete. (Oct. 17 M&O at 5-6.) The court agreed, however, that the Privilege Log Requirement should be narrowed to exclude materials other than DHS and DOJ communications. (Id. at 7-9.) Finally, the court declined to exempt DOJ from the Privilege Log Requirement, as Defendants had failed to explain their apparent reversal in position regarding whether Attorney General Sessions was responsible for the decision to rescind the DACA program. (Id. at 9-10.)

The following evening, Defendants renewed their motion to stay discovery, this time threatening to seek mandamus review if the court did not address their objections by 2 p.m. the following day. (Defs. Oct. 18, 2017, Mot. to Stay (Dkt. 87).) The court ruled expeditiously on these requests. On October 19, 2017, Judge Orenstein issued an order granting Plaintiffs' motion to compel Defendants to produce a complete administrative record. (Oct. 19, 2017, Order Granting Motion to Produce (Dkt. 89).) The same day, this court issued another memorandum and order, granting in part and denying in part Defendants' motion for a stay. (Oct. 19, 2017, Mem. & Order (the "Oct. 19 M&O") at 9-11.) In light of Defendants' ongoing (and, this time, factually substantiated) concerns about the burdens of complying with the Privilege Log Requirement, the court agreed to stay the Privilege Log Requirement except with respect to

17

Reply Add. 17

documents directly considered by the Attorney General, Acting Secretary Duke, and their subordinates who directly advised them on the decision to end the DACA program. (Id.) The court concluded, however, that Defendants had not demonstrated "good cause" warranting a stay of discovery (id. at 4-9), nor that they were entitled to a stay pending mandamus review (id. at 11-12).

On October 20, 2017, the U.S. Court of Appeals for the Second Circuit issued an emergency stay of discovery and record supplementation in proceedings before this court, contingent on Defendants' filing a full petition for a writ of mandamus by 3 p.m. on October 23, 2017. (Oct. 20, 2017, USCA Order (Dkt. 91).) Four days later, the Second Circuit issued a second order, which extended the stay pending determination of the mandamus petition but deferred ruling on that petition "until such time as the district court has considered and decided expeditiously issues of jurisdiction and justiciability." (Oct. 24, 2017, USCA Order (Dkt. 99).) In light of that order, the court directed the parties to file supplemental briefs as to whether the court "lacks jurisdiction to consider the claims raised in [these cases] or why such claims are otherwise non-justiciable." (Oct. 24, 2017, Order.) In response to that order, Defendants filed the motion to dismiss currently before the court. That motion not only argues that the court lacks jurisdiction to hear these cases, but also contends that Plaintiffs fail to state a claim upon which relief should be granted and that the court should not grant a nationwide injunction, should it decide that Plaintiffs are entitled to relief.[8]

---

[8] Prior to filing their Motion to Dismiss, Defendants requested and received leave to file an overlong brief "in order . . . to fully present their dismissal arguments in these cases." (Defs. Oct. 25, 2017, Appl. for Leave to File Excess Pages (Dkt. 94); Oct. 26, 2017, Order Granting Defendants' Application for Leave to File Excess Pages.) That application did not expressly indicate that Defendants intended to present arguments for dismissal for failure to state a claim under Rule 12(b)(6), as opposed to just the "jurisdiction and justiciability" arguments specifically referenced by the Second Circuit's and this court's October 24, 2017, orders. Defendants would not have required these excess pages had they confined their briefing to those issues. (See Oct. 27, 2017, Order (Dkt. 98).)

18

**Reply Add. 18**

## II.   LEGAL STANDARDS

Pursuant to the Second Circuit's direction, the court addresses only "issues of jurisdiction and justiciability" at this point in the proceedings.  (Oct. 24, 2017, USCA Order; Oct. 27, 2017, Order (Dkt. 98).)  Accordingly, the court will consider only those portions of Defendants' motion to dismiss that challenge the court's subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Under Rule 12(b)(1), the court must dismiss a claim "for lack of subject matter jurisdiction . . . when the . . . court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  When considering a Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).  Nevertheless, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'"  Id. (quoting Makarova, 201 F.3d at 113).  "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."  Id. (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)).

## III.   DISCUSSION

Defendants raise four challenges to the court's authority to hear the above-captioned cases.  First, Defendants argue, these cases are not justiciable under the APA because the decision to rescind the DACA program was "committed to agency discretion by law."  See 5 U.S.C. § 701(a)(2).  (Defs. Mem. at 12-17.)  Second, Defendants contend that the decision to terminate the DACA program constitutes a denial of deferred action, judicial review of which is barred by Section 1252(g) of the INA.  See 8 U.S.C. § 1252(g).  (Id. at 17-19.)  Third, they

19

maintain, the <u>Batalla Vidal</u> Plaintiffs lack standing to bring certain claims (<u>id.</u> at 28-29, 34-35, 37), and the State Plaintiffs lack Article III standing to bring any claims (<u>id.</u> at 19-21). Fourth, Defendants assert, the State Plaintiffs and MRNY cannot bring claims under the APA because they assert interests that fall outside the "zone of interests" protected by the INA. (<u>Id.</u> at 19-20.) The court addresses each argument in turn.

## A. Committed to Agency Discretion by Law

Defendants first argue that these cases are non-justiciable because the decision to end the DACA program was committed to DHS's exclusive discretion by law. The court disagrees. Certain agency decisions, including decisions not to institute enforcement action, are presumptively immune from judicial review under the APA because they are "committed to agency discretion by law." <u>See</u> 5 U.S.C. § 701(a)(2); <u>Heckler v. Chaney</u>, 470 U.S. 821 (1985). But the rescission of the DACA program was not such a decision, nor have Defendants explained why Section 701(a)(2) precludes review of Plaintiffs' constitutional claims or other claims challenging actions other than the decision to rescind the DACA program.[9]

### 1. Statutory and Equitable Claims

Section 701(a)(2) of the APA does not preclude judicial review of Plaintiffs' statutory and equitable claims. "Under the APA, a party aggrieved by agency action is generally 'entitled to judicial review thereof.'" <u>Westchester v. U.S. Dep't of Hous. and Urban Dev.</u>, 778 F.3d 412, 418 (2d Cir. 2015) (quoting 5 U.S.C. § 702). "There is a strong presumption favoring judicial review of administrative action." <u>Salazar v. King</u>, 822 F.3d 61, 75 (2d Cir. 2016). Judicial review is not available, however, "to the extent that . . . statutes preclude judicial review,"

---

[9] It is not clear whether Section 701(a)(2) limits the court's jurisdiction or instead forms an "essential element" of a claim for relief under the APA. <u>Sharkey v. Quarantillo</u>, 541 F.3d 75, 87-88 (2d Cir. 2008); <u>accord</u> <u>Conyers v. Rossides</u>, 558 F.3d 137, 143 n.8 (2d Cir. 2009). Nothing turns on this distinction here, however, because Section 701(a)(2) does not shield Defendants' actions from judicial review.

5 U.S.C. § 701(a)(1), or "agency action is committed to agency discretion by law," § 701(a)(2). The latter is "a very narrow exception" to the presumption of reviewability of agency action under the APA, and it applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also Chaney, 470 U.S. at 830 (agency action is unreviewable "if a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"). "To determine whether there is 'law to apply' that provides 'judicially manageable standards' for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." Salazar, 822 F.3d at 76 (quoting Chaney, 470 U.S. at 830). These enactments supply "law to apply" because they may govern the agency's exercise of its own discretion. See id. at 76-77 (citing INS v. Yueh-Shaoi Yang, 519 U.S. 26, 32 (1996)); Sec'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 158-59 (D.C. Cir. 2006).

    *a.  "Law to Apply"*

Here, there is "law to apply," permitting meaningful judicial review of Plaintiffs' statutory claims. Plaintiffs assert statutory claims under the APA and RFA. With respect to Plaintiffs' procedural APA and RFA claims, the relevant "law to apply" is found in the APA and RFA themselves, both of which specify procedures that agencies must follow when engaging in "substantive" or "legislative" rulemaking. See 5 U.S.C. §§ 553, 604. The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable. See Lincoln v. Vigil, 508

Reply Add. 21

U.S. 182, 195-98 (1993); Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1134 (D.C. Cir. 1995); N.Y.C. Employees' Ret. Sys. v. SEC, 45 F.3d 7, 11 (2d Cir. 1995).

There is also "law to apply" permitting meaningful judicial review of Plaintiffs' substantive APA claims. In order to satisfy Section 706(2)(a), Plaintiffs must identify some source of law, other than the APA's "arbitrary and capricious" standard, against which the court can review their claims: "If agency actions could be challenged as 'arbitrary and capricious,' without reference to any other standard, then § 701(a)(2)'s limitation on APA review would amount to no limitation at all, and nothing would ever be 'committed to agency discretion by law.'" Lunney v. United States, 319 F.3d 550, 559 n.5 (2d Cir. 2003). The court agrees that Plaintiffs have identified "law to apply" to these claims. In deciding to rescind the DACA program, Defendants expressly and exclusively relied on a legal determination that the program was unlawful and could not be sustained in court. (Sessions Letter, AR 251; DACA Rescission Memo, AR 253-55.) The court may review that rationale in light of, among other sources, the text of the INA and other statutes, the history of the use of deferred action by immigration authorities, and the OLC Opinion.[10] While Defendants attempt to recast the decision to rescind the DACA program as the product of a discretionary "balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of 'potentially imminent litigation' that could throw DACA into immediate turmoil" (Defs. Mem. at 15), that argument is unsupported by the text of the Sessions Letter and the DACA Rescission Memo.

---

[10] The State Plaintiffs also assert a claim for equitable estoppel. (State Pls. Am. Compl. ¶¶ 246-52.) With respect to the State Plaintiffs' equitable estoppel claim, the court assumes for the sake of argument that the relevant "law to apply" may be found in DHS's past statements and practices regarding the use of DACA applicants' information. See Salazar, 822 F.3d at 76-77. (See State Pls. Am. Compl. ¶¶ 39-44.) The court need not decide this question, however, because, as discussed below, the State Plaintiffs lack standing to assert this claim. (See infra Section III.C.2.b.)

22

Defendants' argument that the <u>decision</u> to rescind the DACA program is unreviewable, notwithstanding the "substantive legal" <u>rationale</u> given for that decision (Defs. Mem. at 15), is unpersuasive. Defendants correctly note that unreviewable agency action does not become reviewable simply because "the agency gives a reviewable reason for otherwise unreviewable action." (Defs. Mem. at 13 (quoting <u>ICC v. Bhd. of Locomotive Eng'rs</u>, 482 U.S. 270, 283 (1987) ("<u>BLE</u>")).) <u>See</u> <u>BLE</u>, 482 U.S. at 283 ("[A] common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief . . . that the law will not sustain a conviction. That is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review."). That argument simply begs the question, however, of whether the decision to rescind DACA is actually unreviewable. While it may be true that a presumptively unreviewable decision does not become subject to judicial review simply because the decisionmaker expresses a "reviewable" rationale," <u>see id.</u>, the decision to rescind the DACA program was not inherently such a decision, as the following section discusses in detail.

b. *Prosecutorial Discretion*

Nor does the decision to end the DACA program fall within a class of decisions traditionally regarded as presumptively immune from judicial review under Section 701(a)(2) of the APA. (Defs. Mem. at 12-14.) Defendants assert that the decision to rescind the DACA program constitutes "an exercise of enforcement discretion" that is "entrusted to the agency alone" and immune from judicial review. (<u>Id.</u> at 15.) The court concludes, however, that the decision to eliminate the DACA program—a program by which certain undocumented immigrants could request immigration authorities to exercise prosecutorial discretion with respect to them—was not itself a presumptively unreviewable exercise of enforcement discretion.

23

Reply Add. 23

Defendants rely in particular on Chaney, which held that decisions not to take enforcement action were presumptively not subject to judicial review under the APA. In Chaney, the Court rejected an attempt by a group of prisoners awaiting execution by lethal injunction to force the Food and Drug Administration to take enforcement action to prevent the use of certain drugs for capital punishment. See Chaney, 470 U.S. at 823-25, 830-33. The Court held that a regulator's refusal to take enforcement action was presumptively unreviewable, because decisions not to take enforcement action typically "involve[]a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," id. at 831, and do not implicate the agency's exercise of "coercive power over an individual's liberty or property rights, and thus do[] not infringe upon areas that courts often are called to protect," id. at 832.

The decision to rescind DACA is unlike the non-enforcement decision at issue in Chaney. First, Plaintiffs do not challenge an agency's failure or refusal to prosecute or take enforcement actions with respect to certain violations of law. Instead, they challenge Defendants' affirmative decision to eliminate a program by which DHS exercised prosecutorial discretion with respect to a large number of undocumented immigrants. The DACA Rescission Memo curtails (if it does not eliminate outright) DHS's ability to exercise prosecutorial discretion with respect to individuals previously eligible to request deferred action. Although the DACA Rescission Memo notes that it does not limit DHS's "otherwise lawful enforcement or litigation prerogatives," it makes clear that DHS "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after [September 5, 2017]" and "[w]ill reject all DACA renewal requests and associated applications for Employment Authorization Documents" inconsistent with the terms of the Memo. This affirmative decision to constrain DHS's prosecutorial discretion cannot be analogized to an exercise of prosecutorial

24

Reply Add. 24

discretion, which would be presumptively immune from judicial review.  Cf. Texas, 809 F.3d at 165-69 (creation of the DAPA program was reviewable because it was a "affirmative agency action," not an exercise of enforcement discretion).  Second, Plaintiffs do not challenge non-enforcement decisions, which do not subject individuals to the "coercive power" of the state. Chaney, 470 U.S. at 831.  To the contrary, the rescission of the DACA program subjects individuals who previously enjoyed some protection from removal to coercive state authority. Third, Defendants' decision to rescind the DACA program does not appear to have been motivated by a "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."  See id.  Instead, Defendants stated that they were required to rescind the DACA program because it was unlawful, which suggests both that Defendants did not believe that they were exercising discretion when rescinding the program and that their reasons for doing so are within the competence of this court to review.  (Sessions Letter; DACA Rescission Memo at 4.)  The decision to rescind the DACA program is thus manifestly unlike the non-enforcement decision at issue in Chaney.  While courts have also held that agency decisions to take (as opposed to refrain from taking) enforcement action are also unreviewable under the APA when there are no judicially manageable standards for reviewing the agency's discretion in choosing to bring an enforcement action, see Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n, 528 F.3d 310, 316-19 (4th Cir. 2008); Twentymile Coal, 456 F.3d at 155-59, those cases are inapposite because there is "law to apply" to review the decision to rescind DACA.

Finally, Defendants' arguments that Section 701(a)(2) precludes judicial review of Plaintiffs' suits focus on the decision to rescind the DACA program.  Defendants do not explain why the alleged decision to change DHS's policy regarding the use of DACA applicants' information should be immune from judicial review.  To the contrary, there is "law to apply" in

reviewing that decision (namely, DHS's prior statements about the uses of DACA applicants' information), and the court does not understand how the change in that policy can be analogized to the sorts of decisions, such as enforcement and non-enforcement decisions, that courts have recognized as presumptively exempt from judicial review. Accordingly, to the extent the Batalla Vidal Plaintiffs also challenge DHS's alleged change in information-use policy as part of their substantive APA claim, that claim is reviewable. (SAC ¶¶ 151, 153-54.)

### 2. Constitutional Claims

Nor does Section 701(a)(2) preclude judicial review of Plaintiffs' constitutional claims. It is well-established that "even where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated." Padula v. Webster, 822 F.2d 97, 101 (D.C. Cir. 1987); accord Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 347 (4th Cir. 2001); Woodward v. United States, 871 F.2d 1068, 1072-73 (Fed. Cir. 1989).

In Webster v. Doe, 486 U.S. 592 (1988), the Court rejected the Government's argument that Section 701(a)(2) barred a former CIA employee from bringing constitutional claims challenging his termination from the agency. Because the National Security Act of 1947 vested the CIA Director with authority over firing decisions, the decision to fire the plaintiff because of his sexual orientation had been "committed to agency discretion by law," and he could not challenge that decision under the APA. Id. at 594-95, 599-601. The National Security Act did not expressly preclude review of constitutional claims, however, so the Court would not presume that such claims were unreviewable. Id. at 603-04 (noting that the Court has held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," in order to "avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (quoting Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n.12 (1986))). Similarly, Defendants

26

Reply Add. 26

identify no express indication that Congress intended to preclude judicial review of the actions at issue in these cases. While DHS undoubtedly exercises "wide discretion . . . in the enforcement of the immigration laws" (Defs. Mem. at 16), that is insufficient to preclude review of Plaintiffs' constitutional claims.

3. Deference to the Executive Branch on Immigration Matters Does Not Counsel a Different Result

Lastly, Defendants contend that the court should read Section 701(a)(2) broadly in light of the Executive Branch's wide discretion to enforce the immigration laws. (Id. at 16-17.) The Supreme Court, however, has applied the "strong presumption in favor of judicial review of administrative action" in the immigration context. See INS v. St. Cyr, 533 U.S. 289, 299 (2001). Defendants' specific arguments for a broad reading of Section 701(a)(2) likewise unavailing. While Defendants argue that judicial review of these cases is inappropriate because review could slow down the Executive Branch's removal of undocumented immigrants from this country, 8 U.S.C. § 1252(g) already precludes individuals in removal proceedings from delaying those proceedings by claiming that they were improperly denied deferred action. See AAADC, 525 U.S. at 485. In any event, those concerns do not apply to these cases, as the court discusses in Section III.B below. Defendants also argue that judicial review of immigration decisions is inappropriate because judicial review "may involve 'not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives' or other sensitive matters." (Defs. Mem. at 16 (quoting AAADC, 525 U.S. at 490).) Defendants' stated rationale for rescinding the DACA program, however, turns wholly on questions of U.S. constitutional and administrative law, not sensitive law-enforcement, intelligence, or foreign-policy issues. In any event, vague speculation that judicial review might somehow implicate foreign-policy concerns is insufficient to justify a presumption that

27

Reply Add. 27

immigration cases are not subject to judicial review. See Washington v. Trump, 847 F.3d 1151, 1161 (9th Cir. 2017) ("[T]he Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration . . . ."), reconsid. en banc denied, 853 F.3d 933 (9th Cir. 2017), superseded by 858 F.3d 1168 (9th Cir. 2017). While the court is sensitive to the deference warranted to the Executive Branch in this sphere, Defendants' claims for deference cannot substitute for the "clear and convincing evidence" that Congress intended to restrict judicial review of administrative action. Sharkey v. Quarantillo, 541 F.3d 75, 84 (2d Cir. 2008) (internal quotation marks and citation omitted).

**B. INA Jurisdictional Bar**

Nor does the INA divest the court of jurisdiction to hear this case. That Act contains a provision, 8 U.S.C. § 1252(g), that limits judicial review of certain actions "by or behalf of any alien arising from" certain deportation proceedings. 8 U.S.C. § 1252(g); see AAADC, 525 U.S. at 472. As explained below, that provision has no bearing on these cases, which do not arise from one of the three specifically enumerated actions by immigration authorities that trigger application of the statute. Moreover, by its terms, Section 1252(g) does not apply to claims brought by MRNY or the State Plaintiffs.

1. Programmatic Challenges to DACA-Related Decisions

First, the court considers whether Section 1252(g) strips the court of jurisdiction to hear Plaintiffs' challenges to the decision to rescind the DACA program. The court begins, as usual, with the text of the statute. In relevant part, Section 1252(g) provides as follows:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

28

**Reply Add. 28**

(emphasis added). As the Court has stated, this "provision applies only to three discrete actions that the Attorney General make take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" AAADC, 525 U.S. at 482. Accordingly, the court must consider whether Plaintiffs' suits "arise from [a] decision or action by [DHS[11]] to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g).

They do not. Defendants' termination of the DACA program does not, by itself, "commence proceedings, adjudicate cases, or execute removal orders against any alien." Id. By rescinding the DACA program, Defendants eliminated a set of guidelines identifying a discrete class of undocumented immigrants who were eligible to apply for deferred action. (See 2012 DACA Memo.) That decision, by itself, did not trigger any specific enforcement proceedings.[12] Nor do the individual Batalla Vidal Plaintiffs attack decisions by DHS to "commence proceedings, adjudicate cases, or execute removal orders" against them or any other specific individuals. Each of those Plaintiffs has received deferred action (see SAC ¶¶ 3-42), and the record does not suggest that any are currently in removal proceedings and seek to challenge the end of the DACA program as a means of obstructing those proceedings. Instead, Plaintiffs bring broad, programmatic challenges to Defendants' decisions (1) to end the DACA program; (2) to provide limited notice of that decision to DACA recipients; and (3) to change DHS's

---

[11] As part of transferring many immigration-related responsibilities from the Attorney General to the Secretary of DHS, the Homeland Security Act of 2002 provides that statutory references "to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary [of DHS], other official, or component of [DHS] to which such function is so transferred." 6 U.S.C. § 557; Shabaj v. Holder, 718 F.3d 48, 51 n.3 (2d Cir. 2013).

[12] Defendants have represented publicly that no action will be taken against DACA recipients prior to March 5, 2018. (See, e.g., Donald J. Trump (@realDonaldTrump), Twitter.com (Sept. 7, 2017, 6:42 a.m.), https://twitter.com/realdonaldtrump/status/905788459301908480 ("For all of those (DACA) that are concerned about your status during the 6 month period, you have nothing to worry about - No action!").)

Reply Add. 29

information-use policy.  None of those constitutes a "decision or action . . . to commence

proceedings, adjudicate cases, or execute removal orders against any alien."  8 U.S.C. § 1252(g);

cf. Texas, 809 F.3d at 164 (creation of DAPA reviewable because "decision to grant lawful

presence to millions of [undocumented immigrants] on a class-wide basis" was not enumerated

in the text of Section 1252(g)).  Accordingly, Section 1252(g) does not bar judicial review of

challenges to those decisions.

This conclusion comports with both the plain meaning of the statute and with the

Supreme Court's decision in AAADC.  First, AAADC makes clear that Section 1252(g) only

limits judicial review with respect to suits arising from certain enumerated decisions by

immigration authorities.  Writing for the Court, Justice Scalia specifically rejected the notion that

Section 1252(g) was "a sort of 'zipper' clause that says 'no judicial review in deportation cases

unless this section provides judicial review."  525 U.S. at 482.  Instead, "[t]he provision applies

only to [the] three discrete actions" referenced above.  Id.  While "[t]here are of course many

other decisions or actions that may be part of the deportation process," the Court stated, "[i]t is

implausible that the mention of three discrete events along the road to deportation was a

shorthand way of referring to all claims arising from deportation proceedings."  Id.  Defendants'

argument that Section 1252(g) encompasses challenges to the decision to end the DACA

program because "[t]he denial of continued deferred action is a necessary step in commencing

enforcement proceedings at some later date" (Defs. Mem. at 18), is thus at odds with AAADC.

Second, the reasoning of AAADC does not support extending Section 1252(g) to

encompass challenges to the decision to rescind DACA.  In AAADC, the Court reasoned that

Section 1252(g) must have been intended to limit judicial review of denials of deferred action:

> Section 1252(g) seems clearly designed to give some measure of
> protection to "no deferred action" decisions and similar

30

> discretionary determinations, providing that if they are reviewable
> at all, they at least will not be made the bases of separate rounds of
> judicial intervention outside the streamlined process that Congress
> has designed [(i.e., for judicial review of final orders of removal)].

525 U.S. at 485. These limits were "entirely understandable" in order to prevent "the

deconstruction, fragmentation, and hence prolongation of removal proceedings" that could result

if immigrants were allowed to attack in-process removal proceedings by claiming that they were

singled out by immigration authorities for adverse treatment. Id. at 487; see id. at 487-92.

Because the Batalla Vidal Plaintiffs challenge the programmatic decision to rescind DACA,

rather than attempting to obstruct their specific removal proceedings by claiming that they were

improperly denied deferred action, these cases do not implicate the concern raised in AAADC.

Accordingly, Section 1252(g) does not preclude review of these actions.

### 2. Claims by MRNY and the State Plaintiffs

Moreover, Section 1252(g) does not preclude judicial review of the claims brought by

MRNY or the State Plaintiffs in particular. Again, the court begins with the text of the statute.

Section 1252(g) only bars suits "by or on behalf of any alien arising from the decision or action .

. . to commence proceedings, adjudicate cases, or execute removal orders against any alien."

(emphasis added). But neither MRNY nor the State Plaintiffs are suing "on behalf of any alien"

in removal proceedings or subject to an order of removal. Instead, MRNY sues in its own right,

because it claims that the rescission of DACA has interfered with its operations. (SAC ¶¶ 54-

57.) Likewise, the State Plaintiffs sue not "on behalf of any alien," but instead to vindicate their

31

**Reply Add. 31**

own proprietary and quasi-sovereign interests.[13]  (State Pls. Opp'n to Mot. to Dismiss ("State Pls. Opp'n") (No. 17-CV-5228, Dkt. 82) at 19-22.)  MRNY and the State Plaintiffs seek to assert their own rights and the rights of the general public, not those of individual immigrants in removal proceedings or subject to orders of removal.  There is no reason why Section 1252(g) would deprive the court of jurisdiction over their claims, brought on their own behalf.

## C. Standing

The court next considers whether Plaintiffs have established that they have standing to sue.  Defendants only cursorily raise Article III standing defenses.  (Defs. Mem. at 19-20, 34, 37.)  "Because the standing issue goes to this [c]ourt's subject matter jurisdiction," however, "it can be raised <u>sua sponte</u>."  <u>Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.</u>, 433 F.3d 181, 198 (2d Cir. 2005).

Under the U.S. Constitution, federal courts may hear only certain "cases" or "controversies."  U.S. Const. art. III, § 2.  This "case-or-controversy requirement" means that a plaintiff must have "standing," or a sufficient interest in a live dispute, to sue in federal court.  <u>See</u> <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1546-47 (2016).  At its "irreducible constitutional minimum," <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992), standing consists of three elements:

> To establish Article III standing, [Plaintiffs] must demonstrate: "(1) <u>injury-in-fact</u>, which is a concrete and particularized harm to a legally protected interest; (2) <u>causation</u> in the form of a fairly

---

[13] While a <u>parens patriae</u> suit is in some sense brought by a state "on behalf of" its citizens, "[t]he asserted quasi-sovereign interests will be deemed sufficiently implicated to support <u>parens patriae</u> standing only if 'the injury alleged affects the general population of a State in a substantial way.'"  <u>Puerto Rico ex rel. Quiros v. Bramkamp</u>, 654 F.2d 212, 215 (2d Cir. 1981) (emphasis added) (quoting <u>Maryland v. Louisiana</u>, 451 U.S. 725, 738 (1981)).  A state cannot sue <u>parens patriae</u> simply to assert its citizens' personal claims.  <u>See</u> <u>Pennsylvania v. New Jersey</u>, 426 U.S. 660, 665-66 (1976) (per curiam) (collecting cases).  To the extent the State Plaintiffs attempt to bring <u>parens patriae</u> claims based on harm to their quasi-sovereign interests, those claims are not "on behalf of" specific immigrants, but instead seek to protect the general welfare of their residents.  In any event, as the court discusses below, the State Plaintiffs lack <u>parens patriae</u> standing to bring these claims.

32

traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."

Allco Fin. Ltd. v. Klee, 861 F.3d 82, 95 (2d Cir. 2017) (quoting W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008)); accord Lujan, 504 U.S. at 560-61. The "first and foremost" of these three requirements, "injury-in-fact" requires a plaintiff to "show that he or she suffered an invasion of a legally protected interest that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks and citation omitted) (quoting Lujan, 504 U.S. at 560). To be "imminent," the injury must be "certainly impending"; "allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal quotation marks, alteration, and citation omitted). The second and third requirements, "causation" and "redressability," require a plaintiff to demonstrate that the "injury-in-fact" he or she suffers is "fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386 (2014) (citing Lujan, 504 U.S. at 560). A plaintiff need not, however, demonstrate that the defendant was the proximate or "but-for" cause of the injury-in-fact. Id. at 1391 n.6; Rothstein v. UBS AG, 708 F.3d 82, 91-92 (2d Cir. 2013).

The court considers standing separately with respect to each claim raised in each case. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" with respect to each claim and form of relief sought. Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 53 n.3 (2006) ("FAIR"). The court therefore considers whether, for each claim raised in each of these two actions, at least one plaintiff has standing to sue.

33

1. Batalla Vidal Plaintiffs

a. *DACA Rescission Claims*

Defendants unsurprisingly do not contest that the Batalla Vidal Plaintiffs have standing to challenge the decision to rescind the DACA program. If the DACA program ends, the individual Batalla Vidal Plaintiffs almost certainly will lose their work authorization, the availability of which turns on their status as recipients of deferred action. See 8 C.F.R. § 274a.12(c)(14). Loss of their ability to work in the United States is clearly an "injury-in-fact" fairly traceable to the rescission of the DACA program. Additionally, if they were to lose their deferred action, the individual Batalla Vidal Plaintiffs would be subject to removal from the United States. There is nothing "speculative" about the possibility that they would actually be removed. See Hedges v. Obama, 724 F.3d 170, 195-97 (2d Cir. 2013) (to establish standing, a plaintiff who is clearly in violation of a "recent and not moribund" statute need not affirmatively demonstrate the government's intent to enforce the statute, absent "a disavowal by the government or another reason to conclude that no such intent exist[s]" (quoting Doe v. Bolton, 410 U.S. 179, 188 (1973))); cf. Amnesty Int'l, 568 U.S. at 410-16 (no standing where alleged injury-in-fact rested on a "speculative" "chain of contingencies"). Those harms are "fairly traceable" to the termination of the DACA program and would be redressed by the vacatur of that decision. The Batalla Vidal Plaintiffs thus have Article III standing to challenge the decision to rescind the DACA program.

The Batalla Vidal Plaintiffs also have standing to challenge the process by which Defendants decided to end the DACA program. Plaintiffs have standing to assert procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest . . . that is the ultimate basis of [their] standing." Lujan, 504 U.S. at 573 n.8. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that

34

the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. EPA, 549 U.S. 497, 518 (2007). Here, there is "some possibility" that if Defendants had subjected the decision to rescind the DACA program to notice and comment and analyzed the impact of that decision on small entities, they would have reached a different outcome. Accordingly, the Batalla Vidal Plaintiffs also have Article III standing to assert their procedural APA claim, and MRNY has Article III standing to assert its RFA claim.

Defendants contend that Plaintiffs cannot assert procedural APA claims because, if the decision to rescind the DACA program was a "substantive" or "legislative" rule requiring notice-and-comment rulemaking, then, "a fortiori so was enacting the policy in the first place," and the DACA program itself was thus "void ab initio—leaving Plaintiffs without a remedy." (Defs. Mem. at 28-29.) It does not follow, however, that if the rescission of the DACA program required notice and comment, the program's creation necessarily required notice and comment as well. (See Defs. Mem. at 29 n.7.) While Defendants might be correct on the merits (an issue that the court does not consider or resolve at this time), all that Article III requires is that Plaintiffs show that their alleged injury would be redressed by the ruling they seek—i.e., that the decision to rescind DACA should be vacated because it was procedurally defective.

b. *Information-Use Policy Claim*

The Batalla Vidal Plaintiffs also have standing to challenge the alleged changes to DHS's information-use policy. To obtain deferred action and work authorization under DACA, an applicant was required to provide USCIS with extensive personal information, including his or her home address, height, weight, hair and eye color, fingerprints, photograph, and signature, and submit to a background check. (See USCIS, Form I-821D: Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60-1)) at ECF pp.6-8; USCIS, Instructions for

35

Consideration of Deferred Action for Childhood Arrivals (SAC, Ex. B (Dkt. 60-1)) at ECF p.3.)
The Batalla Vidal Plaintiffs also allege that DACA applicants "routinely provided" other
personal information, "including copies of school records, pay stubs, bank statements, passports,
birth certificates, and similar records," in support of their applications. (SAC ¶ 70.) They
contend that this information will enable DHS to deport them more easily once their deferred
action expires. (Id. ¶ 127.) The court agrees. It is not difficult to infer that this information
would facilitate DHS's ability to remove these individuals from the country. This increased
likelihood of removal is sufficiently concrete, imminent, and traceable to Defendants' alleged
conduct to establish standing.

Defendants argue that Plaintiffs lack standing to pursue their information-use policy
claims because "[n]o Plaintiff plausibly alleges that the agency has in fact used his DACA
information for any enforcement purpose, much less initiated enforcement proceedings against
him as a result, or that there is any imminent threat of this occurring." (Defs. Mem. at 37.) The
individual Batalla Vidal Plaintiffs need not wait, however, until they are deported to have
standing to press this claim. Once their deferred action expires, they will be subject to removal
from the United States, and the court will presume that Defendants will enforce the immigration
laws against them. See Hedges, 724 F.3d at 197. Nor will the court ignore the obvious reality
that many DACA recipients will be removed from the country when their deferred action
expires. (See, e.g., State Pls. Am. Compl. ¶ 71 (quoting a statement by Acting Director of ICE
Thomas Homan that undocumented immigrants "should be uncomfortable" and "should look
over [their] shoulder[s]" and "be worried").) The threat of removal based on information
provided to DHS is sufficiently imminent as to constitute injury-in-fact.

36

Reply Add. 36

### c. Notice Claim

The Batalla Vidal Plaintiffs lack standing, however, to assert their notice claim. In their Second Amended Complaint, the Batalla Vidal Plaintiffs allege that, following the enactment of the DACA Rescission Memo, Defendants failed to send DACA recipients whose status expired by March 5, 2018, individualized notices "advising them that they must apply to renew DACA by October 5, 2017 or be forever ineligible to renew their status." (SAC ¶ 165; see id. at 3, ¶¶ 48, 103-05, 160-66.) As Defendants correctly note, however, the Batalla Vidal Plaintiffs have not alleged that any of them missed the October 5, 2017, deadline or suffered other adverse effects from not receiving such individualized notice. (Defs. Mem. at 34-35.) Nor, even drawing all reasonable inferences in Plaintiffs' favor, does the Second Amended Complaint show that MRNY was injured by Defendants' failure to provide DACA recipients with individualized notice of the renewal deadline.[14] While the Second Amended Complaint alleges that "MRNY has not been able to reach four DACA recipients to inform them that they need to renew now" (SAC ¶ 48), that does not support the reasonable inferences either that those individuals failed to apply for renewal or that such failure was "fairly traceable" to Defendants' actions.[15] In the absence of a showing that anyone has been harmed by a failure to receive notice

---

[14] The court also notes that the renewal deadline provided by the DACA Rescission Memo was not significantly different than that provided by existing DHS policy. The State Plaintiffs allege that "[p]rior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120-150 days prior to expiration . . . in order to avoid a lapse in deferred action and employment authorization." (State Pls. Am. Compl. ¶ 93.) Under the DACA Rescission Memo, a DACA recipient whose deferred action and work authorization was set to expire on March 4, 2018, was required to file an application for renewal by October 5, 2018—i.e., 150 days before those benefits were set to expire.

[15] Even if those conditions were met, it is not clear that MRNY would have organizational standing to bring this claim. See Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) ("[O]ur prior cases . . . have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm.")

Reply Add. 37

of the change to the application deadline, the <u>Batalla Vidal</u> Plaintiffs have not demonstrated that

they have Article III standing to bring this claim.

2. <u>State Plaintiffs</u>

The court next considers whether the State Plaintiffs have Article III standing. As the

Court has noted, the ordinary rules of standing are somewhat different when a state is a plaintiff.

States are "not normal litigants for the purposes of invoking federal jurisdiction," and they are

entitled to "special solicitude" when they seek to vindicate their "proprietary" or "quasi-

sovereign" interests.[16] <u>Massachusetts v. EPA</u>, 549 U.S. at 518. This does not mean, however,

that states have unbridled license to sue.

*a. The State Plaintiffs Have Standing to Challenge the DACA Rescission*

The State Plaintiffs have Article III standing to challenge Defendants' decision to rescind

the DACA program, as well as the procedures by which that decision was made and

implemented, based on that decision's impacts to the State Plaintiffs' proprietary interests.

States, "like other associations and private parties," may have a "variety of proprietary interests"

that they may vindicate in court. <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez</u>, 458

U.S. 592, 601-02 (1982) ("Snapp"). A state has proprietary interests, for example, in its

ownership of land, <u>id.</u> at 601, and in its relationships with its employees, <u>see Indiana v. IRS</u>, 38

F. Supp. 3d 1003, 1009 (S.D. Ind. 2014) ("The Defendants recognize, as they must, that a State

---

[16] The Court has categorized a state's litigation interests using the trichotomy of "sovereign," "quasi-sovereign," and "proprietary" interests. <u>See</u> <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez</u>, 458 U.S. 592, 601 (1982) ("<u>Snapp</u>"). Proprietary interests are those that a state may have akin to a private party, such as ownership of land or participation in a business venture. <u>Id.</u> at 601. Sovereign interests are interests the state has in its capacity as a state, such as "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" and "the demand for recognition from other sovereigns." <u>Id.</u> "Quasi-sovereign" interests are harder to define but "consist of a set of interests that the State has in the well-being of its populace." <u>Id.</u> at 602; <u>see also id.</u> at 607 ("[T]he articulation of [quasi-sovereign] interests is a matter for case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract . . . .").

and its political subdivisions may sue in their capacity as employers."). A state also has proprietary interests in its "participat[ion] in a business venture," Snapp, 458 U.S. at 601, and in the operation of state-run institutions, such as state colleges and universities, Washington, 847 F.3d at 1159-61; Aziz v. Trump, 231 F. Supp. 3d 23, 32-33 (E.D. Va. 2017).

Here, the State Plaintiffs have amply alleged and documented that the rescission of DACA would harm the states' proprietary interests as employers and in the operation of state-run colleges and universities. (State Pls. Am. Compl. ¶ 190 (states employ "[m]any DACA recipients").). For example, the State of Washington represents that it employs DACA recipients within state government (e.g., Decl. of Paul Quinonez ¶¶ 1-6 (State Pls. Am. Compl., Ex. 56 (Dkt. 55-56)); Decl. of E. Alexandra Monroe ¶ 3-4 (State Pls. Am. Compl., Ex. 62 (Dkt. 55-62))) and at state-run colleges and universities (e.g., Decl. of Lucila Loera ¶ 4 (State Pls. Am. Compl., Ex. 58 (Dkt. 55-58))). If DACA were rescinded, these employees would lose their work authorization, and the State of Washington would incur expenses in identifying, hiring, and training their replacements. (State Pls. Am. Compl. ¶ 190.) Accordingly, the State of Washington has standing to assert equal protection and substantive APA claims challenging the decision to end the DACA program. Moreover, Washington has standing to challenge the procedures by which Defendants decided to end the DACA program, because "there is some possibility" that, if DHS complied with notice-and-comment and RFA rulemaking procedures, it might "reconsider the decision." See Massachusetts v. EPA, 549 U.S. at 518. Because Washington has established its standing to assert substantive and procedural APA and RFA claims, the State Plaintiffs therefore have Article III standing to bring these claims. See FAIR, 547 U.S. at 53 n.3.

Defendants' arguments that State Plaintiffs lack Article III standing because they would be only "incidentally" harmed by the rescission of the DACA program are without merit. (See Defs. Mem. at 19.) Defendants protest that "[i]t would be extraordinary to find Article III standing" based on a state's assertions of "alleged harms to their residents, employees, tax bases, health expenditures, and educational experiences at their universities," as "virtually any administration of federal law by a federal agency could have such effects." (Id.) That a federal policy may have sweeping, adverse effects on states and state-run institutions is not, however, a convincing argument that states should not have standing to challenge that policy. Moreover, Defendants' position is irreconcilable with their own stated rationale for rescinding the DACA program. Defendants have stated that they rescinded the DACA program because it suffered from the same legal flaws as the DAPA program and could not be defended in court against the threatened challenge by Texas and other state plaintiffs. That necessarily assumes that at least one of the plaintiff states in the Texas litigation has standing to challenge the existence of the DACA program. Cf. Texas, 809 F.3d at 150-62 (finding standing based on the likely costs of having to issue drivers licenses to DAPA beneficiaries). Defendants offer no convincing reason why states should have standing to challenge the DACA program but not to challenge the decision to end that program.[17]

---

[17] Defendants' arguments to the contrary are unpersuasive. (Defs. Mem. at 21.) First, Defendants argue that neither the Acting Secretary nor the Attorney General "expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings." (Id.) Jurisdiction is, however, a prerequisite to a ruling on the merits, so the plaintiff states could prevail in their threatened challenge to the DACA program only if they had standing. Second, Defendants argue that "it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place," and that the Executive Branch has "an independent duty to consider the legality of . . . policies regardless of whether they are judicially reviewable." (Id.) The DACA Rescission Memo does not indicate, however, that Defendants actually considered these issues when deciding to rescind the DACA program. Finally, Defendants argue that the adoption of the DACA program could have been reviewed as an abdication of DHS's statutory responsibilities—a grounds for justiciability that would not apply to the decision to rescind the program. (Id. at 21-22.) The Fifth Circuit expressly did not rely on that theory of standing, 809 F.3d at 150, nor is there any indication that the Attorney General or Acting Secretary considered it in rescinding the DACA program.

b. *The State Plaintiffs Lack Standing to Bring Notice and Information-Use Policy Claims*

Whether the State Plaintiffs can assert their notice or information-use policy claims,

however, is a close question. In order to assert these claims, the State Plaintiffs must identify

some cognizable proprietary or quasi-sovereign interest that was harmed by Defendants'

challenged conduct—i.e., (1) with respect to the notice claim, Defendants' communication of its

decision to rescind the DACA program and impose an October 5, 2017, renewal deadline; and

(2) with respect to the information-use policy claims, the alleged change in DHS policy

regarding the use of DACA applicants' information. In the court's view, the State Plaintiffs have

not identified any interests harmed by these actions that they can sue the federal government to

redress, and so they lack standing to bring these claims.

i.   *Proprietary Interests*

While the State Plaintiffs allege that their proprietary interests will be harmed by the

termination of DACA (State Pls. Am. Compl. ¶¶ 15, 100), they do not identify any proprietary

interests that have been or will be harmed by Defendants' alleged failure to provide DACA

recipients with "adequate notice" of the "procedures and timeline for renewing their DACA

status," "about the general termination of the DACA program after March 5, 2018," or "of

[DACA recipients'] inability to apply for renewal of their DACA status after March 5, 2018"

(id. ¶¶ 276-78; cf. State Pls. Mem. at 19-21). It is certainly conceivable that many DACA

recipients who were eligible to renew their deferred action and work authorization under the

DACA Rescission Memo failed to do so before the October 5, 2017 deadline. (State Pls. Am.

Compl. ¶ 96 (noting that "up to one third of DACA grantees who are eligible for renewal had not

applied as of two days before the . . . deadline").) The State Plaintiffs' Amended Complaint does

not provide a sufficient basis for the court to conclude, however, that (1) such failures to renew

were "fairly traceable" to Defendants' decision not to provide each DACA recipient with

41

individualized notice of the change in application procedures and timelines; or (2) that these failures to renew harmed any State Plaintiff's proprietary interests (for example, by depriving a state employee of work authorization). See <u>Amnesty Int'l</u>, 568 U.S. at 410-16. Accordingly, the State Plaintiffs fail to assert a proprietary interest that would give them standing to bring their notice claim.[18]

Nor do the State Plaintiffs identify a cognizable proprietary interest harmed by the alleged change to DHS's information-use policy. The State Plaintiffs' information-use policy claims challenge not the decision to rescind DACA itself, but the alleged changes in DHS's information-use policy, which, Plaintiffs allege, will facilitate the deportation of DACA applicants. As discussed above, the court accepts that these changes (if true) will likely result in more undocumented immigrants' removal from the United States. (See State Pls. Am. Compl. ¶ 86.) The State Plaintiffs have not, however, identified any cognizable harm to their proprietary interests that would result from the removal of their undocumented residents. The State Plaintiffs have proffered evidence that the removal of DACA beneficiaries would grievously affect state economies. (See Decl. of Dr. Ike Brannon ¶¶ 12, 14 (State Pls. Am. Compl., Ex. 4 (Dkt. 55-4)) (estimating that the removal of DACA recipients from the United States "would cost . . . the economy as a whole $215 billion in lost GDP," with impacts falling hardest on states with the largest number of DACA recipients).) Despite the scale of these impacts, the State Plaintiffs' own authority makes clear that states lack standing to bring a "claim . . . that actions taken by United States Government agencies had injured a State's economy and thereby caused a

---

[18] In this circuit, the State Plaintiffs need not demonstrate, however, that the individuals they seek to protect must themselves meet the injury-in-fact, causation, and redressability requirements of Article III. See <u>Connecticut v. Am. Elec. Power Co.</u>, 582 F.3d 309, 338-39 (2d Cir. 2009), <u>aff'd in relevant part by an equally divided court</u>, 564 U.S. 410, 420 (2011).

42

decline in general tax revenues." Wyoming v. Oklahoma, 502 U.S. 437, 448 (1992). Absent some showing of injury to their own proprietary interests (for example, "direct injury in the form of a loss of specific tax revenues," id.), the State Plaintiffs cannot maintain their information-use policy claims based on alleged harms to their proprietary interests.

ii.   *Quasi-Sovereign Interests*

Accordingly, the court will consider whether the State Plaintiffs can assert these claims parens patriae to vindicate their quasi-sovereign interests. States may bring parens patriae (literally, "parent of the country") suits to vindicate what the Court has characterized as "quasi-sovereign" interests. See Snapp, 458 U.S. at 600-02. There are no bright-line rules for which interests qualify as "quasi-sovereign." See id. at 600, 607; 13B Charles A. Wright et al., Federal Practice and Procedure § 3531.11.1, at 117 (3d ed. 2008) ("Wright & Miller"). In general, however, the Court has recognized that a state has quasi-sovereign interests in the "health and well-being—both physical and economic—of its residents in general," in protecting state "residents from the harmful effects of discrimination," and in challenging the discriminatory denial of a state's "rightful status within the federal system." Id. at 607, 609. There are, however, at least two notable limitations on states' parens patriae standing.

First, to be "quasi-sovereign," the state's interests must be sufficiently generalized that the state is seeking to vindicate its citizens' welfare, rather than simply pressing suit on behalf of its individual residents. See id. at 607 ("[M]ore must be alleged than injury to an identifiable group of individual residents . . . ."). A state cannot sue parens patriae when it is "merely litigating as a volunteer the personal claims of its citizens." Pennsylvania v. New Jersey, 426 U.S. 660, 665 (1976).

Second, special considerations are present when a state brings a parens patriae suit against the federal government. See 13B Wright & Miller § 3531.11.1, at 96. In Massachusetts

43

v. Mellon, 262 U.S. 447 (1923), the Court rejected Massachusetts's attempt to bring a parens patriae suit challenging a federal statute as unconstitutional. See id. at 485-86. "While the state, under some circumstances, may sue in [a parens patriae] capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae . . . ." Id. (emphasis added); see also Snapp, 458 U.S. at 609 n.16 ("A State does not have standing as parens patriae to bring an action against the Federal Government."). The Court has rejected the argument, however, that Massachusetts v. Mellon bars all state parens patriae claims against the federal government. See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2664 n.10 (2015) (observing that "[t]he cases on the standing of states to sue the federal government seem to depend on the kind of claim that the state advances" (quoting Richard Fallon et al., Hart and Wechsler's The Federal Courts and the Federal System 263-66 (6th ed. 2009))). Compare Massachusetts v. EPA, 549 U.S. at 520 n.17, with id. at 538-39 (Roberts, C.J., dissenting). Instead, states may sue the federal government parens patriae to enforce rights guaranteed by a federal statute. See Massachusetts v. EPA, 549 U.S. at 520 n.17; see also New York v. Sebelius, No. 1:07-CV-1003 (GLS) (DRH), 2009 WL 1834599, at *12 (N.D.N.Y. June 22, 2009) (collecting cases). Massachusetts v. EPA expressly did not disturb the settled rule, however, that a state may not sue parens patriae to "protect her citizens from the operation of federal statutes." Massachusetts v. EPA, 549 U.S. at 520 n.17 (quoting Georgia v. Penn. R. Co., 324 U.S. 439, 447 (1945)).

The court concludes that the State Plaintiffs lack standing to bring either their notice and information-use policy claims. With respect to their notice claim, the State Plaintiffs have not argued or demonstrated that Defendants' alleged failure to provide DACA applicants with

44

adequate notice of changes in the DACA program and renewal deadline has actually harmed "the health and well-being" of state residents or any other cognizable quasi-sovereign interest. See Snapp, 458 U.S. at 607. (Cf. State Pls. Am. Compl. ¶¶ 15, 100; State Pls. Opp'n at 21-22.) Even if they had done so, they would be challenging federal enforcement of federal immigration laws as unconstitutional, which Massachusetts v. Mellon prohibits. See Massachusetts v. EPA, 549 U.S. at 520 n.17 ("[T]here is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what Mellon prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)."). For the same reason, the State Plaintiffs also lack standing to assert their information-use policy claims. Even assuming, as discussed above, that the change in information-use policy will facilitate the removal of undocumented immigrants from these states, and that this removal will harm the "health and well-being—both physical and economic" of state residents, see Snapp, 458 U.S. at 607, the thrust of the State Plaintiffs' information-use policy claims is to challenge as fundamentally unfair a change in federal policy that will facilitate the federal government's enforcement of the immigration laws.

The State Plaintiffs' argument that they merely seek to "enforce—as opposed to overturn or avoid—application of a federal statute" is unpersuasive. (State Pls. Opp'n at 21 n.11) Plaintiffs plainly seek to invalidate federal action as unconstitutional. Such claims more closely resemble constitutional challenges to application of federal statutes, which Massachusetts v. Mellon prohibits states from asserting parens patriae, than suits to enforce compliance with federal statutory law, which Massachusetts v. EPA permits states to bring parens patriae. When challenging federal action on constitutional grounds, "it is no part of [the state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government."

45

**Reply Add. 45**

Massachusetts v. Mellon, 262 U.S. at 485-86. But see Aziz, 231 F. Supp. 3d at 31-32 (concluding that "a state is not barred by the Mellon doctrine from a parens patriae challenge to executive action when the state has grounds to argue that the executive action is contrary to federal statutory or constitutional law" (emphasis added)).

The court concludes, therefore, that the State Plaintiffs lack standing to assert their notice and information-use policy claims.

### D. Whether State Plaintiffs Have Cause of Action under the APA

Lastly, Defendants assert that neither MRNY's nor the State Plaintiffs' claims are justiciable because those Plaintiffs do not assert interests that are "arguably within the zone of interests . . . protected or regulated by the statute . . . in question." (Defs. Mem. at 21 (quoting Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 395 (1987) (first alteration added)).) To bring suit under the APA, a plaintiff "must satisfy not only Article III's standing requirements, but an additional test: [t]he interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 224 (2012) ("Match-E-Be-Nash") (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)). This test "is not meant to be especially demanding'" and "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" Id. (quoting Secs. Indus. Ass'n, 479 U.S. at 399).

Critically, for the court's current purposes, whether MRNY and the State Plaintiffs assert interests falling within the "zone of interests" protected by the APA is not a question of "jurisdiction" or "justiciability." As the Supreme Court has explained, the question of whether a plaintiff falls within the zone of interests protected by a statute is not properly classed as an issue

46

of "prudential standing," but is instead an issue of "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l, 134 S. Ct. at 1387. That issue "goes not to the court's jurisdiction—that is, 'power'—to adjudicate a case, but instead to whether the plaintiff has adequately pled a claim." Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 201 (2d Cir. 2014) (citing Lexmark Int'l, 134 S. Ct. at 1387 n.4, 1389 n.5); see also Casper Sleep, Inc. v. Mitcham, 204 F. Supp. 3d 632, 637-38 (S.D.N.Y. 2016) (arguments for dismissal for lack of "prudential standing" were appropriately addressed under Rule 12(b)(6), not Rule 12(b)(1), of the Federal Rules of Civil Procedure). Because this argument does not raise an issue of "jurisdiction or justiciability," the court does not address it here.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for lack of subject-matter jurisdiction (Dkt. 95) is GRANTED IN PART and DENIED IN PART. The following claims are dismissed:

- Batalla Vidal v. Duke, No. 16-CV-4756:
    - Fourth claim for relief (Due Process Clause—Notice)
- New York v. Trump, No. 17-CV-5228:
    - Second claim for relief (Due Process Clause—Information-Use Policy)
    - Third claim for relief (Equitable Estoppel—Information-Use Policy)
    - Seventh claim for relief (Due Process Clause—Notice)

Defendants' motion to dismiss for lack of subject-matter jurisdiction is denied with respect to all other claims. The court RESERVES RULING on Defendants' motion to dismiss for failure to state a claim.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      November 9, 2017

NICHOLAS G. GARAUFIS
United States District Judge

Reply Add. 48

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern[*]
Healy Ko, Law Student Intern[*]
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq. (Bar No. 5343314)[†]
Alexia Schapira, Esq. (Bar No. 4625547)[†]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[*] Motion for law-student appearances forthcoming.
[†] Application for admission in the Eastern District of New York forthcoming.

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals, ) ) ) ) ) ) ) ) ) | **PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT JEFFERSON BEAUREGARD SESSIONS III PURSUANT TO RULE 34 OF THE FEDERAL RULES OF CIVIL PROCEDURE, SET TWO** |
| *Plaintiffs*, ) ) | |
| *v.* ) ) | Case No. 1:16-cv-04756 (NGG) (JO) |
| ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFREY BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States, ) ) ) ) ) ) | |
| *Defendants*. ) | |

**PROPOUNDING PARTY:** MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, CAROLINA FUNG

**Reply Add. 49**

1  FENG, and MAKE THE ROAD NEW YORK

2  **RESPONDING PARTY:**  JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY
   GENERAL OF THE UNITED STATES

3

4  **SET NUMBER:**  TWO

5      **PLEASE TAKE NOTICE** that, pursuant to Rule 34 of the Federal Rules of Civil

6  Procedure, Plaintiffs request that Defendant Sessions, in his official capacity as Attorney General

7  of the United States, produce for inspection, copying, and use all responsive documents

8  requested herein. As provided in Magistrate Judge Orenstein's September 27, 2017 Scheduling

9  Order, the documents requested shall be produced for inspection within fourteen (14) days of the

10  service of these Requests, and any objections to these requests shall be made within seven (7)

11  days of service of these requests. *See* Case Management and Scheduling Order 1, ECF No. 67.

12  Defendant Sessions's production of documents shall be in accordance with the Definitions and

13  Instructions set forth below, Fed. R. Civ. P. 34, and the Local Rules of the United States District

14  Court for the Eastern District of New York.

15      The following Definitions and Instructions shall apply to each and every part of this

16  Second Set of Request for Production.

17   

18                  **Definitions:**

19      1.    The word "Plaintiffs" or "Plaintiff" shall mean Martín Batalla Vidal, Antonio

20  Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, Carolina Fung Feng, and Make

21  the Road New York, or any one or combination of those listed.

22      2.    The phrase "Individual Plaintiffs" or "Individual Plaintiff" shall mean Martín

23  Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and

24  Carolina Fung Feng, or any one or combination of these individuals.

25      3.    The word "Defendant" means Attorney General Jefferson Beauregard Sessions

26  III, in his official capacity, and shall include all officers, directors, attorneys, agents, employees,

27  and representatives acting on his behalf, or any one or combination of the foregoing.

28      4.    The word "Defendants" shall mean President Donald J. Trump, Attorney General

Jefferson Beauregard Sessions III, and Acting Secretary Elaine Duke, and shall include all

officers, directors, attorneys, agents, employees and representatives acting on behalf of

Defendants, or any one or combination of the foregoing.

5.    The word "persons" shall include individuals, firms, partnerships, corporations, proprietorships, associations, trusts, estates, governmental units, and every other type of organization or entity.

6.    The word "date" shall mean the exact date, month, and year if ascertainable; otherwise, the word "date" shall mean the best available approximation, including relationship to other events. If the day given is the best available approximation, Defendant Duke should identify it as such.

7.    The word "identify" when used in reference to: (a) an individual, shall mean to state his/her full name, present or last known address, and present or last known business affiliation, job title, employment address, and telephone number, if known; (b) a firm, partnership, corporation, proprietorship, association, trust, estate, or other organization, shall mean to state its full name, present or last known address, and telephone number; and (c) a document, shall mean to state the title (if any), the date, author, sender, recipient, the identity of the person signing, the type of document or such means as to identify it sufficiently to produce it pursuant to Rule 34 of the Federal Rules of Civil Procedure, a summary of its contents, its present location, and custodian.

8.    "Department of Homeland Security" or "DHS" includes the Department of Homeland Security, Customs and Border Protection (CBP), Citizenship and Immigration Services (USCIS) and Immigration and Customs Enforcement (ICE).

9.    The word "you" or "your" shall refer to Defendant, as defined above.

10.   The phrase "DHS employee" or "DHS employees" shall refer to any person or people currently or formerly employed by the U.S. Department of Homeland Security.

11.   The phrase "DOJ employee" or "DOJ employees" shall refer to any person or people currently or formerly employed by the U.S. Department of Justice.

12.   The phrase "USCIS employee" or "USCIS employees" shall refer to any person or people currently or formerly employed by USCIS.

13.   The phrase "Trump Administration" shall refer to President Donald J. Trump and any person or people currently or formerly employed by the White House at any time since January 20, 2017.

14.     The phrase "DACA program" shall mean the Deferred Action for Childhood Arrivals program, established in a memorandum issued on June 15, 2012 by former Department of Homeland Security Secretary Janet Napolitano.

15.     The phrase "executive branch" shall mean the Trump Administration and all Executive agencies, as defined by 5 U.S.C. § 105.

16.     The term "policy" shall mean the DACA program, the lawfulness of the DACA program, and the decision on whether to continue or terminate the DACA program.

17.     The term "actions" shall mean: the termination of the DACA program on September 5, 2017; setting March 5, 2018 as the last DACA-status expiration date for individuals allowed to renew DACA-status; setting October 5, 2017 as the end date for renewal applications; having stopped accepting initial applications or renewal applications from DACA recipients whose status expired by September 5, 2017, as of September 5, 2017; any notices that were sent to DACA recipients regarding renewal of DACA status, whether such notice reflected the termination of the DACA program; and the use of information provided by DACA applicants.

18.     The term "process" shall include, but not be limited to, all communications, meetings, and/or discussions that Defendants or other persons were present for or participated in relating to the lawfulness of DACA, the decision to terminate the DACA program, and the nature of the DACA termination.

19.     The word "document" shall mean any "documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A); Local Rule 26.3(c)(2).

20.     The phrase "present for" shall include physical presence, telephone presence, or any form of electronic presence.

21.     The term "discussion" or "discussions" shall include meetings (in person, over the telephone, by video teleconference, or by electronic means), conversations (in person, over the telephone, or by electronic means), and any communication, including oral conversations

(telephonic or in person), electronic communication (chat, e-mail, or otherwise), and paper communication.

22.     The phrases "relating to" and "relate to" shall be construed in the broadest sense and shall mean describing, setting forth, discussing, mentioning, commenting upon, supporting, contradicting, or referring to the subject or topic in question, either in whole or in part.

23.     The term "considered" shall be construed in the broadest sense and shall mean reviewed, examined, analyzed, developed, relied upon, or noted.

24.     The singular includes the plural and vice versa; "any" or "each" should be understood to include and encompass "all"; "or" should be understood to include and encompass "and"; "and" should be understood to include and encompass "or"; and "any" should be understood to include and encompass "any" and "every"; "among" should be understood to include and encompass "between" and "within."

25.     The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

26.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses, whenever necessary to bring into the scope of the specification all responses which might otherwise be construed outside the scope.

27.     The use of any masculine or feminine pronoun includes both the masculine and feminine.

### Instructions:

1.     These Requests require the production of all responsive documents within the sole or joint possession, custody, or control of Defendant including, but not limited to, any such documents or things that lie within the possession, custody, or control of any agents, agencies, departments, attorneys, employees, consultants, investigators, representatives, or other persons or entities acting for, or otherwise subject to the control of, Defendant.

2.     These Requests are continuing in nature and require prompt supplemental responses for any and all responsive documents that come into Defendant's sole or joint possession, custody, or control after the service of any initial responses hereto.

3.      Each of these Requests requires a separate answer. For each document, indicate the Request to which it responds.

4.      For any responsive document or portion thereof that is either redacted or withheld, in whole or in part, on the basis of any assertion of privilege or other asserted exemptions from discovery, identify each document so redacted or withheld. Under Local Rule 26.2, with regard to all documents or portions of documents redacted or withheld on this basis, identify:

      a.      The type of document (e.g., letter or memorandum);

      b.      The subject matter of the document;

      c.      The date of the document;

      d.      The author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other;

      e.      The contents or subject matter of the document, with sufficient detail to explain the basis for the privilege or exemption asserted, *see* Fed. R. Civ. P. 26(b)(5); and

      f.      A detailed statement of the specific basis on which the privilege or exemption is claimed.

5.      For any such responsive document or portion thereof that may not properly be redacted or withheld in its entirety, produce each and every portion thereof to which the claims of privilege or exemption do not apply and specify, on the face of each such page or portion, the fact and reason for the redaction or withholding.

6.      If any document requested has been lost, discarded, or destroyed, identify such document. State the type of document, its date, the approximate date it was lost, discarded, or destroyed, the reason it was lost, discarded or destroyed, a summary of its substance, and the identity of each person having knowledge of the contents thereof.

7.      These Requests are not intended to be duplicative. All requests should be responded to fully and to the extent not covered by other requests. If there are documents or tangible things that are responsive to more than one Request, please note which Requests the

document or thing is responsive to and produce the document or thing in response to the first Request.

8.    All Requests are for the time period from January 1, 2012, through the present and going forward, unless otherwise indicated.

**Documents Requested:**

1.    All documents considered within any component of the executive branch as part of the process of determining the policy and actions at issue in *Batalla Vidal*.

Dated: October 3, 2017        By:    /s/ Justin B. Cox

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern[*]
Healy Ko, Law Student Intern[*]
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
Scott Foletta, Esq.  (Bar No. 5343314)[†]
Alexia Schapira, Esq. (Bar No. 4625547)[†]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[*] Motion for law-student appearances forthcoming.
[†] Application for admission in the Eastern District of New York forthcoming.

7

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on October 3, 2017, I served a true and correct copy of
**PLAINTIFFS MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON,**

3

**ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and**
**CAROLINA FUNG FENG, and MAKE THE ROAD NEW YORK'S REQUESTS FOR**

4

**PRODUCTION OF DOCUMENTS TO DEFENDANT JEFFERSON SESSIONS**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 34, SET TWO** on the parties

5

in this action by electronic mail transmission to the e-mail addresses listed below.

6

BRAD P. ROSENBERG
Senior Trial Counsel

7

United States Department of Justice
Email: brad.rosenberg@usdoj.gov

8

STEPHEN M. PEZZI (D.C. Bar # 995500)

9

Trial Attorney
United States Department of Justice

10

Email: stephen.pezzi@usdoj.gov

11

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney

12

United States Attorney's Office
Eastern District of New York

13

Email: joseph.marutollo@usdoj.gov

14

*Attorneys for Defendants*

15

16

This the 3rd day of October, 2017

17

By          /s/ Justin B. Cox

18

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER

19

PO Box 170208
Atlanta, GA 30317

20

Phone: (678) 279-5441

21

22

23

24

25

26

27

28

**Reply Add. 56**